13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

INTERCEPT PHARMACEUTICALS, INC., )
et al., )
)
Plaintiffs, )
) C.A. No. 20-1105(MN)
v. )
)
APOTEX, INC., et al., )
)
Defendants. )

Tuesday, April 13, 2021
12:00 p.m.
Teleconference

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE MARYELLEN NOREIKA
United States District Court Judge

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNEL LLP
BY: JEREMY A. TIGAN, ESQ.

-and-

COVINGTON & BURLING LLP
BY: MEGAN KEANE, ESQ.
BY: DOUGLAS BARON, ESQ.

Counsel for the Plaintiffs

**APPEARANCES CONTINUED:**

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
**BY: ANNE SHEA GAZA, ESQ.**

**-and-**

**WINSTON & STRAWN LLP**
**BY: ALISON M. HEYDORN, ESQ.**

**Counsel for the Defendants Amneal, MSN Laboratories, and Dr. Reddy's Laboratories, Inc.**

**SMITH KATZENSTEIN & JENKINS, LLP**
**BY: EVE H. ORMEROD, ESQ.**

**-and-**

**SCHIFF HARDIN LLP**
**BY: ARUN JOHN MOHAN, ESQ.**

**Counsel for the Defendant Apotex, Inc.**

**OFFIT KURMAN, P.A.**
**BY: R. TOUHEY MYER, ESQ.**

**Counsel for the Defendant Optimus Pharma Pvt. Ltd.**

**PHILLIPS McLAUGHLIN & HALL, P.A.**
**BY: JOHN C. PHILLIPS, JR., ESQ.**

**-and-**

**KATTEN MUCHIN ROSENMAN LLP**
**BY: GUYLAINE HACHE, Ph.D., ESQ.**
**BY: LANCE A. SODERSTROM, ESQ.**

**Counsel for the Defendant Lupin Limited**

\- - - - - - - - - - 

THE COURT: Good afternoon, counsel. Who is there, please?

MR. TIGAN: Your Honor, this is Jeremy Tigan with Morris Nichols for Intercept. I'm joined by Megan Keane and Doug Barons from Covington. And Ms. Keane will address your questions today if that's okay.

THE COURT: Okay. Thank you.

MS. GAZA: Good afternoon, Your Honor. This is Anne Gaza on behalf of Amneal, MSN and Dr. Reddy's Laboratories, three of the defendants in the actions before you. With me on the line today is Alison Heydorn from Winston & Strawn. And I'm pleased to report that today Ms. Heydorn will be handling portions of the defendants' arguments and this will be her first argument before the District Court.

THE COURT: Great. Welcome.

MS. ORMEROD: Good afternoon, Your Honor. This is Eve Ormerod from Smith Katzenstein on behalf of the Apotex defendants. I have with me on the line, Arun Mohan from Schiff Hardin. And Mr. Mohan will be also participating in some of the arguments today.

THE COURT: All right. Great. Anyone else?

MR. MYER: Good afternoon, this is Touhey Myer

12:08:53 from Offit Kurman of Delaware for the Optimus defendants.

12:08:55 THE COURT: Okay. Good afternoon.

12:09:00 MR. PHILLIPS: Good afternoon, Your Honor. This
12:09:01 is Jack Phillips on behalf of Lupin, and with me on the
12:09:05 phone are Lance Soderstrom and Guylaine Hache from the
12:09:08 Katten Muchin firm.

12:09:09 THE COURT: Good afternoon to all of you as
12:09:11 well. Anyone else?

12:09:15 All right. So we've received the letters on the
12:09:21 protective order issues and I'm not sure it matters. Does
12:09:31 anyone have a preference, is there a particular order? I
12:09:35 was thinking I would just start with the plaintiffs' opening
12:09:38 letter. Any objection to that?

12:09:42 MS. KEANE: Good afternoon, Your Honor. This is
12:09:44 Megan Keane on behalf of the plaintiffs. That approach
12:09:48 sounds fine with us.

12:09:49 THE COURT: All right. So the first issue is
12:09:54 non-attorney employees having access to plaintiffs'
12:10:00 protective information. And that is just the confidential
12:10:05 information, not the highly confidential information. Is
12:10:09 that right, Ms. Keane?

12:10:11 MS. KEANE: Yes, that's correct.

12:10:15 THE COURT: Okay. And before I hear from you on
12:10:17 this, let me just make sure I understand a few things from
12:10:24 the defendants' response. I understand that MSN has no

in-house legal counsel who works on overseeing litigation such that if I were to adopt plaintiffs' proposal, MSN would have no one able to see the information. Is that correct or incorrect, someone from MSN?

MS. HEYDORN: Good afternoon, Your Honor, this is Alison Heydorn on behalf of MSN. That is correct, MSN does not have any in-house attorneys or counsel and the employee that oversees litigation is a non-attorney.

THE COURT: Okay. Now for DRL and Optimus, it just says they have IP personnel who are not attorneys. Does that mean that they do not have in-house counsel who work on these matters, or not? First for Dr. Reddy's.

MS. KEANE: Yes, this is Alison Keane. DRL does have in-house attorneys that work on these matters. They have a team and some of the members of that team are non-attorneys. The protective order allows for three people to have access to confidential information. And those three people, not all of them are attorneys. So if they were barred from having non-attorneys view the information, they would not be able to have all three of the team members.

THE COURT: How many of them are attorneys?

MS. KEANE: Two.

THE COURT: And what about for Optimus?

MR. MYER: Good afternoon, this is Touhey Myer, for the Optimus defendant. Optimus does not have any

in-house counsel.

THE COURT: All right. So Ms. Keane, I guess my inclination is to allow at least someone from a party to have certain confidential information so that decisions can be made about a case. So with you understanding kind of where I'm coming from, tell me why I should adopt plaintiffs' proposed proposal?

MS. KEANE: Sure, Your Honor. So just some additional clarifications based on some of the information that was just provided by counsel. What our objection to and what we have against Stern West is allowing in the protective order that non-attorney employees for the various defendants could have access to Intercept confidential information under the protective order, we think the misuse with respect to non-attorney employees, the potential for misuse there is higher. Non-attorneys are not bound by the same ethical requirements, they're not subject to the same sanctions. It's not clear here that individuals oversee with these subjects to the same requirements or same jurisdiction of the court.

All of that said, we do recognize that -- that it is important for -- that it's important for the parties in the litigation to have access to in-house counsel who can manage and oversee the litigation or in this case in-house employees. So to the extent that defendants are

representing that they absolutely have no access to in-house counsel, which is what I understand MSN and Optimus to be saying, that there is nobody in-house that could take over the responsibility for managing the litigation or have responsibility for managing the litigation, if there are appropriate safeguards in place such that they can represent that that's the case, as well as have those individuals confirm throughout the course of the litigation that they are complying with those requirements, and in addition that those individuals don't have additional responsibilities for, for example, research and development, I think in those very limited situations we would agree that one person from each of those defendants should have access. What we are not comfortable with is in situations such as DRL's situation where there are in-house attorneys that are capable of managing the litigation. Additional employees who are non-attorneys, we do not agree that they should be permitted access to Intercept's confidential information in those circumstances.

Particularly given here the issues that we expect to be at issue in this litigation, such as infringement, much of that relates to defendants' confidential information and validity which will in large part be based on what we expect to be based on publicly available information.

THE COURT: So when you mention safeguards, what are you talking about? I was thinking that we have these people sign an undertaking that they are abiding by the protective order and that they will submit to the jurisdiction of this Court for any breach of the protective order. And then before they are allowed to see information, it seems to me you don't know who these people are, so you would need them to be disclosed and to have an understanding that they do not have any other responsibilities in terms of R & D and things like that. Are those the safeguards or is there something else you were thinking of?

MS. KEANE: Yes, Your Honor, I think all of those safeguards in addition to the confirmation that they don't have responsibility for R & D, and I think in these circumstances we would also like to see ongoing confirmation that those responsibilities have not changed, or at least the representation that the responsibilities will not change and to the extent that they do in the future, we would be notified and be able to assess the continuing access in those circumstances.

In addition, when I say safeguards, that's another way of phrasing that it should be limited to the very particular situations where there is not in-house counsel that can handle the litigation from an in-house perspective. So I think that this should be limited to only

those, the very particular circumstances where that is not an option that is available to defendant.

THE COURT: Okay. Let me hear from the defendants on this one. And I guess the first question I have is, is this an issue for any of the defendants other than MSN, DRL and Optimus?

MR. SODERSTROM: Your Honor, this is Lance Soderstrom from Katten Muchin on behalf of Lupin. I think unfortunately we're stuck in a spot where it's not exactly the same situation but the individuals that would be responsible for day-to-day oversight of the litigation would be non-attorneys, this is not a situation where there is no in-house attorneys, there is one, but that person is not typically involved in day-to-day litigation. So I don't think we would ask for too much, but I do think if the Court is so inclined to permit one individual, we would ask the same for us. And of course taking on those same obligations to avoid any sort of -- these concerns that plaintiffs have raised noting that they don't have involvement with R & D, no oversight on R & D, and that they're strictly part of the legal team.

MR. MOHAN: Your Honor, this is Arun Mohan on behalf of the Apotex defendant. We don't have a situation like DRL and Optimus, we actually have all attorneys in-house, so it does not apply to us.

THE COURT: All right. So is there -- thank you for that confirmation.

As I understand it now, the only defendants who this is an issue for are MSN and Optimus who have no in-house counsel who can perform the role. DRL who has two out of their three folks on their litigation team that they want to use are attorneys and the third one is not. And Lupin who has in-house counsel, but the person assigned to work on this case is not an attorney. Is there any other defendants -- go ahead.

MR. SODERSTROM: I'm sorry, Your Honor, just for Lupin, I want to clarify, we're looking at three individuals, it would be potentially one that is an attorney, any others would not be attorneys.

THE COURT: All right. So let me hear from the defendants. I don't think that I am at the point in reading the case law that's been cited to me including the *Allergan* case and the *Lumbeck* case that, you know, having multiple non-attorneys on the case is something that I am considering, but you can -- now that you know where I'm coming from as I did with plaintiff, tell me why that shouldn't be the case.

MS. HEYDORN: This is Alison Heydorn with the DRL. With respect to DRL situation, like I mentioned before the protective order specifically contemplates and allows

for in-house individuals who work in teams and provide for three individuals from each party to have access to the confidential information. In our opinion defendant should not be forbidden from using this kind of team system to manage the litigation simply because one or two of the individuals are attorneys on the team. For example, for DRL, even though they do have attorneys on the team, one of the crucial members of the team who is responsible for managing the litigation would be barred from accessing confidential information and that would hamper the entire team from being able to cooperate with each other and work with each other and outside counsel to make sure that they're able to make the decisions that are necessary for the litigation. In our opinion the protective order allows for three in-house individuals. The protective order provisions that provide protections to plaintiff to make sure that the information are not misused would be applicable to everybody. So that's where we're coming from is that the protective order contemplates for multiple individuals so that they are able to work in a team.

THE COURT: Anyone else want to chime in on this one? Okay. So what I am going to do is I am going to adopt plaintiffs' proposal for in-house counsel with the exception that for MSN and for Optimus, because they have no in-house counsel, and by definition would have no one who could see

any confidential information, I will allow them to have one person who is not an attorney have access under the protective order. That person needs to be disclosed in advance with some understanding of what that person's responsibilities are and their role in the company, and whether they have any role in R & D, et cetera. I don't think that we need to have regular check-ins on that person, but I do think if that person's responsibilities change such that they would have responsibility for R & D or something, that that should be -- that update should be given. The person would need to sign on to say they're abiding under the protective order and submit to the jurisdiction of the court for any breach of the protective order.

Any questions on that issue? Okay. Then the next issue.

MS. KEANE: No questions from plaintiffs, Your Honor.

THE COURT: Thank you. The next issue in the plaintiffs' opening letter is the FDA bar. And I guess here what I need to understand from you, Ms. Keane, is what is the real -- what is the real issue here with -- you gave me some generalities saying if defendants' attorneys could be called on to assist in crafting a regulatory strategy that expedites the timing for approval. I need you to be a little more concrete on that. What is it that you really

think that they could do with confidential information in allowing these folks to have any role in pursuing the ANDA?

MS. KEANE: Sure, Your Honor. I would be happy to address that. So first with respect to the proposed bar, Intercept's proposed bar, we've purposely tried to keep it narrow with respect to what exactly the attorneys would be barred from participating in, specifically with respect to the proposed generic products, the proposed versions of Ocaliva. Our concern is that --

THE COURT: Is it really narrow what you want to -- it seems like they can't do anything on the ANDA. Is that sufficiently narrow?

MS. KEANE: They would be barred from communications with the FDA with respect to the ANDA, that particular ANDA. That bar wouldn't extend to other products or other broader communications with the FDA.

And our concern and the reason that we have requested that the bar be entered is that through access to Intercept's confidential information, whether it's the NDA or early research and development materials, the regulatory correspondence with the FDA about the Ocaliva NDA, the concern is that attorneys with access to that information, the communications back and forth that may have been related to getting Ocaliva approved, particularly the strategies that Intercept testing that Intercept did in order to

12:27:14 support approval, that by reviewing that information, attorneys then in communications with FDA with respect to defendants' product could use that information to aid in approval of their product, whether it is particular testing to expedite approval in an event that changes to the ANDA need to be made, changes or amendments to the ANDA or the ANDA product based on information that was learned through access to Intercept's confidential information.

12:27:46 And so that is our concern. And that is why we proposed including again just the attorneys who have access to Intercept's protected material from participating in these communications with the FDA.

12:28:04 THE COURT: All right. Let me hear from the defendants.

12:28:09 MR. MOHAN: Your Honor, this is Arun Mohan from the Apotex defendant, speaking on behalf of all defendants. We would agree that the proposal that plaintiffs have given is quite broad. It's not allowing in-house representatives to work on anything regarding the approval or review of the ANDA products which I want to point out here is key. The ANDA's have already been filed, they have already given the information they need to the FDA. We struggle to see what could be learned from plaintiffs' confidential information that could be used to help with the ANDA approval process.

12:28:39 To the extent that plaintiffs would argue that

12:28:41 it would expedite approval, that's moot here because there is a thirty-month stay in this case. Even if the approval was expedited before that day, they couldn't launch, so there is no harm here to plaintiffs. On the other hand there is a great burden of prejudice to defendants. As Your Honor knows, in-house representatives often have multiple hats in a company, and the person here, the in-house counsel that works on the ANDA in the litigation versus institutional knowledge to run the litigation after it's filed, so it's hard to pass that knowledge on to somebody new and the burden is not really necessary and often times there is no other person to pass on the information that can be used to split it in up into two people. So we don't think plaintiffs have given a concrete harm that they're going to undertake. Based on the letters, I think that's true. And we don't think that outweighs the burden on us to have to split up the information amongst two people.

12:29:37 THE COURT: All right. So Ms. Keane, I guess what I'm trying to figure out is, is it really the communications with the FDA that you're worried about, or is it -- I mean, I'm missing how the communications with the FDA that are the issue here rather than some more generalized concern about misuse of the data in terms of telling someone how to retool the product if that becomes necessary.

12:30:09 **MS. KEANE: Well, Your Honor, I think in this**
12:30:12 **scenario where the accused product that's at issue is the**
12:30:19 **ANDA and at the same time defendants are seeking FDA**
12:30:23 **approval of that ANDA, those two things go hand in hand. So**
12:30:28 **the concern here is that, you know, for example, defendants,**
12:30:33 **or attorneys could have access to Intercept's confidential**
12:30:41 **information, go through the NDA, have access and understand**
12:30:44 **that a certain action was taken during approval of Ocaliva**
12:30:50 **to meet FDA standards and then to ultimately get approval,**
12:30:59 **whether it's a specific amendment, a specific amendment to a**
12:31:01 **product or something along those lines and then if presented**
12:31:05 **with a similar issue during approval of the ANDA leverage**
12:31:08 **that information they've learned from access to Intercept**
12:31:12 **confidential information and again use that to either devise**
12:31:15 **testing, make changes to the ANDA product, whatever that**
12:31:20 **might be and present that to FDA as -- to seek approval for**
12:31:27 **the ANDA product.**
12:31:28 **And so it's that, the cross use of information**
12:31:32 **from what's gleaned from Intercept product then in support**
12:31:36 **of the ANDA and I will say that typically that there is**
12:31:43 **regulatory, there are regulatory individuals who are**
12:31:46 **responsible for the communications with FDA and so the harm**
12:31:51 **here is limited where there are individuals and attorneys**
12:31:54 **focused on the patent litigation versus those who are**
12:31:58 **communicating with FDA and handling the process of the ANDA**

12:32:02 and regulatory approval of the ANDA and research and development related to the ANDA.

12:32:09 THE COURT: Do the same -- does the same bar prevent the plaintiff from doing anything if there are any questions raised about the NDA or the product from the FDA?

12:32:25 MS. KEANE: So the -- well, the Ocaliva product has already been approved and is out on the market. I think the restriction on plaintiff, the weighted restriction on plaintiff is there can be no communications with FDA regarding approval for generic --

12:32:45 THE COURT: That wasn't my question. I know that the product is already approved. But does that mean that there are no communications with the FDA about that product?

12:32:54 MS. KEANE: There may be ongoing communications.

12:32:59 THE COURT: And can the people from plaintiff who have seen confidential information be participating in those?

12:33:10 MS. KEANE: My understanding is as the bar is currently drafted, that yes, that that would be permitted.

12:33:25 MR. MOHAN: Your Honor, this is Arun. If I could point out under defendants' proposal, both plaintiffs would be allowed to work on the NDA and also on the ANDA. Ours is broader in that respect.

12:33:38 THE COURT: That's what made me ask the question

because I was looking at the proposal and I saw that it said -- it referred to both NDAs and ANDA.

I think I am going to adopt defendants' proposal here. I think that the prejudice or the punitive risk of harm that the plaintiffs have suggested is just a little bit too tangental for me to agree that its proposal is correct. So I think that takes care of the two issues in plaintiffs' letter.

And now we have defendants' letter on the scope of the prosecution bar and what the language of that prosecution bar should be. Who is going to handle that for the defendants?

MR. MOHAN: Your Honor, for defendants, this Arun Mohan again.

THE COURT: Okay.

MR. MOHAN: As Your Honor said, the first issue related to the prosecution bar. We had proposed the bar should prevent working on amending and drafting patent claims related to Obeticholic acid, whereas plaintiffs have said it should be limited to patent applications that are issued could be listed in the Orange Book, we think plaintiffs' proposal is far too limited. The drug here is Obeticholic acid, it's not Ocaliva. Defendants have not sought an ANDA for Ocaliva. It's for the Obeticholic acid product itself.

So our proposal is tailored to any patents or patent application related to that compound itself.

THE COURT: When we want to look at what is at issue here, is it -- I mean, these patents for use of Obeticholic acid for a particular use. Is that right? I mean, it's not just claiming Obeticholic acid; right?

MR. MOHAN: That's right, Your Honor, it's Obeticholic acid for a specific use, that's right.

THE COURT: Okay. So why should we limit it for Obeticholic acid for other uses that have nothing to do with this particular litigation?

MR. MOHAN: Well, Your Honor, I proposed to you that the information that may be in an ANDA or an NDA related to Obeticholic acid is not just specific to Ocaliva, it can be such as things such as processes for developing the compound itself, processes for making it, that can be used for things beside Ocaliva, so it's not -- the information in those ANDA's are not necessarily tailored to Ocaliva, it can be given to other products.

I would also point out in plaintiffs' responsive letter they state that they're also developing other products with Obeticholic acid so the danger here of using that information in the ANDA on those products is very real and very harmful for defendants if that does happen.

So the information in the ANDA's is not

necessarily related just to Ocaliva, it can be Obeticholic acid in general, information can be there.

THE COURT: All right. Let me hear from the plaintiffs.

MS. KEANE: Thank you, Your Honor.

First to address your question, I think the proper issue to look at here and to consider here is the scope of what the -- the confidential information that an attorney who is permitted under the protective order to see the confidential information, what that would be. And here it's defendants' proposed generic versions of Ocaliva. And so the prosecution bar that's in place should be tailored to protect --

THE COURT: What about the issue that was just raised, you know, process patents wouldn't have to be listed in the Orange Book, and the footnote that was dropped on why I shouldn't worry about those in plaintiffs' letter wasn't terribly compelling. So why shouldn't we include anything that deals with the use of Obeticholic acid for the particular use that Ocaliva is used for as well as processes for making it?

MS. KEANE: Well, Your Honor, I think that protective order does already -- this is what was addressed in our letter. The protective order does already limit use of information that is disclosed under the protective order

to specifically -- specifically for this litigation. And so now to determine --

THE COURT: Right. But that didn't stop you from wanting an FDA bar and that didn't stop you from wanting to control who saw it from the other side. That's the point of a prosecution bar; right, is to add a little belt and suspenders to the general provisions of the protective order. So, you know, for people where there might be a higher risk of disclosure whether intentional or not. So the method of manufacturing the process doesn't seem like -- the process of manufacturing Obeticholic acid doesn't seem to be out of bounds. And the thing -- under your proposal, and I'm not suggesting that plaintiffs would do this, but I just want to understand. Under your proposal, if one of the defendants used Obeticholic acid in a generic product and changed an excipient so that it was no longer covered by your patent, plaintiffs' counsel who are seeing confidential information of the defendants could go and patent that Obeticholic acid with that excipient and if it didn't cover Ocaliva or Ocaliva, if it didn't cover it, wouldn't be Orange Book listable, and that would be just fine under your proposal.

So tell me aside from saying nobody would do that because you're not allowed to use it for improper purposes, why wouldn't that be allowed under your proposal?

12:40:38 MS. KEANE: So under -- just to be clear, under our proposal where the scope of the patents are those that could be listed for Ocaliva, our intent was that scope of the proposal was to cover essentially anything that -- any patent that could cover generic versions of Ocaliva, whether -- so our intent was not to limit it to exclude that particular situation by pointing to things that could be used to cover Ocaliva and put in the Orange Book, we were attempting to cover generic versions of Ocaliva --

12:41:25 THE COURT: That's not what is proposed here. How would you amend what you have proposed here for me to consider and for the defendants to consider?

12:41:34 MS. KEANE: So, I mean, it could be patent -- prosecution for patent applications that could be listed for Ocaliva or could cover generic versions of Ocaliva, something along those lines. To be clear, we are not trying to exclude the particular situation where there is a new formulation, another formulation, for example, that defendants have and that somehow intersects through the bar would not cover going off and prosecuting a patent under that particular formulation. That was not the intent. We understood that both to be encompassed by the Orange Book listed language and also the standard bar in the protective order barring any sort of that behavior. So we could expand it to and/or generic versions of Ocaliva or something like

that that would potentially resolve the issue if that's helpful.

MR. MOHAN: Your Honor, this is Arun. If I may?

THE COURT: Could you just give your name again just so our record is clear every time you start to speak, it's helpful if you give your name.

MR. MOHAN: I apologize. This is Arun Mohan on behalf of the Apotex defendants. I think what plaintiffs' counsel just asserted hits to the heart of it. Even under that what they proposed, it is very unclear what patent application could be lifted for Ocaliva or even generic versions of Ocaliva, I think even under that proposal Your Honor suggested changing one excipient may not be covered under that. I think plaintiffs' proposal is not helping them in that point either. I think our proposal is much more direct.

THE COURT: Let's say I think your proposal is too broad and we need to work on something that -- I think their's is too narrow and your's is too broad. So what I was thinking of is something along the lines of for any patents or patent applications that if issued could be listed in the Orange Book for Ocaliva or that cover Ocaliva or generic, or could cover generic version of Ocaliva. What are we leaving out there, or Ocaliva, how do you say it, Ms. Keane, Ocaliva?

12:43:48 MS. KEANE: Ocaliva.

12:43:50 THE COURT: Okay.

12:43:52 MR. MOHAN: I believe -- this is Arun. I belive you're leaving out the process patent issue in that proposal. I don't believe I heard that in the proposal.

12:44:05 THE COURT: Okay. So then if it were something along the lines of what I just said and including processes for manufacturing Obeticholic acid, am I leaving anything out then?

12:44:27 MR. MOHAN: Hearing it for the first time, I can't think of anything. Again, this is the first time I have heard this.

12:44:37 THE COURT: All right. Ms. Keane, give me your thoughts on that proposal.

12:44:47 MS. KEANE: So my one -- I think if there is a way to tie process patents, process patents essentially related to any processes that defendants are using or something like that so that it is more narrowly tailored to the confidential information that's coming from defendants, I think would be our only proposal or change with respect to what Your Honor just proposed.

12:45:32 THE COURT: All right. I think that's too confusing. So I think that what I am going to do is to send you back, to reject both proposals and to send you back to agree on a proposal along the lines of what I suggested

which is that it would include patents or patent applications that if issued could be listed in the Orange Book for Ocaliva or that would cover Ocaliva or any generic version of it. And this would include processes, patents or patent applications for processes on the manufacture of Obeticholic acid.

Then the last issue is the disclosure of one defendant's protected material to outside counsel only of the other defendants. So why is this not -- why doesn't this make sense as an efficient way to litigate especially when we're just talking about this being on an outside counsel only basis?

Let me hear from the defendants first.

MS. HEYDORN: Yes, Your Honor. This is Alison Heydorn. This litigation involves six different defendants who are all generic pharmaceutical companies and are direct competitors of one another and they have separate ANDA products that may use unique ingredients and manufacturing processes to create those products. Because each defendant has a unique product and manufacturing process they can be greatly harmed by their sensitive confidential information being disclosed to other defendants.

THE COURT: But we're talking about outside counsel only having it. And doesn't the fact that three different defendants have the same outside counsel suggest

12:47:37 that the concern about outside counsel having access to different defendant's information isn't all that real?

12:47:54 MS. HEYDORN: Yes, Your Honor.

12:47:55 THE COURT: At least DRL, Amneal and MSN are agreeable that the other two's information is fine and dandy to be in the hands of outside counsel. Right?

12:48:07 MS. HEYDORN: Yes, it's correct that MSN, DRL and Amneal are all represented by Winston, but we disagree that this fact should result in plaintiffs having an unrestricted ability to share confidential information among all defendants. MSN, DRL and Amneal chose to have a joint representation, but the other defendants didn't go that route and are under no obligation to share their confidential information with any other competitors.

12:48:32 THE COURT: So is there a joint defense agreement here?

12:48:37 MS. HEYDORN: There is a joint defense agreement between the parties to make sure that we are operating as efficiently as possible during the case, but this agreement does not say anything about the confidential information being shared with one another or have any provisions involving seeing each other's confidential information.

12:48:58 THE COURT: So under the defendants' proposal, the defendants could readily share confidential information with each other, it's just the plaintiff who isn't allowed

to do so? Is that correct?

MS. HEYDORN: I do think that would be correct except for the caveat that plaintiffs are able to share confidential information if they have agreement from the defendants. So if there is a situation where the confidential information was being shared between the defendants, that would mean that it was the type of confidential information that we're not concerned about here and we would be able to give plaintiffs permission to share that, their own as well. What we're really trying to get at here is the confidential information that is highly sensitive and unique to each defendant's ANDA. The patent-in-suit here involves highly technical processes and formulations so each defendant has trade secrets involved and has processes and formulations that are different potentially from other defendants. So that's, you know, the type of information that we're trying to get at.

And we made proposals to plaintiff to try to narrow the type of information that we're trying to exclude from being cross produced to make that burden as small as possible and we're really trying to get at that very confidential and sensitive information that defendants would want to keep out of the hands of other competitors.

THE COURT: Is this issue for confidential information for both confidential and highly confidential?

MS. HEYDORN: Confidential.

THE COURT: Okay. Ms. Keane?

MS. KEANE: Sure, Your Honor. A couple of points in response. Again, we are limiting this disclosure to outside counsel only. And allowing disclosure of one defendant's confidential information to outside counsel for another defendant will only alleviate logistical burdens both on the Court as well as on plaintiff in proceeding through this litigation. There are six different defendants. The cases are consolidated entirely up until trial and everybody has the same trial date. And so it would not really be workable and we don't think it would be a workable scenario to require that certain information could not be disclosed absent written consent that Ms. Heydorn just referred to.

First, the topics and the type of information that defendants are seeking to bucket into the ones that require consent are ones that potentially would be relevant if, for example, we're at claim construction hearing, Your Honor has questions as to how claim construction position affect infringement analysis, that's an area where it could come up. These types of information could be relative to interrogatory responses with respect to validity expert reports with respect to validity, and it's not really workable to require plaintiffs to go and seek consent to use

12:52:36 that information or to disclose that information. One, defendant could withhold that consent. Two, it requires multiday lead time and is not always workable. And three, it then puts the burden on plaintiffs and only plaintiffs to do these redactions. That in and of itself requires generally a lot of back and forth with defendants to confirm the redactions and could lead to disputes over what is properly redacted or not.

12:53:04 On the flip side I don't see a harm here for defendants given as Your Honor noted, three of the defendants are represented by the same outside counsel. Defendants are obviously working together as far as strategy and development of the case goes. So really any sort of burden here is minimal. And it is limited to outside counsel. This isn't even a situation where we're seeking to be able to just disclose to in-house counsel of other defendants or anything like that. Given all the complications that could arise in litigation and the difficulties of the logistics, we don't see how there is any injury or harm to defendants that outweighs the orderly process of litigation.

12:53:52 Finally, I'll note that the burden here, essentially the way that defendants are proposing setting this up, defendants could use it strategically to their advantage and decide at certain points they don't want to

disclose the information where it may be plaintiff seeking to disclose the information, but down the line where it's helpful to them, they may not be able to make a different decision and disclose the information.

THE COURT: All right. For this one, I am going to adopt plaintiffs' proposal. I just think that defendants' proposal is going to add unnecessary logistical concerns to this and probably have disputes and delays in people getting information that is unnecessary given that we're talking about information being given to outside counsel only and not to in-house folks.

Okay. I think that's the end of the issues that were in the letters. Is there anything else that we need to discuss?

MS. KEANE: Not from plaintiffs, Your Honor.

THE COURT: Okay. And hearing nothing from defendants, I understand that that is all we have. So everyone, thank you very much, and hope you enjoy the rest of the week.

(Teleconference concluded at 12:55 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Dale C. Hawkins
Official Court Reporter
U.S. District Court