**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTERCEPT PHARMACEUTICALS, INC. and INTERCEPT PHARMA EUROPE LTD., <br><br> Plaintiffs, <br><br> v. <br><br> APOTEX INC. and APOTEX CORP., <br><br> Defendants. | Civil Action No. 20-1105-MN <br> CONSOLIDATED |

**JOINT CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I.     INTRODUCTION AND BACKGROUND ........................................................ 1

     A.    Plaintiffs' Introduction and Background ............................................. 1

           1.    Intercept's Introduction ............................................................. 1

           2.    Intercept's Technology Background ......................................... 1

           3.    A Person of Ordinary Skill in the Art ...................................... 3

     B.    Defendants' Introduction and Background ......................................... 4

           1.    Background ............................................................................. 4

           2.    Person of Ordinary Skill in the Art ......................................... 4

II.    AGREED-UPON CONSTRUCTIONS ......................................................... 5

III.   DISPUTED CONSTRUCTIONS ................................................................. 6

     A.    '673 Patent Family ............................................................................ 6

           1.    "obeticholic acid Form 1" / "obeticholic acid is Form 1" ..................... 6

           2.    "substantially pure solid form of obeticholic acid" ............................ 31

           3.    "crude OCA" ........................................................................ 42

     B.    '337 Patent Family ......................................................................... 50

           1.    "particles" .............................................................................. 50

           2.    "intra-granular portion comprising obeticholic acid" / "intra-granular portion comprises said obeticholic acid" / "intra-granular portion comprises obeticholic acid" ....................................... 74

## TABLE OF AUTHORITIES

**Case**                                                                                         **Page(s)**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    805 F.3d 1368 (Fed. Cir. 2015)................................................................................10, 34

*AllVoice Computing PLC v. Nuance Commc'ns, Inc.*,
    504 F.3d 1236 (Fed. Cir. 2007)......................................................................................51

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)...........................................................................51, 75, 79

*Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007) ............................................................................ *passim*

*Bioavail Labs. Int'l SRl v. Impax Labs.*,
    433 F. Supp. 2d 501 (E.D. Pa. 2006) ....................................................................12, 59, 68

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
    749 F.3d 1349 (Fed. Cir. 2014).............................................................................8, 21, 32, 38

*Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*,
    No. CV 17-374-LPS, 2018 WL 5077895 (D. Del. Oct. 18, 2018) ...........................................53

*Chiesi USA Inc. et al. v. MSN Pharms. Inc. et al.*,
    Case No. 19-15864-MCA-MAH, D.I. 146 (D.N.J. Oct. 18, 2021) ................................. *passim*

*Cont'l Cirs. LLC v. Intel Corp.*,
    915 F.3d 788, 799 (Fed. Cir. 2019) ................................................................................22

*Cordis Corp. v. Medtronic AVE, Inc.*,
    339 F.3d 1352 (Fed. Cir. 2003)..........................................................................9, 34, 50

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
    880 F.3d 1356 (Fed. Cir. 2018)......................................................................................54

*Curtiss–Wright Flow Control Corp., v. Velan, Inc.*,
    438 F.3d 1374 (Fed. Cir. 2006) ......................................................................................51

*Epistar Corp. v. Int'l Trade Comm'n*,
    566 F.3d 1321 (Fed. Cir. 2009) ......................................................................................67

*Gen. Elec. Co. v. Wabash Appliance Corp.*,
    304 U.S. 364 (1938) ......................................................................................................62

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006) ........................................................................13, 14, 17, 26

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
    822 F.3d 1312 (Fed. Cir. 2016) ...................................................................73

*Hill-Rom Servs. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014)..............................................................53, 76

*Indivior Inc. v. Dr. Reddy's Labs., S.A.*,
    930 F.3d 1325 (Fed. Cir. 2019) ..................................................12, 59, 69, 72

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
    783 F.3d 1262 (Fed. Cir. 2015) ...................................................................64

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA Inc.*,
    450 F.3d 1350 (Fed. Cir. 2008) ...................................................................15

*IYM Techs. LLC v. Advanced Micro Devices, Inc.*,
    No. 16-cv-649-GMS, 2017 WL 4857445 (D. Del. Oct. 27, 2017) ............12, 59, 68

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898, 906 (Fed. Cir. 2004) .............................................................22

*Kraft Foods, Inc. v. Int'l Trading Co.*,
    203 F.3d 1362 (Fed. Cir. 2000) ...................................................................62

*Medicines Co. v. Mylan, Inc.*,
    853 F.3d 1296 (Fed. Cir. 2017) ............................................................ *passim*

*Medicines Co. v. Teva Parenteral Meds., Inc.*,
    Case No. 09-cv-750-RGA, 2013 WL 3658020 (D. Del. July 11, 2013) ..........12, 59

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998) ...................................................................62

*Network Commerce, Inc. v. Microsoft Corp.*,
    422 F.3d 1353, 1361 (Fed. Cir. 2005) ..........................................................47

*Norian Corp. v. Stryker Corp.*,
    432 F.3d 1356 (Fed. Cir. 2005) ...................................................................47

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003).....................................................................11

*Ormco Corp. v. Align Tech., Inc.*,
    498 F.3d 1307 (Fed. Cir. 2007) ...................................................................61

*Pacing Techs. LLC v. Garmin Int'l Inc.*,
    778 F.3d 1021 (Fed. Cir. 2015) ................................................13, 15, 24, 40

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)........................................................ *passim*

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
  717 F.3d 929 (Fed. Cir. 2013) ..............................................................12, 13, 59, 68

*Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co.*,
  212 Fed. Appx. 977 (Fed. Cir. 2007) ..................................................................73

*Sport Squeeze, Inc. v. Pro-Innovative Concepts, Inc.*,
  No. 97-CV-115 TW(JFS), 1999 WL 395328 (S.D. Cal. Apr. 1, 1999)................................53

*SunRace Roots Enter. Co. v. SRAM Corp.*,
  336 F.3d 1298 (Fed. Cir. 2003).........................................................................75, 79

*Takeda Pharm. Co. v. Zydus Pharms.*,
  743 F.3d 1359 (Fed. Cir. 2014) .........................................................................27

*Thorner v. Sony Comput. Ent. Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) .....................................................................53, 64, 67

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1358 (Fed. Cir. 2012)......................................................................53, 54, 76

*Unwired Planet, LLC v. Apple Inc.*,
  829 F.3d 1353 (Fed. Cir. 2016) .........................................................................64

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
  234 F.3d 1370 (Fed. Cir. 2000)........................................................................ *passim*

*Vectura Ltd. v. GlaxoSmithKline LLC*,
  No. 1:16-cv-00638, 2018 WL 4700222 (D. Del. Oct. 1, 2018)..................................... *passim*

*Vectura Ltd. v. GlaxoSmithKline LLC*,
  981 F.3d 1030 (Fed. Cir. 2020).....................................................................9, 11, 23, 68

## TABLE OF ABBREVIATIONS

- **"'673 Patent"** refers to U.S. Patent No. 9,238,673.

- **"'117 Patent"** refers to U.S. Patent No. 10,047,117.

- **"'073 Patent"** refers to U.S. Patent No. 10,174,073.

- **"'337 Patent"** refers to U.S. Patent No. 10,052,337.

- **"'349 Patent"** refers to U.S. Patent No. 10,751,349.

- **"'549 Patent"** refers to U.S. Patent No. 10,758,549.

- **"'977 Publication"** refers to International PCT Patent Application Publication No. WO 2006/122977.

- **"API"** refers to active pharmaceutical ingredient.

- **"Apotex"** refers to Apotex Inc. and Apotex Corp., collectively.

- **"Amneal"** refers to Amneal EU, Limited and Amneal Pharmaceuticals New York, LLC, collectively.

- **"Defendants"** refers to Amneal, Apotex, DRL, Lupin, MSN, and Optimus, collectively.

- **"DRL"** refers to Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories, Ltd., collectively.

- **"FXR"** refers to the farnesoid X receptor.

- **"Intercept"** refers to Intercept Pharmaceuticals, Inc. and Intercept Pharma Europe Ltd., collectively.

- **"Lupin"** refers to Lupin Limited and Lupin Pharmaceuticals, Inc., collectively.

- **"MSN"** refers to MSN Laboratories Private Limited and MSN Pharmaceuticals Inc., collectively.

- **"Myerson Decl."** refers to the Declaration of Dr. Allan S. Myerson on Claim Construction, dated October 26, 2021.

- **"Optimus"** refers to Optimus Pharma Pvt. Ltd. and Optimus Drugs Private Ltd., collectively.

- **"Orange Book"** refers to the FDA publication *Approved Drug Products with Therapeutic Equivalence Evaluations*.

- **"PBC"** refers to primary biliary cholangitis.

- **"UDCA"** refers to ursodeoxycholic acid.

I.      INTRODUCTION AND BACKGROUND

A.      Plaintiffs' Introduction and Background

1.      Intercept's Introduction

Ocaliva®, the novel drug at issue in this case, is a pioneering therapeutic for the treatment of PBC.  PBC is a rare chronic liver disease primarily affecting women that, if left untreated, destroys the bile ducts in the liver, which can lead to liver cirrhosis.  Until Intercept received FDA approval for Ocaliva® (which contains obeticholic acid) in 2016, a drug known as UDCA was the only available treatment for PBC.  UDCA had significant drawbacks; most importantly, it was not effective in a significant number of PBC patients, leaving nonresponsive patients without any treatment options.  FDA granted Ocaliva® "fast track designation," which facilitates the development of, and expedites the review for, drugs that are intended to treat serious conditions and that demonstrate the potential to address unmet medical needs.  Defendants seek FDA approval to make and sell generic versions of Ocaliva® before the Orange Book-listed patents—patents claiming the compound, methods of treatment, and pharmaceutical compositions—expire.

Patents from three patent families are asserted in this case.  The '673 Patent Family, which includes the '673, '117, and '073 Patents, is directed to the purity of the obeticholic acid in pharmaceutical compositions, as well as the processing and uses for obeticholic acid.  The '337 Patent Family, which includes the '337, '349, and '549 Patents, covers pharmaceutical formulations containing obeticholic acid and methods of using them.  The third family, consisting of U.S. Patent No. RE48,286, covers the obeticholic acid drug substance and does not contain any disputed terms.

2.      Intercept's Technology Background

Obeticholic acid is a semi-synthetic bile acid analog that acts as a potent FXR agonist. Scientists now know that FXR is a nuclear receptor that regulates the synthesis of bile acids from

1

cholesterol in the liver.  In healthy humans, bile acids are secreted from the liver into the intestines to aid in the absorption of dietary lipids and vitamins.  If the flow of bile from the liver is blocked, as is the case in patients with PBC, toxic bile acids build up in the liver, damaging the liver. Obeticholic acid interacts with FXR to reduce bile acid production and improve the flow of bile acids out of the liver.

Development of obeticholic acid for administration to patients presented a number of challenges.  For example, initial synthetic processes for obeticholic acid failed to obtain obeticholic acid with impurities below certain thresholds.  The inventors of the '673, '117, and '073 Patents solved this problem by developing new synthetic processes to produce obeticholic acid and were the first to obtain obeticholic acid API that is substantially more pure than the obeticholic acid API in the prior art.  Ex. A, '673 Patent, 27:43–45 (Appx0065).[1]  In the shared specification, the inventors described these improved processes for making obeticholic acid, as well as obeticholic acid with an improved purity profile, various forms of obeticholic acid, and methods of treatment using obeticholic acid.

Formulating pharmaceutical products containing obeticholic acid also presented unique challenges.  The inventors of the '337, '349, and '549 Patents recognized the need to develop "obeticholic acid compositions having [a] desirable dissolution profile and solubility, and possessing advantageous storage stability."  Ex. L, '337 Patent, 1:22–24 (Appx1043).[2]  The inventors achieved this goal, in part, by reducing the size of the obeticholic acid particles through a process called "micronization."  *Id.* at 15:62–16:20, 14:32–40 (Appx1049-50).  The specification

---

[1] The specifications of the '673, '117, and '073 Patents are identical.  Unless otherwise indicated, all citations are to the '673 Patent's specification.

[2] The specifications of the '337, '349, and '549 Patents are identical.  Unless otherwise indicated, all citations are to the '337 Patent's specification.

describes several different ways to micronize obeticholic acid particles, one of which is to use a jet-mill. *Id.* at 16:3–20 (Appx1050). Jet-mills operate by jetting compressed gas and raw material particles from a nozzle into a chamber to reduce particle size through collisions. *See id.* at 16:11–15 (Appx1050).

The inventors also discovered that beneficial tablet properties could be realized by formulating the tablets with an intra-granular portion and an extra-granular portion, each of which can contain obeticholic acid, as well as excipients. *See id.* at 42:12–29 (Appx1063). As the inventors noted, formulating the tablets in this way, with the proper selection of excipients, produced tablets with "superior tablet hardness and an improved dissolution profile." *Id.* at 42:39–43 (Appx1063).

### 3.	A Person of Ordinary Skill in the Art

Intercept proposes that a POSA for the '673 Patent Family is someone having a bachelor's degree in chemistry, chemical engineering, or a related discipline, with a minimum of three years' experience with process chemistry. Alternatively, the person could hold an advanced degree in chemistry, chemical engineering, or a related discipline, with less experience. The POSA may collaborate with others, including a medical doctor with experience treating liver diseases.

Intercept proposes that a POSA for the '337 Patent Family is someone having a bachelor's degree in chemistry, pharmaceutical science, or a related discipline, with a minimum of three years' experience formulating pharmaceutical dosage forms. Alternatively, the person could hold an advanced degree in chemistry, pharmaceutical science, or a related discipline, with less experience. The POSA may collaborate with others, including a medical doctor with experience treating liver diseases.

## B.   Defendants' Introduction and Background

There are consequences to the words one chooses to use.  Here, Intercept told the Patent Office and the public what its patent claims required and, more importantly, what they excluded. Having made those representations to obtain its patents, Intercept now seeks to disavow its past portrayals to improperly broaden or change the scope of its claims to capture what it once disparaged. That is impermissible, and hence Defendants' proposed constructions should be adopted.

### 1.   Background

The patents in dispute are all directed to the compound obeticholic acid. There are two sets of patents for which construction is disputed: the '673 Patent Family, which includes the '673, '117, and '073 Patents, and the '337 Patent Family, which includes the '337, '349, and '549 Patents. The '673 Patent Family claims Form 1 obeticholic acid, which is a non-crystalline physical form of the active ingredient obeticholic acid. Within the patent specifications and during prosecution, Intercept alleged that Form 1 made according to a specific process results in obeticholic acid with, in their view, greater purity compared to prior art forms of obeticholic acid, including non-crystalline obeticholic acid.  The '337 Patent Family focuses on pharmaceutical formulations containing obeticholic acid of a particular particle size and distribution, which according to the patent specifications and prosecution history are necessary and were only achieved by one specific particle size reduction techniques called jet milling.

### 2.   Person of Ordinary Skill in the Art

Defendants propose that the person of ordinary skill in the art ("POSA") for the '673 Patent Family would have had an advanced degree, such as having a Ph.D., in organic chemistry, medicinal chemistry, or a related discipline, and at least 3 years of industry experience in the design and synthesis of pharmaceutical compounds to be administered to patients. Alternatively, a POSA

would have had a master's or bachelor's degree in chemistry or a related discipline and at least 5 years of industry experience in the design and synthesis of pharmaceutical compounds to be administered to patients. Moreover, because of the inherently collaborative nature of drug development, a POSA may work as part of a multi-disciplinary team containing other professionals in the drug development field with an appropriate amount of relevant experience, such as pharmacologists, analytical chemists, formulators, and clinicians.

Defendants propose that a POSA for the '337 Patent Family would have had an advanced degree, such as having a Ph.D., in pharmaceutical formulation, drug delivery, or a related discipline, and at least 2 years of industry experience with formulating pharmaceutical compounds to be administered to patients. Alternatively, a POSA would have had a master's or bachelor's degree in chemistry or a related discipline and at least 4 years of industry experience with formulating pharmaceutical compounds to be administered to patients. As with the '673 Patent Family, the POSA would have access to other professionals in the drug development field with an appropriate amount of relevant experience, such as pharmacologists, process chemists, synthetic chemists, analytical chemists, and clinicians.

## II.   AGREED-UPON CONSTRUCTIONS

| Claim Term | Joint Proposed Construction |
|---|---|
| "pharmaceutical composition"[3]<br><br>'673 Patent<br>(claims 1–23)<br><br>'073 Patent<br>(claims 1–2, 6–27, 36–37, 39–42, 44–61) | "formulation containing obeticholic acid in a form suitable for administration to a subject" |
| "pharmaceutical formulation" | "formulation containing obeticholic acid in a form suitable for administration to a subject" |

---

[3] The parties do not dispute that the preamble is limiting.

| | |
|---|---|
| '117 Patent<br>(claim 1) | |
| "cholestatic liver disease"<br><br>'117 Patent<br>(claims 2 and 3) | "disease or condition in which bile excretion from the liver is impaired or blocked" |
| "chronic liver disease"<br><br>'117 Patent<br>(claims 2 and 4) | "disorder of the liver that persists over time" |
| "primary biliary cirrhosis"<br><br>'117 Patent<br>(claims 2 and 6) | "also known as primary biliary cholangitis" |
| "jet-milling" / "jet-milled"<br><br>'337 Patent<br>(claims 13 and 14)<br><br>'349 Patent<br>(claims 1 and 19)<br><br>'549 Patent<br>(claims 12 and 23) | Jet-milling ('337 Patent): "milling that jets compressed gas and raw material particles from a nozzle into a chamber to reduce particle size through collisions"<br><br>Jet-milled ('337 Patent): "reduced in size using jet-milling"<br><br>Jet-milled particles ('349 and '549 Patents): "particles that have been reduced in size using jet-milling" |

## III.    DISPUTED CONSTRUCTIONS

### A.    '673 Patent Family

#### 1.    "obeticholic acid Form 1" / "obeticholic acid is Form 1"

| Claim(s) | Plaintiff's Proposed Construction | Apotex's Proposed Construction | DRL/MSN/Amneal/ Lupin/Optimus Proposed Construction |
|---|---|---|---|
| '673 patent claims 1-23; '117 patent claim 8 | Non-crystalline obeticholic acid | Non-crystalline obeticholic acid made using a process in which crystalline obeticholic acid is produced as a synthetic intermediate | No construction necessary |

| | | in the penultimate step of synthesis | |
|---|---|---|---|

### a)      Intercept's Opening Position

The dispute between Intercept and Apotex concerns whether "obeticholic acid Form 1" (or the variant "obeticholic acid is Form 1"), which appears in the claims of the '673 and '117 Patents, is limited to obeticholic acid made using a particular process.  Intercept proposes that this term be construed as the specification defines it—"non-crystalline obeticholic acid."  Apotex contends that "obeticholic acid Form 1" is "non-crystalline obeticholic acid made using a process in which crystalline obeticholic acid is produced as a synthetic intermediate in the penultimate step of synthesis."  Apotex's attempt to rewrite the claims to include a process limitation through claim construction contravenes the clear language of the claims as well as the intrinsic evidence, and should be rejected.  Notably, all Defendants except Apotex take the position that no construction is necessary for this term.

### (1)      The intrinsic evidence clearly defines "obeticholic acid Form 1" as "non-crystalline obeticholic acid."

A POSA would understand from the intrinsic evidence that "obeticholic acid Form 1" refers simply to non-crystalline obeticholic acid—and does not limit how that obeticholic acid was produced.  Claim 1 of the '673 Patent, which is representative, recites "[a] pharmaceutical composition comprising obeticholic acid Form 1 and a pharmaceutically acceptable carrier, wherein the obeticholic acid Form 1" meets specific purity limitations. Ex. A, '673 Patent, claim 1 (Appx0091).  The claims do not mention, let alone require, that obeticholic acid Form 1 be "made using a process in which crystalline obeticholic acid is produced as a synthetic intermediate in the penultimate step of synthesis," as Apotex asserts in its proposed construction.

The specification explicitly defines "obeticholic acid Form 1." *Id.* at 40:49–50 (Appx0071). It states that, "[a]s used herein, the term 'obeticholic acid Form 1' refers to non-crystalline obeticholic acid." *Id.* Example 5, entitled "Characterization of Obeticholic Acid Form 1," repeats this definition: "Obeticholic acid Form 1 refers to the non-crystalline form of obeticholic acid." *Id.* at 63:15–16 (Appx0083). Where, as here, the inventors have defined a term in the patent, "the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc); *see also Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) ("Under our precedent, the patentee's lexicography must govern the claim construction analysis.").

Were there any doubt, references to "obeticholic acid Form 1" throughout the specification confirm this definition. The specification repeatedly refers to "obeticholic acid Form 1" as "non-crystalline" to distinguish it from crystalline obeticholic acid. Ex. A, '673 Patent, 31:1–21 (Appx0067) (reporting results of a study of "obeticholic acid Form 1 (non-crystalline) vs. crystalline obeticholic acid Form F"); *see also id.* at 71:39–74:15 (Appx0087). In addition, analytical testing described in the specification establishes that the patentee characterizes "obeticholic acid Form 1" as "non-crystalline." *See id.* at 68:61–63, 62:3–5, 63:58–60, 66:26–30, 67:15–16, 69:7–16, 73:50–52 (Appx0082-88). The repeated references to, and characterization of, "obeticholic acid Form 1" as non-crystalline in the specification confirm the definition provided by the patentee.

The prosecution history further confirms that "obeticholic acid Form 1" simply refers to non-crystalline obeticholic acid and is not limited to obeticholic acid manufactured through any particular process. During prosecution, the applicant repeatedly characterized the claimed invention as an API that was an improvement over the prior art due to the higher purity levels. *See*

Ex. G, INT_OCA_0006711 (Appx0315) ("[T]he instant claims are directed to obeticholic acid and a pharmaceutical composition thereof, wherein the obeticholic acid comprises less than 1% CDCA."), INT_OCA_0006714 (Appx0318), INT_OCA_0006713 (Appx0317); Ex. H, INT_OCA_0006719 (Appx0323) (stating that prior art "could not produce obeticholic acid that comprises less than 1% of CDCA"); Ex. I, INT_OCA_0006779 (Appx0329) (noting that the prior art does not disclose "a form of obeticholic acid that comprises less than 1% chenodeoxycholic acid"). The prosecution history is consistent with the specification. At no point does the prosecution history limit the claimed invention to the specific process that Apotex seeks to insert into the claims.

### (2)   Apotex's proposed construction attempts to rewrite the claims and ignores the patentee's definition.

Apotex's proposed construction lacks merit. Neither the claims nor the specification support Apotex's contention that the term "obeticholic acid Form 1" should be limited to "non-crystalline obeticholic acid made using a process in which crystalline obeticholic acid is produced as a synthetic intermediate in the penultimate step of synthesis." The Federal Circuit has cautioned repeatedly that a court must take care to "avoid importing limitations from the specification into the claims." *Phillips*, 415 F.3d at 1323; *see also Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003) (declining "to superimpose a process limitation on the product claims at issue" where claim language did not require a particular method of manufacture); *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) ("The method of manufacture, even when cited as advantageous, does not of itself convert product claims into claims limited to a particular process."); *Vectura Ltd. v. GlaxoSmithKline LLC*, No. 1:16-cv-00638, 2018 WL 4700222, at *3 (D. Del. Oct. 1, 2018), *aff'd*, 981 F.3d 1030 (Fed. Cir. 2020) ("Just because the specification describes a single known way to make the claimed composition

does not mean that [the court] must read that method into the claims."). Apotex offers no reason to ignore this oft-voiced caution here.

Apotex's proposed construction would limit "obeticholic acid Form 1" to one specific embodiment. The specification states that, "[i]n *one embodiment*, [Form 1] of obeticholic acid is produced via a crystalline obeticholic acid as a synthetic intermediate." Ex. A, '673 Patent, 40:50–52 (Appx0071) (emphasis added); *see also id.* at 63:16–18 (Appx0083) ("[Form 1] of obeticholic acid *can* be produced via a crystalline obeticholic acid as a synthetic intermediate." (emphasis added)). But the Federal Circuit has been clear that "even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1376 (Fed. Cir. 2015).

The specification cannot be read to demonstrate such a clear intent. None of the portions of the specification that Apotex relies on shows intent to limit "obeticholic acid Form 1" to that made through a specific process. Instead, these passages discuss processes for making obeticholic acid Form 1—a different invention from the claimed compositions. *See, e.g.*, Ex. A, '673 Patent, 6:36–37 (Appx0054) ("The *process* of the present application is shown in Scheme 1." (emphasis added)); *id.* at 9:60–61 (Appx0056) (describing the "*process* of the present application" (emphasis added)); *id.* at 20:51–52 (Appx0061) ("The *process* of the present application utilizes a crystalline intermediate in the preparation of obeticholic acid Form 1." (emphasis added)); *id.* at 29:31–35 (Appx0066) (discussing "*the process* of the present application" (emphasis added)). Although it is evident from the specification that the inventors were in possession of both improved processes for manufacturing obeticholic acid as well as improved compositions of obeticholic acid, statements directed to the process should not be imported into a claim term covering a product.

Read in light of the specification as a whole, which includes a definition of "obeticholic acid Form 1," it is clear that these statements simply describe *a* process for making "obeticholic acid Form 1" and, at most, state a preference for using a process with a crystalline intermediate.  Such statements do not import a limitation into claims covering the composition.  *See Vectura*, 981 F.3d at 1038.

Nor does the prosecution history provide any support for Apotex's proposed construction. During prosecution, the applicants distinguished the issued claims on the basis of the purity profile of the composition, *see supra* Section III.A.1.a.1—not on the preferred process in the specification. The statements in the prosecution history are nowhere close to the "clear and unmistakable" statements required to establish disavowal—as Apotex apparently will argue.  *See Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1326 (Fed. Cir. 2003).  Nothing in the prosecution history suggests the patentee limited the term "obeticholic acid Form 1" to non-crystalline obeticholic acid produced through a process that contains a crystalline intermediate.

### b)      Defendants' Answering Position

#### (1)      Apotex's Proposed Construction Reflects What Intercept Told The Patent Office Was "Critical" For Obtaining Form 1

The dispute between Intercept and Apotex is whether the term "**obeticholic acid [is] Form 1**" should be limited by the only process disclosed and relied upon by Intercept, as the patent applicants, during prosecution to obtain allowance of the patents.  While it is "generally true" that product claims are not limited by the method of manufacture, it is binding precedent that "process steps can be treated as part of a product claim if the patentee has made clear that the process steps are an essential part of the claimed invention."  *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1375 (Fed. Cir. 2007) (construing "composite structural member" to require a pelletization process, even though the claims did not "contain an explicit process-based

limitation.").  Based on the intrinsic record, the '673 Patent Family fits squarely in a long line of cases in which courts have incorporated process steps into a claim construction, particularly in cases involving pharmaceutical compositions.  *See e.g.*, *Indivior Inc. v. Dr. Reddy's Labs., S.A.*, 930 F.3d 1325, 1337-39 (Fed. Cir. 2019); *The Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1303-06 (Fed. Cir. 2017) ("Medicines Co."); *Chiesi USA Inc. et al., v. MSN Pharmaceuticals Inc. et al.*, Case No. 19-15864-MCA-MAH, D.I. 146 at 19 (D.N.J. Oct. 18, 2021) (unreported) (limiting "high purity cangrelor" in claims to products created using the 3-step process set forth in the specification); *IYM Techs. LLC v. Advanced Micro Devices, Inc.*, No. 16-cv-649-GMS, 2017 WL 4857445, at *1 n2 (D. Del. Oct. 27, 2017); *The Medicines Co. v. Teva Parenteral Meds., Inc.*, Case No. 09-cv-750-RGA, 2013 WL 3658020, at *2 (D. Del. July 11, 2013); *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 937-940 (Fed. Cir. 2013); *Biovail Labs. Int'l SRl v. Impax Labs.*, 433 F. Supp. 2d 501, 511-516 (E.D. Pa. 2006).  The common factor is the patentee's expression of the criticality of the process used to obtain the product of the claims.

> **(a)** **The intrinsic evidence compels a construction where obeticholic acid Form 1 is made using a process in which crystalline obeticholic acid is produced as a synthetic intermediate in the penultimate step of synthesis**

Here, Intercept repeatedly represented that the process steps were essential to the claimed invention, both within the patent and during prosecution.  The patent specification emphasized the use of a crystalline obeticholic acid as the penultimate step in producing Form 1 as "critical" to the <u>purity</u> of Form 1, '673 patent at 29:31-36 (Appx0066), which is the very characteristic the applicants relied upon to distinguish its claims from the prior art. *Id.* at 27:41-46 (Appx0065). The amorphous form of obeticholic acid, was already known in the prior art. *E.g.*, Ex. F, Jan. 8, 2015 Non-Final Rejection, '673 patent prosecution history, at 3 (Appx0297) (Examiner stating "Form 1 and the compound taught by the prior art [Pelliciari 2002] are identical."). In other words,

Intercept would not have been able to receive a patent if not for its reliance and disclosure of this penultimate step for manufacturing its Form 1 product, and it cannot now expand its claims to exceed what Intercept claimed to invent. This is evident throughout the specification, which consistently describes Form 1 by its process of manufacture. Moreover, Intercept has provided no alternative processes by which Form 1 could be made, either during prosecution or in its opening brief. Instead, it has repeatedly emphasized the criticality of using crystalline obeticholic acid in the penultimate step to obtain Form 1.

The shared specification of the '673 Patent Family consistently describe Form 1 as a <u>process</u> where the penultimate step involves converting a crystalline intermediate product into non-crystalline obeticholic acid. In fact, the '673 patent states that the "<u>present invention</u> relates to a process for preparing obeticholic acid Form 1…[by] <u>converting crystalline obeticholic acid to obeticholic acid Form 1</u>" *no fewer than 10 times*. '673 patent 1:41-2:50, 6:35-39, 10:12-15, 20:51-57 (emphasis added) (Appx0052, Appx0054, Appx0056, Appx0062). This phrasing qualifies as a "requirement" sufficient to show disavowal, and is not language of mere "preference" at least because the process is not referred to or considered optional. *Andersen Corp.*, 474 F.3d at 1372.

The Federal Circuit has found disavowal or disclaimer of claim scope from similar language "based on clear and unmistakable statements by the patentee that limits the claims, such as 'the present invention includes…' or 'the present invention is…'…." *Pacing Techs. LLC v. Garmin Int'l Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (*citing Regents*, 717 F.3d 929 at 936); *see also Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1316-19 (Fed. Cir. 2006). In *Honeywell*, for example, the Federal Circuit limited the claim term "fuel injection system component" to a fuel filter because on at least four occasions the specification referred to the fuel filter as "this invention" or "the present invention," leading to the conclusion that "a fuel filter is

13

the only 'fuel injection component system' that the claims cover" and not merely a preferred embodiment. *Honeywell*, 452 F.3d at 1318. The same reasoning applies here.

The "Summary of the Invention" section of the patent, when read as a whole, further shows that obeticholic acid Form 1 is not contemplated separately from the process of manufacture. *See* '673 Patent at 1:10-3:50 (Appx0052-Appx0053). Intercept alleges that the patent covers both processes for manufacturing and compositions of obeticholic acid, *supra* at III.A.1.a.2, but the patent summary does not contain a single reference to obeticholic acid Form 1 divorced from the process by which it is formed. For example, there is only one reference to a pharmaceutical composition comprising obeticholic acid Form 1 in the "Summary of the Invention", but that statement immediately includes the following limitation: "<u>produced by a process of the invention</u> and a pharmaceutically acceptable carrier." '673 patent at 3:35-36 (Appx0053). The reasoning is clear: there exists no alleged invention in the claim term "obeticholic acid Form 1" without the specific process of manufacturing Form 1.

Moreover, every single "embodiment," schema, or example related to <u>Form 1</u> of obeticholic acid disclosed in the specification expressly includes the crystalline intermediate step at issue, including:

- Twelve (12) embodiments for making Form 1 from crystalline obeticholic acid (*id.* at 9:16-12:64 (Appx0056-0057);

- Two detailed synthetic schemes (*id.* at 6:36-8:60 (Appx0054-Appx0055));

- A comparison of the process to prior art processes for making obeticholic acid with a Table detailing the process differences and impact (*id.* at Table A, 26:50–27:47 (Appx0064-Appx0065); and

- An example describing the process using crystalline obeticholic acid (*id.* at Example 1, 46:37-54:47 at 54:35-47 (Appx0074-Appx0078).

Crucially, Intercept also disparaged processes that do not use a crystalline intermediate, including processes used in the prior art to make non-crystalline obeticholic acid. The specification

explains that the Form 1 "obeticholic acid made by the process of the present application is substantially more pure than obeticholic acid produced by processes in the prior art, including the '390 [patent] process and the '977 [application] process." '673 patent at 27:41-46 (emphasis added) (Appx0065). The applicants expressly attributed the alleged improvement to "the importance of producing crystalline obeticholic acid as an intermediate in the penultimate step of the process of the present application." *Id.* at 29:24-27 (Appx0066) (emphasis added). In fact, Intercept stated that use of the crystalline intermediate "in the process of the present application is indeed critical to the preparation of substantially pure obeticholic acid." *Id.* at 29:31-36 (emphasis added) (Appx0066).

This disparagement supports a finding that the claims require the use of crystalline obeticholic acid in the construction of the Form 1 terms. *See Pacing Techs.*, 778 F.3d at 1025 (holding "we have used disclaimer to limit a claim element to a feature of the preferred embodiment when the specification described that feature as a 'very important feature . . . in an aspect of the present invention,' and disparaged alternatives to that feature.") (*quoting Inpro II Licensing, S.A.R.L. v. T-Mobile USA Inc.*, 450 F.3d 1350, 1354-55 (Fed. Cir. 2008)).

Additionally, the Federal Circuit recently limited a chemical product claim limitation to the process by which it is created where the process was relied upon by the patent applicants to distinguish the prior art. In *Medicines Co.*, the Federal Circuit held that the proper construction of the term "batches" in the two asserted patents required that the batches of the drug are made using "efficient mixing." *Medicines Co.*, 853 F.3d at 1303-1306. Despite the fact that one of the patents plainly contained product claims with no process limitations, the court held that "the reading of the batches limitation that 'most naturally aligns with the patent's description of the invention' is one that requires 'efficient mixing.'" *Id.* at 1305 (quoting *Philips*, 415 F.3d at 1316). The patentee

had repeatedly stressed the importance of using its "efficient mixing" method to obtain bivalirudin that, unlike the prior art, had consistently lower amounts of a specific impurity.  The Federal Circuit explained that its "decision does not impermissibly add a process limitation to a product claim that does not require a process because the specification's definition of 'batches' by itself injects a compounding process as a limitation in the asserted claims." *Id.* at 1304.  Similarly here, there is no improper importation of a process limitation.  As detailed above, "[t]he situation here involves specifications that in all respects tell us what the claims mean." *Id.* at 1305.  That meaning is that Form 1 must be construed as requiring the use of a crystalline obeticholic acid intermediate to make non-crystalline Form 1 obeticholic acid.

### (b)    Intercept's proposed construction is inconsistent with the intrinsic and extrinsic evidence

A POSA would understand, just as Intercept clearly understood during prosecution of the '673 Patent Family, that Form 1 is limited by its process of manufacture. Intercept argues that Form 1 "refers simply to non-crystalline obeticholic acid—and does not limit how that obeticholic acid was produced." *Supra* at III.A.1.a.1. But that is inconsistent with the intrinsic evidence.

As discussed above, the patent specification explicitly ties the process of preparing Form 1 to every description of the alleged invention. The specification does refer to Form 1 as "non-crystalline," but that is merely descriptive of a single physical property of Form 1, and is provided for purposes of comparing it to the crystalline Form C.  The description of Form 1 as "non-crystalline" cannot expand the scope of the claim in view of the clear process limitation repeatedly emphasized by Intercept during prosecution. Intercept even acknowledges that the specification refers to "obeticholic acid Form 1 as non-crystalline to distinguish it from crystalline obeticholic acid". *Supra* at III.A.1.a.1. Further, the contrast between how the two forms are described within the patent specification highlights that Form 1 is intended to be identified exclusively by its process

of preparation. For example, the specification refers to Form C by physical characterizations of the compound such as X-ray diffraction pattern or Differential Scanning Colorimetry, *e.g.*, '673 patent. at 29:36-39, 57-60 (Appx0066), but refers to Form I consistently by the "process for preparing obeticholic acid Form 1." *Id.* at 1:41-43 (Appx0052).

Intercept relies on a purported definition of Form 1 in the specification, but that statement "lacks the clear expression of intent necessary for a patentee to act as its own lexicographer." *Medicines Co.*, 853 F.3d at 1306. In *Medicines Co.*, the Federal Circuit rejected a construction "taken verbatim from the specification" because it departed from the "linguistic formula used by the patentee to signal . . . designation of other defined terms." *Id.* Intercept's alleged description of "obeticholic acid form 1" does not follow any standardized format and thus "does not purport to be definitional." *Id*. More importantly, however, Intercept's argument ignores the totality of the specification's description of the invention as well as its clear and unambiguous statements to the patent examiner regarding the criticality of the process in making Form 1.

Intercept's remaining arguments are similarly unavailing. Intercept argues that the '673 and '117 patent claims themselves do not list the process for manufacturing Form 1, but that is irrelevant. *See supra* at III.A.1.a.1. As stated above, courts have consistently held that process limitations do not need to be expressly listed in the claims themselves in order to be limiting. *See, e.g., Honeywell*, 452 F.3d at 1316-19; *Medicines Co.*, 853 F.3d at 1304. In fact, it is a fundamental rule of claim construction that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).

Intercept also argues that Apotex's proposed construction would limit obeticholic acid Form 1 to only one embodiment. *Supra* at III.A.1.a.2. That is untrue. It is correct that the specification uses the term "one embodiment" but as explained above, <u>all</u> embodiments listed in the '673 patent family specification related to Form 1 expressly state the process of manufacture. Instead, the "one embodiment" language cited by Intercept is used to distinguish the Form 1 embodiments from embodiments related to Form C, the crystalline obeticholic acid used as an intermediary to produce Form 1. *See supra* at III.A.1.b.1.a.

Moreover, the prosecution history cited by Intercept similarly only supports Apotex's proposed construction. *See Supra* at III.A.1.a.1. When read in combination with the specification, it is clear that Intercept relied on the process of manufacturing Form 1 as the basis for the alleged purity improvement statements made during prosecution.

          **(c)**     **Intercept's proposed construction would render the claims invalid for lack of enablement and written description**

Finally, if Intercept's proposed construction is accepted, the asserted claims necessarily will be invalid for lack of enablement and written description. As explained above, the patent specification and prosecution history make clear that the applicants did not contemplate or teach any alternative methods of preparing a non-crystalline Form 1 obeticholic acid meeting the specific purity limitations. Instead, the applicants repeatedly emphasized the criticality of the specific process of using crystalline obeticholic in the penultimate step to make Form 1. Thus, if this Court finds that the term obeticholic acid Form 1 includes products made by processes other than the intermediate crystalline step, then the patents do not teach, nor do they demonstrate that the applicants had possession of, the full scope of the patent claims.

### c)  Plaintiffs' Reply Position

Intercept's proposed construction is the express lexicographic definition that the patentee provided in the specification. Nothing in the intrinsic evidence contradicts this clear definition, much less rises to a clear and unmistakable disavowal that would be required to displace the patentee's express definition. Furthermore, the prosecution history confirms that both the applicant and examiner understood "obeticholic acid Form 1" to refer to non-crystalline obeticholic acid.

Apotex seemingly concedes the meaning of "obeticholic acid Form 1" on the first page of its brief: "The '673 Patent Family claims Form 1 obeticholic acid, *which is a non-crystalline physical form of the active ingredient obeticholic acid*." *See supra* Part I.B.1 (emphasis added). Yet Apotex urges the court to disregard the intrinsic evidence to import a process step, ostensibly because this step is critical for obtaining obeticholic acid Form 1. In doing so, Apotex seeks to rewrite the claims. Apotex's proposed construction should be rejected.

### (1)  The '673 and '117 Patents' claims do not restrict "obeticholic acid Form 1" to a particular process.

Apotex's arguments ignore the plain claim language. The '673 Patent claims "[a] *pharmaceutical composition* comprising obeticholic acid Form 1," and the '117 Patent claims a method of treating diseases by administering "a *pharmaceutical formulation* comprising an effective amount of a substantially pure solid form of obeticholic acid," wherein "the solid form of obeticholic acid is Form 1." Ex. A, '673 Patent, claim 1 (Appx0091) (emphasis added); Ex. B, '117 Patent, claims 1 and 8 (Appx0184) (emphasis added). These claims recite compositions, not processes. Apotex attempts to limit the claimed compositions to those made through a specific process, but overlooks that the patent discloses separate inventions: compositions *and* processes. Apotex also argues that "Form 1" must be limited to a specific process because the amorphous form of obeticholic acid was in the prior art, but this fails to account for all of the claim elements.

*See supra* Section III.A.1.b.1.a. The remaining claim elements limit the obeticholic acid compositions to those with specific impurity limitations. Thus, the applicant did limit the claims without reference to a specific processes.

> ### (2) The specification provides no support for limiting the product claims to a particular manufacturing process.

The specification provides a clear lexicographic definition of the term. Far from demonstrating a clear intent that Form 1 is limited to manufacture through a particular process (as Apotex claims), the specification demonstrates clear intent—through an express definition—that "obeticholic acid Form 1" means "non-crystalline obeticholic acid." Indeed, Intercept is not aware of, nor has Apotex cited, a single case where the court has ignored an express definition in the specification and read a process limitation into a composition claim.

That a process limitation should not be read into a claim to supplant an express definition is particularly true here where the specification discloses both a novel form of obeticholic acid and novel processes for obtaining it. *Compare, e.g.*, Ex. A, '673 Patent, 3:29–33 (Appx0053) ("The present invention relates to [] obeticholic acid, or a pharmaceutically acceptable salt, solvate or amino acid conjugate thereof, having a potency of greater than" certain percentages)*, with id.* at 1:44–45 (Appx0052) ("The present invention relates to a process for preparing obeticholic acid Form 1 . . . ."). The specification further describes processes for preparing obeticholic acid Form 1 that do not require formation of a crystalline intermediate as the penultimate step in the process. *See, e.g.*, Ex. A, '673 Patent, 2:61–65 (Appx0052) (explaining that the "present invention" relates to "a process for preparing obeticholic acid Form 1, wherein reacting [reactant] with Pd/C and hydrogen gas to form 3α-hydroxy-6α-ethyl-7-keto-5β-cholan-24-oic acid is carried out at" specific temperature and pressure ranges); *id.* at 3:1–6 (Appx0053) (similar), *id.* at 3:7–13 (similar); *id.* at 3:14–21 (similar); *id.* at 3:22–27 (similar). And Example 5, titled "Characterization of Obeticholic

Acid Form 1," provides detailed data and figures on the physical characterization of obeticholic acid Form 1—demonstrating that obeticholic acid Form 1 is defined by its physical properties, not the process by which it is made.

As demonstrated above, Apotex ignores that "obeticholic acid Form 1" is not consistently described as the product of a particular process, *supra* Section III.A.1.b.1.a; is incorrect that "every single 'embodiment,' schema, or example related to <u>Form 1</u> of obeticholic acid disclosed in the specification expressly includes the crystalline intermediate step at issue," *supra* Section III.A.1.b.1.a[4]; and overlooks Example 5, which describes Form 1 by its physical characterizations, *supra* Section III.A.1.b.1.b.

### (a)    The specification contains an express definition.

Federal Circuit precedent is clear that when the patentee provides a lexicographic definition in the specification, that definition controls. *Phillips*, 415 F.3d at 1316; *see also Braintree*, 749 F.3d at 1356. The specification does just that: "As used herein, the term 'obeticholic acid Form l' refers to non-crystalline obeticholic acid." Ex. A, '673 Patent, 40:49–50 (Appx0071); *see id.* at 63:15–16 (Appx0083) (similar).

Apotex counters that this "purported" definition lacks the "clear expression of intent" to demonstrate lexicography. *See supra* Section III.A.1.b.1.b. Apotex points to *Medicines Co.*, where the Federal Circuit rejected a proposed construction taken verbatim from the specification as definitional because it did not use the "linguistic formula" employed by the patentee to define other terms. 853 F.3d at 1306. But the clear "linguistic formula" identified by the Federal Circuit in

---

[4] Even if the process was included in every embodiment discussed in the specification, this is not a ground to limit the composition term to that particular process. Federal Circuit precedent is clear both that the lexicographic definition of a claim term controls and that process limitations should not be imported into product claims. *See infra* Section III.A.1.c.2.b.

*Medicines Co.* was "the defined term in quotation marks, followed by the terms 'refers to' or 'as defined herein.'" *Id.* This is the *exact* syntax used by the patentee to define "obeticholic acid Form 1" here. *See* Ex. A, '673 Patent, 40:49–50 (Appx0071). Moreover, the definition of "obeticholic acid Form 1" is included as a term in the "Definitions" section of the specification. *See id.*

This clear lexicographic definition distinguishes Apotex's long string cite of cases where it contends courts "incorporated process steps into a claim construction." *See supra* Section III.A.1.b.1.a. None of those cases involved a situation where the inventors defined the term at issue by explicitly stating in the specification what the term "refers" to.

> **(b)    Apotex's attempt to displace the patentee's lexicographic definition is contrary to precedent.**

As already demonstrated by Intercept, process limitations generally should not be read into product claims. *See supra* Section III.A.1.a.2. The only exception is where the patentee has either clearly and unmistakably disavowed claim scope or otherwise demonstrated a clear intent to limit the claims. *See Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 799 (Fed. Cir. 2019) (holding that for a process step to be read into a product claim, not only must "the patentee clearly and unmistakably disavow[] claim scope," but it also must make "clear that the process steps are an essential part of the claimed invention"); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." (internal quotations omitted)). It cannot be the case here—where the applicant demonstrated a clear intent to define "obeticholic acid Form 1" as "non-crystalline obeticholic acid"—that the applicant also evinced a clear intent to further limit the claims to a particular process.

The Federal Circuit's recent opinion in *Vectura Ltd. v. GlaxoSmithKline LLC* is instructive. 981 F.3d at 1030. There, the court refused to read a "high energy milling" process limitation into the construction of "composite active particles." *Id.* at 1037–38. Even though the specification contained "a few statements suggesting that its high-energy milling is *required*" to produce the claimed particles, the court declined to import a process limitation because "those statements are outweighed by the numerous statements indicating that high-energy milling is merely a preferred process." *Id.* at 1038 (emphasis added).

The cases that Apotex relies on are inapposite. For example, Apotex points to *Andersen*, which was distinguished by *Vectura*, to suggest that process steps can be treated as part of a composition claim "if the patentee has made clear that the process steps are an essential part of the claimed invention." *See supra* Section III.A.1.b.1.a. But the patent in *Andersen* did not expressly define the disputed claim term, and the specification stated that "the manufacture of the composition . . . *requires* two important steps." 474 F.3d at 1372 (emphasis added). Even with this "language of requirement," the Court stated that if it only considered the specification, the issue would be a "close one." *Id.* at 1372–73. However, the Court concluded that a "clear disavowal" in the prosecution history "definitely resolve[d]" that the composition must be made by the disclosed process steps. *Id.* at 1373 (noting that applicants distinguished prior art by arguing that "the presently claimed composite *is prepared by*" a particular process (emphasis added)). Here, in contrast, the specification expressly defines "obeticholic acid Form 1," and the prosecution history does not contain a clear disavowal. *See infra* Part A.1.c.3. Indeed, Apotex does not cite a single sentence in the prosecution history as support for disavowal. *See supra* Section III.A.1.b.1.[5]

---

[5] Other cases cited by Apotex fare no better. In *Chiesi*, for example, the specification did not contain an express definition of the disputed term. There, the district court relied on "language of requirement" in the specification. 2021 WL 4843806, at *7. The court contrasted this with "softer (continued…)

Moreover, the language in the specification does not rise to the "language of requirement" relied on by the Court in *Andersen*. 474 F.3d at 1372. To the contrary, the specification discloses embodiments produced by processes other than the crystallization step Apotex seeks to read into the claims. Ex. A, '673 Patent, 2:61–3:28 (Appx0052). Far from *requiring* that obeticholic acid Form 1 be produced through a process with crystalline obeticholic acid as a synthetic intermediate, the specification merely states that non-crystalline obeticholic acid with the claimed purity profile "*can* be produced via a crystalline obeticholic acid as a synthetic intermediate." *Id.* at 63:16–18 (Appx0083) (emphasis added); *see also id.* at 40:50–52 (Appx0071) (stating that Form 1 is produced through a crystalline intermediate "[i]n *one embodiment*") (emphasis added); *id.* at 3:33–36 (Appx0053) ("The present invention relates to a pharmaceutical composition comprising obeticholic acid Form 1 produced by *a* process of the invention . . . ." (emphasis added)). And, contrary to Apotex's characterization, *See supra* Section III.A.1.b.1.a, nothing in *Andersen* suggests that references to the "present invention" are limiting or otherwise qualify as language of "requirement." 474 F.3d at 1373; *see also Pacing Techs.*, 778 F.3d at 1025 (noting that characterization of an object of the present invention "will not always rise to the level of disclaimer" and often "many of the different 'objects of the present invention' . . . are recited as features in one or more independent and dependent claims").

---

language to describe exemplary methods of completing each step," such as "can be." *Id.* at *7 n.9. The '673 Patent employs this "softer," non-restrictive language in explaining that obeticholic acid Form 1 "can be" produced through the improved process. '673 Patent, 63:16–18.

And in *Medicines Co.*, it was undisputed that the specification defined the term "batches" as being produced by a particular process. 853 F.3d at 1300, 1304. Based on that agreement, the Court stated that its construction did "not impermissibly add a process limitation to a product claim." *Id. Medicines Co.* is in stark contrast to the case here where the specification does *not* define obeticholic acid Form 1 by reference to a particular process.

Not only is there no mandate for using a particular process to make obeticholic acid Form 1, the specification does not clearly disavow any particular processes for preparing obeticholic acid Form 1. Apotex contends that the "Summary of the Invention" shows that obeticholic acid Form 1 is limited to a particular manufacturing process because it does not "contain a single reference to obeticholic acid Form 1 divorced from the process by which it is formed." *See supra* Section III.A.1.b.1.a. But Apotex neglects to mention that the Summary of the Invention refers to numerous processes for making obeticholic acid Form 1 that do not require formation of a crystalline intermediate as the penultimate step of synthesis. *See supra* Section III.A.1.c.2  (citing '673 Patent, 2:61–67, 3:1–27, 3:33–35). This section also discloses highly pure obeticholic acid as an embodiment separate and apart from any process for obtaining it. *See* Ex. A, '673 Patent, 3:29–33 (Appx0053).

Similarly, Apotex conflates discussions of the processes and pharmaceutical compounds discussed in the specification when it contends that the patentee disclaimed all other processes for making obeticholic acid Form 1 by consistently "emphasiz[ing] the use of a crystalline obeticholic acid as the penultimate step in producing Form 1 as 'critical' to the purity." *See supra* Section III.A.1.b.1.a. Just because the specification discloses processes for making the claimed compound—and not just the compound itself—does not mean that the claimed compound is limited by those additional disclosures. Indeed, the specification and prosecution history recognize that the disclosed processes and the compounds are *separate* inventions. *See supra* Section III.A.1.c.1.

Nor does the specification disparage other processes for producing obeticholic acid Form 1 *with the claimed purity profiles*. Apotex focuses on statements it characterizes as disparagement of the prior art processes, *see supra* Section III.A.1.b.1.a, but these statements merely distinguish

a novel process from prior art processes. The statements do not disparage any other processes that could be used to make the novel composition, i.e., non-crystalline obeticholic acid with the claimed purity profiles. There is similarly no disavowal in the prosecution history. *See supra* Section III.A.1.a.1; *infra* Section III.A.1.c.3; *see also Vanguard*, 234 F.3d at 1372 (explaining that statement about the benefits of a manufacturing process "does not of itself convert product claims into claims limited to a particular process"). This is distinct from *Honeywell*, 452 F.3d at 1320, when the Federal Circuit held that a patentee disavowed embodiments where the specification contained "repeated derogatory statements" that went "beyond expressing the patentee's preference for one material over another."

### (3)     The file history confirms the absence of disavowal.

Nothing in the prosecution history limits the claimed inventions to a particular process either. Apotex's statement that "Intercept would not have been able to receive a patent if not for its reliance and disclosure of this penultimate step for manufacturing its Form 1 product" is wrong. *See supra* Section III.A.1.b.1.a. The prosecution history makes clear that the claimed purity profile, not the process for making the compound, was the basis for patentability. *See supra* Section III.A.1.a.1. When Intercept filed the application for the '673 Patent, the examiner issued a restriction requirement, stating that the "process of making" obeticholic acid and the "product made" are "distinct" inventions. Ex. D, INT_OCA_0003334–39 (Appx0280-85). In response, Intercept elected to proceed with the claims that in the examiner's words are "drawn to []
**compositions** comprising obeticholic acid." *Id.*; Ex. E, INT_OCA_0003346–53 (Appx0286-93).
Moreover, in the Notice of Allowance for the '673 Patent, the examiner emphasized the novelty of the *composition*, stating that "highly pure obeticholic acid comprising less than 1% chenodeoxycholic acid ('CDCA') <u>could not be</u> successfully prepare[d]" in view of the prior art.
Ex. I, INT_OCA_0006779 (Appx0329); *see also* Ex. F, INT_OCA_0006647 (Appx0307) (non-

final rejection noting that the issue is "whether the purity of the product is non-obvious over the prior art"). Intercept received a patent on compositions comprising obeticholic acid, not the process for preparing it.

The prosecution history does not show any disavowal of compositions with the claimed purity profile made through alternate processes and, to the contrary, demonstrates the claimed compositions are not limited by the disclosed processes. Although Apotex argues that Intercept's proposed construction would "expand the scope of the claim in view of the clear process limitation repeatedly emphasized by Intercept during prosecution," Apotex does not cite a single statement in the prosecution history to support this characterization. *See supra* Section III.A.1.b.1.b. Nor does Apotex provide any evidentiary support for its argument that the patentee made "clear and unambiguous statements" about the "criticality of the process in making Form 1." *Id.* This is not surprising because Intercept did not emphasize a process limitation during prosecution. Instead, Intercept's arguments focused on physical properties of the *composition*—the claimed purity profiles. *See supra* Section III.A.1.a.1. The examiner understood this and emphasized that a composition *with the claimed purity profile* was not in the prior art, and therefore, the characteristics of the composition itself were the critical component in demonstrating that the invention was patentable. Ex. I, INT_OCA_0006774–80 (Appx0324-30).

### (4) Intercept's construction would not render the claims invalid for lack of enablement or written description.

Apotex must prove lack of enablement and written description by clear and convincing evidence. A patentee need not describe every possible method of making a composition to enable a composition claim; the specification need only disclose at least one method for making it. *Takeda Pharm. Co. v. Zydus Pharms.*, 743 F.3d 1359, 1369 (Fed. Cir. 2014). Similarly, "inventors need not describe every conceivable embodiment of their invention" to satisfy the written description

requirement. *Asahi Glass Co. v. Guardian Indus. Corp.*, 813 F. Supp. 2d 602, 617 (D. Del. 2011). The specification here satisfies both standards; Apotex has not met its heavy burden to the contrary.

### d)    Defendants' Sur-Reply Position

Intercept told the Patent Office and the public that the synthetic intermediate step is "critical" to obtaining Form 1. *E.g.*, '673 patent at 29:34 (Appx 0066). To distract from this clear disavowal, Intercept misstates Apotex's position, the asserted patents, and the case law. But none of Intercept's arguments alter the clear limitation on Form 1 obeticholic acid as set forth by the patents and Intercept during prosecution. Ultimately, Intercept's attempt to limit "obeticholic acid Form 1" to nothing more than non-crystalline obeticholic acid would impermissibly strip the term of its context as used in the asserted patent claims and should be denied.

### (1)    The Intrinsic Evidence Shows Clear Intent To Limit The Scope Of The Term

Intercept myopically focuses on an "express definition" while ignoring the full scope of the intrinsic evidence. *See supra* at III.A.1.c.2. But Apotex's proposed construction is consistent with Intercept's alleged "express definition" of "non-crystalline obeticholic acid." In fact, Apotex's proposed construction <u>includes</u> this language and clarifies it based on the Applicant's own words to the Patent Office and the public. Apotex does not "add" anything new because the specification's reliance on the crystalline intermediate step "itself injects a [manufacturing] process as a limitation in the asserted claims." *See Medicines Co.*, 853 F.3d at 1304.

Moreover, the so-called "express definition" cannot be read at the exclusion of the remainder of the patent and prosecution history. In *Chiesi*, the court construed "high purity cangrelor" based on the intrinsic evidence to be limited by a three-step process for manufacture that was, like the present "Form 1" patents, described in the specification as critical but not listed in the claims. *Chiesi*, 2021 WL 4843806, at *7, *14. Contrary to Intercept's allegation, *supra* at

23 n.5, the patent specification in *Chiesi* did include what Intercept would call an "express definition" of the disputed term "high purity cangrelor": "High purity cangrelor is cangrelor having a combined total of selected hydrolysis and oxidation degradants of cangrelor not exceeding about 1.5% by weight of the high purity cangrelor." *See, e.g.*, '575 patent at 2:45-48, 3:22-25, 4:27-30, 6:49-52, 8:55-58, 9:7-10. Like the *Chiesi* court, this Court should clarify the "express definition" and import the critical process limitation. *Chiesi*, 2021 WL 4843806, at *7; *see also Trading Techs Intern., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353 (Fed. Cir. 2010) (upholding construction that "may seem narrower than the inventors' express definition" based on remaining intrinsic evidence).

Intercept argues that the claims do not restrict "obeticholic acid Form 1" to a particular process, but acknowledges that process limitations are read into product claims where the patentee has either clearly and unmistakably disavowed claim scope or otherwise demonstrated a clear intent to limit the claims. *Supra* at 18-20. That is precisely the situation here, where the summary of the invention and every embodiment requires obeticholic acid Form 1 to be made by a synthetic intermediate, and the patent applicants expressly disparaged prior art processes for making obeticholic acid. *Supra* at III.A.1.b.1.a. Ultimately, whether this Court construes the product claim to require a process step in view of the clear intent of the patentee or this Court finds that express disclaimer/disavowal occurred, the effect is the same: the manufacturing process limits the scope of Form 1. *See Medicines Co.*, 853 F.3d at 1305. And while Intercept claims the specification describes processes that do not require the crystalline intermediate step, that is incorrect. *Supra* at III.A.1.c.2. The entire process "is a 6-step synthesis followed by one purification step," where it is the 6th step that results in crystalline obeticholic acid and the 7th step that performs the requisite process step of achieving Form 1 from the crystalline obeticholic acid. '673 patent at 9:61-10:12

29

(Appx0056). Intercept points only to portions of the specification that describe steps 1-5, which occur <u>before</u> the requisite crystalline intermediate step and thus cannot suggest any alternative. *Supra* at III.A.1.c.2.

Intercept's identification of Example 5 as showing various characteristics of obeticholic acid Form I, *supra* at III.A.1.c.2, supports Apotex's view: the phrase "non-crystalline obeticholic acid" itself cannot define the full scope of the form to a POSA. Intercept cannot rely on detailed data of physical characteristic testing to define Form 1, which included XPRD, NMR, FT-IR, DSC, TGA, and KF measurement data, *see* '673 patent at 63:20-28 (Appx 0083), while simultaneously arguing that Form 1 can be simply described as a "non-crystalline obeticholic acid."

### (2)  The Compositions and Process are Necessarily Intertwined Here

Intercept's argument that the compositions and processes disclosed in the patents are separate inventions has no basis in the context of the intrinsic evidence and the case law. Intercept argues that the use of the word "composition" somehow removes process from the claims. *Supra* at III.A.1.c.1. But Intercept obtained its claims by differentiating its substantially pure Form 1 obeticholic acid from the prior art, and the specification only discusses the purity of the obeticholic acid <u>compound</u>. *See* '673 patent at 31:60-61 ("Purity is based on the "organic" purity **of the compound**.") (emphasis added) (Appx0067). And the patent states use of crystalline obeticholic acid as the penultimate step is "critical" to obtaining the requisite <u>purity</u> of Form 1, '673 patent at 29:31-36. Again, *Chiesi* is instructive: the patent there stated the method of manufacture was "critical" to the high purity compound, and the court held the patentee to its language of requirement. *Chiesi*, 2021 WL 4843806, at *7. Here too, the critical purity feature of the compound is directly tied to the process for making it, and is therefore tied to "Form 1."

Additionally, Intercept's cite to *Vectura* is not persuasive here because the limitation in *Vectura* was simply a "preferred" embodiment and here, the patent specification clearly states the process is "**critical**." '673 patent at 29:24-36 (emphasis added) (Appx0066); *see also supra* at III.A.1.b.1.a.

**(3)**     **Intercept's proposed construction would render the claims invalid for lack of enablement and written description**

Intercept alleges that its disparagement of prior art processes does not exclude other processes for producing non-crystalline obeticholic acid having the claimed purity profiles. *Supra* at III.A.1.c.2.b. But Intercept never identifies any suitable processes that existed and were not excluded, and the intrinsic evidence shows none. The crystalline intermediate process is the <u>only</u> way disclosed by the patents to achieve Form 1, and the specification characterizes the process as "**critical**." If Intercept's allegation that other processes exist and are covered by the asserted claims is correct, then such processes are not disclosed or even referenced by the patent and the claims are invalid for lack of enablement and written description. *See supra* at III.A.1.b.1.c.

**2.**     **"substantially pure solid form of obeticholic acid"**

| Claim(s) | Plaintiff's Proposed Construction | Apotex's Proposed Construction | DRL/MSN/Amneal/ Lupin/Optimus Proposed Construction |
|---|---|---|---|
| '117 patent claim 1 | Obeticholic acid that has a potency of greater than about 95%, taking into account impurities, including solvents and water | Non-crystalline obeticholic acid made using a process in which crystalline obeticholic acid is produced as a synthetic intermediate in the penultimate step of synthesis | No construction necessary |

**a)**     **Intercept's Opening Position**

"Substantially pure solid form of obeticholic acid," which appears in claim 1 of the '117 Patent, should be construed as "obeticholic acid that has a potency of greater than about 95%,

31

taking into account impurities, including solvents and water."  Again, the primary dispute appears to be whether "substantially pure" obeticholic acid should be given its clear definition from the specification or should be narrowed to obeticholic acid produced by a specific process.  The term should not be so limited.

### (1)    The intrinsic evidence defines a "substantially pure solid form of obeticholic acid."

A POSA would understand from the intrinsic record that "substantially pure solid form of obeticholic acid" refers to "obeticholic acid that has a potency of greater than about 95%, taking into account impurities, including solvents and water."  Representative claim 1 covers a method of treating an FXR-mediated disease by administering a pharmaceutical formulation comprising an effective amount of "substantially pure solid form of obeticholic acid," wherein the solid form of obeticholic acid "comprises less than 1% of chenodeoxycholic acid."  Ex. B, '117 Patent, claim 1 (Appx0184).  The claims do not mention, much less require, that obeticholic acid be made "using a process in which crystalline obeticholic acid is produced as a synthetic intermediate in the penultimate step of synthesis."

The specification expressly defines the term "substantially pure solid form of obeticholic acid": "As used herein, the term 'substantially pure obeticholic acid' refers to obeticholic acid that has a potency of greater than about 95%."  Ex. B, '117 Patent, 40:40–42 (Appx0163).  "[P]otency of the obeticholic acid," the specification explains, "takes into account impurities including e.g., water, solvents, and other organic and inorganic impurities that are in a sample of obeticholic acid."  Id. at 40:43–45.  The definition then describes methods of measuring potency and potential impurities in substantially pure obeticholic acid, but contains no limitation for the process of making substantially pure obeticholic acid.  Id. at 40:45–60.  Where, as here, the patentee has defined the term in the specification, that definition is dispositive.  Braintree, 749 F.3d at 1356.

That definition is consistent with the plain meaning of "substantially pure" obeticholic acid, and no other portion of the specification contradicts this clear definition or otherwise limits "substantially pure" obeticholic acid to obeticholic acid produced through a certain process. To the contrary, the specification specifically links "substantially pure obeticholic acid" with the purity obtained, rather than with the process used to make the composition. A section of the specification entitled "Substantially Pure Obeticholic Acid" provides embodiments of highly pure obeticholic acid based on different levels of impurities, and not a single embodiment in this section is limited based on the method of producing the compound that Apotex puts forward. Ex. B, '117 Patent, 31:40–34:31 (Appx0159-60). Indeed, the fact that all Defendants except Apotex take the position that no construction is necessary for this term reinforces that the specification clearly defines the term.

Furthermore, the prosecution history confirms what is already clear from the specification—"substantially pure solid form of obeticholic acid" is a composition, not a composition that must be made by a specific process. Indeed, the prosecution history shows that the applicants distinguished the claimed composition from the prior art based on the purity of the composition, not the process used to manufacture it. *See* Ex. G, INT_OCA_0006711 (Appx0315) ("[T]he instant claims are directed to obeticholic acid and a pharmaceutical composition thereof, wherein the obeticholic acid comprises less than 1% CDCA."), INT_OCA_0006714 (Appx0318), INT_OCA_0006713 (Appx0317), Ex. H, INT_OCA_0006719 (Appx0323) (stating that prior art "could not produce obeticholic acid that comprises less than 1% of CDCA"); Ex. I, INT_OCA_0006779 (Appx0329) (noting that the prior art does not disclose "a form of obeticholic acid that comprises less than 1% chenodeoxycholic acid"). The prosecution history confirms what is clear from the specification: "substantially pure solid form of obeticholic acid" refers to

obeticholic acid with a potency of greater than 95%, taking into account impurities, including water and solvents.

> **(2)      Apotex's proposed construction attempts to rewrite the claims and ignores the patentee's definition.**

Apotex's proposed construction lacks merit.  Neither the claims nor the specification limit a "substantially pure solid form of obeticholic acid" to that made by a process in which crystalline obeticholic acid is produced as a synthetic intermediate in the penultimate step of synthesis.  As discussed above, *see supra* III.A.2.a.1, Federal Circuit precedent is clear that claims should not be limited to a specific embodiment where the specification is clear that the disclosed embodiment is merely one possible embodiment of the claimed invention, *see Phillips*, 415 F.3d at 1323; *Akamai Techs*, 805 F.3d at 1375–76, nor should process limitations be read into product claims, *see Cordis*, 339 F.3d at 1357; *Vanguard Prods.*, 234 F.3d at 1372; *Vectura*, 2018 WL 4700222, at *3.

Just as with "obeticholic acid Form 1," Apotex's proposed construction of a "substantially pure solid form of obeticholic acid" disregards this basic rule of claim construction and improperly seeks to limit the term to one embodiment.  Although the specification describes preparing highly pure obeticholic acid through a process that produces crystalline obeticholic acid as a synthetic intermediate, nowhere does the specification limit "substantially pure" obeticholic acid used in the treatment of patients to obeticholic acid produced through this process.  Instead, the disclosed process is merely one example of a method for making the claimed highly pure compound.

The specification is clear that the inventions described in the specification include highly pure obeticholic acid itself, administration of highly pure obeticholic acid to patients, and processes for preparing highly pure obeticholic acid.  *See* Ex. B, '117 Patent, 1:14–34 (Appx0144) ("The present invention relates to obeticholic acid, an agonist for FXR, processes of preparation for obeticholic acid, pharmaceutical formulations comprising obeticholic acid, *and* the therapeutic

use of the same." (emphasis added)); *id.* at 6:10–38 (Appx0146).  Accordingly, as with the term "obeticholic acid Form 1," discussions in the specification about processes for synthesizing obeticholic acid cannot be used to limit "substantially pure solid form of obeticholic acid."  *See supra* Section III.A.1.a.2.

Moreover, as with "obeticholic acid Form 1" the prosecution history does not support Apotex's position, let alone rise to the level of clear disavowal that would be required to limit "substantially pure solid form of obeticholic acid" to a specific process.  *See supra* III.A.1.a.2.

    **b)**  **Defendants' Answering Position**

      **(1)**  **As With The "Form 1" Construction, Apotex's Proposed Construction Is Consistent With Intercept's Descriptions Of Its Purported Invention**

For largely the same reasons discussed above with respect to "obeticholic acid Form 1," the term "substantially pure solid form of obeticholic acid" should also be construed as "non-crystalline obeticholic acid made using a process in which crystalline obeticholic acid is produced as a synthetic intermediate in the penultimate step of synthesis."

        **(a)**  **The intrinsic evidence compels a construction where substantially pure solid form of obeticholic acid is made through the critical process**

As discussed above in Section II.A.1.a, the intrinsic evidence shows that the applicants intended to limit the alleged invention to products created by the process that it repeatedly emphasized in the specifications and during prosecution. The specification additionally states that Form 1 obeticholic acid is "substantially pure," and notes that "obeticholic acid made by the process of the present application is substantially more pure than obeticholic acid produced by processes in the prior art, including the '390 [patent] process and the '977 [application] process." '673 patent at 27:41-46 (Appx0065).   For good measure, Intercept again emphasized the

importance of the process in making a substantially pure product that is an improvement over the prior art:

> The process of the present application *utilizes a crystalline intermediate in the preparation of obeticholic acid Form 1*, which unexpectedly led to significant improvements in the overall preparation and purity of the final product. Specifically, Step 6 of the synthesis produces a novel crystalline form of obeticholic acid. *The production of this crystalline form leads to substantially pure obeticholic acid Form 1*.

'673 patent at 20:50-56 (emphasis added) (Appx0061).

The specification further discusses "the importance of producing crystalline obeticholic acid as an intermediate in the penultimate step of the process of the present application" to achieve the target purity. *Id*. at 29:24-27 (Appx0066).  In fact, Intercept stated that use of the crystalline intermediate "in the process of the present application *is indeed critical* to the preparation of substantially pure obeticholic acid."  *Id*. at 29:31-36 (emphasis added) (Appx0066).

Once again, Intercept should be held to their words in construing its patent claims, and should not be permitted to expand the scope of its claims during claim construction.  Intercept emphasized the criticality of the process used to make a substantially pure solid obeticholic acid, showing that the process is "not merely a preferred embodiment, but is a critical element in the process that produces those properties." *Andersen*, 474 F.3d at 1367.  The construction of the term "substantially pure solid form of obeticholic acid" therefore should include the critical step of converting a crystalline intermediate into non-crystalline obeticholic acid.

### (b)   Intercept's proposed construction is inconsistent with the intrinsic and extrinsic evidence

A POSA would understand, just as Intercept clearly understood during patenting of the '673 Patent Family claims, that this term is limited by its process of manufacture. Intercept argues that the specification expressly defines the term in dispute, but it is incorrect. *See Supra* at

III.A.2.a.1. Specifically, Intercept points to the use of the phrase "substantially pure obeticholic acid" within the specification, *id.*, but the specification does not expressly define "substantially pure **solid form of** obeticholic acid" as the term is used in claim 1 of the '117 patent. Moreover, as explained above, Intercept's proposed construction would ignore the clear disavowals made by applicants within the patent and during prosecution.

> **(c)** **Intercept's proposed construction would render the patent claims invalid for lack of enablement and written description**

Additionally, just like with the Form 1 claim terms, if Intercept's proposed construction is accepted, claim 1 of the '117 patent necessarily will be invalid for lack of enablement and written description. As explained above, the patent specification and prosecution history make clear that the applicants did not contemplate or teach any alternative methods of preparing a substantially pure solid form of obeticholic acid other than the process identified by Apotex. In other words, if this Court finds that the term substantially pure solid form of obeticholic acid includes products created by a process other than the intermediate crystalline step, then the patent does not teach, nor does it demonstrate that the applicants had possession of, the full scope of the patent claims.

> **c)** **Plaintiffs' Reply Position**

Once again, Intercept's proposed construction tracks the lexicographic definition provided by the patentee in the specification. And once again, Apotex seeks to brush aside this definition by importing a process limitation into the term—the same process limitation it seeks to import into "obeticholic acid Form 1." But the process limitation Apotex identifies relates to the improved process, not the composition itself, and nothing in the intrinsic record contradicts the express definition in the specification, much less rises to a clear and unmistakable disavowal. Apotex cites

no case (nor is Intercept aware of one) where an express definition of a claim term in a composition claim was disregarded in favor of reading in a process limitation.

 "Substantially pure obeticholic acid" is expressly defined without reference to any particular process: "As used herein, the term 'substantially pure obeticholic acid' refers to "obeticholic acid that has a potency of greater than about 95%. The potency of the obeticholic acid takes into account impurities including e.g., water, solvents, and other organic and inorganic impurities . . . ." Ex. B, '117 Patent, 40:40–45 (Appx0163). Nothing in the specification or prosecution history contradicts this clear definition. As with "obeticholic acid Form 1," this definition in the specification is dispositive. *Braintree*, 749 F.3d at 1356; *Phillips*, 415 F.3d at 1316.

Apotex counters that this lexicographic definition does not control because the claims recite a "substantially pure *solid form of* obeticholic acid." *See supra* Section III.A.2.b.1.b. Apotex does not expand on this argument or explain why adding a requirement that the substantially pure obeticholic acid be in solid form somehow renders the patentee's express definition inapplicable. Indeed, neither statement in the specification that Apotex relies on refers to a "substantially pure *solid form* of obeticholic acid." *See supra* Section III.A.2.b.1.a (citing '673 Patent, 29:31–36 (referring to "substantially pure obeticholic acid")); *id.* (citing '673 Patent, 20:50–56 (referring to "obeticholic acid Form 1")).

Similar to "obeticholic acid Form 1," the specification does not contain "language of requirement" that substantially pure obeticholic acid must be produced through any particular process. Indeed, a section of the specification entitled "Substantially Pure Obeticholic Acid" provides embodiments of highly pure obeticholic acid with different levels of impurities, reinforcing that the term refers to a composition, not a process. Ex. B, '117 Patent, 31:40–34:31

(Appx0159); *supra* Section III.A.2.a.1. Instead, the statements that Apotex cites discuss the improved *processes* for preparing substantially pure obeticholic acid. *See supra* Section III.A.2.b.1.a. Statements concerning these processes cannot demonstrate clear intent to limit a composition that is discussed extensively in the specification, particularly where the patentee demonstrated a clear intent to define "substantially pure obeticholic acid." *See supra* Section III.A.2.a.2; *supra* Section A.1.c.2.b. The facts here are very different from those in *Andersen*, where the specification stated that process steps were "required" and the prosecution history reflected a clear disavowal of other processes for making a product. 474 F.3d at 1367.

Nor does the prosecution history contain any disavowal of alternate processes for preparing substantially pure obeticholic acid. While Apotex asserts that it does, it cites no statements in the prosecution history in support. *See See supra* Section III.A.2.b.1.c. Not surprisingly, the prosecution history reveals that Intercept distinguished prior art based on the purity profile of obeticholic acid, not on the process for preparing substantially pure obeticholic acid. *supra* Section III.A.2.a.1. Moreover, Intercept filed the application that led to the '117 Patent for claims directed to a method of treatment after the examiner issued a restriction requirement during prosecution of the '673 Patent that categorized a "method of preparing" obeticholic acid and a "method of treating or preventing" a FXR mediated disease as separate inventions. Ex. D, INT_OCA_0003334 (Appx0280).[6]

### d) Defendants' Sur-Reply Position

Intercept's position here is even weaker than that for "obeticholic acid Form 1." Intercept gives no justification for ignoring the essential process limitation that it deemed "critical" in the

---

[6] Intercept's proposed construction would not render the claims invalid for lack of enablement or written description for the same reasons discussed above. *See supra* Section III.A.1.c.4.

patent specification. Intercept's entire argument for its "substantially pure solid form of obeticholic acid" proposed construction relies on the premise that there is some fundamental distinction between the product and the process by which it is made, but no such distinction exists here, where Intercept relied on the process of manufacture to define the claimed product.

Contrary to Intercept's allegation, there is no express definition of the claimed phrase "substantially pure solid form of obeticholic acid" **<u>at all</u>**. Intercept argues that use of "substantially pure obeticholic acid" in the specification has the same meaning as the disputed claim term, and attempts to shift the burden to Apotex to explain why this term is different from one that omits the phrase "solid form." *Supra* at III.A.2.a.1. But under Plaintiffs' own logic, if the two terms are the same despite the different language, then the criticality of the manufacturing process must also be the same. In any event, as seen above, even when a patent uses "express definition" language claims can be construed to include process limitations when the intrinsic evidence shows the process is critical to obtaining the claimed product. *See, e.g.*, *Chiesi*, 2021 WL 4843806, at *7; *Trading Techs*, 595 F.3d at 1353.

To challenge its admitted criticality of the synthetic intermediate step, Intercept relies on other areas of the patent that describe processes for preparing the product at different purity levels. *Supra* at III.A.2.a.1. But, as written by Intercept, the patent read as a whole discloses that the only way (*i.e.*, the "critical" way) to obtain the claimed impurity profile is through the synthetic intermediate step. Intercept suggests that its use of "critical" is different from the use of "required" in *Andersen*, but there is no meaningful distinction: both terms reflect necessity to achieve the claimed product. *See Pacing Techs.*, 778 F.3d at 1025 (recognizing use of the phrase "very important feature" has limited product claims to a process).

40

Intercept next argues that "the prosecution history reveals that Intercept distinguished prior art based on the purity profile of obeticholic acid, not on the process for preparing substantially pure obeticholic acid." *Supra* at III.A.2.a.2. But these issues are one and the same. The specification unambiguously states that the crystalline intermediate "in the process of the present application *is indeed critical* to the preparation of substantially pure obeticholic acid." *Id*. at 29:31-36 (emphasis added) (Appx0066). In other words, the substantially pure obeticholic acid could only be made using the crystalline intermediate step, exactly as Apotex has proposed in its construction.

Intercept's footnote response to the lack of enablement or written description is similarly unpersuasive, pointing to no disclosure or instruction in the patent to teach a POSA how to obtain "substantially pure solid form of obeticholic acid" without the "critical" crystalline intermediate step.

### 3.      "crude OCA"

| Claim(s) | Plaintiff's Proposed Construction | Defendants' Proposed Construction[7] |
|---|---|---|
| '073 patent claim 1 | No construction necessary. To the extent the Court decides a construction is required, the term should be construed consistent with its plain and ordinary meaning, which is "OCA that needs additional purification to be pharmaceutically acceptable" | "a solid chemical substance comprising the chemical compound obeticholic acid as the free acid having the following chemical structure:  crude obeticholic acid " |

#### a)      Intercept's Opening Position

The term "crude OCA" (i.e., crude obeticholic acid) does not need to be construed.  To the extent the Court determines that construction is necessary, the term should be construed consistent with its plain and ordinary meaning, which is "OCA that needs additional purification to be pharmaceutically acceptable."  Defendants argue that "crude OCA" should be more limited. Specifically, Defendants argue that "crude OCA" refers to "a solid chemical substance comprising the chemical compound obeticholic acid as the free acid having the following chemical structure: [compound]."  MSN, Amneal, and DRL argue that "crude OCA" should be given its plain and ordinary meaning and left for trial.

---

[7] DRL, MSN, and Amneal are of the position that this term should be given its plain and ordinary meaning and be left for trial, but in the event that claim construction goes forward, DRL, MSN, and Amneal agree with the construction proposed by the other Defendants, which is the plain and ordinary meaning of this term.

### (1)    Intercept's proposed construction is the plain and ordinary meaning of the claim language.

The claims of the '073 Patent, as distinguished from the '673 and '117 Patents, are generally directed to purified, non-crystalline obeticholic acid that is prepared through a process that involves crystallizing "crude OCA." Ex. C, '073 Patent, claim 1 (Appx0275). The term "crude OCA" does not need to be construed because a POSA would have understood its meaning as of the priority date in June 2012. Ex. K, Myerson Decl. ¶¶ 20, 30–31 (Appx0352, Appx0355-56). To the extent the term is construed, however, a POSA would have understood that the plain and ordinary meaning of "crude OCA" is "OCA that needs additional purification to be pharmaceutically acceptable." *Id.* ¶ 20, 32–33(Appx0352, Appx0355-56). As Dr. Myerson explains, "crude" is well understood in the pharmaceutical industry to mean "unrefined." *Id.* ¶ 31 (Appx0355). Medical dictionaries confirm this well-understood meaning. *See* Ex. K, Myerson Decl., Ex. 4, *Dorland's Medical Dictionary* at 443 (31st ed. 2007) (Appx0519) (defining "crude" as "raw or unrefined"); Ex. K.5, Myerson Declaration, Ex. 5, *Taber's Cyclopedic Medical Dictionary* at 582 (22d ed. 2013) (Appx0523) (defining "crude" as "[r]aw, unrefined, or in a natural state"). Accordingly, a POSA would have understood that "crude OCA" refers to unrefined obeticholic acid that needs to be further purified in order to be incorporated into a pharmaceutical formulation. Ex. K, Myerson Decl. ¶ 32 (Appx0356). Indeed, at least one Defendant, DRL, provided a nearly identical definition for "Crude" obeticholic acid in one of its patents. *See* Ex. K.6, Myerson Decl., Ex. 6, U.S. Patent No. 10,875,887, 25:51–52 (Appx0541) (defining "Crude" as "material [that] is not pure enough to be used as [a] drug").

The use of "crude OCA" throughout the specification is consistent with this plain and ordinary meaning. In each instance where the term "crude OCA" is used, it refers to a product that requires further processing in order to be acceptable for pharmaceutical use. *See* Ex. C, '073

Patent, 23:1–26:16 (Appx0247-48) (indicating further purification was necessary); *id.* at 54:21–44 (Appx0262) (discussing crude OCA in the context of purification); *see also* Ex. K, Myerson Decl. ¶ 39 (Appx0357-58).

        **(2)    Defendants' proposed construction is counter to the plain and ordinary meaning and imports limitations that are absent from the intrinsic record.**

Contrary to Defendants' proposed construction, a POSA would not understand the term "crude OCA" to require that the obeticholic acid be "a solid chemical substance comprising the chemical compound obeticholic acid as the free acid having the following chemical structure: [compound]." As an initial matter, a POSA would not understand "crude OCA" to be limited to a "solid chemical substance" comprising obeticholic acid. *See* Ex. K, Myerson Decl. ¶¶ 22, 38–41 (Appx0353, Appx0357-60). Such a limitation would exclude crude OCA in other states, such as solutions or oils.

Moreover, the specification contains no statements limiting the term in this way. In fact, a prior art reference that is discussed in the patent specification—"the '977 Publication"—uses "crude" to refer to a product that is in solution. The '977 Publication describes a synthetic process in which "[c]rystallization of the crude product is obtained by cooling *the organic solution*." Ex. K, Myerson Decl., Ex. 7, '977 Publication, 15:24 (Appx0563) (emphasis added). This is consistent with a POSA's understanding of the term "crude," i.e., that it encompasses products in other forms, such as solutions. Ex. K, Myerson Decl. ¶ 36 (Appx0357).

Defendants' own patents and patent applications reinforce that the plain and ordinary meaning of "crude" does not require a compound to be in a solid state. At least Apotex, Lupin, DRL, MSN, and Amneal have obtained patents showing that, in the pharmaceutical industry, a crude chemical substance may be a solid, oil, or in solution. Ex. K, Myerson Decl. ¶ 40 (Appx0358-59) (compiling patents). For example, Apotex filed a patent application in 2010—

before the priority date in this case—that described a "*solution* of this *crude* compound." Ex. K, Myerson Decl., Ex. 9, U.S. Patent No. 9,382,272, 46:12–15 (Appx0649) (emphases added).

### b) Defendants' Answering Position

The central issue of the dispute centers on whether "crude OCA" should be construed as it is explicitly shown in the specification: as a free acid having the chemical structure depicted in the table above. "[T]he inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1316. Plaintiffs' declaration and reference to other extrinsic evidence to argue that crude OCA "needs additional purification" is nothing more than an attempt to divert the Court's attention from the true question at hand: when the claim recites "crude OCA", is it referring to the chemical structure depicted expressly as "crude obeticholic acid" in the specification or, as Plaintiffs' proposed construction leaves open, can it be something else? The Court need not engage in whether crude OCA requires "additional purification", only that crude OCA has the structural definition provided by the patentees in the specification.

Claim construction has long been governed by the principle that "the specification necessarily informs the proper construction of the claims." *Id.* (citations omitted). The specification "is the single best guide to the meaning of a disputed term." *Id.* at 1315. Here, rather than parse through the less relevant extrinsic evidence provided by Plaintiffs, the Court need look no further than the '073 specification to determine the meaning of crude OCA. "Crude obeticholic acid" appears twice in the specification, where it is unambiguously depicted having the following structure (as Defendants propose in their construction):

| | |
|---|---|
| <br>crude obeticholic acid<br>step 9<br>purification | Col. 24, step 9 (Appx0247). |
| <br>crude obeticholic acid | Col. 26, ll. 1-16 (Appx0248). |

These clear references indicate that the inventors intended "crude obeticholic acid" (or more simply "crude OCA") to be the chemical structure depicted at col. 24, Step 9, and col. 26 ll. 1-16 (Appx0247, 48). *Phillips*, 415 F.3d at 1315. Further, there is no dispute that as shown in the specification, the structure is a free acid of OCA (that is, there is no counterion present or depiction of salt form).

Plaintiffs attempt to obscure the plain meaning of "crude OCA" by contending that it "needs additional purification to be pharmaceutically acceptable". However, when it comes to defining the chemical structure of "crude OCA"—the specific point of contention between the parties—Plaintiffs circularly refer to it as "OCA", leaving it unclear whether it is the chemical depicted as "crude OCA" in the specification, or whether Plaintiffs are taking the position that "crude OCA" can also be something else. Even if Plaintiffs believe that additional purification were required for "crude OCA", that construction says nothing about the structure of crude OCA.

46

Neglecting to address the fact that the specification clearly depicts "crude OCA" as the free acid is fatal to Plaintiffs' argument, regardless of whether crude OCA requires additional purification. The claim construction inquiry should end there.

Plaintiffs cannot rely on what they call the "plain and ordinary meaning" in a vacuum without giving due consideration to the intrinsic evidence, such as here, the specification. *See, e.g., Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1362 (Fed. Cir. 2005) ("Norian's arguments distill to the basic contention that a person of skill in the art would understand that any 'sodium phosphate solution' will contain sodium ions and phosphate ions, no matter whether it is made from one type or multiple types of sodium phosphate. While that may be so, it does not change the clear effect of the prosecution history, *the specification*, and the claim language.") (emphasis added) (internal citations omitted). By relying on extrinsic evidence without addressing that the specification depicts crude OCA as the free acid, Plaintiffs are simply not giving the specification the weight required by the Federal Circuit.

Defendants' proposed construction is the only construction that properly addresses the structure of crude OCA—namely, crude OCA is defined in the specification by its structure as the free acid. Neither Plaintiffs nor Dr. Myerson address this issue. As such, Plaintiffs' arguments should be disregarded, *see Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005), and the Court should adopt Defendants' proposed construction for crude OCA.

### c) Plaintiffs' Reply Position

It is axiomatic that claim terms are given their plain and ordinary meaning absent lexicography, disclaimer, or disavowal. The plain and ordinary meaning of "crude OCA" to the

POSA[8] is "OCA that needs additional purification to be pharmaceutically acceptable." *See* Ex. K, Myerson Decl. ¶¶ 20, 30–33 (Appx0352, Appx0355-56) (noting that DRL endorsed similar definition for "crude" in its own patent relating to obeticholic acid). Defendants do not dispute the plain meaning of the term. Nor is there an express definition in the specification, disclaimer, or disavowal. The inquiry should end there.

Instead, Defendants attempt to rewrite the claim term by importing additional limitations. Defendants' construction requires a "solid chemical substance," but there is no support for such a limitation in the plain meaning (*see* Ex. K, Myerson Decl. ¶¶ 20, 30 (Appx0352, Appx0355)) or the intrinsic evidence (as Defendants appear to concede by their lack of citations). In fact, Defendants have not explained why "crude OCA" could not be, for example, in solution. *See id.* ¶¶ 34–36 (Appx0356-57).

Moreover, "OCA" refers to ***all forms*** of the compound with the below chemical structure:



This is both the plain and ordinary meaning of "OCA" and the definition in the specification. *See* Ex. C, '073 Patent, 38:66–39:21 (Appx0254-55) (noting "OCA" refers to "all forms of obeticholic acid"). "Forms" includes, for example, "non-crystalline," "crystalline," and "substantially pure," Ex. C, '073 Patent 39:20–21 (Appx0255), and "neutral" and "ionized" forms, *id.* at 68:58

---

[8] Intercept disagrees with Defendants' definitions of a POSA for both patent families, *see supra* Section I.B.2, but even under Defendants' definitions, Intercept's proposed constructions are correct.

(Appx0269). It is unclear whether Defendants dispute both the plain meaning and the definition of "OCA" in the specification. To the extent Defendants are seeking to import additional limitations into the claim, those attempts should be rejected.

Finally, to the extent Defendants are arguing that "crude OCA" is defined in the specification, *see supra* Section III.A.3.b, they are incorrect. Defendants' construction appears nowhere in the specification. The depictions of "crude OCA" that Defendants cite appear in a discussion of prior art, from which it is clear that "crude OCA" may be in solution. *See supra* Section III.A.3.a.2.

### d) Defendants' Sur-Reply Position

There is no dispute that "crude OCA" must have the chemical structure below:



*See supra* at III.A.3.c (citing '073 patent at 39:66-39:21 (Appx0254-55)). In their Reply, Plaintiffs argue that "'OCA' refers to all forms of the compound with the [above] chemical structure." *Id.* (emphasis removed). Plaintiffs refer to this definition of "OCA" as both the "plain and ordinary meaning" and "the definition in the specification." *Id.* More importantly, though, Plaintiffs incorporate this definition of OCA into their proposed construction of "crude OCA". *See id.* Indeed, Plaintiffs refer to "crude OCA" as having the plain and ordinary meaning, and in the same breath argue that the plain and ordinary meaning of "OCA" must have the above structure. Moreover, Plaintiffs do not suggest or otherwise imply anywhere in their briefing that "crude" modifies what the chemical structure of "OCA" is. In other words, "crude OCA" must be a

compound with the above chemical structure.  Lastly, Plaintiffs do not dispute that this structure

is known as the "free acid" of OCA.  *See supra* at III.A.3.b.

Therefore, the construction of "crude OCA" should at least be "a chemical substance

comprising the chemical compound obeticholic acid as the free acid having the following chemical

structure [*see* structure in Section III.A.3]."

## B.     '337 Patent Family

### 1.     "particles"

| Claims | Plaintiff's Proposed Construction | Apotex's Proposed Construction | DRL/MSN/Amneal/ Lupin/Optimus Proposed Construction |
|---|---|---|---|
| '337 patent claims 1-8, 13, 15; '349 patent claims 1, 19; '549 patent claims 12, 23 | No construction necessary | Obeticholic acid that has been subjected to jet milling | No construction necessary |

### a)     Intercept's Opening Position

The term "particles" in the claims of the '337, '349, and '549 Patents requires no

construction beyond its plain and ordinary meaning.  *See, e.g.*, *Phillips*, 415 F.3d at 1312–13

("[T]he words of a claim are generally given their ordinary and customary meaning." (citation

omitted)).  Other than Apotex, every Defendant agrees that this term requires no construction.

Here, the dispute does not appear to be centered on what the plain meaning of "particles"

is.  Instead, the dispute is whether Apotex should be permitted to limit the claims to particles of

obeticholic acid that have been reduced in size using one specific technique: jet-milling.  This is a

transparent attempt to read a limitation from the specification into the claims.  *See, e.g.*, *Cordis*

*Corp.*, 339 F.3d at 1357 (declining "to superimpose a process limitation on the product claims at

issue" where claim language did not require a particular method of manufacture).   Apotex's

proposed construction violates several well-established canons of claim construction, and for the

reasons set forth below, it should be rejected.

**(1)      The claim language counsels against reading a "jet-milling" limitation into the meaning of "particles."**

Claims 1–8 of the '337 Patent, for example, recite a "composition comprising obeticholic acid . . . wherein obeticholic acid . . . is in the form of particles" with various particle size requirements.  The claim provides all the guidance a POSA needs—the obeticholic acid is in the form of particles within the required particle size.  The claim language certainly contains no requirement that the particles of obeticholic acid "be[] subjected to jet-milling."

Furthermore, Apotex's proposed construction runs afoul of the doctrine of claim differentiation.  *See Phillips*, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.").  The Federal Circuit "has made clear that when a patent claim 'does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.'" *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003) (quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985)).  Doing so would "render additional, or different, language in another independent claim superfluous."  *AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1247 (Fed. Cir. 2007) (citing *Curtiss–Wright Flow Control Corp., v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006)).

Here, some claims of the '337, '349, and '549 Patents claim obeticholic acid "particles," whereas others claim obeticholic acid particles that have been jet-milled.  *Compare, e.g.*, '337 Patent, claim 1 ("A composition comprising obeticholic acid . . . wherein obeticholic acid . . . is in the form of particles . . . ."), *with* Ex. L, '337 Patent, claim 13 (Appx1105) ("A method for preparing a composition comprising obeticholic acid . . . in the form of particles . . . comprising *forming the particles through jet-milling*." (emphasis added)), *and* Ex. M, '349 Patent, claim 1 (Appx1210) ("A tablet comprising obeticholic acid . . . , wherein said obeticholic acid is *in the*

51

*form of jet-milled particles*." (emphasis added)).   Because reading a jet-milling limitation into

"particles" would render the jet-milling limitation in other claims superfluous, Apotex's proposed

claim construction should be rejected.

**(2)      The intrinsic evidence does not limit the scope of "particles."**

The specification demonstrates that the term "particles" is not confined to obeticholic acid

that has been jet-milled.   For example, the specification explains that "[a] first aspect of the

disclosure relates to a composition comprising obeticholic acid . . . in the form of particles, and

wherein at least 50% of the particles have a diameter of less than 200 μm."   Ex. L, '337 Patent,

1:63–2:2 (Appx1043).   It does not limit the invention to particles of obeticholic acid that have been

jet-milled.   Moreover, discussions of obeticholic acid "particles" in the written description

overwhelmingly appear without reference to jet-milling.   *See, e.g.*, *id.* at 3:4–16, 14:32–15:62,

18:46–20:29, 23:27–33 (Appx1044-54).

This is confirmed by the specification's discussion of various techniques to reduce the size

of obeticholic acid particles.   Although several methods for reducing particle size are disclosed,

including high-speed rotating impact mills, carrier mills, and jet-mills, *see id.* at 15:63–16:15

(Appx1050), the inventors made clear that jet-milling was only one embodiment, *see id.* at 16:15–

16 (Appx1050) ("In one embodiment, the particle size of obeticholic acid is reduced using a jet

mill.").

Likewise, the portions of the specification cited by Apotex establish only that jet-milled

particles are one embodiment of the claimed inventions.   *See, e.g.*, *id.* at 3:37–42 (Appx1044)

(explaining that, "[i]n another aspect [of the invention], the disclosure relates to a method for

preparing a composition comprising obeticholic acid, . . . comprising forming the particles through

jet-milling"); *id.* at 26:16–17 (Appx1055) ("In one embodiment, the micronizing is carried out

52

using a jet-mill").  But that is no basis for reading a process limitation from the specification into the claims.  *See Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, No. CV 17-374-LPS, 2018 WL 5077895, at *5–6 (D. Del. Oct. 18, 2018) (rejecting argument that "apaxiban particles have a $D_{90}$" should be limited to a particular method of measuring particle size); *Vectura Ltd.*, 2018 WL 4700222, at *3–4 (rejecting argument that "composite active particle" should be limited to a particular milling process); *Sport Squeeze, Inc. v. Pro-Innovative Concepts, Inc.*, No. 97-CV-115 TW(JFS), 1999 WL 395328, at *4 (S.D. Cal. Apr. 1, 1999) (rejecting argument that "particles" should be limited to particular embodiment in specification that disclosed specific particle size).

The Court should "depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal."  *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014).  "'To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning' and must 'clearly express an intent to redefine the term.'"  *Id.* (quoting *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).  "Disavowal requires that the specification or prosecution history make clear that the invention does not include a particular feature, or is clearly limited to a particular form of the invention," *id.* at 1372 (internal citations and alternations omitted), and the disavowal of claim scope must be "clear and unambiguous," *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1367, 1370 (Fed. Cir. 2012).

Neither applies here.  The portions of the specification cited by Apotex do not contain an express definition of "particles," nor do they demonstrate a clear and unambiguous disavowal of claim scope.  The same holds true for the prosecution history.  Although the applicants stated during prosecution that jet-milling was a preferred process for micronizing the claimed obeticholic acid particles, this does not rise to the level of clear and unambiguous disavowal of claim scope.

For example, in responding to a restriction requirement, the applicants explained that "jet-milling is *a* preferred process for making the claimed product particles" not that it is *the* required process for practicing the claimed invention.  Ex. R, INT OCA_0013089 (Appx1349) (emphasis added).  In making this statement, the applicants contrasted jet-milling with several prior art micronization techniques.  *See id.*  Importantly, the applicants did not denigrate other micronization techniques disclosed in the specification, such as "hammer mills" or "rotating impact mills," Ex. L, '337 Patent, 16:3–7 (Appx1050), which confirms that jet-milling is just one way of obtaining the claimed particles.  Therefore, this statement does not rise to the level of a clear and unambiguous disavowal of claim scope that is sufficient to limit the claims to particles formed via a jet-milling process.  *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1367 (Fed. Cir. 2018) (cautioning against finding prosecution disclaimer where alleged disclaimer is "amenable to multiple reasonable interpretations"); *Vanguard*, 234 F.3d at 1372 ("The method of manufacture, even when cited as advantageous, does not of itself convert product claims into claims limited to a particular process.") *Toshiba*, 681 F.3d at 1370; *Vectura Ltd.*, 2018 WL 4700222, at *4.

### b) Defendants' Answering Position

#### (1) Apotex's Proposed Construction Is Consistent With Intercept's Statements Throughout The Intrinsic Evidence

The term "particle" does not inherently have a plain and ordinary meaning—particles can be of all different sizes, shapes, compositions, and have different properties.  Intercept gave this term a specialized meaning here because Intercept made clear to the public that the claimed "particles" are particles of obeticholic acid that are made by a specific process—jet milling.  Intercept was emphatic in the intrinsic evidence that only obeticholic acid particles made by jet milling resulted in a product that had the necessary properties for the drug to be effective in treating

liver diseases.  In fact, Intercept told the Patent Office that "the claimed product cannot be made by another process" because other processes such as the ball milling referred to in the specification "may not provide the desired particle size and particle size distribution." Ex. O, July 7, 2017 Applicant Remarks, '337 patent prosecution history, at 7 (Appx1324).  This is a clear disavowal of other processes used to create obeticholic acid particles. Far from importing a process limitation into the claims, Apotex's proposed construction holds Intercept to its representations and disparagements that it made in order to obtain its patent claims. Intercept should not be permitted to use claim construction now to expand the scope of its claims beyond the sphere of the Patent Office's grant.

**(a)**     **The intrinsic evidence compels a construction where the claimed "particles" are made by jet milling**

The specification of the formulation patents makes clear that the sole way of achieving the claimed composition is through jet milling, a position that is buttressed by statements made in the prosecution history.  The specification states that the "composition of the present disclosure comprising obeticholic acid…in the form of particles, offers improved dissolution and solubility." Ex. L, '337 patent 16:62-65 (Appx1050); *see also id.* at Abstract, 1:28-32, 14:33-40, 18:46-51, 19:40-45 (Appx1043, Appx1049 Appx1052, Appx1053).  The '337 patent expressly states that these improved properties are a function of obtaining reduced particle size and a proper particle size distribution of the obeticholic acid.  *Id*. at 17:2-6 (Appx1051); *see also id.* at 82:10-14 (Appx1083). For example, the specification states that larger particle size obeticholic acid formulations are associated with greater adverse events. *Id*. at 58:61-63 (Appx1071). In fact, the

specification states that particle size distribution "is considered *a critical process parameter*." *Id.* at 91:44-46 (Appx1089) (emphasis added).

Intercept argues that the specification "disclosed" several methods for reducing particle size, *supra* at III.B.1.a.2., but ignores that these are identified merely as "known" methods of reducing particle size generally. '337 patent at 16:3-15 (Appx1050). When it comes to making the claimed obeticholic acid product, however, every single embodiment and example in the patent identifies only one method—jet milling—that can result in the claimed obeticholic acid particles. *Id.* at 16:15-16(Appx1050); *see also id.* at 3:37-42(Appx1044); 25:63-64(Appx1055); 26:4-5, 16-17, 28-29, 45-46, 59-60 (Appx1055); 27:5-6 (Appx-056); Example 1 at 82:5-84:60 (Appx1083-Appx1084); Example 3 at 89:46-91:60 (Appx1088-Appx1089); Example 4 at 91:61-92:20 (Appx1089). Additionally, the specification equates jet milling to the more general term "micronization" using either the definitional term "i.e." or substituting jet milling for micronization parenthetically. *See id.* at 91:17 (Appx1089) (equating the two with "Jet-milling (i.e., micronization)…"); Tables 4-1 and 4-2 (Appx 1084) (using the heading "Impact of jet-milling (micronization)" as compared to unmicronized particles).

Importantly, the specification shows that other particle size reduction techniques fail to provide obeticholic acid particles having the required characteristics. The patent applicants expressly identified particle size and particle size distribution as "playing a *primary role* in the release rate and dissolution and variability in the blend uniformity and content uniformity of the tablet formulations." *Id.* at 82:10-14 (Appx1083) (emphasis added). The applicants investigated the particle size distribution of unmilled particles and particles that were reduced in size using a technique called "comilling." *Id.* at Table 1 (Appx1083). While both the unmilled and comilled particles were at the desired particle size, there was little difference between the two sets of

particles and the data demonstrated "a more robust milling technique is required to significantly reduce the particle size of the material." *Id*. 82:65-83:3 (Appx103-Appx1084). According to the applicants, jet milling provided "a significant reduction in the [particle size distribution]", and that "the API particle size distribution after jet-milling undergoes a dramatic shift towards much smaller, more uniformly-sized particles within a tighter distribution, while surface area increases approximately 3-fold." *Id*. at 83:28-84:60 (Appx1084). From their investigation that "[j]et-milling (i.e., micronization) resulted in material that had a smaller, more uniform particle size and increased surface area leading to faster drug release from tablets containing jet-milled [obeticholic acid]," *id*. at 91:17-20 (Appx1089), the applicants represented that "the particle size distribution of the active is considered a *critical process parameter*," *id*. at 44-46 (Appx1089)(emphasis added). Comilling, on the other hand, achieved unacceptable "higher variability in content uniformity." *Id*. at 92:15-18 (Appx1089). Thus, the specification shows that the applicant disparaged using methods other than jet milling to achieve the obeticholic acid particles having the critical characteristics.

Intercept's disparagement of other particle-size reduction techniques continued during prosecution of the patents, leading a POSA to understand that jet milling is the only way to obtain the claimed obeticholic acid "particles." During prosecution of the '337 patent, the initial claims were subjected to a restriction requirement for claiming independent and distinct groups of inventions including a product (composition with obeticholic acid of a specific particle size) and a process for making the product (via jet milling). *Compare* Ex. Q, May 10, 2017 Requirement for Restriction, '337 patent prosecution history, at 2-3 (Appx1334-Appx1335) with Ex. P, April 26, 2016 Pending Claims, '337 patent prosecution history, at claims 1-10 and 13 (Appx1328). Specifically, the Examiner found that "[i]n the instant case the product can be made by

another…process such as ball milling, high pressure homogenization or cryogenic spray process." Ex. Q, May 10, 2017 Requirement for Restriction at 3 (Appx1335).   In response, Intercept responded that the "restrictions between product and process for making the product…should be withdrawn." Exhibit O, July 7, 2017 Resps. at 8 (Appx1325).   Intercept argued that "[c]ontrary to the Examiner's allegations, the claimed product cannot be made by another process such as ball milling, high pressure homogenization or cryogenic spray process because these processes may not provide the desired particle size and particle size distribution."   *Id*. at 7 (Appx1324).   Ball milling is one of the "known" particle size reduction techniques mentioned in the patent specification, and according to Intercept, that technique does not work to achieve the claimed obeticholic acid particles.   In light of these arguments, the Examiner withdrew the restriction requirement and the claims issued after applicants addressed unrelated enablement issues. Even if Intercept did not specifically denigrate every possible alternative micronization technique by name, *see supra* at III.B.1.a.2, their statements during prosecution clearly showed that jet-milling was the <u>only</u> intended process.

A POSA reading the intrinsic evidence would understand that not all particle reduction methods will result in the claimed obeticholic acid "particles": the applicants disparaged other known methods for reducing particle size, including methods mentioned in the patent (ball milling and comilling) and methods not mentioned in the patent (high pressure homogenization or cryogenic spray process).   The POSA would also understand from the applicants that only jet milling was "robust" enough to meet the "critical process parameter" of a narrow particle size distribution that the applicants emphasized was needed to provide the improved product characteristics.   Other vague or general statements in the specification cannot undermine the

applicants' clear advocacy of jet milling as the only way to obtain the claimed "particles" and disparagement of other processes in their inability to achieve the same.

> **(b)      Precedent compels a construction where the claimed "particles" are made by jet milling**

Numerous cases demonstrate that the claim term "particles" is properly construed here to include the process limitation that the obeticholic acid particles are made using jet milling.  As stated above, "process steps can be treated as part of a product claim if the patentee has made clear that the process steps are an essential part of the claimed invention," *Anderson*, 474 F.3d at 1375, and numerous cases have incorporated process steps into a claim construction, particularly in cases involving pharmaceutical compositions.  *See e.g.*, *Indivior*, 930 F.3d at 1337-39; *Medicines Co.*, 853 F.3d at 1303-06; *Chiesi*, Case No. 19-15864-MCA-MAH, D.I. 146 at 19; *IYM Techs.*, 2017 WL 4857445, at *1 n.2; *Meds. Co. v. Teva*, 2013 WL 3658020, at *2; *Regents*, 717 F.3d at 937-940; *Biovail*, 433 F. Supp. 2d at 511-516.  The common factor in each case is the patentee clearly expressed the criticality of the process used to obtain the product of the claims.

Here, Intercept not only clearly expressed the criticality of the process, but repeatedly emphasized it both in the specification and during prosecution.  For example, every claim of the formulation patents require that the particles of obeticholic acid are of a certain particle size.  And as seen above, Intercept clearly and definitively stressed that mean particle size alone was not sufficient and that the particle size distribution is critical, which can only be achieved by jet milling.  *See, e.g.*, '337 patent at 82:65-83:3 (Appx1083-Appx0084), 83:28-84:60 (Appx1084), 91:17-46 (Appx1089); Ex. O, July 7, 2017 Resps. at 7 (Appx1324).  Intercept told the public that all other known particle size reduction techniques were unsuccessful in achieving the critical particle size and particle size distribution necessary for obtaining the improved solubility, dissolution, and adverse event profile.  *Id*.  Therefore, whether Intercept disclaimed all other

methods for making obeticholic acid particles or the term "particles" is construed to require jet milling, the end result is the same and obeticholic acid particles of the claims must be made by jet milling.  *See Medicines Co.*, 853 F.3d at 1305 ("Whether we view the patentee as having disclaimed inefficient mixing or construe 'batches' to require efficient mixing,…at bottom, the compounding process must be one that uses efficient mixing.").

The *Andersen* case provides yet another example of how the term "particles" should be construed in this case.  The Federal Circuit in *Andersen* included a process limitation into the construction of "composite composition," despite the fact that "nothing on the face of the asserted claims states that the term…is limited to a mixture that is in pellet or linear extrudate form," because of statements made by the applicant in the intrinsic evidence.  The court held that "[t]he portions of the specification that describe how the physical properties of the claimed composite composition are obtained make clear that the formation of linear extrudates or pellets is not merely a preferred embodiment, but is a critical element in the process that produces those properties." 474 F.3d at 1367.  The same is true here.  As seen above, the specification of the formulation patents state that the obeticholic acid particle size distribution is "critical," and only jet milling achieved the required critical particle size distribution.

The *Andersen* court also relied on the statements the applicant made during prosecution of the patent at issue.  The court noted that the "applicant distinguished two prior art references by relying heavily on the role of palletization in the claimed invention."  *Id*. at 1368.  The court held that the applicants' statements during prosecution "serve to limit the scope of the applicants' claimed subject matter," and applied to all claims.  *Id*. at 1369.  Again here, Intercept argued to the Examiner that the product is achieved by jet milling the obeticholic acid to make particles of a specific particle size and distribution, and that other methods in the prior art could not achieve the

critical properties.  Just like in *Andersen*, Intercept must be held to the characterization of its claim scope that it asserted during prosecution to obtain its claims.

Intercept argues that the critical product properties are not recited in the claims, *supra* at III.B.1.a.1, but that does not distinguish this case from *Medicines Co.* and *Andersen*.  Here, the claims all require a specific obeticholic acid particle size as one of the critical criteria.  And as seen above, the applicants stated in the specification that achieving a specific particle size is not enough as unmilled and comilled obeticholic acid resulted in the right particle size but not the correct particle size distribution.  The specification and prosecution history clearly state that jet milling is the only way to achieve both the necessary particle size and particle size distribution.  "The situation here involves specifications that in all respects tell us what the claims mean, buttressed by statements made during prosecution . . . Accordingly, to attribute to the claims a meaning broader than any indicated in the patents and their prosecution history would be to ignore the totality of the facts of the case and exalt slogans over real meaning."  *Medicines Co.*, 853 F.3d at 1305 (*quoting Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1316 (Fed. Cir. 2007)).  If the Court ignores Intercept's statements in the specification and prosecution history and allows for particles made from any process to satisfy the claims, then Intercept will be obtaining a claim scope much larger than that contemplated by the Patent Office when issuing the claims of the formulation patents.

### (c)    Apotex's proposed construction of "particles" does not violate the doctrine of claim differentiation

Intercept argues that the doctrine of claim differentiation prevents the term "particles" from being limited to particles made by jet milling because "some claims" claim particles while others claim particles that have been jet-milled. *Supra* at III.B.1.a.1. But Intercept's own statements in its patent specifications and during prosecution limited the scope of its obeticholic acid, and undercuts

any inference of claim differentiation.  "[T]he doctrine of claim differentiation cannot broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence."  *Andersen*, 474 F.3d at 1370 (*quoting Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998)).

Moreover, Intercept conflates the doctrine of claim differentiation with the principle of overlapping claims, which are permissible. For example, claim 13 of the '337 Patent, which does specify jet-milling, overlaps with other claims that do not. Overlapping claims are common because "claims that are written in different words may ultimately cover substantially the same subject matter." *Id.* (Appx1105); *see also Medicines Co.*, 853 F.3d at 1305 (*citing Andersen*, 474 F.3d at 1370 holding that "overlapping patent claims are not unusual").

In *Medicines Co.*, the Federal Circuit recognized that including the "efficient mixing" process element into the construction of "batches" would render claims that expressly required efficient mixing superfluous.  However, the court found that ignoring the patentee's express meaning of the scope of the claims would "have the impermissible result of 'extend[ing] [Medicine's] monopoly beyond the invention' disclosed, and potentially the prior art."  *Id.* (*quoting Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371 (1938)).  Here, like in *Medicines Co.*, Intercept's "written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation." *Andersen*, 474 F.3d at 1370 (*citing Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000)).

Intercept cannot rely on the doctrine of claim differentiation to erase its clear and consistent statements that no other particle reduction technique except jet milling can achieve the claimed obeticholic acid particles.  Therefore, the term "particles" should be construed such that the particles are made using jet milling.

**(d)** **Intercept's proposed construction would render the patent claims invalid for lack of enablement and written description**

Additionally, if Intercept's proposed construction is accepted, the asserted claims necessarily will be invalid for lack of enablement and written description. As explained above, the patent specification and prosecution history make clear that the applicants did not contemplate or teach any method of obtaining particles sufficient to meet the conditions required by applicants other than the jet-milling process. Moreover, the applicants disparaged known methods, such as co-milling or ball milling.  Therefore, if this Court finds that the term particles includes products created by methods other than jet-milling, then the patents do not teach, nor do they demonstrate that the applicants had possession of, the full scope of the patent claims.

**c)** **Plaintiffs' Reply Position**

The term "particles" is well-understood and requires no construction beyond its plain and ordinary meaning. *See supra* Section III.B.1.a. Apotex counters that the term should be confined to particles reduced in size through jet-milling because the applicant supposedly disclaimed "all other methods for making obeticholic acid particles." *See supra* Section III.B.1.b.1.b. But the standard for disavowal is "exacting" and requires that the intrinsic record "is 'both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer.'" *Openwave Sys.*, *Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015) (citation omitted). Apotex has not demonstrated, and the other five Defendants do not even argue, that this standard has been met. *See supra* Section III.B.1.b.1.

**(1)** **The written description does not narrow the plain meaning of the term "particles."**

At bottom, Apotex argues that a jet-milling process limitation should be read into the term "particles" because the specification discusses jet-milling in detail and discloses a number of

embodiments that use jet-milling. This would violate a cardinal rule of claim construction that embodiments should not be imported from the specification into the claims. *See Thorner*, 669 F.3d at 1366 ("We do not read limitations from the specification into claims . . . ."); *supra* Section III.A.1.c.

First, Apotex contends that "every single embodiment and example" in the specification identifies jet-milling as the "only" method that can produce the claimed particles. *See supra* Section III.B.1.b.1.a. Even if every embodiment was limited to jet-milling (they are not), that would not be enough to import a limitation from the embodiments into the claims. *See Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1359 (Fed. Cir. 2016) ("[W]e have repeatedly held that it is not enough that the only embodiments, or all of the embodiments, contain a particular limitation to limit claims beyond their plain meaning." (citations and internal quotation marks omitted)); *Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1267 (Fed. Cir. 2015) (same); *Phillips*, 415 F.3d at 1323 (reversing a narrow construction of "baffle" despite single embodiment).

More importantly, the very portions of the specification that Apotex relies on disclose aspects of the invention that are not limited to any particular micronization technique. For example, the specification provides: "In another aspect, the present disclosure provides a method for preparing a pharmaceutical composition containing a therapeutically effective amount of obeticholic acid . . . in the form of particles, comprising i) micronizing obeticholic acid . . . until at least 90% of the particles have a diameter of less than" a given number of microns. Ex. L, '337 Patent, 25:59–26:4 (Appx1055); *see also id.* at 26:6–17 (similar); 18–29 (similar); 30–46 (similar); 47–59 (similar). Although the next sentence explains that, "*[i]n one embodiment*, the micronizing is carried out using a jet-mill," *id.* at 26:4–5 (emphasis added), that does not change the fact that

the invention as a whole is not so limited. There are also numerous embodiments that disclose particle size distributions for obeticholic acid without mentioning a micronization technique at all. *See, e.g.*, *id.* at 14:32–40, 41–57, 58–67, 15:1–3, 4–11, 12–24, 25–41, 42–50, 51–62 (Appx1049).[9]

As further support, Apotex argues that the "specification equates jet milling to the more general term 'micronization' using either the definitional term 'i.e.' or substituting jet milling for micronization parenthetically." *See supra* Section III.B.1.b.1.a. Apotex fails to mention, however, that the specification expressly defines "micronization" based on the size of the particles without reference to any particle size reduction technique. *See* Ex. L, '337 Patent, 16:16–20 (Appx1050) ("'Micronization,' as defined herein, is a reduction of particle size of an active ingredient, i.e., obeticholic acid, to a diameter that is less than about" a certain number of microns). In context, the portions of the specification Apotex cites demonstrate only that the inventors identified jet-milling as one possible micronization technique.

Second, Apotex incorrectly asserts that "the specification shows that other particle size reduction techniques fail to provide obeticholic acid particles having the required characteristics" and that these techniques produce "unacceptable" results. *See supra* Section III.B.1.b.1.a. In support of this broad assertion, Apotex cites to Examples 1, 3 and 4, which compare comilling and jet-milling. *Id.* The specification does explain that jet-milled particles possessed favorable properties relative to particles produced by comilling, *see, e.g.*, Ex. L, '337 Patent, tbls. 1, 2, 13, 14 (Appx1083-88), but that does not rise to the level of disparagement that is required to displace the plain and ordinary meaning of the term "particles." *See, e.g.*, *Vanguard,* 234 F.3d at 1372 ("The

---

[9] Apotex highlights descriptions of the importance of particle size and particle size distributions to the inventions. *See supra* Section III.B.1.b.1.a (describing "*primary role*" of particle size and particle size distribution); *id.* (characterizing particle size distribution as "a *critical process parameter*"). This is beside the point. Statements touting the benefits of the disclosed particle size distributions say nothing about the methods through which these properties can be achieved.

method of manufacture, even when cited as advantageous, does not of itself convert product claims into claims limited to a particular process."); *Vectura*, 2018 WL 4700222, at *3 ("Just because the specification describes a single known way to make the claimed composition does not mean that [the court] must read that method into the claims.").[10]

### (2)   The term "particles" was not narrowed during prosecution.

Apotex further argues that, "[e]ven if Intercept did not specifically denigrate every possible alternative micronization technique by name," the applicant's statements made "during prosecution clearly showed that jet-milling was the *only* intended process." *See supra* Section III.B.1.b.1.a. At the outset, the Federal Circuit has cautioned that "the prosecution history . . . often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Regardless, the prosecution history explains that three specific micronization methods may be less preferred for achieving the claimed properties. Specifically, the applicant stated:

> [T]he claimed product cannot be made by another process *such as* ball milling, high pressure homogenization or a cryogenic spray process because *these* processes *may* not provide the desired particle size and particle size distribution. For example, one of ordinary skill in the art would know that jet-milling is *a preferred process* for making the claimed product particles because it provides very narrow particle size range, whereas although ball milling *may* produce the desired particle size, the particle size distribution curve is very wide, and therefore, undesirable for the claimed product.

---

[10] And even if it did, the comparison to comilling says nothing about the ability of other particle size reduction techniques disclosed in the specification, such as high-speed rotating impact mills and carrier mills, Ex. L, '337 Patent at 16:3–15 (Appx1050), to produce obeticholic acid particles with the claimed characteristics. Accordingly, it cannot amount to disparagement of those methods.

(continued...)

Ex. O, INT_OCA_0013089 (Appx1324) (emphases added). This statement cannot fairly be read to suggest that the claimed particles cannot be made by *any* process other than jet milling, but is at most a criticism of ball milling, high pressure homogenization, or cryogenic spray processes and a description of jet-milling as *a* preferred process, not the "only intended process." *See supra* Section III.B.1.b.1. (asserting that this statement showed *all* other particle size reduction methods were unsuccessful).[11]

But to even read the prosecution history to disclaim—rather than simply criticize—these three specific methods would be a stretch: the prosecution history makes clear that these methods simply "may" not provide the desired particle size distribution. *See* Ex. O, INT_OCA_0013089 (Appx1324). "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Thorner*, 669 F.3d at 1366; *see also Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) ("A patentee's discussion of the shortcomings of certain techniques is not a disavowal of the use of those techniques in a manner consistent with the claimed invention."). For these reasons, the prosecution history does not compel construing "particles" to disclaim even the three specific micronization methods criticized, let alone *all* processes other than jet-milling.

### (3)  Precedent does not require limiting "particles" to those made by jet-milling.

The Federal Circuit's opinion in *Vectura* further counsels against importing a process limitation here. Aside from statements in the specification in *Vectura* suggesting that high energy

---

[11] Applicant's statement during prosecution that "restrictions between product and process for making the product . . . should be withdrawn," *see supra* Section III.B.1.b.1.a., tracks the language of the restriction requirement. It does not limit the invention to particles produced by jet-milling, which the inventors describe on the previous page of the prosecution history as just one preferred process.

milling was "required" to obtain the claimed particles—Defendants point to no analogous language here—the specification in *Vectura* criticized other techniques and the prosecution history distinguished prior art by stating that "the composite particles 'are fused to the active particle in a manner only possible using an aggressive milling procedure.'" 981 F.3d at 1039. Yet the court concluded that these statements did "not make its milling method an essential part of" the claim and therefore declined to read a process limitation into the term "composite active particles." *Id.* at 1038–39.

Apotex string-cites a handful of inapposite cases in support of its argument that "particles" should be limited to those formed by jet-milling. These cases are distinguishable. In *Medicines Co.*, the specification included a process limitation in the *definition* of the term at issue. 853 F.3d at 1300 (requiring "compounding process" for "batch[es]"). And in *Andersen*, the Federal Circuit affirmed a holding that the claimed "composite compositions" are limited to materials that have been extruded to make pellets based on extensive evidence in the intrinsic record: The applicants stated in four separate passages in the specification that "successful manufacture of structural members . . . *requires*" manufacturing the composite in the form of a pellet, and relied on the pelletizing process during prosecution to overcome prior art rejections. 474 F.3d at 1366–68.[12]

Here, there is no statement in the specification that jet-milling is *required* to produce the "particles"; instead, the patent specification and prosecution history simply identify jet-milling as

---

[12] Other cases Apotex cites also include "language of requirement" in the specification that is not present here. *Chiesi*, 2021 WL 4843806, at *7 (emphasizing "language of requirement"); *Biovail*, 433 F. Supp. 2d at 515–16 (noting that specification repeatedly made clear that special coating was part of claimed "delayed release tablet"). The remaining cases Apotex relies on also do not support its position. *See Regents*, 717 F.3d at 938 (addressing claim reciting a heart catheter with two disks affixed to each other where patentee argued the claim should be construed to cover a single disk); *IYM Techs.*, 2017 WL 4857445, at *1 n.2 (construing term "local process modifications" in patent for method for adjusting computer chips to have improved processing).

(continued…)

one possible process that can produce particles with the claimed characteristics.[13] Nor did the inventors rely on jet-milling during prosecution to overcome prior art rejections. *Andersen* and *Medicines Co.* have no bearing on the facts presented here.[14]

Similarly, the alleged disavowal or disparagement Apotex points to does not approach the level that courts have required to narrow a patentee's invention to a specific process. In *Indivior*, the court found that "the *unequivocal* disparagement of conventional top air drying" warranted excluding this method from the construction of the term "capable of being dried without loss of substantial uniformity of the active." 930 F.3d at 1332, 1338 (emphasis added). The disparagement in *Indivior* was "repeated" and made clear that conventional top-drying methods could not produce the claimed film. *See id.* at 1336–38 (finding that through statements in the specification such as, "conventional drying methods . . . are unable to provide uniform films" and "[c]onventional convection air drying from the top is not employed," and examples demonstrating the failure of conventional drying methods to achieve uniformity, the patentee had disclaimed the use of conventional drying methods). Even then, the Court found disclaimer only of the specific technique that was disparaged by the specification, not all other drying techniques. In contrast, the statements Apotex identifies only describe jet-milling as a preferred embodiment. These are insufficient to establish disparagement of all other particle size reduction methods.

---

[13] *See, e.g.*, Ex. L, '337 Patent at 16:15–16 ("In one embodiment, the particle size of obeticholic acid is reduced using a jet mill"), 3:37–42 ("In another aspect, the disclosure relates to a method . . . comprising forming the particles through jet milling"), 26:4–5, 16–17, 28–29, 45–46, 59–60 ("In one embodiment, the micronizing is carried out using a jet mill"); 16:3–11 (listing other known particle size reduction methods).

[14] Apotex notes that the specification describes particle size distribution as a "critical" parameter, *See supra* Section III.B.1.b.1.b, but that does not limit the method used to obtain the desired distribution.

### (4)    The claim language does not support reading a jet-milling limitation into the term "particles."

Apotex does not meaningfully contend that the plain claim language justifies its position. Some claims in the '337 Patent recite "particles" of obeticholic acid, *see, e.g.*, Ex. L, '337 Patent, claim 1 (Appx1104), whereas others expressly require "forming particles through jet-milling," *id.*, claim 13. Accordingly, reading a jet-milling limitation into the construction of "particles" would render the jet-milling limitation in other claims superfluous.

Apotex counters by relying on the "principle of overlapping claims." *See supra* Section III.B.1.b.1.c. As support, Apotex cites *Medicines Co.*, where the Federal Circuit rejected a claim differentiation argument, in part, to avoid the "impermissible result of 'extend[ing] [the patentee's] monopoly beyond the invention' disclosed." 853 F.3d at 1305. That concern is not present here because the intrinsic record does not limit the claimed inventions to particles produced via jet-milling. Thus, claim differentiation would not expand Intercept's monopoly beyond the disclosed inventions.[15]

### d)    Defendants' Sur-Reply Position

Plaintiffs vaguely claim that the term "particles" is well-understood without providing any explanation, but does not acknowledge Apotex's point that particles can be of all different sizes, shapes, compositions, and have different properties.  This is particularly important here, where Intercept has deemed the particle <u>size and distribution</u> as fundamental or "critical."

### (1)    All Intrinsic Evidence Supports Apotex's Proposed Construction

Intercept admits in the briefing only that "particle size distribution was an important process parameter" for the claimed invention. *Infra* at III.B.2.c. But to the Patent Office and the

---

[15] Intercept's proposed construction would not render the claims invalid for lack of enablement or written description for the same reasons discussed above. *See supra* Section III.A.1.c.4.

public, Intercept stated in the specification that particle size distribution "is considered a **critical process parameter**." '337 patent at 91:44-46 (emphasis added). Intercept buries in footnotes that such statements merely "tout[]" the benefits of the disclosed particle size distributions. *Supra* at 6 n.9. That cannot be squared with the prosecution history, where Intercept explained: "the claimed product <u>cannot be made</u> by another process" **because** those methods would not produce the appropriate particle sizes. *Supra* at III.B.1.c.2; INT_OCA_0013089 (Appx1349) (emphasis added).

Intercept cannot now ignore what they communicated to the public. Intercept admits it "criticized" during prosecution ball milling, high pressure homogenization, or cryogenic spray processes as methods of micronization, but alleges it did not "disparage" these methods. *Supra* at III.B.1.c.2. Intercept would have this Court believe alternative processes were still acceptable, but it clearly told the Patent Office that the product "<u>cannot be made</u> by another process such as ball milling, high pressure homogenization or a cryogenic spray process". INT_OCA_0013089 (emphasis added). How can this possibly be criticism but not disparagement? The only plausible reading of "cannot be made" goes beyond disparagement and undeniably removes these methods of micronization from the scope of the claims.

Intercept further misstates its language to the Patent Office by suggesting that these methods merely "may" not provide the desired particle size distribution. *Supra* at III.B.1.c.2. The statement clearly shows that Intercept told the Patent Office that these methods "<u>cannot</u>" be used, and that even if one of the disavowed methods "may" produce some particles in the correct size, the method would <u>still</u> be unsuitable because "the particle size distribution curve is very wide," meaning that the method would result in a product having particles either much larger or much smaller than would be considered acceptable for the claimed product. *See* INT_OCA_0013089.

Similarly, there is no reason to believe Intercept's claim that its disavowal was limited only to three methods. The "such as" language makes it clear that Intercept envisioned other methods as unacceptable. At best, a POSA would understand Intercept had disavowed **many** micronization methods and would not be able to tell what methods were appropriate save for one suitable method identified the patent and prosecution history: jet-milling.

Intercept argues in a three word parenthetical that not all embodiments in the '337 patent family are limited to jet-milling, but does not and cannot identify any embodiment where the alleged invention was prepared using any other method. *Supra* at III.B.1.c.1. Plaintiffs rely on a few broad statements in the patent that do not "mention[] a micronization technique at all." *Supra* at III.B.1.c.1. But as Apotex has already explained, the specification and prosecution history discloses only jet milling to achieve the required particle size and distribution and clearly disavow all other methods of manufacture. And Apotex showed that the specification equates micronization to jet milling. *Supra* at III.B.1.b.1.a, citing '337 patent 91:17 (Appx1089); Tables 4-1, 4-2 (Appx1084).

### (2)    The Case Law Is Clear That Disavowal Has Occurred

None of Intercept's attempts to distinguish the case law are persuasive. In *Vectura*, for example, the language centered on preferred embodiments and the patents at issue did not contain clear statements that the disclaimed processes are "critical" or "cannot be used." 2018 WL 4700222 at *4. Thus *Vectura* is inapposite to this case, where Intercept told the Patent Office that micronization methods other than jet-milling "cannot be used" to achieve the "critical process parameter" for the claimed particles. The disparagement found by the *Indivior* court, however, closely parallels Intercept's similar disparagement here. The *Indivior* court relied on language such as "conventional drying methods . . . are unable to provide uniform films" and "conventional convection air drying from the top is not employed." 930 F.3d at 1336-38. The "cannot be made"

language that Intercept used is as strong, if not even stronger, than the statements in *Indivior*. To the extent Intercept claims its disavowal can be ignored because it was set forth during prosecution and not in the specification itself, that argument has no basis and Intercept does not provide any support for such an allegation.

Nevertheless, regardless of whether this Court construes the product claim to require a process step in view of the clear intent of the patentee or this Court finds that express disclaimer/disavowal occurred, the effect is the same: the process of manufacture limits the Form 1 claim scope. *See Medicines Co.*, 853 F.3d at 1305.

**(3)    Intercept Does Not Meaningfully Challenge the Principle of Overlapping Claims or the Lack of Enablement or Written Description**

Intercept tries to ignore the strong intrinsic evidence here by relying on claim differentiation, arguing that under Apotex's construction there would be no meaningful difference between independent claim 11 and dependent claim 14. But claim differentiation is "a guide, not a rigid rule," and the Federal Circuit has warned against allowing the "dependent claim tail…wag the independent claim dog" in claim construction. *See Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1323 (Fed. Cir. 2016) (citations omitted). Claim differentiation "is a rebuttable presumption that may be overcome by a contrary construction dictated by the written description or prosecution history." *Id.* Like in *Howmedica*, the intrinsic evidence overcomes claim differentiation and dictates adding a limitation to the independent claim found in dependent claims. *Id.*; *see also Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co.*, 212 Fed. Appx. 977, 986 (Fed. Cir. 2007) (affirming claim differentiation overcome by intrinsic evidence even though construed independent claim is narrower than dependent claims).

Similarly, Intercept provides no meaningful explanation of its written description and enablement position. If the claims are not limited to jet-milling, then a POSA would not be able to

identify the particle size distribution characteristics required for the claimed product even though

Intercept admits "particle size distribution was an important process parameter." *Infra* at III.B.2.c.

Additionally, in light of Intercept's statements that certain micronization techniques are unsuitable,

a POSA would not understand what micronization techniques other than jet-milling could be used.

Thus, if the claims are not limited to jet-milling, the patents do not teach nor demonstrate the

applicants had possession of the full scope of the patent claims.

> 2. **"intra-granular portion comprising obeticholic acid" / "intra-granular portion comprises said obeticholic acid" / "intra-granular portion comprises obeticholic acid"**

| Claims | Plaintiff's Proposed Construction | Apotex's Proposed Construction | DRL/MSN/Amneal/ Lupin/Optimus Proposed Construction |
|---|---|---|---|
| '337 patent claim 11; '349 patent claim 4; '549 patent claims 12, 23 | No construction necessary | Intra-granular portion comprising obeticholic acid that has been subjected to jet milling | No construction necessary |

> a) **Intercept's Opening Position**

The terms "intra-granular portion comprising obeticholic acid," "intra-granular portion

comprises said obeticholic acid," and "intra-granular portion comprises obeticholic acid"[16] in the

claims of the '337, '349, and '549 Patents require no construction beyond their plain and ordinary

meaning. *See, e.g.*, *Phillips*, 415 F.3d at 1312–13. As with the "particles" term, every Defendant

other than Apotex agrees with Intercept that the Court need not construe this term. And, as with

the "particles" term, the dispute does not appear to be over the plain meaning of the terms, but

whether Apotex should be permitted to limit the terms to obeticholic acid that has been jet-milled.

---

[16] Intercept refers to these terms collectively as "intra-granular" for short.

For similar reasons to those discussed above, the Court should reject Apotex's attempt to read a jet-milling limitation into the claims.

### (1)     The claim language is clear and does not require further construction.

Nothing in the claim language itself limits the "intra-granular" portion of the claimed tablets to containing only jet-milled obeticholic acid.  For example, claim 11 recites a "tablet comprising an intra-granular portion and an extra-granular portion, the intra-granular portion comprising obeticholic acid . . .  and the extra-granular portion comprising one or more pharmaceutical excipients."  Ex. L, '337 Patent, claim 11 (Appx1104); *see also* Ex. N, '549 Patent, claim 1 (Appx1316) (similar).  There is no requirement that the obeticholic acid be jet-milled.

Claim differentiation further undercuts Apotex's proposed construction.  Claim 14, which depends from claim 11, adds one additional limitation: it recites the "tablet of claim 11, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is jet-milled."  Ex. L, '337 Patent, claim 14 (Appx1105).  Apotex's proposed construction would cabin claim 11 such that it is identical in scope to dependent claim 14.  This cannot be correct under the doctrine of claim differentiation.  *See SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1302–03 (Fed. Cir. 2003) (recognizing "presumption that each claim in a patent has a different scope" is "especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim"); *see also Amgen Inc.*, 314 F.3d at 1326.

### (2)     The specification confirms that "intra-granular" is not limited to only jet-milled obeticholic acid.

The specification makes clear that the intra-granular portion of the tablet disclosed in the '337, '349, and '549 Patents can contain obeticholic acid made by a variety of processes, not just

jet-milled obeticholic acid. The specification's description of obeticholic acid in the intra-granular portion of the tablet often appears without reference to jet-milling. For example, the "Summary" section of the specification notes that: "Another aspect of the disclosure relates to a tablet comprising an intra-granular portion and an extra-granular portion, the intra-granular portion comprising obeticholic acid . . . and one or more additional pharmaceutical excipients, and the extra-granular portion comprising one or more pharmaceutical excipients." Ex. L, '337 Patent, 3:43–50 (Appx1256); *see also id.* at 45:21–27, 45:58–64, 85:24–87:37, 89:51–90:28 (Appx1277-99).

As explained above, the Court should only depart from a claim term's plain and ordinary meaning if the inventors acted as their own lexicographers or if there is a clear and unambiguous disavowal of claim scope. *See Hill-Rom Servs.*, 755 F.3d at 1371; *Toshiba*, 681 F.3d at 1370. The portions of the specification cited by Apotex contain neither. And, for the same reasons articulated for the "particles" term, *see supra* Section III.B.1.c.2, the prosecution history fails to supply the requisite lexicography or clear and unambiguous disavowal of claim scope. Accordingly, the Court should apply the plain and ordinary meaning. *See Hill-Rom Servs.*, 755 F.3d at 1371–72.

### b) Defendants' Answering Position

#### (1) Apotex's Proposed Construction Incorporates A Process Intercept Described As "Critical" During Prosecution

As seen above with the discussion of the claim term "particles," Intercept repeatedly stressed the criticality of using obeticholic acid particles made by jet milling in making obeticholic acid compositions. It is equally critical that the term "intra-granular portion comprising

obeticholic acid" also include the critical process step of subjecting the obeticholic acid to jet milling, lest Intercept be allowed to improperly expand the scope of its patent claims.

### (a) The intrinsic evidence compels a construction where the claimed intra-granular portions are made by jet milling

The intrinsic evidence clearly shows that obeticholic acid in the intra-granular portion of the composition must be interpreted as obeticholic acid made by using jet milling. *See Medicines Co.*, 853 F.3d at 1305 ("Whether we view the patentee as having disclaimed inefficient mixing or construe 'batches' to require efficient mixing,…at bottom, the compounding process must be one that uses efficient mixing.").

As detailed in Section B.1.a.1 above, Intercept stressed in the specification and prosecution history that jet milling is a "critical process parameter" for achieving obeticholic acid with the necessary properties including particle size and distribution, and that other known particle size reduction techniques like ball milling or comilling failed to provide these essential properties. Additionally, Intercept performed dissolution testing on obeticholic acid tablets that had an intra-granular portion containing jet milled or comilled obeticholic acid particles. *See* Ex. L, '337 patent at 89:47-91:60 (Appx1087-88).  Table 11 of Example 3 shows that the obeticholic acid was included in the intra-granular portion of the tablets, and the applicants concluded from their testing that "[j]et milling (i.e., micronization) resulted in material that had smaller, more uniform particle size and increased surface area, leading to faster drug release from tablets containing jet-milled [obeticholic acid]." *Id*. at Table 11, 91:16-19 (Appx1088).  It was based on this dissolution testing that applicants concluded that "particle size distribution is considered a critical process parameter." *Id*. at 91:44-46 (Appx1088).  In the very next Example, Intercept disclosed that the critical particle size distribution cannot be achieved from comilling but instead can only be achieved by jet milling. *Id*. at 91:61-92:20 (Appx1088).

For the same reasons explained in Section B.1.a.2 above, this Court should apply Apotex's proposed construction consistent with precedent such as *Medicines Co.* and *Andersen*. *Medicines Co.*, 853 F.3d at 1305; *Andersen*, 474 F.3d at 1370.

Further, for the same reasons as explained in Section B.1.a.3 above, Apotex's proposed construction does not violate the doctrine of claim differentiation.

### (b)   Intercept's proposed construction would render the patent claims invalid for lack of enablement and written description

Additionally, if Intercept's proposed construction is accepted by this Court, the asserted claims necessarily will be invalid for lack of enablement and written description. As explained above, the patent specification and prosecution history make clear that the applicants did not contemplate or teach any method of obtaining intra-granular portions sufficient to meet the conditions required by applicants other than the jet-milling process. As a result, if this Court finds that the intra-granular portion terms include products created by methods other than jet-milling, then the patents do not teach, nor do they demonstrate that the applicants had possession of, the full scope of the patent claims.

### c)   Plaintiffs' Reply Position

For at least the same reasons discussed above with respect to the "particles" term, it would be improper to import a jet-milling limitation into the claims. Indeed, Apotex's position for the "intra-granular" term is even more strained. Its argument appears to be that the claims recite tablets with intra-granular portions that contain obeticholic acid particles, which in turn, Apotex argues, must be jet-milled. *See supra* III.B.2.b.1.a. Apotex relies on Example 3 in the specification, which describes experiments to measure the dissolution rates for tablets containing unmilled, comilled, and jet-milled obeticholic acid. *See* Ex. L, '337 Patent, 89:55–91:60 (Appx1299-1300). These tests showed that particle size distribution was an important process parameter, *see id.* at 91:44–46

(Appx1300), but they do not disclaim any processes for obtaining the desired distribution. Similarly, Apotex is incorrect that Example 4 showed that the particle size distribution "can only be achieved by jet milling." *See supra* III.B.2.b.1.a. That example notes that jet-milling obeticholic acid produced "better" content uniformity than comilling. Ex. L, '337 Patent, 92:18–20 (Appx1300). It does not state that jet-milling is the only process that can be used. The standard for disavowal requires a "clear and unmistakable" indication to limit the invention. *Luminara Worldwide, LLC v. Liown Electronics Co. Ltd*, 814 F.3d 1343, 1353 (Fed. Cir. 2016). Apotex's attenuated argument does not meet this high bar.

Moreover, Apotex's proposed construction would render '337 Patent claim 14, which depends from claim 11, wholly redundant. *See supra* Section III.B.2.a. In this situation, claim differentiation is "especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim [claims 11 and 14, respectively], and one party is urging that the limitation in the dependent claim [jet-milling requirement] should be read into the independent claim." *SunRace*, 336 F.3d at 1303; *see also Amgen Inc.*, 314 F.3d at 1326.[17]

### d) Defendants' Sur-Reply Position

Intercept again distorts the intrinsic evidence in its defense of the "intra-granular" terms, and does not meaningfully address its statements to the Patent Office that jet milling is a "critical process parameter." Again, Intercept cannot downplay the specification's description of particle size as merely an "important" process parameter, *supra* at III.B.2.c, when it clearly uses the term "critical process parameter." Ex. L, '337 patent at 91:44-46 (Appx1089). For the same reasons set

---

[17] Intercept's proposed construction would not render the claims invalid for lack of enablement or written description for the same reasons discussed above. *See supra* Section III.A.1.c.4.

forth with respect to "particles," the intra-granular terms should be limited by Intercept's disavowals.

Intercept also again ignores the principle of overlapping claims and provides no meaningful explanation of its written description and enablement position. If the claims are not limited to jet-milling, then a POSA would not be able to identify the particle size distribution characteristics required for the claimed product even though Intercept admits "particle size distribution was an important process parameter." *Supra* at III.B.2.c. Additionally, in light of Intercept's statements that certain micronization techniques are unsuitable, a POSA would not understand what micronization techniques other than jet-milling could be used to create an "intra-granular portion" within the scope of the claims. Thus, the patents do not teach, nor do they demonstrate that the applicants had possession of, the full scope of the patent claims if the claims are not limited to jet-milling.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*

SMITH, KATZENSTEIN & JENKINS LLP

*/s/ Eve H. Ormerod*

_____
Neal C. Belgam (#2721)
Eve H. Ormerod (#5369)
1000 West Street, Suite 1501
Wilmington, DE  19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

*Attorneys for Defendants*
*Apotex Inc. and Apotex Corp.*

KRATZ & BARRY LLP

/s/ R Touhey Myer

_____

R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE  19801
(302) 527-9378
tmyer@kratzandbarry.com

*Attorneys for Defendants*
*Optimus Pharma Pvt. Ltd.*
*and Optimus Drugs Private Ltd.*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Samantha G. Wilson

_____

Anne Shea Gaza (#4093)
Samantha G. Wilson (#5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Amneal EU,*
*Limited, Amneal Pharmaceuticals of New*
*York, LLC, MSN Laboratories Private*
*Limited, MSN Pharmaceuticals Inc., Dr.*
*Reddy's Laboratories, Inc. and Dr. Reddy's*
*Laboratories, Ltd.*

PHILLIPS, MCLAUGHLIN & HALL, P.A.

/s/ Megan C. Haney

_____

John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE  19806-4204
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Defendants Lupin Limited*
*and Lupin Pharmaceuticals, Inc.*

February 3, 2022