# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| INTERCEPT PHARMACEUTICALS, INC., et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>APOTEX INC., et al.,<br><br>　　　　　Defendants. | C.A. No. 20-1105-MN-JLH<br>(CONSOLIDATED)<br><br>REDACTED - PUBLIC VERSION |

## EXHIBITS TO LETTER IN SUPPORT OF DEFENDANTS' MOTION FOR LEAVE TO AMEND THEIR ANSWERS AND COUNTERCLAIMS
### Volume 1 of 3
### (Exhibit A-1, Part 1 (with its Exhibits 1-50))

Neal C. Belgam (No. 2721)
Eve H. Ormerod (No. 5369)
SMITH, KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

*Attorneys for Defendants Apotex Inc. and Apotex Corp.*

Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Amneal EU, Limited, Amneal Pharmaceuticals of New York, LLC, MSN Laboratories Private Limited, and MSN Pharmaceuticals Inc.*

John C. Phillips, Jr. (No. 110)
Megan C. Haney (No. 5016)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806-4204
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Defendants Lupin Limited and Lupin Pharmaceuticals, Inc.*

R Touhey Myer (No. 5939)
OFFIT KURMAN, P.A.
222 Delaware Avenue, Suite 1105
Wilmington, DE 19801
(302) 351-0900
touhey.myer@offitkurman.com

*Attorneys for Defendants Optimus Pharma Pvt. Ltd. and Optimus Drugs Private Ltd.*

# EXHIBIT A-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTERCEPT PHARMACEUTICALS, INC. and INTERCEPT PHARMA EUROPE LTD., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| APOTEX INC and APOTEX CORP., et al., | ) ) |
| Defendants. | ) ) ) |

C.A. No. 20-1105 (MN)
(consolidated)

**CONFIDENTIAL**

**DEFENDANTS MSN LABORATORIES PRIVATE LTD. AND
MSN PHARMACEUTICALS INC.'S FIRST AMENDED ANSWER
AND COUNTERCLAIMS**

Defendants MSN Laboratories Private Ltd. ("MSN Laboratories") and MSN Pharmaceuticals Inc. ("MSN Pharmaceuticals") (collectively, "MSN"), by and through their undersigned attorneys, submit their answer, affirmative defenses, and Counterclaims to Plaintiffs Intercept Pharmaceuticals, Inc. and Intercept Pharma Europe Ltd.'s (collectively, "Intercept" or "Plaintiffs") First Amended Complaint for Patent Infringement ("Complaint") as follows:

Pursuant to Fed. R. Civ. P. 8(b)(3), MSN denies all allegations in Plaintiffs' Complaint, except those expressly admitted below. This pleading is based upon MSN's knowledge of its own activities, and upon information and belief as to the activities of others.

**NATURE OF THE ACTION**

1.       This action for patent infringement, brought pursuant to the patent laws of the United States, 35 U.S.C. § 1, *et seq*., and in particular under 35 U.S.C. § 271, arises from Defendants' submission of Abbreviated New Drug Application ("ANDA") No. 215017 to the United States Food and Drug Administration ("FDA"). Through this ANDA, Defendants seek approval to market a generic version of the pharmaceutical product OCALIVA® (obeticholic acid, 5 and 10 mg) prior to the expiration of U.S. Patent Nos. RE48286 (filed June 21, 2019) ("the

RE286 Patent");[1] 9,238,673 (filed June 17, 2013) ("the '673 Patent"); 10,047,117 (filed Nov. 20, 2015) ("the '117 Patent"); 10,052,337 (filed Apr. 26, 2016) ("the '337 Patent"); 10,174,073 (filed Apr. 25, 2017) ("the '073 Patent"); and 10,758,549 (filed Feb. 11, 2020) ("the '549 Patent") (collectively the "patents-in-suit"). Plaintiffs seek injunctive relief prohibiting infringement, attorneys' fees, and any other relief the Court deems just and proper.

**RESPONSE:** MSN admits that Plaintiffs' Complaint against MSN is for infringement of United States Patent Nos. RE48,286 ("the RE286 patent"); 9,238,673 ("the '673 patent"); 10,047,117 ("the '117 patent"); 10,052,337 ("the '337 patent"); and 10,174,073 ("the '073 patent") (collectively, the "patents-in-suit") arising under the Patent Laws of the United States, 35 U.S.C. § 271, but denies that Plaintiffs are entitled to any such relief. MSN states that the filing dates of the patents-in-suit speak for themselves.

MSN further admits that it submitted an Abbreviated New Drug Application ("ANDA") No. 215017 seeking U.S. Food and Drug Administration ("FDA") approval to market a generic obeticholic acid product, which Plaintiffs market as a product called OCALIVA®, prior to the expiration of the patents-in-suit. MSN denies any remaining allegations in this paragraph.

2.      This is also an action under 28 U.S.C. §§ 2201–02 for a declaratory judgment of patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*., and in particular under 35 U.S.C. § 271.

**RESPONSE:** MSN admits that Plaintiffs' Complaint against MSN is for a declaratory judgment of patent infringement of the patents-in-suit arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*., and in particular under 35 U.S.C. § 271. MSN denies any remaining allegations in this paragraph.

---

[1] The RE286 Patent is a reissue of U.S. Patent No. 7,138,390 ("the '390 Patent"), which was originally asserted in this litigation. Pursuant to 35 U.S.C. § 252, the RE286 Patent contains claims that are substantially identical to those of the '390 Patent, and the RE286 Patent constitutes a continuation of the '390 Patent and has effect continuously from the issue date of the '390 Patent. On November 12, 2020, the Court entered a stipulation substituting the RE286 patent for the '390 patent in this action. D.I. 14.

## THE PARTIES

3.      Plaintiff Intercept Pharmaceuticals is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 10 Hudson Yards, 37th Floor, New York, New York 10001.

**RESPONSE:** On information and belief, MSN admits that Plaintiff Intercept

Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of

Delaware.  MSN lacks knowledge or information sufficient to form a belief as to the truth or falsity

of the remaining allegations of this paragraph and, therefore, denies those allegations.

4.      Plaintiff IPEL is a limited corporation organized under the laws of the United Kingdom, having a principal place of business at One Glass Wharf, Bristol, BS2 0ZX United Kingdom.

**RESPONSE:** On information and belief, MSN admits that Plaintiff Intercept

Pharmaceutical Europe Limited is a corporation organized under the laws of the United Kingdom.

MSN lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

remaining allegations of this paragraph and, therefore, denies those allegations.

5.      On information and belief, defendant MSN Laboratories Private Limited is a corporation organized and existing under the laws of the Republic of India, having its principal place of business at MSN House, Plot No. C-24, Industrial Estate, Sanathnagar, Hyderabad 500 018, Telangana, India.

**RESPONSE:** MSN admits that MSN Laboratories is a Private Limited company

organized and existing under the laws of India, with a principal place of business at MSN House,

Plot No.: C-24, Industrial Estate, Sanath Nagar, Hyderabad, Telangana, India, 500018.

6.      On information and belief, defendant MSN Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 20 Duke Road, Piscataway, New Jersey 08854. On information and belief, MSN Pharmaceuticals, Inc. is a wholly owned subsidiary of MSN Laboratories Private Limited.

**RESPONSE:** MSN admits that MSN Pharmaceuticals is a corporation organized and

existing under the laws of the State of Delaware, with a principal place of business at 20 Duke

3

Road, Piscataway, New Jersey 08854.  MSN admits that MSN Pharmaceuticals is a wholly owned

subsidiary of MSN Laboratories.

7.      On information and belief, MSN Pharmaceuticals, Inc acts at the direction, and for
the benefit of MSN Laboratories Private Limited, and is controlled and/or dominated by MSN
Laboratories Private Limited.

**RESPONSE:** MSN admits that MSN Pharmaceuticals is a subsidiary of MSN

Laboratories.  MSN denies any remaining allegations in this paragraph.

8.      On further information and belief, MSN Pharmaceuticals, Inc., and MSN
Laboratories Private Limited collaborate with respect to the development, regulatory approval,
marketing, sale, and/or distribution of pharmaceutical products. On further information and belief,
Defendants are agents of each other and/or operate in concert as integrated parts of the same
business group, and enter into agreements with each other that are nearer than arm's length.

**RESPONSE:** MSN admits that MSN Pharmaceuticals is a subsidiary of MSN

Laboratories.  MSN denies any remaining allegations in this paragraph.

9.      On information and belief, MSN Pharmaceuticals, Inc. acts as the U.S. agent for
MSN Laboratories Private Limited for purposes of regulatory submissions to the FDA in seeking
approval for generic drugs.

**RESPONSE:** MSN admits that MSN Pharmaceuticals acts as the U.S. agent for MSN

Laboratories for purposes of regulatory submissions to the FDA with respect to ANDA No.

215017.  MSN denies any remaining allegations in this paragraph.

10.     On information and belief, Defendants prepared and submitted ANDA No. 215017
(the "MSN ANDA") and continue to seek FDA approval of that application.

**RESPONSE:** MSN admits that MSN Laboratories submitted ANDA No. 215017 with the

FDA and is seeking FDA approval of that application.  MSN denies any remaining allegations in

this paragraph.

11.     On information and belief, Defendants intend to commercially manufacture,
market, offer for sale, and sell the products described in the MSN ANDA (the "MSN ANDA
Products" or "ANDA Products") throughout the United States, including in the State of Delaware,
in the event the FDA approves the MSN ANDA.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or

sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States.

MSN denies any remaining allegations in this paragraph.

## JURISDICTION AND VENUE

12.     This civil action for patent infringement arises under the patent laws of the United
States, including 35 U.S.C. § 271, and alleges infringement of the patents-in-suit. This Court has
jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338, and
2201– 02.

**RESPONSE:** This paragraph contains conclusions of law for which no response is

required.  To the extent a response is required, MSN admits that Plaintiffs' Complaint is for a civil

action for patent infringement arising under the patent laws of the United States, including 35

U.S.C. § 271, and alleges infringement of the patents-in-suit.  MSN admits that this Court has

jurisdiction over patent infringement cases pursuant to 28 U.S.C. §§ 1331, 1338, and 2201-02.

13.     This Court has personal jurisdiction over Defendants because, on information and
belief, Defendants, *inter alia*, have continuous and systematic contacts with Delaware, regularly
conduct business in Delaware, either directly or through one or more of their wholly owned
subsidiaries, agents, and/or alter egos, have purposefully availed themselves of the privilege of
doing business in Delaware, and intend to sell the MSN ANDA Products in Delaware upon
approval of the MSN ANDA.

**RESPONSE:** This paragraph contains conclusions of law for which no response is

required.  To the extent a response is required, MSN does not contest that this Court has personal

jurisdiction for the purposes of this action only.  MSN admits that MSN Laboratories seeks

approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017

throughout the United States.  MSN denies any remaining allegations contained in this paragraph.

14.     MSN Pharmaceuticals, Inc. is a corporation organized and existing under the laws
of the State of Delaware.

**RESPONSE:** This paragraph contains conclusions of law for which no response is

required.  To the extent a response is required, MSN does not contest that this Court has personal

jurisdiction for the purposes of this action only.  MSN admits that MSN Pharmaceuticals is a

corporation organized and existing under the laws of the State of Delaware, with a principal place

of business at 20 Duke Road, Piscataway, New Jersey 08854.  MSN denies any remaining

allegations contained in this paragraph.

15.    On information and belief, Defendants are in the business of manufacturing,
marketing, importing, distributing, and selling pharmaceutical drug products, including generic
drug products, either directly or through subsidiaries, agents, and/or alter egos, which Defendants
manufacture, distribute, market and/or sell throughout the United States and in this judicial district.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or

sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States.

MSN lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

remaining allegations of this paragraph and, therefore, denies those allegations.

16.    On information and belief, Defendants are licensed to sell generic and proprietary
pharmaceutical products in Delaware, either directly or through one or more of their wholly owned
subsidiaries, agents, and/or alter egos.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or

sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States.

MSN lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

remaining allegations of this paragraph and, therefore, denies those allegations.

17.    Defendants have committed, or aided, abetted, contributed to, and/or participated
in the commission of, acts of infringement of the asserted patents that will lead to foreseeable harm
and injury to Plaintiffs. On information and belief, and as indicated by a letter dated July 28, 2020
sent by MSN Pharmaceuticals, Inc. and MSN Laboratories Private Limited to Intercept
Pharmaceuticals pursuant to 21 U.S.C. § 355(j)(2)(b), Defendants prepared and filed the MSN
ANDA with the intention of seeking to market the MSN ANDA Products nationwide, including
within this judicial district.

**RESPONSE:** MSN admits that MSN Pharmaceuticals and MSN Laboratories sent a

Paragraph IV Notice Letter to Intercept Pharmaceuticals on July 28, 2020 pursuant to 21 U.S.C. §

355(j)(2)(b) to notify Intercept that MSN had filed ANDA No. 215017.  MSN admits that MSN

Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States.  The remainder of this paragraph contains conclusions of law for which no response is required.  To the extent a response is required, MSN denies the remaining allegations in this paragraph.

18.     On information and belief, Defendants plan to sell the MSN ANDA Products in Delaware, list the MSN ANDA Products on Delaware's prescription drug formulary, and seek Medicaid reimbursements for sales of the MSN ANDA Products in the State of Delaware, either directly or through one or more of their wholly owned subsidiaries, agents, and/or alter egos.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph and, therefore, denies those allegations.

19.     On information and belief, Defendants know and intend that the MSN ANDA Products will be distributed and sold in Delaware and will thereby displace sales of OCALIVA$^{®}$, causing injury to Plaintiffs. Defendants intend to take advantage of their established channels of distribution in Delaware for the sale of the MSN ANDA Products.

**RESPONSE:** This paragraph contains conclusions of law for which no response is required.  To the extent a response is required from MSN, MSN denies Plaintiffs will suffer any injury.  MSN otherwise lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph and, therefore, denies those allegations.

20.     Defendants have engaged in patent litigation concerning FDA-approved drug products in this judicial district and have not contested personal jurisdiction or venue in this judicial district in such litigation. *See, e.g.*, *Exelixis, Inc. v. MSN Laboratories Private Limited et al.*, No. 20-633 (RGA) (D. Del. May 22, 2020); *Otsuka Pharmaceuticals Co., Ltd. et al. v. MSN Laboratories Pvt. Ltd. et al.*, No. 19-2009 (LPS) (D. Del. Mar. 16, 2020); *Vanda Pharmaceuticals Inc. v. MSN Pharmaceuticals Inc. et al.*, No. 20-318 (CFC) (D. Del. Mar. 13, 2020); *Amgen Inc. et al. v. MSN Pharmaceuticals, Inc. et al.*, No. 20-137 (CFC) (D. Del. Apr. 29, 2020); *Taiho Pharmaceutical Co., Ltd. et al. v. MSN Laboratories Private Ltd. et al.*, No. 19-2342 (CFC) (D. Del. Mar. 2, 2020).

**RESPONSE:** This paragraph contains conclusions of law for which no response is required. To the extent a response is required, MSN does not contest that this Court has personal jurisdiction for the purposes of this action only. MSN admits that it has engaged in patent litigation concerning FDA-approved drug products in this judicial district. MSN denies any remaining allegations contained in this paragraph.

21.     Additionally, this Court has personal jurisdiction over MSN Laboratories Private Limited because the requirements of Federal Rule of Civil Procedure 4(k)(2)(A) are met as (a) Intercept's claims arise under federal law; (b) MSN Laboratories Private Limited is a foreign defendant not subject to general personal jurisdiction in the courts of any state; and (c) MSN Laboratories Private Limited has sufficient contacts in the United States as a whole, including, but not limited to, participating in the preparation and submission of the MSN ANDA and/or manufacturing and/or selling pharmaceutical products distributed throughout the United States, including in this judicial district, such that this Court's exercise of jurisdiction over MSN Laboratories Private Limited satisfies due process.

**RESPONSE:** This paragraph contains conclusions of law for which no response is required. To the extent a response is required from MSN, MSN denies the allegations in this paragraph.

22.     Venue is proper in this district for MSN Pharmaceuticals, Inc. pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, *inter alia*, MSN Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware and is subject to personal jurisdiction in this judicial district.

**RESPONSE:** This paragraph contains conclusions of law for which no response is required. To the extent a response is required, MSN does not contest that this Court has personal jurisdiction over MSN Pharmaceuticals and MSN does not contest venue for the purposes of this action only. MSN admits that MSN Pharmaceuticals is a corporation organized and existing under the laws of the State of Delaware. MSN denies any remaining allegations contained in this paragraph.

23.     Venue is proper in this district for MSN Laboratories Private Limited pursuant to 28 U.S.C. § 1391(c)(3) because, *inter alia*, MSN Laboratories Private Limited is a corporation organized and existing under the laws of the Republic of India and may be sued in any judicial district.

8

**RESPONSE:** This paragraph contains conclusions of law for which no response is required. To the extent a response is required, MSN does not contest that this Court has personal jurisdiction over MSN Laboratories and MSN does not contest venue for the purposes of this action only. MSN admits that MSN Laboratories is a corporation organized and existing under the laws of the Republic of India. MSN denies any remaining allegations contained in this paragraph.

## INTERCEPT'S APPROVED OCALIVA® DRUG PRODUCT AND PATENTS

24. Intercept makes and sells OCALIVA®, a product used in the treatment of primary biliary cholangitis (PBC) in combination with ursodeoxycholic acid (UDCA) in adults with an inadequate response to UDCA, or as monotherapy in adults unable to tolerate UDCA. The active ingredient in OCALIVA® is obeticholic acid. OCALIVA® is available in two strengths, 5 mg and 10 mg. A true and correct copy of the prescribing label for OCALIVA® is attached as Exhibit A.

**RESPONSE:** Upon information and belief, MSN admits that Intercept makes and sells OCALIVA®, which is indicated to treat primary biliary cholangitis (PBC) in combination with ursodeoxycholic acid (UDCA) in adults with an inadequate response to UDCA, or as monotherapy in adults unable to tolerate UDCA. Further, upon information and belief, MSN admits that the active ingredient in OCALIVA® is obetcholic acid, and OCALIVA® is available in two strengths, 5 mg and 10 mg. MSN admits that a purported copy of the OCALIVA® prescribing label was attached to Plaintiffs' Complaint as Exhibit A. MSN lacks knowledge or information sufficient to form a belief as to the truth or falsity of any remaining allegations of this paragraph and, therefore, denies those allegations.

25. Intercept Pharmaceuticals is the holder of New Drug Application ("NDA") No. 207999 for OCALIVA® and the owner of the patents-in-suit. The FDA approved NDA No. 207999 for OCALIVA® on May 27, 2016, and granted OCALIVA® five years of regulatory exclusivity for a new chemical entity pursuant to 21 C.F.R. § 314.108, which expires on May 27, 2021. The FDA also granted OCALIVA® orphan drug exclusivity pursuant to 21 C.F.R. § 316.31, which expires on May 27, 2023.

**RESPONSE:** Upon information and belief, MSN admits that Intercept Pharmaceuticals, Inc. is the holder of New Drug Application ("NDA") No. 207999 for OCALIVA® and purports

to be the owner of the patents-in-suit.  MSN admits that, according to information available on the

FDA's website, OCALIVA® was approved on May 27, 2016, and OCALIVA® was granted a

five-year new chemical entity, which expires on May 27, 2021. MSN admits that, according to

information available on the FDA's website, OCALIVA® was granted an orphan drug exclusivity,

which expires on May 27, 2023.  MSN lacks knowledge or information sufficient to form a belief

as to the truth or falsity of any remaining allegations of this paragraph and, therefore, denies those

allegations.

26.    IPEL is the exclusive licensee of the patents-in-suit, which are listed in the
Approved Drug Products With Therapeutic Equivalence Evaluations (an FDA publication
commonly known as the "Orange Book") for OCALIVA®.

**RESPONSE:** MSN lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations of this paragraph and, therefore, denies the allegations on this

basis.

27.    The RE286 patent entitled, "Steroids as Agonists for FXR," was duly and lawfully
issued by the USPTO on October 27, 2020. A true and correct copy of the RE286 patent is attached
as Exhibit B.

**RESPONSE:** MSN admits that, on its face, the RE286 patent is entitled "Steroids as

Agonists for FXR."  MSN admits that the USPTO reissued the RE286 patent on October 27, 2020,

but specifically denies that the patent was duly and legally issued.  MSN admits that a copy of the

RE286 patent was attached as Exhibit B to the Complaint.

28.    The '673 Patent entitled, "Preparation and Uses of Obeticholic Acid," was duly and
lawfully issued by the USPTO on January 19, 2016. A true and correct copy of the '673 Patent is
attached as Exhibit C.

**RESPONSE:** MSN admits that, on its face, the '673 patent is entitled "Preparation and

Uses of Obeticholic Acid."  MSN admits that the USPTO issued the '673 patent on January 19,

2016, but specifically denies that the patent was duly and legally issued.  MSN admits that a

purported copy of the '673 patent was attached to Plaintiffs' Complaint as Exhibit C.

10

29.    The '117 Patent entitled, "Preparation and Uses of Obeticholic Acid," was duly and lawfully issued by the USPTO on August 14, 2018. A true and correct copy of the '117 Patent is attached as Exhibit D.

**RESPONSE:** MSN admits that, on its face, the '117 patent is entitled "Preparation and Uses of Obeticholic Acid." MSN admits that the USPTO issued the '117 patent on August 14, 2018, but specifically denies that the patent was duly and legally issued. MSN admits that a purported copy of the '117 patent was attached to Plaintiffs' Complaint as Exhibit D.

30.    The '337 Patent entitled, "Compositions of Obeticholic Acid and Methods of Use," was duly and lawfully issued by the USPTO on August 21, 2018. A true and correct copy of the '337 Patent is attached as Exhibit E.

**RESPONSE:** MSN admits that, on its face, the '337 patent is entitled "Compositions of Obeticholic Acid and Methods of Use." MSN admits that the USPTO issued the '337 patent on August 21, 2018, but specifically denies that the patent was duly and legally issued. MSN admits that a purported copy of the '337 patent was attached to Plaintiffs' Complaint as Exhibit E.

31.    The '073 Patent entitled, "Preparation and Uses of Obeticholic Acid," was duly and lawfully issued by the USPTO on January 8, 2019. A true and correct copy of the '073 Patent is attached as Exhibit F.

**RESPONSE:** MSN admits that, on its face, the '073 patent is entitled "Preparation and Uses of Obeticholic Acid." MSN admits that the USPTO issued the '073 patent on January 8, 2019, but specifically denies that the patent was duly and legally issued. MSN admits that a purported copy of the '073 patent was attached to Plaintiffs' Complaint as Exhibit F.

32.    The '549 Patent entitled, "Compositions of Obeticholic Acid and Methods of Use," was duly and lawfully issued by the USPTO on September 1, 2020. A true and correct copy of the '549 Patent is attached as Exhibit G.

**RESPONSE:** MSN admits that, on its face, the '549 patent is entitled "Compositions of Obeticholic Acid and Methods of Use." MSN admits that the USPTO issued the '549 patent on September 1, 2020, but specifically denies that the patent was duly and legally issued. MSN admits that a purported copy of the '549 patent was attached to Plaintiffs' Complaint as Exhibit G.

11

## MSN'S ANDA

33.     On information and belief, MSN has submitted or caused to be submitted ANDA No. 215017 to the FDA under 21 U.S.C. § 355(j), in order to obtain approval to engage in the commercial manufacture, use, or sale of obeticholic acid tablets, as a purported generic version of OCALIVA®, prior to the expiration of the patents-in-suit.

**RESPONSE:** MSN admits that it submitted ANDA No. 215017 to the FDA under 21 U.S.C. § 355(j).  MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's obeticholic acid ANDA product that is the subject of ANDA No.  215017.  MSN denies any remaining allegations contained in this paragraph.

34.     On information and belief, on or about July 28, 2020, MSN Pharmaceuticals, Inc. and MSN Laboratories Private Limited mailed a letter to Intercept Pharmaceuticals regarding "Notification Pursuant to the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)(2)(B)(iv) and 21 C.F.R. § 314.95) Concerning ANDA No. 215017 and Ocalivia® [sic] (Obeticholic Acid Oral Tablets)" (the "First Notice Letter"). The First Notice Letter represented that MSN had submitted to the FDA the MSN ANDA and a purported Paragraph IV certification to obtain approval to engage in the commercial manufacture, use, or sale of the product described in the MSN ANDA before the expiration of patents listed in the Orange Book for OCALIVA®. Hence, MSN's purpose in submitting the MSN ANDA is to manufacture and market the ANDA Products before the expiration of the patents-in-suit.

**RESPONSE:** MSN admits to having sent a First Notice Letter dated July 28, 2020 pursuant to 21 U.S.C. § 355(j)(2)(B)(iv) and 21 C.F.R. § 314.95.  MSN states that the letter speaks for itself and no further answer is required.  To the extent an answer is required, MSN admits that it submitted ANDA No. 215017 to the FDA with a Paragraph IV certification.  MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's obeticholic acid ANDA product that is the subject of ANDA No.  215017.  MSN denies any remaining allegations contained in this paragraph.

12

35.    MSN's First Notice Letter stated that the Paragraph IV certification in the MSN ANDA alleges that the '390,[2] '673, '117, '337, and '073 Patents are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of the ANDA Products.

**RESPONSE:** MSN admits to having sent a First Notice Letter dated July 28, 2020 pursuant to 21 U.S.C. § 355(j)(2)(B)(iv) and 21 C.F.R. § 314.95.  MSN states that the letter speaks for itself and no further answer is required.  To the extent a response is required, MSN admits that its ANDA No. 215017 included a Paragraph IV certification with respect to the '390, '673, '117, '337, and '073 patents, alleging that the patents are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, offer or sale, or sale of the MSN ANDA product that is the subject of ANDA No. 215017.  MSN denies any remaining allegations contained in this paragraph.

36.    MSN's First Notice Letter contained a purported detailed statement of the factual and legal basis for its Paragraph IV certification ("First Detailed Statement").

**RESPONSE:** MSN admits to having sent a First Notice Letter dated July 28, 2020 pursuant to 21 U.S.C. § 355(j)(2)(B)(iv) and 21 C.F.R. § 314.95.  MSN states that the letter speaks for itself and no further answer is required.  To the extent a response is required, MSN admits that its First Notice Letter contained a detailed statement of the factual and legal bases of non-infringement and/or invalidity for the '673 patent, '117 patent, '337 patent, '390 patent, and '073 patent.  MSN denies any remaining allegations contained in this paragraph.

37.    On information and belief, on or about November 18, 2020, MSN Pharmaceuticals, Inc. and MSN Laboratories Private Limited mailed a letter to Intercept Pharmaceuticals regarding "Notification Pursuant to the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)(2)(B)(iv) and 21 C.F.R. § 314.95) Concerning ANDA No. 215017 and Ocaliva® [sic] (Obeticholic Acid Oral Tablets)" (the "Second Notice Letter"). The Second Notice Letter represented that MSN had submitted to the FDA a purported Paragraph IV certification to obtain approval to engage in the commercial manufacture, use, or sale of the product described in the MSN ANDA before the expiration of patents listed in the Orange Book for OCALIVA®, the '549 Patent, and the RE286

[2] Plaintiffs' original complaint alleged infringement of the '390 Patent, which has now been reissued as the RE286 Patent.

Patent. Hence, MSN's purpose in submitting the MSN ANDA is to manufacture and market the ANDA Products before the expiration of the patents-in-suit.

**RESPONSE:** MSN admits to having sent a Second Notice Letter dated November 18, 2020 pursuant to 21 U.S.C. § 355(j)(2)(B)(iv) and 21 C.F.R. § 314.95.  MSN states that the letter speaks for itself and no further answer is required.  To the extent an answer is required, MSN admits that it submitted ANDA No. 215017 to the FDA with a Paragraph IV certification.  MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's obeticholic acid ANDA product that is the subject of ANDA No.  215017.  MSN denies any remaining allegations contained in this paragraph.

38.     MSN's Second Notice Letter stated that the Paragraph IV certification in the MSN ANDA alleges that the '549 Patent and the RE286 Patent are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of the ANDA Products.

**RESPONSE:**  MSN admits to having sent a Second Notice Letter dated November 18, 2020 pursuant to 21 U.S.C. § 355(j)(2)(B)(iv) and 21 C.F.R. § 314.95.  MSN states that the letter speaks for itself and no further answer is required.  To the extent a response is required, MSN admits that its ANDA No. 215017 included a Paragraph IV certification with respect to the '549 Patent, RE286 Patent, and U.S. Patent No. 10,751,349 ("the '349 patent")[3], alleging that the patents are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, offer or sale, or sale of the MSN ANDA product that is the subject of ANDA No. 215017. MSN denies any remaining allegations contained in this paragraph.

39.     MSN's Second Notice Letter contained a purported detailed statement of the factual and legal basis for its Paragraph IV certification ("Second Detailed Statement").

**RESPONSE:** MSN admits to having sent a Second Notice Letter dated November 18, 2020 pursuant to 21 U.S.C. § 355(j)(2)(B)(iv) and 21 C.F.R. § 314.95.  MSN states that the letter

---

[3] Intercept has not asserted the '349 patent against MSN in this action.

speaks for itself and no further answer is required. To the extent a response is required, MSN admits that its Second Notice Letter contained a detailed statement of the factual and legal bases of non-infringement and/or invalidity for the '549 Patent and RE286 Patent. MSN denies any remaining allegations contained in this paragraph.

40.     On information and belief, Defendants have participated in the preparation and submission of the MSN ANDA, have provided material support to the preparation and submission of the MSN ANDA, and intend to support the further prosecution of the MSN ANDA.

**RESPONSE:** MSN admits that MSN Laboratories submitted ANDA No. 215017 with the FDA and is seeking FDA approval of that application. MSN admits that MSN Pharmaceuticals acts as the U.S. agent for MSN Laboratories for purposes of regulatory submissions to the FDA with respect to ANDA No. 215017. MSN lacks knowledge or information sufficient to form a belief as to the truth or falsity of any remaining allegations of this paragraph and, therefore, denies those allegations.

41.     On information and belief, if the FDA approves the MSN ANDA, Defendants will manufacture, offer for sale, or sell the ANDA Products within the United States, including within Delaware, or will import the ANDA Products into the United States, including Delaware.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN specifically denies that the manufacture, use, offer for sale, sale, or importation of MSN's ANDA Product that is the subject of ANDA No. 215017 will directly infringe any valid claim of the patents-in-suit.

42.     Alternatively, on information and belief, if the FDA approves the MSN ANDA, Defendants will actively induce or contribute to the manufacture, use, offer for sale, or sale of the ANDA Products.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN specifically denies that the manufacture, use, offer for sale, sale, or importation of MSN's

ANDA Product that is the subject of ANDA No. 215017 will actively induce and/or contribute to its alleged infringement of the patents-in-suit.

43.     This action was filed within forty-five days of Intercept Pharmaceuticals' receipt of the First Notice Letter.  This First Amended Complaint is being filed within forty-five days of receipt of the Second Notice Letter.

**RESPONSE:** MSN admits that its First Notice Letter was received by Plaintiffs on July 29, 2020, which is 43 days before the filing date of Intercept's Complaint in this action.  MSN further admits that its Second Notice Letter was received by Plaintiffs on November 19, 2020, which is 41 days before the filing date of Intercept's First Amended Complaint in this action.

44.     MSN consented to the filing of this First Amended Complaint on December 29, 2020.

**RESPONSE:** MSN admits that it consented to the filing of this First Amended Complaint on December 29, 2020.  MSN gave that consent without waiver of any objection or response to the complaint except that it lacked MSN's consent pursuant to Federal Rule of Civil Procedure 15(a)(2).  This consent did not constitute agreement with, or admission to, any allegation in the current or any forthcoming complaint.  MSN denies any remaining allegations in this paragraph.

## COUNT I
## [ALLEGED] INFRINGEMENT OF THE RE286 PATENT

45.     Plaintiffs incorporate by reference paragraphs 1–44 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-44 as if fully set forth herein.

46.     On information and belief, Defendants have submitted or caused the submission of the MSN ANDA to the FDA and continue to seek FDA approval of the MSN ANDA.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN denies any remaining allegations in this paragraph.

16

47.     Defendants have infringed the RE286 Patent under 35 U.S.C. § 271(e)(2)(A) by submitting the MSN ANDA with a Paragraph IV certification and seeking FDA approval of the MSN ANDA prior to the expiration of the RE286 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

48.     On information and belief, if the MSN ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, or otherwise distribute the ANDA Products in the United States, directly infringing the RE286 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

49.     On information and belief, upon FDA approval of the MSN ANDA, Defendants will market and distribute the MSN ANDA Products to resellers, pharmacies, health care professionals, and end users of the MSN ANDA Products. Accompanying the MSN ANDA Products, Defendants will also knowingly and intentionally include a product label and insert containing instructions for administering the MSN ANDA Products. Accordingly, Defendants will induce physicians and other health care professionals, resellers, pharmacies, and end users of the MSN ANDA Products to directly infringe one or more claims of the RE286 Patent. In addition, on information and belief, Defendants will encourage acts of direct infringement with knowledge of the RE286 Patent and knowledge that they are encouraging infringement.

**RESPONSE:** MSN denies the allegations in this paragraph.

50.     Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Products would actively induce and/or contribute to infringement of the RE286 Patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 215017, Defendants will make, use, offer to sell, or sell the ANDA Products within the United States, or will import the ANDA Products into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the RE286 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

51.     Defendants had actual knowledge of the '390 Patent prior to filing the MSN ANDA. Defendants filed the MSN ANDA without a reasonable basis for asserting the '390 Patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Products. The RE286 Patent contains claims that are substantially identical to the '390 Patent.  In addition, the parties have stipulated that "all references to the '390 [P]atent in Plaintiffs' complaint shall be deemed to refer to the RE286 [P]atent," that "Plaintiffs' complaint shall be treated as if the RE286 [P]atent has been substituted for the '390 [P]atent," and that "the RE286 [P]atent is substituted for the '390 [P]atent in this action."  D.I. 14.  Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the RE286 Patent renders this case "exceptional" under 35 U.S.C. § 285.

**RESPONSE:** MSN admits that the parties filed a stipulation agreeing to substitute the

RE286 Patent for the '390 Patent.  MSN otherwise denies the allegations in this paragraph.

52. Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '390 Patent. Plaintiffs do not have an adequate remedy at law, and considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

**RESPONSE:** MSN denies the allegations in this paragraph.

## COUNT II
## DECLARATORY JUDGMENT OF [ALLEGED] INFRINGEMENT
## OF THE RE286 PATENT

53. Plaintiffs incorporate by reference paragraphs 1–52 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-52 as if fully set forth herein.

54. Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**RESPONSE:** MSN denies the allegations in this paragraph.

55. On information and belief, if the MSN ANDA is approved, the ANDA Products will be made, offered for sale, sold, or otherwise distributed in the United States, by or through Defendants and their affiliates.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN denies any remaining allegations in this paragraph.

56. On information and belief, Defendants know that health care professionals or patients will use the ANDA Products in accordance with the labeling sought by the MSN ANDA and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the RE286 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

57. On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Products complained of herein will begin immediately after the FDA approves the MSN ANDA. Any such conduct before the RE286 Patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the RE286 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

58.     As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the RE286 Patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

**RESPONSE:** This paragraph contains conclusions of law for which no response is required.  To the extent a response is required, MSN admits that a justiciable controversy exists between Plaintiffs and MSN regarding infringement of the RE286 Patent.

59.     Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

**RESPONSE:** MSN denies the allegations in this paragraph.

60.     This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

<div align="center">

**COUNT III**
**[ALLEGED] INFRINGEMENT OF THE '673 PATENT**

</div>

61.     Plaintiffs incorporate by reference paragraphs 1–60 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-60 as if fully set forth herein.

62.     On information and belief, Defendants have submitted or caused the submission of the MSN ANDA to the FDA and continue to seek FDA approval of the MSN ANDA.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN denies any remaining allegations in this paragraph.

63.     Defendants have infringed the '673 Patent under 35 U.S.C. § 271(e)(2)(A) by submitting the MSN ANDA with a Paragraph IV certification and seeking FDA approval of the MSN ANDA prior to the expiration of the '673 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

<div align="center">

19

</div>

64. On information and belief, if the MSN ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, or otherwise distribute the ANDA Products in the United States, directly infringing the '673 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

65. On information and belief, upon FDA approval of the MSN ANDA, Defendants will market and distribute the MSN ANDA Products to resellers, pharmacies, health care professionals, and end users of the MSN ANDA Products. Accompanying the MSN ANDA Products, Defendants will also knowingly and intentionally include a product label and insert containing instructions for administering the MSN ANDA Products. Accordingly, Defendants will induce physicians and other health care professionals, resellers, pharmacies, and end users of the MSN ANDA Products to directly infringe one or more claims of the '673 Patent. In addition, on information and belief, Defendants will encourage acts of direct infringement with knowledge of the '673 Patent and knowledge that they are encouraging infringement.

**RESPONSE:** MSN denies the allegations in this paragraph.

66. Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Products would actively induce and/or contribute to infringement of the '673 Patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 215017, Defendants will make, use, offer to sell, or sell the ANDA Products within the United States, or will import the ANDA Products into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '673 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

67. Defendants had actual knowledge of the '673 Patent prior to filing the MSN ANDA. Defendants filed the MSN ANDA without a reasonable basis for asserting the '673 Patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Products. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '673 Patent renders this case "exceptional" under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

68. Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '673 Patent. Plaintiffs do not have an adequate remedy at law, and considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

**RESPONSE:** MSN denies the allegations in this paragraph.

<div align="center">

**COUNT IV**
**DECLARATORY JUDGMENT OF [ALLEGED] INFRINGEMENT**
**OF THE '673 PATENT**

</div>

69.     Plaintiffs incorporate by reference paragraphs 1–68 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-68 as if fully set forth herein.

70.     Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**RESPONSE:** MSN denies the allegations in this paragraph.

71.     On information and belief, if the MSN ANDA is approved, the ANDA Products will be made, offered for sale, sold, or otherwise distributed in the United States, by or through Defendants and their affiliates.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN denies any remaining allegations in this paragraph.

72.     On information and belief, Defendants know that health care professionals or patients will use the ANDA Products in accordance with the labeling sought by the MSN ANDA and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '673 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

73.     On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Products complained of herein will begin immediately after the FDA approves the MSN ANDA. Any such conduct before the '673 Patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '673 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

74.     As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '673 Patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

**RESPONSE:** This paragraph contains conclusions of law for which no response is required. To the extent a response is required, MSN admits that a justiciable controversy exists between Plaintiffs and MSN regarding infringement of the '673 Patent.

75. Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

**RESPONSE:** MSN denies the allegations in this paragraph.

76. This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

## COUNT V
## [ALLEGED] INFRINGEMENT OF THE '117 PATENT

77. Plaintiffs incorporate by reference paragraphs 1–76 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-76 as if fully set forth herein.

78. On information and belief, Defendants have submitted or caused the submission of the MSN ANDA to the FDA and continue to seek FDA approval of the MSN ANDA.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN denies any remaining allegations in this paragraph.

79. Defendants have infringed the '117 Patent under 35 U.S.C. § 271(e)(2)(A) by submitting the MSN ANDA with a Paragraph IV certification and seeking FDA approval of the MSN ANDA prior to the expiration of the '117 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

80. On information and belief, if the MSN ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, or otherwise distribute the ANDA Products in the United States, directly infringing the '117 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

81.     On information and belief, upon FDA approval of the MSN ANDA, Defendants will market and distribute the MSN ANDA Products to resellers, pharmacies, health care professionals, and end users of the MSN ANDA Products. Accompanying the MSN ANDA Products, Defendants will also knowingly and intentionally include a product label and insert containing instructions for administering the MSN ANDA Products. Accordingly, Defendants will induce physicians and other health care professionals, resellers, pharmacies, and end users of the MSN ANDA Products to directly infringe one or more claims of the '117 Patent. In addition, on information and belief, Defendants will encourage acts of direct infringement with knowledge of the '117 Patent and knowledge that they are encouraging infringement.

**RESPONSE:** MSN denies the allegations in this paragraph.

82.     Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Products would actively induce and/or contribute to infringement of the '117 Patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 215017, Defendants will make, use, offer to sell, or sell the ANDA Products within the United States, or will import the ANDA Products into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '117 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

83.     Defendants had actual knowledge of the '117 Patent prior to filing the MSN ANDA. Defendants filed the MSN ANDA without a reasonable basis for asserting the '117 Patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Products. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '117 Patent renders this case "exceptional" under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

84.     Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '117 Patent. Plaintiffs do not have an adequate remedy at law, and considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

**RESPONSE:** MSN denies the allegations in this paragraph.

## COUNT VI
## DECLARATORY JUDGMENT OF [ALLEGED] INFRINGEMENT
## OF THE '117 PATENT

85.     Plaintiffs incorporate by reference paragraphs 1–84 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-

84 as if fully set forth herein.

23

86.     Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**RESPONSE:** MSN denies the allegations in this paragraph.

87.     On information and belief, if the MSN ANDA is approved, the ANDA Products will be made, offered for sale, sold, or otherwise distributed in the United States, by or through Defendants and their affiliates.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or

sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States.

MSN denies any remaining allegations in this paragraph.

88.     On information and belief, Defendants know that health care professionals or patients will use the ANDA Products in accordance with the labeling sought by the MSN ANDA and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '117 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

89.     On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Products complained of herein will begin immediately after the FDA approves the MSN ANDA. Any such conduct before the '117 Patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '117 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

90.     As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '117 Patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

**RESPONSE:** This paragraph contains conclusions of law for which no response is

required.  To the extent a response is required, MSN admits that a justiciable controversy exists

between Plaintiffs and MSN regarding infringement of the '117 Patent.

91.     Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

24

**RESPONSE:** MSN denies the allegations in this paragraph.

92.    This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

## COUNT VII
## [ALLEGED] INFRINGEMENT OF THE '337 PATENT

93.    Plaintiffs incorporate by reference paragraphs 1–92 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-92 as if fully set forth herein.

94.    On information and belief, Defendants have submitted or caused the submission of the MSN ANDA to the FDA and continue to seek FDA approval of the MSN ANDA.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States.

MSN denies any remaining allegations in this paragraph.

95.    Defendants have infringed the '337 Patent under 35 U.S.C. § 271(e)(2)(A) by submitting the MSN ANDA with a Paragraph IV certification and seeking FDA approval of the MSN ANDA prior to the expiration of the '337 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

96.    On information and belief, if the MSN ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, or otherwise distribute the ANDA Products in the United States, directly infringing the '337 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

97.    On information and belief, upon FDA approval of the MSN ANDA, Defendants will market and distribute the MSN ANDA Products to resellers, pharmacies, health care professionals, and end users of the MSN ANDA Products. Accompanying the MSN ANDA Products, Defendants will also knowingly and intentionally include a product label and insert containing instructions for administering the MSN ANDA Products. Accordingly, Defendants will induce physicians and other health care professionals, resellers, pharmacies, and end users of the MSN ANDA Products to directly infringe one or more claims of the '337 Patent. In addition, on information and belief, Defendants will encourage acts of direct infringement with knowledge of the '337 Patent and knowledge that they are encouraging infringement.

25

**RESPONSE:** MSN denies the allegations in this paragraph.

98.     Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Products would actively induce and/or contribute to infringement of the '337 Patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 215017, Defendants will make, use, offer to sell, or sell the ANDA Products within the United States, or will import the ANDA Products into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '337 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

99.     Defendants had actual knowledge of the '337 Patent prior to filing the MSN ANDA. Defendants filed the MSN ANDA without a reasonable basis for asserting the '337 Patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Products. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '337 Patent renders this case "exceptional" under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

100.    Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '337 Patent. Plaintiffs do not have an adequate remedy at law, and considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

**RESPONSE:** MSN denies the allegations in this paragraph.

<div align="center">

**COUNT VIII**
**DECLARATORY JUDGMENT OF [ALLEGED] INFRINGEMENT**
**OF THE '337 PATENT**

</div>

101.    Plaintiffs incorporate by reference paragraphs 1–100 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-

100 as if fully set forth herein.

102.    Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**RESPONSE:** MSN denies the allegations in this paragraph.

103.    On information and belief, if the MSN ANDA is approved, the ANDA Products will be made, offered for sale, sold, or otherwise distributed in the United States, by or through Defendants and their affiliates.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or

sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States.

MSN denies any remaining allegations in this paragraph.

104.    On information and belief, Defendants know that health care professionals or patients will use the ANDA Products in accordance with the labeling sought by the MSN ANDA and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '337 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

105.    On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Products complained of herein will begin immediately after the FDA approves the MSN ANDA. Any such conduct before the '337 Patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '337 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

106.    As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '337 Patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

**RESPONSE:** This paragraph contains conclusions of law for which no response is

required.  To the extent a response is required, MSN admits that a justiciable controversy exists

between Plaintiffs and MSN regarding infringement of the '337 Patent.

107.    Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

**RESPONSE:** MSN denies the allegations in this paragraph.

108.    This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

**COUNT IX**
**[ALLEGED] INFRINGEMENT OF THE '073 PATENT**

27

109.    Plaintiffs incorporate by reference paragraphs 1–108 as if fully set forth herein.

**RESPONSE:**  MSN repeats and incorporates by reference its responses to paragraphs 1-108 as if fully set forth herein.

110.    On information and belief, Defendants have submitted or caused the submission of the MSN ANDA to the FDA and continue to seek FDA approval of the MSN ANDA.

**RESPONSE:**  MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN denies any remaining allegations in this paragraph.

111.    Defendants have infringed the '073 Patent under 35 U.S.C. § 271(e)(2)(A) by submitting the MSN ANDA with a Paragraph IV certification and seeking FDA approval of the MSN ANDA prior to the expiration of the '073 Patent.

**RESPONSE:**  MSN denies the allegations in this paragraph.

112.    On information and belief, if the MSN ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, or otherwise distribute the ANDA Products in the United States, directly infringing the '073 Patent.

**RESPONSE:**  MSN denies the allegations in this paragraph.

113.    On information and belief, upon FDA approval of the MSN ANDA, Defendants will market and distribute the MSN ANDA Products to resellers, pharmacies, health care professionals, and end users of the MSN ANDA Products. Accompanying the MSN ANDA Products, Defendants will also knowingly and intentionally include a product label and insert containing instructions for administering the MSN ANDA Products. Accordingly, Defendants will induce physicians and other health care professionals, resellers, pharmacies, and end users of the MSN ANDA Products to directly infringe one or more claims of the '073 Patent. In addition, on information and belief, Defendants will encourage acts of direct infringement with knowledge of the '073 Patent and knowledge that it is encouraging infringement.

**RESPONSE:**  MSN denies the allegations in this paragraph.

114.    Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Products would actively induce and/or contribute to infringement of the '073 Patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 215017, Defendants will make, use, offer to sell, or sell the ANDA Products within the United States, or will import the ANDA Products into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '073 Patent.

**RESPONSE:**  MSN denies the allegations in this paragraph.

115.     Defendants had actual knowledge of the '073 Patent prior to filing the MSN ANDA. Defendants filed the MSN ANDA without a reasonable basis for asserting the '073 Patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Products. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '073 Patent renders this case "exceptional" under 35 U.S.C. § 285.

**RESPONSE:**  MSN denies the allegations in this paragraph.

116.     Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '073 Patent. Plaintiffs do not have an adequate remedy at law, and considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

**RESPONSE:**  MSN denies the allegations in this paragraph.

### COUNT X
### DECLARATORY JUDGMENT OF [ALLEGED] INFRINGEMENT
### OF THE '073 PATENT

117.     Plaintiffs incorporate by reference paragraphs 1–116 as if fully set forth herein.

**RESPONSE:**  MSN repeats and incorporates by reference its responses to paragraphs 1-116 as if fully set forth herein.

118.     Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**RESPONSE:**  MSN denies the allegations in this paragraph.

119.     On information and belief, if the MSN ANDA is approved, the ANDA Products will be made, offered for sale, sold, or otherwise distributed in the United States, by or through Defendants and their affiliates.

**RESPONSE:**  MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States.

MSN denies any remaining allegations in this paragraph.

120.     On information and belief, Defendants know that health care professionals or patients will use the ANDA Products in accordance with the labeling sought by the MSN ANDA and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '073 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

29

**RESPONSE:** MSN denies the allegations in this paragraph.

121.    On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Products complained of herein will begin immediately after the FDA approves the MSN ANDA. Any such conduct before the '073 Patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '073 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

122.    As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '073 Patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

**RESPONSE:** This paragraph contains conclusions of law for which no response is required. To the extent a response is required, MSN admits that a justiciable controversy exists between Plaintiffs and MSN regarding infringement of the '073 Patent.

123.    Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

**RESPONSE:** MSN denies the allegations in this paragraph.

124.    This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

<div align="center">

**COUNT XI**
**[ALLEGED] INFRINGEMENT OF THE '549 PATENT**

</div>

125.    Plaintiffs incorporate by reference paragraphs 1–124 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-124 as if fully set forth herein.

126.    On information and belief, Defendants have submitted or caused the submission of the MSN ANDA to the FDA and continue to seek FDA approval of the MSN ANDA.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States. MSN denies any remaining allegations in this paragraph.

127.    Defendants have infringed the '549 Patent under 35 U.S.C. § 271(e)(2)(A) by submitting the MSN ANDA with a Paragraph IV certification and seeking FDA approval of the MSN ANDA prior to the expiration of the '549 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

128.    On information and belief, if the MSN ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, or otherwise distribute the ANDA Products in the United States, directly infringing the '549 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

129.    On information and belief, upon FDA approval of the MSN ANDA, Defendants will market and distribute the MSN ANDA Products to resellers, pharmacies, health care professionals, and end users of the MSN ANDA Products. Accompanying the MSN ANDA Products, Defendants will also knowingly and intentionally include a product label and insert containing instructions for administering the MSN ANDA Products. Accordingly, Defendants will induce physicians and other health care professionals, resellers, pharmacies, and end users of the MSN ANDA Products to directly infringe one or more claims of the '549 Patent. In addition, on information and belief, Defendants will encourage acts of direct infringement with knowledge of the '549 Patent and knowledge that it is encouraging infringement.

**RESPONSE:** MSN denies the allegations in this paragraph.

130.    Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Products would actively induce and/or contribute to infringement of the '549 Patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 215017, Defendants will make, use, offer to sell, or sell the ANDA Products within the United States, or will import the ANDA Products into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '549 Patent.

**RESPONSE:** MSN denies the allegations in this paragraph.

131.    Defendants had actual knowledge of the '549 Patent prior to filing the Paragraph IV certification to the MSN ANDA, and were aware that submitting a Paragraph IV certification requesting FDA approval prior to the expiration of the '549 Patent would constitute an act of infringement of the '549 Patent. Defendants filed the Paragraph IV certification to the MSN ANDA without a reasonable basis for asserting the '549 Patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Products. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '549 Patent renders this case "exceptional" under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

132.    Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '549 Patent. Plaintiffs do not have an adequate remedy at law, and considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

**RESPONSE:** MSN denies the allegations in this paragraph.

<div align="center">

**COUNT XII**
**DECLARATORY JUDGMENT OF [ALLEGED] INFRINGEMENT**
**OF THE '549 PATENT**

</div>

133.    Plaintiffs incorporate by reference paragraphs 1–132 as if fully set forth herein.

**RESPONSE:** MSN repeats and incorporates by reference its responses to paragraphs 1-

132 as if fully set forth herein.

134.    Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**RESPONSE:** MSN denies the allegations in this paragraph.

135.    On information and belief, if the MSN ANDA is approved, the ANDA Products will be made, offered for sale, sold, or otherwise distributed in the United States, by or through Defendants and their affiliates.

**RESPONSE:** MSN admits that MSN Laboratories seeks approval to offer to sell and/or

sell MSN's ANDA product that is the subject of ANDA No. 215017 throughout the United States.

MSN denies any remaining allegations in this paragraph.

136.    On information and belief, Defendants know that health care professionals or patients will use the ANDA Products in accordance with the labeling sought by the MSN ANDA and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '549 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

137.    On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Products complained of herein will begin immediately after the FDA approves the MSN ANDA. Any such conduct before the '549 Patent expires will contribute to the infringement of and/or induce the infringement

of one or more claims of the '549 Patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f) and (g).

**RESPONSE:** MSN denies the allegations in this paragraph.

138.   As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '549 Patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

**RESPONSE:** This paragraph contains conclusions of law for which no response is required.  To the extent a response is required, MSN admits that a justiciable controversy exists between Plaintiffs and MSN regarding infringement of the '549 Patent.

139.   Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

**RESPONSE:** MSN denies the allegations in this paragraph.

140.   This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

**RESPONSE:** MSN denies the allegations in this paragraph.

## RESPONSE TO PLAINTIFFS' REQUEST FOR RELIEF

MSN denies that Plaintiffs are entitled to any of the relief requested in their Prayer for Relief or to any relief whatsoever, including any such relief specifically requested as against MSN.

## MSN'S AFFIRMATIVE DEFENSES

Further answering the Complaint, MSN asserts the following defenses in response to the allegations of the Complaint, undertaking the burden of proof only as to those defenses required by law, regardless of how such defenses are denominated below.  MSN reserves the right to amend this Answer with additional defenses as further information is obtained in discovery.  MSN asserts the following defenses without prejudice to the denials in this Answer and without admitting any allegations of the Complaint not otherwise admitted.

33

## FIRST AFFIRMATIVE DEFENSE
### (Invalidity)

The '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, and '549 patent and each of the claims thereof are invalid for failure to comply with one or more conditions for patentability set forth in one or more provisions of 35 U.S.C. §§ 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

## SECOND AFFIRMATIVE DEFENSE
### (No Direct Infringement)

MSN does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, and '549 patent.  If the product that is the subject of ANDA No. 215017 were marketed, MSN would not infringe any valid and enforceable claim of the '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, and '549 patent.

## THIRD AFFIRMATIVE DEFENSE
### (No Indirect Infringement)

MSN has not, does not, and will not induce the infringement of, or contribute to the infringement of, any valid and enforceable claim of the '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, and '549 patent.  If the product that is the subject of ANDA No. 215017 were marketed, MSN would not induce the infringement of, or contribute to the infringement of, any valid and enforceable claim of the '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, and '549 patent.

## FOURTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

The Complaint fails to state a claim for relief against MSN.

34

## FIFTH AFFIRMATIVE DEFENSE
### (No Exceptional Case)

The Complaint fails to state a claim for relief against MSN for an exceptional case under 35 U.S.C. § 285.

## SIXTH AFFIRMATIVE DEFENSE
### (Unenforceability)

Plaintiffs' infringement claims regarding the '673 patent, '117 patent, '337 patent, '073 patent, and '549 patent are barred because one or more of the Plaintiffs, the named inventors on those patents, their attorneys, representatives, predecessors in interest, and/or other persons with a duty of candor to the PTO has unclean hands, and engaged in inequitable conduct, on account of violations of the duty of candor to the PTO and misrepresentation of material facts to the PTO. The factual basis of the allegations in this paragraph is described below in MSN's counterclaims, which are incorporated herein by reference.

## SEVENTH AFFIRMATIVE DEFENSE

Any additional defenses that discovery may reveal.

WHEREFORE, MSN respectfully requests that Plaintiffs take nothing by way of their Complaint, that judgment be entered in favor of MSN, that MSN be awarded its attorneys' fees and costs, and all other just and proper relief.

## MSN LABORATORIES PRIVATE LTD. AND MSN PHARMACEUTICALS INC.'S
## COUNTERCLAIMS FOR DECLARATORY JUDGMENT

For their Counterclaims against Intercept Pharmaceuticals, Inc. and Intercept Pharma Europe Ltd. (collectively, "Intercept"), MSN Laboratories Private Ltd. ("MSN Laboratories") and MSN Pharmaceuticals Inc. ("MSN Pharmaceuticals") (collectively, "MSN" or "Counterclaim Plaintiffs") state as follows:

### THE PARTIES

1.      MSN Laboratories is a company organized and existing under the laws of India, having a principal place of business at Plot #C-24, Industrial Estate, Sanathnagar Hyderabad-18 Telangana, India.

2.      MSN Pharmaceuticals is a Delaware corporation having a principal place of business at 20 Duke Road, Piscataway, New Jersey 08854.

3.      On information and belief, Intercept Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 10 Hudson Yards, 37th Floor, New York, New York 10001.

4.      On information and belief, Intercept Pharma Europe Ltd. is a limited corporation organized under the laws of the United Kingdom, having a principal place of business at One Glass Wharf, Bristol, BS2 0ZX United Kingdom.

### JURISDICTION AND VENUE

5.      These Counterclaims arise under the patent laws of the United States and the Declaratory Judgment Act.  This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

6.      This Court has personal jurisdiction over Intercept on the basis of, *inter alia*, its contacts with Delaware relating to the subject matter of this action, including having filed this suit.

7.      Venue is proper under 28 U.S.C. §§ 1391 and 1400.

8.      Upon information and belief, Intercept holds approved New Drug Application ("NDA") No. 207999 for OCALIVA®, a product used in the treatment of primary biliary cholangitis (PBC) in combination with ursodeoxycholic acid (UDCA) in adults with an inadequate response to UDCA, or as monotherapy in adults unable to tolerate UDCA. The active ingredient in OCALIVA® is obeticholic acid. OCALIVA® is available in two strengths, 5 mg and 10 mg.

9.      An NDA must include, among other things, the number of any patent that claims the "drug" or a "method of using [the] drug" for which the NDA was submitted and for which a claim of patent infringement could reasonably be asserted against an authorized party. *See* 21 U.S.C. § 355(b)(1), -(c)(2); 21 C.F.R. § 314.53(b), -(c)(2).

10.      Upon approval of the NDA, the U.S. Food and Drug Administration ("FDA") publishes patent information for the approved drug in the "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book." *See* 21 U.S.C. § 355(j)(7)(A)(iii).

11.      U.S. Patent No. RE48,286 ("the RE286 patent"), entitled "Steroids as Agonists for FXR," was reissued by the United States Patent & Trademark Office ("USPTO") on October 27, 2020.

12.      Upon information and belief, Intercept purports to be the owner of all right, title, and interests in the RE286 patent.

13.      U.S. Patent No. 9,238,673 ("the '673 patent"), entitled "Preparations and Uses of Obeticholic Acid," was issued by the USPTO on January 19, 2016.

14.      Upon information and belief, Intercept purports to be the owner of all right, title, and interests in the '673 patent.

37

15.     U.S. Patent No. 10,047,117 ("the '117 patent"), entitled "Preparations and Uses of Obeticholic Acid," was issued by the USPTO on August 14, 2018.

16.     Upon information and belief, Intercept purports to be the owner of all right, title, and interests in the '117 patent.

17.     U.S. Patent No. 10,052,337 ("the '337 patent"), entitled "Compositions of Obeticholic Acid and Methods of Use," was issued by the USPTO on August 21, 2018.

18.     Upon information and belief, Intercept purports to be the owner of all right, title, and interests in the '337 patent.

19.     U.S. Patent No. 10,174,073 ("the '073 patent"), entitled "Preparations and Uses of Obeticholic Acid," was issued by the USPTO on January 8, 2019.

20.     Upon information and belief, Intercept purports to be the owner of all right, title, and interests in the '073 patent.

21.     U.S. Patent No. 10,758,549 ("the '549 patent"), entitled "Compositions of Obeticholic Acid and Methods of Use," was issued by the USPTO on September 1, 2020.

22.     Upon information and belief, Intercept purports to be the owner of all right, title, and interests in the '549 patent.

23.     U.S. Patent No. 10,751,349 ("the '349 patent"), entitled "Compositions of Obeticholic Acid and Methods of Use," was issued by the USPTO on August 25, 2020.  Upon information and belief, a true and correct copy of the '349 patent is attached as Exhibit 1.

24.     Upon information and belief, Intercept purports to be the owner of all right, title, and interests in the '349 patent.

25.     Upon information and belief, Intercept caused the '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, '549 patent, and '349 patent to be listed in the Orange Book in connection with OCALIVA®.

26.     MSN submitted Abbreviated New Drug Application ("ANDA") No. 215017 to obtain FDA approval to engage in the commercial manufacture, use, and sale of oral tablets containing 5 mg or 10 mg of obeticholic acid ("MSN's ANDA Product") prior to the expiration of the '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, '549 patent, and '349 patent. The '349 patent, '549 patent and RE286 patent did not issue until after MSN's ANDA was filed.

27.     MSN's ANDA No. 215017 contains a "Paragraph IV" certification under 21 U.S.C. § 505(j)(2)(A)(vii)(IV) that the '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, '549 patent, and '349 patent are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of MSN's ANDA Product.  The '349 patent, '549 patent and RE286 patent did not issue until after MSN's ANDA was filed.

28.     By a letter dated July 28, 2020 (the "First Notice Letter"), pursuant to 21 U.S.C. § 355(j)(2)(B) and 21 C.F.R. § 314.95, MSN notified Intercept that ANDA No. 215017 includes a Paragraph IV certification with respect to the '390 patent, '673 patent, '117 patent, '337 patent, and '073 patent.  MSN's First Notice Letter, which is hereby incorporated by reference as if fully set forth herein, contained a detailed statement of the factual and legal bases for MSN's Paragraph IV certification that the claims of the '390 patent, '673 patent, '117 patent, '337 patent, and '073 patent are invalid, unenforceable, and/or will not be infringed by MSN's ANDA Product.

29.     On September 10, 2020, Intercept filed its original complaint in this lawsuit alleging infringement of the '390 patent (since substituted with the RE286 patent), '673 patent, '117 patent, '337 patent, and '073 patent.

39

30.     By a letter dated November 18, 2020 (the "Second Notice Letter"), pursuant to 21 U.S.C. § 355(j)(2)(B) and 21 C.F.R. § 314.95, MSN notified Intercept that ANDA No. 215017 includes a Paragraph IV certification with respect to the '349 patent, '549 patent, and RE286 patent.  MSN's Second Notice Letter, which is hereby incorporated by reference as if fully set forth herein, contained a detailed statement of the factual and legal bases for MSN's Paragraph IV certification that the claims of the '349 patent, '549 patent, and RE286 patent are invalid, unenforceable, and/or will not be infringed by MSN's ANDA Product.

31.     On December 30, 2020, Intercept filed its First Amended Complaint in this lawsuit alleging infringement of the '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, and '549 patent.  Intercept did not file suit against MSN alleging infringement of the '349 patent within 45-days of the receipt of the Second Notice Letter.  Thus, MSN is permitted under the relevant statutes to bring an action under section 2201 for declaratory judgment related to the '349 patent. 21 U.S.C. 355(c)(3)(D).

32.     Intercept's conduct impairs MSN's ability to market MSN's ANDA Product.  MSN thus seeks a declaratory judgment that MSN's ANDA Product does not infringe the '673 patent, '117 patent, '337 patent, RE286 patent, '073 patent, '549 patent, and the '349 patent and/or that the afore-referenced patents are invalid and/or unenforceable.

## BACKGROUND – PURITY PATENTS

33.     The '673 patent is a parent patent to the '117 patent and the '073 patent.  The '673, '117, and '073 patents (hereinafter, "the purity patents") each require, *inter alia*, obeticholic acid comprising "less than 1%" of chenodeoxycholic acid ("CDCA").  *See* '673 patent at cl. 1; '117 patent at cl. 1; '073 patent at cl. 1.

34. The purity patents acknowledge that processes to prepare obeticholic acid were known in the art, including WO 2006/122977 ("the '977 application" or "Ferrari '977"). '673 patent at 20:59-64. The purity patents allege that "obeticholic acid produced by the processes of the present application is substantially more pure than obeticholic acid produced by processes in the prior art, including . . . the '977 process." *Id.* at 27:43-46.

35. Table B of the purity patents is titled "Comparison of Impurities of Obeticholic Acid Generated from Process of the Application and '977 Process." *Id.* at 27:55-56. Table B reports, *inter alia*, that the "process of the application" results in 0.2% of CDCA (Impurity 5), while the Ferrari '977 process results in 1% of CDCA. *Id.* at 27:53-28:48. Table B is reproduced below:

TABLE B

| Comparison of Impurities of Obeticholic Acid Generated from Process of the Application and '977 Process | | | |
|---|---|---|---|
| Parameter | Specification limit | Process of the application | '977 process |
| Water (KF) | NMT 4.5% | 1.0% | 2.1% |
| Impurity 1 and Impurity 4 | NMT 0.15% | <0.05% | <0.05% |
| Impurity 2 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 3 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 5 | NMT 3.0% | 0.2% | 1.0% |
| Impurity 6 | NMT 0.15% | <0.05% | <0.05% |

Impurity 1 is 6-ethylursodeoxycholic acid.
Impurity 2 is 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.
Impurity 3 is 6β-ethylchenodeoxycholic acid.
Impurity 4 is 3α,7α-dihydroxy-6-ethyliden-5βl-cholan-24-oic acid.
Impurity 5 is chenodeoxycholic acid.
Impurity 6 is 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid (6ECDCA dimer).
NMT refers to "not more than".

36. The purity patents also require, *inter alia*, "Form 1" or "non-crystalline" obeticholic acid. *See* '673 patent at cl. 1; '117 patent at cl. 8; '073 patent at cl. 1. The purity patents define "Form 1" obeticholic acid as "non-crystalline obeticholic acid." '673 patent at 40:49-50.

41

### A. Prosecution of the '673 patent.

37.     On June 17, 2013, Intercept filed a patent application for what later issued as the '673 patent.

38.     During the prosecution of the '673 patent, the examiner rejected all pending claims for anticipation and/or obviousness over Ferrari '977.  *See* Ex. 2 ('673 Prosecution, Jan. 8, 2015 Non-Final Rejection) at 8-14.  The examiner found "Ferrari ['977] teaches methods of preparing purified forms of obeticholic acid," and that the difference in purity levels obtained by Ferrari '977 and that claimed by the '673 patent was "slight."  *Id.* at 8-9; *see also, e.g.*, *id.* at 12 (finding that the claimed amount of "0.5% or below" of CDCA was "only a slight different from 1.0% produced by the process of the '977 disclosure").  The examiner reasoned that "[p]urer forms of known products may be patentable, but the mere purity of a product, by itself, does not render the product unobvious."  *Id.* at 12.

39.     The examiner then laid out "[f]actors to be considered" to determine "whether a purified form of an old product is obvious over the prior art."  *Id.*  First, a purified form of an old product may be obvious if "the claimed chemical compound or composition has the same utility as closely related materials in the prior art."  *Id.*  Second, a purified form of an old product may be obvious if "the prior art suggests the particular form or structure of the claimed material."  *Id.*  And third, a purified form of an old product may be obvious if the prior art suggests "suitable methods for obtaining that form or structure."  *Id.*

40.     The examiner found "the composition claimed would have the same and/or substantially similar properties based on merely altering the purity by a minimal percentage one of the five [im]purities and water."  *Id.* at 13.  The examiner also found a POSA "would have arrived at the instantly claimed invention" and "would have been motivated to do so" in view of

the "slight difference" in impurity levels. *Id.* While the examiner did not specify which "suitable method" a POSA would use to further purify obeticholic acid from the Ferrari '977 process, *see id.* at 12-13, the examiner found that the '673 patent's use of HPLC to measure the impurities in obeticholic acid prepared by the Ferrari '977 process provided "indicia that HPLC separates out other bile acids during purification," including CDCA. *Id.* at 6. HPLC is a form of chromatography.

41.     On June 8, 2015, Intercept traversed the examiner's rejections. *See* Ex. 3 ('673 Prosecution, June 8, 2015 Applicant Remarks). Intercept told the examiner "a skilled artisan, based on the disclosure of Ferrari ['977], could not have arrived at the instant invention with a reasonable expectation of success." *Id.* at 11. Intercept stated "a skilled artisan using the process described in Ferrari ['977] could in no way achieve a highly pure obeticholic acid comprising less than 1% of CDCA." *Id.*

42.     Intercept further "disagree[d]" with the examiner's "suggest[ion] that a skilled artisan, in view of Ferrari ['977], would resort to HPLC and, by using HPLC, would reasonably expect to achieve the instant invention." *Id.* Intercept argued that "as stated in the Rewolinski Declaration, due to the similarities in their physicochemical properties (as discussed above), it would be impractical to separate CDCA and obeticholic acid using column chromatography in order to achieve the instant invention." *Id.* According to Intercept, the "partition coefficient and total surface polarity" would make it "impractical" to purify "CDCA from obeticholic acid." *Id.* at 8.

43.     Dr. Melissa Rewolinski, one of the named inventors, filed a declaration containing many of the same representations as Intercept's. *See* Ex. 4 ('673 Prosecution, June 8, 2015 Rewolinski Decl.). Dr. Rewolinski held the position as Vice President at Intercept, has a Ph.D. in

synthetic chemistry, and declared that "[b]y virtue of my education and work experience, I am skilled in the art of organic synthetic chemistry, both currently and at the time of the subject invention." *Id.* ¶¶ 1-3. Dr. Rewolinski declared that "due to the similarity in their physicochemical properties, it would be impractical to separate obeticholic acid and CDCA using a chromatographic purification method such as HPLC to achieve highly pure obeticholic acid comprising less than 1% CDCA." *Id.* at ¶ 8. Dr. Rewolinski also declared that the "synthetic method in Ferrari could not produce obeticholic acid that comprises less than 1% of CDCA." *Id.* at ¶ 9.

44.     Dr. Rewolinski also emphasized the importance of reducing CDCA to less than 1% in obeticholic acid compositions. Dr. Rewolinski declared that because "obeticholic acid is at least 100-fold more potent than CDCA in activating the FXR nuclear receptor," the claimed composition "comprising less than 1% of CDCA[] would advantageously display improved, potent pharmaceutical effectiveness for treating diseases mediated by the FXR nuclear receptor." *Id.* at ¶ 6.

45.     The examiner subsequently requested that Dr. Rewolinski file a new declaration stating "highly pure obeticholic acid comprising less than 1% [CDCA] could not be successfully prepared" in view of another prior-art reference, Pellicciari. *See* Ex. 5 ('673 Prosecution, Nov. 12, 2015 Remarks); Ex. 6 ('673 Prosecution, Sept. 25, 2015 Rewolinski Decl.). At the same time, the examiner withdrew his rejections over Ferrari '977 "[i]n view of [the Rewolinski] declaration" and determined the rejected claims were allowable. Ex. 5 ('673 Prosecution, Nov. 12, 2015 Final Rejection) at 2.

46.     The examiner relied on the Rewolinski Declaration in the notice of allowance: "Specifically, the Declaration of Dr. Melissa Rewolinski indicates that 'highly pure obeticholic acid comprising less than 1% [CDCA] <u>could not be</u> successfully prepare[d] in view of Pellicciari,

Natalini, Eichner, Kipp, and Ferrari ['977]," which was a statement of "fact, not an opinion."  Ex. 7 ('673 Prosecution, Nov. 24, 2015 Notice of Allowance) at 2.

47.    The '673 patent issued with 23 claims.  Claim 1 of the '673 patent is reproduced below:

> 1.  A pharmaceutical composition comprising obeticholic acid Form 1 and a pharmaceutically acceptable carrier, wherein the obeticholic acid Form 1 comprises less than 1% of chenodeoxycholic acid.

**B. Prosecution of the '117 and '073 patents.**

48.    Around the time the '673 patent claims were allowed, on November 20, 2015, Intercept filed a related application that resulted in the '117 patent.  Intercept filed another related application on April 25, 2017, which resulted in the '073 patent.

49.    During the prosecution of both the '117 and '073 patents, the examiner again rejected the pending claims for obviousness over Ferrari '977.  *See* Ex. 8 ('117 Prosecution, Sept. 26, 2017 Non-Final Rejection) at 6-9; Ex. 9 ('073 Prosecution, Sept. 29, 2017 Non-Final Rejection) at 5-8.

50.    During the prosecution of the '073 patent, Intercept specifically cross-referenced the Rewolinski Declaration filed during the '673 patent prosecution, and stated "a skilled artisan using the process described in Ferrari ['977] could in no way achieve a highly pure obeticholic acid comprising less than 1% of CDCA, as instantly claimed."  Ex. 10 ('073 Prosecution, Dec. 29, 2017 Remarks) at 12.  Both the '117 and '073 patents were later allowed.  *See* Ex. 11 ('117 Prosecution, June 2, 2018 Notice of Allowance); Ex. 12 ('073 Prosecution, Aug. 27, 2018 Notice of Allowance).

51.     The '117 patent issued with 13 claims.  Claims 1 and 8 of the '117 patent are reproduced below:

1. A method of treating an FXR mediated disease or condition in a subject comprising administering to the subject a pharmaceutical formulation comprising an effective amount of a substantially pure solid form of obeticholic acid, wherein the solid form of obeticholic acid comprises less than 1% of chenodeoxycholic acid, and wherein the formulation comprises about 1 mg to about 30 mg of obeticholic acid.

8. The method of claim 1, wherein the solid form of obeticholic acid is Form 1 and wherein the solid form of obeticholic acid Form 1 is the non-crystalline form.

52.     The '073 patent issued with 61 claims.  Claim 1 of the '073 patent is reproduced below:

1. A pharmaceutical composition comprising non-crystalline obeticholic acid (OCA) comprising less than 1% by weight of chenodeoxycholic acid (CDCA), wherein the non-crystalline OCA is prepared by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent.

## BACKGROUND – PARTICLE SIZE PATENTS

53.     The '337 patent is a parent patent to the '349 patent and the '549 patent.  The '337 and '549 patents (hereinafter, "the particle size patents") both require, *inter alia*, obeticholic acid in the form of particles in which "at least 50% of the particles have a diameter of 200 μm or less." '337 patent at cl. 1;'549 patent at cl. 12.  The '349 patent requires, *inter alia*, obeticholic acid particles "wherein D50 is not more than 50 μm."  '349 patent at cl. 1.

46

## A. Prosecution of the '337 patent.

54.     On April 26, 2016, Intercept filed an application for what later issued as the '337 patent.

55.     During the prosecution of the '337 patent, Intercept filed a single information disclosure statement ("IDS") on January 4, 2017. *See* Ex. 13 ('337 Prosecution, Jan. 4, 2017 IDS). The IDS identified only ten references and did not include Ferrari '977. *See id.* The IDS also did not include any internal data. *Id.*

56.     On May 10, 2017, the examiner issued a requirement for restriction/election. *See* Ex. 14 ('337 Prosecution, May 10, 2017 Requirement for Restriction/Election). The examiner explained, *inter alia*, that then-pending claim 13—which recited using "jet-milling" to obtain obeticholic acid in which "50% of the particles have a diameter of 200 μm or less"—was distinct from the claimed compositions that did not specify obtaining the claimed particle size through jet-milling. *See id.* at 2-3; *see also* Ex. 15 ('337 Prosecution, Apr. 26, 2016 Pending Claims). The examiner reasoned that the claimed particle size "can be made by another and materially [different] process such as ball milling, high pressure homogenization or a cryogenic spray process," which evidenced that "[t]he inventions are distinct." Ex. 14 ('337 Prosecution, May 10, 2017 Requirement for Restriction/Election) at 3.

57.     On July 7, 2017, Intercept traversed the examiner's restriction requirement. *See* Ex. 16 ('337 Prosecution, July 7, 2017 Applicant Remarks). Intercept argued "[c]ontrary to the Examiner's allegations, the claimed product"—*i.e.*, the claimed particle size—"cannot be made by another process such as ball milling, high pressure homogenization or a cryogenic spray process because these processes may not provide the desired particle size and particle size distribution." *Id.* at 7.

58.    The examiner did not consider Ferrari '977 or any data from Intercept before allowing the '337 patent.  *See* Ex. 17 ('337 Prosecution, July 25, 2017 List of References); Ex. 18 ('337 Prosecution, April 10, 2018 Notice of Allowance).

59.    The '337 patent issued with 19 claims.  Claim 1 of the '337 patent is reproduced below:

> 1. A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less.

**B. Prosecution of the '349 and '549 patents.**

60.    On January 15, 2019, Intercept filed an application related to the '337 patent, which resulted in the '349 patent.  On February 11, 2020, Intercept filed another application related to the '337 patent, which resulted in the '549 patent.

61.    As with the '337 patent, Intercept did not identify Ferrari '977, or Intercept's internal data, in any IDS during the prosecution of the '349 and '549 patents.  *See* Ex. 19 ('349 Prosecution, Apr. 26, 2019 IDS); Ex. 20 ('349 Prosecution, Feb. 12, 2020 IDS); Ex. 21 ('349 Prosecution, May 22, 2020 IDS); Ex. 22 ('549 Prosecution, Feb. 21, 2020 IDS); Ex. 23 ('549 Prosecution, May 26, 2020 IDS).

62.    Consequently, the examiner did not consider Ferrari '977, or Intercept's internal data before allowing the '349 and '549 patent claims.  *See* Ex. 24 ('349 Prosecution, Oct. 24, 2019 List of References); Ex. 25 ('349 Prosecution, May 14, 2020 List of References); Ex. 26 ('349 Prosecution, June 1, 2020 List of References); Ex. 27 ('549 Prosecution, Mar. 23, 2020, List of References); Ex. 28 ('549 Prosecution, June 4, 2020, List of References); *see also* Ex. 29 ('349

Prosecution, June 1, 2020 Notice of Allowance); Ex. 30 ('549 Prosecution, June 4, 2020, Notice of Allowance).

63.     The '349 patent issued with 22 claims.  Claim 1 of the '349 patent is reproduced below:

1. A tablet comprising obeticholic acid in an amount of 1 mg to 50 mg and a pharmaceutically acceptable excipient, wherein said obeticholic acid is in the form of jet-milled particles having a diameter of less than about 100 μm when analyzed by laser diffraction, and wherein D50 is not more than 50 μm, and

wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 6% (wt/wt).

64.     The '549 patent issued with 33 claims.  Claim 12 of the '549 patent is reproduced below:

12. A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject a tablet comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients,

wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, and wherein at least 50% of the particles have a diameter of 200 μm or less;

wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w);

wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; and

49

wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M).

**INTERCEPT POSSESSED MATERIAL INFORMATION**

65.     Long before Intercept applied for the purity and particle size patents, it (and the named inventors, including at least Dr. Rewolinski and Richard Lancaster) possessed material information regarding the characteristics of obeticholic acid resulting from the Ferrari '977 process. ██████████████████████████████████████████████████████

██████████████████████████████

66.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████  ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

67.     ████████████████████████████████████████████████

████████████████████████████████.  ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

50

68.

69.

70.

71.

████████████████████████████████████████ ██████████

in her declaration, Dr. Rewolinski represented to the PTO that she had "been participating in the

development of obeticholic acid and [was] aware of the synthetic method described in

Ferrari ['977]."  Ex. 6 ('673 Prosecution, Sept. 25, 2015 Rewolinski Decl. ¶ 9).

72.     Before Intercept applied for the purity and particle size patents, ████████████

████████████████████████████████████ ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

73.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

████████████████████████████████.

74.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████.  ██████████████████████████

██████████████████.

75.     ████████████████████████████████████████

████████████████████████████████████████.  ██

████████████████████████████████████████████



76.

77.

78.

T



84.

85.



87.

88.



89.

90.

91.

92.

58

## COUNT I
### (Declaratory Judgment of Non-Infringement of the RE286 Patent)

93.     MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-92 of its Counterclaims as if fully set forth herein.

94.     Intercept alleges ownership of the RE286 patent, and Intercept has brought claims against MSN alleging infringement of the RE286 patent.

95.     The manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the RE286 patent, either directly or indirectly, and either literally or under the doctrine of equivalents.

96.     There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the RE286 patent.

97.     MSN has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the RE286 patent and is not liable for such infringement.

98.     MSN is entitled to a declaration that the manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the RE286 patent.

## COUNT II
### (Declaratory Judgment of Invalidity or Unenforceability of the RE286 Patent)

99.     MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-98 of its Counterclaims as if fully set forth herein.

100.     Intercept alleges ownership of the RE286 patent, and Intercept has brought claims against MSN alleging infringement of the RE286 patent.

101.    One or more claims of the RE286 patent are invalid under one or more provisions of 35 §§ U.S.C. 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

102.    By way of example and not limitation, one or more claims of the RE286 patent are invalid under 35 U.S.C. § 103 in view of, at least, the prior art references identified in MSN's Second Notice Letter that Intercept received.

103.    The alleged invention of the RE286 patent does no more than combine familiar elements according to known compounds, formulas, and methods to yield predictable results.  Any alleged improvement over the prior art set forth in the RE286 patent is not more than the predictable use of prior art elements according to their established functions.  A person of skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the RE286 patent and would have had a reasonable expectation of success in doing so.

104.    The subject matter claimed in the RE286 patent fails to comply with 35 U.S.C. § 103 in that the differences between the subject matter claimed in the patent and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

105.    MSN reserves the right to provide additional prior art and bases for invalidity in its contentions, responses to discovery requests, expert reports, and/or pleadings filed and/or served later in this action.

106.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use,

offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the RE286 patent.

107.    MSN is entitled to a declaration that all claims of the RE286 patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

## COUNT III
### (Declaratory Judgment of Non-Infringement of the '673 Patent)

108.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-107 of its Counterclaims as if fully set forth herein.

109.    Intercept alleges ownership of the '673 patent, and Intercept has brought claims against MSN alleging infringement of the '673 patent.

110.    The manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '673 patent, either directly or indirectly, and either literally or under the doctrine of equivalents.

111.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '673 patent.

112.    MSN has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the '673 patent and is not liable for such infringement.

113.    MSN is entitled to a declaration that the manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '673 patent.

**COUNT IV**
**(Declaratory Judgment of Invalidity or Unenforceability of the '673 Patent)**

114.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-113 of its Counterclaims as if fully set forth herein.

115.    Intercept alleges ownership of the '673 patent, and Intercept has brought claims against MSN alleging infringement of the '673 patent.

116.    One or more claims of the '673 patent are invalid under one or more provisions of 35 §§ U.S.C. 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

117.    By way of example and not limitation, one or more claims of the '673 patent are invalid under 35 U.S.C. § 103 in view of, at least, the prior art references identified in MSN's First Notice Letter that Intercept received.

118.    The alleged invention of the '673 patent does no more than combine familiar elements according to known compositions to yield predictable results.  Any alleged improvement over the prior art set forth in the '673 patent is not more than the predictable use of prior art elements according to their established functions.  A person of skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the '673 patent and would have had a reasonable expectation of success in doing so.

119.    The subject matter claimed in the '673 patent fails to comply with 35 U.S.C. § 103 in that the differences between the subject matter claimed in the patent and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

120.    MSN reserves the right to provide additional prior art and bases for invalidity in its contentions, responses to discovery requests, expert reports, and/or pleadings filed and/or served later in this action.

121.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '673 patent.

122.    MSN is entitled to a declaration that all claims of the '673 patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

## COUNT V
### (Declaratory Judgment of Non-Infringement of the '117 Patent)

123.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-122 of its Counterclaims as if fully set forth herein.

124.    Intercept alleges ownership of the '117 patent, and Intercept has brought claims against MSN alleging infringement of the '117 patent.

125.    The manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '117 patent, either directly or indirectly, and either literally or under the doctrine of equivalents.

126.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '117 patent.

127.    MSN has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the '117 patent and is not liable for such infringement.

128.    MSN is entitled to a declaration that the manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '117 patent.

## COUNT VI
### (Declaratory Judgment of Invalidity or Unenforceability of the '117 Patent)

129.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-128 of its Counterclaims as if fully set forth herein.

130.    Intercept alleges ownership of the '117 patent, and Intercept has brought claims against MSN alleging infringement of the '117 patent.

131.    One or more claims of the '117 patent are invalid under one or more provisions of 35 §§ U.S.C. 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

132.    By way of example and not limitation, one or more claims of the '117 patent are invalid under 35 U.S.C. § 103 in view of, at least, the prior art references identified in MSN's First Notice Letter that Intercept received.

133.    The alleged invention of the '117 patent does no more than combine familiar elements according to known methods to yield predictable results.  Any alleged improvement over the prior art set forth in the '117 patent is not more than the predictable use of prior art elements according to their established functions.  A person of skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the '117 patent and would have had a reasonable expectation of success in doing so.

134.    The subject matter claimed in the '117 patent fails to comply with 35 U.S.C. § 103 in that the differences between the subject matter claimed in the patent and the prior art are such

that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

135.    MSN reserves the right to provide additional prior art and bases for invalidity in its contentions, responses to discovery requests, expert reports, and/or pleadings filed and/or served later in this action.

136.    There is an actual, substantial, continuing and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '117 patent.

137.    MSN is entitled to a declaration that all claims of the '117 patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

## COUNT VII
### (Declaratory Judgment of Non-Infringement of the '337 Patent)

138.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-137 of its Counterclaims as if fully set forth herein.

139.    Intercept alleges ownership of the '337 patent, and Intercept has brought claims against MSN alleging infringement of the '337 patent.

140.    The manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '337 patent, either directly or indirectly, and either literally or under the doctrine of equivalents.

141.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use,

offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '337 patent.

142.   MSN has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the '337 patent and is not liable for such infringement.

143.   MSN is entitled to a declaration that the manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '337 patent.

## COUNT VIII
### (Declaratory Judgment of Invalidity or Unenforceability of the '337 Patent)

144.   MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-143 of its Counterclaims as if fully set forth herein.

145.   Intercept alleges ownership of the '337 patent, and Intercept has brought claims against MSN alleging infringement of the '337 patent.

146.   One or more claims of the '337 patent are invalid under one or more provisions of 35 §§ U.S.C. 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

147.   By way of example and not limitation, one or more claims of the '337 patent are invalid under 35 U.S.C. § 103 in view of, at least, the prior art references identified in MSN's First Notice Letter that Intercept received.

148.   The alleged invention of the '337 patent does no more than combine familiar elements according to known compositions to yield predictable results.  Any alleged improvement over the prior art set forth in the '337 patent is not more than the predictable use of prior art elements according to their established functions.  A person of skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the '337 patent and would have had a reasonable expectation of success in doing so.

149.    The subject matter claimed in the '337 patent fails to comply with 35 U.S.C. § 103 in that the differences between the subject matter claimed in the patent and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

150.    MSN reserves the right to provide additional prior art and bases for invalidity in its contentions, responses to discovery requests, expert reports, and/or pleadings filed and/or served later in this action.

151.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '337 patent.

152.    MSN is entitled to a declaration that all claims of the '337 patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

## <u>COUNT IX</u>
### (Declaratory Judgment of Non-Infringement of the '073 Patent)

153.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-152 of its Counterclaims as if fully set forth herein.

154.    Intercept alleges ownership of the '073 patent, and Intercept has brought claims against MSN alleging infringement of the '073 patent.

155.    The manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '073 patent, either directly or indirectly, and either literally or under the doctrine of equivalents.

156.     There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '073 patent.

157.     MSN has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the '073 patent and is not liable for such infringement.

158.     MSN is entitled to a declaration that the manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '073 patent.

## COUNT X
### (Declaratory Judgment of Invalidity or Unenforceability of the '073 Patent)

159.     MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-158 of its Counterclaims as if fully set forth herein.

160.     Intercept alleges ownership of the '073 patent, and Intercept has brought claims against MSN alleging infringement of the '073 patent.

161.     One or more claims of the '073 patent are invalid under one or more provisions of 35 §§ U.S.C. 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

162.     By way of example and not limitation, one or more claims of the '073 patent are invalid under 35 U.S.C. § 103 in view of, at least, the prior art references identified in MSN's First Notice Letter that Intercept received.

163.     The alleged invention of the '073 patent does no more than combine familiar elements according to known compositions to yield predictable results.  Any alleged improvement over the prior art set forth in the '073 patent is not more than the predictable use of prior art elements according to their established functions.  A person of skill in the art would have been

motivated to combine the teachings of the prior art to achieve the alleged invention of the '073 patent and would have had a reasonable expectation of success in doing so.

164. The subject matter claimed in the '073 patent fails to comply with 35 U.S.C. § 103 in that the differences between the subject matter claimed in the patent and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

165. MSN reserves the right to provide additional prior art and bases for invalidity in its contentions, responses to discovery requests, expert reports, and/or pleadings filed and/or served later in this action.

166. There is an actual, substantial, continuing and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '073 patent.

167. MSN is entitled to a declaration that all claims of the '073 patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

## COUNT XI
**(Declaratory Judgment of Non-Infringement of the '549 Patent)**

168. MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-167 of its Counterclaims as if fully set forth herein.

169. Intercept alleges ownership of the '549 patent, and Intercept has brought claims against MSN alleging infringement of the '549 patent.

170.    The manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '549 patent, either directly or indirectly, and either literally or under the doctrine of equivalents.

171.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '549 patent.

172.    MSN has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the '549 patent and is not liable for such infringement.

173.    MSN is entitled to a declaration that the manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '549 patent.

### COUNT XII
**(Declaratory Judgment of Invalidity or Unenforceability of the '549 Patent)**

174.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-173 of its Counterclaims as if fully set forth herein.

175.    Intercept alleges ownership of the '549 patent, and Intercept has brought claims against MSN alleging infringement of the '549 patent.

176.    One or more claims of the '549 patent are invalid under one or more provisions of 35 §§ U.S.C. 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

177.    By way of example and not limitation, one or more claims of the '549 patent are invalid under 35 U.S.C. § 103 in view of, at least, the prior art references identified in MSN's Second Notice Letter that Intercept received.

70

178.    The alleged invention of the '549 patent does no more than combine familiar elements according to known compositions to yield predictable results.  Any alleged improvement over the prior art set forth in the '549 patent is not more than the predictable use of prior art elements according to their established functions.  A person of skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the '549 patent and would have had a reasonable expectation of success in doing so.

179.    The subject matter claimed in the '549 patent fails to comply with 35 U.S.C. § 103 in that the differences between the subject matter claimed in the patent and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

180.    MSN reserves the right to provide additional prior art and bases for invalidity in its contentions, responses to discovery requests, expert reports, and/or pleadings filed and/or served later in this action.

181.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '549 patent.

182.    MSN is entitled to a declaration that all claims of the '549 patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

## COUNT XIII
### (Declaratory Judgment of Non-Infringement of the '349 Patent)

183.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-182 of its Counterclaims as if fully set forth herein.

184.    Intercept has alleged ownership of the '349 patent, in, *e.g.*, related actions filed in this judicial district.

185.    The manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '349 patent, either directly or indirectly, and either literally or under the doctrine of equivalents.

186.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '349 patent.

187.    MSN has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the '349 patent and is not liable for such infringement.

188.    MSN is entitled to a declaration that the manufacture, use, or sale of MSN's ANDA Product would not infringe any valid or enforceable claim of the '349 patent.

## <u>COUNT XIV</u>
### (Declaratory Judgment of Invalidity or Unenforceability of the '349 Patent)

189.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-188 of its Counterclaims as if fully set forth herein.

190.    Intercept has alleged ownership of the '349 patent, in, *e.g.*, related actions filed in this judicial district.

191.    One or more claims of the '349 patent are invalid under one or more provisions of 35 §§ U.S.C. 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

192.    By way of example and not limitation, one or more claims of the '349 patent are invalid under 35 U.S.C. § 103 in view of, at least, the prior art references identified in MSN's Second Notice Letter that Intercept received.

193.    The alleged invention of the '349 patent does no more than combine familiar elements according to known compositions to yield predictable results.  Any alleged improvement over the prior art set forth in the '349 patent is not more than the predictable use of prior art elements according to their established functions.  A person of skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the '349 patent and would have had a reasonable expectation of success in doing so.

194.    The subject matter claimed in the '349 patent fails to comply with 35 U.S.C. § 103 in that the differences between the subject matter claimed in the patent and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

195.    MSN reserves the right to provide additional prior art and bases for invalidity in its contentions, responses to discovery requests, expert reports, and/or pleadings filed and/or served later in this action.

196.    There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether the filing of MSN's ANDA No. 215017 and/or the manufacture, use, offer to sell, sale, and/or importation into the United States of MSN's ANDA Product infringes, has infringed, and/or will infringe a valid and enforceable claim of the '349 patent.

197.    MSN is entitled to a declaration that all claims of the '349 patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, or under other judicially created bases for invalidation.

## COUNT XV
### (Unenforceability of the '673 Patent)

198.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-197 of its Counterclaims as if fully set forth herein.

199.    There is an actual, substantial, and continuing justiciable case or controversy between MSN and Intercept having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment concerning the enforceability of the '673 patent.

200.    For the reasons discussed below and based at least on the conduct discussed in paragraphs 33-52 and 65-82, the claims of the '673 patent are unenforceable for, without limitation, inequitable conduct.

### A. Intercept and Dr. Rewolinski submitted false material information and withheld material information.

201.    Upon information and belief, Intercept and Dr. Rewolinski submitted false material information, and withheld material information, relevant to the '673 patent.

202.    Intercept, through its prosecution counsel, submitted false material information regarding the ability of chromatographic purification methods to separate CDCA from obeticholic acid to obtain the claimed "less than 1%" of CDCA.  For example, while Intercept informed the examiner that "due to the similarities in their physicochemical properties (as discussed above), it would be impractical to separate CDCA and obeticholic acid using column chromatography," Ex. 3 ('673 Prosecution, June 8, 2015 Applicant Remarks) at 11.

203.    Intercept also submitted false material information regarding whether such chromatographic purification methods could be used to purify obeticholic acid prepared from the

Ferrari '977 synthetic method.  While Intercept represented that "a skilled artisan using the process described in Ferrari ['977] could *in no way* achieve a highly pure obeticholic acid comprising less than 1% of CDCA," Ex. 3 ('673 Prosecution, June 8, 2015 Applicant Remarks) at 11 (emphasis added).

204.    Dr. Rewolinski similarly submitted false material information regarding the feasibility of purifying prior-art obeticholic acid compositions with chromatography to obtain the claimed "less than 1%" of CDCA.  Dr. Rewolinski declared that "due to the similarity in their physicochemical properties, it would be impractical to separate obeticholic acid and CDCA using a chromatographic purification method such as HPLC to achieve highly pure obeticholic acid comprising less than 1% CDCA."  Ex. 6 (Sept. 25, 2015 Rewolinski Decl.) at ¶ 8.

205.    Dr. Rewolinski also declared that the "synthetic method in Ferrari ['977] could not produce obeticholic acid that comprises less than 1% of CDCA." Ex. 6 (Sept. 25, 2015 Rewolinski Decl.)  at ¶ 9.

██████████████████████████████████████████████████ ███████

████████████████████████████

206.  In  sum,  ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████

207.  ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████  A  reasonable  examiner  would  have

considered such information important in deciding whether to allow the '673 patent claims.

208.  Intercept and Dr. Rewolinski's material omissions were compounded by other false

representations  and  omissions.  ████████████████████████████████████

████████████████████████████████████████████████████  While

Dr. Rewolinski declared that obeticholic acid compositions comprising less than 1% of CDCA

display "improved, potent pharmaceutical effectiveness," Ex. 6 (Sept. 25, 2015 Rewolinski Decl.)

at ¶ 6, ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████   ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████



209. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. While the purity patents each claim "Form 1"

or "non-crystalline" obeticholic acid, '673 patent at cl. 1; '117 patent at cl. 1; '073 patent at cl. 1,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮

**B. Intercept and Dr. Rewolinski intended to deceive the PTO.**

210. Upon information and belief, Intercept, through its prosecution counsel, and Dr.

Rewolinski submitted false material information, and withheld material information, with an intent

to deceive the PTO. As discussed above, Intercept and Dr. Rewolinski knew that the examiner's

rejection of the pending '673 patent claims was premised on the fact that "a purified form of an

old product is obvious over the prior art" if the prior art suggests "suitable methods for obtaining

that form or structure." *See* Ex. 2 ('673 Prosecution, Jan. 8, 2015 Non-Final Rejection) at 12.

Intercept and Dr. Rewolinski also knew that the examiner "suggested that a skilled artisan, in view

of Ferrari ['977], would resort to HPLC"—a chromatographic purification method—"and, by

using HPLC, would reasonably expect to achieve the instant invention." Ex. 3 ('673 Prosecution,

June 8, 2015 Applicant Remarks) at 11. Against this backdrop, Intercept and Dr. Rewolinski

submitted false information ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Intercept and Dr. Rewolinski

77

further repeated this information after the examiner indicated he would allow the claims based on these representations. *See* Ex. 5 ('673 Prosecution, Nov. 12, 2015 Remarks); Ex. 6 ('673 Prosecution, Sept. 25, 2015 Rewolinski Decl.). In view of this sequence of events and the information available to Intercept and Dr. Rewolinski, the only reasonable inference is that Intercept and Dr. Rewolinski submitted false information with an intent to deceive the PTO in order to obtain the '673 patent. Intercept and Dr. Rewolinski further knew, or should have known, ███████████████████████████████████████████████████████████████████████████████.

211. ███████████████████████████████████████████

███████████████████████████████████   ██████████████████████

███████████████████████████████████████████████████████████

████████████████████

212. ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ However, as Dr. Rewolinski acknowledged in her declaration, the Rewolinski Declaration was submitted to overcome "the Non-Final Office Action mailed January 8, 2015," in which "the Examiner has rejected the claimed invention . . . as ***being obvious*** over Ferrari *et al.* (WO2006/122977, 'Ferrari')"—not solely for anticipation over Ferrari '977. Ex. 6 ('673 Prosecution, Sept. 25, 2015 Rewolinski Decl.) at ¶ 4 (emphasis added). Intercept also expressly acknowledged that the examiner "suggested that a skilled artisan, in view of Ferrari ['977], would resort to HPLC"—a chromatography method—"to achieve the instant invention." Ex. 3 ('673 Prosecution, June 8, 2015 Applicant Remarks) at 11. ████████████████████████████████

████████████████████████████████████████████

213. ██████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████  But this response is again implausible in view of Dr. Rewolinski's

declaration.

214.   Dr. Rewolinski did not declare that ████████████████████████

███████████████████████████████████, she declared that "***due to the***

***similarity in their physicochemical properties***, it would be impractical to separate obeticholic acid

and CDCA using a chromatographic purification method such as HPLC to achieve highly pure

obeticholic acid comprising less than 1% CDCA."   Ex. 6 ('673 Prosecution, Sept. 25, 2015

Rewolinski Decl.) at ¶ 8 (emphasis added).    Indeed, to support her statement that "a

chromatographic purification method" would be "impractical" to obtain less than 1% CDCA, Dr.

Rewolinski focused exclusively on obeticholic acid and CDCA's similar physicochemical

properties, including their similar "partition co-efficient and total surface polarity." *Id.* at ¶ 7. Dr.

Rewolinski never declared that a chromatographic purification method would be "impractical" to

obtain less than 1% CDCA██████████████████████████████.

215.   ███████████████████████████████████████████

irrelevant to the '673 patent claims that were pending when Dr. Rewolinski filed the Rewolinski

Declaration.  None of the pending claims, which issued as claims 1-23 of the '673 patent, expressly

██████████████████████████ *See* Ex. 51 ('673 Prosecution, Pending Claims).  Instead,

the '673 patent limits the amount of impurities reported in Table B—█████████████████

██████    *See* '673 patent at 27:53-28:48 (identifying Impurities 1-6); *see generally* '673 patent

claims (specifying, to varying degrees, the percent of one or more of Impurities 1-6); ██████

████████████████████████████████████████████████████████████████████████

██████    The '673 patent also does not limit ██████████████████ based on the overall

purity of obeticholic acid.  None of claims 1-23 of the '673 patent recite a limitation concerning

the overall purity of obeticholic acid.  *Compare, e.g.*, '673 patent at cl. 1, *with* '117 patent at cl. 1

(reciting "substantially pure" obeticholic acid).

216.   ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████  ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████  Intercept also asserts

infringement over claims of the RE286 patent—which recites a "pharmaceutical formulation" of

obeticholic acid and methods of treatment using obeticholic acid—even though that patent only

discloses purifying obeticholic acid by chromatography.  *See* '286 patent at cls. 4, 5; *Id.* at 10:54-

55 (stating the obeticholic acid residue "was chromatographed on [a] silica gel column").  ██████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  In fact, the purity

patents explain removing residual solvents from obeticholic acid by drying with a vacuum—a

conventional and routine method to remove residual solvents that was known in the art.  *See, e.g.*,

'673 patent at 16:33-34 (explaining that "residual amounts of solvent are distilled off under

vacuum"); Ex. 52 (U.S. Patent No. 6,933,380) at 4:1-14 (explaining methods to "that can be used to extract residual solvent," including a step consisting of a "conventional drying method").

217.    MSN is accordingly entitled to a declaratory judgment that the claims of the '673 patent are unenforceable.

## COUNT XVI
### (Unenforceability of the '117 Patent)

218.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-217 of its Counterclaims as if fully set forth herein.

219.    There is an actual, substantial, and continuing justiciable case or controversy between MSN and Intercept having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment concerning the enforceability of the '117 patent.

220.    For the reasons discussed below and based at least on the conduct discussed in paragraphs 33-52 and 65-82, the claims of the '117 patent are unenforceable for, without limitation, inequitable conduct.

221.    The '673 patent is a parent to the '117 patent.  For the same reasons discussed above in connection with the '673 patent, a reasonable examiner would have considered Intercept's withheld information important in deciding whether to allow the parent application.  *See supra* ¶¶ 198-217.

222.    Additionally, both the '673 and '117 patents recite the same limitation "less than 1%" of CDCA.  *See* '673 patent at cl. 1; '117 patent at cl. 1.  Both patents also recite "Form 1" of obeticholic acid.  *See* '673 patent at cl. 1; '117 patent at cl. 8.

223.    For the same reasons discussed in connection with the parent '673 patent, upon information and belief, Intercept and Dr. Rewolinski submitted false material information, and withheld material information, relevant to the '117 patent.  *See supra* ¶¶ 198-217.

81

224.     For the same reasons discussed in connection with the parent '673 patent, upon information and belief, Intercept and Dr. Rewolinski submitted false material information, and withheld material information, with an intent to deceive the PTO.  *See supra* ¶¶ 198-217.

225.     MSN is accordingly entitled to a declaratory judgment that the claims of the '117 patent are unenforceable.

## COUNT XVII
### (Unenforceability of the '073 Patent)

226.     MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-225 of its Counterclaims as if fully set forth herein.

227.     There is an actual, substantial, and continuing justiciable case or controversy between MSN and Intercept having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment concerning the enforceability of the '073 patent.

228.     For the reasons discussed below and based at least on the conduct discussed in paragraphs 33-52 and 65-82, the claims of the '073 patent are unenforceable for, without limitation, inequitable conduct.

229.     The '673 patent is a parent to the '073 patent.  For the same reasons discussed above in connection with the '673 patent, a reasonable examiner would have considered Intercept's withheld information important in deciding whether to allow the parent application.  *See supra* ¶¶ 198-217.

230.     Additionally, both the '673 and '073 patents recite the same limitation "less than 1%" of CDCA.  *See* '673 patent at cl. 1; '073 patent at cl. 1.  Both patents also recite "Form 1" or "non-crystalline" obeticholic acid.  *See* '673 patent at cl. 1; '073 patent at cl. 1.

231.    For the same reasons discussed in connection with the parent '673 patent, upon information and belief, Intercept and Dr. Rewolinski submitted false material information, and withheld material information, relevant to the '073 patent.  *See supra* ¶¶ 198-217.

232.    For the same reasons discussed in connection with the parent '673 patent, upon information and belief, Intercept and Dr. Rewolinski submitted false material information, and withheld material information, with an intent to deceive the PTO.  *See supra* ¶¶ 198-217.

233.    MSN is accordingly entitled to a declaratory judgment that the claims of the '073 patent are unenforceable.

### COUNT XVIII
### (Unenforceability of the '337 Patent)

234.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-233 of its Counterclaims as if fully set forth herein.

235.    There is an actual, substantial, and continuing justiciable case or controversy between MSN and Intercept having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment concerning the enforceability of the '337 patent.

236.    For the reasons discussed below and based at least on the conduct discussed in paragraphs 53-73 and 83-92, the claims of the '337 patent are unenforceable for, without limitation, inequitable conduct.

**A. Intercept and the named inventors withheld material information and submitted false material information.**

237.   Upon information and belief, Intercept, through its prosecution counsel, and the named inventors, including at least Richard Lancaster, withheld material information, and submitted false material information, relevant to the '337 patent.

238.   

. As shown in the below table, Intercept and the named inventors, including at least Richard Lancaster,

:



| '337 Patent Representative Claims | |
|---|---|
| 1. A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least **50% of the particles have a diameter of 200 µm or less.** | |
| 6. The composition of claim 1, wherein at least **90% of the particles have a diameter of 200 µm or less.** | |



239. ████████████████████████████████████████████████

████ Intercept did not disclose Ferrari '977 as a prior-art reference during prosecution. *See* Ex. 13 ('337 Prosecution, Jan. 4, 2017 IDS). Accordingly, the examiner did not consider Ferrari '977—████████████████████████████████████—before allowing the '337 patent claims. *See* Ex. 17 ('337 Prosecution, July 25, 2017 List of References); Ex. 18 ('337 Prosecution, April 10, 2018 Notice of Allowance).

240. Intercept and the named inventors, including at least Richard Lancaster, also ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ████:

| '337 Patent Representative Claims | | | |
|---|---|---|---|
| 1. A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least **50% of the particles have a diameter of 200 μm or less.** |  | | |

85

| '337 Patent Representative Claims | |
|---|---|
| 6. The composition of claim 1, wherein at least **90% of the particles have a diameter of 200 μm or less.** |  |

241.    Intercept's material omissions were compounded by its false representation that one could not obtain the claimed particle size absent jet milling the particles. *See* Ex. 16 ('337 Prosecution, July 7, 2017 Applicant Remarks) at 7 ("Contrary to the Examiner's allegations, the claimed product cannot be made by another process such as ball milling, high pressure homogenization or a cryogenic spray process because these processes may not provide the desired particle size and particle size distribution."). Upon information and belief, this false representation misled the examiner into believing the claimed particle size was not inherent to prior-art obeticholic acid compositions.

**B. Intercept and the named inventors intended to deceive the PTO.**

242.    Upon information and belief, Intercept, through its prosecution counsel, and the named inventors, including at least Richard Lancaster, withheld material information, and submitted false material information, with an intent to deceive the PTO. Intercept and the named inventors, including at least Richard Lancaster and/or Kay Olmstead, sought and obtained claims

████████████████████. Intercept and the named inventors, including at least Richard Lancaster and/or Kay Olmstead, ████████████████████████ neglected to identify Ferrari '977 as a relevant prior-art reference at all.

243.    Intercept and the named inventors, including at least Richard Lancaster, knew, or should have known, ████████████████████████████████████ ████████████████████████. ██████████████████████████ ██████████████████████, that Ferrari '977 would be material to the PTO's consideration of the patent application.  Instead of submitting this material information, Intercept deceived the PTO by falsely claiming the claimed particle size could not be obtained without the use of jet-milling.

244.    In view of this sequence of events and the information available to Intercept and the named inventors, including at least Richard Lancaster, the only reasonable inference is that Intercept and the named inventors, including at least Richard Lancaster, withheld material information, and submitted false material information, with an intent to deceive the PTO in order to obtain the '337 patent.

245.    MSN is accordingly entitled to a declaratory judgment that the claims of the '337 patent are unenforceable.

### COUNT XIX
### (Unenforceability of the '349 Patent)

246.    MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-245 of its Counterclaims as if fully set forth herein.

247.    There is an actual, substantial, and continuing justiciable case or controversy between MSN and Intercept having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment concerning the enforceability of the '349 patent.

248.    For the reasons discussed below and based at least on the conduct discussed in paragraphs 53-73 and 83-92, the claims of the '349 patent are unenforceable for, without limitation, inequitable conduct.

249.    The '337 patent is a parent to the '349 patent.  For the same reasons discussed above in connection with the '337 patent, a reasonable examiner would have considered Intercept and the named inventors', including at least Richard Lancaster's, withheld information important in deciding whether to allow the parent application.  *See supra* ¶¶ 234-245.

250.    Additionally, the '337 patent claims include a limitation "at least 50% of the particles have a diameter of 200 μm or less," and the '349 patent claims include a limitation "wherein D50 is not more than 50 μm."  '337 patent at cl. 1; '349 patent at cl. 1.  As with the '337 patent, ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████.

251.    For the same reasons discussed in connection with the parent '337 patent, upon information and belief, Intercept and the named inventors, including at least Richard Lancaster, submitted false material information, and withheld material information, relevant to the '349 patent.  *See supra* ¶¶ 234-245.

252.    For the same reasons discussed in connection with the parent '337 patent, upon information and belief, Intercept and the named inventors, including at least Richard Lancaster, submitted false material information, and withheld material information, with an intent to deceive the PTO.  *See supra* ¶¶ 234-245.

253.    MSN is accordingly entitled to a declaratory judgment that the claims of the '349 patent are unenforceable.

## COUNT XX
### (Unenforceability of the '549 Patent)

254.     MSN repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1-253 of its Counterclaims as if fully set forth herein.

255.     There is an actual, substantial, and continuing justiciable case or controversy between MSN and Intercept having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment concerning the enforceability of the '549 patent.

256.     For the reasons discussed below and based at least on the conduct discussed in paragraphs 53-73 and 83-92, the claims of the '549 patent are unenforceable for, without limitation, inequitable conduct.

257.     The '337 patent is a parent to the '549 patent.  For the same reasons discussed above in connection with the '337 patent, a reasonable examiner would have considered Intercept and the named inventors', including at least Richard Lancaster's, withheld information important in deciding whether to allow the parent application.  *See supra* ¶¶ 234-245.

258.     Additionally, both the '337 and '549 patent claims include a limitation "at least 50% of the particles have a diameter of 200 μm or less."  '337 patent at cl. 1; '549 patent at cl. 12.

259.     For the same reasons discussed in connection with the parent '337 patent, upon information and belief, Intercept and the named inventors, including at least Richard Lancaster, submitted false material information, and withheld material information, relevant to the '549 patent.  *See supra* ¶¶ 234-245.

260.     For the same reasons discussed in connection with the parent '337 patent, upon information and belief, Intercept and the named inventors, including at least Richard Lancaster, submitted false material information, and withheld material information, with an intent to deceive the PTO.  *See supra* ¶¶ 234-245.

261.    MSN is accordingly entitled to a declaratory judgment that the claims of the '549 patent are unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, MSN respectfully requests judgment in its favor and against Plaintiffs/Counterclaim Defendants as follows:

a.    declaring that MSN has not infringed and will not infringe any valid and enforceable claim of the RE286 patent;

b.    declaring that the claims of the RE286 patent are invalid;

c.    declaring that MSN has not infringed and will not infringe any valid and enforceable claim of the '673 patent;

d.    declaring that the claims of the '673 patent are invalid;

e.    declaring that the claims of the '673 patent are unenforceable;

f.    declaring that MSN has not infringed and will not infringe any valid and enforceable claim of the '117 patent;

g.    declaring that the claims of the '117 patent are invalid;

h.    declaring that the claims of the '117 patent are unenforceable;

i.    declaring that MSN has not infringed and will not infringe any valid and enforceable claim of the '337 patent;

j.    declaring that the claims of the '337 patent are invalid;

k.    declaring that the claims of the '337 patent are unenforceable;

l.    declaring that MSN has not infringed and will not infringe any valid and enforceable claim of the '073 patent;

m.    declaring that the claims of the '073 patent are invalid;

n.     declaring that the claims of the '073 patent are unenforceable;

o.     declaring that MSN has not infringed and will not infringe any valid and enforceable claim of the '549 patent;

p.     declaring that the claims of the '549 patent are invalid;

q.     declaring that the claims of the '549 patent are unenforceable;

r.     declaring that MSN has not infringed and will not infringe any valid and enforceable claim of the '349 patent;

s.     declaring that the claims of the '349 patent are invalid;

t.     declaring that the claims of the '349 patent are unenforceable;

u.     declaring this case exceptional and awarding MSN its attorneys' fees, costs, and expenses in this action under 35 U.S.C § 285 and all other applicable statutes and rules in common law that would be appropriate, with pre- and post-judgment interest thereon; and

v.     awarding such other and further relief as this Court deems just and proper.

Dated:

*OF COUNSEL:*

George C. Lombardi
Maureen L. Rurka
Bryce A. Cooper
Alison M. King
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
GLombard@winston.com
MRurka@winston.com
BCooper@winston.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

AMKing@winston.com

Jovial Wong
Claire A. Fundakowski
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, D.C. 2006
(202) 282-5000
JWong@winston.com
CFundakowski@winston.com

*Attorneys for Defendants/Counterclaim*
*Plaintiffs MSN Laboratories Private Ltd.*
*and MSN Pharmaceuticals Inc.*

# EXHIBIT 1

US010751349B2

(12) **United States Patent**
Lancaster et al.

(10) Patent No.: **US 10,751,349 B2**
(45) Date of Patent: ***Aug. 25, 2020**

(54) **COMPOSITIONS OF OBETICHOLIC ACID AND METHODS OF USE**

(71) Applicants: **Intercept Pharmaceuticals, Inc.**, New York, NY (US); **Sumitomo Dainippon Pharma Co., Ltd.**, Osaka-shi, Osaka (JP)

(72) Inventors: **Richard Gail Lancaster**, San Diego, CA (US); **Kay K. Olmstead**, Escondido, CA (US); **Masashi Kagihiro**, Suita (JP); **Mitsuhiro Matono**, Osaka (JP); **Ikuko Taoka**, Toyonaka (JP); **Mark Pruzanski**, New York, NY (US); **David Shapiro**, Rancho Santa Fe, CA (US); **Roya Hooshmand-Rad**, San Diego, CA (US); **Richard Pencek**, San Diego, CA (US); **Cathi Sciacca**, San Diego, CA (US); **Lise Eliot**, San Diego, CA (US); **Jeffrey Edwards**, San Diego, CA (US); **Leigh A. MacConell**, Encinitas, CA (US); **Tonya K. Marmon**, San Diego, CA (US)

(73) Assignee: **Intercept Pharmaceuticals, Inc.**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/248,512**

(22) Filed: **Jan. 15, 2019**

(65) **Prior Publication Data**

US 2019/0255071 A1      Aug. 22, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/030,141, filed on Jul. 9, 2018, now Pat. No. 10,646,499, which is a
(Continued)

(51) **Int. Cl.**
*A61K 31/575* (2006.01)
*A61K 47/50* (2017.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. *A61K 31/575* (2013.01); *A61K 9/14* (2013.01); *A61K 9/1617* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .. A61K 31/575; A61K 9/1617; A61K 9/2072; A61K 9/2059; A61K 9/2054;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,238,695 B1    5/2001  Makooi-Morehead et al.
7,078,376 B1    7/2006  Thomson

FOREIGN PATENT DOCUMENTS

EP          0261693        3/1988
WO    WO 2004/004774 A2    1/2004
(Continued)

OTHER PUBLICATIONS

Corpechot, C. et al. "Biochemical Response to Ursodeoxycholic Acid and Long-Term Prognosis in Primary Biliary Cirrhosis", Hepatology, 2008, vol. 48, p. 871-877.
(Continued)

*Primary Examiner* — Carlos A Azpuru
(74) *Attorney, Agent, or Firm* — Cooley LLP; Ivor R. Elrifi; Chen Chen

**US 10,751,349 B2**

Page 2

(57)                **ABSTRACT**

The disclosure relates to obeticholic acid formulations with improved stability, dissolution, and/or solubility, methods of preparing the same for use and methods of treating various diseases and conditions.

**22 Claims, 41 Drawing Sheets**

**Related U.S. Application Data**

continuation of application No. 15/139,138, filed on Apr. 26, 2016, now Pat. No. 10,052,337.

(60)   Provisional application No. 62/317,933, filed on Apr. 4, 2016, provisional application No. 62/153,040, filed on Apr. 27, 2015.

(51)   **Int. Cl.**

| | |
|---|---|
| *A61K 9/16* | (2006.01) |
| *A61K 9/14* | (2006.01) |
| *C07J 9/00* | (2006.01) |
| *A61K 9/20* | (2006.01) |
| *A61K 45/06* | (2006.01) |

(52)   **U.S. Cl.**
CPC .......... *A61K 9/2054* (2013.01); *A61K 9/2059* (2013.01); *A61K 9/2072* (2013.01); *A61K 45/06* (2013.01); *A61K 47/50* (2017.08); *C07J 9/005* (2013.01)

(58)   **Field of Classification Search**
CPC ........ A61K 9/14; A61K 9/1652; A61K 47/50; A61K 45/06
See application file for complete search history.

(56)              **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,138,390 | B2 | 11/2006 | Pellicciari |
| 8,216,613 | B2 | 7/2012 | Gryczke |
| 10,052,337 | B2 * | 8/2018 | Lancaster ............... A61K 9/14 |
| 2004/0161407 | A1 | 8/2004 | Kimura et al. |
| 2005/0101565 | A1 | 5/2005 | Dasseux |
| 2012/0071451 | A1 | 3/2012 | Spenard et al. |
| 2012/0160944 | A1 | 6/2012 | Dodd et al. |
| 2013/0345188 | A1 | 12/2013 | Steiner et al. |
| 2014/0186438 | A1 | 7/2014 | Manku et al. |
| 2019/0076446 | A1 | 3/2019 | Lancaster et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 2005/077935 A1 | 8/2005 |
| WO | WO 2006/056812 A1 | 6/2006 |
| WO | WO 2007/008480 A1 | 1/2007 |
| WO | WO 2010/121323 A1 | 10/2010 |
| WO | WO 2011/131943 A2 | 10/2011 |
| WO | WO 2013/192097 A1 | 12/2013 |
| WO | WO 2014/142364 A2 | 9/2014 |
| WO | WO 2014/184271 A1 | 11/2014 |
| WO | WO 2015/036442 A1 | 3/2015 |
| WO | WO 2016/107575 A1 | 7/2016 |

OTHER PUBLICATIONS

Corpechot, C. et al. "Early primary biliary cirrhosis: Biochemical response to treatment and prediction of long-term outcome", Journal of Hepatology, 2011, vol. 55, p. 1361-1367.
Kuiper, E. et al. "Improved Prognosis of Patients with Primary Biliary Cirrhosis That Have a Biochemical Response to Ursodeoxycholic Acid", Gastroenterology, 2009, vol. 136, p. 1281-1287.
Kumagi, T. et al. "Baseline Ductopenia and Treatment Response Predict Long-Term Histological Progression in Primary Biliary Cirrhosis", The American Journal of Gastroenterology, 2010, vol. 105, p. 2186-2194.
Momah, N. et al. "Optimizing biochemical markers as endpoints for clinical trials in primary biliary cirrhosis", Liver International, 2012, vol. 32, p. 790-795.
Mudaliar, S. et al. "Efficacy and Safety of the Farnesoid X Receptor Agonist Obeticholic Acid in Patients With Type 2 Diabetes and Nonalcoholic Fatty Liver Disease", Gastroenterology, 2013, vol. 145, No. 3, p. 574-582.
Stanimirov, B. et al. "Pleiotropic functions of bile acids mediated by the farnesoid X receptor", Acta Gastro-Enterologica Belgica, 2012, vol. 75, p. 389-398.
Fukunaka T. et al. "Effect of Particle Shape of Active Pharmaceutical Ingredients Prepared by Fluidized-Bed Jet-Milling on Cohesiveness", Journal of Pharmaceutical Sciences, 2005, vol. 94, No. 5, p. 1004-1012.
Hirschfield G. et al. "Efficacy of Obeticholic Acid in Patients with Primary Billiary Cirrhosis and Inadequate Response to Ursodeoxycholic Acid", Gastroenterology, 2015, 148(4), p. 751-761.
Kesisoglou F. et al. "Understanding the Effect of API Properties on Bioavailability Through Absorption Modelling", The AAPS Journal, , 2008, vol. 10, No. 4, p. 516-525.
Li J. et al. "The role of Intra- and Extragranular Microcrystal line Cellulose in Tablet Dissolution", Pharmaceutical Development and Technology, 1996, vol. 1, No. 4, p. 343-355.
Loh Z. et al. "Overview of milling techniques for improving the solubility of poorly water-soluble drugs", Science Direct, Asian Journal of Pharmaceutical Sciences, 2015, vol. 10, p. 255-274.
Patel R. et al. "An overview of size reduction technologies in the field of pharmaceutical manufacturing", Asian Journal of Pharmaceutics, 2008, p. 216-220.
Questran® powder 44.4% package insert, 2012.

* cited by examiner



FIG. 1



FIG.2

**U.S. Patent**     Aug. 25, 2020     Sheet 3 of 41     US 10,751,349 B2



**FIG. 3**



**FIG. 4**



**FIG. 5**



FIG. 6



FIG.7A



FIG.7B



FIG.8A



FIG.8B



FIG.8C



FIG.9



**FIG. 10**



FIG.11



FIG. 12

**FIG. 13**



FIG.14A



FIG.14B

U.S. Patent        Aug. 25, 2020        Sheet 19 of 41        US 10,751,349 B2



FIG.14C



**FIG. 15A**



FIG. 15B



**FIG. 16**



**FIG. 17A**



FIG. 17B



Black circles represent individual data points. Solid blue line is the line of unity. Solid red line is a loess fit of the relationship between predicted and observed.





FIG.19F



FIG.19E



FIG.19D



FIG.20A

FIG.20B

FIG.20C



**FIG.20D**



**FIG.20E**



FIG.20F



FIG.21A

FIG.21B



FIG.21C

FIG.21D



Blue circles represent observed data points. Solid red line represents median of observed data. Dashed red lines represent the 5th and 95th percentiles of observed data. Solid black line represents predicted median. Gray band represents the 90% prediction interval.





**FIG. 24A**



FIG. 24B



FIG. 24C









US 10,751,349 B2

1

# COMPOSITIONS OF OBETICHOLIC ACID AND METHODS OF USE

## BACKGROUND

The farnesoid X receptor (FXR), also known as the bile acid receptor (BAR) or NR1H4, is a member of the nuclear receptor superfamily of ligand-activated transcription factors. FXR forms with retinoid X receptor (RXR) a heterodimer receptor crucial for bile acid homeostasis. FXR is expressed in various tissues including the liver, kidney, intestine, colon, ovary, and adrenal gland, and is activated by a variety of naturally occurring bile acids, including the primary bile acid chenodeoxycholic acid (CDCA) and its taurine and glycine conjugates. Upon activation, the FXR-RXR heterodimer binds the promoter region of target genes and regulates their expression.

6-Ethyl-chenodeoxycholic acid (6-ECDCA, or obeticholic acid, or OCA), a bile acid derivative, shows a potent FXR activating activity, and accordingly offers great promise for the treatment of FXR-mediated diseases or conditions. Thus, there is a need to develop obeticholic acid compositions having desirable dissolution profile and solubility, and possessing advantageous storage stability.

## SUMMARY

The present disclosure relates to novel formulations of obeticholic acid, an FXR agonist, with improved stability, dissolution, and solubility, methods of preparing the same and methods of using the novel formulations for treating a disease or condition. In certain instances, the disease or condition is primary biliary cirrhosis (PBC), also known as primary biliary cholangitis. In other instances, the disease or condition is primary sclerosing cholangitis (PSC), chronic liver disease, nonalcoholic fatty liver disease (NAFLD), nonalcoholic steatohepatitis (NASH), hepatitis C infection, alcoholic liver disease, liver damage due to progressive fibrosis, or liver fibrosis. In another instance, the disease is NASH. In still other instances, the disease or condition is solid-tumor cancer such as, for example, hepatocellular carcinoma (HCC), colorectal cancer, gastric cancer, liver cancer, breast cancer, kidney cancer, or pancreatic cancer. Further provided herein are novel dosing regimens for administration of obeticholic acid for treatment of the diseases or conditions described herein.



obeticholic acid
(also known as INT-747)

A first aspect of the disclosure relates to a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester,

2

or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of less than 200 µm. Such compositions include all those described herein.

Another aspect of the disclosure relates to treating a disease or condition described herein in a patient in need thereof by administering a composition that includes obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, where the obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles.

Another aspect of the disclosure relates to treating a disease or condition described herein in a patient in need thereof by administering a composition that includes obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, where the obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 µm or less.

Another aspect of the disclosure relates to treating primary biliary cirrhosis (PBC) in a patient in need thereof by administering a composition that includes obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, optionally in a titration period, where the obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 µm or less.

In still another aspect of the disclosure is a method of treating primary sclerosing cholangitis (PSC), chronic liver disease, nonalcoholic fatty liver disease (NAFLD), nonalcoholic steatohepatitis (NASH), hepatitis C infection, alcoholic liver disease, liver damage due to progressive fibrosis, or liver fibrosis in a patient in need thereof by administering a composition that includes obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, optionally in a titration period, where the obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles. In one example, at least 50% of the particles have a diameter of 200 µm or less.

In yet another aspect of the disclosure is a method of treating a solid-tumor cancer in a patient in need thereof by administering a composition that includes obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, optionally in a titration period, where the obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles. In one example, at least 50% of the particles have a diameter of 200 µm or less.

In another aspect of the disclosure is a method of treating an autoimmune disease in a patient in need thereof by administering a composition that obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, optionally in a titration period, where the obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles. In one example, at least 50% of the particles have a diameter of 200 µm or less.

In another aspect of the disclosure are methods of treating a disease or condition described herein by administering a obeticholic acid composition described herein where the obeticholic acid composition is administered as part of a treatment regimen that includes a titration period and a starting dose of the obeticholic acid composition at an amount of about 5 mg or 10 mg. In particular instances, such methods include daily (QD) administration of an obeticholic

US 10,751,349 B2

3

acid described herein during the titration period. In particular instances, such methods also include administration of an adjusted dose of an obeticholic acid composition described herein after the titration period.

Another aspect of the disclosure relates to a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of less than 200 μm. Another aspect of the disclosure relates to a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and a pharmaceutically acceptable excipient (e.g., sodium starch glycolate) having a low alcohol (e.g., ethanol or methanol) content (e.g., less than 5% (wt/wt)).

In another aspect, the disclosure relates to a pharmaceutical composition, comprising a therapeutically effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, and a pharmaceutically acceptable excipient (e.g., sodium starch glycolate) having a low alcohol (e.g., ethanol or methanol) content (e.g., less than 5% (wt/wt)), wherein at least 50% of the particles have a diameter of less than 200 μm.

Another aspect of the disclosure relates to a pharmaceutical composition, comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, wherein at least 50% of the particles have a diameter of less than 200 μm, at about 1% to about 6% by weight, sodium starch glycolate at about 2% to about 8% by weight having a low alcohol (e.g., ethanol or methanol) content (e.g., less than 5% (wt/wt)), a lubricant (e.g., magnesium stearate) at about 0.1% to about 2.0% by weight, and a diluent (e.g., microcrystalline cellulose) at about 85% to about 95% by weight.

In another aspect, the disclosure relates to a method for preparing a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, wherein at least 50% of the particles have a diameter of less than 200 μm, comprising forming the particles through jet-milling.

Another aspect of the disclosure relates to a tablet comprising an intra-granular portion and an extra-granular portion, the intra-granular portion comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose, and one or more additional pharmaceutical excipients, and the extra-granular portion comprising one or more pharmaceutical excipients.

Another aspect of the disclosure relates to a tablet comprising an intra-granular portion and an extra-granular portion, the intra-granular portion comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose, and one or more additional pharmaceutical excipients, and the extra-granular portion comprising microcrystalline cellulose and one or more additional pharmaceutical excipients.

In another aspect, the disclosure relates to methods for treating or preventing an FXR mediated disease or condition or a disease or condition in which elevated concentrations of circulating lipid compounds or glucose in the blood, or decreased insulin level, or increased insulin resistance is involved, or inhibiting or reversing fibrosis, comprising administering a therapeutically effective amount of a composition of the present disclosure to a subject in need thereof.

4

Another aspect of the disclosure relates to use of a composition of the present disclosure for treating or preventing an FXR mediated disease or condition or a disease or condition in which elevated concentrations of circulating lipid compounds or glucose in the blood, or decreased insulin level, or increased insulin resistance is involved, or for inhibiting or reversing fibrosis.

In another aspect, the disclosure relates to use of a composition of the present disclosure in the manufacture of a medicament for treating or preventing an FXR mediated disease or condition or a disease or condition in which elevated concentrations of circulating lipid compounds or glucose in the blood, or decreased insulin level, or increased insulin resistance is involved, or for inhibiting or reversing fibrosis.

The compositions and methods of the present disclosure address unmet needs in the treatment or prevention of an FXR mediated disease or a disease or disorder in which elevated concentrations of circulating lipid compounds in the blood such as cholesterol and triglycerides or glucose are involved.

The compositions and methods of the present disclosure address unmet needs in the treatment of diseases and conditions described herein, including for example, PBC, PSC, NAFLD, NASH, cancer, and autoimmune diseases described herein.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a particle size distribution histogram of obeticholic acid before jet-milling.

FIG. 2 is a particle size distribution histogram of obeticholic acid after jet-milling.

FIG. 3 is a graph showing the dissolution profile of 10 mg tablets containing unmilled/non-agglomerated, unmilled/agglomerated, or jet-milled obeticholic acid.

FIG. 4 is a graph showing the dissolution profile of 5 mg tablets containing unmilled or jet-milled obeticholic acid.

FIG. 5 is a graph showing solubility of obeticholic acid in various buffers at 37° C. over a pH range of about 1.2 to about 12. The dashed and dotted lines represent the Biopharmaceutical Classification System (BCS) limit for 5 mg and 10 mg doses, respectively (5 and 10 mg/250 mL)

FIG. 6 is a graph showing obeticholic acid solubility in various biologically relevant buffers over a pH range of about 1.2 to about 12. The dashed and dotted lines represent the Biopharmaceutical Classification System (BCS) high-solubility limit for 5 mg and 10 mg doses, respectively (5 and 10 mg/250 mL).

FIG. 7A shows the LC/HRMS spectrum in the positive mode of a sample of obeticholic acid OCA and the synthesized ethyl ester of obeticholic acid OCA. FIG. 7B shows the mass spectrum in the positive mode of a sample of obeticholic acid OCA and the synthesized ethyl ester of obeticholic acid OCA.

FIG. 8A shows the total ion count (TIC) chromatogram in the positive ion mode acquired on Q-TOF LC/MS of a sample of obeticholic acid OCA containing the PEG impurity.

FIG. 8B shows the mass spectra in the positive mode acquired on Q-TOF LC/MS of a sample of obeticholic acid OCA containing the PEG impurity. FIG. 8C shows the total ion count (TIC) chromatogram acquired on triple quad (QQQ) mass spectrometer of a sample of obeticholic acid OCA containing the PEG impurity.

5

FIG. 9 shows an enlarged spectrum of the co-eluting peaks containing obeticholic acid OCA and the PEG impurity displaying spacing characteristics of PEG.

FIG. 10 illustrates the percent Change in ALP levels from Baseline to EOS: mITT Population (N=161).

FIG. 11 illustrates ALP Concentration (U/L) over duration of treatment.

FIG. 12 illustrates TB Concentration (μmol/L) over duration of treatment.

FIG. 13 illustrates proposed metabolic pathways of OCA in human plasma.

FIGS. 14A-14C illustrate Observed Individual Patient-Level Change in ALP from Baseline at Month for responders and non-responders by treatment group (Placebo (FIG. 14A), for OCA titration (FIG. 14B) and for OCA 10 mg (FIG. 14C)).

FIG. 15A illustrates mean ALP over time and FIG. 15B illustrates mean total bilirubin (TB) over time.

FIG. 16 illustrates the mean plasma concentration-time profile (Semi-log) of total OCA following a single oral dose of 10 mg OCA (inset shows expanded view of first 24 hours).

FIG. 17A illustrates ALP levels and FIG. 17B illustrates change in ALP from baseline with OCA monotherapy and combination therapy with UDCA, based on pooled data from study 747-201, study 747-202 and Phase 3 study 747-301.

FIGS. 18A-18F illustrate the Goodness of Fit: Observed Concentrations vs Predicted Concentrations of OCA. FIG. 18A shows the individual glyco-OCA group, FIG. 18B shows the individual unconjugated OCA group, FIG. 18C shows individual tauro-OCA group, FIG. 18D shows the population glyco-OCA group, FIG. 18E shows the population unconjugated OCA group, and FIG. 18F shows the population tauro-OCA group.

FIGS. 19A-19F illustrate the Goodness of Fit: Residuals. FIG. 19A shows the glyco-OCA group vs. concentration, FIG. 19B shows the unconjugated OCA group vs. concentration, FIG. 19C shows the tauro-OCA group vs. concentration, FIG. 19D shows the glyco-OCA group vs. time, FIG. 19E shows the unconjugated OCA group vs. time, and FIG. 19F shows the tauro-OCA group vs. time.

FIGS. 20A-20F illustrate External Validation of Model in Subjects with Normal Hepatic Function. FIG. 20A shows the single dose of 5 mg OCA, FIG. 20B shows the single dose of 10 mg OCA, FIG. 20C shows the single dose of 25 mg OCA, FIG. 20D shows the multiple dose of 5 mg OCA, FIG. 20E shows the multiple dose of 10 mg OCA, and FIG. 20F shows the multiple dose of 25 mg OCA.

FIGS. 21A-21D illustrate External Validation of Model in Subjects with Normal Hepatic Function. FIG. 21A shows the 6 day profile in Period 1, FIG. 21B shows the 24 hour profile in Period 1, FIG. 21C shows the 6 day profile in Period 2, and FIG. 21D shows the 24 hour profile in Period 2.

FIGS. 22A-22F illustrate External Validation of Model in Patients with Impaired Hepatic Function. FIG. 22A shows the effect of 10 mg OCA in mild impairment, FIG. 20B shows the effect of 10 mg OCA in moderate impairment, FIG. 20C shows the effect of 10 mg OCA in severe impairment, FIG. 22D shows the effect of 25 mg OCA in mild impairment, FIG. 20E shows the effect of 25 mg OCA in moderate impairment, and FIG. 20F shows the effect of 25 mg OCA in severe impairment.

6

FIG. 23A and FIG. 23B illustrate plasma OCA Concentrations are a Poor Surrogate for Liver OCA Concentrations.

FIG. 24A, FIG. 24B, and FIG. 24C illustrate changes in 4FIB-4, APRI Score, and NFS during the course of treating NASH using the obeticholic acid compositions described herein, respectively. *p<0.05, **p<0.01, ***p<0.0001; P-values were calculated using ANCOVA models, regressing change from baseline at each post-baseline visit on treatment group and baseline value of the outcome.

FIGS. 25A-25D illustrate a Visual Predictive Check of PK Model in Subjects with Normal Hepatic Function where FIG. 25A shows a 6-day profile, FIG. 25B shows a 24-hour profile, FIG. 25C shows a 6-day profile over period 2 and FIG. 25D shows a 24-hour profile over period 2.

FIGS. 26A-26D show Visual Predictive Check of PK model in Patients with Normal and Impaired Hepatic Function where FIG. 26A shows normal function, FIG. 26B shows mild impairment, FIG. 26C shows moderate impairment and FIG. 26D shows severe impairment.

FIGS. 27A-27F show External Validation of Model in Subjects with Normal Hepatic Function where FIG. 27A shows a single dose of OCA 5 mg, FIG. 27B shows a single dose of OCA 10 mg, FIG. 27C shows a single dose of OCA 25 mg, FIG. 27D shows a multiple dose of OCA 5 mg, FIG. 27E shows a multiple dose of OCA 10 mg, and FIG. 27F shows a multiple dose of OCA 25 mg.

FIGS. 28A-28F show External Validation of Model in Patients with Impaired Hepatic Function where FIG. 28A shows mild impairment of OCA 10 mg, FIG. 28B shows moderate impairment of OCA 10 mg, FIG. 28C shows severe impairment of OCA 10 mg, FIG. 28D shows mild impairment of OCA 25 mg, FIG. 28E shows moderate impairment of OCA 25 mg, and FIG. 28F shows severe impairment of OCA 25 mg.

## DETAILED DESCRIPTION

Pharmaceutical preparations containing a poorly water-soluble drug require some tools for improving the dissolution property of the drug, for example, adding a surfactant or other additive, or amorphizing the drug. However, the addition of the surfactant or other additive can chemically destabilize the drug, and methods of amorphizing the drug may require changing the crystal form.

When compositions containing a high concentration of a poorly water-soluble drug are produced, usually, powders are tableted by direct compression or granules are produced by dry or wet granulation methods and tableted. However, tableting by direct compression and granulation are largely affected by the physical properties of the drug and often have great weight variations and poor content uniformity at the time of tableting, resulting in poor manufacturability in consideration of productivity. Moreover, these approaches can provide a drug product with poor dissolution.

The present application is directed to compositions and formulations of obeticholic acid, a pharmaceutically active ingredient (also known as INT-747) having the chemical structure:

US 10,751,349 B2

7



obeticholic acid
(also known as INT-747)

or a pharmaceutically acceptable salt, ester, or amino acid conjugate (such as, e.g., glycine, taurine or sarcosine conjugate) thereof having improved dissolution, solubility, and stability for the treatment of a disease or condition described herein.

The details of the disclosure are set forth in the accompanying description below. Although methods and materials similar or equivalent to those described herein can be used in the practice or testing of the present disclosure, illustrative methods and materials are now described. Other features, objects, and advantages of the disclosure will be apparent from the description and from the claims. In the specification and the appended claims, the singular forms also include the plural unless the context clearly dictates otherwise. Unless defined otherwise, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this disclosure belongs. In the case of conflict, the present specification will control. All patents and publications cited in this specification are incorporated herein by reference in their entireties.

All percentages and ratios used herein, unless otherwise indicated, are by weight.

The term "viscosity enhancer," as used herein, refers to an agent or a mixture of agents that increases the thickness of a liquid thereby keeping the active ingredient suspended to allow accurate dosing. Viscosity enhancers include, but are not limited to, xantham gum, guar gum, acacia, alginic acid, sodium alginate, propylene glycol alginate, povidone, carbomer, salts of carboxymethylcellulose, methylcellulose, ethylcellulose, hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropyl methylcellulose, bentonite, polydextrose, carrageenan, sucrose, sorbitol, xylitol, dextrose, fructose, malitol, gelatin, tragacanth, a polyvinyl alcohol, cetearyl alcohol, colloidal silicon dioxide and mixtures thereof. In one embodiment, the viscosity enhancer can be any viscosity enhancer known in the art.

The term "flavoring agent," as used herein, refers to an agent or a mixture of agents that adds flavor to a mixture. Flavoring agents include, but are not limited to, artificial strawberry flavor, art banana flavor and artificial cream flavor. In one embodiment, the flavoring agent can be any flavoring agent known in the art.

The term "preservative," as used herein, refers to an agent or mixture of agents that is used to protect a composition against antimicrobial (e.g., yeast, mold, bacteria) activity. Preservatives include, but are not limited to, sodium benzoate, benzoic acid, ethylenediaminetetraacetic acid, sorbic acid, benzethonium chloride, benzalkonium chloride, bronopol, butyl paraben, methyl paraben, ethylparaben, propyl paraben, thiomerosol, sodium propionate, chlorhexidine, chlorobutanol, chlorocresol, cresol, imidurea, phenol, phe-

8

nylmercuric salts, potassium sorbate, propylene glycol, and mixtures thereof. In one embodiment, the preservative can be any preservative known in the art.

The term "organ" refers to a differentiated structure (as in a heart, lung, kidney, liver, etc.) consisting of cells and tissues and performing some specific function in an organism. This term also encompasses bodily parts performing a function or cooperating in an activity (e.g., an eye and related structures that make up the visual organs). The term "organ" further encompasses any partial structure of differentiated cells and tissues that is potentially capable of developing into a complete structure (e.g., a lobe or a section of a liver).

As used herein the term "6-ethyl chenodeoxycholic acid", "6-ECDCA", "obeticholic acid" or "OCA" refers to a compound having the chemical structure:



Other chemical names for obeticholic acid include: 3α, 7α-dihydroxy-6α-ethyl-5β-cholan-24-oic acid, 6α-ethyl-chenodeoxycholic acid, 6-ethyl-CDCA, 6ECDCA, cholan-24-oic acid, 6-ethyl-3,7-dihydroxy-(3α, 5β, 6α, 7α)- and INT-747. The CAS registry number for obeticholic acid is 459789-99-2. This term refers to all forms of obeticholic acid, e.g., non-crystalline, crystalline and substantially pure.

An "obeticholic acid composition" described herein refers to obeticholic acid administered to a patient in any form described herein including as a component of a pharmaceutical composition.

The articles "a" and "an" are used in this disclosure to refer to one or more than one (i.e., to at least one) of the grammatical object of the article. By way of example, "an element" means one element or more than one element.

The term "and/or" is used in this disclosure to mean either "and" or "or" unless indicated otherwise.

As used herein, the term "purity" refers to a chemical analysis of a compound obtained from, e.g., HPLC. In one embodiment, the purity of a compound is compared to the purity of the reference standard, e.g., obeticholic acid, via the area under their respective peak for comparisons. In one embodiment, purity accounts for the organic impurities in a sample.

"Treating", includes any effect, e.g., lessening, reducing, modulating, or eliminating, that results in the improvement of the condition, disease, disorder, etc. "Treating" or "treatment" of a disease state includes: inhibiting the disease state, i.e., arresting the development of the disease state or its clinical symptoms; or relieving the disease state, i.e., causing temporary or permanent regression of the disease state or its clinical symptoms.

The term "regimen" refers to a protocol for dosing and/or timing the administration of one or more therapies (e.g., an obeticholic acid composition described herein or another active agent such as for example UDCA) for treating a

US 10,751,349 B2

9

disease, disorder, or condition described herein. A regimen can include periods of active administration and periods of rest as known in the art. Active administration periods include administration of the obeticholic acid compositions described herein in a defined course of time, including, for example, the number of and timing of dosages of the compositions. In some regimens, one or more rest periods can be included where no compound is actively administered, and in certain instances, includes time periods where the efficacy of such compounds can be minimal.

The term "enhance" refers to an increase or improvement in the function or activity of a protein or cell after administration or contacting with a combination described herein compared to the protein or cell prior to such administration or contact.

"Preventing" the disease state includes causing the clinical symptoms of the disease state not to develop in a subject that may be exposed to or predisposed to the disease state, but does not yet experience or display symptoms of the disease state.

The term "inhibiting" or "inhibition," as used herein, refers to any detectable positive effect on the development or progression of a disease or condition. Such a positive effect may include the delay or prevention of the onset of at least one symptom or sign of the disease or condition, alleviation or reversal of the symptom(s) or sign(s), and slowing or prevention of the further worsening of the symptom(s) or sign(s).

"Disease state" means any disease, disorder, condition, symptom, or indication.

The term "effective amount" as used herein refers to an amount of obeticholic acid (e.g., an FXR-activating ligand) that produces an acute or chronic therapeutic effect upon appropriate dose administration. The effect includes the prevention, correction, inhibition, or reversal of the symptoms, signs and underlying pathology of a disease/condition (e.g., fibrosis of the liver, kidney, or intestine) and related complications to any detectable extent.

"A therapeutically effective amount" means the amount of obeticholic acid that, when administered to a mammal for treating a disease, is sufficient to effect such treatment for the disease. The "therapeutically effective amount" will vary depending on obeticholic acid, the disease and its severity and the age, weight, etc., of the mammal to be treated. A therapeutically effective amount can refer to a starting dose or adjusted dose as set forth herein.

A therapeutically effective amount of obeticholic acid can be formulated with a pharmaceutically acceptable carrier for administration to a human or an animal. Accordingly, obeticholic acid or its formulations can be administered, for example, via oral, parenteral, or topical routes, to provide an effective amount of the compound. In alternative embodiments, obeticholic acid prepared in accordance with the present disclosure can be used to coat or impregnate a medical device, e.g., a stent.

For any compound, the therapeutically effective amount can be estimated initially either in cell culture assays or in animal models, usually rats, mice, rabbits, dogs, or pigs. The animal model may also be used to determine the appropriate concentration range and route of administration. Such information can then be used to determine useful doses and routes for administration in humans. Therapeutic/prophylactic efficacy and toxicity may be determined by standard pharmaceutical procedures in cell cultures or experimental animals, e.g., $ED_{50}$ (the dose therapeutically effective in 50% of the population) and $LD_{50}$ (the dose lethal to 50% of the population). The dose ratio between toxic and therapeutic effects

10

is the therapeutic index, and it can be expressed as the ratio, $LD_{50}/ED_{50}$. Pharmaceutical compositions that exhibit large therapeutic indices are preferred. The dosage may vary within this range depending upon the dosage form employed, sensitivity of the patient, and the route of administration.

Dosage and administration are adjusted to provide sufficient levels of the active agent(s) or to maintain the desired effect. Factors which may be taken into account include the severity of the disease state, general health of the subject, age, weight, and gender of the subject, diet, time and frequency of administration, drug combination(s), reaction sensitivities, and tolerance/response to therapy.

A "starting dose" as used herein refers to an initial dose provided to a patient to provide a clinical effect while minimizing onset or occurrence of an adverse effect. A starting dose can, in certain instances, be less than an amount typically administered to a patient. A starting dose is provided in an amount that is titrated or gradually increased over the course of a titration period or during the course of treatment with an obeticholic acid composition described herein.

A "titration period" refers to a length of time for which a starting dose is administered to a patient. A titration period continues for a specified length of time, where the patient is often monitored for liver function and/or liver biochemistry as described herein. In one embodiment a titration period concludes when a patient tolerates an obeticholic acid composition described herein but has a decreased or minimal reduction in alkaline phosphatase.

An "adjusted dose" as used herein refers to a dose of an obeticholic acid composition described herein administered after the termination of a titration period. An adjusted dose is often increased compared to a starting dose but, as provided herein, patient tolerance and other factors described herein determine the dosage amount of an adjusted dose. A "re-adjusted dose" as used herein refers to any changed dosage amount or dose frequency of an adjusted dose in a patient.

"Hepatic impairment" is used in accordance with its standard meaning(s) in the art and can, in certain embodiments herein refer to scoring based upon the Child-Pugh Score of A, B, and C.

The term "administering" refers to the act of delivering an obeticholic acid composition described herein into a subject by such routes as oral, mucosal, topical, suppository, intravenous, parenteral, intraperitoneal, intramuscular, intralesional, intrathecal, intranasal or subcutaneous administration. Parenteral administration includes intravenous, intramuscular, intra-arterial, intradermal, subcutaneous, intraperitoneal, intraventricular, and intracranial administration. The term can also refer to the frequency (e.g., daily, weekly, monthly, etc.) of providing an obeticholic acid composition described herein to a patient. Administration generally occurs after the onset of the disease, disorder, or condition, or its symptoms but, in certain instances, can occur before the onset of the disease, disorder, or condition, or its symptoms (e.g., administration for patients prone to such a disease, disorder, or condition). In certain embodiments, administration as used herein refers to oral administration.

The term "co-administration" refers to administration of two or more agents (e.g., an obeticholic acid composition described herein and another active agent such as UDCA or an anti-cancer agent described herein). The timing of co-administration depends in part of the combination and the compositions administered and can include administration at

US 10,751,349 B2

11

the same time, prior to, or after the administration of one or more additional therapies. An obeticholic acid composition of the instant invention can be administered alone or can be coadministered to the patient. Co-administration is meant to include simultaneous or sequential administration of an obeticholic acid composition individually or in combination (more than one compound or agent). Thus, the preparations can also be combined, when desired, with other active substances (e.g., to reduce metabolic degradation). The obeticholic acid compositions described herein can be used in combination with each other (i.e., two different obeticholic acid compositions), with other active agents known to be useful in treating a disease, or with adjunctive agents that are not effective alone, but can contribute to or enhance the efficacy of the active agent.

The term "anti-cancer agent" is used in accordance with its plain ordinary meaning and refers to a composition having anti-neoplastic properties or the ability to inhibit the growth or proliferation of cells. In embodiments, an anti-cancer agent is a chemotherapeutic agent. In embodiments, an anti-cancer agent is an agent identified herein having utility in methods of treating cancer. In embodiments, an anti-cancer agent is an agent approved by the FDA or similar regulatory agency of a country other than the USA, for treating cancer.

"Pharmacological effect" as used herein encompasses effects produced in the subject that achieve the intended purpose of a therapy. In one embodiment, a pharmacological effect means that primary indications of the subject being treated are prevented, alleviated, or reduced. For example, a pharmacological effect would be one that results in the prevention, alleviation or reduction of primary indications in a treated subject. In another embodiment, a pharmacological effect means that disorders or symptoms of the primary indications of the subject being treated are prevented, alleviated, or reduced. For example, a pharmacological effect would be one that results in the prevention or reduction of primary indications in a treated subject.

"Geometric Isomers" means the diastereomers that owe their existence to hindered rotation about double bonds. These configurations are differentiated in their names by the prefixes cis and trans, or Z and E, which indicate that the groups are on the same or opposite side of the double bond in the molecule according to the Cahn-Ingold-Prelog rules.

"Solvates" means solvent addition forms that contain either stoichiometric or non-stoichiometric amounts of solvent. Obeticholic acid may have a tendency to trap a fixed molar ratio of solvent molecules in the crystalline solid state, thus forming a solvate. If the solvent is water the solvate formed is a hydrate, when the solvent is alcohol, the solvate formed is an alcoholate. Hydrates are formed by the combination of one or more molecules of water with one of the substances in which the water retains its molecular state as H₂O, such combination being able to form one or more hydrate. Additionally, the compounds of the present disclosure, for example, the salts of the compounds, can exist in either hydrated or unhydrated (the anhydrous) form or as solvates with other solvent molecules. Non-limiting examples of hydrates include monohydrates, dihydrates, etc. Non-limiting examples of solvates include ethanol solvates, acetone solvates, etc.

"Tautomers" refers to compounds whose structures differ markedly in arrangement of atoms, but which exist in easy and rapid equilibrium. It is to be understood that obeticholic acid may be depicted as different tautomers. It should also be understood that when obeticholic acid and synthetic intermediates of the disclosure have tautomeric forms, all

12

tautomeric forms are intended to be within the scope of the disclosure, and the naming of obeticholic acid does not exclude any tautomer form. obeticholic acid and synthetic intermediates of the disclosure can exist in several tautomeric forms, including the keto-enol. For example, in keto-enol tautomerism a simultaneous shift of electrons and a hydrogen atom occurs. Tautomers exist as mixtures of a tautomeric set in solution. In solid form, usually one tautomer predominates. Even though one tautomer may be described, the present disclosure includes all tautomers of the present compounds.

It is to be understood accordingly that the isomers arising from asymmetric carbon atoms (e.g., all enantiomers and diastereomers) are included within the scope of the disclosure, unless indicated otherwise. Such isomers can be obtained in substantially pure form by classical separation techniques and by stereochemically controlled synthesis. Furthermore, the structures and other compounds and moieties discussed in this application also include all tautomers thereof. Alkenes can include either the E- or Z-geometry, where appropriate. Obeticholic acid and synthetic intermediates may exist in stereoisomeric form, and therefore can be produced as individual stereoisomers or as mixtures.

A "pharmaceutical composition" is a formulation containing obeticholic acid in a form suitable for administration to a subject. In one embodiment, the pharmaceutical composition is in bulk or in unit dosage form. It is can be advantageous to formulate compositions in dosage unit form for ease of administration and uniformity of dosage. Dosage unit form, as used herein, refers to physically discrete units suited as unitary dosages for the subject to be treated; each unit containing a predetermined quantity of active reagent calculated to produce the desired therapeutic effect in association with the required pharmaceutical carrier. The specification for the dosage unit forms of the disclosure are dictated by and directly dependent on the unique characteristics of the active reagent and the particular therapeutic effect to be achieved, and the limitations inherent in the art of compounding such an active agent for the treatment of individuals.

The term "unit dosage form" refers to physically discrete units suitable as unitary dosages for human subjects and other mammals, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect, in association with a suitable pharmaceutical excipient as described above.

The unit dosage form is any of a variety of forms, including, for example, a capsule, an IV bag, a tablet, a single pump on an aerosol inhaler, or a vial. The quantity obeticholic acid (e.g., a formulation of obeticholic acid, or a pharmaceutically acceptable salt, solvate, or amino acid conjugate thereof) in a unit dose of composition is an effective amount and is varied according to the particular treatment involved. One skilled in the art will appreciate that it is sometimes necessary to make routine variations to the dosage, depending on the age and condition of the patient. The dosage will also depend on the route of administration. A variety of routes are contemplated, including oral, pulmonary, rectal, parenteral, transdermal, subcutaneous, intravenous, intramuscular, intraperitoneal, inhalational, buccal, sublingual, intrapleural, intrathecal, intranasal, and the like. Dosage forms for the topical or transdermal administration of a compound of this disclosure include powders, sprays, ointments, pastes, creams, lotions, gels, solutions, patches and inhalants. In one embodiment, obeticholic acid is mixed

US 10,751,349 B2

13

under sterile conditions with a pharmaceutically acceptable carrier, and with any preservatives, buffers, or propellants that are required.

The term "flash dose" refers to obeticholic acid formulations that are rapidly dispersing dosage forms.

The term "immediate release" is defined as a release of obeticholic acid from a dosage form in a relatively brief period of time, generally up to about 60 minutes. The term "modified release" is defined to include delayed release, extended release, and pulsed release. The term "pulsed release" is defined as a series of releases of drug from a dosage form. The term "sustained release" or "extended release" is defined as continuous release of obeticholic acid from a dosage form over a prolonged period.

A "subject" or "patient" includes mammals, e.g., humans, companion animals (e.g., dogs, cats, birds, and the like), farm animals (e.g., cows, sheep, pigs, horses, fowl, and the like) and laboratory animals (e.g., rats, mice, guinea pigs, birds, and the like). In one embodiment, the patient is human. In one embodiment, the subject is human child (e.g., between about 30 kg to about 70 kg). In one embodiment, the human child has had a Kasai procedure, where the Kasai procedure effectively gives them a functional bile duct when they are born either without a bile duct or a bile duct that is completely blocked at birth.

As used herein, the phrase "pharmaceutically acceptable" refers to those compounds, materials, compositions, carriers, and/or dosage forms which are, within the scope of sound medical judgment, suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk ratio.

"Pharmaceutically acceptable excipient" means an excipient that is useful in preparing a pharmaceutical composition that is generally safe, non-toxic and neither biologically nor otherwise undesirable, and includes excipient that is acceptable for veterinary use as well as human pharmaceutical use. A "pharmaceutically acceptable excipient" as used in the specification and claims includes both one and more than one such excipient.

A pharmaceutical composition of the disclosure is formulated to be compatible with its intended route of administration. Examples of routes of administration include parenteral, e.g., intravenous, intradermal, subcutaneous, oral (e.g., inhalation), transdermal (topical), and transmucosal administration. Solutions or suspensions used for parenteral, intradermal, or subcutaneous application can include the following components: a sterile diluent such as water for injection, saline solution, fixed oils, polyethylene glycols, glycerine, propylene glycol or other synthetic solvents; antibacterial agents such as benzyl alcohol or methyl parabens; antioxidants such as ascorbic acid or sodium bisulfite; chelating agents such as ethylenediaminetetraacetic acid (EDTA); buffers such as acetates, citrates or phosphates, and agents for the adjustment of tonicity such as sodium chloride or dextrose. The pH can be adjusted with acids or bases, such as hydrochloric acid or sodium hydroxide. The parenteral preparation can be enclosed in ampoules, disposable syringes or multiple dose vials made of glass or plastic.

"Process of the disclosure" refers to a method for preparing obeticholic acid as described herein, wherein the method comprises preparing a crystalline form of obeticholic acid.

A "control" as used herein refers to a baseline level determined on a patient-by-patient basis, an amount or level considered by those skilled in the art as a normal value, or any level or measure of a condition or biomarker described

14

herein taken from a patient or population of patients at any given time for a given condition.

"Fibrosis" refers to a condition involving the development of excessive fibrous connective tissue, e.g., scar tissue, in a tissue or organ. Such generation of scar tissue may occur in response to infection, inflammation, or injury of the organ due to a disease, trauma, chemical toxicity, and so on. Fibrosis may develop in a variety of different tissues and organs, including the liver, kidney, intestine, lung, heart, etc.

As used herein, a "cholestatic condition" refers to any disease or condition in which bile excretion from the liver is impaired or blocked, which can occur either in the liver or in the bile ducts. Intrahepatic cholestasis and extrahepatic cholestasis are the two types of cholestatic conditions. Intrahepatic cholestasis (which occurs inside the liver) is most commonly seen in primary biliary cirrhosis, primary sclerosing cholangitis, sepsis (generalized infection), acute alcoholic hepatitis, drug toxicity, total parenteral nutrition (being fed intravenously), malignancy, cystic fibrosis, and pregnancy. Extrahepatic cholestasis (which occurs outside the liver) can be caused by bile duct tumors, strictures, cysts, diverticula, stone formation in the common bile duct, pancreatitis, pancreatic tumor or pseudocyst, and compression due to a mass or tumor in a nearby organ.

Clinical symptoms and signs of a cholestatic condition include: itching (pruritus), fatigue, jaundiced skin or eyes, inability to digest certain foods, nausea, vomiting, pale stools, dark urine, and right upper quadrant abdominal pain. A patient with a cholestatic condition can be diagnosed and followed clinically based on a set of standard clinical laboratory tests, including measurement of levels of alkaline phosphatase, γ-glutamyl transpeptidase (GGT), 5' nucleotidase, bilirubin, bile acids, and cholesterol in a patient's blood serum. Generally, a patient is diagnosed as having a cholestatic condition if serum levels of all three of the diagnostic markers alkaline phosphatase, GGT, and 5' nucleotidase, are considered abnormally elevated. The normal serum level of these markers may vary to some degree from laboratory to laboratory and from procedure to procedure, depending on the testing protocol. Thus, a physician will be able to determine, based on the specific laboratory and test procedure, what an abnormally elevated blood level is for each of the markers. For example, a patient suffering from a cholestatic condition generally has greater than about 125 IU/L alkaline phosphatase, greater than about 65 IU/L GGT, and greater than about 17 NIL 5' nucleotidase in the blood. Because of the variability in the level of serum markers, a cholestatic condition may be diagnosed on the basis of abnormal levels of these three markers in addition to at least one of the symptoms mentioned above, such as itching (pruritus).

In one aspect, the disclosure provides a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of less than 200 The composition of the disclosure possesses advantageous properties, including improved dissolution profile and solubility.

In one embodiment, 90% of the particles have a diameter of 400 μm or less, 300 μm or less, 200 μm or less, 100 μm or less, 90 μm or less, 80 μm or less, 70 μm or less, 60 μm or less, 50 μm or less, 25 μm or less. In a further embodiment, 90% of the particles have a diameter of 300 μm or less, such as 200 μm or less, 100 μm or less, 90 μm or less, 80 μm or less, 70 μm or less, 60 μm or less, 50 μm or less, 25 μm

US 10,751,349 B2

15

16

or less. In a further embodiment, 90% of the particles have a diameter of 100 µm or less, such as 90 µm or less, 80 µm or less, 70 µm or less, more preferably 60 µm or less, more preferably 50 µm or less, 25 µm or less. In a further embodiment, 90% of the particles have a diameter of 90 µm or less, such as 80 µm or less, 70 µm or less, 60 µm or less, 50 µm or less, 25 µm or less. In a further embodiment, 90% of the particles have a diameter of 50 µm or less, such as 25 µm or less. In a further embodiment, 90% of the particles have a diameter of 25 µm or less.

In one embodiment, 50% of the particles have a diameter of 200 µm or less, such as 150 µm or less, 100 µm or less, 80 µm or less, 60 µm or less, 40 µm or less, 20 µm or less, 15 µm or less, 10 µm or less, 5 µm or less. In a further embodiment, 50% of the particles have a diameter of 100 µm or less, such as 80 µm or less, 60 µm or less, 40 µm or less, 20 µm or less, 15 µm or less, more preferably 10 µm or less, 5 µm or less. In a further embodiment, 50% of the particles have a diameter of 20 µm or less, such as 15 µm or less, 10 µm or less, 5 µm or less. In a further embodiment, 50% of the particles have a diameter of 10 µm or less, such as 5 µm or less. In a further embodiment, 50% of the particles have a diameter of 5 µm or less.

In one embodiment, 10% of the particles have a diameter of 5 µm or less, such as 4 µm or less, 3 µm or less, 2 µm or less, 1 µm or less. In a further embodiment, 10% of the particles have a diameter of 3 µm or less, 2 µm or less, or 1 µm or less. In a further embodiment, 10% of the particles have a diameter of 2 µm or less, such as, e.g., 1 µm or less. In a further embodiment, 10% of the particles have a diameter of 1 µm or less.

In one embodiment, 90% of the particles have a diameter of 400 µm or less, 50% of the particles have a diameter of 200 µm or less, and 10% of the particles have a diameter of 5 µm or less. In a further embodiment, 90% of the particles have a diameter of 300 µm or less, 50% of the particles have a diameter of 150 µm or less, and 10% of the particles have a diameter of 5 µm or less. In another embodiment, 90% of the particles have a diameter of 100 µm or less, 50% of the particles have a diameter of 50 µm or less, and 10% of the particles have a diameter of 5 µm or less. In another embodiment, 90% of the particles have a diameter of 100 µm or less, 50% of the particles have a diameter of 20 µm or less, and 10% of the particles have a diameter of 5 µm or less.

In yet another embodiment, 90% of the particles have a diameter of 100 µm or less, 50% of the particles have a diameter of 10 µm or less, and 10% of the particles have a diameter of 5 µm or less. In yet another embodiment, 90% of the particles have a diameter of 90 µm or less, 50% of the particles have a diameter of 10 µm or less, and 10% of the particles have a diameter of 5 µm or less. In another embodiment, 90% of the particles have a diameter of 50 µm or less, 50% of the particles have a diameter of 10 µm or less, and 10% of the particles have a diameter of 5 µm or less. In a further embodiment, 90% of the particles have a diameter of 50 µm or less, 50% of the particles have a diameter of 5 µm or less, and 10% of the particles have a diameter of 1 µm or less. In a further embodiment, 90% of the particles have a diameter of 25 µm or less, 50% of the particles have a diameter of 5 µm or less, and 10% of the particles have a diameter of 1 µm or less.

In one embodiment, 99% of the particles have a diameter of 200 µm or less, such as 1 µm to 100 µm, and 1 µm to 80 µm; 90% of the particles have a diameter of 200 µm or less, such as 2 µm to 100 µm, and 2 µm to 80 µm; and 50% of the particles have a diameter of 200 µm or less, such as 7 µm to 100 µm, 8 µm to 100 µm, and 9 µm to 80 µm. Furthermore

preferably 90% of the particles have a diameter of 100 µm or less, and 50% of the particles have a diameter of 90 µm or less.

In one embodiment, 50% of the particles have a diameter of 100 µm or less, such as 5 µm to 100 µm, and 5 µm to 50 µm; 90% of the particles have a diameter of 200 µm or less, such as 3 µm to 200 µm, and 3 µm to 150 µm; and 99% of the particles have a diameter of 300 µm or less, such as 1 µm to 300 µm, and 1 µm to 200 µm. In a further embodiment, 90% of the particles have a diameter of 150 µm or less, such as 3 µm to 150 µm, and 3 µm to 100 µm; and 99% of the particles have a diameter of 200 µm or less, such as 1 µm to 200 µm, and 1 µm to 150 µm. In a further embodiment, 99% of the particles have a diameter of 150 µm or less, preferably 2 µm to 150 µm, and more preferably 2 µm to 100 µm.

In the present disclosure, the "particle size reduction" is carried out for the purpose of crushing solid particles by the application of mechanical force such as impact, shearing, or friction thereto to reduce the particle sizes, thereby facilitating the formation of a homogeneous mixed state and improving the dissolution rate and bioavailability of the drug owing to the increased surface area (which refers to as specific surface area, or "SSA") of the drug. Known particle size reduction methods include, but are not limited to: high-speed rotating impact mills (hammer mills and impact mills), which reduce particle size by means of the impact force of a high-speed rotating hammer or pin in a chamber; carrier mills (ball mills or vibration mills) which reduce particle size powder by means of impact force or friction force in a rotating cylinder in which the powder and magnetic balls are placed; and fluid energy mills (jet mills), which reduce particle size by jetting compressed air and raw material particles from a nozzle and colliding the particles accelerated by the jet of air with swirling particles in a chamber. In one embodiment, the particle size of obeticholic acid is reduced using a jet mill. "Micronization," as defined herein, is a reduction of particle size of an active ingredient, i.e., obeticholic acid, to a diameter that is less than about 200 µm, such as less than about 100 µm, less than about 50 µm, and less than 25 µm.

In some examples, obeticholic acid has a particle size distribution with a $D_{50}$ of not more than 100 µm. In specific embodiments, the $D_{50}$ is not more than 50 µm, not more than 20 µm, or not more than 10 µm. In other examples, the $D_{90}$ is not more than 200 µm, or not more than 100 µm. In still other examples, the $D_{10}$ is not more than 20 µm, not more than 10 µm, or not more than 5 µm.

Particle size analysis can be carried out via different methods. Non-limiting examples of the methods include, but are not limited to, sieve technique, wet dispersion method with laser diffraction analysis, dry dispersion method with laser diffraction analysis, or a combination thereof. Particle size analysis is not limited to the methods described herein and can be carried out using any method known to one skilled in the art. In one embodiment, particle size analysis can be performed via a sieve technique. In another embodiment, particle size analysis can be performed using a wet dispersion method (e.g., water as the dispersing agent, and analysis by laser diffraction using, e.g., Sympatec equipment). In yet another embodiment, particle size analysis can be performed using a dry dispersion method and analyzed by laser diffraction using, e.g., Sympatec equipment.

In one embodiment, particle size distribution (% volume at each particle size) is measured via a Sympatec laser diffraction analyzer (e.g., Helos/KF-Magic F71000 with Rodos Dispersing Unit, Vibri sampling unit with Sniffer rotation, Nilfisk exhaustion, or equivalent). In another

17
18

embodiment, particle size distribution (% volume at each particle size) is measured via a Malvern laser diffraction analyzer.

For example, particles can be measured using the following:

Particle diameter distribution measurement apparatus: HELOS (KF-Magic F71000) & RODOS System (manufactured by Sympatec GmbH);

Measurement range of laser diffraction apparatus: 0.5/0.9 to 175 μm;

Calculation mode of laser diffraction apparatus: Fraunhofer HRLD (v3.2 Rel. 2);

Disperser: RODOS, dry dispersion system;

Dispersive pressure: 1.0 bar.

The composition of the present disclosure comprising obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, offers improved dissolution and solubility.

Without any intent to be bound by theory, obeticholic acid (OCA) ($pK_a$=4.82) exhibits a pH-solubility profile consistent with that of a weak acid. Solutions of OCA at pH 6.8 to 10 produce clear solutions. However, recovery of OCA steadily diminishes at pH higher than 8.0, indicating basic decomposition of OCA. Despite the solubility observed at pH 6.8 to 10, the particle size distribution of OCA is believed to impact its dissolution rate.

In one embodiment, in vitro dissolution rates or profiles of the entire active ingredient of the pharmaceutical composition are measured from the entire pharmaceutical composition according to the steps and conditions in Example 3. The dissolution rate can be measured in a variety of buffers, which optionally contains one or more surfactants. Non-limiting examples of buffers include acetate buffer, phosphate buffers, and alkaline borate buffers, or a combination thereof. Non-limiting examples of surfactants include, polysorbate 80 (Tween 80®), potassium laurate, sodium laurate, triethanol ammonium laurate, potassium myristate, sodium myristate, triethanol ammonium myristate, sodium lauryl sulfate, polyoxyethylene alkyl ether sodium sulfate, sodium alkyl β-alanine, sodium sulfosuccinate, acylmethyl taurine, sodium alkylethane sulfonate, polyoxyethylene alkyl ether sodium carboxylate, trimethyl ammonium chloride, benzalkonium chloride, lauryl amine oxide, amide propyl betaine coconut fatty acid, amide propyl beanie laurate, amide propyl betaine myristate, sorbitan monolaurate, sorbitan monopalmitate, sorbitan sesquioleate, polyoxyethylene sorbitan monolaurate, polyethylene glycol monooleate, polyoxyethylene alkyl ether, polyglycol diester, lauroyl diethanol amide, fatty acid isopropanol amide, maltitol hydroxy fatty acid alkyl ether, alkylated polysaccharide, alkyl glucoside, and sucrose fatty acid ester or a combination thereof. In one embodiment, the dissolution rate is measured in Disodium Hydrogen Phosphate Buffer ($Na_2HPO_4$). In another embodiment, the dissolution rate is measured in a buffer containing a surfactant (e.g., 0.01-0.1% wt/wt). In one embodiment, the surfactant is polysorbate 80 (Tween 80®).

In one embodiment, in vitro dissolution rates or profiles are measured by using a using USP II paddle apparatus in Disodium Hydrogen Phosphate Buffer ($Na_2HPO_4$) at a temperature of about 37±0.5° C. and paddles rotation between about 50 rpm to about 100 rpm. In another embodiment, in vitro dissolution rates or profiles are measured by using a using USP II paddle apparatus in Disodium Hydrogen Phosphate Buffer ($Na_2HPO_4$) containing polysorbate 80 (Tween 80®) (e.g., 0.01-0.1% wt/wt) at a temperature of about 37±0.5° C. and paddles rotation between about 50 rpm to about 100 rpm. The entire pharmaceutical composition

includes the entire active ingredient and if the pharmaceutical composition contains a capsule shell, carrier, excipient, diluent, disintegrating agent, lubricant, binder or any additional agent described in the Pharmaceutical Composition Section below, the measurement is performed with those components.

In one embodiment, in vitro dissolution is conducted at about 75 rpm using Disodium Hydrogen Phosphate Buffer ($Na_2HPO_4$). In another embodiment, in vitro dissolution is conducted at 75 rpm using about 900 mL of a Disodium Hydrogen Phosphate Buffer ($Na_2HPO_4$). Solutions are collected at 15 minutes, 30 minutes, 45 minutes, 60 minutes, and 75 minutes after the start of the dissolution. The dissolution rate of the compound is measured by high-performance liquid chromatography (HPLC) with Corona Charged Aerosol Detection (CAD).

In one embodiment, the concentration for OCA (e.g., in a Disodium Hydrogen Phosphate Buffer, optionally containing a surfactant, such as polysorbate 80 (Tween 80®)), after dissolution is between about 0.001 mg/mL to about 0.01 mg/mL, or between about 0.001 mg/mL to about 0.03 mg/mL. Above pH 6.8, the solubility of OCA is well above 0.01 mg/mL.

In one embodiment, the concentration for dissolved 5 mg tablets of OCA is between about 0.001 mg/mL to about 0.02 mg/mL. In another embodiment, the concentration for dissolved 5 mg tablets of OCA is between about 0.003 mg/mL to about 0.01 mg/mL. In yet another embodiment, the concentration for dissolved 5 mg tablets of OCA is between about 0.004 mg/mL to about 0.009 mg/mL. In another embodiment, the concentration for dissolved 5 mg tablets of OCA is between about 0.005 mg/mL to about 0.008 mg/mL. In yet another embodiment, the concentration for dissolved 5 mg tablets of OCA is between about 0.006 mg/mL to about 0.007 mg/mL. In another embodiment, the concentration for dissolved 5 mg tablets of OCA is about 0.006 mg/mL. In yet another embodiment, the concentration for dissolved 5 mg tablets of OCA is about 0.0056 mg/mL.

In one embodiment, the concentration for dissolved 10 mg tablets of OCA is between about 0.001 mg/mL to about 0.03 mg/mL. In another embodiment, the concentration for dissolved 10 mg tablets of OCA is between about 0.005 mg/mL to about 0.025 mg/mL. In yet another embodiment, the concentration for dissolved 10 mg tablets of OCA is between about 0.008 mg/mL to about 0.02 mg/mL. In another embodiment, the concentration for dissolved 10 mg tablets of OCA is between about 0.009 mg/mL to about 0.015 mg/mL. In yet another embodiment, the concentration for dissolved 10 mg tablets of OCA is about 0.011 mg/mL. In another embodiment, the concentration for dissolved 10 mg tablets of OCA is about 0.010 mg/mL.

In one embodiment, the concentration for dissolved 25 mg tablets of OCA is between about 0.001 mg/mL to about 0.05 mg/mL. In another embodiment, the concentration for dissolved 25 mg tablets of OCA is between about 0.01 mg/mL to about 0.08 mg/mL. In yet another embodiment, the concentration for dissolved 25 mg tablets of OCA is between about 0.02 mg/mL to about 0.06 mg/mL. In another embodiment, the concentration for dissolved 25 mg tablets of OCA is between about 0.025 mg/mL to about 0.04 mg/mL. In yet another embodiment, the concentration for dissolved 25 mg tablets of OCA is about 0.026 mg/mL to about 0.03 mg/mL. In another embodiment, the concentration for dissolved 25 mg tablets of OCA is about 0.028 mg/mL.

In one embodiment, the composition of the present disclosure comprising obeticholic acid or a pharmaceutically

US 10,751,349 B2

19

acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, provides improved dissolution of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof. For example, obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the particle composition of the present disclosure dissolves (e.g., in a Disodium Hydrogen Phosphate Buffer) at a rate that is at least 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10%, 15%, 20%, 30%, 40%, 50%, 80%, or 100% faster than the dissolution rate when obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is not present in the particle composition of the present disclosure.

For example, about 55% to about 95% of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the particle composition of the present disclosure is dissolved within about 15 minutes, or about 65% to about 95% is dissolved within about 30 minutes, or about 80% to about 95% is dissolved within about 45 minutes, or about 87% to about 97% is dissolved within about 60 minutes, or about 87% to about 99% is dissolved within about 75 minutes. For example, about 60% to about 84% of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the particle composition of the present disclosure is dissolved within about 15 minutes, or about 75% to about 91% is dissolved within about 30 minutes, or about 85% to about 93% is dissolved within about 45 minutes, or about 90% to about 96% is dissolved within about 60 minutes, or about 90% to about 97% is dissolved within about 75 minutes. For example, about 62% to about 83% of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the particle composition of the present disclosure is dissolved within about 15 minutes, or about 80% to about 90% is dissolved within about 30 minutes, or about 87% to about 94% is dissolved within about 45 minutes, or about 92% to about 96% is dissolved within about 60 minutes, or about 91% to about 97% is dissolved within about 75 minutes. For example, about 60% to about 84% obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the particle composition of the present disclosure is dissolved within about 15 minutes, or about 70% to about 90% is dissolved within about 30 minutes, or about 85% to about 92% is dissolved within about 45 minutes, or about 89% to about 96% is dissolved within about 60 minutes, or about 90% to about 96% is dissolved within about 75 minutes. For example, at least about 60% obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the particle composition of the present disclosure is dissolved within about 15 minutes, or at least about 90% is dissolved within about 60 minutes. For example, obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the particle composition of the present disclosure has an in vitro dissolution profile of about 51% dissolved within about 15 minutes, or about 66% dissolved within about 30 minutes, or about 79% dissolved within about 45 minutes, or about 85% dissolved within about 60 minutes.

In one embodiment, the composition of the present disclosure comprising obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, provides improved solubility of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof. For example, obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the particle composition of the present

20

disclosure has a solubility (e.g., in a Disodium Hydrogen Phosphate Buffer) that is at least 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10%, 15%, 20%, 30%, 40%, 50%, 80%, or 100% higher than the solubility when obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is not present in the particle composition of the present disclosure. For example, obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the particle composition of the present disclosure has a solubility (e.g., in a Disodium Hydrogen Phosphate Buffer) that is at least 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10%, 15%, or 20% higher than the solubility when obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is not present in the particle composition of the present disclosure at a pH (e.g., pH 6.8) at which obeticholic acid has the highest solubility (e.g., freely soluble) when not present in the particle composition of the present disclosure.

In one embodiment, obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and/or particles of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, has a solubility of about 0.001 to about 0.600 mg/mL. In another embodiment, obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and/or particles of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, has a solubility of about 0.02 to about 0.500 mg/mL. In yet another embodiment, obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and/or particles of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, has a solubility of about 0.03 to about 0.48 mg/mL. In another embodiment, obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and/or particles of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, has a solubility of about 0.05 to about 0.46 mg/mL. In yet another embodiment, obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and/or particles of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, has a solubility of about 0.1 to about 0.5 mg/mL. In another embodiment, obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and/or particles of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, has a solubility of about 0.2 to about 0.6 mg/mL.

The disclosure also comprehends isotopically-labeled obeticholic acid, or pharmaceutically acceptable salts, solvate, or amino acid conjugates thereof, which are identical to those recited in formulae of the disclosure and following, but for the fact that one or more atoms are replaced by an atom having an atomic mass or mass number different from the atomic mass or mass number most commonly found in nature. Examples of isotopes that can be incorporated into obeticholic acid, or pharmaceutically acceptable salts, solvate, or amino acid conjugates thereof include isotopes of hydrogen, carbon, nitrogen, fluorine, such as $^3H$, $^{11}C$, $^{14}C$ and $^{18}F$.

Obeticholic acid, or pharmaceutically acceptable salts, solvates, or amino acid conjugates thereof that contain the aforementioned isotopes and/or other isotopes of other atoms are within the scope of the present disclosure. Isotopically-labeled obeticholic acid, or pharmaceutically acceptable salts, solvates, or amino acid conjugates thereof, for example those into which radioactive isotopes such as $^3H$,

[14]C are incorporated, are useful in drug and/or substrate tissue distribution assays. Tritiated, i.e., [3]H, and carbon-14, i.e., [14]C, isotopes are particularly preferred for their ease of preparation and detectability. Further, substitution with heavier isotopes such as deuterium, i.e., [2]H, can afford certain therapeutic advantages resulting from greater metabolic stability, for example increased in vivo half-life or reduced dosage requirements and, hence, may be preferred in some circumstances, isotopically labeled obeticholic acid, or pharmaceutically acceptable salts, solvates, or amino acid conjugates thereof can generally be prepared by carrying out the procedures disclosed in the Schemes and/or in the Examples of the disclosure, by substituting a readily available isotopically labeled reagent for a non-isotopically labeled reagent. In one embodiment, obeticholic acid, or pharmaceutically acceptable salts, solvates, or amino acid conjugates thereof are not isotopically labeled. In one embodiment, deuterated obeticholic acid is useful for bioanalytical assays. In another embodiment, obeticholic acid, or pharmaceutically acceptable salts, solvates, or amino acid conjugates thereof are radiolabeled.

In another aspect, the disclosure provides a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and a pharmaceutically acceptable excipient having a low alcohol (e.g., an impurity having at least one primary OH group, such as ethanol or methanol) content. In one embodiment, the alcohol is a primary alcohol. As defined herein "primary alcohol" is an alcohol which has a hydroxy group connected to a primary carbon atom. The composition of the disclosure possesses advantageous properties, including improved stability of obeticholic acid in the composition.

The excipient can be any excipient present in the composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof. Examples of excipients include, but are not limited to, calcium phosphate, microcrystalline cellulose, sodium starch glycolate and magnesium stearate, or a combination thereof. In one embodiment, the excipient can be any excipient known in the art. In another embodiment, the excipient is selected from calcium phosphate, microcrystalline cellulose, sodium starch glycolate and magnesium stearate. In yet another embodiment, the excipient is selected from microcrystalline cellulose, sodium starch glycolate and magnesium stearate. In another embodiment, the excipient is the excipient is magnesium stearate. In yet another embodiment, the excipient is microcrystalline cellulose. In a further embodiment, the excipient is sodium starch glycolate.

In one embodiment, the excipient has an impurity having a primary alcohol group. In another embodiment, the impurity in the excipient is ethanol, methanol, polyvinyl alcohol, polyethylene glycol, or a substance having at least one primary OH moiety.

In one embodiment, the total alcohol (e.g., the impurity having at least one primary OH group) content in the excipient is less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5% (wt/wt). In one embodiment, the alcohol is a substance having at least one primary OH moiety. In one embodiment, the alcohol is ethanol, methanol, polyvinyl alcohol, polyethylene glycol, or a combination thereof. In one embodiment, the total content of ethanol, methanol, polyvinyl alcohol, polyethylene glycol, or a combination thereof in the excipient is less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5% (wt/wt).

In one embodiment, the alcohol is ethanol. In one embodiment, the total ethanol content in the excipient is less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5%

(wt/wt). In another embodiment, the excipient is sodium starch glycolate. In one embodiment, the sodium starch glycolate comprises less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5% (wt/wt) ethanol.

In one embodiment, the alcohol is methanol. In one embodiment, the total methanol content in the excipient is less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5% (wt/wt).

In another embodiment, the alcohol is a substance having at least one primary OH moiety. In one embodiment, the total content of the substance having at least one primary OH moiety in the excipient is less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5% (wt/wt).

In one embodiment, the alcohol is polyvinyl alcohol. In one embodiment, the total polyvinyl alcohol content in the excipient is less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5% (wt/wt). In one embodiment, the excipient is sodium starch glycolate. In one embodiment, the sodium starch glycolate comprises less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5% (wt/wt) polyvinyl alcohol.

In another embodiment, the alcohol is polyethylene glycol. In one embodiment, the total polyethylene glycol content in the excipient is less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5% (wt/wt). In one embodiment, the excipient is sodium starch glycolate. In one embodiment, the sodium starch glycolate comprises less than 6%, 5%, 4.5%, 4%, 3.5%, 3%, 2.5%, 2%, 1.5%, 1%, or 0.5% (wt/wt) polyethylene glycol.

The composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and a pharmaceutically acceptable excipient having low alcohol content offers advantageous stability of obeticholic acid upon storage under various conditions.

In one embodiment, the composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and a pharmaceutically acceptable excipient having a low primary alcohol content comprises a decreased amount of impurities, as compared to an obeticholic acid composition comprising an excipient having a high alcohol (e.g., greater than or equal to 6% (wt/wt) content).

In one embodiment, the impurity is an ester of obeticholic acid. In one embodiment, the amount of the ester of obeticholic acid is decreased by at least 10%, 20%, 30%, 40%, 50%, 60%, 70%, 80%, 90%, 95%, or 99%. In one embodiment, the amount of the ester of obeticholic acid is decreased by at least 50%, 60%, 70%, 80%, 90%, 95%, or 99%.

In one embodiment, the impurity is an ethyl ester of obeticholic acid. In one embodiment, the amount of the ethyl ester of obeticholic acid is decreased by at least 10%, 20%, 30%, 40%, 50%, 60%, 70%, 80%, 90%, 95%, or 99%. In one embodiment, the amount of the ethyl ester of obeticholic acid is decreased by at least 50%, 60%, 70%, 80%, 90%, 95%, or 99%. In another embodiment, the amount of the ethyl ester of obeticholic acid is less than 0.5%, 0.4%, 0.3%, 0.2%, 0.1%, 0.09%, 0.08%, 0.07%, 0.06%, 0.05%, 0.04%, 0.03%, 0.02%, or 0.01% (wt/wt). In a further embodiment, the amount of the ethyl ester of obeticholic acid is less than 0.5%, 0.4%, 0.3%, 0.2%, 0.1%, 0.09%, 0.08%, 0.07%, 0.06%, 0.05%, 0.04%, 0.03%, 0.02%, or 0.01% (wt/wt) at the storage condition of 40° C., 75% RH for 4 weeks. In a further embodiment, the amount of the ethyl ester of obeticholic acid is less than 0.2%, 0.1%, 0.09%, 0.08%, 0.07%, 0.06%, 0.05%, 0.04%, 0.03%, 0.02%, or 0.01% (wt/wt) at the storage condition of 40° C., 75% RH for 4 weeks.

US 10,751,349 B2

23

In one embodiment, the impurity is a methyl ester of obeticholic acid. In one embodiment, the amount of the methyl ester of obeticholic acid is decreased by at least 10%, 20%, 30%, 40%, 50%, 60%, 70%, 80%, 90%, 95%, or 99%. In one embodiment, the amount of the methyl ester of obeticholic acid is decreased by at least 50%, 60%, 70%, 80%, 90%, 95%, or 99%. In another embodiment, the amount of the methyl ester of obeticholic acid is less than 0.5%, 0.4%, 0.3%, 0.2%, 0.1%, 0.09%, 0.08%, 0.07%, 0.06%, 0.05%, 0.04%, 0.03%, 0.02%, or 0.01% (wt/wt).

An analysis of the impurities in an obeticholic acid composition (e.g., the obeticholic acid composition of the present disclosure) can be conducted with methods known to one skilled in the art, for example, with LC/HRMS using LTQ-Orbitrap. The identities of various impurities can be confirmed through various techniques available in the art. For example, to determine whether an ethyl ester of obeticholic acid is an impurity, obeticholic acid can be dissolved in ethanol, and treated with concentrated acid and heated to synthesize the ethyl ester. The retention time and mass spectrometry of the impurity can be compared with those of the synthesized ethyl ester of obeticholic acid. The excipients were analyzed for ethanol content and excipients containing higher ethanol content were substituted with a low ethanol content excipient.

The composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, or the composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and a pharmaceutically acceptable excipient having a low alcohol content, as disclosed herein, can be incorporated into a pharmaceutical composition suitable for administration (e.g., oral administration).

Thus, in another aspect, the present disclosure provides a pharmaceutical composition, comprising a therapeutically effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and a pharmaceutically acceptable excipient having a low alcohol content. In one embodiment, the pharmaceutical composition has a low alcohol content as described herein. In another embodiment, the pharmaceutical composition comprises sodium starch glycolate comprising less than 5% alcohol (e.g., ethanol).

In another embodiment, the pharmaceutical composition comprises a therapeutically effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and a pharmaceutically acceptable excipient having a low alcohol content, wherein obeticholic acid is in the form of particles. In one embodiment, the particles have a size distribution as described herein.

In one embodiment, the pharmaceutical composition further comprises one or more pharmaceutical excipients. The excipient can be one or more selected from the group consisting of diluents, sweeteners, viscosity enhancing agents, dispersing agents, preservatives, flavoring agents and the like. One excipient can perform more than one function. In one embodiment, the one or more pharmaceutical excipients include a lubricant and/or a diluent.

Non-limiting examples of sweeteners include natural sweeteners such as sugars, e.g., fructose, glucose, sucrose, sugar alcohols such as mannitol, sorbitol or mixtures thereof and artificial sweeteners such as sodium saccharine, sodium cyclamate and aspartame. In one embodiment, the sweetener can be any sweetener known in the art. In another embodiment, the sweetener is selected from fructose, glucose, sucrose, mannitol, and sorbitol, or a combination thereof.

24

Dispersing agents include, but are not limited to, colloidal silicon dioxide and surfactants, wherein the surfactant is used alone or as an admixture with one or more surfactant. In one embodiment, the dispersing agent can be any dispersing agent known in the art. Combinations of colloidal silicon dioxide with one or more surfactants can also be used.

In one embodiment, the lubricant can be any lubricant known in the art. Non-limiting examples of lubricants include magnesium stearate, calcium stearate, stearic acid, glyceryl behenate, hydrogenated vegetable oil, and glycerine fumarate, and/or a combination thereof. In another embodiment, the lubricant is selected from magnesium stearate, calcium stearate, stearic acid, glyceryl behenate, hydrogenated vegetable oil, and glycerine fumarate. In another embodiment, the lubricant is calcium stearate. In yet another embodiment, the lubricant is stearic acid. In further embodiment, the lubricant is magnesium stearate.

In one embodiment, the diluent can be any diluent known in the art. Non-limiting examples of diluents include starch, pregelatinized starch, microcrystalline cellulose, calcium carbonate, dibasic calcium phosphate, tribasic calcium phosphate, calcium phosphate, lactose, dextrose, fructose, lactitol, lactose, magnesium carbonate, magnesium oxide, maltitol, maltodextrin, maltose, simethicone, sodium chloride, talc, xylitol, sorbitol, mannitol, and sucrose, and/or a combination thereof. In another embodiment, the diluent is selected from starch, pregelatinized starch, microcrystalline cellulose, calcium phosphate, lactose, sorbitol, mannitol, and sucrose. In another embodiment, the diluent is calcium phosphate. In yet another embodiment, the diluent is mannitol. In further embodiment, the diluent is microcrystalline cellulose.

In one embodiment, the pharmaceutical composition may further comprise a coating agent such as sugar-based coating agents, water-soluble film coating agents, enteric coating agents and delayed release coating agents or a coating composition comprising any combination thereof. In another embodiment, the coating agent can be any coating agent known in the art. Examples of coating agents include, but are not limited to, saccharose used alone or together with any of the agents such as talc, calcium carbonate, calcium phosphate, calcium sulphate, gelatine, gum arabic, polyvinylpyrrolidone and pullulan or any combination thereof; cellulose derivatives such as hydroxypropyl cellulose, hydroxypropyl methyl cellulose, hydroxyethyl cellulose, methyl hydroxyethyl cellulose and sodium carboxymethyl cellulose; synthetic polymers such as polyvinyl acetal diethyl amino acetate, aminoalkyl methacrylate copolymers and polyvinylpyrrolidone; polysaccharides such as pullulan; hydroxypropyl methyl cellulose phthalate; hydroxypropyl methyl cellulose acetate succinate; carboxymethyl ethyl cellulose; cellulose acetate phthalate; acrylic acid derivatives such as methacrylic acid copolymer L, methacrylic acid copolymer LD and methacrylic acid copolymer S; natural substances such as shellac; titanium dioxide; polyvinyl alcohol (e.g., Opadry®); polyethylene glycol; talc; lecithin; and/or combinations thereof. In one embodiment, the coating agent is selected from hydroxypropyl cellulose, hydroxypropyl methyl cellulose, hydroxyethyl cellulose, methyl hydroxyethyl cellulose, sodium carboxymethyl cellulose, polyvinyl acetal diethyl amino acetate, polyvinyl alcohol, polyethylene glycol, and lecithin, or a combination thereof. In another embodiment, the coating agent is Opadry® II (e.g., Opadry® II green, white, yellow, etc.).

In one embodiment, the pharmaceutical composition comprising obeticholic acid, or a pharmaceutically accept-

25

26

able salt, ester, or amino acid conjugate thereof, in the form of particles, at about 1% to about 6% by weight, sodium starch glycolate at about 2% to about 8% by weight having a low alcohol content, a lubricant (e.g., magnesium stearate) at about 0.1% to about 2.0% by weight, and a diluent (e.g., microcrystalline cellulose) at about 85% to about 95% by weight. In one embodiment, the sodium starch glycolate comprises less than 6% (wt/wt) ethanol.

In one embodiment, the pharmaceutically composition is in solid particle form. Any inert excipient that is commonly used as a carrier or diluent may be used in the pharmaceutical composition of the present disclosure, such as for example, a gum, a starch, a sugar, a cellulosic material, a glycolate, an acrylate, or mixtures thereof. In one embodiment, the filler/diluent is microcrystalline cellulose. The pharmaceutical composition may further comprise a disintegrating agent (e.g., sodium starch glycolate) and/or a lubricant (e.g., magnesium stearate). Also, the pharmaceutical composition may comprise one or more additives selected from a buffer, a surfactant, a solubilizing agent, a plasticizer, an emulsifier, a stabilizing agent, a viscosity increasing agent, a sweetener, a film forming agent, or any combination thereof. Furthermore, the pharmaceutical composition of the present disclosure may be in the form of controlled release of immediate release formulations.

The percentage of the active ingredient (i.e., obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof) and various excipients in the pharmaceutical composition of the present disclosure may vary. For example, the composition may comprise between about 0.1 and about 99%, between about 1-50%, between about 1-25%, or about 1-6% by weight of active ingredient. Furthermore, the composition may comprise between about 20-99%, between about 45-97%, between about 65-96%, or between about 85-95% by weight microcrystalline cellulose as a filler or diluent. Furthermore, the composition may comprise between about 1-30%, between about 1-20%, or between about 2-8% by weight sodium starch glycolate as a disintegrant. Furthermore, the composition may comprise between about 0.1-5% or about 0.5-2.0% by weight magnesium stearate as a lubricant.

In one embodiment, the pharmaceutical composition of the present disclosure is about 0.1% to about 10% by weight of active ingredient (i.e., obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof), about 0.1% to about 20% by weight of sodium starch glycolate, about 0.01% to about 8.0% by weight of magnesium stearate, and about 65% to about 99% by weight of microcrystalline cellulose. In another embodiment, the pharmaceutical composition of the present disclosure is about 0.5% to about 8% by weight of active ingredient, about 1% to about 10% by weight of sodium starch glycolate, about 0.05% to about 4.0% by weight of magnesium stearate, and about 75% to about 97% by weight of microcrystalline cellulose. In yet another embodiment, the pharmaceutical composition of the present disclosure is about 1% to about 6% by weight of active ingredient, about 2% to about 8% by weight of sodium starch glycolate, about 0.1% to about 2.0% by weight of magnesium stearate, and about 85% to about 95% by weight of microcrystalline cellulose. In one embodiment, obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the pharmaceutical composition is in the form of particles, as described herein.

In another aspect, the present disclosure provides a pharmaceutical composition, comprising a therapeutically effective amount of obeticholic acid, or a pharmaceutically

acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, and a pharmaceutically acceptable excipient having a low alcohol content. In one embodiment, the obeticholic acid particle composition is an obeticholic acid particle composition described herein. In one embodiment, the pharmaceutical composition has a low alcohol content as described herein. In one embodiment, the pharmaceutical composition comprises sodium starch glycolate comprising less than 6% alcohol (e.g., ethanol).

In another aspect, the present disclosure provides a method for preparing a pharmaceutical composition containing a therapeutically effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, comprising i) micronizing obeticholic acid acceptable salt, ester, or amino acid conjugate thereof until at least 90% of the particles have a diameter of less than 100 μm, such as less than 90 μm, less than 50 μm, less than 25 μm, less than 20 μm, less than 15 μm, less than 10 μm, less than 5 μm, or less than 1 μm, and ii) combining the micronized obeticholic acid particles with at least one pharmaceutically acceptable excipient. In one embodiment, the micronizing is carried out using a jet-mill.

In another aspect, the present disclosure provides a method for preparing a pharmaceutical composition containing a therapeutically effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, comprising i) micronizing obeticholic acid acceptable salt, ester, or amino acid conjugate thereof until at least 50% of the particles have a diameter of less than 10 μm, i.e., less than 5 μm, and ii) combining the micronized obeticholic acid particles with at least one pharmaceutically acceptable excipient. In one embodiment, the micronizing is carried out using a jet-mill.

In another aspect, the present disclosure provides a method for preparing a pharmaceutical composition containing a therapeutically effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, comprising i) micronizing obeticholic acid acceptable salt, ester, or amino acid conjugate thereof until at least 10% of the particles have a diameter of less than 5 μm, i.e., less than 1 μm, and ii) combining the micronized obeticholic acid particles with at least one pharmaceutically acceptable excipient. In one embodiment, the micronizing is carried out using a jet-mill.

In another aspect, the present disclosure provides a method for preparing a pharmaceutical composition containing a therapeutically effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, comprising i) micronizing obeticholic acid acceptable salt, ester, or amino acid conjugate thereof until at least 90% of the particles have a diameter of less than 100 μm, preferably less than 90 μm, less than 50 μm, less than 25 μm, less than 20 μm, less than 15μ, less than 10 μm, less than 5 μm, less than 1 μm; at least 50% of the particles have a diameter of less than 10 μm, less than 5 μm, less than 1 μm; and at least 10% of the particles have a diameter of less than 5 μm, or less than 1 μm, and ii) combining the micronized obeticholic acid particles with at least one pharmaceutically acceptable excipient. In one embodiment, the micronizing is carried out using a jet-mill.

In another aspect, the present disclosure provides a method for preparing a pharmaceutical composition containing a therapeutically effective amount of obeticholic

US 10,751,349 B2

27                                                    28

acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, comprising i) micronizing obeticholic acid acceptable salt, ester, or amino acid conjugate thereof until at least 90% of the particles have a diameter of less than 100 µm, at least 50% of the particles have a diameter of less than 10 µm, and at least 10% of the particles have a diameter of less than 5 µm, and ii) combining the micronized obeticholic acid particles with at least one pharmaceutically acceptable excipient. In one embodiment, the micronizing is carried out using a jet-mill.

In another aspect, the present disclosure provides a method for preparing a pharmaceutical composition containing a therapeutically effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, comprising i) micronizing obeticholic acid acceptable salt, ester, or amino acid conjugate thereof until at least 90% of the particles have a diameter of less than 25 µm, at least 50% of the particles have a diameter of less than 5 µm, and at least 10% of the particles have a diameter of less than 1 µm, and ii) combining the micronized obeticholic acid particles with at least one pharmaceutically acceptable excipient. In one embodiment, the micronizing is carried out using a jet-mill.

In another aspect the present disclosure provides a method for treating or preventing a disease or condition, comprising administering an effective amount of an obeticholic acid composition of the present disclosure to a patient in need thereof.

In one aspect, the present disclosure provides a method for treating a disease or condition by administering an effective amount of an obeticholic acid composition described herein to a patient in need thereof. In certain embodiments herein the effective amount refers to a titrated dosage administered during a titration period as set forth herein. In other embodiments, the effective amount refers to an adjusted or re-adjusted dosage administered after a titration period as set forth herein.

It is to be understood that the methods described herein refer generally to the obeticholic acid compositions set forth herein. The methods described herein can include any specific formulation provided herein, for example, that provided in Example 11. In one embodiment, the obeticholic acid composition useful in the methods of treating described herein is a composition provided in Example 11. In another embodiment, the obeticholic acid composition useful in the methods of treating described herein is a composition that includes microcrystalline cellulose, sodium starch glycolate, and magnesium stearate as excipients. Such a composition can be provided in a dosage form set forth herein, e.g., an oral dosage form such as a tablet or coated tablet. Thus, in certain instances, the obeticholic acid composition useful in the methods is a tablet or coated tablet for oral administration. In one embodiment, the oral dosage form of the obeticholic acid composition includes a film coating that includes one or more excipients selected from polyvinyl alcohol (part hydrolyzed), titanium dioxide, macrogol (polyethylene glycol 3350), talc, and iron oxide.

In one embodiment, the disease or condition is an FXR mediated disease or condition. Examples of the FXR mediated diseases or conditions include, but not limited to, liver diseases such as a cholestatic liver disease such as primary biliary cirrhosis (PBC) also known as primary biliary cholangitis (PBC), primary sclerosing cholangitis (PSC), chronic liver disease, nonalcoholic fatty liver disease (NAFLD), nonalcoholic steatohepatitis (NASH), hepatitis C infection, alcoholic liver disease, liver damage due to pro-

gressive fibrosis, and liver fibrosis. Examples of FXR mediated diseases also include portal hypertension, bile acid diarrhea, hyperlipidemia, high LDL-cholesterol, high HDL-cholesterol, high triglycerides, and cardiovascular disease.

In another aspect, the present disclosure provides methods of treating or preventing a disease or condition described herein by administering an obeticholic acid composition described herein (e.g., obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, where the obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 µm or less).

In still another aspect the present disclosure provides a method of treating primary biliary cirrhosis (PBC) by administering an obeticholic acid composition described herein (e.g., obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, where the obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 µm or less), optionally in a titration period. In some examples, the method comprise administering a starting dose in a titration period. The starting dose, adjusted dose, and titration period are as described below.

The PBC can be advanced stage PBC. "Advanced stage PBC" refers to PBC characterized by one or more of the following: Baseline total bilirubin>upper liming of normal (ULN); Baseline total ALP>5×ULN; Baseline transient elastography (TE)>10.7 kPa; Cirrhosis based on an initial or baseline biopsy result or patient having an Ishak score 6 (cirrhosis) or Ludwig/Scheuer PBC Stage 4; or Medical history of ascites, hepatic cirrhosis, jaundice, portal hypertension, portal hypertensive gastropathy or varices esophageal.

Further provided herein are methods of treating primary sclerosing cholangitis (PSC), chronic liver disease, nonalcoholic fatty liver disease (NAFLD), nonalcoholic steatohepatitis (NASH), hepatitis C infection, alcoholic liver disease, liver damage due to progressive fibrosis, or liver fibrosis in a patient in need thereof by administering an effective amount of an obeticholic acid composition described above. In another embodiment, the method is a method of treating NAFLD by administering an effective amount of an obeticholic acid composition described above. In still another embodiment, the method is a method of treating PSC by administering an effective amount of an obeticholic acid composition described above. In yet another embodiment, the method is a method of treating fibrosis (e.g., progressive or liver fibrosis) by administering an effective amount of an obeticholic acid composition described above. In yet another embodiment, the method is a method of treating cirrhosis by administering an effective amount of an obeticholic acid composition described above.

NAFLD is a medical condition that is characterized by the buildup of fat (called fatty infiltration) in the liver. NAFLD is one of the most common causes of chronic liver disease, and encompasses a spectrum of conditions associated with lipid deposition in hepatocytes. It ranges from steatosis (simple fatty liver), to nonalcoholic steatohepatitis (NASH), to advanced fibrosis and cirrhosis. The disease is mostly silent and is often discovered through incidentally elevated liver enzyme levels. NAFLD is strongly associated with obesity and insulin resistance and is currently considered by many as the hepatic component of the metabolic syndrome.

Nonalcoholic steatohepatitis (NASH) is a condition that causes inflammation and accumulation of fat and fibrous

US 10,751,349 B2

29

(scar) tissue in the liver. Liver enzyme levels in the blood may be more elevated than the mild elevations seen with nonalcoholic fatty liver (NAFL). Although similar conditions can occur in people who abuse alcohol, NASH occurs in those who drink little to no alcohol. NASH affects 2 to 5 percent of Americans, and is most frequently seen in people with one of more of the following conditions: obesity, diabetes, hyperlipidemia, insulin resistance, uses of certain medications, and exposure to toxins. NASH is an increasingly common cause of chronic liver disease worldwide and is associated with increased liver-related mortality and hepatocellular carcinoma, even in the absence of cirrhosis. NASH progresses to cirrhosis in 15-20% of affected individuals and is now one of the leading indications for liver transplantation in the United States. At present there are no approved therapies for NASH.

In one embodiment, the method is a method of treating NASH by administering an obeticholic acid composition described herein, optionally in a titration period as described herein. The NASH patient can be a high risk NASH patient. A "high risk NASH patient" refers to characterization by one or more of: NAS≥4; baseline fibrosis stage 2 or 3; or baseline fibrosis stage 1 with a comorbidity (type 2 diabetes, BMI≥30 kg/m2 or ALT≥60 U/L).

In one embodiment, the disease or condition is hyperlipidemia. In one embodiment, the disease or condition is a cholestatic liver disease. In one embodiment, the disease or condition is PBC. In another embodiment, the disease or condition is a cardiovascular disease. In another embodiment, the cardiovascular disease is atherosclerosis, hypercholesteremia, or hypertriglyceridemia.

The present disclosure also provides a method for treating or preventing NAFLD or NASH. In one embodiment, the present disclosure provides a method for treating or preventing NAFLD or NASH that is associated with hyperlipidemia. In one embodiment, the present disclosure provides a method for treating or preventing NASH. In one embodiment, the present disclosure provides a method for treating or preventing NASH that is associated with hyperlipidemia.

In another aspect, the present disclosure also provides a method for decreasing liver enzymes, comprising administering a therapeutically effective amount of the composition of the present disclosure to a subject in need thereof. In one embodiment, the subject is not suffering from a cholestatic condition. In another embodiment, the subject is suffering from a cholestatic condition. In one embodiment, the liver enzyme is alkaline phosphatase, 7-glutamyl transpeptidase (GGT), and/or 5' nucleotidase.

In certain instances, the methods described herein also include assessing, monitoring, measuring, or otherwise detecting liver function. Assessing, monitoring, measuring, or otherwise detecting liver function can be performed before, during, or after a titration period described herein, or in other instances, performed during the course of any treatment described herein. Liver function can be determined by, for example, assessing, monitoring, measuring, or otherwise detecting a level of one or more liver biomarkers compared to a control. In certain instances the control is a baseline taken from the patient before beginning treatment. In other instances the control is preestablished baseline considered as a normal value.

Values for measure or detection of liver function biomarkers and controls can be expressed as a comparison to Upper Limit of Normal (ULN).

Liver biomarkers can be used to ascertain, quantify the efficacy of the course of treatment with an obeticholic acid composition described herein. In other instances, liver bio-

30

markers described herein can be used to ascertain, quantify liver function during the course of treatment with an obeticholic acid composition described herein. Liver biomarkers can also be used to predict whether a patient or patient population will be susceptible to treatment with an obeticholic acid composition described herein. In one embodiment, the liver biomarkers include assessing, monitoring, measuring or otherwise detecting an amount or level of aspartate transaminase (AST), alanine transaminase (ALT), alkaline phosphatase (ALP), bilirubin, glycine conjugated obeticholic acid, taurine conjugated obeticholic acid, a bile acid, a bile acid glycine conjugate, or a bile acid taurine conjugate. For example, the liver biomarker assessed, monitored, measured, or detected can be ALP.

The ALP level can be a measure of ULN. In one embodiment, a patient before treatment can have an ALP level of at least 1.1×ULN to at least 20×ULN; at least 1.1×ULN to at least 15×ULN; at least 1.1×ULN to at least 12×ULN; at least 1.1×ULN to at least 10×ULN; at least 1.1×ULN to at least 8×ULN; at least 1.1×ULN to at least 6×ULN; at least 1.1×ULN to at least 5×ULN; at least 1.1×ULN to at least 4×ULN; at least 1.1×ULN to at least 3×ULN; or at least 1.1×ULN to at least 2×ULN.

A patient before a treatment described herein can have an ALP level of about 1.5×ULN to about 20×ULN; about 1.5×ULN to about 15×ULN; about 1.5×ULN to about 10 ULN; about 1.5×ULN to about 5×ULN; or about 1.5×ULN to about 3×ULN. A patient before treatment can have an ALP level before a treatment described herein of about 1.5×, 2×, 3×, 4×, 5×, 8×, 10×, 15×, or 20×ULN.

A patient before treatment can have an ALP level before a treatment described herein of greater than about 1.5×, 2×, 3×, 4×, 5×, 8×, 10×, 15×, or 20×ULN. In one embodiment, a patient has an ALP level of about 1.5×ULN. In one embodiment, a patient has a ALP level of about 5×ULN. In one embodiment, a patient has an ALP level of about 10×ULN. In one embodiment, a patient has a bilirubin level of about 15×ULN. In one embodiment, a patient has an ALP level greater than about 1.5×ULN. In one embodiment, a patient has an ALP level greater than about 2×ULN. In one embodiment, a patient has a ALP level greater than about 5×ULN. In one embodiment, a patient has an ALP level greater than about 10×ULN. In one embodiment, a patient has a bilirubin level greater than about 15×ULN.

In another example, the liver biomarker assessed, monitored, measured, or detected can be bilirubin. The bilirubin level can be a measure of ULN. In one embodiment, a patient before treatment can have a bilirubin level of at least 1.1×ULN to at least 20×ULN; at least 1.1×ULN to at least 15×ULN; at least 1.1×ULN to at least 12×ULN; at least 1.1×ULN to at least 10×ULN; at least 1.1×ULN to at least 8×ULN; at least 1.1×ULN to at least 6×ULN; at least 1.1×ULN to at least 5×ULN; at least 1.1×ULN to at least 4×ULN; at least 1.1×ULN to at least 3×ULN; or at least 1.1×ULN to at least 2×ULN.

A patient before a treatment described herein can have a bilirubin level of about 1.5×ULN to about 20×ULN; about 1.5×ULN to about 15×ULN; about 1.5×ULN to about 10 ULN; about 1.5×ULN to about 5×ULN; or about 1.5×ULN to about 3×ULN. In another example a patient before a treatment described herein can have a bilirubin level of about 2×ULN to about 20×ULN; about 2×ULN to about 15×ULN; about 2×ULN to about 10 ULN; about 2×ULN to about 5×ULN; or about 2×ULN to about 3×ULN. In another example a patient before a treatment described herein can have a bilirubin level of greater than about 2×ULN to greater

US 10,751,349 B2

31                                                                                    32

than about 20×ULN; greater than about 2×ULN to greater than about 15×ULN; greater than about 2×ULN to greater than about 10 ULN; greater than about 2×ULN to greater than about 5×ULN; or greater than about 2×ULN to greater than about 3×ULN.

A patient before treatment can have a bilirubin level before a treatment described herein of about 1.5×, 2×, 3×, 4×, 5×, 8×, 10×, 15×, or 20×ULN. A patient before treatment can have a bilirubin level before a treatment described herein of greater than about 1.5×, 2×, 3×, 4×, 5×, 8×, 10×, 15×, or 20×ULN. In one embodiment, a patient has a bilirubin level greater than about 2×ULN. In one embodiment, a patient has a bilirubin level greater than about 5×ULN. In one embodiment, a patient has a bilirubin level greater than about 10×ULN. In one embodiment, a patient has a bilirubin level greater than about 15×ULN. In one embodiment, a patient has a bilirubin level less than about 2×ULN. In one embodiment, a patient has a bilirubin level less than about 5×ULN. In one embodiment, a patient has a bilirubin level less than about 10×ULN. In one embodiment, a patient has a bilirubin level less than about 15×ULN.

In some instances it can be useful to assess, monitor, measure, or detect ALP and bilirubin to assess, monitor, measure, or otherwise detect liver function or changes in liver function during treatment with an obeticholic acid composition described herein. In certain instances, a patient has an ALP level as provided above (e.g., about 1.5×ULN to about 10×ULN) and a bilirubin level as provided above (e.g., less than about 5×ULN). In one embodiment, the patient has an ALP level between about 1.5×ULN to about 10×ULN and a bilirubin level less than about 2×ULN.

Treatment with a obeticholic acid composition described herein can reduce the levels of ALP and/or bilirubin in a patient described herein. For example, treatment of a disease or condition described herein (e.g., PBC) with an obeticholic acid composition described herein can reduce the level of ALP by 2, 4, 5, 6, 8, 9, 10, 12, 15, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, 88, 90, 92, 94, 96, 97, 98, 99, 99.2, 99.4, 99.6, 99.7, 99.8, 99.9, or 100%. In another example, the level of ALP can be reduced by at least 100%, at least 125%, at least 150%, at least 175%, at least 200%, at least 225%, at least 250% or at least 300%.

In another example, the level of ALP can be reduced by about 5% to about 50%; about 10% to about 55%; about 10% to about 45%; about 10% to about 40%; about 10% to about 33%, about 10% to about 30%; about 15% to about 30%; about 15% to about 25%; about 20% to about 50%; about 20% to about 40%; about 20% to about 35%; about 20% to about 30%; 20% to about 27%; or about 20% to about 27%. In another example, the level of ALP can be reduced by at least 50%. The level of ALP can be reduced by at least 40%. The level of ALP can be reduced by at least 35%. The level of ALP can be reduced by at least 30%. The level of ALP can be reduced by at least 27%. The level of ALP can be reduced by at least 25%. The level of ALP can be reduced by at least 20%.

The reduction of ALP levels can be represented by the fold change over ULN. For example, treatment with an obeticholic acid described herein can reduce the ALP level of a patient described herein to less than about 5×ULN; less than about 4×ULN, less than about 3×ULN, less than about 2×ULN, less than about 1.7×ULN, less than about 1.5×ULN, less than about 1.25×ULN, or less than about ULN.

In another example, the ALP level is reduced by at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 15, 20, 25, 30, 40, or 50 fold compared to a baseline value. For example, the ALP level

after treatment with an obeticholic acid composition described herein can be reduced by 1, 1, 2, 1, 4, 1.6, 1.8, or 2 fold, including intervening values therein, compared to a baseline value. In another example, the ALP level can be reduced by 2, 2.2, 2.4, 2.6, 2.8, or 3 fold, including intervening values therein, compared to a baseline value. In another example, the ALP level can be reduced 3, 4, or 5 fold, including intervening values therein, compared to a baseline value. In another example, the ALP level can be reduced 5, 7, 9, or 10 fold, including intervening values therein, compared to a baseline value. In another example, the ALP level can be reduced 10, 12, 15, or 20 fold, including intervening values therein, compared to a baseline value.

Treatment of a disease or condition described herein (e.g., PBC) with an obeticholic acid composition described herein can reduce the level of bilirubin by 2, 4, 5, 6, 8, 9, 10, 12, 15, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 35, 4–, 45, 50, 55, 60, 65, 70, 75, 80, 85, 88, 90, 92, 94, 96, 97, 98, 99, 99.2, 99.4, 99.6, 99.7, 99.8, 99.9, or 100%. In another example, the level of bilirubin can be reduced by at least 100%, at least 125%, at least 175%, at least 200%, at least 225%, at least 250% or at least 300%.

In another example, the level of bilirubin can be reduced by about 5% to about 50%; about 10% to about 55%; about 10% to about 45%; about 10% to about 40%; about 10% to about 33%, about 10% to about 30%; about 15% to about 30%; about 15% to about 25%; about 20% to about 50%; about 20% to about 40%; about 20% to about 35%; about 20% to about 30%; 20% to about 27%; or about 20% to about 27%. In another example, the level of bilirubin can be reduced by at least 50%. The level of bilirubin can be reduced by at least 40%. The level of bilirubin can be reduced by at least 35%. The level of bilirubin can be reduced by at least 30%. The level of bilirubin can be reduced by at least 27%. The level of bilirubin can be reduced by at least 25%. The level of bilirubin can be reduced by at least 20%.

The reduction of bilirubin levels can be represented by the fold change over ULN. For example, treatment with an obeticholic acid described herein can reduce the bilirubin level of a patient described herein to less than about 5×ULN; less than about 4×ULN, less than about 3×ULN, less than about 2×ULN, less than about 1.7×ULN, less than about 1.5×ULN, less than about 1.25×ULN, or less than about ULN.

In another example, the bilirubin level is reduced by at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 15, 20, 25, 30, 40, or 50 fold compared to a baseline value. For example, the bilirubin level after treatment with an obeticholic acid composition described herein can be reduced by 1, 1, 2, 1, 4, 1.6, 1.8, or 2 fold, including intervening values therein, compared to a baseline value. In another example, the bilirubin level can be reduced by 2, 2.2, 2.4, 2.6, 2.8, or 3 fold, including intervening values therein, compared to a baseline value. In another example, the bilirubin level can be reduced 3, 4, or 5 fold, including intervening values therein, compared to a baseline value. In another example, the bilirubin level can be reduced 5, 7, 9, or 10 fold, including intervening values therein, compared to a baseline value. In another example, the bilirubin level can be reduced 10, 12, 15, or 20 fold, including intervening values therein, compared to a baseline value.

In another embodiment, one or more biomarkers can stratify a patient population undergoing or who will undergo treatment with an obeticholic acid composition described

US 10,751,349 B2

33

herein. For example, a PBC patient can be stratified for the risk of hepatocellular carcinoma (HCC).

In yet another embodiment, liver biomarkers useful for detection can include metabolites and bile acids. For example, assessing, monitoring, measuring, or otherwise detecting levels of glycine and taurine conjugates of obeticholic acid can be useful for measuring efficacy of a treatment regimen described herein. For example, assessing, monitoring, measuring, or otherwise detecting levels or detecting plasma levels of bile acids including cholic acid, chenodeoxycholic acid, deoxycholic acid, lithocholic acid, and urosodeoxycholic acid, including glycine and taurine conjugates thereof, and optionally comparing the levels to a control, can be useful for measuring efficacy of a treatment regimen described herein.

In still other embodiments, calculating an AST to platelet index (APRI) can be useful for assessing, monitoring, measuring, or otherwise detecting liver function (including changes thereof). The obeticholic acid compositions described herein can reduce the APRI of a patient described herein. In certain instances, monitoring or measuring the APRI can be used to determine efficacy of treatment with an obeticholic acid composition described herein. In some embodiments, a reduction in APRI is observed in a patient (e.g., a PBC or NASH patient) after administration of an obeticholic acid composition described herein. For example, the APRI may be reduced by about 5% to about 50% in patients treated with obeticholic acid relative to baseline levels measured before dose administration. The reduction may be up to about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45% or 50%.

Further provided herein is a method for treating PBC in a patient in need thereof by administering a starting dose of an obeticholic acid composition described herein in a titration period. The method includes assessing liver function of the patient before, during, and after said titration period by either calculating an APRI score for said patient; or by measuring the level of one or more liver biomarker selected from ALP, bilirubin, AST, ALT, glycine conjugated obeticholic acid, taurine conjugated obeticholic acid, a bile acid, a bile acid glycine conjugate, or a bile acid taurine conjugate, where a reduced APRI score compared to a control or a reduced level of the one or more liver biomarkers compared to a control indicates non-impaired liver function. The method further includes assessing tolerance of the patient to the starting dose by grading the severity of one or more adverse effects, if present, and administering an adjusted dose of the obeticholic acid composition, where the adjusted dose includes an amount equal to or greater than an amount of the starting dose. The starting dose, adjusted dose, and titration period are as described below. For example, the starting dose can be about 5 to about 50 mg (e.g., 5 mg) and the adjusted dose can be about 5 to about 50 mg (e.g., 5 mg, 10 mg, or 25 mg) and the titration period can be a time of about 1 to about 6 months, e.g., 1 month, 2 months, 3 months, 4 months, 5 months, or 6 months.

Also provided herein are methods to reduce or eliminate rejection failure of a liver transplant by administering an effective amount of an obeticholic acid composition described above. In certain instances administration of an obeticholic acid composition described herein reduces expression or levels of ALP and/or bilirubin. In one embodiment, administration of an obeticholic acid composition described herein reduces ALP and bilirubin levels, thereby reducing transplant complications or rejection. In another embodiment, administration of an effective amount of an

34

obeticholic acid composition described herein increases post-transplantation survival rate of a liver transplantee.

In one aspect, obeticholic acid may mediate its action primarily via FXR agonism, wherein FGF-19 released from gut enterocytes (in response to FXR agonist) into portal circulation down regulates endogenous bile acid synthesis in the liver. The present disclosure comprehends a method of measuring FXR agonist activity by, for example, measuring release of FGF-19 into the bloodstream or circulation of a patient administered with OCA. Levels of FGF-19 may be measured by methods known in the art, such as those described herein.

Obeticholic acid administration may lead to a significant and a dose-dependent increase in the levels of FGF-19 and in some embodiments, a decrease in the levels of endogenous bile acids and C4 (a bile acid precursor). In some embodiments, a significant increase in FGF-19 levels may be observed from baseline to month 3, month 6 and month 12 after dose administration. In some examples, the FGF-19 levels may increase from about 5% to about 200%. In specific embodiments, the levels may increase by about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95% or 100%.

In some embodiments, the plasma levels of FGF-19, a marker of FXR activation, are determined using a qualified method and a validated method using an enzyme-linked immunosorbent assay (ELISA) method. The plasma concentrations of FGF-19 may be quantitated at predose and after administration of dose.

In some examples, a monoclonal antibody specific for FGF-19 is pre-coated onto a microplate. Standards, quality controls and samples are pipetted into the wells and any FGF-19 present is bound by the immobilized antibody. After washing away any unbound substances, an enzyme-linked polyclonal antibody specific for FGF-19 is added to the wells. Following a wash to remove any unbound antibody-enzyme reagent, a substrate solution is added to the wells and color develops in the proportion to the amount of FGF-19 bound in the initial step. The color development is stopped and the intensity of the color is measured. The calibration range of the method is 15.625 pg/ml to 1000 pg/ml for FGF-19 using a 100 μl aliquot of standard curve, quality control and sample. In some embodiments, no minimum required dilution is used. In other embodiments, samples may be subjected to a 3× minimum required dilution.

Also provided herein are methods to reduce or eliminate rejection failure of a liver transplant by administering an effective amount of an obeticholic acid composition described above. In certain instances, administration of an obeticholic acid composition described herein reduces expression or levels of ALP and/or bilirubin. In one embodiment, administration of an obeticholic acid composition described herein reduces ALP and bilirubin levels, thereby reducing transplant complications or rejection. In another embodiment, administration of an effective amount of an obeticholic acid composition described herein increases post-transplantation survival rate of a liver transplantee.

In another aspect of the disclosure is a method of treating a solid-tumor cancer by administering an effective amount of an obeticholic acid composition as described herein. In another aspect, such methods include treating hepatocellular carcinoma (HCC), colorectal cancer, gastric cancer, liver cancer, breast cancer, renal cancer, or pancreatic cancer by administering an obeticholic acid composition as described herein. In one embodiment is a method of treating HCC by administering an effective amount of an obeticholic acid

US 10,751,349 B2

35

composition as described herein. In one embodiment is a method of treating colorectal cancer by administering an effective amount of an obeticholic acid composition as described herein. In another embodiment is a method of treating gastric cancer by administering an effective amount of an obeticholic acid composition as described herein. In another embodiment is a method of treating liver cancer by administering an effective amount of an obeticholic acid composition as described herein. In still another embodiment is a method of treating renal cancer by administering an effective amount of an obeticholic acid composition as described herein. In still another embodiment is a method of treating pancreatic cancer by administering an effective amount of an obeticholic acid composition as described herein. It is understood that the treatment of a cancer described herein can be performed by administering an effective amount of an obeticholic acid composition described herein in combination with one or more anticancer agents, such as those described herein. In some embodiments, the effective amount administered is a starting dose as described herein.

Still further provided herein are methods of treating an autoimmune disease in a patient in need thereof by administering an effective amount of an obeticholic acid composition as described herein. In one instance, the autoimmune disease is selected from multiple sclerosis, rheumatoid arthritis, and type I diabetes. In one embodiment is a method of treating multiple sclerosis by administering an effective amount of an obeticholic acid composition as described herein. In another embodiment is a method of treating rheumatoid arthritis by administering an effective amount of an obeticholic acid composition as described herein. In still another embodiment is a method of treating type I diabetes by administering an effective amount of an obeticholic acid composition as described herein. In certain instances, the treatment of the autoimmune disease includes further administering another active agent useful for the treatment, such as without limitation, non-steroidal anti-inflammatory agents (NSAIDs) such as ibuprofen, naproxen, corticosteroids, disease-modifying anti-rheumatic drugs such as methotrexate (Trexall, Otrexup, Rasuvo), leflunomide (Arava), hydroxychloroquine (Plaquenil) and sulfasalazine (Azulfidine), biologic agents such as abatacept (Orencia), adalimumab (Humira), anakinra (Kineret), certolizumab (Cimzia), etanercept (Enbrel), golimumab (Simponi), infliximab (Remicade), rituximab (Rituxan), tocilizumab (Actemra) and tofacitinib (Xelj anz), interferons, such as interferon alpha, interferon beta, interferon gamma, and PEGylated versions thereof, glatiramer acetate (also known in the art as Copaxone), dimethyl fumarate (also known in the art as Tecfidera), fingolimod (also known in the art as Gilenya), teriflunomide (also known in the art as Aubagio), natalizumab (also known in the art as Tysabri), alemtuzumab (also known in the art as Lemtrada), and mitoxantrone. For example, an obeticholic acid composition described herein can be administered in combination with metformin, insulin, insulin mimetic, or any other known anti-diabetic or anti-glycemic agent for treatment of diabetes. In some embodiments, the effective amount administered is a starting dose as described herein.

In another aspect, the present disclosure also provides a method for inhibiting or reversing fibrosis, comprising administering a therapeutically effective amount of the composition of the present disclosure to a subject in need thereof. In one embodiment, the subject is not suffering from a cholestatic condition. In another embodiment, the subject is suffering from a cholestatic condition.

36

In one embodiment, the subject is not suffering from a cholestatic condition associated with a disease or condition selected from the group consisting of cancers, such as, e.g., cancers as described herein, including primary liver and biliary cancer, metastatic cancer, sepsis, chronic total parenteral nutrition, cystic fibrosis, and granulomatous liver disease. In embodiments, the fibrosis to be inhibited occurs in an organ where FXR is expressed.

In one embodiment, a cholestatic condition is defined as having an abnormally elevated serum level of alkaline phosphatase, 7-glutamyl transpeptidase (GGT), and/or 5' nucleotidase. In another embodiment, a cholestatic condition is further defined as presenting with at least one clinical symptom. In one embodiment, the symptom is itching (pruritus). In another embodiment, a cholestatic condition is selected from the group consisting of primary biliary cirrhosis (PBC), primary sclerosing cholangitis (PBS), biliary atresia, drug-induced cholestasis, hereditary cholestasis, and intrahepatic cholestasis of pregnancy.

In one embodiment, the fibrosis is selected from the group consisting of liver fibrosis, kidney fibrosis, and intestinal fibrosis.

In one embodiment, the subject has liver fibrosis associated with a disease selected from the group consisting of hepatitis B; hepatitis C; parasitic liver diseases; post-transplant bacterial, viral and fungal infections; alcoholic liver disease (ALD); non-alcoholic fatty liver disease (NAFLD); non-alcoholic steatohepatitis (NASH); liver diseases induced by methotrexate, isoniazid, oxyphenistatin, methyldopa, chlorpromazine, tolbutamide, or amiodarone; autoimmune hepatitis; sarcoidosis; Wilson's disease; hemochromatosis; Gaucher's disease; types III, IV, VI, IX and X glycogen storage diseases; $\alpha_1$-antitrypsin deficiency; Zellweger syndrome; tyrosinemia; fructosemia; galactosemia; vascular derangement associated with Budd-Chiari syndrome, veno-occlusive disease, or portal vein thrombosis; and congenital hepatic fibrosis.

In another embodiment, the subject has intestinal fibrosis associated with a disease selected from the group consisting of Crohn's disease, ulcerative colitis, post-radiation colitis, and microscopic colitis.

In another embodiment, the subject has renal fibrosis associated with a disease selected from the group consisting of diabetic nephropathy, hypertensive nephrosclerosis, chronic glomerulonephritis, chronic transplant glomerulopathy, chronic interstitial nephritis, and polycystic kidney disease.

In another aspect, the present disclosure also provides a method for treating or preventing all forms of conditions related to elevated lipid levels. In one embodiment, the condition is hyperlipidemia where it is associated with a condition selected from resistant primary biliary cirrhosis; primary biliary cirrhosis where there is associated liver function test elevation and hyperlipidemia, primary sclerosing cholangitis, non-alcohol-induced steatohepatitis; and chronic liver disease associated with hepatitis B, C or alcohol. In another embodiment, the present disclosure provides a method for treating or preventing hyperlipidemia, where the hyperlipidemia is primary hyperlipidemia with or without a genetic component, or hyperlipidemia associated with coronary artery disease, cerebrovascular arterial disease, peripheral vascular disease, aortic aneurisms, or carotid atherosclerosis.

In one aspect, the present disclosure provides a method for treating or preventing primary sclerosing cholangitis for similar biochemical abnormalities, as well as chronic hepatitis caused by hepatitis B, C or by alcohol. In one aspect, the

US 10,751,349 B2

37

present disclosure provides a method for treating or preventing other arterial disorders associated with hyperlipidemia. In one aspect, the present disclosure provides a method for treating or preventing hypertriglyceridemia.

Therapies with FXR agonists may produce various side effects, one of which is pruritus. Pruritus or itch is defined as an unpleasant sensation of the skin that provokes the urge to scratch. It is a characteristic feature of many skin diseases and an unusual sign of some systemic diseases. Pruritus may be localized or generalized and can occur as an acute or chronic condition. Itching lasting more than 6 weeks is termed chronic pruritus. Itching can be intractable and incapacitating, as well as a diagnostic and therapeutic challenge.

One of the advantages of the compositions of the present disclosure includes a decrease in the incidence and/or severity of pruritus in subjects treated with the compositions and according to the methods of the present disclosure.

In one embodiment, the incidence of pruritus decreases by at least 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, or 50% in subjects treated with the compositions of the present disclosure. In a further embodiment, the incidence of pruritus decreases by at least 20%, 25%, 30%, 35%, 40%, 45%, or 50% in subjects treated with the compositions of the present disclosure. In a further embodiment, the incidence of pruritus decreases by at least 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, or 50% in subjects treated with the compositions of the present disclosure during the first one month, two months, three months, four months, five months, or six months after the beginning of the treatment. In a further embodiment, the incidence of pruritus decreases by at least 20%, 25%, 30%, 35%, 40%, 45%, or 50% in subjects treated with the compositions of the present disclosure during the first one month, two months, three months, four months, five months, or six months after the beginning of the treatment.

In one embodiment, the severity of the pruritus decreases by at least 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, or 50% in subjects treated with the compositions of the present disclosure. In a further embodiment, the severity of pruritus decreases by at least 20%, 25%, 30%, 35%, 40%, 45%, or 50% in subjects treated with the compositions of the present disclosure. In a further embodiment, the severity of pruritus decreases by at least 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, or 50% in subjects treated with the compositions of the present disclosure during the first one month, two months, three months, four months, five months, or six months after the beginning of the treatment. In a further embodiment, the severity of pruritus decreases by at least 20%, 25%, 30%, 35%, 40%, 45%, or 50% in subjects treated with the compositions of the present disclosure during the first one month, two months, three months, four months, five months, or six months after the beginning of the treatment.

Obeticholic acid compositions described herein can be administered to a patient in an amount of between about: 1 mg to about 50 mg; 1 to about 40 mg; 1 to about 30 mg; 1 to about 25 mg; 1 to about 20 mg; 1 mg to about 10 mg; or 1 mg to about 5 mg. In one embodiment, the obeticholic acid composition can be administered to a patient in an amount of about: 5 to about 50 mg; 5 to about 40 mg; 5 to about 30 mg; 5 to about 25 mg; 5 to about 20 mg; or 5 to about 10 mg. In other instances, the obeticholic acid composition can be administered in an amount of about 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 30, 35, 40, 45, or 50 mg. In still other instances, the obeticholic acid composition described herein can be admin-

38

istered at an amount of about 5 mg, 10 mg, 15 mg, 25 mg, or 50 mg. For example, an effective amount of a obeticholic acid composition described herein can be about 5 mg, 10 mg, 25 mg, or 50 mg. In another example, the amount of a starting dose of an obeticholic acid composition described herein can be about 5 mg, 10 mg, 25 mg, or 50 mg. In another example, the amount of an adjusted dose or re-adjusted dose of an obeticholic acid composition described herein can be about 5 mg, 10 mg, 25 mg, or 50 mg. It is to be understood the amount of an obeticholic acid composition described herein as administered to a patient described herein refers to the amount of obeticholic acid in the composition.

The amount of an obeticholic acid composition as provided above can refer to an effective amount as described herein. In certain embodiments, an effective amount of the obeticholic acid composition administered to a patient described herein can be 5 mg. In another embodiment, an effective amount of the obeticholic acid composition administered to a patient described herein can be 10 mg. In still another embodiment, an effective amount of the obeticholic acid composition administered to a patient described herein can be 25 mg. In yet another embodiment, an effective amount of the obeticholic acid composition administered to a patient described herein can be 50 mg.

The amount of an obeticholic acid composition as provided above can optionally refer to a starting dose administered during a titration period as described herein. In certain embodiments, a starting dose of the obeticholic acid composition administered to a patient described herein can be 5 mg. In another embodiment, a starting dose of the obeticholic acid composition administered to a patient described herein can be 10 mg. In still another embodiment, a starting dose of the obeticholic acid composition administered to a patient described herein can be 25 mg. In yet another embodiment, a starting dose of the obeticholic acid composition administered to a patient described herein can be 50 mg.

The amount of an obeticholic acid composition as provided above can refer to an adjusted dose administered after a titration period as described herein. In certain embodiments, an adjusted dose of the obeticholic acid composition administered to a patient described herein can be 5 mg. In another embodiment, an adjusted dose of the obeticholic acid composition administered to a patient described herein can be 10 mg. In still another embodiment, an adjusted dose of the obeticholic acid composition administered to a patient described herein can be 25 mg. In yet another embodiment, an adjusted dose of the obeticholic acid composition administered to a patient described herein can be 50 mg.

The amount of an obeticholic acid composition as provided above can refer to a re-adjusted dose administered after a titration period as described herein. In certain embodiments, a re-adjusted dose of the obeticholic acid composition administered to a patient described herein can be 5 mg. In another embodiment, a re-adjusted dose of the obeticholic acid composition administered to a patient described herein can be 10 mg. In still another embodiment, a re-adjusted dose of the obeticholic acid composition administered to a patient described herein can be 25 mg. In yet another embodiment, a re-adjusted dose of the obeticholic acid composition administered to a patient described herein can be 50 mg.

While it is possible to administer obeticholic acid directly without any formulation, obeticholic acid is usually administered in the form of pharmaceutical formulations comprising a pharmaceutically acceptable excipient and obeticholic

US 10,751,349 B2

39                                                                    40

acid. These formulations can be administered by a variety of routes including oral, buccal, rectal, intranasal, transdermal, subcutaneous, intravenous, intramuscular, and intranasal. Oral formulation of obeticholic acid are described further herein under the section entitled "Oral Formulation and Administration".

In one embodiment, obeticholic acid can be administered transdermally. In order to administer transdermally, a transdermal delivery device ("patch") is needed. Such transdermal patches may be used to provide continuous or discontinuous infusion of a compound of the present disclosure in controlled amounts. The construction and use of transdermal patches for the delivery of pharmaceutical agents is well known in the art. See, e.g., U.S. Pat. No. 5,023,252. Such patches may be constructed for continuous, pulsatile, or on demand delivery of pharmaceutical agents.

Pharmaceutical compositions suitable for injectable use include sterile aqueous solutions (where water soluble) or dispersions and sterile powders for the extemporaneous preparation of sterile injectable solutions or dispersion. For intravenous administration, suitable carriers include physiological saline, bacteriostatic water, Cremophor EL™ (BASF, Parsippany, N.J.) or phosphate buffered saline (PBS). In all cases, the composition must be sterile and should be fluid to the extent that easy syringeability exists. It must be stable under the conditions of manufacture and storage and must be preserved against the contaminating action of microorganisms such as bacteria and fungi. The carrier can be a solvent or dispersion medium containing, for example, water, ethanol, polyol (for example, glycerol, propylene glycol, and liquid polyethylene glycol, and the like), and suitable mixtures thereof. The proper fluidity can be maintained, for example, by the use of a coating such as lecithin, by the maintenance of the required particle size in the case of dispersion and by the use of surfactants. Prevention of the action of microorganisms can be achieved by various antibacterial and antifungal agents, for example, parabens, chlorobutanol, phenol, ascorbic acid, thimerosal, and the like. In many cases, it will be preferable to include isotonic agents, for example, sugars, polyalcohols such as mannitol, sorbitol, sodium chloride in the composition. Prolonged absorption of the injectable compositions can be brought about by including in the composition an agent which delays absorption, for example, aluminum monostearate and gelatin.

Sterile injectable solutions can be prepared by incorporating the active compound, obeticholic acid or obeticholic acid particles, in the required amount in an appropriate solvent with one or a combination of ingredients enumerated herein, as required, followed by filtered sterilization. Generally, dispersions are prepared by incorporating the obeticholic acid into a sterile vehicle that contains a basic dispersion medium and the required other ingredients from those enumerated above. In the case of sterile powders for the preparation of sterile injectable solutions, methods of preparation are vacuum drying and freeze-drying that yields a powder of the obeticholic acid or obeticholic acid particles, plus any additional desired ingredient from a previously sterile-filtered solution thereof.

It can be useful to orally administer an obeticholic acid composition described herein. Oral compositions generally include an inert diluent or an edible pharmaceutically acceptable carrier. They can be enclosed in gelatin capsules or compressed into tablets. For the purpose of oral therapeutic administration, the active compound, obeticholic acid or obeticholic acid particles, can be incorporated with excipients and used in the form of tablets, troches, or capsules. Oral compositions can also be prepared using a fluid carrier for use as a mouthwash, wherein the obeticholic acid or obeticholic acid particles in the fluid carrier is applied orally and swished and expectorated or swallowed. Pharmaceutically compatible binding agents, and/or adjuvant materials can be included as part of the composition. The tablets, pills, capsules, troches and the like can contain any of the following ingredients, or compounds of a similar nature: a binder such as microcrystalline cellulose, gum tragacanth or gelatin; an excipient such as sodium starch glycolate, starch or lactose, a diluent such as microcrystalline cellulose, a disintegrating agent such as alginic acid, Primogel, or corn starch; a lubricant such as magnesium stearate or Sterotes; a glidant such as colloidal silicon dioxide; a sweetening agent such as sucrose or saccharin; or a flavoring agent such as peppermint, methyl salicylate, or orange flavoring.

For administration by inhalation, the obeticholic acid or obeticholic acid particles is delivered in the form of an aerosol spray from pressured container or dispenser, which contains a suitable propellant, e.g., a gas such as carbon dioxide, or a nebulizer.

Systemic administration can also be by transmucosal or transdermal means. For transmucosal or transdermal administration, penetrants appropriate to the barrier to be permeated are used in the formulation. Such penetrants are generally known in the art, and include, for example, for transmucosal administration, detergents, bile salts, and fusidic acid derivatives. Transmucosal administration can be accomplished through the use of nasal sprays or suppositories. For transdermal administration, the obeticholic acid or obeticholic acid particles is formulated into ointments, salves, gels, or creams as generally known in the art.

The obeticholic acid or obeticholic acid particles can be prepared with pharmaceutically acceptable carriers that will protect the compound against rapid elimination from the body, such as a controlled release formulation, including implants and microencapsulated delivery systems. Biodegradable, biocompatible polymers can be used, such as ethylene vinyl acetate, polyanhydrides, polyglycolic acid, collagen, polyorthoesters, and polylactic acid. Methods for preparation of such formulations will be apparent to those skilled in the art. The materials can also be obtained commercially from Alza Corporation and Nova Pharmaceuticals, Inc. Liposomal suspensions (including liposomes targeted to infected cells with monoclonal antibodies to viral antigens) can also be used as pharmaceutically acceptable carriers. These can be prepared according to methods known to those skilled in the art, for example, as described in U.S. Pat. No. 4,522,811.

It is especially advantageous to formulate oral or parenteral compositions in dosage unit form for ease of administration and uniformity of dosage. Dosage unit form as used herein refers to physically discrete units suited as unitary dosages for the subject to be treated; each unit containing a predetermined quantity of obeticholic acid or obeticholic acid particles calculated to produce the desired therapeutic effect in association with the required pharmaceutical carrier. The specification for the dosage unit forms of the disclosure are dictated by and directly dependent on the unique characteristics of the obeticholic acid or obeticholic acid particles and the particular therapeutic effect to be achieved.

In one embodiment of the present disclosure, there is provided a pharmaceutical formulation comprising at least obeticholic acid as described above in a formulation adapted for buccal and/or sublingual, or nasal administration. This

US 10,751,349 B2

41                                                                42

embodiment provides administration of obeticholic acid in a manner that avoids gastric complications, such as first pass metabolism by the gastric system and/or through the liver. This administration route may also reduce adsorption times, providing more rapid onset of therapeutic benefit. The compounds of the present disclosure may provide particularly favorable solubility profiles to facilitate sublingual/buccal formulations. Such formulations typically require relatively high concentrations of active ingredients to deliver sufficient amounts of active ingredients to the limited surface area of the sublingual/buccal mucosa for the relatively short durations the formulation is in contact with the surface area, to allow the absorption of the active ingredient. Thus, the very high activity of obeticholic acid, combined with its high solubility, facilitates its suitability for sublingual/buccal formulation.

Obeticholic acid is preferably formulated in a unit dosage form, each dosage containing from about 0.05 mg to about 1500 mg. In another embodiment, the formulation comprises about 0.05 mg to about 100 mg. In yet another embodiment, the formulation comprises about 1 mg to about 100 mg. In another embodiment, the formulation comprises about 0.05 mg to about 50 mg. In yet another embodiment, the formulation comprises about 0.05 mg to about 30 mg. In another embodiment, the formulation comprises about 0.05 mg to about 20 mg. In yet another embodiment, the formulation comprises about 0.5 mg to about 30 mg. In another embodiment, the formulation comprises about 0.5 mg to about 25 mg. In yet another embodiment, the formulation comprises about 1 mg to about 25 mg. In another embodiment, the formulation comprises about 4 mg to about 26 mg. In another embodiment, the formulation comprises about 5 mg to about 25 mg. In yet another embodiment, the formulation comprises about 0.05 mg to about 2 mg. In another embodiment, the formulation comprises about 1 mg to about 2 mg. In one embodiment, the formulation comprises about 1.2 mg to about 1.8 mg. In one embodiment, the formulation comprises about 1.3 mg to about 1.7 mg. In one embodiment, the formulation comprises about 1.5 mg. In one embodiment, the formulation comprises about 0.05 mg to about 0.5 mg. In one embodiment, the formulation comprises about 0.08 mg to about 0.8 mg. In yet another embodiment, the formulation comprises about 0.1 mg to about 0.5 mg. In another embodiment, the formulation comprises about 0.25 mg.

Obeticholic acid is generally effective over a wide dosage range. For examples, dosages per day normally fall within the range of about 0.0001 to about 30 mg/kg of body weight. In the treatment of adult humans, the range of about 0.1 to about 15 mg/kg/day, in single or divided dose, is especially preferred. In one embodiment, the formulation comprises about 0.05 mg to about 1500 mg. In another embodiment, the formulation comprises about 0.05 mg to about 100 mg. In yet another embodiment, the formulation comprises about 1 mg to about 100 mg. In another embodiment, the formulation comprises about 0.05 mg to about 50 mg. In another embodiment, the formulation comprises about 0.05 mg to about 30 mg. In yet another embodiment, the formulation comprises about 0.05 mg to about 20 mg. In yet another embodiment, the formulation comprises about 0.05 mg to about 10 mg.

In one embodiment, the formulation comprises about 3 mg to about 30 mg. In another embodiment, the formulation comprises about 0.05 mg to about 25 mg. In another embodiment, the formulation comprises about 4 mg to about 25 mg. In another embodiment, the formulation comprises about 5 mg to about 25 mg. In another embodiment, the

formulation comprises about 5 mg to about 10 mg. In one embodiment, the formulation comprises about 1 mg to about 2 mg. In one embodiment, the formulation comprises about 1.2 mg to about 1.8 mg. In one embodiment, the formulation comprises about 1.3 mg to about 1.7 mg. In one embodiment, the formulation comprises about 0.05 mg to about 0.5 mg. In another embodiment, the formulation comprises about 0.08 mg to about 0.8 mg. In yet another embodiment, the formulation comprises about 0.1 mg to about 0.5 mg. In another embodiment, the formulation comprises about 25 mg. In another embodiment, the formulation comprises about 10 mg. In one embodiment, the formulation comprises about 5 mg. In another embodiment, the formulation comprises about 0.25 mg. However, it will be understood that the amount of obeticholic acid actually administered will be determined by a physician, in the light of the relevant circumstances, including the condition to be treated, the chosen route of administration, the form of obeticholic acid administered, the age, weight, and response of the individual patient, and the severity of the patient's symptoms, and therefore the above dosage ranges are not intended to limit the scope of the disclosure in any way. In some instances dosage levels below the lower limit of the aforesaid range may be more than adequate, while in other cases still larger doses may be employed without causing any harmful side effect, provided that such larger doses are first divided into several smaller doses for administration throughout the day.

The tablet of the present disclosure can comprise an intra-granular portion and an extra-granular portion. The intra-granular portion can contain obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and one or more pharmaceutical excipients. The extra-granular portion can contain obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and one or more pharmaceutical excipients. In one embodiment, the intra-granular portion and the extra-granular portion of the tablet contain obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and one or more pharmaceutical excipients. In another embodiment, the intra-granular portion contains obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof and/or the extra-granular portion does not contain obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof.

The presence of microcrystalline cellulose in the intra-granular portion and/or the extra-granular portion of a tablet comprising obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, can affect the properties of the tablet. In one embodiment, when microcrystalline cellulose is added to only the intra-granular portion of the tablet, tablets of moderate hardness can be produced. In another embodiment, when microcrystalline cellulose is added to only the intra-granular portion of the tablet, tablets of tolerable hardness may be produced. In another embodiment, addition of microcrystalline cellulose to both the intra-granular and extra-granular portions can provide tablets having superior tablet hardness and an improved dissolution profile. In one embodiment, microcrystalline cellulose is added to the intra-granular portion of the tablet. In another embodiment, microcrystalline cellulose is added to both the intra-granular portion and extra-granular portion of the tablet.

When the microcrystalline cellulose is present in the intra-granular portion it can be present in a ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof,

US 10,751,349 B2

43

between about 20:1 to about 1:5. In one embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, may be, e.g., between about 19:1 to about 1:5, between about 19:1 to about 1:4, between about 19:1 to about 1:3, between about 19:1 to about 1:2, between about 18:1 to about 1:5, between about 18:1 to about 1:4, between about 18:1 to about 1:3, between about 18:1 to about 1:2, between about 17:1 to about 1:5, between about 17:1 to about 1:4, between about 17:1 to about 1:3, between about 17:1 to about 1:2, between about 16:1 to about 1:5, between about 16:1 to about 1:4, between about 16:1 to about 1:3, between about 16:1 to about 1:2, between about 15:1 to about 1:5, between about 15:1 to about 1:4, between about 15:1 to about 1:3, between about 15:1 to about 1:2, between about 14:1 to about 1:5, between about 14:1 to about 1:4, between about 14:1 to about 1:3, between about 14:1 to about 1:2, between about 13:1 to about 1:5, between about 13:1 to about 1:4, between about 13:1 to about 1:3, between about 13:1 to about 1:2, between about 12:1 to about 1:5, between about 12:1 to about 1:4, between about 12:1 to about 1:3, between about 12:1 to about 1:2, between about 11:1 to about 1:5, between about 11:1 to about 1:4, between about 11:1 to about 1:3, or between about 11:1 to about 1:2. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 10:1 to about 1:5, between about 10:1 to about 1:4, between about 10:1 to about 1:3, or between about 10:1 to about 1:2. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 9:1 to about 1:4, between about 9:1 to about 1:3, between about 9:1 to about 1:2, or between about 9:1 to about 1:1. In yet another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 8:1 to about 1:3, between about 8:1 to about 1:2, or between about 8:1 to about 1:1. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 7:1 to about 1:2 or between about 7:1 to about 1:1. In yet another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 6:1 to about 1:1. In other embodiments, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 20:1 to about 1:1, between about 19:1 to about 1:1, between about 18:1 to about 1:1, between about 17:1 to about 1:1, between about 16:1 to about 1:1, between about 15:1 to about 1:1, between about 14:1 to about 1:1, between about 13:1 to about 1:1, between about 12:1 to about 1:1, or between about 11:1 to about 1:1. In another embodiments, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 20:1 to about 2:1, between about 20:1 to about 3:1, between about 20:1 to about 4:1, between about 20:1 to about 5:1, between about 20:1 to about 6:1, between about 20:1 to about 7:1, between about 20:1 to about 8:1, between about 20:1 to about 9:1, between about 20:1 to about 10:1, between about 20:1 to about 11:1, between about 19:1 to about 2:1, between about 19:1 to about 3:1, between about 19:1 to about 4:1, between about 19:1 to about 5:1, between about 19:1 to about 6:1, between about 19:1 to about 7:1, between about 19:1 to about 8:1, between about

44

19:1 to about 9:1, between about 19:1 to about 10:1, between about 19:1 to about 11:1, between about 18:1 to about 2:1, between about 18:1 to about 3:1, between about 18:1 to about 4:1, between about 18:1 to about 5:1, between about 18:1 to about 6:1, between about 18:1 to about 7:1, between about 18:1 to about 8:1, between about 18:1 to about 9:1, between about 18:1 to about 10:1, between about 18:1 to about 11:1, between about 17:1 to about 2:1, between about 17:1 to about 3:1, between about 17:1 to about 4:1, between about 17:1 to about 5:1, between about 17:1 to about 6:1, between about 17:1 to about 7:1, between about 17:1 to about 8:1, between about 17:1 to about 9:1, between about 17:1 to about 10:1, between about 17:1 to about 11:1, between about 16:1 to about 2:1, between about 16:1 to about 3:1, between about 16:1 to about 4:1, between about 16:1 to about 5:1, between about 16:1 to about 6:1, between about 16:1 to about 7:1, between about 16:1 to about 8:1, between about 16:1 to about 9:1, between about 16:1 to about 11:1, between about 15:1 to about 2:1, between about 15:1 to about 3:1, between about 15:1 to about 4:1, between about 15:1 to about 5:1, between about 15:1 to about 6:1, between about 15:1 to about 7:1, between about 15:1 to about 8:1, between about 15:1 to about 9:1, between about 15:1 to about 10:1, between about 15:1 to about 11:1, between about 14:1 to about 2:1, between about 14:1 to about 3:1, between about 14:1 to about 4:1, between about 14:1 to about 5:1, between about 14:1 to about 6:1, between about 14:1 to about 7:1, between about 14:1 to about 8:1, between about 14:1 to about 9:1, between about 14:1 to about 10:1, between about 14:1 to about 11:1, between about 13:1 to about 2:1, between about 13:1 to about 3:1, between about 13:1 to about 4:1, between about 13:1 to about 5:1, between about 13:1 to about 6:1, between about 13:1 to about 7:1, between about 13:1 to about 8:1, between about 13:1 to about 9:1, between about 13:1 to about 10:1, between about 13:1 to about 11:1, between about 12:1 to about 2:1, between about 12:1 to about 3:1, between about 12:1 to about 4:1, between about 12:1 to about 5:1, between about 12:1 to about 6:1, between about 12:1 to about 7:1, between about 12:1 to about 8:1, between about 12:1 to about 9:1, between about 12:1 to about 10:1, between about 12:1 to about 11:1, between about 11:1 to about 2:1, between about 11:1 to about 3:1, between about 11:1 to about 4:1, between about 11:1 to about 5:1, between about 11:1 to about 6:1, between about 11:1 to about 7:1, between about 11:1 to about 8:1, or between about 11:1 to about 9:1, or between about 11:1 to about 10:1. Preferably, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, may be between about 20:1 to about 5:1, between about 16:1 to about 6:1, or between about 16:1 to about 11:1, or any of the above-mentioned ratio ranges between about 20:1 to about 5:1. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is about 16:1. In yet another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is about 11:1. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is about 6:1. In yet another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is about 10:1 to about 1:1. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable

US 10,751,349 B2

45

salt, ester, or amino acid conjugate thereof, is between about 5:1 to about 1:1. In yet another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 3:1 to about 1:1. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 2:1 to about 1:1. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 4:1 to about 2:1. In yet another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is between about 3:1 to about 2:1. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is 4:1. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is about 3:1. In yet another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is about 2:1. In another embodiment, the ratio of microcrystalline cellulose to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, is about 1:1.

The tablet hardness of an obeticholic acid containing tablet can be between about 6 kilopascals (kP) to about 14 kP. In one embodiment, the tablet hardness is between about 7 kP to about 12 kP. In another embodiment, the tablet hardness is between about 8 kP to about 12 kP. In yet another, the tablet hardness is between about 8 kP to about 11 kP. In another embodiment, the tablet hardness is between about 9 kP to about 11 kP. In yet another embodiment, the tablet hardness is between about 10 kP to about 11 kP.

In one embodiment, the tablets of the present disclosure comprising obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose and optionally one or more additional pharmaceutical excipients in the intra-granular portion, and one or more pharmaceutical excipients in the extra-granular portion possess increased hardness. In one embodiment, the tablets of the present disclosure comprising obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose and optionally one or more additional pharmaceutical excipients in the intra-granular portion, and microcrystalline cellulose and optionally one or more additional pharmaceutical excipients in the extra-granular portion possess increased hardness. In particular, the tablets of the present disclosure comprising microcrystalline cellulose in both the intra-granular portion and extra-granular portion possess increased hardness, for example, as compared with tablets comprising microcrystalline cellulose in only the intra-granular portion. In one embodiment, the hardness is increased at least about 5%, at least about 10%, at least about 20%, at least about 30%, at least about 40%, at least about 50%, at least about 60%, or at least about 70%, for example, as compared with tablets comprising microcrystalline cellulose in only the intra-granular portion. In one embodiment, the hardness is increased about 20%, at least about 30%, at least about 40%, or at least about 50%, for example, as compared with tablets comprising microcrystalline cellulose in only the intra-granular portion. In another embodiment, the hardness is increased between about 5% and about 45%, between about 10% and about 40%, between about 15% and about

46

35%, between about 20% and about 30%, between about 25% and about 35%, between about 25% and about 40%, between about 25% and about 50%, or between about 30% and about 50%, for example, as compared with tablets comprising microcrystalline cellulose in only the intra-granular portion.

In one embodiment, the tablets of the present disclosure comprising obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose and optionally one or more additional pharmaceutical excipients in the intra-granular portion, and one or more pharmaceutical excipients in the extra-granular portion possess increased hardness. In another embodiment, the tablets of the present disclosure comprising obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose, and optionally one or more additional pharmaceutical excipients in the intra-granular portion, and microcrystalline cellulose and optionally one or more additional pharmaceutical excipients in the extra-granular portion possess improved dissolution of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof. In particular, the tablets of the present disclosure comprising microcrystalline cellulose in both the intra-granular portion and extra-granular portion possess improved dissolution of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, for example, as compared with tablets comprising microcrystalline cellulose in only the intra-granular portion. For example, obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the tablets of the present disclosure dissolves (e.g., in a Disodium Hydrogen Phosphate Buffer) at a rate that is at least 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10%, 15%, 20%, 30%, 40%, 50%, 80%, or 100% faster than, for example, as compared with the dissolution rate tablets comprising microcrystalline cellulose in only the intra-granular portion.

For example, about 55% to about 95% of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the tablet of the present disclosure is dissolved within about 15 minutes, or about 65% to about 95% is dissolved within about 30 minutes, or about 80% to about 95% is dissolved within about 45 minutes, or about 87% to about 97% is dissolved within about 60 minutes, or about 87% to about 99% is dissolved within about 75 minutes. For example, about 60% to about 84% of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the tablet of the present disclosure is dissolved within about 15 minutes, or about 75% to about 91% is dissolved within about 30 minutes, or about 85% to about 93% is dissolved within about 45 minutes, or about 90% to about 96% is dissolved within about 60 minutes, or about 90% to about 97% is dissolved within about 75 minutes. For example, about 62% to about 83% of obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the tablet of the present disclosure is dissolved within about 15 minutes, or about 80% to about 90% is dissolved within about 30 minutes, or about 87% to about 94% is dissolved within about 45 minutes, or about 92% to about 96% is dissolved within about 60 minutes, or about 91% to about 97% is dissolved within about 75 minutes. For example, about 60% to about 84% obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the tablet of the present disclosure is dissolved within about 15 minutes, or about 70% to about 90% is dissolved within about 30 minutes, or about 85% to about 92% is dissolved

US 10,751,349 B2

47

within about 45 minutes, or about 89% to about 96% is dissolved within about 60 minutes, or about 90% to about 96% is dissolved within about 75 minutes. For example, at least about 60% obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the tablet of the present disclosure is dissolved within about 15 minutes, or at least about 90% is dissolved within about 60 minutes. For example, obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in the tablet of the present disclosure has an in vitro dissolution profile of about 51% dissolved within about 15 minutes, or about 66% dissolved within about 30 minutes, or about 79% dissolved within about 45 minutes, or about 85% dissolved within about 60 minutes.

Obeticholic acid tablets can be manufactured via a manufacturing process comprising dry granulation by roller compaction followed by tablet compression and coating. The process steps used to manufacture OCA tablets include: pre-blending, dry granulation, final blending, compression, coating, and packaging.

Obeticholic acid drug substance and one or more pharmaceutical excipients (i.e., microcrystalline cellulose, sodium starch glycolate, and/or magnesium stearate) are added and further optionally blended to produce a premix. In one embodiment, OCA and microcrystalline cellulose is blended to produce a premix. In one embodiment, the premix is blended, passed through a screen and then again blended. In another embodiment, the one or more pharmaceutical excipients are added in small portions and blended between each addition. In one embodiment, the one or more pharmaceutical excipients are added sequentially. In another embodiment, the one or more pharmaceutical excipients are added together.

The premix is then granulated and optionally milled to reduce particle size. In one embodiment, the premix is roller compacted. In another embodiment, the premix is further milled. The premix can be milled using various methods. In one embodiment, the premix is milled using a comil. In another embodiment, the premix is milled using a comil followed by an oscillating bar screen mill.

Once the premix is granulated, a final blending of the obeticholic acid tablet formulation is performed. In the final blending, one or more pharmaceutical excipients (i.e., microcrystalline cellulose, sodium starch glycolate, and/or magnesium stearate) are added to provide a final blend which is further optionally blended. In one embodiment, microcrystalline cellulose is added during the final blending. In one embodiment, the one or more pharmaceutical excipients are added sequentially. In another embodiment, the one or more pharmaceutical excipients are added together.

The final blend is then compressed to form the tablet. The compression parameters can be adjusted to produce tablets of the desired weight, hardness, thickness, and friability. The tablet press speed and feeder speed can also be adjusted to help reduce tablet weight variation. The obeticholic acid tablets are then coated with a coating material (i.e., Opadry® II white, Opadry® II green, or Opadry® II yellow) using a coating solution.

Obeticholic acid compositions described herein can be administered in accordance with a dosing regimen. A dosing regimen refers to continual and intermittent administration of a obeticholic acid composition described herein at one or more of the amounts described herein. Thus, in certain instances, a dosing regimen can include administration of a obeticholic acid composition described herein continually for any number of days, weeks, months, or years as set forth herein. In other instances, a dosing regimen can include

48

administration of a obeticholic acid composition described herein intermittently, where, for example, the composition is administered for one period of time followed by a rest period or off period where the obeticholic acid composition is not administered.

Obeticholic acid compositions useful in the methods of treating described herein include administration of such compositions daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M). In one embodiment, a obeticholic acid composition described herein is administered QD. Thus, an effective amount of an obeticholic acid composition described herein can be administered QD to treat a disease or condition described herein. A starting dose described herein can be administered QD during the course of a titration period described herein to treat a disease or condition described herein. An adjusted dose described herein can be administered QD to treat a disease or condition described herein.

In another embodiment, an obeticholic acid composition described herein is administered Q2D. An effective amount of an obeticholic acid composition described herein can be administered Q2D to treat a disease or condition described herein. A starting dose described herein can be administered Q2D during the course of a titration period described herein to treat a disease or condition described herein. An adjusted dose described herein can be administered Q2D to treat a disease or condition described herein.

In another embodiment, an obeticholic acid composition is described herein administered QW. An effective amount of an obeticholic acid composition described herein can be administered QW to treat a disease or condition described herein. A starting dose described herein can be administered QW during the course of a titration period described herein to treat a disease or condition described herein. An adjusted dose described herein can be administered QW to treat a disease or condition described herein.

In another embodiment, an obeticholic acid composition is described herein administered BID. An effective amount of an obeticholic acid composition described herein can be administered BID to treat a disease or condition described herein. A starting dose described herein can be administered BID during the course of a titration period described herein to treat a disease or condition described herein. An adjusted dose described herein can be administered BID to treat a disease or condition described herein.

In another embodiment, an obeticholic acid composition is described herein administered TIW. An effective amount of an obeticholic acid composition described herein can be administered TIW to treat a disease or condition described herein. A starting dose described herein can be administered TIW during the course of a titration period described herein to treat a disease or condition described herein. An adjusted dose described herein can be administered TIW to treat a disease or condition described herein.

In another embodiment, an obeticholic acid composition is described herein administered QM. An effective amount of an obeticholic acid composition described herein can be administered QM to treat a disease or condition described herein. A starting dose described herein can be administered QM during the course of a titration period described herein to treat a disease or condition described herein. An adjusted dose described herein can be administered QM to treat a disease or condition described herein.

In another embodiment, an obeticholic acid composition is described herein administered Q2M. An effective amount of an obeticholic acid composition described herein can be

**49**

administered Q2M to treat a disease or condition described herein. A starting dose described herein can be administered Q2M during the course of a titration period described herein to treat a disease or condition described herein. An adjusted dose described herein can be administered Q2M to treat a disease or condition described herein.

The embodiments described above include administration at an amount described above. For example, an obeticholic acid composition described herein can be administered in a frequency provided above in an amount of 5 mg, 10 mg, 25 mg, or 50 mg.

Dosing regimens of the obeticholic acid compositions described herein useful for treating diseases and conditions described herein can include a titration period. A titration period typically includes a lower dosage of an obeticholic acid composition described herein for a period of time. In certain instances, and without being bound by any particular theory, administration using a titration period described herein can decrease or eliminate the onset of adverse effects. In other instances, and without being bound by any particular theory, administration using a titration period described herein can permit increased dosages of obeticholic acid compositions described herein to an individual over the course of a treatment.

A titration period can be a period of time of about: 1 month to about 24 months; 1 month to about 21 months; 1 month to about 18 months; 1 month to about 15 months; 1 month to about 12 months; 1 month to about 9 months; 1 month to about 6 months; or 1 month to about 3 months. In another embodiment, a titration period includes a time of about: 3 months to about 24 months; 3 months to about 21 months; 3 months to about 18 months; 3 months to about 15 months; 3 months to about 12 months; 3 or months to about 6 months. In still another embodiment, a titration period includes a time of about: 6 months to about 24 months; 6 months to about 21 months; 6 months to about 18 months; 6 months to about 15 months; or 6 months to about 12 months. In yet another embodiment, a titration period includes a time of about: 2 months to about 4 months; 2 months to about 7 months; 2 months to about 8 months; 4 months to about 8 months; 5 months to about 7 months; or 5 months to about 8 months. For example, a titration period can be about 1 to about 6 months. In another example, a titration period can be about 3 to about 6 months.

A titration period can include a time of about 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, or 24 months. In certain embodiments, a titration period includes a time of about 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 months. In another embodiment, the titration period includes a time of about 1, 2, 3, 4, 5, 6, 7, 8, or 9 months. In another embodiment, the titration period includes a time of about 1, 2, 3, 4, 5, or 6 months. In another embodiment, the titration period includes a time of about 1, 2, or 3 months. For example, a titration period can be about 1 month. In another example a titration period can be about 2 months. In another example a titration period can be about 3 months. In still another example a titration period can be about 4 months. In yet another example a titration period can be about 5 months. In another example a titration period can be about 6 months. In one example a titration period is 3 months or 6 months. In another example a titration period can be about 7 months. In another example a titration period can be about 8 months. In another example a titration period can be about 9 months.

As provided above, the amounts of a obeticholic acid composition described herein, optionally administered in a titration period can be reduced compared to an adjusted

**50**

amount as described herein. Accordingly, provided herein are treatment regimens that include administering obeticholic acid compositions described herein for the treatment of a disease or condition described herein (e.g., PBC) wherein the starting dose administered during a titration period described above is lower than the amount of an adjusted dose administered after a titration period. Still further provided herein are treatment regimens that include administering obeticholic acid compositions described herein for the treatment of a disease or condition described herein (e.g., PBC) where the starting dose administered during a titration period described above is lower than the amount of an adjusted dose administered after a titration period and where the frequency of administration (e.g., QD, Q2D, or QW) for the adjusted dose is greater than the frequency of administration of the starting dose. Still further provided herein are treatment regimens that include administering obeticholic acid compositions described herein for the treatment of a disease or condition described herein (e.g., PBC) where the starting dose administered during a titration period described above is lower than the amount of an adjusted dose administered after a titration period and where the frequency of administration (e.g., QD, Q2D, or QW) for the adjusted dose is less than the frequency of administration of the starting dose. Increases in the adjusted dose (or any re-adjusted dose) can be performed after the patient's liver function is assessed, monitored, or measured as described herein, where the liver function is considered not-impaired.

In embodiments, the adjusted dose can be increased compared to the starting dose when the level of ALP is about equal to or is not reduced compared to a control as described herein. In embodiments, the adjusted dose can be increased compared to the starting dose when the level of bilirubin is about equal to or is not reduced compared to a control as described herein. In embodiments, the adjusted dose can be increased compared to the starting dose when the level of ALP and bilirubin are about equal to or are not reduced compared to a control as described herein. In certain instances, the adjusted dose can be increased compared to the starting dose where a patient described herein tolerates the starting dose amount. In certain embodiments, the starting dose can be 5 mg. In certain embodiments, the starting dose is 10 mg. In certain embodiments, the starting dose is 5 mg and the adjusted dose is greater than 5 mg (e.g., about 6 mg to about 50 mg). In one embodiment, the starting dose is 5 mg and the adjusted dose is 10 mg.

Also provided herein are treatment regimens that include administering obeticholic acid compositions described herein for the treatment of a disease or condition described herein (e.g., PBC) where the starting dose administered during a titration period described above is equal to the amount of an adjusted dose administered after a titration period. Further provided herein are treatment regimens that include administering obeticholic acid compositions described herein for the treatment of a disease or condition described herein (e.g., PBC) where the starting dose administered during a titration period described above is equal to the amount of an adjusted dose administered after a titration period and where the frequency of administration (e.g., QD, Q2D, or QW) for the starting dose is the same as the adjusted dose. Still further provided herein are treatment regimens that include administering obeticholic acid compositions described herein for the treatment of a disease or condition described herein (e.g. PBC) where the starting dose administered during a titration period described above is equal to the amount of an adjusted dose administered after a titration period and where the frequency of administration (e.g., QD,

Q2D, or QW) for the adjusted dose is greater than the frequency of administration of the starting dose. Still further provided herein are treatment regimens that include administering obeticholic acid compositions described herein for the treatment of a disease or condition described herein (e.g., PBC) where the starting dose administered during a titration period described above is equal to the amount of an adjusted dose administered after a titration period and where the frequency of administration (e.g., QD, Q2D, or QW) for the adjusted dose is less than the frequency of administration of the starting dose. The adjusted dose (or any re-adjusted dose) can be equal to the starting dose where the patient's liver function is assessed, monitored, or measured as described herein, where the liver function is considered not-impaired.

In embodiments, the adjusted dose can be equal to the starting dose when the level of ALP is reduced compared to a control as described herein. In embodiments, the adjusted dose can be equal to the starting dose when the level of bilirubin is reduced compared to a control as described herein. In embodiments, the adjusted dose can be equal to the starting dose when the level of ALP and bilirubin are reduced compared to a control as described herein. In certain instances, the adjusted dose can be equal to the starting dose where a patient described herein tolerates or poorly tolerates (e.g., has onset of adverse effects described herein) the starting dose amount. In certain embodiments, the starting dose can be 5 mg. In certain embodiments, the starting dose is 10 mg. In certain embodiments, the starting dose is 5 mg and the adjusted dose is 5 mg. In one embodiment, the starting dose is 10 mg and the adjusted dose is 10 mg.

Further provided herein are treatment regimens that optionally include a starting dose and an adjusted dose as provided in the regimens above, where the adjusted dose is further reduced during the course of treatment. In certain instances, the adjusted dose is reduced to a new re-adjusted dose having a decreased amount of an obeticholic acid composition described herein. In other instances the adjusted dose is reduced to a new re-adjusted dose having the same amount of an obeticholic acid composition described herein but a decreased frequency of administration (e.g., from QD to Q2D or QW). In still other instances, the adjusted dose is modified such that the re-adjusted dose includes a decreased amount of an obeticholic acid composition described herein and is administered at a decreased frequency compared to the adjusted dose.

The obeticholic acid composition described herein can be administered for any number of days, weeks, months, or years, including indefinitely, provided that the dosage remains efficacious for the patient and the patient tolerates the dosage (e.g., an adjusted or re-adjusted dose as described herein). In certain instances, an obeticholic acid composition described herein is administered to a patient described herein until loss of efficacy, or until development of unacceptable toxicity or undesired adverse effects, such as, for example, those described herein. Daily dosing of an obeticholic acid composition described herein can be dependent upon patient tolerance to the dosage, composition, or frequency of administration. For example, daily dosing can be administered to a patient described herein where the patient tolerates a daily dosage amount (e.g., 5 mg, 10 mg, 25 mg, or 50 mg). Alternatively or additionally, the daily dosing can be modified to increase or reduce the amount of an obeticholic acid composition described herein as provided above where the patient is tolerant or is intolerant to the dose, respectively. In certain embodiments, modification of the adjusted dose (or any re-adjusted dose) can be performed

after the patient's liver function is assessed, monitored, or measured as described herein. In certain instances, the adjusted dose (or re-adjusted dose) is increased or maintained (e.g., equivalent to a starting dose) where the liver function is not-impaired. In other instances, the adjusted dose (or re-adjusted dose) is decreased or maintained (e.g., equivalent to a starting dose) where the patient's liver function is impaired.

The amount of an obeticholic acid described herein administered to a patient described herein can be modified as a result of intolerability or development of one or more adverse effects such as those described herein. For example, in one instance the amount of an obeticholic acid composition described herein administered to a patient can be changed from a QD dosage to a Q2D dosage. In certain embodiments, the dosage of an obeticholic acid described herein is modified from a QD to Q2D dosage upon development of an adverse effect described herein (e.g., severe pruritus). In one example, administration of an obeticholic acid composition described herein at 5 mg QD can be modified to a 5 mg Q2D dosage. Such a modification can reduce or eliminate undesired adverse effects while maintaining the desired efficacy. In another example, administration of an obeticholic acid composition described herein at 10 mg QD can be reduced to 5 mg QD. It should be understood that exemplary dosing regimens described herein can be combined. For example, a reduced dosage of an obeticholic acid composition described herein from 10 mg to 5 mg QD could be further reduced to a 5 mg Q2D dosage where undesired adverse effects remain. In still another example, dosing of the obeticholic acid composition can be temporarily suspended (e.g., an off period) for about 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, or 14 days, or 1, 2, 3, or 4 weeks.

In one exemplary dosing regimen, a PBC patient is administered an obeticholic acid composition described herein where: the starting dose of the obeticholic acid composition described herein is administered QD to a patient described herein at an amount of 5 mg and the obeticholic acid composition is administered QD to the patient in an adjusted dose of 5 mg. The exemplary dosing regimen can include a titration period of about 1 to about 6 months.

In another exemplary dosing regimen, a PBC patient is administered an obeticholic acid composition described herein where: the starting dose of the obeticholic acid composition described herein is administered QD to a patient described herein at an amount of 5 mg in a titration period of about 3 months or about 6 months and the obeticholic acid composition is administered QD to the patient in an adjusted dose of 5 mg.

In still another exemplary dosing regimen, a PBC patient is administered an obeticholic acid composition described herein where: the starting dose of the obeticholic acid composition described herein is administered QD to a patient in a titration period of about 3 months or about 6 months and the obeticholic acid composition is administered QD to the patient in an adjusted dose of 10 mg.

In another exemplary dosing regimen, a PBC patient is administered an obeticholic acid composition described herein where: the starting dose of the obeticholic acid composition described herein is administered QD to a patient in a titration period of about 3 months or about 6 months and the obeticholic acid composition is administered QD to the patient in an adjusted dose of 5 mg, where the

US 10,751,349 B2

53                                                    54

adjusted dose is modified to a 5 mg Q2D re-adjusted dose upon development of an adverse effect (e.g., pruritus or severe pruritus).

In still another exemplary dosing regimen, a PBC patient is administered a obeticholic acid composition described herein, where the starting dose of the obeticholic acid composition described herein is administered QD to a patient in a titration period of about 3 months or about 6 months and the obeticholic acid composition is administered QD to the patient in an adjusted dose of 10 mg, where the adjusted dose is subsequently modified to a 5 mg QD re-adjusted dose upon development of an adverse effect (e.g., pruritus or severe pruritus).

The amount of an obeticholic acid composition described herein administered to a patient can be determined by the existence of any preexisting conditions in the patient. For example, where a patient described herein has or has had hepatic impairment, the dosage of the obeticholic acid composition described herein can be modified. In certain instances, the hepatic impairment is a Child-Pugh Class B or Class C hepatic impairment. In one embodiment, the hepatic impairment is Child-Pugh Class C. In such instances, the amount of an obeticholic acid composition described herein can be administered in a decreased amount during and after a titration period when compared to administration of the same obeticholic acid composition to a patient who does not have hepatic impairment.

In one example dosing regimen, a patient having hepatic impairment is administered an obeticholic acid composition described herein at an amount of about 1 mg to about 5 mg, where the composition is administered at least once weekly (QW). In one instance, the obeticholic acid composition described herein is administered at an amount of about 5 mg once weekly to a patient diagnosed with hepatic impairment (e.g., Child-Pugh Class B or C).

For example, the dosing regimen can include administering an obeticholic acid composition described herein to a patient having hepatic impairment, where the obeticholic acid composition is administered at a starting dose of 5 mg QW for a titration period of 3 or 6 months and administered at an adjusted dose of 5 mg QW. The patient's liver function can be assessed, monitored, or measured as described herein. Where the patient's liver function is not impaired, the adjusted dose can be increased to a re-adjusted dose of 5 mg administered BIW or 5 mg QD.

In certain instances a patient can develop liver impairment during the course of administration. It is understood, using the disclosure provided herein, that the adjusted dose can be decreased in amount or frequency to avoid progression of liver impairment.

Further provided herein is a method of treating PBC in a patient in need thereof by administering an effective amount of a obeticholic acid composition described herein QD, where the effective amount is either a 5 mg or 10 mg dose. In another aspect is a method of treating PBC in a patient in need thereof by administering a starting dose of 5 mg QD of an obeticholic acid composition described herein for at least 3 months; evaluating the tolerance of the patient, the patient's liver function as described herein, and/or the efficacy of treatment, where patient tolerance, liver function, and/or lowered efficacy indicate end of a titration period and administration of an adjusted dose of 10 mg QD. In one embodiment, the patient tolerance, liver function, and/or lowered efficacy indicate end of a titration period and administration of an adjusted dose of 5 mg QD.

In embodiments described herein, an obeticholic acid composition described herein can be metabolized to a obet-icholic acid conjugate, such as for example, a glycine, taurine, or sarcosine conjugate of obeticholic acid. Such metabolites can be useful in treating a disease or condition provided herein. In certain instances, production of conjugates can be assessed, monitored, measured, or detected, as described herein during the course of a treatment. In some embodiments, increased levels of obeticholic acid conjugates can result in adjusted dosages of an obeticholic acid composition described herein.

Also provided herein are methods of treating a disease or condition described herein where the treatment further includes administration of one or more active agents and combinations thereof. For example, ursodeoxycholic acid (UDCA) is commonly administered for treatment of PBC, yet a majority of patients administered UDCA alone have either an inadequate response or no response to the treatment. In such instances, there is a need for new medicaments or additional medicaments for the treatment of PBC. The obeticholic acid compositions described herein can be administered as described herein (e.g., according to one or more dosing regimens provided above) in combination with UDCA. In some instances, the UDCA is administered at an amount of about 10 to 15 mg/kg/day. In another instance, the UDCA is administered at an amount of about 300, 600, 900, or 1200 mg/day. Administration of UDCA can include a rest or off period of 1, 2, 3, or 4 weeks. In one example, an obeticholic acid composition described herein is administered as described herein in combination with UDCA, where the UDCA is administered at an amount provided above or in accordance with a package insert. The term package insert refers to instructions customarily included in commercial packages of medicaments approved by the FDA or a similar regulatory agency of a country other than the USA, which contains information about, for example, the usage, dosage, administration, contraindications, and/or warnings concerning the use of such medicaments.

In another example, the active agent is a peroxisome proliferator-activated receptor alpha (PPARα) agonist, a peroxisome proliferator-activated receptor delta (PPARδ) agonist, a dual PPARα/δ agonist, a dual PPARα/γ agonist, or pan-PPAR agonist, an HMG CoA reductase inhibitor, a GLP1 agonist, insulin, insulin mimetic, metformin, a GTP4 agonist, an HST2 inhibitor, a DPP-IV inhibitor, an SGLT2 inhibitor or a hydroxysteroid dehydrogenase (HSD) inhibitor, such as an 11β-HSD1 inhibitor, an ASK1 inhibitor, an ACC1 inhibitor, a NOX1 and/or NOX4 inhibitor, an inhibitor or antagonist of one or more chemokine receptors, such as, for example, CCR2 and CCR5.

In instances where an obeticholic acid composition described herein is useful for the treatment of a cancer described herein, such compositions can be co-administered with one or more cancer agents.

The anti-cancer agent useful in methods of treating solid-tumor cancers provided herein can include any known class of anti-cancer agents such as, for example, radiation therapy, operations, alkylating agents, antimetabolites, anthracy-clines, campothecins, vinca alkaloids, taxanes or platinums, as well as other antineoplastic agents known in the art. Such anti-cancer agent and antineoplastic agent classifications are known in the art and used in accordance with their plain and ordinary meaning.

Exemplary anti-cancer agents include but are not limited to: ABRAXANE; abiraterone; ace-11; aclarubicin; acivicin; acodazole hydrochloride; acronine; actinomycin; acylful-vene; adecypenol; adozelesin; adriamycin; aldesleukin; all trans-retinoic acid (ATRA); altretamine; ambamustine; ambomycin; ametantrone acetate; amidox; amifostine;

US 10,751,349 B2

55

aminoglutethimide; aminolevulinic acid; amrubicin; amsacrine; anagrelide; anastrozole; andrographolide; antarelix; anthramycin; aphidicolin glycinate; apurinic acid; ara-CDP-DL-PTBA; arginine deaminase; ARRY-162; ARRY-300; ARRY-142266; AS703026; asparaginase; asperlin; asulacrine; atamestane; atrimustine; AVASTIN; axinastatin 1; axinastatin 2; axinastatin 3; azasetron; azatoxin; azatyrosine; azacitidine; AZD8330; azetepa; azotomycin; balanol; batimastat; BAY 11-7082; BAY 43-9006; BAY 869766; bendamustine; benzochlorins; benzodepa; benzoylstaurosporine; beta-alethine; betaclamycin B; betulinic acid; b-FGF inhibitor; bicalutamide; bisantrene; bisaziridinylspermine; bisnafide; bisnafide dimesylate; bistratene A; bisantrene hydrochloride; bleomycin; bleomycin sulfate; busulfan; bizelesin; breflate; bortezomib; brequinar sodium; bropirimine; budotitane; buthionine sulfoximine; bryostatin; cactinomycin; calusterone; calcipotriol; calphostin C; camptothecin derivatives; capecitabine; carboxamide-amino-triazole; carboxyamidotriazole; CaRest M3; CARN 700; caracemide; carbetimer; carboplatin; carmustine; carubicin hydrochloride; carzelesin; castanospermine; cecropin B; cedefingol; celecoxib; cetrorelix; chlorins; chloroquinoxaline sulfonamide; cicaprost; chlorambucil; Chlorofusin; cirolemycin; cisplatin; CI-1040; cis-porphyrin; cladribine; clomifene analogues; clotrimazole; collismycin A; collismycin B; combretastatin A4; combretastatin analogue; conagenin; crambescidin 816; crisnatol; crisnatol mesylate; cryptophycin 8; cryptophycin A derivatives; curacin A; cyclopentanthraquinones; cycloplatam; cypemycin; cyclophosphamide; cytarabine; cytarabine ocfosfate; cytolytic factor; cytostatin; dacarbazine; dactinomycin; daunorubicin; daunorubicin hydrochloride; decarbazine; dacliximab; dasatinib; dectiabine; dehydrodidemnin B; deslorelin; dexamethasone; dexifosfamide; dexrazoxane; dexverapamil; dexormaplatin; dezaguanine; dezaguanine mesylate; diaziquone; didemnin B; didox; diethylnorspermine; dihydro 5 azacytidine; dihydrotaxol; 9-dioxamycin; diphenyl spiromustine; docosanol; dolasetron; docetaxel; doxorubicin; doxorubicin hydrochloride; doxifluridine; droloxifene; droloxifene citrate; dromostanolone propionate; dronabinol; duazomycin; duocarmycin SA; ebselen; ecomustine; edelfosine; edrecolomab; edatrexate; eflornithine hydrochloride; eflornithine; elemene; emitefur; elsamitrucin; enloplatin; enpromate; epipropidine; epirubicin; epirubicin hydrochloride; epristeride; erbulozole; eribulin; esorubicin hydrochloride; estramustine; estramustine phosphate sodium; etanidazole; etoposide; etoposide phosphate; etoprine; exemestane; fadrozole; fadrozole hydrochloride; fazarabine; fenretinide; filgrastim; finasteride; flavopiridol; flezelastine; fluasterone; floxuridine; fludarabine phosphate; fludarabine; fluorodaunorubicin hydrochloride; forfenimex; formestane; fluorouracil; floxouridine; flurocitabine; fosquidone; fostriecin sodium; fostriecin; fotemustine; gadolinium texaphyrin; gallium nitrate; galocitabine; ganirelix; gelatinase inhibitors; gemcitabine; geldanamycin; gossyphol; GDC-0973; GSK1120212/trametinib; herceptin; hydroxyurea; hepsulfam; heregulin; hexamethylene bisacetamide; hypericin; ibandronic acid; ibrutinib; idarubicin; idarubicin hydrochloride; ifosfamide; canfosfamide; ilmofosine; iproplatin; idoxifene; idramantone; ilmofosine; ilomastat; imidazoacridones; imatinib (e.g., GLEEVEC); imiquimod; iniparib (BSI 201); iobenguane; iododoxorubicin; ipomeanol; irinotecan; irinotecan hydrochloride; irsogladine; isobengazole; isohomohalicondrin B; itasetron; iimofosine; interleukin IL-2 (including recombinant interleukin II; or r1L.sub.2); interferon alfa-2α; interferon alfa-2b; interferon alfa-nl; interferon alfa-n3; interferon beta-la; interferon gamma-1b; j

56

asplakinolide; kahalalide F; lamellarin N triacetate; lanreotide; leinamycin; lenograstim; lentinan sulfate; leptolstatin; letrozole; leuprorelin; levamisole; lenalidomide; lenvatinib; liarozole; lissoclinamide 7; lobaplatin; lombricine; lometrexol; lonidamine; losoxantrone; lovastatin; loxoribine; lurtotecan; lutetium texaphyrin; lysofylline; lanreotide acetate; lapatinib; leltrozole; leucovorin; leuprolide acetate; liarozole hydrochloride; lometrexol sodium; lomustine; losoxantrone hydrochloride; pomalidomide; LY294002; maitansine; mannostatin A; marimastat; masoprocol; maspin; matrilysin inhibitors; menogaril; merbarone; meterelin; methioninase; metoclopramide; MIF inhibitor; mifepristone; miltefosine; mirimostim; mitoguazone; mitolactol; mitonafide; mitoxantrone; mofarotene; molgramostim; mopidamol; mycaperoxide B; myriaporone; maytansine; mechlorethamine hydrochloride; megestrol acetate; melengestrol acetate; melphalan; mercaptopurine; methotrexate; methotrexate sodium; metoprine; meturedepa; mitindomide; mitocarcin; mitocromin; mitogillin; mitomalcin; mitomycin; mitosper; mitotane; mitoxantrone hydrochloride; mycophenolic acid; nafarelin; nagrestip; napavin; naphterpin; nartograstim; nedaplatin; nemorubicin; neridronic acid; nilutamide; nisamycin; nitric oxide modulators; nitroxide antioxidant; nitrullyn; nocodazole; nogalamycin; oblimersen (GENASENSE); octreotide; okicenone; olaparib (LYNPARZA); oligonucleotides; onapristone; ondansetron; oracin; oral cytokine inducer; ormaplatin; oxisuran; oxaloplatin; osaterone; oxaliplatin; oxaunomycin; palauamine; palmitoylrhizoxin; pamidronic acid; panaxytriol; panomifene; parabactin; PARP (polyADP ribose polymerase) inhibitors; pazelliptine; pegaspargase; peldesine; pentosan polysulfate sodium; pentostatin; pentrozole; perflubron; perfosfamide; perillyl alcohol; phenazinomycin; phenylacetate; phosphatase inhibitors; picibanil; pilocarpine hydrochloride; pirarubicin; piritrexim; placetin A; placetin B; porfiromycin; prednisone; prostaglandin J2; pyrazoloacridine; paclitaxel; PD035901; PD184352; PD318026; PD98059; peliomycin; pentamustine; peplomycin sulfate; PKC412; pipobroman; piposulfan; piroxantrone hydrochloride; plicamycin; plomestane; podophyllotoxin; polyphenol E; porfimer sodium; porfiromycin; prednimustine; procarbazine; procarbazine hydrochloride; puromycin; puromycin hydrochloride; pyrazofurin; raltitrexed; ramosetron; retelliptine demethylated; rhizoxin; rituximab; RII retinamide; rogletimide; rohitukine; romurtide; roquinimex; rubiginone B1; ruboxyl; riboprine; romidepsin; rucaparib; safingol; safingol hydrochloride; saintopin; sarcophytol A; sargramostim; semustine; sizofiran; sobuzoxane; sodium borocaptate; sodium phenylacetate; solverol; sonermin; sorafenib; sunitinib; sparfosic acid; spicamycin D; spiromustine; splenopentin; spongistatin 1; Spongistatin 2; Spongistatin 3; Spongistatin 4; Spongistatin 5; Spongistatin 6; Spongistatin 7; Spongistatin 8; and Spongistatin 9; squalamine; stipiamide; stromelysin inhibitors; sulfinosine; suradista; suramin; swainsonine; SB239063; selumetinib/AZD6244; simtrazene; SP600125; sparfosate sodium; sparsomycin; spirogermanium hydrochloride; spiroplatin; streptonigrin; streptozocin; sulofenur; tallimustine; tamoxifen methiodide; talazoparib (BMN 673); tauromustine; tazarotene; tecogalan sodium; tegafur; tellurapyrylium; temoporfin; temozolomide; teniposide; tetrachlorodecaoxide; tetrazomine; thaliblastine; thiocoraline; thrombopoietin; thymalfasin; thymopoietin receptor agonist; thymotrinan; tirapazamine; titanocene bichloride; topsentin; toremifene; tretinoin; triacetyluridine; triciribine; trimetrexate; triptorelin; tropisetron; turosteride; tyrphostins; talisomycin; TAK-733; taxotere; tegafur; teloxantrone hydrochloride; terox-

US 10,751,349 B2

57

58

irone; testolactone; thiamiprine; thioguanine; thiotepa; tiazofurin; tirapazamine; toremifene citrate; trastuzumab; trestolone acetate; triciribine phosphate; trimetrexate; trimetrexate glucuronate; triptorelin; tubulozole hydrochloride; tumor necrosis factor-related apoptosis-inducing ligand (TRAIL); UBC inhibitors; ubenimex; U0126; uracil mustard; uredepa; vapreotide; variolin B; velaresol; veliparib (ABT-888); veramine; verteporfin; vinorelbine; vinxaltine; vitaxin; vinblastine; vinblastine sulfate; vincristine sulfate; vindesine; vindesine sulfate; vinepidine sulfate; vinglycinate sulfate; vinleurosine sulfate; vinorelbine tartrate; vinrosidine sulfate; vinzolidine sulfate; vorozole; wortmannin; XL518; zanoterone; zeniplatin; zilascorb; zinostatin stimalamer; zinostatin; and zorubicin hydrochloride.

Other exemplary anti-cancer agents include Erbulozole (e.g., R-55104); Dolastatin 10 (e.g., DLS-10 and NSC-376128); Mivobulin isethionate (e.g., CI-980); NSC-639829; Discodermolide (e.g., NVP-XX-A-296); ABT-751 (Abbott; e.g., E-7010); Altorhyrtin A; Altorhyrtin C; Cemadotin hydrochloride (e.g., LU-103793 and NSC-D-669356); CEP 9722; Epothilone A; Epothilone B; Epothilone C; Epothilone D; Epothilone E; Epothilone F; Epothilone B N-oxide; Epothilone A N-oxide; 16-aza-epothilone B; 21-aminoepothilone B; 21-hydroxyepothilone D; 26-fluoroepothilone (e.g., NSC-654663); Soblidotin (e.g., TZT-1027); LS-4559-P (Pharmacia; e.g., LS-4577); LS-4578 (Pharmacia; e.g., LS-477-P); LS-4477 (Pharmacia); LS-4559 (Pharmacia); RPR-112378 (Aventis); DZ-3358 (Daiichi); FR-182877 (Fujisawa; e.g., WS-9265B); GS-164 (Takeda); GS-198 (Takeda); KAR-2 (Hungarian Academy of Sciences); BSF-223651 (BASF; e.g., ILX-651 and LU-223651); SAH-49960 (Lilly/Novartis); SDZ-268970 (Lilly/Novartis); AM-97 (Armad/Kyowa Hakko); AM-132 (Armad); AM-138 (Armad/Kyowa Hakko); IDN-5005 (Indena); Cryptophycin 52 (e.g., LY-355703); AC-7739 (Ajinomoto; e.g., AVE-8063A and CS-39.HCl); AC-7700 (Ajinomoto; e.g., AVE-8062; AVE-8062A; CS-39-L-Ser.HCl; and RPR-258062A); Vitilevuamide; Tubulysin A; Canadensol; CA-170 (Curis, Inc.); Centaureidin (e.g., NSC-106969); T-138067 (Tularik; e.g., T-67; TL-138067 and TI-138067); COBRA-1 (Parker Hughes Institute; e.g., DDE-261 and WHI-261); H10 (Kansas State University); H16 (Kansas State University); Oncocidin A1 (e.g., BTO-956 and DIME); DDE-313 (Parker Hughes Institute); Fijianolide B; Laulimalide; SPA-2 (Parker Hughes Institute); SPA-1 (Parker Hughes Institute; e.g., SPIKET-P); 3-IAABU (Cytoskeleton/Mt. Sinai School of Medicine; e.g., MF-569); Narcosine (e.g., NSC-5366); Nascapine; D-24851 (Asta *Medica*); A-105972 (Abbott); Hemiasterlin; 3-BAABU (Cytoskeleton/Mt. Sinai School of Medicine; e.g., MF-191); TMPN (Arizona State University); Vanadocene acetylacetonate; T-138026 (Tularik); Monastrol; Inanocine (e.g., NSC-698666); 3-IAABE (Cytoskeleton/Mt. Sinai School of Medicine); A-204197 (Abbott); T-607 (Tularik; e.g., T-900607); RPR-115781 (Aventis); Eleutherobins (e.g., Desmethyleleutherobin; Desaetyleleutherobin; Isoeleutherobin A; and Z-Eleutherobin); Caribaeoside; Caribaeolin; Halichondrin B; D-64131 (Asta Medica); D-68144 (Asta Medica); Diazonamide A; A-293620 (Abbott); NPI-2350 (Nereus); Taccalonolide A; TUB-245 (Aventis); A-259754 (Abbott); Diozostatin; (–)-Phenylahistin (e.g., NSCL-96F037); D-62638 (Asta Medica); D-62636 (Asta Medica); Myoseverin B; D-43411 (Zentaris; e.g., D-81862); A-289099 (Abbott); A-318315 (Abbott); HTI-286 (e.g., SPA-110; trifluoroacetate salt) (Wyeth); D-82317 (Zentaris); D-82318 (Zentaris); SC-12983 (NCI); Resverastatin phosphate sodium; BPR-OY-007 (National Health Research Institutes); and SSR-250411 (Sanofi)); goserelin; leuprolide; triptolide; homoharringtonine; topotecan; itraconazole; deoxyadenosine; sertraline; pitavastatin; clofazimine; 5-nonyloxytryptamine; vemurafenib; dabrafenib; gefitinib (IRESSA); erlotinib (TARCEVA); cetuximab (ERBITUX); lapatinib (TYKERB); panitumumab (VECTIBIX); vandetanib (CAPRELSA); afatinib/BIBW2992; CI-1033/canertinib; neratinib/HKI-272; CP-724714; TAK-285; AST-1306; ARRY334543; ARRY-380; AG-1478; dacomitinib/PF299804; OSI-420/desmethyl erlotinib; AZD8931; AEE726; pelitinib/EKB-569; CUDC-101; WZ8040; WZ4002; WZ3146; AG-490; XL647; PD153035; 5-azathioprine; 5-aza-2'-deoxycytidine; 17-N-Allylamino-17-Demethoxygeldanamycin (17-AAG); 20-epi-1,25 dihydroxyvitamin D3; 5 ethynyluracil; and BMS-599626.

In one aspect is a method for treating patients with colorectal cancer (optionally refractory) by administering an obeticholic acid composition described herein in combination with capecitabine and/or PLX4032 (Plexxikon).

In another aspect is a method for treating colorectal cancer (optionally refractory) by administering an obeticholic acid composition described herein in combination with capecitabine, xeloda, and/or CPT-11.

In another aspect is a method for treating colorectal cancer (optionally refractory) by administering an obeticholic acid composition described herein in combination with capecitabine, xeloda, and/or CPT-11.

In another aspect is a method for treating patients with colorectal cancer (optionally refractory) or patients with unresectable or metastatic colorectal carcinoma by administering an obeticholic acid composition described herein in combination with capecitabine and irinotecan.

In another aspect is a method for treating patients with unresectable or metastatic hepatocellular carcinoma by administering an obeticholic acid composition described herein in combination with interferon alpha or capecitabin.

In another aspect is a method for treating patients with pancreatic cancer by administering an obeticholic acid composition described herein in combination with gemcitabine.

Patients described herein include a patients having a disease or condition described herein. A patient can be described or referred to by the condition treated. For example, a patient having PBC can be referred to herein as a PBC patient. A patient described herein can have a preexisting condition (e.g., a condition other than the disease or condition treated by the obeticholic acid composition described herein that existed at the time of first administration). In one instance a patient described herein has hepatic impairment. In another instance a patient described herein has renal impairment. In yet another instance the patient is an elderly/geriatric patient or a pregnant patient. In another instance the patient is an pediatric patient.

In some embodiments, administration of an obeticholic acid composition described herein together with certain contra-active agents can result in (1) decreased efficacy of the obeticholic acid composition and/or (2) development of toxicity or adverse effects described herein. For example, administration of an obeticholic acid composition described herein with blood clotting and anti-coagulation agents can result in decreased International Normalized Ratio (INR). In certain instances, coagulation and anti-coagulation agents can be administered in combination with an obeticholic acid composition described herein by monitoring fluctuations of the INR of the patient and adjusting dosages as understood in the art to maintain proper INR.

59 60

In another example, administration of an obeticholic acid composition described herein in combination with a bile acid binding resin (e.g., cholestyramine, colestipol, or cole-sevelam) can result in decreased efficacy of the obeticholic acid composition at a lower dosage of the composition (e.g., 1 to 5 mg). In certain embodiments, a bile acid binding resin is administered in combination with an obeticholic acid composition described herein at least about 4 to 6 hours before or after the dosage of the obeticholic acid composition.

In one embodiment, the compositions described herein reduce adverse effects associated with other formulations (e.g., larger particle sized obeticholic acid). For example, an obeticholic acid composition described herein when administered to a patient described herein for a condition or disease described herein can reduce one or more adverse effects selected from Hepatic encephalopathy, ascites, variceal bleeding, skin eruptions, prurigo, pruritus (including generalized, eye, anal, vulvovaginal and rash), fatigue, asthenia, abdominal pain (including upper and lower pain and tenderness), abdominal discomfort, gastrointestinal pain, dizziness, urticaria (including cholinergic), rashes (including macular, popular, maculo-papular, and heat rashes), arthralgia, oropharyngeal pain, cough, constipation, edemal peripheral, palpitations, pyrexia, eczema, and procedural pain. In certain instances, the one or more adverse effects that are reduced include pruritus. It was discovered, inter alia, that titration of an obeticholic acid composition described herein can reduce the incidence of or mean time until onset of severe pruritus.

In another embodiment, the obeticholic acid compositions described herein include reduced levels of impurities commonly found in the synthesis of obeticholic acid. 6α-ethyl-lursodeoxycholic acid (6-EUDCA), 3α-hydroxy-6α-ethyl-7-keto-5β-cholan-24-oic acid, 6β-ethylchenodeoxycholic acid; 3α, 7α-dihydroxy-6β-ethyl-5β-cholan-24-oic acid, 3α, 7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid, Chenode-oxycholic acid (CDCA); 3α, 7α-dihydroxy-5β-cholan-24-oic acid, Dimer of OCA, 3α-(3α, 7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid, or 3α-O-Acetyl-6α-ethylchenodeoxycholic acid; 3α-O-acetyl-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

All publications and patent documents cited herein are incorporated herein by reference as if each such publication or document was specifically and individually indicated to be incorporated herein by reference. Citation of publications and patent documents is not intended as an admission that any is pertinent prior art, nor does it constitute any admission as to the contents or date of the same. The disclosure having now been described by way of written description, those of skill in the art will recognize that the disclosure can be practiced in a variety of embodiments and that the foregoing description and examples below are for purposes of illustration and not limitation of the claims that follow.

SELECTED EMBODIMENTS

Embodiment 1

A method of treating primary biliary cirrhosis (PBC) in a patient in need thereof, the method comprising administering a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in

the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less.

Embodiment 2

A method of treating primary sclerosing cholangitis (PSC), chronic liver disease, nonalcoholic fatty liver disease (NAFLD), nonalcoholic steatohepatitis (NASH), hepatitis C infection, alcoholic liver disease, liver damage due to pro-gressive fibrosis, or liver fibrosis in a patient in need thereof, the method comprising administering a composition com-prising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obet-icholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less.

Embodiment 3

The method of embodiment 2, wherein the method com-prises treating NASH.

Embodiment 4

A method of treating a solid-tumor cancer in a patient in need thereof, the method comprising administering an effec-tive amount of a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceu-tically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less.

Embodiment 5

The method of embodiment 1, 2 or 4, wherein the effective amount comprises a starting dose.

Embodiment 6

The method of embodiment 5, wherein the starting dose is administered in a titration period.

Embodiment 7

The method of any one of embodiments 4 to 6, wherein the cancer comprises hepatocellular carcinoma (HCC), col-orectal cancer, gastric cancer, liver cancer, kidney cancer, or pancreatic cancer.

Embodiment 8

A method of treating an autoimmune disease in a patient in need thereof, the method comprising administering an effective amount of a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a phar-maceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less.

Embodiment 9

The method of embodiment 7, wherein the effective amount comprises a starting dose.

US 10,751,349 B2

**61**

### Embodiment 10

The method of embodiment 8, wherein the starting dose is administered in a titration period.

### Embodiment 11

The method of embodiment 7 or 8, wherein the autoimmune disease is selected from the group consisting of: PBC, multiple sclerosis, rheumatoid arthritis, and type-I diabetes.

### Embodiment 12

The method of any one of embodiments 1-2, 6 or 9, wherein the titration period comprises 1 to 6 months.

### Embodiment 13

The method of embodiment 11, wherein the titration period is 3 months.

### Embodiment 14

The method of embodiment 11, wherein the titration period is 6 months.

### Embodiment 15

The method of any one of embodiments 12 to 15, wherein the starting dose is administered to the patient once daily.

### Embodiment 16

The method of any one of embodiments 11 to 14, wherein the starting dose is administered to the patient once daily.

### Embodiment 17

The method of any one of embodiments 11 to 14, wherein the starting dose is administered to the patient once weekly.

### Embodiment 18

The method of any one of embodiments 11 to 14, wherein the starting dose is administered to the patient once every other day.

### Embodiment 19

The method of any one of embodiments 11 to 17, wherein the starting dose comprises about 1 mg to 50 mg.

### Embodiment 20

The method of any one of embodiments 11 to 17, wherein the starting dose comprises about 1 mg to 25 mg.

### Embodiment 21

The method of any one of embodiments 11 to 17, wherein the starting dose comprises about 1 mg to 10 mg.

### Embodiment 22

The method of any one of embodiments 11 to 17, wherein the starting dose comprises about 1 mg to 5 mg.

**62**

### Embodiment 23

The method of any one of embodiments 11 to 17, wherein the starting dose comprises about 5 mg.

### Embodiment 24

The method of any one of embodiments 11 to 17, wherein the starting dose comprises about 10 mg.

### Embodiment 25

The method of any one of embodiments 11 to 17, wherein the starting dose comprises about 25 mg.

### Embodiment 26

The method of any one of embodiments 11 to 17, wherein the starting dose comprises about 50 mg.

### Embodiment 27

The method of any one of embodiments 1 to 26, further comprising assessing or monitoring liver function before, during, or after the titration period.

### Embodiment 28

The method of embodiment 27, wherein the assessing or monitoring comprises measuring a level of one or more liver biomarkers compared to a control.

### Embodiment 29

The method of embodiment 28, wherein the liver biomarker is selected from the group consisting of: AST, ALT, alkaline phosphatase (ALP), bilirubin, glycine conjugated obeticholic acid, taurine conjugated obeticholic acid, a bile acid, a bile acid glycine conjugate, or a bile acid taurine conjugate.

### Embodiment 30

The method of embodiment 29, comprising detecting a level of ALP in the patient.

### Embodiment 31

The method of embodiment 29 or 30, comprising detecting a level of bilirubin in the patient.

### Embodiment 32

The method of any one of embodiments 27 to 31, further comprising calculating a AST to platelet ratio (APRI) for the patient.

### Embodiment 33

The method of any one of embodiments 12 to 32, wherein the obeticholic acid composition is administered to the patient as an adjusted dose after the titration period.

### Embodiment 34

The method of embodiment 33, wherein the adjusted dose is equal to the titrated dose.

US 10,751,349 B2

63

64

### Embodiment 35

The method of embodiment 33, wherein the adjusted dose is equal to the starting dose when the level of ALP is reduced compared to a control.

### Embodiment 36

The method of embodiment 33, wherein the adjusted dose is greater than the titrated dose.

### Embodiment 37

The method of any one of embodiments 33 to 36, wherein the adjusted dose is administered more frequently than the titrated dose.

### Embodiment 38

The method of any one of embodiments 33 to 36, wherein the adjusted dose is administered less frequently than the titrated dose.

### Embodiment 39

The method of any one of embodiments 33 to 38, wherein the adjusted dose of the obeticholic acid composition is administered to the patient once daily.

### Embodiment 40

The method of any one of embodiments 33 to 38, wherein the adjusted dose of the obeticholic acid composition is administered to the patient once daily.

### Embodiment 41

The method of any one of embodiments 33 to 38, wherein the adjusted dose of the obeticholic acid composition is administered to the patient once daily.

### Embodiment 42

The method of any one of embodiments 33 to 38, wherein the adjusted dose of the obeticholic acid composition is administered to the patient once weekly.

### Embodiment 43

The method of any one of embodiments 33 to 38, wherein the adjusted dose of the obeticholic acid composition is administered to the patient once every other day.

### Embodiment 44

The method of any one of embodiments 33 to 38, wherein the adjusted dose of the obeticholic acid composition is administered to the patient twice a week.

### Embodiment 45

The method of any one of embodiments 33 to 44, wherein the adjusted dose comprises about 1 mg to 50 mg.

### Embodiment 46

The method of any one of embodiments 33 to 44, wherein the adjusted dose comprises about 1 mg to 25 mg.

### Embodiment 47

The method of any one of embodiments 33 to 44, wherein the adjusted dose comprises about 1 mg to 10 mg.

### Embodiment 48

The method of any one of embodiments 33 to 44, wherein the adjusted dose comprises about 1 mg to 5 mg.

### Embodiment 49

The method of any one of embodiments 33 to 44, wherein the adjusted dose comprises about 5 mg.

### Embodiment 50

The method of any one of embodiments 33 to 44, wherein the adjusted dose comprises about 10 mg.

### Embodiment 51

The method of any one of embodiments 33 to 44, wherein the adjusted dose comprises about 25 mg.

### Embodiment 52

The method of any one of embodiments 33 to 44, wherein the adjusted dose comprises about 50 mg.

### Embodiment 53

The method of any one of embodiments 1 to 52, wherein the method further comprises administering one or more active agents, or combinations thereof.

### Embodiment 54

The method of embodiment 53, wherein the active agent is ursodeoxycholic acid (UDCA).

### Embodiment 55

The method of embodiment 53, wherein the active agent is a peroxisome proliferator-activated receptor alpha (PPARα) agonist, a peroxisome proliferator-activated receptor delta (PPARδ) agonist, a dual PPARα/δ agonist, a dual PPARα/γ agonist, or pan-PPAR agonist, an HMG CoA reductase inhibitor, a GLP1 agonist, insulin, insulin mimetic, metformin, a GTP4 agonist, an HST2 inhibitor, a DPP-IV inhibitor, an SGLT2 inhibitor or a hydroxysteroid dehydrogenase (HSD) inhibitor, such as an 11β-HSD1 inhibitor, an ASK1 inhibitor, an ACC1 inhibitor, a NOX1 and/or NOX4 inhibitor, an inhibitor or antagonist of one or more chemokine receptors, such as, for example, CCR2 and CCR5.

### Embodiment 56

The method of any one of embodiments 1 to 55, wherein the obeticholic acid composition is administered as a first line therapy for the treatment of PBC.

### Embodiment 57

The method of any one of embodiments 1 to 56, wherein the patient is has renal impairment or hepatic impairment.

US 10,751,349 B2

65
66

## Embodiment 58

A method for treating primary biliary cirrhosis (PBC) in a patient in need thereof, the method comprising:

administering a starting dose of a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in a titration period, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less;

assessing liver function of the patient before, during, and after the titration period by: calculating an AST to platelet ratio (APRI) score for the patient; or

measuring the level of one or more liver biomarker selected from ALP, bilirubin, AST, ALT, glycine conjugated obeticholic acid, taurine conjugated obeticholic acid, a bile acid, a bile acid glycine conjugate, or a bile acid taurine conjugate;

wherein a reduced APRI score compared to a control or a reduced level of the one or more liver biomarkers compared to a control indicates non-impaired liver function;

assessing tolerance of the patient to the starting dose by grading the severity of one or more adverse effects, if present; and

administering an adjusted dose of the obeticholic acid composition, wherein the adjusted dose comprises an amount equal to or greater than an amount of the starting dose.

## Embodiment 59

The method of embodiment 58, wherein the adjusted dose is administered at an amount equal to an amount of the starting dose.

## Embodiment 60

The method of embodiment 58, wherein the adjusted dose is administered at an amount greater than an amount of the starting dose.

## Embodiment 61

The method of embodiment 58, wherein the adjusted dose of the obeticholic acid composition is administered at the same frequency as the starting dose.

## Embodiment 62

The method of embodiment 58, wherein the adjusted dose of the obeticholic acid composition is administered at a decreased frequency than the starting dose.

## Embodiment 63

The method of embodiment 58, wherein the effective amount of the obeticholic acid composition is administered at an increased frequency than the starting dose.

## Embodiment 64

The method of any one of embodiments 58 to 63, wherein the starting dose is 5 mg.

## Embodiment 65

The method of any one of embodiments 58 to 64, wherein the starting dose is administered QD.

## Embodiment 66

The method of any one of embodiments 58 to 64, wherein the adjusted dose is 5 mg.

## Embodiment 67

The method of any one of embodiments 58 to 64, wherein the adjusted dose is 10 mg.

## Embodiment 68

The method of any one of embodiments 58 to 67, wherein the adjusted dose is administered QD or Q2D.

## Embodiment 69

The method of any one of embodiments 58 to 68, further comprising assessing the patient for tolerance to the adjusted dose.

## Embodiment 70

The method of embodiment 69, wherein the adjusted dose is modified to a re-adjusted dose when the patient.

## Embodiment 71

The method of embodiment 70, wherein the re-adjusted dose comprises an equal amount compared to the adjusted dose and administration at a reduced frequency.

## Embodiment 72

The method of embodiment 71, wherein the re-adjusted dose comprises a reduced amount compared to the adjusted dose and administration at an equal frequency.

## Embodiment 73

The method of embodiment 58, wherein the patient has hepatic impairment.

## Embodiment 74

The method of embodiment 73, wherein the starting dose is administered QW.

## Embodiment 75

The method of embodiment 74, wherein the starting dose is 5 mg.

## Embodiment 75

The method of any one of embodiments 58 to 75, wherein the adjusted dose is equivalent to the starting dose when the level of ALP is reduced compared to a control.

## Embodiment 76

The method of any one of embodiments 58 to 75, wherein the adjusted dose comprises an amount equal to the starting

US 10,751,349 B2

67 68

dose and wherein the adjusted dose is administered at a greater frequency than the starting dose.

Embodiment 77

A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less, for use in treating primary biliary cirrhosis (PBC) in a patient in need thereof.

Embodiment 78

A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less, for use in treating primary biliary cirrhosis (PBC) in a patient in need thereof.

Embodiment 79

A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less, for use in treating primary sclerosing cholangitis (PSC), chronic liver disease, nonalcoholic fatty liver disease (NAFLD), nonalcoholic steatohepatitis (NASH), hepatitis C infection, alcoholic liver disease, liver damage due to progressive fibrosis, or liver fibrosis in a patient in need thereof in a patient in need thereof.

Embodiment 80

The composition of embodiment 79, for use in treating NASH.

Embodiment 81

A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less, for use in treating a solid-tumor cancer in a patient in need thereof.

Embodiment 82

The composition of embodiments 77, 79 or 81, wherein said composition further comprises said obeticholic acid composition as a starting dose.

Embodiment 83

The composition of embodiment 82, wherein said starting dose is prepared to be administered in a titration period.

Embodiment 84

The composition of any one of embodiments 81 to 83, for use in treating hepatocellular carcinoma (HCC), colorectal cancer, gastric cancer, liver cancer, kidney cancer, or pancreatic cancer.

Embodiment 85

A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less, for use in treating an autoimmune disease in a patient in need thereof.

Embodiment 86

The composition of embodiment 85, wherein said composition further comprises said obeticholic acid composition as a starting dose.

Embodiment 87

The composition of embodiment 86, wherein said starting dose is prepared to be administered in a titration period.

Embodiment 88

The composition of embodiment 85 or 86, for use in treating multiple sclerosis, rheumatoid arthritis, or type-I diabetes.

Embodiment 89

The composition of any one of embodiments 78-79, 83 or 87, wherein said titration period comprises 1 to 6 months.

Embodiment 90

The composition of embodiment 89, wherein said titration period is 3 months.

Embodiment 91

The composition of embodiment 89, wherein said titration period is 6 months.

Embodiment 92

The composition of any one of embodiments 89 to 91, wherein said starting dose is prepared to be administered to said patient once daily.

Embodiment 93

The composition of any one of embodiments 89 to 92, wherein said starting dose is prepared to be administered to said patient once daily.

Embodiment 94

The composition of any one of embodiments 89 to 92, wherein said starting dose is prepared to be administered to said patient once weekly.

US 10,751,349 B2

69

70

### Embodiment 95

The composition of any one of embodiments 89 to 92, wherein said starting dose is prepared to be administered to said patient once every other day.

### Embodiment 96

The composition of any one of embodiments 89 to 95, wherein said starting dose comprises about 1 mg to 50 mg.

### Embodiment 97

The composition of any one of embodiments 89 to 95, wherein said starting dose comprises about 1 mg to 25 mg.

### Embodiment 98

The composition of any one of embodiments 89 to 95, wherein said starting dose comprises about 1 mg to 10 mg.

### Embodiment 99

The composition of any one of embodiments 89 to 95, wherein said starting dose comprises about 1 mg to 5 mg.

### Embodiment 100

The composition of any one of embodiments 89 to 95, wherein said starting dose comprises about 5 mg.

### Embodiment 101

The composition of any one of embodiments 89 to 95, wherein said starting dose comprises about 10 mg.

### Embodiment 102

The composition of any one of embodiments 89 to 95, wherein said starting dose comprises about 25 mg.

### Embodiment 103

The composition of any one of embodiments 89 to 95, wherein said starting dose comprises about 50 mg.

### Embodiment 104

The composition of any one of embodiments 78 to 103, wherein said patient liver function assessed or monitored before, during, or after said titration period.

### Embodiment 105

The composition of embodiment 104, wherein said assessing or monitoring comprises measuring a level of one or more liver biomarkers compared to a control.

### Embodiment 106

The composition of embodiment 105, wherein said liver biomarker is selected from the group consisting of: AST, ALT, alkaline phosphatase (ALP), bilirubin, glycine conjugated obeticholic acid, taurine conjugated obeticholic acid, a bile acid, a bile acid glycine conjugate, or a bile acid taurine conjugate.

### Embodiment 107

The composition of embodiment 106, wherein said liver biomarker is ALP.

### Embodiment 108

The composition of embodiment 106 or 107, wherein said liver biomarker is bilirubin.

### Embodiment 109

The composition of any one of embodiments 104 to 108, further comprising calculating an AST to platelet ratio (APRI) for said patient.

### Embodiment 110

The composition of any one of embodiments 89 to 109, wherein said obeticholic acid composition is prepared to be administered to said patient as an adjusted dose after said titration period.

### Embodiment 111

The composition of embodiment 110, wherein said adjusted dose is equal to said titrated dose.

### Embodiment 112

The composition of embodiment 110, wherein said adjusted dose is equal to said starting dose when a level of ALP is reduced compared to a control.

### Embodiment 113

The composition of embodiment 110, wherein said adjusted dose is greater than said titrated dose.

### Embodiment 114

The composition of any one of embodiments 110 to 113, wherein said adjusted dose is prepared to be administered more frequently than said titrated dose.

### Embodiment 115

The composition of any one of embodiments 110 to 113, wherein said adjusted dose is prepared to be administered less frequently than said titrated dose.

### Embodiment 116

The composition of any one of embodiments 110 to 115, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once daily.

### Embodiment 117

The composition of any one of embodiments 110 to 115, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once daily.

US 10,751,349 B2

71

72

### Embodiment 118

The composition of any one of embodiments 110 to 115, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once daily.

### Embodiment 119

The composition of any one of embodiments 110 to 115, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once weekly.

### Embodiment 120

The composition of any one of embodiments 110 to 115, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once every other day.

### Embodiment 121

The composition of any one of embodiments 110 to 115, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient twice a week.

### Embodiment 122

The composition of any one of embodiments 110 to 121, wherein said adjusted dose comprises about 1 mg to 50 mg.

### Embodiment 123

The composition of any one of embodiments 110 to 121, wherein said adjusted dose comprises about 1 mg to 25 mg.

### Embodiment 124

The composition of any one of embodiments 110 to 121, wherein said adjusted dose comprises about 1 mg to 10 mg.

### Embodiment 125

The composition of any one of embodiments 110 to 121, wherein said adjusted dose comprises about 1 mg to 5 mg.

### Embodiment 126

The composition of any one of embodiments 110 to 121, wherein said adjusted dose comprises about 5 mg.

### Embodiment 127

The composition of any one of embodiments 110 to 121, wherein said adjusted dose comprises about 10 mg.

### Embodiment 128

The composition of any one of embodiments 110 to 121, wherein said adjusted dose comprises about 25 mg.

### Embodiment 129

The composition of any one of embodiments 110 to 121, wherein said adjusted dose comprises about 50 mg.

### Embodiment 130

The composition of any one of embodiments 78 to 129, wherein said obeticholic acid composition is prepared to be co-administered one or more active agents, or combinations thereof.

### Embodiment 131

The composition of embodiment 130, wherein said active agent is ursodeoxycholic acid (UDCA).

### Embodiment 132

The composition of embodiment 130, wherein the active agent is a peroxisome proliferator-activated receptor alpha (PPARα) agonist, a peroxisome proliferator-activated receptor delta (PPARδ) agonist, a dual PPARα/δ agonist, a dual PPARα/γ agonist, or pan-PPAR agonist, an HMG CoA reductase inhibitor, a GLP1 agonist, insulin, insulin mimetic, metformin, a GTP4 agonist, an HST2 inhibitor, a DPP-IV inhibitor, an SGLT2 inhibitor or a hydroxysteroid dehydrogenase (HSD) inhibitor, such as an 11β-HSD1 inhibitor, an ASK1 inhibitor, an ACC1 inhibitor, a NOX1 and/or NOX4 inhibitor, an inhibitor or antagonist of one or more chemokine receptors, such as, for example, CCR2 and CCR5.

### Embodiment 133

The composition of any one of embodiments 78 to 132, wherein said obeticholic acid composition is prepared to be administered as a first line therapy for the treatment of PBC.

### Embodiment 134

The composition of any one of embodiments 78 to 133, wherein said patient is has renal impairment or hepatic impairment.

### Embodiment 135

A composition comprising a starting dose of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less for use in treating primary biliary cirrhosis (PBC) in a patient in need thereof wherein the composition is prepared to be administered in a titration period wherein

the liver function of the patient is assessed before, during, and after said titration period by calculating an AST to platelet ratio (APRI) score for said patient or by measuring the level of one or more liver biomarker selected from ALP, bilirubin, AST, ALT, glycine conjugated obeticholic acid, taurine conjugated obeticholic acid, a bile acid, a bile acid glycine conjugate, or a bile acid taurine conjugate, wherein a reduced APRI score compared to a control or a reduced level of said one or more liver biomarkers compared to a control indicates non-impaired liver function; and

the tolerance of the patient to said starting dose is assessed by grading the severity of one or more adverse effects, if present; and the obeticholic acid composition is prepared to be administered as an adjusted dose, wherein said adjusted dose comprises an amount equal to or greater than an amount of said starting dose.

US 10,751,349 B2

73

74

### Embodiment 136

The composition of embodiment 135, wherein said adjusted dose is prepared to be administered at an amount equal to an amount of said starting dose.

### Embodiment 137

The composition of embodiment 135, wherein said adjusted dose is prepared to be administered at an amount greater than an amount of said starting dose.

### Embodiment 138

The composition of embodiment 135, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered at the same frequency as said starting dose.

### Embodiment 139

The composition of embodiment 135, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered at a decreased frequency than said starting dose.

### Embodiment 140

The composition of embodiment 135, wherein said effective amount of said obeticholic acid composition is prepared to be administered at an increased frequency than said starting dose.

### Embodiment 141

The composition of any one of embodiments 135 to 140, wherein said starting dose is 5 mg.

### Embodiment 142

The composition of any one of embodiments 135 to 141, wherein said starting dose is prepared to be administered QD.

### Embodiment 143

The composition of any one of embodiments 135 to 141, wherein said adjusted dose is 5 mg.

### Embodiment 144

The composition of any one of embodiments 135 to 141, wherein said adjusted dose is 10 mg.

### Embodiment 145

The composition of any one of embodiments 135 to 144, wherein said adjusted dose is prepared to be administered QD or Q2D.

### Embodiment 146

The composition of any one of embodiments 135 to 145, wherein said patient is assessed for tolerance to said adjusted dose.

### Embodiment 147

The composition of embodiment 146, wherein said adjusted dose is modified to a re-adjusted dose.

### Embodiment 148

The composition of embodiment 147, wherein said re-adjusted dose comprises an equal amount compared to said adjusted dose and is prepared to be administrated at a reduced frequency.

### Embodiment 149

The composition of embodiment 148, wherein said re-adjusted dose comprises a reduced amount compared to said adjusted dose and is prepared to be administrated at an equal frequency.

### Embodiment 150

The composition of embodiment 135, wherein said patient has hepatic impairment.

### Embodiment 151

The composition of embodiment 150, wherein said starting dose is prepared to be administered QW.

### Embodiment 152

The composition of embodiment 151, wherein said starting dose is 5 mg.

### Embodiment 153

The composition of any one of embodiments 135 to 152, wherein said adjusted dose is equivalent to said starting dose when said level of ALP is reduced compared to a control.

### Embodiment 154

The composition of any one of embodiments 135 to 152, wherein said adjusted dose comprises an amount equal to said starting dose and wherein said adjusted dose is prepared to be administered at a greater frequency than said starting dose.

### Embodiment 155

Use of a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less, in the manufacture of a medicament for use in treating primary biliary cirrhosis (PBC) in a patient in need thereof.

### Embodiment 156

Use of a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less, for the manu-

US 10,751,349 B2

75 76

facture of a medicament for use in treating primary scleros-ing cholangitis (PSC), chronic liver disease, nonalcoholic fatty liver disease (NAFLD), nonalcoholic steatohepatitis (NASH), hepatitis C infection, alcoholic liver disease, liver damage due to progressive fibrosis, or liver fibrosis in a patient in need thereof in a patient in need thereof.

### Embodiment 157

The use of embodiment 156, for use in treating NASH.

### Embodiment 158

Use of a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid con-jugate thereof, wherein obeticholic acid or a pharmaceuti-cally acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less, for the manu-facture of a medicament for use in treating a solid-tumor cancer in a patient in need thereof.

### Embodiment 159

The use of embodiments 155, 156 or 158, wherein said composition further comprises said obeticholic acid com-position as a starting dose.

### Embodiment 160

The use of embodiment 159, wherein said starting dose is prepared to be administered in a titration period.

### Embodiment 161

The use of any one of embodiments 158 to 160, wherein said cancer is hepatocellular carcinoma (HCC), colorectal cancer, gastric cancer, liver cancer, kidney cancer, or pan-creatic cancer.

### Embodiment 162

Use of a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid con-jugate thereof, wherein obeticholic acid or a pharmaceuti-cally acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less, for the manu-facture of a medicament for use in treating an autoimmune disease in a patient in need thereof.

### Embodiment 163

The use of embodiment 162, wherein said said obeticholic acid composition is prepared to be administered as a starting dose.

### Embodiment 164

The use of embodiment 163, wherein said starting dose is prepared to be administered in a titration period.

### Embodiment 165

The use of embodiment 162 or 163, wherein said auto-immune disease is multiple sclerosis, rheumatoid arthritis, or type-I diabetes.

### Embodiment 166

The use of any one of embodiments 155-156, 160 or 164, wherein said titration period comprises 1 to 6 months.

### Embodiment 167

The use of embodiment 166, wherein said titration period is 3 months.

### Embodiment 168

The use of embodiment 166, wherein said titration period is 6 months.

### Embodiment 169

The use of any one of embodiments 166 to 168, wherein said starting dose is prepared to be administered to said patient once daily.

### Embodiment 170

The use of any one of embodiments 166 to 169, wherein said starting dose is prepared to be administered to said patient once daily.

### Embodiment 171

The use of any one of embodiments 166 to 169, wherein said starting dose is prepared to be administered to said patient once weekly.

### Embodiment 172

The use of any one of embodiments 166 to 169, wherein said starting dose is prepared to be administered to said patient once every other day.

### Embodiment 173

The use of any one of embodiments 166 to 172, wherein said starting dose comprises about 1 mg to 50 mg.

### Embodiment 174

The use of any one of embodiments 166 to 172, wherein said starting dose comprises about 1 mg to 25 mg.

### Embodiment 175

The use of any one of embodiments 166 to 172, wherein said starting dose comprises about 1 mg to 10 mg.

### Embodiment 176

The use of any one of embodiments 166 to 172, wherein said starting dose comprises about 1 mg to 5 mg.

### Embodiment 177

The use of any one of embodiments 166 to 172, wherein said starting dose comprises about 5 mg.

### Embodiment 178

The use of any one of embodiments 166 to 172, wherein said starting dose comprises about 10 mg.

US 10,751,349 B2

| 77 | 78 |
|---|---|

### Embodiment 179

The use of any one of embodiments 166 to 172, wherein said starting dose comprises about 25 mg.

### Embodiment 180

The use of any one of embodiments 166 to 172, wherein said starting dose comprises about 50 mg.

### Embodiment 181

The use of any one of embodiments 155 to 180, wherein liver function of said patient is assessed or monitored before, during, or after said titration period.

### Embodiment 182

The use of embodiment 181, wherein said assessing or monitoring comprises measuring a level of one or more liver biomarkers compared to a control.

### Embodiment 183

The use of embodiment 182, wherein said liver biomarker is selected from the group consisting of: AST, ALT, alkaline phosphatase (ALP), bilirubin, glycine conjugated obeticholic acid, taurine conjugated obeticholic acid, a bile acid, a bile acid glycine conjugate, or a bile acid taurine conjugate.

### Embodiment 184

The use of embodiment 183, wherein said liver biomarker is ALP.

### Embodiment 185

The use of embodiment 183 or 184, wherein said liver biomarker is bilirubin.

### Embodiment 186

The use of any one of embodiments 181 to 185, further comprising calculating an AST to platelet ratio (APRI) for said patient.

### Embodiment 187

The use of any one of embodiments 166 to 186, wherein said obeticholic acid composition is prepared to be administered to said patient as an adjusted dose after said titration period.

### Embodiment 188

The use of embodiment 187, wherein said adjusted dose is equal to said titrated dose.

### Embodiment 189

The use of embodiment 187, wherein said adjusted dose is equal to said starting dose when a level of ALP is reduced compared to a control.

### Embodiment 190

The use of embodiment 187, wherein said adjusted dose is greater than said titrated dose.

### Embodiment 191

The use of any one of embodiments 187 to 190, wherein said adjusted dose is prepared to be administered more frequently than said titrated dose.

### Embodiment 192

The use of any one of embodiments 187 to 190, wherein said adjusted dose is prepared to be administered less frequently than said titrated dose.

### Embodiment 193

The use of any one of embodiments 187 to 192, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once daily.

### Embodiment 194

The use of any one of embodiments 187 to 192, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once daily.

### Embodiment 195

The use of any one of embodiments 187 to 192, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once daily.

### Embodiment 196

The use of any one of embodiments 187 to 192, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once weekly.

### Embodiment 197

The use of any one of embodiments 187 to 192, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient once every other day.

### Embodiment 198

The use of any one of embodiments 187 to 192, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered to said patient twice a week.

### Embodiment 199

The use of any one of embodiments 187 to 198, wherein said adjusted dose comprises about 1 mg to 50 mg.

### Embodiment 200

The use of any one of embodiments 187 to 198, wherein said adjusted dose comprises about 1 mg to 25 mg.

### Embodiment 201

The use of any one of embodiments 187 to 198, wherein said adjusted dose comprises about 1 mg to 10 mg.

US 10,751,349 B2

79

**Embodiment 202**

The use of any one of embodiments 187 to 198, wherein said adjusted dose comprises about 1 mg to 5 mg.

**Embodiment 203**

The use of any one of embodiments 187 to 198, wherein said adjusted dose comprises about 5 mg.

**Embodiment 204**

The use of any one of embodiments 187 to 198, wherein said adjusted dose comprises about 10 mg.

**Embodiment 205**

The use of any one of embodiments 187 to 198, wherein said adjusted dose comprises about 25 mg.

**Embodiment 206**

The use of any one of embodiments 187 to 198, wherein said adjusted dose comprises about 50 mg.

**Embodiment 207**

The use of any one of embodiments 155 to 206, wherein said obeticholic acid composition is prepared to be administered in combination with one or more active agents, or combinations thereof.

**Embodiment 208**

The use of embodiment 207, wherein said active agent is ursodeoxycholic acid (UDCA).

**Embodiment 209**

The use of embodiment 207, wherein the active agent is a peroxisome proliferator-activated receptor alpha (PPARα) agonist, a peroxisome proliferator-activated receptor delta (PPARδ) agonist, a dual PPARα/δ agonist, a dual PPARα/γ agonist, or pan-PPAR agonist, an HMG CoA reductase inhibitor, a GLP1 agonist, insulin, insulin mimetic, metformin, a GTP4 agonist, an HST2 inhibitor, a DPP-IV inhibitor, an SGLT2 inhibitor or a hydroxysteroid dehydrogenase (HSD) inhibitor, such as an 11β-HSD1 inhibitor, an ASK1 inhibitor, an ACC1 inhibitor, a NOX1 and/or NOX4 inhibitor, an inhibitor or antagonist of one or more chemokine receptors, such as, for example, CCR2 and CCR5.

**Embodiment 210**

The use of any one of embodiments 155 to 209, wherein said obeticholic acid composition is prepared to be administered as a first line therapy for the treatment of PBC.

**Embodiment 211**

The use of any one of embodiments 155 to 210, wherein said patient is has renal impairment or hepatic impairment.

**Embodiment 212**

The use of a composition comprising a starting dose of obeticholic acid, or a pharmaceutically acceptable salt, ester,

80

or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less for use in treating primary biliary cirrhosis (PBC) in a patient in need thereof wherein the composition is prepared to be administered in a titration period wherein:

the liver function of the patient is assessed before, during, and after said titration period by calculating an AST to platelet ratio (APRI) score for said patient or by measuring the level of one or more liver biomarker selected from ALP, bilirubin, AST, ALT, glycine conjugated obeticholic acid, taurine conjugated obeticholic acid, a bile acid, a bile acid glycine conjugate, or a bile acid taurine conjugate, wherein a reduced APRI score compared to a control or a reduced level of said one or more liver biomarkers compared to a control indicates non-impaired liver function; and the tolerance of the patient to said starting dose is assessed by grading the severity of one or more adverse effects, if present; and the obeticholic acid composition is prepared to be administered as an adjusted dose, wherein said adjusted dose comprises an amount equal to or greater than an amount of said starting dose.

**Embodiment 213**

The use of embodiment 212, wherein said adjusted dose is prepared to be administered at an amount equal to an amount of said starting dose.

**Embodiment 214**

The use of embodiment 212, wherein said adjusted dose is prepared to be administered at an amount greater than an amount of said starting dose.

**Embodiment 215**

The use of embodiment 212, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered at the same frequency as said starting dose.

**Embodiment 216**

The use of embodiment 212, wherein said adjusted dose of said obeticholic acid composition is prepared to be administered at a decreased frequency than said starting dose.

**Embodiment 217**

The use of embodiment 212, wherein said effective amount of said obeticholic acid composition is prepared to be administered at an increased frequency than said starting dose.

**Embodiment 218**

The use of any one of embodiments 212 to 217, wherein said starting dose is 5 mg.

**Embodiment 219**

The use of any one of embodiments 212 to 218, wherein said starting dose is prepared to be administered QD.

US 10,751,349 B2

<table>
<tr><td>81</td><td>82</td></tr>
</table>

**81**

## Embodiment 220

The use of any one of embodiments 212 to 218, wherein said adjusted dose is 5 mg.

## Embodiment 221

The use of any one of embodiments 212 to 218, wherein said adjusted dose is 10 mg.

## Embodiment 222

The use of any one of embodiments 212 to 221, wherein said adjusted dose is prepared to be administered QD or Q2D.

## Embodiment 223

The use of any one of embodiments 212 to 222, wherein said patient is assessed for tolerance to said adjusted dose.

## Embodiment 224

The use of embodiment 223, wherein said adjusted dose is modified to a re-adjusted dose.

## Embodiment 225

The use of embodiment 224, wherein said re-adjusted dose comprises an equal amount compared to said adjusted dose and is prepared to be administered at a reduced frequency.

## Embodiment 226

The use of embodiment 225, wherein said re-adjusted dose comprises a reduced amount compared to said adjusted dose and is prepared to be administered at an equal frequency.

## Embodiment 227

The use of embodiment 212, wherein said patient has hepatic impairment.

## Embodiment 228

The use of embodiment 227, wherein said starting dose is prepared to be administered QW.

## Embodiment 229

The use of embodiment 228, wherein said starting dose is 5 mg.

## Embodiment 230

The use of any one of embodiments 212 to 229, wherein said adjusted dose is equivalent to said starting dose when said level of ALP is reduced compared to a control.

## Embodiment 231

The use of any one of embodiments 212 to 229, wherein said adjusted dose comprises an amount equal to said starting dose and wherein said adjusted dose is prepared to be administered at a greater frequency than said starting dose.

**82**

## Examples

The disclosure is further illustrated by the following examples, which are not to be construed as limiting this disclosure in scope or spirit to the specific procedures herein described. It is to be understood that the examples are provided to illustrate certain embodiments and that no limitation to the scope of the disclosure is intended. It is to be further understood that resort may be had to various other embodiments, modifications, and equivalents thereof which may suggest themselves to those skilled in the art without departing from the spirit of the present disclosure and/or scope of the appended claims.

### Example 1: Particle Size Analysis

5 mg tablet and 10 mg tablet formulations of obeticholic acid (OCA or INT-747) demonstrated a slow dissolution release profile. Particle size of agglomeration was identified as playing a primary role in the release rate and dissolution and variability in the blend uniformity and content uniformity of the tablet formulations. In order to obtain an appropriate particle size distribution (PSD), milling of obeticholic acid was investigated. The particle size of the formulations was reduced using comilling and jet milling to improve its dissolution release profile. Particle size analysis was performed using a dry dispersion method and analyzed by laser diffraction using Sympatec equipment.

Particle size distribution was assessed using a dry dispersion method analyzed by laser diffraction using a Sympatec Laser Helos/KF-Magic F71000 with Rodos Dispersing Unit. The OCA sample (0.5 g sample) was tested as a dry powder. The parameters for the validated particle size analysis method are described below:

Apparatus: Sympatec Laser Helos/KF-Magic F71000 with Rodos Dispersing Unit, Vibri sampling unit with Sniffer rotation, Nilfisk exhaustion or equivalent.

Deionization apparatus: Sartorius or equivalent.

Measuring range: R3: 0.5/0.9 to 175 μm.

Dispersing principle: Dry.

Pressure: 1.0 bar.

Feed rate: 80%.

Feed height: 2 mm.

Sniffer rotation: 20%.

Trigger conditions: Time base: 100 ms; Start: Ka.28≥1%; Stop: 1 s c.opt≤1%.

Comilling. The use of a comil with different screen sizes was evaluated. Three comil screens were utilized: 1.14 mm, 0.61 mm, and 0.46 mm. The milled active pharmaceutical ingredient (API) was evaluated for appearance, particle size distribution as well as process yield. The process yield was difficult to determine accurately, but as expected, a larger amount of milled drug product was recovered from the larger screen sizes. The particle size distribution of unmilled and comilled obeticholic acid is shown below in Table 1.

TABLE 1

| Particle size distribution of unmilled and comilled obeticholic acid. | | | | | | |
|---|---|---|---|---|---|---|
| Sample Description | $D_{10}$ | $D_{25}$ | $D_{50}$ | $D_{75}$ | $D_{90}$ | $D_{95}$ |
| Unmilled API (no comil) | 4.8 | 105.1 | 218.6 | 335.7 | 427.6 | 472.6 |
| Unmilled API (no comil) | 3.3 | 36.4 | 167.7 | 273.7 | 355.6 | 398.2 |
| Comilled with 0.46 mm screen | 5.7 | 122.9 | 217.5 | 283.0 | 335.1 | 360.3 |
| Comilled with 0.61 mm screen | 4.1 | 102.2 | 263.1 | 351.0 | 410.9 | 447.9 |

US 10,751,349 B2

**83**

TABLE 1-continued

| Particle size distribution of unmilled and comilled obeticholic acid. | | | | | | |
|---|---|---|---|---|---|---|
| Sample Description | $D_{10}$ | $D_{25}$ | $D_{50}$ | $D_{75}$ | $D_{90}$ | $D_{95}$ |
| Comilled with 0.61 mm screen | 5.5 | 106.6 | 223.2 | 320.8 | 393.8 | 429.8 |
| Comilled with 1.14 mm screen | 7.9 | 73.9 | 239.3 | 340.8 | 412.0 | 452.7 |

After the comil, the material visually appeared to have a lower particle size and be more uniform in size when compared to unmilled (API). However, the measured particle size distribution of the material by dry dispersion described above did not show a difference between the comilled and the unmilled OCA. The PSD data demonstrate a more robust milling technique is required to significantly reduce the particle size of the material.

Jet milling using Hosokawa AFG 100 jet mill

Jet milling studies were performed using a Hosokawa AFG 100 jet mill. The results showed a significant reduction in the particle size distribution (PSD). Jet milling was carried out with various classifier speeds to determine the optimum set of jet mill parameters. The jet mill parameters used in the Hosokawa AFG 100 jet mill are provided below:

Hosokawa AFG 100 jet mill parameters:
Pressure in the mill: −0.2~−0.3 mm Aq.
Nozzle diameter/number: 1.9 φmm×3
Consumption of compressed air: 0.7 Nm3/min
Classification parameters
Rotor rotation speed: 4000 rpm
Current rating of motor: 4.2 Amp
Current operating: 2.4 Amp
Rotor seal pressure: 0.1 MPa (1 bar)
Bearing seal pressure: 0.1 MPa (1 bar)
Rotor type: SUS
Powder collector
Filter material/length/number: Gore/2 ft/4

The particle size distribution of unmilled and jet milled OCA (API) is shown below in Table 2.

TABLE 2

| Particle size distribution of unmilled and jet milled obeticholic acid. | | | | | | |
|---|---|---|---|---|---|---|
| Sample Description | $D_{10}$ | $D_{16}$ | $D_{50}$ | $D_{84}$ | $D_{90}$ | $D_{99}$ |
| Unmilled API | 4.8 | — | 218.6 | — | 427.6 | — |
| Jet mill, classifier speed 2000 rpm | 1.7 | 2.3 | 10.9 | 57.2 | 69.3 | 97.9 |
| Jet mill, classifier speed 5000 rpm | 1.3 | 1.7 | 4.2 | 15.2 | 18.9 | 55.8 |
| Jet mill, classifier speed 10000 rpm | 1.1 | 1.4 | 2.7 | 4.7 | 5.6 | 9.0 |
| Jet mill, classifier speed 4000 rpm | 1.3 | 1.6 | 3.8 | 17.0 | 21.7 | 36.0 |

The results above show that jet milling at high classifier speeds (i.e., 4000 rpm, 5000 rpm and 10000 rpm) showed a significant reduction in the PSD.

Jet milling using spiral jet mill. Jet milling studies were performed using a spiral jet mill. The results showed a significant reduction in the particle size distribution (PSD). Jet milling was carried out with various range of parameters to determine the optimal settings. The jet mill parameters used in the spiral jet mill are provided below:

**84**

Spiral jet mill parameters controlling the final PSD are:

Feed rate: Product amount fed into the milling chamber per unit time

Pressure: Fluid pressure through the nozzle section which influences the speed at which the particles collide

TABLE 3

| Milling Parameters Used During Development at JetPharma | | | | |
|---|---|---|---|---|
| Lot Number | Batch Size | Feed Rate | Nitrogen Pressure | PSD |
| JP1307001 | 10.0 kg | Evaluated range: 200-400 g/30″ Target range: 300 ± 10 g/30″ | Evaluated range: 2.0-4.0 bar Target range: 3.0 ± 0.2 bar | $X_{10}$: 1 µm $X_{50}$: 5 µm $X_{90}$: 20 µm |
| JP1408001 | 5.6 kg | Evaluated range: 200-400 g/30″ Target range: 290 ± 10 g/30″ | Evaluated range: 2.0-4.0 bar Target range: 3.2 ± 0.2 bar | $X_{10}$: 1 µm $X_{50}$: 5 µm $X_{90}$: 19 µm |
| JP1408002 | 4.8 kg | Evaluated range: 200-400 g/30″ Target range: 290 ± 10 g/30″ | Evaluated range: 2.0-4.0 bar Target range: 3.2 ± 0.2 bar | $X_{10}$: 1 µm $X_{50}$: 4 µm $X_{90}$: 14 µm |
| JP1408003 | 6.3 kg | Evaluated range: 200-400 g/30″ Target range: 290 ± 10 g/30″ | Evaluated range: 2.0-4.0 bar Target range: 3.2 ± 0.2 bar | $X_{10}$: 1 µm $X_{50}$: 4 µm $X_{90}$: 15 µm |

The impact of jet-milling on API particle size and surface area is detailed in Table 4-1 and Table 4-2, respectively. Surface area was tested per a BET (Brunauer, Emmett, and Teller theory). The BET method for analyzing surface area is based on adsorption of gas on a surface. The amount of gas adsorbed at a given pressure allows a determination of the surface area.

As can be observed from Table 2, the API particle size distribution after jet-milling undergoes a dramatic shift towards much smaller, more uniformly-sized particles within a tighter distribution, while surface area increases approximately 3-fold. FIG. 1 and FIG. 2 illustrate the typical particle size distribution of unmilled and jet-milled API, respectively.

TABLE 4-1

| Impact of jet-milling (micronization) on particle size distribution of OCA drug substance Particle Size Distribution of Unmicronized and Micronized OCA Drug Substance | | | | | | |
|---|---|---|---|---|---|---|
| | OCA Example # | | | | | |
| | 1 | | 2 | | 3 | |
| | Before | After | Before | After | Before | After |
| $D_v$ (10) | 2.6 | 0.7 | 1.8 | 0.6 | 5.3 | 0.7 |
| $D_v$ (50) | 26 | 6.1 | 19 | 4.4 | 39 | 4.9 |
| $D_v$ (90) | 162 | 18.8 | 231 | 17.8 | 221 | 14.1 |
| $D_v$ (99) | 419 | 30.8 | 509 | 34.6 | 513 | 25.9 |

US 10,751,349 B2

85

86

TABLE 4-2

Impact of jet-milling (micronization) on
surface area of OCA drug substance
Surface Area of Unmicronized and Micronized
OCA Drug Substance

| | OCA Example # | | | | | |
|---|---|---|---|---|---|---|
| | 1 | | 2 | | 3 | |
| | Before | After | Before | After | Before | After |
| Surface Area (m²/kg) | 1557 | 3178 | 1854 | 3848 | 809 | 3412 |

### Example 2: Improved Manufacturing Process of Obeticholic Acid (OCA) Tablets

The manufacturing process of 5 mg and 10 mg obeticholic acid (OCA) tablets uses dry granulation by roller compaction followed by tablet compression and coating. The process steps used to manufacture OCA tablets include: preblending; dry granulation, final blending, compression, coating, and packaging. The equipment to manufacture OCA tablets are shown in Table 5.

TABLE 5

Equipment Used to Manufacture OCA Tablets

| Process Step | Equipment |
|---|---|
| Sieving | 0.5 mm and 1.0 mm aperture sieve |
| Pre-blending | Drum and Bin blender, appropriately sized drum and bin |
| Roller compaction | Roller compactor, Alexanderwerk PP150 (or WP120) or equivalent fitted with upper and lower mill screens |
| Final blending | Bin blender, appropriately sized bin |
| Compression | Rotary tablet press, Kilian T300 or equivalent |
| Coating | Perforated pan coater, Manesty Accelacota 150 or equivalent 48-inch coating pan |

Microcrystalline cellulose was added to the intra-granular portion of the tablet mixture which produced tablets of moderate hardness. Modification to the manufacturing process to add microcrystalline cellulose to both the intra-granular and extra-granular portions of the tablet for both the 5 mg and 10 mg tablet generated more robust tablets (harder tablets). The compression challenges observed were overcome by redistributing a portion of microcrystalline cellulose in the 5 mg and 10 mg OCA formulation blends. This change in the manufacturing process impacted the quality attributes, specifically the dissolution profile, of the OCA tablets.

OCA drug substance and excipients were added in specific quantities and order during pre- and final blending. Prior to manufacture, the materials were dispensed in the appropriate portions as shown in Table 6. Microcrystalline cellulose (MCC) and sodium starch glycolate (SSG) were sieved with a 1.0 mm aperture sieve before use. Magnesium stearate was sieved using a 0.5 mm aperture sieve immediately before use.

TABLE 6

Material Dispensing Summary for OCA Tablets

| Component | Quantity for 5 mg OCA Tablet Formulation (kg) | Quantity for 10 mg OCA Tablet Formulation (kg) | Quantity for 25 mg OCA Tablet Formulation (kg) |
|---|---|---|---|
| Intra-granular (Pre Blending) | | | |
| OCA drug substance | 2.5[a] | 5.0[a] | 12.5[a] |
| MCC-for-Premix | 7.5 | 10.0 | 25.0 |
| MCC-for-Rinse | 7.5 | 10.0 | 12.5 |
| MCC-1 | 25.5[a] | 33.0[a] | 41.0[a] |
| SSG-1 | 4.0 | 4.0 | 4.0 |
| Silicon dioxide-1 | — | — | 1.0 |
| Magnesium stearate-1 | 0.5 | 0.5 | 0.5 |
| Extra-granular (Final Blending) | | | |
| MCC-2 | 50.0[b] | 35.0[b] | — |
| SSG-2 | 2.0[b] | 2.0[b] | 2.0[b] |
| Silicon dioxide-2 | — | — | 1.0[b] |
| Magnesium stearate-2 | 0.5[b] | 0.5[b] | 0.5[b] |
| Coating | | | |
| Opadry ® II Yellow 85F32351 | 6.0[c] | 6.0[c] | 6.0[c] |
| Purified water[d] | 24.0 | 24.0 | 24.0 |
| Total | 104.0 | 104.0 | 104.0 |

MCC = Microcrystalline cellulose;
SSG = Sodium starch glycolate;
[a]OCA drug substance amount assumes the drug substance content is 100%; actual amount added is adjusted for based on the potency of the drug substance lot used; the amount of microcrystalline cellulose is correspondingly decreased.
[b]The amounts of extra-granular excipients are adjusted based on the yield of the process through roller compaction. The dispensing summary presented assumes a 100% yield through roller compaction.
[c]The amount of coating material prepared during the process is 150% of target. Excess coating material is discarded.
[d]Water is removed during processing.

Preblending Process. To an appropriately sized blender drum was added OCA and a microcrystalline cellulose (MCC) for premix (MCC-for-Premix: a portion of the total MCC added to the tablet formulation) to produce OCA premix. The resulting mixture was blended 90 to 120 revolutions (approximately for 3 minutes at a blender speed of about 30 rpm) and discharged. For the 5 mg tablets, OCA was pre-mixed with approximately 3 parts MCC (to 1 part OCA). For the 10 mg tablets, OCA was pre-mixed with approximately 2 parts MCC (to 1 part OCA).

After unloading the API/MCC premix (OCA premix) from the drum, the drum was rinsed with a further portion of MCC (MCC-for-Rinse: same amount as used for the premix), to recover any API retained on the drum surfaces to provide the MCC-rinse portion. A blend time of 3 minutes (i.e., about 90 to 120 revolutions) was used for this rinse process, i.e., MCC-rinse process. The API/MCC premix and MCC drum rinse (MCC-rinse portion) were passed through a 1.0 mm aperture sieve on addition to the larger drum used for the Pre-RC (roller compaction) blending process (i.e., 150 liter drum for 5 mg tablets and 70 liter drum for 10 mg tablets). The sieve removed any soft agglomerates of OCA, and ensured good blend uniformity was achieved before roller compaction.

An appropriately sized bin was then charged with the following components: approximately ¼ (one-fourth) of MCC-1, ½ (half) of OCA Premix, MCC drum rinse (MCC Rinse), ½ of OCA Premix, and ¼ of MCC-1 in the order specified. The resulting mixture was then blended for 300 to 360 revolutions (about 20 minutes for 5 mg tablets, about 10 minutes for 10 mg tablets) in a Pharmatech MB400 drum blender or a Tumblemix drum blender or V-blender. The SSG-1 and the remaining ½ of MCC-1 was added to the bin

US 10,751,349 B2

and the mixture was then blended for 300 to 360 revolutions (about 10 to 20 minutes). Magnesium stearate-1 was then added to the bin via a 0.5 mm aperture sieve and the mixture was blended for 70 to 90 revolutions (about 3 minutes). For the 25 mg tablet, silicon dioxide was added via a 0.5 mm aperture sieve together with SSG-1 and the remaining ½ of MCC-1 to the bin and the mixture was then blended for 300 to 360 revolutions (about 10 to 20 minutes). The blender revolutions for the various preblending steps provide homogeneity of the pre-blend formulation.

Dry granulation. The pre-blend was transferred from the bin blender to the roller compactor hopper. The pre-blend was roller compacted to provide flakes which were milled into granules through an in-line dual screen milling system. The granules were then collected in a suitable container. Roller compaction parameters used in the commercial production are shown in Table 7. This process provided the roller compacted active granules (intra-granular portion) for use in the final blending step. Roll pressure (compaction force), roll gap, and screen size (lower mill) are meaningful process parameters in the roller compaction process. The roll pressure, roll gap, and screen size provided granules with consistent physical characteristics and particle-size distribution.

TABLE 7

| Roller Compactor Settings Used for Commercial Production | |
| --- | --- |
| Attribute | Setting |
| Roll pressure (bar) | 40 to 48 |
| Roll gap (mm) | 2.5 to 4.0 |
| Upper mill screen size (mm) | 2.0 |
| Lower mill screen size (mm) | 0.8 |

Final Blending. The final blending of the OCA tablet formulation was performed in 2 steps. First, an appropriately sized bin was charged with the roller-compacted active granules (intra-granular portion), extra-granular sodium starch glycolate-2 (SSG-2) and extra-granular MCC-2, and the resulting mixture was blended for 450 to 540 revolutions. For the 25 mg tablet, silicon dioxide was added via a 0.5 aperture sieve together with SSG-2 and extra-granular MCC-2. Magnesium stearate-2 was then added to the bin and the mixture was blended for 70 to 90 revolutions. Blender revolution is a meaningful process parameter in the final blending process providing a final blend with acceptable homogeneity.

Compression Process. The final blend prepared in the blending process was used to supply the rotary tablet press fitted with the appropriate OCA tablet tooling. OCA tablet tooling is specific to the tablet strength. During equipment start-up, the tablet press was set up by adjusting compression parameters to produce tablets that meet the in-process control targets for tablet weight, hardness, thickness, and friability. Tablet press speed (about 70 rpm) and feeder speed (about 30 rpm to about 40 rpm) were set to achieve satisfactory tablet weight variation. The tablet press depth of fill was set to achieve the target tablet weight. The main compression pressure (rollers) was set to achieve the target hardness and thickness (compression force of about 8 kN). A small amount of pre-compression force (about 0.5 kN) was applied before the main compression to expel air from the blend to ensure satisfactory tablet friability. Adjustments were made throughout the compression operation to continuously meet the in-process control targets. After the

tablets were ejected from the press, they were passed through a tablet deduster and metal detector prior to collection in tablet containers.

In-process control testing for appearance, tablet weight, hardness, thickness, friability, and disintegration time is conducted at specific internals throughout the tablet compression process and are provided in Table 8. Press speed and compression are meaningful process parameters in the tablet compression process. The specified press speed provided tablets with the target tablet weight. Compression, including both pre- and main compression, provided tablets that met the tablet hardness, thickness and firability limits. In addition, the provided tablets showed fast disintegration time.

TABLE 8

| In-Process Tests for Compression Step | | | |
| --- | --- | --- | --- |
| In-process Test | 5 mg OCA Tablets | 10 mg OCA Tablet | 25 mg OCA Tablet |
| | | Acceptance Criteria | |
| Appearance | White, round tablets with 5 debossed on one side and INT on the other side | White, triangular tablets with 10 debossed on one side and INT on the other side | White, oval tablets with 25 debossed on one side and INT on the other side |
| Weight of 20 tablets | 3.92 g to 4.08 g (Target 4.00 g) | | |
| Individual weight of 20 tablets | 200 mg, NMT 2 individual tablets deviate from mean by more than 7.5% and none by more than 15% | | |
| Hardness (mean) | 7 kP to 13 kP (target 10 kP) | 8 kP to 14 kP (target 11 kP) | 9 kP to 15 kP (target 12 kP) |
| Thickness (mean) | 3.5 mm to 4.1 mm (target: 3.8 mm) | 4.0 mm to 4.6 mm (target: 4.3 mm) | 4.3 mm to 4.9 mm (target: 4.6 mm) |
| Friability (6.5 g/100 rotations) | NMT 0.5% | | |
| Disintegration time (6 tablets) | NMT 2 min | | |

NMT = not more than

Tablet Coating. The 5 mg and 10 mg OCA tablets were coated with a non-functional immediate release coating material. Tablet cores were coated with Opadry® II coating material using a perforated pan coater and a 48-inch pan. A 20% w/w coating solution was prepared by mixing Opadry® II with purified water. An excess of coating solution was prepared to ensure sufficient coating material is available for the coating process.

The tablet cores were loaded into the pan of the perforated pan coater (i.e., O'Hara Labcoat MX coating machine and 1× Schlick Model 930/7-1 S35 with 1.2 mm nozzle spray gun) and the coating process was initiated. The pan rotation speed (about 12 rpm) was monitored and maintained in the appropriate range to ensure the tablet cores flowed consistently throughout the coating process. Pan speed is a meaningful process parameter, as this can affect tablet appearance (too high a pan speed can damage the tablets). Tablet bed temperature is a meaningful process parameter, as this can affect tablet water content and protects the tablets from over-wetting (which causes tablet appearance defects). Exhaust air temperature is linked to tablet bed temperature and is a meaningful process parameter if tablet bed temperature is not recorded.

US 10,751,349 B2

**89**

The supply air temperature of about 60 to 72° C. and an exhaust air temperature of about 45 to 55° C. was used to maintain tablet bed temperature at about 45 to 48° C. Supply and exhaust air temperatures were monitored throughout the coating step to maintain the bed temperature range of about 45 to 48° C. After the desired 4% weight gain was achieved, the pan speed and supply air temperature were reduced (to about 4 rpm and 45° C.) to ensure dry tablets. The heater was then turned off and tablets were further cooled while jogging the pan. Tablet weight gain (target 4% gain) and appearance were checked periodically during the tablet coating process as in-process controls. The in-process tests conducted during the coating process are shown below in Table 9.

TABLE 9

| In-Process Tests for Coating Process | | | |
|---|---|---|---|
| In-process Test | 5 mg OCA Tablets | 10 mg OCA Tablets Acceptance Criteria | 25 mg OCA Tablets |
| Appearance | Off-white to yellow, round tablets with 5 debossed on one side and INT on the other side | Off-white to yellow, triangular tablets with 10 debossed on one side and INT on the other side | Off-white to yellow, oval tablets with 25 debossed on one side and INT on the other side |
| Tablet weight gain | 3.0% to 5.0% | 3.0% to 5.0% | 3.0% to 5.0% |

Packaging. Tablets were packaged in the commercial primary packaging configuration using a standard automated bottling operation. The primary packaging configuration utilized a white high-density polyethylene bottle (40 cc) and child resistant cap with an induction seal. The commercial bottle will contain 30 OCA tablets. Tablet quantity, induction seal, cap torque, print quality, and appearance control testing was conducted at specific intervals throughout the packaging process. Induction sealing is a meaningful process parameter in the packaging process providing a completely sealed bottle. The in-process testing parameters for the packaging process is provided in Table 10 below.

TABLE 10

| In-Process Tests for Packaging Process | |
|---|---|
| In-process Test | Acceptance Criteria |
| Tablet quantity | Correct tablet fill quantity (30 count) |
| Induction seal integrity | Totally sealed bottle |
| Cap torque test | 15 lb/in² to 25 lb/in² |
| Print quality | Print is present and correct |
| Appearance (AQL inspection) | Satisfactory |

AQL = Acceptable quality limit

Example 3: Dissolution Testing of Obeticholic Acid Film-coated Tablets

Unmilled 5 mg tablet and 10 mg tablet formulations of OCA were observed to release the drug slowly. The formulation of the 5 mg and 10 mg tablets are shown below in Table 11.

**90**

TABLE 11

| 5 mg, 10 mg, and 25 mg film-coated tablets formulations | | | |
|---|---|---|---|
| | | mg/tablet | |
| Material | 5 mg | 10 mg | 25 mg |
| Intragranular | | | |
| OCA Drug Substance[a] | 5.0 | 10.0 | 25.0 |
| Microcrystalline Cellulose[a] | 81.0 | 106.0 | 157.0 |
| Sodium Starch Glycolate | 8.0 | 8.0 | 8.0 |
| Colloidal Silicon Dioxide | — | — | 2.0 |
| Magnesium Stearate | 1.0 | 1.0 | 1.0 |
| Granule Mass | 95.0 | 125.0 | 193.0 |
| Ratio of Microcrystalline Cellulose to OCA | about 16:1 | about 11:1 | about 6:1 |
| Extragranular | | | |
| Microcrystalline Cellulose | 100.0 | 70.0 | — |
| Sodium Starch Glycolate | 4.0 | 4.0 | 4.0 |
| Colloidal Silicon Dioxide | — | — | 2.0 |
| Magnesium Stearate | 1.0 | 1.0 | 1.0 |
| Final Blend/Tablet Core | 200.0 | 200.0 | 200.0 |
| Tablet Coating | | | |
| Opadry II Coating Material | 8.0 | 8.0 | 8.0 |
| Coated Tablet | 208.0 | 208.0 | 208.0 |

[a]OCA quantity presented assumes drug substance is anhydrous and 100% pure; actual amount is adjusted based on potency of the drug substance lot used, and amount of microcrystalline cellulose is correspondingly decreased.

Upon testing, the tablets containing unmilled OCA demonstrated a slow dissolution release profile. For the dissolution method, both RI and Corona detectors were initially evaluated for analysis of the dissolution media. Considering the need to quantify OCA (INT-747) at levels as low as 10% of a 5 mg strength tablet dissolved in the dissolution media (1 μg/mL), the Corona CAD detector was chosen for the dissolution tests because it has a better sensitivity to OCA than the RI detector.

Tablet dissolution for both the 5 mg and 10 mg tablets was conducted in 900 mL of 50 mM Disodium Hydrogen Phosphate Buffer (Na₂HPO₄), pH 6.8 at 37° C. using USP II paddle apparatus at a paddle speed of 75 rpm. Samples were assayed undiluted by filtering through a 0.2 μm PVDF syringe filter using a gradient RP-HPLC method with CAD detection. This method utilized an Agilent Zorbax SB-C18 4.6 mm×150 mm, 3.5 μm HPLC column. A 50 μL sample was separated by a 20 minute gradient program, at a temperature of 40° C. and a flow rate of 1.5 mL per minute. Two mobile phases were used in the program; one consisted of a degassed Acidified Water pH 3.0/Acetonitrile (45:55) mixture and the other degassed Acetonitrile. The OCA drug substance eluted with an approximate retention time of 10 minutes.

The dissolution methodology is summarized below in Table 12.

TABLE 12

| Parameters for the obeticholic acid 5 mg and 10 mg tablet dissolution method. | |
|---|---|
| Parameter | Value |
| Apparatus | USP Apparatus II (paddles) |
| Dissolution Media | 50 mM sodium phosphate dibasic buffer, pH 6.8 |
| Dissolution Volume | 900 mL |
| Rotation Speed | 75 rpm |
| Temperature | 37° C. ± 0.5° C. |
| Sample Volume | 10 mL with medium replacement |

US 10,751,349 B2

**91**

TABLE 12-continued

| Parameters for the obeticholic acid 5 mg and 10 mg tablet dissolution method. | |
|---|---|
| Parameter | Value |
| Sample Pull Times | 10, 15, 30, 45, 60 minutes |
| Sample Analysis | HPLC/Corona CAD |

Abbreviations:
HPLC = high performance liquid chromatography;
rpm = revolutions per minute;
USP = United States Pharmacopeia;
CAD = charged aerosol detector

Obeticholic acid was comilled with a 0.61 mm screen or jet-milled as described above to reduce the particle size of the material. Jet-milling (i.e., micronization) resulted in material that had a smaller, more uniform particle size and increased surface area, leading to faster drug release from tablets containing jet-milled OCA. The dissolution release rate of tablets containing comilled and jet-milled OCA is shown below in Table 13.

TABLE 13

| Dissolution release rates of comilled and jet-milled OCA | | | |
|---|---|---|---|
| Dissolution time (min) | 5 mg tablets containing comilled OCA Dissolution rate (%) | 10 mg tablets containing comilled OCA Dissolution rate (%) | 5 mg tablets containing Jet-milled OCA Dissolution rate (%) |
| 15 | 42 | 51 | 83 |
| 30 | 57 | 66 | 89 |
| 45 | 68 | 79 | 91 |
| 60 | 77 | 85 | 94 |
| 75 | 89 | 92 | 95 |

Table 13 shows that reduction in particle size of the OCA drug product improves elution properties.

As shown in FIG. 3 and FIG. 4, the particle size distribution of the OCA impacted the drug dissolution rate, even in media where OCA is freely soluble (pH 6.8). It is therefore possible that differences in particle size could impact OCA bioavailability if dissolution becomes rate-limiting for absorption. For this reason, the particle size distribution of the active is considered a critical process parameter.

The dissolution profiles of 10 mg tablets containing either unmilled (a batch of unmilled OCA with smaller particle size; $D_{50}$>about 100 μM), unmilled/agglomerated, or jet-milled OCA is compared in FIG. 3.

Drug release was compared for 5 mg tablets containing unmilled (agglomerated) and jet-milled OCA. The difference in release profiles was more dramatic for the 5 mg tablets than the 10 mg tablets. This is likely due to coning effects in the smaller dissolution volume of 500 mL which may have contributed to the slower/incomplete dissolution due to the non-favorable hydrodynamics in the test vessel. The dissolution profiles of 5 mg tablets containing either unmilled/agglomerated, or jet-milled OCA is compared in FIG. 4.

Example 4: Content Uniformity Testing of Obeticholic Acid Tablets

The content uniformity of 5 mg and 10 mg tablets containing comilled OCA and jet-milled OCA was evaluated by RP-HPLC. The results are shown below in Table 14.

**92**

TABLE 14

| Content uniformity of 5 mg and 10 mg tablets of unmilled, comilled and jet-milled OCA | | | |
|---|---|---|---|
| | 5 mg tablets containing comilled OCA | 10 mg tablets containing comilled OCA | 5 mg tablets containing jet-milled OCA |
| Content Uniformity (%) | 104 (AV = 18, 89.0%-110.6%) | 104 (AV = 14, 97.4%-111.5%) | 105.2 (AV = 8, 101.4%-109.2%) |

The results in Table 14 show the content uniformity data for tablets containing comilled and jet-milled OCA. Tablets containing comilled OCA showed a higher variability in content uniformity. The smaller particle size of the jet-milled material provides better content uniformity of the OCA tablets.

Example 5: Stability Studies of 5 mg and 25 mg Obeticholic Acid Tablets

The stability of 5 mg and 25 mg tablets were tested in accelerated stability studies. The stability test was conducted at 40° C. and. 75 relative humidity (RH) for 6 months. The formulation of the 5 mg and 25 mg tablets are shown above in Table 11.

5 mg and 25 mg OCA tablets were placed on stability at the 40° C./75% RH storage conditions. Samples stored at the accelerated condition were pulled from storage at 1, 2, 3, and 6 months for assessment of stability. The tests performed for stability evaluations include appearance, assay for OCA by HPLC, and related substances by HPLC Corona.

Obeticholic acid and formulations of obeticholic acid were tested for stability. An unknown impurity at relative retention time (RRT) 1.75 was observed during stability studies of the tablets containing different batches of the 5 mg and 25 mg tablet formulation. The stability test using uncoated tablets showed an increase of a new impurity at about 0.05% with the test conducted at 25° C., 60% RH for 4 weeks, and about 0.2% with the test conducted at 40° C., 75% RH for 4 weeks. A study was conducted to identify the structure of the impurity, clarify the origin for the generation of the impurity, and adopt measures to ensure that quality was not compromised during storage of the tablet. The structure of OCA and the identified structure of the impurity are respectively shown below:



OCA

US 10,751,349 B2

93

-continued



ethyl ester impurity

An analysis was conducted with LC/HRMS using LTQ-Orbitrap Discovery. The LC/HRMS Test conditions used are outlined in Table 15 below:

TABLE 15

| LC/HRMS conditions for identifying impurities found in OCA after stability testing | | |
|---|---|---|
| Equipment: | [HPLC] | Shimadzu prominence (LC-20A series) |
| | [MS] | Thermo Fisher Scientific LTQ Orbitrap Discovery |
| Ionization method: | ESI | (negative and positive mode) |
| HPLC conditions: | [Column] | Phenomenex, Kinetex C-18, 2.6 μm, 4.6 mm I.D. × 100 mm |
| | [Mobile phase] | A: AcOH aqueous solution*¹ containing 15% MeOH |
| | | B: MeCN containing 15% MeOH |

| Gradient conditions. | | |
|---|---|---|
| | Time (min.) | B (%). |
| | 0.0 → 25.0 | 40 → 65 |
| | 25.0 → 35.0 | 65 → 95 |
| | 35.0 → 50.0 | 95 |
| | 50.0 → 50.1 | 95 → 40 |
| | 50.1 → 60.0 | 40 |
| | 60.1 | stop. |

| | [Measurement time] | 60 min |
|---|---|---|
| | [Detection] | Total Ion Current Chromatogram (TICC) |
| | [Flow rate] | 1.0 mL/min. |
| | [Column temperature] | Approximately 40° C. |
| | [Sample drug product solvent] | Mobile phase B |
| | [Injection] | 5 μl |
| Sample*² | | OCA drug product (product stored for 4 weeks at 60° C.) solution (OCA concentration 500 μg/mL.) *³ |
| | | Drug product placebo solution (prepared in the same way as (1)) |
| | | Impurity 1-5 and OCA mixed solution (5 μg/mL each) |
| | | OCA powder (5000 rppm) |
| | | OCA unground product |
| | | OCA drug product (stored at 50° C., 85% RH for 4 weeks) solution |

Based on the results, it was determined that the impurity is an ethyl ester of obeticholic acid (OCA). Subsequently, an authentic sample of the ethyl ester was synthesized by dissolving obeticholic acid in ethanol, adding concentrated sulfuric acid and heating the mixture. The retention time and mass spectrometry of the authentic sample matched those of the impurity and thus the structure of the impurity was confirmed as an ethyl ester of obeticholic acid (FIG. **7**A and

94

FIG. **7**B). Comparison of the retention time and the mass spectrum of the ethy ester impurity and authentic sample is shown in FIG. **7**A and FIG. **7**B.

Bottom row: TICC of ethyl ester (positive mode)

The structure of the ethyl ester impurity (shown above) was determined through mass spectrometry analysis combined with analysis of OCA fragmentation, and was confirmed by mass spectrometry analysis of synthesized OCA ethyl ester (the above authentic sample having the same retention time as the ethyl ester impurity).

Since the ethyl ester impurity can be formed in the presence of ethanol, the formulation was examined to determine if any excipient could be a possible source of the ethanol. It was found that sodium starch glycolate from two different manufacturers, sodium starch glycolate (Glycolys®) from Roquette Pharma containing no more than 6% ethanol and sodium starch glycolate (Explotab®) from JRS Pharma containing no more than 3% ethanol, were used to make the tablet formulations. A comparison of accelerated stability data at 40° C./75% RH of batches are shown below in Table 16.

TABLE 16

| OCA Ethyl Ester Impurity (RRT 1.75) Content in Accelerated (40° C./75% RH) Stability Studies | | | | |
|---|---|---|---|---|
| Lot Number (Manufacturer) | Time 0 | 1 Month | 3 Months | 6 Months |
| DNSY, 5 mg Patheon (Explotab ®) | ND | ND | ND | ND |
| DNSZ, 25 mg Patheon (Explotab ®) | ND | ND | ND | ND |
| PDS0048-03, 5 mg Piramal (Glycolys ®) | ND | NT | 0.35% | 0.44% |
| PDS0048-10, 25 mg Piramal (Glycolys ®) | ND | NT | 0.17% | 0.25% |

ND = Not detected;
NT = Not tested

The results in Table 16 show that the ethyl ester impurity is not observed after 6 months in samples containing low ethanol sodium starch glycolate (i.e., Explotab®). However, the ethyl ester impurity in samples containing high ethanol sodium starch glycolate (i.e., Glycolys®) was observed as early as three months into the stability study. This data indicates that the ethanol content of the sodium starch glycolate is critical to the stability of the OCA formulation.

Stability Testing of Film Coated Tablets. Furthermore, in the film coated tablet stability test an increase in a specific impurity was confirmed at a rate of approximately 0.09% with the test conducted at 40° C., 75% RH for 4 weeks. Given that the generation of this impurity only occurred in film coated tablets, it was surmised that the impurity was a reactant with a film coating component. Also, based on the structure of ethyl ester impurity it is known that the carboxylic acid of OCA reacted easily with alcohol. Of the film coating components, it was possible that 2 components, polyvinyl alcohol (PVA) and polyethylene glycol (PEG) 4000 could be the cause of the impurity.

Subsequently, when a blending combination change test was conducted the specific impurity was generated and it was discovered that PEG4000 was the cause. Therefore, it was estimated that the structure of this impurity was an ester produced by a reaction between a PEG4000 hydroxyl group and the OCA carboxylic acid. The structure of OCA and PEG ester impurity are shown below:

US 10,751,349 B2

95 96

OCA

PEG ester impurity

High resolution mass spectrometry (HRMS) was conducted to confirm the structure. The mean molecular weight of PEG ester impurity was expected to exceed 4000. micrO-TOF-QII (Bruker Daltonics) was used to measure high molecular weight compounds. When measured with the APCI technique in positive mode, an m/z was obtained that supported the structure of PEG ester impurity shown above. (FIGS. **8**A, **8**B, and **8**C). Enlargement of the mass spectrum of a sample containing the specific impurity showed peak spacing characteristic of PEG (FIG. **9**).

The LC/HRMS Test conditions used are outlined in Table 17 below:

TABLE 17

| LC/HRMS test conditions for the identification of the impurity found in film coated OCA tablets after stability testing. | | |
|---|---|---|
| Equipment: | [HPLC] | Agilent 1200 |
| | [MS] | micrOTOF-QII (Bruker Daltonics) |
| Ionization method: | APCI | positive mode |
| HPLC conditions: | [Column] | Phenomenex, Kinetex C-18, 2.6 μm, 4.6 mm I.D. × 100 mm |
| | [Mobile phase] | A: AcOH aqueous solution[*2] containing 15% MeOH B: MeCN containing 15% MeOH |

| Gradient conditions. | | |
|---|---|---|
| | Time (min.) | B (%). |
| | 0.0 → 25.0 | 40 → 65 |
| | 25.0 → 35.0 | 65 → 95 |
| | 35.0 → 50.0 | 95 |
| | 50.0 → 50.1 | 95 → 40 |
| | 50.1 → 60.0 | 40 |
| | 60.1 | stop. |

| | | |
|---|---|---|
| [Measurement time] | 60 min | |
| [Detection] | Total Ion Current Chromatogram (TICC) | |
| [Flow rate] | 1.0 mL/min. | |

TABLE 17-continued

| LC/HRMS test conditions for the identification of the impurity found in film coated OCA tablets after stability testing. | | |
|---|---|---|
| | [Column temperature] | Approximately 40° C. |
| | [Sample drug product solvent] | Mobile phase B |
| | [Injection] | 5 μl |
| Sample | | OCA film coated tablet (product stored for 4 weeks at 60° C.) extract solution[*3] |

[*2]pH 3.0
[*3]The 500 μl sample prepared was concentrated to dryness under a stream of nitrogen, dissolved in 50 μl of mobile phase B and used as the sample (OCA concentration: 5 mg/mL).

The extract from the film coated tablets was measured using the APCI technique in positive mode. Analysis of the retention time, the mass spectra, and the m/z value confirmed the structure of PEG ester impurity (shown above and in FIGS. **8**A, **8**B, and **8**C).

Example 6: Solubility Studies of OCA in Various Buffers and Biological Media

Solubility Studies of OCA in Various Buffers. A study was performed to screen different media of various pH over the pH range 1.2-10.0, incorporating the physiological pH range (1.2-6.8) for immediate release tablets. The solubility of OCA was measured at 37° C. in various buffers from pH 1.2 to 10.0. The equilibrium solubility results for OCA in various aqueous buffer solutions are presented in Table 18 below.

TABLE 18

| Equilibrium solubility and recovery for OCA at 37° C. in various buffers from pH 1.2 to 10.0 | | | |
|---|---|---|---|
| pH, Media (Buffer) | Solubility (mg/mL) | % Recovery | USP Solubility Rating |
| pH 1.2 Hydrochloric acid | N/A | <1 | Practically insoluble |
| pH 2.0 Hydrochloric acid | N/A | <1 | Practically insoluble |
| pH 3.0 Acid Phthalate | N/A | <1 | Practically insoluble |
| pH 4.1 Acetate | 0.003 | <1 | Slightly soluble |
| pH 5.1 Acetate | 0.023 | 5 | Sparingly soluble |
| pH 6.0 Phosphate | 0.050 | 10 | Soluble |
| pH 6.8 Phosphate[a] | 0.220 | 94 | Freely soluble |
| pH 7.0 Phosphate | 0.462 | 92 | Freely soluble |
| pH 8.0 Phosphate | 0.486 | 97 | Freely soluble |
| pH 9.0 Alkaline Borate | 0.462 | 92[b] | Freely soluble |
| pH 10.0 Alkaline Borate | 0.056 | 11[b] | Soluble |

[a]Dissolution media (50 mM sodium phosphate dibasic buffer, pH 6.8)
[b]Basic decomposition of drug substance suspected.

OCA is a weak acid (pK$_a$=4.82) and exhibits a pH-solubility profile consistent with that of a weak acid. As expected, the solubility of the free acid form is highest when deprotonated and lowest when protonated.

OCA drug substance was observed to precipitate out of solution in those acidic buffers in the pH range 1.2 to 3.0. Solutions at pH 4.1 to 6.0 also had some precipitation resulting in a cloudy solution. Solutions at pH 6.8 to 10 produced clear solutions. The recovery of OCA steadily diminishes at pH higher than 8.0, indicating basic decomposition of the drug sub stance.

The nominal concentration for dissolved 5 mg and 10 mg tablets in the typical dissolution volume of 900 mL is

US 10,751,349 B2

97

approximately 0.006 & 0.01 mg/mL, respectively. Above pH 6.8 the solubility is well above 0.01 mg/mL, the minimum concentration required to dissolve a 5 mg or 10 mg tablet in 900 mL of dissolution medium (i.e., sink conditions).

As demonstrated in FIG. **5**, solubility of OCA increases as a function of increasing pH, plateauing just above approximately pH 7. The dramatic increase in solubility observed between approximately pH 4 and pH 7 indicates that this pH region is less-than-ideal for use in the dissolution media. However, given that OCA is freely soluble at pH 6.8 and that this pH is physiologically relevant to the site of absorption, it was selected for use in diligent pursuit of a discriminating and relevant dissolution method.

Solubility Studies of OCA in Biological Media. A solubility study was performed in physiologically relevant dissolution media at 37° C. and pH of 1.2, 4.5, and 6.8 along with fasted state simulated gastric fluid (FaSSGF, pH 1.2), fed state simulated intestinal fluid (FeSSIF, pH 5.0) and fasted state simulated intestinal fluid (FaSSIF, pH 6.5). The solubility results for OCA in physiologically relevant buffers are presented in Table 19.

TABLE 19

Solubility of OCA in biologically relevant media at 37° C.

| pH (Medium) | Solubility (mg/mL) | USP Solubility Rating |
|---|---|---|
| 1.2 (0.1N HCl) | <LOQ | Practically insoluble |
| 1.2 (FaSSGF)[a] | <LOQ | Practically insoluble |
| 4.5 | <LOQ | Practically insoluble |
| 5.0 (FeSSIF)[b] | 0.82 | Freely soluble |
| 6.5 (FaSSIF)[c] | 0.64 | Freely soluble |
| 6.8[d] | 0.22 | Freely soluble |
| 6.8 with surfactant[e] | 0.59 | Freely soluble |

[a]FaSSGF is de-ionized water containing sodium taurocholate (80 µM) and NaCl (34.2 mM), pH 1.6.
[b]FeSSIF is de-ionized water containing sodium taurocholate (15 mM) and lecithin (3.75 mM) with an osmolarity of 635 ± 10 mOsmol, pH 5.0.
[c]FaSSIF is de-ionized water containing sodium taurocholate (3 mM) and lecithin (0.75 mM) with an osmolarity of 270 ± 10 mOsmol, pH 6.5.
[d]Proposed dissolution medium: 0.5 mM sodium phosphate dibasic, pH 6.8.
[e]Surfactant is polysorbate 80 (Tween 80 ®)
Abbreviation:
USP = United States Pharmacopeia

As shown in Table 19 and FIG. **6**, from a Biopharmaceutical Classification System (BCS) perspective, OCA is poorly soluble below pH 4.5 and highly soluble above pH 5.0 in biologically relevant media. This provides further support and justification for selecting pH 6.8 phosphate buffer as the dissolution medium. A 35-fold increase in OCA solubility is evident at pH 5.0 in the presence of the taurocholate bile acid and lecithin emulsifier vs. pH 5.1 acetate buffer alone. This is likely due to the formation of highly soluble micelles in the presence of the amphipathic surfactant lecithin. One would expect similar solubility enhancement in vivo, as taurocholic acid and lecithin are typically present in the gastric and intestinal milieu.

Example 7

This example describes a study of two doses of OCA (10 mg and 50 mg) vs. placebo for a period of 12 weeks (85 days). The study was completed by 48 patients and PK data are available for 34 patients. All patients returned to the study site for 4 visits (Day 15, Day 29, Day 57, and Day 85) for evaluations of efficacy, safety, tolerability, and compliance with investigational product.

98

Key Inclusion criteria:
Age>18 years,
Both male and female had to use one effective method of contraception,
Proven or likely PBC demonstrated by patient presenting with at least 2 of the 3 diagnostic criteria
History of increased ALP
Positive AMA
Liver biopsy consistent with PBC
Screening ALP value between 1.5 and 10×ULN.
Key Exclusion Criteria
1. The following drugs were contraindicated: ursodeoxycholic acid (UDCA), colchicine, methotrexate, azathioprine, or systemic corticosteroids
2. Conjugated bilirubin>2×ULN; ALT or AST>5×ULN and serum creatinine>133 µmol/L (1.5 mg/dL)
3. History or presence of hepatic decompensation
4. History of presence of concomitant liver diseases such as Hepatitis B or C; HIV; primary sclerosing cholangitis, alcoholic liver disease, definite autoimmune liver disease or biopsy proven nonalcoholic steatohepatitis (NASH).

The percent change (%) in serum ALP from Baseline to End of Study (EOS) was monitored. The baseline value was the mean of the pretreatment screening and day 0 evaluations. The EOS value was Day 85/ET or the last observed ALP value on treatment.

Absolute changes in serum ALP levels were monitored from Baseline to Day 15, Day 29, Day 57, Day 85/ET and Follow-Up (Day 99). The percentage of patients was calculated who met the definition of PBC responder criteria applying the Paris I, Toronto I, Toronto II, Toronto III, Toronto IV, Mayo II, and Barcelona disease prognostic risk criteria at Day 85/ET. Each patient was tested for absolute and percent change in serum aspartate aminotransferase (AST), alanine aminotransferase (ALT), gamma-glutamyl transferase (GGT), and conjugated (direct) bilirubin values from Baseline to Day 15, Day 29, Day 57, Day 85/ET and Follow-Up (Day 99). Efficacy results are shown in Table 20 below.

TABLE 20

Percent Change in ALP from Baseline - ITT population.

| Percent Change | Placebo (n = 23) | OCA 10 mg (n = 20) | OCA 50 mg (n = 16) |
|---|---|---|---|
| Mean (SD) | 0.4 (15.3) | −44.5 (24.4) | −37.6 (21.0) |
| Median | −0.8 | −53.9 | −37.2 |
| p-value[a, b] | NA | <0.0001 | <0.0001 |

Reductions in GGT and ALT and AST. GGT levels decreased, relative to placebo, at all-time points from day 15 to Day 85/ET in both the OCA 10 mg and OCA 50 mg groups. In the ITT Population, the mean (SD) GGT levels decreased from 653 (370) U/L at baseline to 184 (203) U/L at Day 85/ET in the OCA 10 mg group, and from 455 (418) U/L at baseline to 202 (300) U/L at day 85/ET in the OCA 50 mg group. Placebo GGT levels were 466 (321) U/L at Baseline and 502 (383) U/L at Day 85/ET.

ALT levels decreased, relative to placebo, from baseline to Day 85/ET in both OCA 10 mg and OCA 50 mg groups. The mean (SD) ALT levels decreased from 86 (44) U/L at baseline to 54 (41) U/L at Day 85/ET in the OCA 10 mg group, and similarly decreased from 71 (38) U/L at baseline to 49 (29) U/L at Day 85/ET in the OCA 50 mg group. There was no change in the levels of ALT in the placebo group from baseline to Day 85/ET.

The mean (SD) AST levels at Day 85/ET were 54 (40) U/L and 56 (28) U/L in OCA 10 mg and OCA 50 mg groups compared to baseline levels of 67 (33) U/L and 66 (29) U/L, respectively. There was no change in the levels of AST in the placebo group from Baseline to Day 85/ET.

Changes in serum lipids were observed across all treatment groups including placebo, but the magnitude of HDL-C change was greater in the OCA treatment groups. Mean HDL-C levels decreased from 1.73 (0.45) mmol/L at baseline to 1.57 (0.46) mmol/L at the end of treatment (ET) in the OCA 10 mg arm. In the OCA 50 mg arm, the mean (SD) HDL-C decreased from 1.95 (0.55) mmol/L at baseline to 1.86 (0.56) mmol/L at ET. In the placebo arm the mean HDL-C decreased from 1.84 (0.52) mmol/L at baseline to 1.70 (0.44) mmol/L at ET. The effect of HDL-C lowering is not as prominent in the OCA 50 mg treatment group, perhaps due to a 44% dropout rate which occurred early in treatment (<1 month). At Day 85/ET, a mean change in LDL-C of −0.08 (0.43) mmol/L was observed in the placebo group compared to mean changes of +0.10 (0.58) mmol/L and +0.23 (0.52) mmol/L in the OCA 10 mg and OCA 50 mg groups, respectively.

Patients with early stage PBC demonstrated ALP reductions with OCA 10 mg and 50 mg monotherapy, which were greater than placebo (on average approximately 40% for each OCA dose vs. minimal change in placebo). The adverse events reported were consistent with the known safety profile of the drug, with pruritus and headache being the most frequent AEs reported. Fatigue was reported infrequently.

TABLE 21

| ALP Levels (U/L) at Baseline and Day 85/ET: ITT Population (n = 59). | | | |
|---|---|---|---|
| | Placebo (n = 23) | OCA 10 mg (n = 20) | OCA 50 mg (n = 16) |
| Baseline | | | |
| Mean (SD) | 408.4 (223.0) | 461.6 (298.7) | 431.1 (177.2) |
| Median | 320.5 | 366.3 | 379.0 |
| Day 85/ET | | | |
| Mean (SD) | 420.1 (253.5) | 228.1 (117.0) | 269.8 (158.9) |
| Median | 288.0 | 196.5 | 197.5 |
| Change from Baseline to Day 85/ET, Mean (SD) | 11.7 (63.0) | −233.5 (212.3) | −161.3 (129.7) |

Example 8

This example describes a study conducted using an international, multi-center, randomized, double-blind, placebo-controlled, multi-dose, parallel group to determine efficacy and safety of obeticholic acid (OCA) in combination with ursodeoxycholic acid (UDCA) in subjects with primary biliary cirrhosis.

Key Inclusion Criteria

Male or female age 18-75 years and on a stable dose of UDCA for at least 6 months prior to screening

Screening ALP level between 1.5× upper limit of normal (ULN) and 10×ULN

Proven or likely PBC, as demonstrated by the subject presenting with at least 2 of the following 3 diagnostic factors:

History of increased ALP levels for at least 6 months prior to Day 0

Positive antimitochondrial antibody (AMA) titer (>1:40 titer on immunofluorescence or M2 positive by enzyme-linked immunosorbent assay) or PBC-specific antinuclear antibodies (antinuclear dot and nuclear rim positive)

Liver biopsy consistent with PBC

Key Exclusion criteria

Use of colchicine, methotrexate, azathioprine, or systemic corticosteroids

Screening conjugated (direct) bilirubin>2×ULN; ALT or AST>5×ULN; serum creatinine>1.5 mg/dL (133 µmol/L)

History or presence of hepatic decompensation (e.g., variceal bleeds, encephalopathy, or poorly controlled ascites)

History or presence of other concomitant liver diseases or human immunodeficiency virus (HIV) or other viral hepatitis infection

Clinically significant medical condition, and gastrointestinal conditions affecting drug ADME

The percent change (%) in serum ALP from Baseline to End of Study (EOS) was tested where [EOS=Day 85 or last observed ALP value on treatment]

Also observed were the absolute and percent changes in serum ALP levels from Baseline to Day 15, Day 29, Day 57, Day 85/ET and Follow-Up (Day 99). Patients were examined for the absolute and percent change in serum gamma-glutamyl transferase (GGT), alanine aminotransferase (ALT), and aspartate aminotransferase (AST) values from Baseline to Day 15, Day 29, Day 57, Day 85/ET and Follow-Up (Day 99). Patients were examined for absolute and percent changes in serum albumin and conjugated (direct) bilirubin values from Baseline to Day 15, Day 29, Day 57, Day 85/ET and Follow-Up (Day 99). Patients' Enhanced liver fibrosis (ELF) score and change in levels of its components, hyaluronic acid, aminoterminal peptide of pro-collagen III, and tissue inhibitor of matrix metalloproteinase-1 from Baseline to Day 85/ET were performed. The absolute and percent changes in levels of C-reactive protein, non-esterified fatty acid, tumor necrosis factor alpha, tumor necrosis factor beta, tumor growth factor beta, bile acids, glutathione, immunoglobulin M, and osteopontin from Baseline to Day 85/ET were taken.

Bile acid analysis: Absolute and percent changes in the levels of total bile acids and OCA plasma concentrations, and their conjugates, from Baseline to Day 85/ET.

The absolute and percent change in fibroblast growth factor-19 (FGF-19) levels from Baseline to Day 85/ET were taken.

Overall, 165 subjects (100%) received at least 1 dose of investigational product (ITT and Safety Populations) and 136 subjects comprised the Completer Population. One hundred sixty-one subjects (98%) were included for the analysis of the mITT Population as measured by the percent change in ALP from Baseline to EOS; the mITT Population for sensitivity analysis of the primary endpoint included 163 subjects. It should be noted that the mITT population was defined for the primary analysis as all patients randomized who received at least one dose of study medication and had at least one post-baseline ALP evaluation which was taken at most seven days after their last dose of study medication. (See FIG. 10). The mITT Population for the sensitivity analysis included ALP assessments obtained up to 15 days after the last investigational product use (unlike 7 days for primary endpoint). The number of subjects was balanced

US 10,751,349 B2

101

across all groups in all analysis populations with the exception of the Completer Population due to the higher proportion of discontinuations with OCA 50 mg.

102

History of elevated ALP levels for at least 6 months
Positive anti-mitochondrial antibody (AMA) titer or if AMA negative or in low titer (<1:80) PBC specific

TABLE 22

| ALP (U/L) at Baseline to Day 85/ET: ITT Population (N = 165) and Completer Population (N = 136). | | | |
|---|---|---|---|
| | Placebo | OCA 10 mg | OCA 25 mg | OCA 50 mg |
| ITT Population Baseline | (n = 38) | (n = 38) | (n = 48) | (n = 41) |
| Mean (SD) | 275.2 (102.7) | 294.4 (149.4) | 290.0 (123.6) | 289.5 (106.2) |
| Median | 249.5 | 234.8 | 255.8 | 262.5 |
| Day 85/ET | | | | |
| Mean (SD) | 270.7 (118.7) | 219.0 (113.5) | 225.0 (169.1) | 227.9 (115.9) |
| Median | 234.5 | 177.5 | 187.5 | 197.0 |
| Mean (SD) Change | −4.6 (34.9) | −75.4 (81.5) | −65.0 (91.3) | −62.9 (101.9) |
| Median Change | −6.3 | −47.5 | −69.3 | −56.5 |
| Mean (SD) Percent Change | −2.6 (12.4) | −23.3 (17.1) | −24.0 (18.8) | −20.0 (27.4) |
| Median Percent Change | −3.2 | −21.0 | −27.8 | −22.7 |
| P-value | NA | <0.0001 | <0.0001 | <0.0001 |
| Completer Population Baseline | (n = 37) | (n = 32) | (n = 42) | (n = 25) |
| Mean (SD) | 276.4 (103.8) | 298.6 (159.5) | 274.9 (80.2) | 279.3 (110.5) |
| Median | 250.0 | 234.8 | 255.8 | 236.5 |
| Day 85/ET | | | | |
| Mean (SD) | 272.1 (120.0) | 212.3 (120.2) | 199.0 (59.8) | 179.1 (63.6) |
| Median | 235.0 | 175.0 | 187.5 | 158.5 |
| Mean (SD) Change | −4.3 (35.3) | −86.3 (83.7) | −76.0 (48.8) | −101.8 (85.5) |
| Median Change | −6.0 | −61.3 | −71.3 | −76.0 |
| Mean (SD) Percent Change | −2.5 (12.6) | −26.7 (16.0) | −26.6 (14.7) | −32.5 (20.1) |
| Median Percent Change | −3.1 | −23.5 | −28.2 | −33.9 |

Example 9

This example describes a randomized, double-blind, placebo-controlled, parallel-group, 12-month trial evaluating OCA in patients with PBC as a monotherapy. The study was performed using a randomized, double-blind, placebo-controlled, parallel-group, in patients with PBC who either: (1) were on ursodeoxycholic acid (UDCA) for at least 12 months (and on stable dose for months≥3 months), or (2) were unable to tolerate UDCA, and did not receive UDCA for months prior to Day 0.

Where all eligibility criteria (see below) were met, participants were stratified into one of four groups, i.e., two factors each with two sub-categories (specified in parentheses):

pre-treatment ALP≥3.0×ULN and/or aspartate aminotransferase (AST)≥2.0×ULN and/or TB≥ULN; ('no' for all three conditions, 'yes' to at least one of the three conditions)

intolerance to UDCA; ('no' hence UDCA usage for at least 12 months, with a stable dose for at least 3 months, prior to study start with the assumption of continued stable usage of UDCA throughout the study; 'yes' hence no UDCA usage for at least 3 months prior to study start with the assumption of continued non-usage of UDCA throughout the study).

Key inclusion criteria

Definite or probable PBC diagnosis as demonstrated by the presence of 2 of the following 3 diagnostic factors:

antibodies (anti-GP210 and/or anti-SP100 and/or antibodies against the major M2 components [PDC-E2, 2-oxo-glutaric acid dehydrogenase complex])

Liver biopsy consistent with PBC

At least 1 of the following qualifying biochemistry values:

ALP 1.67×ULN or

Total bilirubin>ULN but<2×ULN

Age 18 years

Taking UDCA for at least 12 months (stable dose for ≥3 months) prior to Day 0, or unable to tolerate UDCA (no UDCA for ≥3 months) prior to Day 0.

Contraception: Female patients had to be postmenopausal, surgically sterile, or if premenopausal, had to use≥1 effective (≤1% failure rate) method of contraception during the trial and for 30 days after the EOT Visit.

Key exclusion criteria

Any hepatic decompensation

Portal hypertension, cirrhosis and complications of cirrhosis/portal hypertension

History of liver transplantation, current placement on a liver transplant list or current Model for End Stage Liver Disease (MELD) score≥15

Cirrhosis with complications, including history or presence of: spontaneous bacterial peritonitis, hepatocellular carcinoma, bilirubin>2×ULN

Hepatorenal syndrome (type I or II) or Screening serum creatinine>2 mg/dL (178 μmol/L)

103

Competing etiology for liver disease (e.g., hepatitis C, active hepatitis B, nonalcoholic steatohepatitis (NASH), alcoholic liver disease (ALD), autoimmune hepatitis, primary sclerosing cholangitis, Gilbert's Syndrome)

Severe pruritus (Intense or widespread and interfering with activities of daily living) or pruritus requiring treatment with bile acid sequestrants, rifampicin within 2 months of day 0

On prohibited medications (such as fenofibrates, budesonide, corticosteroids, valproate, isoniazid etc.); please see the list of prohibited medications in protocol review.

Patients who had previously participated in a clinical trial of OCA were not allowed to participate

Prolonged QT interval, pregnancy or lactation.

If female: known pregnancy, or had a positive urine pregnancy test (confirmed by a positive serum pregnancy test), or lactating

Known history of human immunodeficiency virus infection

Presence of any other disease or condition that was interfering with the absorption, distribution, metabolism, or excretion of drugs including bile salt metabolism in the intestine. Patients with inflammatory bowel disease or who had undergone gastric bypass procedures were excluded (gastric lap band was acceptable).

Medical conditions that could cause non-hepatic increases in ALP (e.g., Paget's disease)

One goal of the study was to demonstrate the efficacy of OCA, relative to placebo, based on its effects on ALP and TB. Other objectives included assessing safety, histological, bile acid, and biomarker (i.e., not including ALP and TB) parameters.

ALP and TB composite response criteria were measured; a patient was designated as a responder if all three of the following conditions were met:

A value of ALP<1.67×ULN

ALP reduction from baseline≥15%

A value of TB<ULN

The absolute and percent change from Baseline in ALP, gamma-glutamyl transferase (GGT), alanine aminotransferase (ALT), AST, total bilirubin, conjugated (direct) bilirubin, albumin, prothrombin time and international normalized ratio (INR) at all-time points was measured. The percentage of patients with a decrease in ALP of ≥10%, ≥15%, ≥20%, and ≥40% from Baseline or ≤ULN at month 12 was measured. The percentage of patients achieving the following biochemical response criteria was also measured:

ALP≥3×ULN and AST≤2×ULN and bilirubin≤ULN ((Corpechot 2008); Paris I)

ALP≤1.5×ULN and AST≤1.5×ULN and bilirubin≤ULN ((Corpechot 2011), Paris II)

ALP≤1.67×ULN and bilirubin≤ULN ((Momah 2012), Mayo II)

ALP≤1.76×ULN ((Kumagi 2010b), Toronto II)

Normal bilirubin (values≤ULN) and/or normal albumin (values lower limit of normal [LLN]; (Kuiper 2009) [Rotterdam criteria])

The absolute change from Baseline for enhanced liver fibrosis (ELF) and hepatic stiffness (at select sites) as assessments of end stage liver failure. The absolute and percent change from Baseline on: C-reactive protein (CRP), tumor necrosis factor-alpha (TNF-α), tumor necrosis factor-beta (TGF-β), fibroblast growth factor-19 (FGF-19) levels,

104

interleukin-6 (IL-6), and CK-18 was measured. The absolute and percent change from Baseline on PBC-40 domains was measured.

Absolute and percent change from Baseline on PBC autoantibodies (IgA, IgG, IgM) and interleukins (IL-12 [p40], IL-23) were measured.

Measuring the plasma OCA concentrations including OCA (unconjugated), conjugates (glyco-OCA and tauro-OCA), and total OCA (the sum of OCA unconjugated, glyco-OCA, and tauro-OCA).

Measuring the absolute change from Baseline for total bile acids, endogenous bile acids, and individual total and unconjugated bile acids (UDCA, deoxycholic acid, cholic acid and lithocholic acid), glyco-conjugate, and tauro-conjugate; proportion of each of the individual bile acids to total bile acids

Bile acid sequestrant (BAS) concomitant exposure. The primary analysis set used for all efficacy analyses, along with the summarization of disposition along with demographics and baseline characteristics, was the 'Intent-to-Treat' (ITT) analysis set. This analysis set included all randomized patients who received at least one dose of blinded study drug. When utilizing this analysis set, patients were analyzed according to the treatment group that they were randomized to regardless of the actual treatment received. It should be noted that all but one randomized patient received at least one dose of blinded study drug.

For sensitivity analysis purposes, all efficacy analyses were repeated utilizing a 'Completer' analysis set. This analysis set was comprised of all ITT patients who participated through the end of the double-blind period (i.e., through the Month 12 visit). When utilizing this analysis set, patients were analyzed according to the treatment group that they were randomized to, regardless of the actual treatment received.

For additional sensitivity analysis purposes, all efficacy analyses were again repeated utilizing an 'Efficacy Evaluable' (EE) analysis set. This analysis set was comprised of all 'Completer' patients who did not have any major protocol deviations that would potentially affect the efficacy of the study drug. This analysis set definition was finalized in a blinded manner prior to database lock.

For population pharmacokinetic (PK) analysis purposes, the PK analysis set was utilized, which consisted of all patients who had at least 1 confirmed fasted analyzable sample at and who did not have any major protocol deviations that could potentially affect exposure levels.

To control the overall study-wise type I error rate, a step-down/closed sequential testing procedure was pre-specified to adjust for the multiple comparisons of the two OCA dose groups individually to placebo on the primary study endpoint alone. Starting with the 10 mg OCA comparison to placebo on the primary endpoint, the step-down could only be carried to the OCA Titration comparison to placebo (on the primary endpoint), if and only if the 10 mg OCA comparison to placebo was found to be statistically significant (i.e., p-value less than 0.05). If the 10 mg OCA comparison to placebo was not statistically significant (i.e., p-value greater than or equal to 0.05), then the hypothesis test for the OCA Titration comparison to placebo on the primary endpoint would be deemed as exploratory.

This pre-specified multiplicity adjustment procedure was narrow in scope in that it only pertained to the individual OCA dose comparisons with placebo on the primary endpoint alone. Hence even if both OCA dose comparisons were found to be statistically significant, then any other hypothesis test would still be deemed as exploratory in nature.

US 10,751,349 B2

105

106

A Cochran-Mantel-Haenszel (CMH) test which adjusted for both randomization stratification variables as described above, was used for pre-specified analysis. In tandem with the CMH test, a Breslow-Day test was also conducted, to test for the homogeneity of the treatment effect across the different randomization strata.

The PK population was used to summarize OCA and bile acid concentrations. The change from Baseline concentrations within each treatment group was compared using a paired t-test. Descriptive statistics of OCA plasma concentrations and the extent of BAS concomitant exposure were provided by treatment group. Initial evaluation of the effects of BAS on OCA, total bile acid concentrations, and ALP was performed using a correlation analysis.

It can be observed from Table 23 that both OCA treatment groups showed a superior difference in the proportion/percentage of patients achieving response at Month 12 when individually compared to placebo using the CMH test. The corresponding Breslow-Day test result shows that the treatment effects were homogeneous across the different randomization strata. This analysis was repeated utilizing the Completer and EE analysis sets and the conclusions were consistent. The ultra-worse-case imputation strategy, implemented by the FDA statistical reviewer as described above, did not impact the study conclusions. In regards to ALP or TB values at Month 12, there were no patients who were designated as outliers (i.e., by having studentized residual values greater than three), and there was no impact on study conclusions between corrected 30 laboratory values (as presented) and original (i.e., uncorrected) laboratory values. All of the previously presented analyses were re-conducted utilizing a baseline value that was the median of all pre-first dose measurements, and, separately, a traditional baseline definition (both approaches as described above); there was no impact on study conclusions with either approach. Considering the pre-specified step-down/closed sequential testing procedure as previously described, formal hypothesis testing is stopped at this point. Any subsequent inferential statistic reported below should be considered exploratory

TABLE 23

| | Proportion of Patients who Achieved Response | | |
|---|---|---|---|
| Statistics | 10 mg OCA (N = 73) | OCA Titration (N = 70) | Placebo (N = 73) |
| Response at Month 6 - n (%) [1] | 37 (50.7%) | 24 (34.3%) | 5 (6.9%) |
| Corresponding 95% Wald CI | 39.2%, 62.2% | 23.2%, 45.4% | 1.1%, 12.6% |
| Response at Month 12 - n (%) [1] | 34 (46.6%) | 32 (45.7%) | 7 (9.6%) |
| Corresponding 95% Wald CI | 36.5%, 59.4% | 34.0%, 57.4% | 2.8%, 16.3% |
| CMH Test p-value [2] | <0.0001 | <0.0001 | |
| Corresponding Breslow-Day Test p-value | 0.9072 | 0.5045 | |

It can be observed from Table 24 that both OCA treatment arms reduced ALP relative to placebo. It should be noted that the continuous descriptive statistics pertaining to the baseline absolute change from baseline≥12 and percentage change from baseline utilized only the available data at those time points (i.e., no missing data were imputed). The categorical descriptive statistics (i.e., frequencies and corresponding proportions) utilized the worse-case (i.e., non-response) imputation strategy.

Patients from the OCA Titration and OCA 10 mg groups, respectively, achieved an ALP reduction from Baseline 40% compared with 1 (1%) placebo patient. The numbers of patients normalizing ALP values i.e., 118 U/L in females and 124 U/L males are as follows: 1 (1%) patient from OCA titration group, 5 (7%) patients from the OCA 10 mg group, and zero placebo-treated patients.

It can be seen that ALP concentration levels are reduced in both OCA treatment groups, and during the first three months; these reduced levels remain stable during the long-term safety and efficacy (LTSE) period, signifying durability of response.

TABLE 24

| | Total Bilirubin (TB) Summary. | | |
|---|---|---|---|
| Time Point/Statistics | 10 mg OCA (N = 73) | OCA Titration (N = 70) | Placebo (N = 73) |
| Baseline ALP Concentration (U/L) | | | |
| N | 73 | 70 | 73 |
| Mean (SD) | 316.3 (103.88) | 325.9 (116.24) | 327.5 (115.01) |
| Median | 271.3 | 281.3 | 311.9 |
| Min, Max | 207, 620 | 187, 811 | 144, 746 |
| Month 12 ALP Concentration (U/L) | | | |
| N | 63 | 64 | 70 |
| Mean (SD) | 191.2 (61.38) | 219.5 (99.76) | 321.3 (142.88) |
| Median | 181.7 | 196.6 | 270.5 |
| Min, Max | 95, 444 | 116, 690 | 149, 733 |
| Absolute Change from Baseline to Month 12 (U/L) | | | |
| N | 63 | 64 | 70 |
| Mean (SD) | −117.1 (72.84) | −103.5 (87.03) | −7.7 (87.96) |
| Median | −99.0 | −88.5 | −15.8 |
| Min, Max | −346, 0.3 | −402, 127 | −208, 308 |
| Percentage Change from Baseline to Month 12 (%) | | | |
| N | 63 | 64 | 70 |
| Mean (SD) | −36.4 (14.88) | −30.5 (18.97) | −2.5 (23.82) |
| Median | −38.3 | −31.5 | −4.7 |

US 10,751,349 B2

TABLE 24-continued

| | 10 mg OCA (N = 73) | OCA Titration (N = 70) | Placebo (N = 73) |
|---|---|---|---|
| Total Bilirubin (TB) Summary. | | | |
| Time Point/Statistics | | | |
| Min, Max | −72, 0.1 | −74, 23 | −45, 80 |
| Decrease in ALP ≥ 10% at Month 12 - n (%) | 61 (83.6%) | 55 (78.6%) | 29 (39.7%) |
| Decrease in ALP ≥ 15% at Month 12 - n (%) | 57 (78.1%) | 54 (77.1%) | 21 (28.8%) |
| Decrease in ALP ≥ 20% at Month 12 - n (%) | 54 (74.0%) | 49 (70.0%) | 17 (23.3%) |
| Decrease in ALP ≥ 40% at Month 12 - n (%) | 25 (34.3%) | 21 (30.0%) | 1 (1.4%) |
| Baseline ALP Concentration (×ULN) | | | |
| N | 73 | 70 | 73 |
| Mean (SD) | 2.658 (0.878) | 2.747 (0.9851) | 2.760 (0.9732) |
| Median | 2.293 | 2.378 | 2.607 |
| Min, Max | 1.68, 5.23 | 1.58, 6.86 | 1.22, 6.31 |
| Month 12 ALP Concentration (×ULN) | | | |
| N | 63 | 64 | 70 |
| Mean (SD) | 1.606 (0.5161) | 1.851 (0.8449) | 2.705 (1.1987) |
| Median | 1.527 | 1.661 | 2.286 |
| Min, Max | 0.80, 3.75 | 0.98, 5.84 | 1.26, 6.19 |
| ALP < 1.0 × ULN at Month 12 - n (%) | 5 (6.9%) | 1 (1.4%) | 0 |
| ALP < 1.67 × ULN at Month 12 - n (%) | 48 (54.8%) | 33 (47.1%) | 12 (16.4%) |

After completing the treatment period, 193 out of the 216 ITT patients (64 on 10 mg OCA, 63 on OCA Titration, and 66 Placebo patients) continued on open-label OCA treatment during the LTSE period (note: that all placebo patients were switched to OCA 5 mg and then all patients were switched to OCA 10 mg). FIG. **11** presents ALP concentrations over time, organized by originally randomized treatment group.

It can be observed from Table above that reductions from baseline in TB were greater in both OCA treatment groups than in the placebo group. It should be noted that the continuous descriptive statistics pertaining to the baseline, absolute change from baseline and percentage change from baseline values utilized only the available data at those time points (i.e., no missing data was imputed). The categorical descriptive statistics (i.e., frequencies and corresponding proportions) utilized the worse-case imputation strategy. FIG. **12** illustrates TB concentrations over time, organized by originally randomized treatment group for the 193 ITT patients continuing on open-label OCA treatment during the LTSE period.

Dose Titration: A total of 69 of 70 ITT patients from the OCA titration group completed month 6. Of these, 36 (52%) remained at 5 mg for the duration of the treatment period and 33 (48%) who did not meet the primary composite endpoint at Month 6, but, because they tolerated the investigational product, were titrated to 10 mg. Thirteen (39%) of the patients who up-titrated met the composite endpoint suggesting that a benefit can be gained with titration of OCA from 5 mg to 10 mg in those patients who did not respond to the 5 mg dose.

Because for some patients, a response can be achieved with OCA 5 mg, initiating treatment on OCA 5 mg and titrating subsequently to 10 mg if needed and if tolerated

appears to be a reasonable dosing strategy. For patients who do not achieve an optimal response within 6 months of treatment with OCA 5 mg, additional benefit may be gained by titrating to OCA 10 mg.

Effect of Bile Acid Sequestrants (BAS) Exposure on Efficacy. For patients receiving BAS, OCA 5 mg and 10 mg trough concentrations were slightly lower compared to those patients who did not receive BAS. The decreased trough concentrations resulted in a modest attenuation in efficacy in patients receiving OCA 5 mg (despite instruction to dose BS at least 4 hours apart from OCA), but did not appear to affect efficacy in patients receiving OCA 10 mg.

ALP and total bilirubin, were evaluated in relation to age at baseline, age at time of diagnosis, and years since diagnosis. The effect of OCA was consistent independent of age at diagnosis, duration of PBC, or years since diagnosis. In general, the subgroups were consistent with the observed effect in the overall ITT population. Greater improvements were observed in OCA-treated subjects, compared with placebo subjects.

It can be observed from Table 25 that both OCA treatment groups showed a difference in the proportion/percentage of patients achieving response when individually compared to placebo. This analysis was repeated utilizing the Completer and EE analysis sets and the conclusions were consistent. The ultra-worse-case imputation strategy, implemented by the FDA statistical reviewer as described above, did not impact the results. All of the previously presented analyses were re-conducted utilizing a baseline value that was the median of all pre-first dose measurements, and, separately, a traditional baseline definition (both approaches as described above); there was no impact on the results with either approach.

US 10,751,349 B2

**109**        **110**

TABLE 25

| Proportion of Patients who Achieved Response | | | |
|---|---|---|---|
| Statistics | 10 mg OCA (N = 60) | OCA Titration (N = 60) | Placebo (N = 61) |
| Response at Month 6 - n (%) [1] | 25 (41.7%) | 21 (35.0%) | 1 (1.6%) |
| Corresponding 95% Wald CI | 29.2%, 54.1% | 22.9%, 47.1% | 0.0%, 4.8% |
| Baseline ALP ≥ 2.0 × ULN - n (%) | 42 (70.0%) | 47 (78.3%) | 46 (75.4%) |
| ALP < 2.0 × ULN at Month 6 - n (%) [2] | 30 (71.4%) | 24 (51.1%) | 8 (17.4%) |
| Decrease in ALP ≥ 40% at Month 6 - n (%) [2] | 10 (23.8%) | 13 (27.7%) | 0 |
| ALP < 2.0 × ULN and Decrease ≥ 40% at Month 6 - n (%) [2] | 9 (21.4%) | 11 (23.4%) | 0 |
| Baseline ALP ≥ 1.67 × ULN but < 2.0 × ULN - n (%) | 18 (30.0%) | 13 (21.7%) | 15 (24.6%) |
| ALP < 1.67 × ULN at Month 6 - n (%) [3] | 17 (94.4%) | 10 (76.9%) | 3 (20.0%) |
| Decrease in ALP ≥ 15% at Month 6 - n (%) [3] | 16 (88.9%) | 11 (84.6%) | 1 (6.7%) |
| ALP < 1.67 × ULN and Decrease ≥ 15% at Month 6 - n (%) [3] | 16 (88.9%) | 10 (76.9%) | 1 (6.7%) |
| Response at Month 12 - n (%) [1] | 26 (43.3%) | 23 (38.3%) | 3 (4.9%) |
| Corresponding 95% Wald CI | 30.8%, 55.9% | 26.0%, 50.6% | 0.0%, 10.3% |
| Baseline ALP ≥ 2.0 × ULN - n (%) | 42 (70.0%) | 47 (78.3%) | 46 (75.4%) |
| ALP < 2.0 × ULN at Month 12 - n (%) [2] | 29 (69.1%) | 28 (59.6%) | 9 (19.6%) |
| Decrease in ALP ≥ 40% at Month 12 - n (%) [2] | 13 (31.0%) | 16 (34.0%) | 1 (2.2%) |
| ALP < 2.0 × ULN and Decrease ≥ 40% at Month 12 - n (%) [2] | 12 (28.6%) | 13 (27.7%) | 1 (2.2%) |
| Baseline ALP ≥ 1.67 × ULN but < 2.0 × ULN - n (%) | 18 (30.0%) | 13 (21.7%) | 15 (24.6%) |
| ALP < 1.67 × ULN at Month 12 - n (%) [3] | 16 (88.9%) | 11 (84.6%) | 6 (40.0%) |
| Decrease in ALP ≥ 15% at Month 12 - n (%) [3] | 14 (77.8%) | 10 (76.9%) | 2 (13.3%) |
| ALP < 1.67 × ULN and Decrease ≥ 15% at Month 12 - n (%) [3] | 14 (77.8%) | 10 (76.9%) | 2 (13.3%) |

Treatment with OCA (10 mg) in a cohort of subjects with early stage PBC who were enrolled with incomplete biochemical response to UDCA resulted in statistically significant improvement from baseline in alkaline phosphatase for the pre-specified endpoint of reduction of ALP to <1.67× ULN and 15%, relative to placebo. The percentage of patients achieving response was statistically significantly different than placebo [34 of 73 (46.6%) in the OCA 10 mg arm, 32 of 70 (45.7%) in the titration arm and 7 of 73 (9.6%) in the placebo arm]. The effect of OCA on achieving a reduction in ALP was independent of age at diagnosis, duration of PBC, and baseline ALP.

Secondary analysis showed that patients from the OCA Titration and OCA 10 mg groups achieved an ALP reduction from Baseline≥40% compared with 1 (1%) placebo patient. The numbers of patients normalizing ALP values i.e., 118 U/L in females and 124 U/L males are as follows: 1 (1%) patient from OCA titration group, 5 (7%) patients from the OCA 10 mg group, and zero placebo-treated patients.

Example 10

This example describes clinical pharmacology and dosing of obeticholic acid (OCA—including obeticholic acid compositions described herein). The starting dosage of OCA is 5 mg orally once daily in adult patients who have failed to achieve an adequate reduction in alkaline phosphatase on a stable dose of UDCA for an adequate duration or who were intolerant to UDCA. OCA can be supplied as an oral tablet containing obeticholic acid in a formulation as described herein.

If an adequate reduction in alkaline phosphatase has not been achieved after 3 months of OCA 5 mg once daily, and the patient is tolerating the drug, the dose of OCA can be increased to 10 mg once daily.

For patients experiencing intolerability due to pruritus, one of the following modifications was considered:

Reduce the dosage to:
    5 mg every other day, for patients intolerant to 5 mg once daily or
    5 mg once daily, for patients intolerant to 10 mg once daily

Alternative dosing schedules, such as dosing every other day, every third day or every seventh day.

Interruption of dosing for up to 2 weeks followed by restarting at a reduced dose or on an alternative dosing schedule.

hepatic decompensation.

Addition of an antihistamine or a bile acid sequestrants. OCA may be taken with or without food. Food does not have a clinically relevant effect on the PK of 10 mg OCA.

Bile acid binding resins may be taken at least 4 hours before or 4 hours after (or at as great an interval as possible) OCA. Bile acid binding resins such as cholestyramine, colestipol, or colesevelam affect bile acid absorption and may reduce the absorption, systemic exposure, and efficacy of OCA.

No dose adjustment is believed to beneeded when OCA is used in patients with serum creatinine clearance>50 mL/min/1.73 m². No data are available as to how severe impairment would impact the systemic exposure to OCA and its conjugates.

Dose adjustment may be needed in patients with hepatic impairment. Dose adjustment may not be needed in patients with mild hepatic impairment (Child-Pugh Class A). In some examples, the starting dosage is 5 mg once weekly for patients with moderate or severe hepatic impairment (Child-Pugh Class B or C). If an adequate reduction in alkaline phosphatase has not been achieved after 3 months of OCA 5 mg once weekly, and the patient is tolerating the drug, the OCA dose should be increased to 5 mg twice weekly and then to 5 mg every day depending on response and tolerability.

Obeticholic acid is absorbed with peak plasma concentrations (Cmax) occurring at a median time (tmax) of approximately 2 hours. Co-administration with food does not alter the extent of absorption of obeticholic acid. Following multiple-dose administration of 5, 10, and 25 mg once daily for 14 days, systemic exposures of obeticholic acid increase dose proportionally. Exposures to glyco-obeticholic acid and tauro-obeticholic acid, and total obeticholic acid increase more than proportionally with dose.

Following multiple oral doses of OCA 10 mg once daily, peak plasma concentrations (Cmax) of OCA occurring at a

US 10,751,349 B2

<table>
<tr><td>111</td><td>112</td></tr>
</table>

median time (Tmax) of approximately 1.5 hours. Median Tmax for glyco-OCA and tauro-OCA is 10 hours.

Distribution. Human plasma protein binding of obeticholic acid and its conjugates is greater than 99%. The volume of distribution of OCA is 613L. The volume of distributions of glycol- and tauro-obeticholic acid has not been determined.

Elimination and Metabolism. Obeticholic acid is conjugated with glycine or taurine in the liver and secreted into bile. These glycine and taurine conjugates of obeticholic acid are absorbed in the small intestine leading to enterohepatic recirculation. The conjugates can be deconjugated in the ileum and colon by intestinal microbiota, leading to the conversion to obeticholic acid that can be reabsorbed or excreted in feces, the principal route of elimination.

After daily administration of obeticholic acid, there is accumulation of the glycine and taurine conjugates of obeticholic acid which have in vitro pharmacological activities similar to the parent drug, obeticholic acid. The metabolite-to-parent ratios of the glycine and taurine conjugates of obeticholic acid were 13.8 and 12.3, respectively, after daily administration. An additional third obeticholic acid metabolite, 3-glucuronide is formed but is considered to have minimal pharmacologic activity.

Excretion. After administration of radiolabeled obeticholic acid, greater than 85% is excreted in feces. Urinary excretion is less than 3%.

The proposed human metabolic pathways are shown in FIG. 13.

Following an oral administration of 25 mg [$^{14}$C]-OCA, about 87% of the dose is excreted in feces through biliary secretion. Less than 3% of the dose is excreted in the urine with no detection of OCA.

The effective half-life of OCA is about 24 hours.

Gender, age, and race had no impact on the pharmacokinetics of OCA based on the population-PK analysis. Population PK analysis dataset consisted of 301 female and 505 male subjects, age ranging from 18 to 71 years and had 10 Asian, 233 Black, 554 White and 9 Other subjects.

In vitro studies: Obeticholic acid is not an inhibitor of CYP2C8 and did not cause a significant change in the expression of CYP2B6, CYP2C8, CYP2D6, MRP2, MRP3, MRP4, MATE1, and OATP2B1. Obeticholic acid showed either no or weak effects on these metabolizing enzymes and transporters.

Concomitant administration of 20 mg omeprazole once daily with obeticholic acid 10 mg once daily resulted in a less than 1.2-fold increase in obeticholic acid exposure.

Treatment with obeticholic acid 10 mg or obeticholic acid titration (5 mg to 10 mg) resulted in clinically meaningful and statistically significant increases (p<0.0001) relative to placebo, in the number of patients achieving the primary composite endpoint at all study time points (see Table 26). Responses occurred as early as 2 weeks and were dose dependent (obeticholic acid 5 mg compared with obeticholic acid 10 mg at 6 months, p=0.04).

TABLE 26

Percentage of Patients Achieving Response.$^A$

| | Obeticholic acid ± UDCA $^B$ | | |
|---|---|---|---|
| | Obeticholic acid Titration $^C$ (N = 70) | Obeticholic acid 10 mg (N = 73) | Placebo ± UDCA $^B$ (N = 73) |
| Month 6 | | | |
| Dose Responders, n (%) | 5 mg 24 (34) | 10 mg 37 (51) | 5 (7) |
| p-value $^D$ | <0.0001 | <0.0001 | NA |
| Month 12 | | | |
| Dose Responders, n (%) | 5 mg or 10 mg 32 (46) | 10 mg 34 (47) | 7 (10) |
| p-value $^D$ | <0.0001 | <0.0001 | NA |

NA = not applicable
$^A$ Percentage of Subjects Achieving an ALP less than 1.67 × ULN and Total Bilirubin less than or equal to the ULN and an ALP decrease of 15% or greater. Missing values were considered a non-response.
$^B$ The majority of patients received treatment in combination with UDCA and a small number of patients unable to tolerate UDCA received obeticholic acid as monotherapy.
$^C$ Subjects randomized to obeticholic acid titration received obeticholic acid 5 mg for the initial 6-month period. At Month 6, patients who did not achieve the composite endpoint and did not have evidence of tolerability issues were titrated from 5 mg to 10 mg for the final 6 months of the double-blind phase.
$^D$ p-values for comparing obeticholic acid versus placebo are obtained using CMH General Association test stratified by double-blind Baseline UDCA usage (yes/no) and double-blind Baseline total bilirubin (less than or equal to the ULN/greater than the ULN).

In one example, 77% of patients on both titration and 10 mg obeticholic acid achieved a reduction of at least 15% in ALP at 12 months compared to 29% of patients on placebo (see FIG. 14A, FIG. 14B, FIG. 14C). In addition, 36% of patients treated with placebo experienced an increase in ALP associated with worsening of disease compared to 5% of patients on titration obeticholic acid and 2% on 10 mg obeticholic acid.

Treatment with obeticholic acid also resulted in clinically meaningful and statistically significant improvements versus placebo (p<0.0001) in ALP levels as early as 2 weeks and at all timepoints thereafter (see FIG. 15A, FIG. 15B). During the double-blind, 12 month period, bilirubin levels increased in the placebo patients and remained stable in patients taking obeticholic acid.

Patients randomized to the obeticholic acid titration group received obeticholic acid 5 mg for the initial 6-month period. At Month 6, patients who did not yet meet the criteria for the composite endpoint and did not have evidence of tolerability issues were titrated from obeticholic acid 5 mg to obeticholic acid 10 mg for the final 6 months of the double-blind phase. SE=standard error.

The above dosing regimen including a 5 mg QD starting dose, followed by up-titration to 10 mg QD at 3 months was based on response and tolerability for the overall population. Based on the dose dependent increase in incidences of pruritus and better tolerability profile with time with a lower starting dose, 5 mg QD (once daily) is an effective starting dose for the general population.

The increase in dose from 5 mg to 10 mg QD resulted in additional responders from month 6 to month 12. There were also 19% patients (out of patients on 5 mg QD dosing) who were responders (as per the primary composite endpoint criteria), but became non-responders, possibly due to disease progression, with continued dosing of 5 mg QD. These patients also benefit from up-titration to 10 mg QD.

In the dedicated hepatic impairment study with a single dose of 10 mg, the systemic exposure (AUCO-9 days) to total OCA was 1.1-, 4.2-, and 17.3-fold in subjects with

US 10,751,349 B2

113

114

mild, moderate and severe hepatic impairment, respectively, when compared to normal healthy volunteers. The mean total OCA concentration-time profiles in this study are shown in FIG. 16 and the mean PK parameters (Cmax and AUCt) for total OCA in plasma for normal healthy volunteers and subjects with various categories of hepatic impairment are quantified in Table 27.

TABLE 27

Mean (SD) PK parameters of plasma total OCA.

| Parameters | Normal Hepatic Function (N = 8) | Mild (N = 8) | Moderate (N = 8) | Severe (N = 8) |
|---|---|---|---|---|
| Cmax (ng/mL) | 68.3 (27.6) | 107 (65.1) | 348 (377) | 674 (281) |
| AUC0-t (hr*ng/mL) | 2480 (1810) | 2770 (2060) | 15700 (19100) | 41000 (21900) |

There was no apparent association of change of unbound free fraction percentage (% Fu) of OCA and tauro-OCA with the increased degree of hepatic impairment. Mean % Fu of glyco-OCA increased in patients with severe hepatic impairment.

Example 11

Obeticholic acid (OCA) is a farnesoid X receptor (FXR) agonist and as shown, inter alia, useful for the treatment of primary biliary cholangitis/cirrhosis (PBC), nonalcoholic steatohepatitis (NASH), and other liver diseases. OCA is the $6\alpha$-ethyl derivative of chenodeoxycholic acid (CDCA). Patients with cirrhosis have systemic bile acid exposure higher than those in healthy subjects (×18) while hepatic bile acid exposure is only~2× higher. Thus systemic OCA exposure may not be reflective of OCA concentrations in the liver or intestine, the primary sites of action.

Plasma levels of OCA and its conjugates were measured in healthy subjects and cirrhotic patients with varying degrees of hepatic impairment. A physiologic pharmacokinetic model for OCA was developed to quantitatively describe the absorption, distribution, metabolism, and excretion of OCA in patients with and without hepatic impairment. The model was based on a published multi-compartment PK model for CDCA, and consisted of systemic, hepatobiliary, and intestinal systems. The model was used to simulate the pathophysiological abnormalities caused by cirrhosis including decreased hepatic uptake, portal-systemic shunting, decreased liver volume, and differences in amino acid conjugation.

There was good agreement between predicted and observed increases in systemic OCA exposure after a single 10 mg dose in subjects with mild (×1.4), moderate (×8), and severe (×13) hepatic impairment relative to healthy subjects. The predicted increases in liver exposure for subjects with mild, moderate, and severe hepatic impairment were increased only 1.1-, 1.5-, and 1.7-fold, relative to healthy participants. Hepatic exposure of OCA, the primary site of pharmacological activity, is increased marginally (~2-fold) in patients with cirrhosis.

Bile acids are the natural endogenous ligand for the farnesoid X receptor (FXR) which is a nuclear receptor with high expression levels in the liver and intestine. Nuclear receptors constitute a family of ligand-activated transcription factors which can either activate or repress target genes, including those involved in bile acid homeostasis. FXR activation appears to lead to decreased bile acid synthesis via CYP7A1 suppression, decreased conjugated bile acid uptake, and increased excretion from the hepatocytes via induction of transporters. Obeticholic acid (OCA, 6-ethyl chenodeoxycholic acid) is a FXR agonist. OCA is a modification of chenodeoxycholic acid (CDCA), the most potent endogenous agonist of FXR and differs from CDCA by the addition of an ethyl group at the 6 carbon position. The addition of this ethyl group to CDCA confers approximately 100-fold greater potency compared to CDCA.

PBC is a rare chronic autoimmune disease characterized by T-cell mediated destruction of the intrahepatic bile ducts, decreased bile secretion, bile acid retention in the liver, inflammation, fibrosis, cirrhosis, and liver failure, followed by either liver transplantation or death. NASH is a chronic liver disease often associated with type 2 diabetes or metabolic syndrome which is defined by presence of hepatic steatosis, inflammation, and cytological ballooning with eventual varying degrees of fibrosis and possible cirrhosis leading to liver transplantation, hepatocellular carcinoma or death. In general, chronic injury to the liver can lead to the formation of regenerative nodules and fibrous bands in the liver that form after an extended process of fibrosis. Cirrhosis causes the interface between the sinusoids and the hepatocytes to fill with fibrotic tissue leading to increased resistance to hepatic blood flow causing portal hypertension and its associated complications. Previous reports have shown that patients with cirrhosis have systemic bile acid exposure markedly higher than those in healthy subjects (18-fold higher) while hepatic bile acid exposure was only~2-fold higher.

There are 4 primary mechanisms of hepatic impairment that are related to the pharmacokinetics of endogenous bile acids and OCA: reduced hepatic uptake (caused in part by capillarization of the sinusoids), portal systemic shunting (both hepatic and extrahepatic), decreased functional liver volume, and increased taurine conjugation. Mild liver disease may be associated with little or no change in the hepatic uptake of bile acids but severe cirrhosis and/or jaundice causes large decreases in the extraction ratio that affects all bile acids similarly. Healthy control subjects have hepatic uptakes of bile acids of at least 70%. In contrast, values in cirrhotic patients were reduced over a wide range of values with some less than 10%.

Portosystemic shunting appears to occur secondary to the development of portal hypertension. With ongoing liver injury, resultant fibrogenesis and the occurrence of nodular regeneration, intrahepatic resistance increases. When coupled with increased splanchnic blood flow into the liver that occurs as a result of splanchnic vasodilation in cirrhotics, portal pressures can become elevated and blood is shunted through collateral vessels, away from the liver. Portosystemic shunting can occur via either diversion of blood through newly developed veins or via anastomoses ("shunts") formed between existing portal and hepatic veins and is associated with higher systemic bile acid concentra-

US 10,751,349 B2

115

tions. Relative to normal controls, the portal blood flow was 91%, 64%, and 55% for Child-Pugh scores-A, -B, and -C, respectively. In response to the decreased portal blood flow to the liver, the hepatic arterial blood flow increased by 41%, 63%, and 92% for Child Pugh-A, —B, and —C, relative to normal controls. This increase in arterial blood flow in response to decreased portal blood flow is termed hepatic arterial buffer response and allows for relatively constant blood flow to the liver regardless of portosystemic shunting. The SimCYP library for cirrhotic subjects uses a decrease of 89%, 71%, and 61% in functional liver size relative to control subjects in subjects with Child-Pugh Score-A, -B, and -C, respectively, based on meta-analyses (SimCYP simulator Version 11; Simcyp Limited, Sheffield, UK).

Bile acids are metabolized in the liver, primarily by conjugation (N-acylamidation) to the amino acids glycine or taurine. In healthy humans, a normal adult ratio of glycine to taurine bile acid conjugation ("G/T ratio") is 3:1 with a range of 1:1 to 5:1. Dietary intake of taurine increases the proportion of bile acids conjugated with taurine. In contrast, oral ingestion of glycine does not change the G/T ratio. The G/T ratio in healthy and disease states appears to be governed by the liver as opposed to intestinal control via preferential deconjugation of glycine conjugated bile acids by bacteria or preferential conjugate uptake into the enterocytes. It has been reported in the literature that the G/T ratio is decreased in patients with cirrhosis.

A physiologic pharmacokinetic model exists describing the metabolism and enterohepatic circulation of CDCA. The CDCA model included 9 spaces based on anatomical and physiological considerations (systemic circulation, portal circulation, sinusoidal circulation, liver, bile duct, gallbladder, duodenum-jejunum, ileum, and colon) with each space possessing a compartment of either CDCA, glycine-conjugated CDCA (glyco-CDCA), or taurine-conjugated CDCA (tauro-CDCA). The model included transfer coefficients describing fluid flow, biotransformation of chemical entities, and transport across membranes.

Without being bound by any particular theory, due to the similar structure of CDCA, OCA was considered to have comparable pharmacokinetic properties when compared to CDCA. This examples describes development of a physiologic PK model to quantitatively describe the absorption, distribution, metabolism, and excretion of OCA. In addition, the model was used to define the effect of hepatic impairment to predict the systemic and liver exposure to OCA in subjects with various degrees of liver impairment relative to healthy subjects with normal liver function. The model was developed based on 3 studies in healthy volunteers and 2 studies in patients with varying degrees of hepatic impairment (N=399).

All participants in each of the studies were over 18 years of age and provided informed consent for willing participation. The studies were conducted in accordance with the Declaration of Helsinki (Seoul 2008 Revision) and adhered to guidelines for Good Clinical Practices and were approved by all relevant ethics committees.

Data from was used to develop the model in healthy subjects (n=160) and then adjust for hepatic impairment (n=32) using the data from the above Examples. After development, the model was validated with data sourced from healthy subjects and cirrhotic patients.

The data used in model development included subject identifiers, time of dosing and sample collection, plasma drug concentrations (OCA, glyco-OCA, and tauro-OCA), dose amount, disease status (e.g., Child-Pugh score), and meal consumption information. Study participants received

116

standardized meals at specified times during inpatient observation. Gallbladder contraction was assumed to last 90 minutes after the start of a meal. Drug concentrations below the limit of quantification (BLQ) were imputed to half of the lower limit of quantification (LLOQ). Observed and BLQ concentrations of OCA, glyco-OCA, and tauro-OCA associated with samples drawn prior to the first dose were excluded from the analyses. As the glyco- and tauro-conjugates are nearly equipotent relative to OCA on FXR, total OCA concentrations were calculated as the sum of OCA, glyco-OCA, and tauro-OCA.

Concentrations of OCA (420.6 g/mol), glyco-OCA (477.7 g/mol), and tauro-OCA (527.8 g/mol) were measured from human plasma samples using high performance liquid chromatography tandem mass spectrometry (LC-MS/MS) (Shimadzu 10AVP HPLC System, Kyoto, Japan; AB MDX Sciex API-4000 LC-MS/MS System, Framingham, Mass.). The LLOQ for OCA, glyco-OCA, and tauro-OCA was 0.594 nM, 0.523 nM, and 0.474 nM, respectively.

The PK model developed for CDCA used 27 compartments consisting of 9 spaces with anatomical and physiological considerations, each requiring three compartments to accommodate CDCA, glyco-CDCA, and tauro-CDCA. Division of each space into 3 compartments was necessary because while flow rates (e.g., blood flow) were independent of chemical structure, biotransformation rates (e.g., conjugation and deconjugation) and transport rates (e.g., hepatic uptake) differed based on chemical structure. Values for the physiologic compartment volumes and transfer rates used in the model were obtained from the literature. To construct the PK model for OCA, the physiologic PK model for CDCA was structurally modified to accurately reflect the interaction of human physiology and OCA.

A number of structural modifications were made to the base CDCA model in order to adapt it for use with OCA. For simplification, a single space was used to represent the gut (small and large intestines). Since OCA is an exogenous molecule, it was assumed that there was no endogenous synthesis and an absorption compartment with a first-order transfer coefficient ($K_a$) was included to represent the administration and absorption kinetics of an oral OCA dose. Based on steric hindrance by the 6-ethyl group of OCA, no bacterial 7-alpha dehydroxylation biotransformation activity (i.e., CDCA to lithocholic acid) was included in the model. Compartment volumes in the model were fixed to physiological values from the base CDCA model. The OCA model used the physiological flow values for blood, bile and gastrointestinal transit from the original physiologic PK model for CDCA, with the exception of flows from bile duct to gallbladder and from bile duct to gut. The physiological values from the base model led to poor predictions and may not be applicable due to the simplification of the enteral system into a unified gut compartment. The biotransformation and transport rates in the model, being dependent on chemical entity structure, were estimated by fitting the model to the plasma concentration time profiles of OCA, glyco-OCA, and tauro-OCA.

The PK model was first developed using the OCA, glyco-OCA, and tauro-OCA plasma concentration time profiles from healthy volunteers with normal hepatic function. Model parameter estimates related to healthy physiology were then held constant while the PK model was further developed using OCA, glyco-OCA, and tauro-OCA plasma concentration time profiles from patients with hepatic impairment (Child-Pugh scores A, B, and C). Only parameters specific to hepatic impairment were estimated during this process.

US 10,751,349 B2

117

Four mechanisms of hepatic impairment were incorporated into the OCA PK model and included (1) reduction of hepatic uptake, (2) portal systemic shunting, (3) decreased functional volume, and (4) preferential conjugation to taurine. These parameters were incorporated in the model in a manner allowing the parameter estimates in subjects with mild, moderate, and severe hepatic impairment to progressively deviate relative to the parameter values estimated in healthy volunteers. These deviations for the portal systemic shunting and decreased functional liver volume mechanisms used physiological values from the Simcyp library for cirrhotic subjects (SimCYP simulator Version 11; Simcyp Limited, Sheffield, UK). The deviations for the reduced hepatic uptake and change in OCA conjugation mechanisms were estimated based on fitting of the plasma drug concentration time profiles from subjects with hepatic impairment. Table 28 lists the model parameters and coding modifications associated with the four mechanisms of hepatic impairment.

TABLE 28

Model Parameters and Coding Modification associated with mechanism of Hepatic Impairment.

| Anatomical/ Physiological Change | Equations |
| --- | --- |
| Decreased hepatic uptake | $t_{10\text{-}Mild} = t_{10}$ *exp(Effect in Mild hepatic impairment in hepatic uptake of OCA and conjugates) $t_{10\text{-}Moderate} = t_{10}$ *exp(Effect in Moderate hepatic impairment in hepatic uptake of OCA and conjugates) $t_{10\text{-}Severe} = t_{10}$ *exp(Effect in Severe hepatic impairment in hepatic uptake of OCA and conjugates) |
| Portal-systemic shunting/ Arterial buffer response | $f_{4\text{-}Mild} = f_4$*1.408 for mild hepatic impairment $f_{4\text{-}Moderate} = f_4$*1.625 for moderate hepatic impairment $f_{4\text{-}Severe} = f_4$*1.915 for severe hepatic impairment $f_{8\text{-}Mild} = f_8$*0.91 for mild hepatic impairment $f_{8\text{-}Moderate} = f_8$*0.635 for moderate hepatic impairment $f_{8\text{-}Severe} = f_8$*0.554 for severe hepatic impairment |
| Decreased functional/ anatomical liver volume | $V_{liver\text{-}Mild} = V_{liver\text{-}healthy}$*0.891 for mild hepatic impairment $V_{liver\text{-}Moderate} = V_{liver\text{-}healthy}$*0.71 for moderate hepatic impairment $V_{liver\text{-}Severe} = V_{liver\text{-}healthy}$*0.61 for severe hepatic impairment |
| Changes in metabolism/ conjugation | $b_{16\text{-}Mild} = b_{16}$* exp(Effect of Mild hepatic impairment on OCA tauro-conjugation) for mild hepatic impairment $b_{16\text{-}Moderate} = b_{16}$* exp(Effect of Moderate hepatic impairment on OCA tauro-conjugation) for moderate hepatic impairment $b_{16\text{-}Severe} = tb_{16}$* exp(Effect of Severe hepatic impairment on OCA tauro-conjugation) for severe hepatic impairment |

For the portal systemic shunting mechanism, the coefficient for portal to sinusoidal flow was progressively decreased as hepatic impairment worsened and was matched by a progressive increase in flow from the portal to systemic circulation of equal magnitude. The latter flow does not occur in healthy individuals. To compensate for reduced blood flow to the liver, the coefficient for hepatic arterial flow from the systemic circulation to the sinusoids was progressively increased with worsening hepatic impairment (i.e., hepatic arterial buffer response).

The biotransformation coefficient for conjugation of taurine to OCA was allowed to change for mild, moderate, and severe hepatic impairment relative to the coefficient in healthy subjects while the coefficient for conjugation to glycine was fixed at the value for healthy individuals.

118

The OCA physiologic PK model used a population PK approach and consisted of a description of the relationships between plasma drug concentrations and time as well as components for between subject and residual variability. Between subject variability (BSV) was modeled assuming a log-normal distribution as follows:

$$\theta_{in} = \theta_{TVn} \exp(\eta_{in})$$

$$(\eta_1 \ldots \eta_m) \sim MVN(0, \Omega)$$

Where $\theta T_{Vn}$ is the population typical value for the $n^{th}$ PK parameter (e.g., clearance) and $\eta_{in}$ (ETA) is the random BSV on the $n^{th}$ parameter for subject i that jointly follow a multivariate normal distribution (MVN) with a mean of zero and variance of $\Omega$. The BSV model assumes that PK parameters are log-normally distributed. Due to the high level of model complexity, BSV was only incorporated on $K_a$ and the flow rate from gallbladder to gut, both parameters that analysis showed had substantial impact on the plasma concentration time profiles. Residual variability was assumed to have additive and proportional components:

$$y_{ij} = \hat{y}_{ij} \times (1 + \varepsilon_{1ij}) + \varepsilon_{2ij}$$

Where $y_{ij}$ and $\hat{y}_{ij}$ represent the $j^{th}$ observed and predicted plasma drug concentration for the $i^{th}$ subject and E is the random residual variability. Each E is normally distributed with a mean of zero and a variance of $\sigma^2$. Distinct residual variability components were estimated for OCA, glyco-OCA, and tauro-OCA.

Model development was guided by feedback from various diagnostic plots including: observed OCA, glyco-OCA, and tauro-OCA versus population prediction (PRED) or individual prediction (IPRED) with a line of unity and trend line, conditional weighted residuals (CWRES) of OCA, glyco-OCA, and tauro-OCA versus PRED or time, and prediction-corrected visual predictive checks (pcVPC; 200 iterations).

A simulation with 200 replicates was performed based on subjects in the phase 1 hepatic impairment study using the OCA physiologic PK model. Dosing and meal consumption history were used to simulate rich 0 to 216 hour concentration-time profiles of OCA, glyco-OCA, and tauro-OCA. Total OCA was calculated for each observation by summing the molar-based concentrations for OCA, glyco-OCA, and tauro-OCA. Total OCA concentrations from the systemic circulation and liver were subjected to non-compartmental analysis to calculate Cmax and $AUC_{(0-216h)}$.

Phoenix® NLME™ software version 1.3 (Certara Inc., Princeton, N.J.) was used for the physiologic population PK analysis and simulations with Lindstrom-Bates First-order Conditional Estimation (FOCE-LB). Analysis datasets, visualizations, and exploratory analyses were created using R software version 3.1 (The R Foundation) and SAS version 9.4 (SAS Institute Inc., Cary, N.C.). GraphPad Prism software version 6.07 (Graphpad Software Inc., La Jolla, Calif.) was used for the generation of some graphical analyses.

The OCA physiologic PK model was initially developed using 8248 plasma sample concentrations of OCA, glyco-OCA, and tauro-OCA from 160 healthy volunteers administered 10 mg OCA in a cross-over design. Each subject contributed PK samples from both study periods. The healthy volunteer pool had normal hepatic function, was primarily male (59%), mean (SD) age was 37.0 (9.8) years, and mean (SD) weight was 76.4 (11.8) kg. Volunteers were 65.6% white, 32.5% black, 0.6% Asian, and 1.3% other. The percentage of BLQ samples with imputed concentrations was 38.2%, 9.4%, and 24.4% for OCA, glyco-OCA, and tauro-OCA, respectively.

US 10,751,349 B2

119
120

The healthy PK model contained a total of 22 parameters: 7 flow parameters, 4 biotransformation parameters, and 11 transport parameters (Table 29). Many of these were expected to have values specific to exogenous OCA (e.g., hepatic uptake) or did not exist in the base model (e.g., $K_a$ or $K_{out}$) and thus required estimation. Most of the flow parameters were fixed to physiological values from the literature with the exception of bile duct to gallbladder and from bile duct to gut. All structural parameters (Table 29) were well estimated (≤5.5% CV). The BSV for flow from bile duct to gallbladder was 78.1% (19.3% CV) and for the oral absorption of OCA was 195% (2.21% CV). The additive portion of residual variability was ≤1 nM (15-50% CV) and the proportional portion ranged from 72% to 88% (30-70% CV) for OCA and its conjugates. The pcVPC results shown in FIG. 25A, FIG. 25B, FIG. 25C, and FIG. 25D and the goodness of fit plots shown in FIGS. 18A-18F and FIGS. 19A-19F indicate acceptable model performance.

TABLE 29

Model Parameters in Normal Hepatic Function

| Parameter | Parameter Description | Estimate | CV % | BSV (RSE %) |
|---|---|---|---|---|
| $f_4$ (L/h) | Hepatic arterial flow | 14.4 | Fixed | NA |
| $f_3$ (L/h) | Hepatic portal flow | 39.6 | Fixed | |
| $t_{10}$ (h⁻¹) | OCA transport rate from liver to sinusoidal space | 1698 | 1.0 | |
| $t_9$ (h⁻¹) | Glyco-OCA transport rate from sinusoidal space to liver | 1210 | 2.0 | |
| $t_{11}$ (h⁻¹) | Tauro-OCA transport rate from sinusoidal space to liver | 1615 | 1.9 | |
| $t_{13}$ (h⁻¹) | OCA transport rate from sinusoidal space to liver | 1.62 | Fixed | |
| $t_{12}$ (h⁻¹) | Glyco-OCA and tauro-OCA transport rate from liver to sinusoidal space | 1.62 | Fixed | |
| $f_{24}$ (L/h) | Flow from bile duct to gut | 7.29 | 4.5 | |
| $f_{22}$ (L/h) | Flow from bile duct to gallbladder | 0.856 | 4.4 | 78.1% (19.3) |
| $f_{23}$ (h⁻¹) | Rate of output from gallbladder to gut | 1.2 | Fixed | NA |
| $k_{out}$ (L/h) | Rate of fecal elimination of OCA | 0.612 | 5.5 | |
| $b_{15}$ (h⁻¹) | OCA rate of conjugation with glycine | 1.44 | 4.5 | |
| $b_{16}$ (h⁻¹) | OCA rate of conjugation with taurine | 0.312 | 1.9 | |
| $b_{36}$ (h⁻¹) | Glyco-OCA rate of deconjugation to OCA | 0.0431 | 4.5 | |
| $b_{37}$ (h⁻¹) | Tauro-OCA rate of deconjugation to OCA | 0.0200 | 1.8 | |
| $t_{34}$ (h⁻¹) | OCA rate of absorption from gut to portal space | 0.857 | 3.4 | |
| $t_{33}$ (h⁻¹) | Glyco-OCA rate of absorption from gut to portal space | 0.904 | 1.1 | |
| $t_{35}$ (h⁻¹) | Tauro-OCA rate of absorption from gut to portal space | 1.62 | 2.2 | |
| $K_a$ (h⁻¹) | OCA first order rate constant of oral absorption | 5.32 | 1.0 | 195% (2.21) |
| $t_{19}$ (h⁻¹) | Glyco-OCA transport rate from liver to bile duct | 7.44 | 0.7 | NA |
| $t_{21}$ (h⁻¹) | Tauro-OCA transport rate from liver to bile duct | 9.28 | 1.0 | |
| | Proportional Error OCA (%) | 88.0 | 33.9 | NA |
| | Proportional Error Glyco-OCA (%) | 62.6 | 32.7 | |
| | Proportional Error Tauro-OCA (%) | 71.6 | 70.4 | |
| | Additive Error OCA (nM) | 0.546 | 16.5 | |
| | Additive Error Glyco-OCA (nM) | 0.675 | 21.8 | |
| | Additive Error Tauro-OCA (nM) | 0.469 | 50.3 | |

Development of the PK model for the physiological changes associated with hepatic impairment used 928 plasma sample concentrations of OCA, glyco-OCA, and tauro-OCA from 32 subjects—8 subjects each with mild, moderate, severe hepatic impairment and normal hepatic function. Subjects were administered a single 10 mg dose of OCA. The study subjects were primarily male (72%), had a mean (SD) age of 55.0 (5.6) years, and mean (SD) body weight was 81.7 (16.9) kg. Participants were 90.6% white, 3.1% black, 3.1% Asian, and 3.1% other. Mean Child-Pugh Score was 8.0 (2.0) (Child-Pugh Score: Class A/Mild 5-6 points, Class B/Moderate 7-9 points, Class C/Severe 10-15 points). The percentage of BLQ samples with imputed concentrations was 16.8%, 5.4%, and 9.6% for OCA, glyco-OCA, and tauro-OCA, respectively.

The 22 PK parameters from the healthy PK model were held fixed during the development of the model for hepatic impairment. Portal systemic shunting and reduced functional liver volume parameters were fixed to physiological values from the literature while parameters associated with reduced hepatic uptake and changes in OCA conjugation were estimated. Parameter estimates for hepatic uptake and taurine conjugation obtained from the hepatic impairment PK model are presented in Table 30. The structural parameters were well estimated (<25% CV) with the exception of the change in hepatic uptake in OCA and its conjugates in moderate hepatic impairment (44% CV) and the change in OCA conjugation for severe hepatic impairment (109% CV). The BSV for flow from bile duct to gallbladder was 168% (299% CV) and for the oral absorption of OCA was 246% (9.87% CV). The additive portion of residual variability was <1 nM (>75% CV) and the proportional portion ranged from 112% to 123% for OCA and its conjugates (>75% CV). This magnitude of variability is consistent with a bile acid analog that undergoes extensive enterohepatic recirculation. The pcVPC results shown in FIGS. 26A-26D and the goodness of fit plots indicate acceptable model performance.

TABLE 30

Modified Model Parameters in Impaired Hepatic Function

| Parameter | Estimate | CV % |
|---|---|---|
| Effect in Mild hepatic impairment in hepatic uptake of OCA and conjugates | −0.132 | 9.11 |
| Effect in Moderate hepatic impairment in hepatic uptake of OCA and conjugates | −1.86 | 44.3 |
| Effect in Severe hepatic impairment in hepatic uptake of OCA and conjugates | −2.37 | 24.9 |
| Effect of Mild hepatic impairment on OCA tauro-conjugation | 0.00481 | 0.341 |
| Effect of Moderate hepatic impairment on OCA tauro-conjugation | 1.05 | 15.8 |
| Effect of Severe hepatic impairment on OCA tauro-conjugation | 1.56 | 109 |
| Proportional Error OCA (%) | 122 | 77.1 |
| Proportional Error Glyco-OCA (%) | 112 | 384 |
| Proportional Error Tauro-OCA (%) | 123 | 636 |
| Additive Error OCA (nM) | 0.993 | 77.1 |
| Additive Error Glyco-OCA (nM) | 0.273 | 383 |
| Additive Error Tauro-OCA (nM) | 0.532 | 627 |
| BSV | | |
| OCA first order rate constant of oral absorption | 246% | 9.87 |
| Flow from bile duct to gallbladder | 168% | 299 |

The final OCA physiologic PK model, developed for both normal and impaired hepatic function, was validated with external PK data in subjects with normal (single doses of 10

US 10,751,349 B2

121 / 122

mg and multiple-dosing to steady-state with doses of 5 mg, 10 mg, or 25 mg) and hepatic impairment (cirrhosis and portal hypertension). FIG. 27A to FIG. 27C and FIG. 28A to FIG. 28C show pcVPC-based assessments of the model's ability to accurately predict the plasma total OCA concentration time profiles under these varied conditions. The model predicted the profiles well for subjects with normal hepatic function (FIGS. 20A-20F, FIGS. 21A-21D) and for subjects with moderate and severe hepatic impairment (FIGS. 22A-22F). For mild hepatic impairment, the model tended to underestimate the total OCA concentrations.

Simulations of total OCA in the systemic circulation (plasma) and in the liver after a single 10 mg dose were compared to observed total OCA plasma concentrations from the hepatic impairment clinical study in FIGS. 23A-22B. The total OCA exposures are summarized as either the Cmax or the AUC over the 216 hour sampling period. For both exposure measures, and across all levels of hepatic function, there appeared to be agreement between the exposures observed in the clinical trial and the exposures predicted by the PK model. Simulation data in Table 31 reveals that the systemic AUC of total OCA in subjects with mild, moderate, and severe hepatic impairment increased 1.4-, 8.0-, and 13-fold relative to subjects with normal hepatic function. However, in the liver, the predicted AUC of total OCA in subjects with mild, moderate, and severe hepatic impairment increased only 1.1-, 1.5-, and 1.7-fold relative to subjects with normal hepatic function.

but the high BSV on $K_a$ indicated that the absorption process varied substantially between subjects. Once in the gut, the model estimated the extent of intestinal absorption for OCA at approximately 56%. This value is likely an underestimation due to consolidation of the various segments of the small and large intestine into a single gut compartment wherein OCA gets absorbed and excreted from the same compartment. The extent of intestinal absorption for glyco-OCA and tauro-OCA was 95% and 99%, respectively. Simulations for healthy subjects using the PK model showed that at steady-state, ~90% of total OCA mass is distributed to the gut and the gallbladder. Approximately 8% of the total OCA mass resides in the liver while ~1% can be found in the plasma of the systemic circulation. In contrast, the simulated total OCA mass increases to ~10% in the systemic circulation in patients with Child-Pugh C hepatic impairment with the liver distribution being approximately equal to healthy subjects (~10%). The simulated gut and gallbladder distribution was 79% in patient with Child-Pugh C hepatic impairment. The low systemic levels of total OCA would in part explain the high variability observed in plasma.

The PK model estimated hepatic uptake, in healthy subjects, at 79%, 73%, and 78% for OCA, glyco-OCA, and tauro-OCA, respectively, are consistent with hepatic uptake values reported for CDCA. Once in the liver, OCA was conjugated to glycine and taurine in a ratio of 4.6:1, consistent with the normal range for endogenous bile acids. Simulations from the PK model showed that the half-life for

TABLE 31

| | | | Liver Impairment | | | Ratio (Liver Impairment/Normal) | | |
|---|---|---|---|---|---|---|---|---|
| Exposure | Metric | Normal | Mild | Moderate | Severe | Mild/Normal | Moderate/normal | Severe/normal |
| Systemic | AUC (ng × h/mL) | 2339 | 3156 | 18785 | 30986 | 1.35 | 8.03 | 13.2 |
| | $C_{avg}$ (ng/mL) | 10.8 | 14.6 | 87 | 143 | 1.35 | 8.03 | 13.2 |
| | $C_{max}$ (ng/mL) | 99.5 | 131 | 634 | 961 | 1.31 | 6.38 | 9.66 |
| Liver | AUC (ng × h/mL) | 47427 | 53032 | 69540 | 82521 | 1.12 | 1.47 | 1.74 |
| | $C_{avg}$ (ng/mL) | 220 | 246 | 322 | 382 | 1.12 | 1.47 | 1.74 |
| | $C_{max}$ (ng/mL) | 2395 | 2665 | 2701 | 2651 | 1.11 | 1.13 | 1.11 |

| Mean Simulated OCA Distribution (% Nanomoles Total OCA) | | |
|---|---|---|
| Systemic Circulation | 1.03 | 10.36 |
| Portal Circulation | 0.77 | 2.33 |
| Sinusoidal Circulation | 0.05 | 0.45 |
| Liver | 7.88 | 10.44 |
| Bile Ducts | 0.14 | 0.13 |
| Gallbladder | 39.94 | 37.74 |
| Gut | 50.20 | 38.56 |

Systemic AUC of total OCA in Patients with mild, moderate, and severe hepatic impairment.

This OCA physiologic PK model, derived from prior bile acid models, provides valuable insights into the absorption, distribution, metabolism, and excretion of the drug. Orally administered OCA is absorbed from the intestines, conjugated with glycine or taurine in the hepatocyte, and the conjugated OCA circulates enterohepatically. Conjugation also results in most of the OCA conjugates being poorly absorbed in the proximal small intestine and reaching the terminal ileum, where bile acids are actively conserved. The predominant pharmacodynamic activity of OCA is thus mediated by its taurine and glycine amides in the hepatocyte and distal small intestine.

The PK model used a dosing compartment and first-order rate constant ($K_a$) to represent the cumulative processes from oral intake of OCA through entry into the gut. The population mean half-life for this process was 0.13 hours,

OCA is approximately 4 days indicating a time to steady-state or a post-treatment washout period of about 2 weeks. The estimated OCA half-life is consistent with the half-life values for CDCA reported in the literature.

Simulations using the PK model predicted changes in systemic and liver OCA concentrations associated with changes in the severity of hepatic impairment. Model simulations predicted that for mild, moderate, and severe hepatic impairment, total OCA concentrations in the plasma increase 1.4-, 8.0-, and 13-fold relative to subjects with normal hepatic function while total OCA concentrations in the liver increase 1.1-, 1.5-, and 1.7-fold, respectively. The predicted changes in plasma OCA concentrations were similar to the observed concentration of total endogenous bile acids in subjects with alcoholic cirrhosis. The concentration of total endogenous bile acids measured in the plasma were

123

increased 1.6-, 6.4-, and 13-fold for mild, moderate, and severe hepatic impairment relative to normal hepatic function, respectively. Previously, soluble and tissue-bound hepatic bile acids were measured by Fischer et al. from the livers of end-stage liver disease patients and compared to measurements made from healthy livers (resected for tumors but functionally and histologically normal). It was shown that endogenous bile acid levels in the serum of patients with end-stage liver disease prior to liver transplantation were 18-fold greater than those in healthy subjects; however, in the livers from patients with end-stage liver disease bile acid levels were only approximately 2-fold higher relative to healthy livers. The observed 2-fold increase in the liver exposure of endogenous bile acids is in good agreement with the predicted increase in total OCA exposure in subjects with severe hepatic impairment (1.7-fold; Child-Pugh C). These results suggest that the PK characteristics of OCA are very similar to endogenous bile acids.

There were some differences between the observed and predicted values in the external validation in patients with mild hepatic impairment. The Child-Pugh score is based on total bilirubin, serum albumin, prothrombin time, ascites, and hepatic encephalopathy. While all of these parameters are indicators of prognosis in liver disease, they do not all necessarily reflect substantial changes in PK or flow mechanics in/around the liver. Without being bound by any particular theory, the presence of portal hypertension in the validation cohort for mild impairment may be a reason for a discrepancy between predicted and observed values in patients with mild hepatic impairment.

The OCA physiologic model predicted liver to plasma ratios for OCA concentrations that were similar to the ratios previously observed for endogenous bile acids. These results indicate that the liver to plasma ratio is not consistent between healthy subjects and patients with hepatic impairment. The liver is the primary site of action for the safety and efficacy of OCA; therefore, it is important to account for the differences in systemic and liver exposure when assessing an effective dose. The hepatically-impaired patients treated with OCA experienced plasma OCA exposures>10-fold higher than those experienced by healthy subjects, yet there was no apparent impact on the overall safety profile experienced by these patients. The safety results are consistent with only a modest increase in liver exposure of OCA associated with hepatic impairment. Collectively, the results from these analyses and those from literature for bile acids would suggest that the dose of OCA administered to hepatically-impaired patients should be modestly lower than those for patients with normal hepatic function to achieve similar hepatic exposure.

Example 12

This example describes a clinical, double-blind study examining the effect of daily 25 mg OCA on nonalcoholic steatohepatitis (NASH). OCA lead to biopsy proven improvements in liver fibrosis. Patients with NASH who have elevated NAFLD activity scores (NAS) and are at a higher risk of progression to cirrhosis and liver related mortality.

The high risk subgroup was defined as patients with a baseline NAS≥4, baseline fibrosis stage 2 or 3 or baseline fibrosis stage 1 with a comorbidity (type 2 diabetes, BMI≥30 kg/$m^2$ or ALT>60 U/L) (OCA n=114; Placebo n=112). The Fibrosis-4 (FIB-4), the aspartate transaminase to platelet ratio (APRI), and the NAFLD fibrosis score (NFS) were all

124

examined between baseline through 72 weeks of treatment and for an additional 24 weeks of follow up.

Significant reductions were observed as early as week 24 and persisted through the course of treatment. Patients receiving OCA had significant improvements compared to placebo in all three non-invasive measures of fibrosis at week 72 (FIB-4 OCA-Placebo LS Mean change=−0.33, 95% CI=[−0.47, −0.19], p<0.0001; APRI OCA-Placebo LS Mean change=−0.23, 95% CI=[−0.32, −0.15], p<0.0001; NFS OCA-Placebo LS Mean change=−0.28, 95% CI=[−0.45, −0.10], p<0.01). However, 24 weeks after concluding treatment, all three scores had diminished improvement and trended toward baseline values.

Treatment with OCA lead to significant early and sustained improvements in FIB-4, APRI, and NFS in patients in a subgroup at higher risk for liver related mortality in NASH. However, without OCA, improvement in these non-invasive measures of fibrosis diminished, possibly due to continuing underlying disease pathogenesis.

The invention claimed is:

**1.** A tablet comprising obeticholic acid in an amount of 1 mg to 50 mg and a pharmaceutically acceptable excipient, wherein said obeticholic acid is in the form of jet-milled particles having a diameter of less than about 100 μm when analyzed by laser diffraction, and wherein $D_{50}$ is not more than 50 μm, and

wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 6% (wt/wt).

**2.** The tablet of claim **1**, wherein $D_{50}$ is not more than 20 μm.

**3.** The tablet of claim **1**, wherein $D_{50}$ is not more than 10 μm.

**4.** The tablet of claim **1**, wherein the tablet comprises an intra-granular portion and an extra-granular portion, wherein the intra-granular portion comprises said obeticholic acid and a pharmaceutically acceptable excipient, and the extra-granular portion comprises a pharmaceutically acceptable excipient.

**5.** The tablet of claim **4**, wherein the extra-granular portion does not contain obeticholic acid.

**6.** The tablet of claim **1**, wherein said pharmaceutically acceptable excipient having a total primary alcohol impurity of less than about 6% (wt/wt) is sodium starch glycolate.

**7.** The tablet of claim **5**, wherein the intra-granular portion comprises a diluent selected from: starch, pregelatinized starch, microcrystalline cellulose, calcium carbonate, dibasic calcium phosphate, tribasic calcium phosphate, calcium phosphate, lactose, dextrose, fructose, lactitol, lactose, magnesium carbonate, magnesium oxide, maltitol, maltodextrin, maltose, simethicone, sodium chloride, talc, xylitol, sorbitol, mannitol, and sucrose, and/or a combination thereof.

**8.** The tablet of claim **5**, wherein the extra-granular portion comprises a diluent selected from: starch, pregelatinized starch, microcrystalline cellulose, calcium carbonate, dibasic calcium phosphate, tribasic calcium phosphate, calcium phosphate, lactose, dextrose, fructose, lactitol, lactose, magnesium carbonate, magnesium oxide, maltitol, maltodextrin, maltose, simethicone, sodium chloride, talc, xylitol, sorbitol, mannitol, and sucrose, and/or a combination thereof.

**9.** The tablet of claim **7**, wherein the diluent is microcrystalline cellulose.

**10.** The tablet of claim **9**, wherein a ratio of microcrystalline cellulose to obeticholic acid in the intra-granular portion is from about 20:1 to about 1:5.

US 10,751,349 B2

125        126

**11**. The tablet of claim **10**, wherein the ratio is from about 20:1 to about 1:1.

**12**. The tablet of claim **11**, wherein the ratio is from 20:1 to about 5:1.

**13**. The tablet of claim **5**, wherein the tablet comprises 5 mg of obeticholic acid.

**14**. The tablet of claim **5**, wherein the tablet comprises 10 mg of obeticholic acid.

**15**. The tablet of claim **5**, wherein the tablet comprises 25 mg of obeticholic acid.

**16**. The tablet of claim **1**, wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 3% (wt/wt).

**17**. The tablet of claim **1**, wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 0.5% (wt/wt).

**18**. The tablet of claim **1**, wherein $D_{50}$ is not more than 5 µm.

**19**. A tablet comprising:

obeticholic acid in an amount of 1 mg to 50 mg; and

sodium starch glycolate,

wherein said obeticholic acid is in the form of jet-milled particles having a diameter of less than about 100 µm when analyzed by laser diffraction, wherein $D_{50}$ is not more than 50 µm, and

wherein the total alcohol impurity in said sodium starch glycolate is less than about 6% (wt/wt).

**20**. The tablet of claim **19**, wherein $D_{50}$ is not more than 5 µm.

**21**. The tablet of claim **19**, wherein the total alcohol impurity in said sodium starch glycolate is less than about 3% (wt/wt).

**22**. The tablet of claim **19**, wherein the total alcohol impurity in said sodium starch glycolate is less than about 0.5% (wt/wt).

\* \* \* \* \*

# EXHIBIT 2

U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/919,734 | 06/17/2013 | André Steiner | IPHA-017/001US | 1063 |

127041          7590          01/08/2015
Cooley LLP/Intercept Pharmaceuticals, Inc.
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004

| EXAMINER |
|---|
| BARSKY, JARED |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1628 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/08/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| **Office Action Summary** | Application No.<br>13/919,734 | Applicant(s)<br>STEINER ET AL. | |
|---|---|---|---|
| | Examiner<br>JARED D. BARSKY | Art Unit<br>1628 | AIA (First Inventor to File)<br>Status<br>Yes |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>October 15, 2014</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☐ This action is **FINAL**.  2b)☒ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5)☒ Claim(s) <u>1-3,18,19 and 21-53</u> is/are pending in the application.
  5a) Of the above claim(s) <u>1-3</u> is/are withdrawn from consideration.
6)☐ Claim(s) _____ is/are allowed.
7)☒ Claim(s) <u>18, 19, and 21-53</u> is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
  a)☐ All  b)☐ Some**  c)☐ None of the:
  1.☐ Certified copies of the priority documents have been received.
  2.☐ Certified copies of the priority documents have been received in Application No. _____.
  3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1) ☒ Notice of References Cited (PTO-892)
2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date <u>9/12/2013 and 10/15/2014</u>.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____.

Application/Control Number: 13/919,734                                    Page 2
Art Unit: 1628

The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.

## DETAILED ACTION

### *Election/Restrictions*

Applicant's election of Group I, corresponding to claims 1-3, 18-19, and 21-53, in the

reply filed on October 15, 2014, is acknowledged.  Because applicant did not distinctly and

specifically point out the supposed errors in the restriction requirement, the election has been

treated as an election without traverse (MPEP § 818.03(a)).

Additionally, the examiner spoke with Applicant's representative, Chen Chen, on January

6, 2015, and requested Applicant elected a form of obeticholic acid as a species as a result of the

addition of new claims 21-53.  Applicant elected the species of obeticholic acid Form 1 without

traverse, corresponding to claims 18 and 21-53.  As such, claims 1-3 are preliminarily withdrawn

from consideration.


### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(a)(1) the claimed invention was patented, described in a printed publication, or in
public use, on sale or otherwise available to the public before the effective filing
date of the claimed invention.

**Claims 18 and 53 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by**

**Pelliciari et al., "Nongenomic Actions of Bile Acids. Synthesis and Preliminary**

Application/Control Number: 13/919,734                                    Page 3

Art Unit: 1628

**Characterization of 23- and 6,23-Alkyl Substituted Bile Acid Derivatives as Selective**

**Modulators for the G-Protein Coupled Receptor TGR5," J. Med. Chem. 2007, 50, 4265-**

**4268.**

Claim 18 recites:

An obeticholic acid, or a pharmaceutically acceptable salt, solvate or amino acid
conjugate thereof, having a potency of greater than about 98%, greater than about
98.5%, greater than about 99.0%, or greater than about 99.5%.

Pelliciari teaches obeticholic acid as well as other natural and synthetic bile acids as

shown below.



Chart 1. Synthetic and Natural Bile Acids

6α-Ethyl-Chenodeoxycholic Acid
(6ECDCA, 1)

According to the instant Specification at page 64, the "Form 1" that is claimed by Applicant has

the following structure:



obeticholic acid Form 1

Form 1 and the compound taught by the prior art are identical.

Application/Control Number: 13/919,734                                           Page 4
Art Unit: 1628

With regard to claim 18, the compound shown above is claimed to have a potency of

greater than 98%.  The examiner notes that Pelliciari teaches 6EDCA (INT747) as the most

potent steroid ligand for FXR so far available (p. 4265, last par.).   Further, "potency" appears to

refer to an efficacy when used in a treatment.  However, an intended use does not modify the

structural limitations of a product claim, as potency depends on a selected subject population,

dosage, route of administration, etc.

With regard to claim 53, Form 1 is obeticholic acid that is formed by a process that is

purportedly unique.  According to M.P.E.P. § 2113, "[E]ven though product-by-process claims

are limited by and defined by the process, determination of patentability is based on the product

itself.  The patentability of a product does not depend on its method of production.  If the product

in the product-by-process claim is the same as or obvious from a product of the prior art, the

claim is unpatentable even though the prior product was made by a different process." *In re

Thorpe,* 777 F.2d 695, 698, 227 USPQ 964, 966 (Fed. Cir. 1985).  See M.P.E.P. § 2113.

As such, claims 18 and 53 are directed towards obeticholic acid as taught by the prior art.

Claims 18 and 53 are anticipated by the prior art.


### *Claim Rejections - 35 USC § 102/§ 103*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 and 35

U.S.C. 103 that forms the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

**§ 102-**
(a)(1) the claimed invention was patented, described in a printed publication, or in
public use, on sale or otherwise available to the public before the effective filing
date of the claimed invention.

**§ 103-**
A patent for a claimed invention may not be obtained, notwithstanding that the
claimed invention is not identically disclosed as set forth in section 102 of this
title, if the differences between the claimed invention and the prior art are such
that the claimed invention as a whole would have been obvious before the
effective filing date of the claimed invention to a person having ordinary skill in
the art to which the claimed invention pertains.  Patentability shall not be negated
by the manner in which the invention was made.

**Claims 18-19 and 21-53 are rejected under 35 U.S.C. 102(a)(1) as anticipated by or,
in the alternative, under 35 U.S.C. 103 as obvious over Natalini et al., "Correlation between
CMC and chromatographic index: simple and effective evaluation of hydrophobic/
hydrophilic balance of bile acids," Anal Bioanal Chem (2007) 388:1681-1688, as *evidenced*
by Eichner et al., (US20070087961) and as *evidenced* by Kipp et al., (US20030077329).**

The instant Specification indicates that obeticholic acid Form 1 refers to the non-
crystalline form of obeticholic acid (Spec. p. 76, Example 5).

Natalini teaches a method of purifying through reverse phase high performance liquid
chromatography (RP-HPLC) the most potent FXR agonist, (6-ECDCA) (p. 1681, 1st par.).  RP-
HPLC was conducted using a mobile phase of NaH2PO4 in water, and NaOH as a buffer (p.
1682, *Materials*).   The materials were filtered and bile acids were prepared in concentrations of
1.0 and 1.5 mg/ml.   Table 1 indicates the analytes that were separated included 6ECDCA and
CDCA (i.e., chenodeoxycholic acid), among others.  As *evidenced* by Eichner, sodium
dihydrogen phosphate is a pharmaceutically acceptable carrier for use in administering an API
through parenteral routes (par. 161).  As *evidenced* by Kipp, sodium hydroxide is a known pH
adjusting agent (prior art claim 17).  As such, the prior art teachings separating 6-ECDCA
through a purification technique that would yield a mobile phase comprising: sodium dihydrogen

Application/Control Number: 13/919,734                                    Page 6
Art Unit: 1628

phosphate, sodium hydroxide (i.e., the mobile phase), and the separated 6-ECDCA in a container

or vial comprising the mobile phase solvent and buffer, yielding 6-EDCA, a pharmaceutical

carrier, and a buffer.

      <u>Claim 18</u> is interpreted as directed towards obeticholic acid with an intended use, as

explained above.

      <u>With regard to claims 19 and 21-52</u>, the examiner notes that 6-ECDCA was separated out

and the fraction collector included NaOH (i.e., a buffer) and sodium dihydrogen phosphate (i.e.,

the mobile phase components).  Absent evidence to the contrary, purified 6-ECDCA comprises

minimal amounts, in any, of bile acid (BA) compound.  Further, the examiner does not have the

facilities and resources to provide the factual evidence needed in order to establish that the

product of the prior art does not possess the same material, structural and functional

characteristics of the claimed product. "In the absence of evidence to the contrary, the burden is

on the applicant to prove that the claimed product is different from those taught by the prior art

and to establish patentable differences."  See *In re Best* 562F.2d 1252, 195 USPQ 430 (CCPA

1977) and *Ex parte Gray* 10 USPQ 2d 1922 (PTO Bd. Pat. App. & Int. 1989).  Additionally, the

instant Specification notes that HPLC was used (as shown in Table B on page 31) to identify the

percentages of impurities in an obeticholic acid as prepared using a method discussed in

WO2006/122977.  This is indicia that HPLC separates out other bile acids during purification,

including UCDA (i.e., chenodeoxycholic acid).  According to <u>M.P.E.P. § 2113</u>, "Once the

examiner provides a rationale tending to show that the claimed product appears to be <u>the same or</u>

<u>similar</u> to that of the prior art, although produced by a different process, the burden shifts to

applicant to come forward with evidence establishing an unobvious difference between the

claimed product and the prior art product." *In re Marosi,* 710 F.2d 798, 802, 218 USPQ 289, 292 (Fed. Cir. 1983).

Further, "[T]he lack of physical description in a product-by-process claim makes determination of the patentability of the claim more difficult, since in spite of the fact that the claim may recite only process limitations, it is the patentability of the product claimed and not of the recited process steps which must be established. We are therefore of the opinion that when the prior art discloses a product which reasonably appears to be either identical with or only slightly different than a product claimed in a product-by-process claim, <u>a rejection based alternatively on either section 102 or section 103 of the statute is eminently fair and acceptable</u>. As a practical matter, the Patent Office is not equipped to manufacture products by the myriad of processes put before it and then obtain prior art products and make physical comparisons therewith." *In re Brown,* 459 F.2d 531, 535, 173 USPQ 685, 688 (CCPA 1972).

<u>Alternatively</u>, if the exact percentages of each impurity claimed are not anticipated by the prior art disclosure, those differences appear to be only slight differences. As such, the burden is on applicant to provide <u>a non-obvious difference</u> between the prior art and the instant claims. See <u>M.P.E.P. § 2113</u>.

<u>With regard to claim 53</u>, Form 1 is obeticholic acid that is formed by a process that is purportedly unique. The instant Specification indicates that obeticholic acid Form 1 refers to the non-crystalline form of obeticholic acid (Spec. p. 76, Example 5). According to <u>M.P.E.P. § 2113</u>, "[E]ven though product-by-process claims are limited by and defined by the process, determination of patentability is based on the product itself.

As such, claims 18-19, 21-53 are rejected by the prior art.

Application/Control Number: 13/919,734                                           Page 8
Art Unit: 1628

### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(a)(1) the claimed invention was patented, described in a printed publication, or in
public use, on sale or otherwise available to the public before the effective filing
date of the claimed invention.

(a)(2) the claimed invention was described in a patent issued under section 151, or
in an application for patent published or deemed published under section 122(b),
in which the patent or application, as the case may be, names another inventor and
was effectively filed before the effective filing date of the claimed invention.

**Claims 18-19, 21, 25-26, 30-34, 36, 38, 40-42, 45, 47, 49, 52, and 53 are rejected**

**under 35 U.S.C. 102(a)(1) and 102(a)(2)  as being anticipated by Ferrari et al.,**

**(WO2006/122977).**

Ferrari teaches methods of preparing purified forms of obeticholic acid (prior art claim 1,

e.g.).

<u>With regard to claim 18</u>, the prior art teaches 6EDCA (INT747).  Further, "potency"

appears to refer to an efficacy when used in a treatment.  However, an intended use does not

modify the structural limitations of a product claim, as potency depends on a selected subject

population, dosage, route of administration, etc.

According to the instant Specification (pages 29-31), Table B compares the impurities

and water concentration formulation by the instantly claimed process of arriving at Form 1 and

that described in by Ferrari (shown below).  Further, Applicant explains that Ferrari synthesized

obeticholic acid through a different process and the product produced through that process and

Application/Control Number: 13/919,734                                         Page 9
Art Unit: 1628

the obeticholic acid prepared through the process used to arrive at the instantly claimed product

are shown in a side-by-side comparison in Table B (Spec., page 31).

**Table B: Comparison of Impurities of Obeticholic Acid Generated from Process of the Application and '977 Process**

| Parameter | Specification limit | Process of the application | '977 process |
|---|---|---|---|
| Water (KF) | NMT 4.5% | 1.0% | 2.1% |
| Impurity 1 and Impurity 4 | NMT 0.15% | <0.05% | <0.05% |
| Impurity 2 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 3 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 5 | NMT 3.0% | 0.2% | 1.0% |
| Impurity 6 | NMT 0.15% | <0.05% | <0.05% |

Impurity 1 is 6-ethylursodeoxycholic acid.
Impurity 2 is 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.
Impurity 3 is 6β-ethylchenodeoxycholic acid.
Impurity 4 is 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid.
Impurity 5 is chenodeoxycholic acid.
Impurity 6 is 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid (6ECDCA dimer).
NMT refers to "not more than".

The differences shown in chart are slight and only necessarily result in water and

impurity 5.  Further, the Specification limit is high enough to encompass both the instantly

claimed process and that of the '977 disclosure.

With regard to claim 19, the examiner considers "less than about 2%" to include less than

about 2.2 %, which is inclusive of 2.1%.  Generally, the phrase less than about as used in the

claims is interpreted to include at least a deviation of 0.2%.

Additionally, the phrase "not more than" includes a range of 0 to 3%, e.g., as recited in

claim 25.  Generally, the phrase not more than means less than or equal to.

With regard to claim 26, the examiner interprets "less than about 1%" to include less than

1.2%, which is inclusive of 1%.

With regard to claim 52, the compound claimed is taught for use with a pharmaceutically acceptable diluent or excipient.  The examiner interprets a diluent to be a carrier and a carrier is a species of excipient that a person having ordinary skill in the art would immediately envisage in view of the prior art.

With regard to claim 53, Form 1 is obeticholic acid that is formed by a process that is purportedly unique.  The instant Specification indicates that obeticholic acid Form 1 refers to the non-crystalline form of obeticholic acid (Spec. p. 76, Example 5).  According to M.P.E.P. § 2113, "[E]ven though product-by-process claims are limited by and defined by the process, determination of patentability is based on the product itself.

Table B indicates that the claimed concentrations taught by the prior art in a final product of obeticholic acid include the concentrations instantly claimed.

As such, claims 18-19, 21, 25-26, 30-34, 36, 38, 40-42, 45, 47, 49, 52, and 53 are anticipated by the prior art.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102 of this title, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.  Patentability shall not be negated by the manner in which the invention was made.

Application/Control Number: 13/919,734                                    Page 11
Art Unit: 1628

**Claims 22-24, 27-29, 35, 37, 39, 43-44, 46, 48, 50, and 51 are rejected under 35 U.S.C.**
**103 as being unpatentable over Ferrari et al., (WO2006/122977), as applied to claims 18,-**
**19, 21, 25-26, 30-34, 36, 38, 40-42, 45, 47, 49, 52, and 53, above.**

Ferrari teaches methods of preparing purified forms of obeticholic acid (p. 4).  According
to the instant Specification, Table B compares the impurities and water concentration
formulation by the instantly claimed process of arriving at Form 1 and that described in the '997
application (shown below).

**Table B: Comparison of Impurities of Obeticholic Acid Generated from Process of the Application and '977 Process**

| Parameter | Specification limit | Process of the application | '977 process |
|---|---|---|---|
| Water (KF) | NMT 4.5% | 1.0% | 2.1% |
| Impurity 1 and Impurity 4 | NMT 0.15% | <0.05% | <0.05% |
| Impurity 2 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 3 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 5 | NMT 3.0% | 0.2% | 1.0% |
| Impurity 6 | NMT 0.15% | <0.05% | <0.05% |

Impurity 1 is 6-ethylursodeoxycholic acid.
Impurity 2 is $3\alpha$-hydroxy-$6\alpha$-ethyl-7-cheto-$5\beta$-cholan-24-oic acid.
Impurity 3 is $6\beta$-ethylchenodeoxycholic acid.
Impurity 4 is $3\alpha,7\alpha$-dihydroxy-6-ethyliden-$5\beta$-cholan-24-oic acid.
Impurity 5 is chenodeoxycholic acid.
Impurity 6 is $3\alpha$($3\alpha,7\alpha$-dihydroxy-$6\alpha$-ethyl-$5\beta$-cholan-24-oyloxy)-$7\alpha$-hydroxy-$6\alpha$-ethyl-$5\beta$-cholan-24-oic acid (6ECDCA dimer).
NMT refers to "not more than".

The table above shows that the '977 process and the instant application fall within the
"Specification limit" prescribed.  Additionally, the only conclusively established impurity
differential exists for impurity 5 and water because the other parameters include a "less than"
symbol, which is interpreted as inclusive of lower amounts.

With regard to claims 22-24, 27-29, 35, 37, 39, 43-44, 46, 48, 50, and 51, the examiner
notes that Applicant has not established a non-obvious difference between the instantly claimed

Application/Control Number: 13/919,734                                                Page 12
Art Unit: 1628

impurity concentrations and those impurity concentrations produced by the process described in

the '977 disclosure with respect to the following claims.

Claims 22-24, 27-29, 35, 37, 39, 43-44, 46, 48, 50, and 51 include concentrations of

impurity 5 that is about 0.5% or below.  This is only a slight difference from 1.0% produced by

the process of the '977 disclosure.

According to M.P.E.P. § 2144.04, "Pure materials are novel *vis-à-vis* less pure or impure

materials because there is a difference between pure and impure materials. Therefore, the issue is

whether claims to a pure material are unobvious over the prior art. *In re Bergstrom,* 427 F.2d

1394, 166 USPQ 256 (CCPA 1970). Purer forms of known products may be patentable, but the

mere purity of a product, by itself, does not render the product unobvious. Factors to be

considered in determining whether a purified form of an old product is obvious over the prior art

include whether the claimed chemical compound or composition has the same utility as closely

related materials in the prior art, and whether the prior art suggests the particular form or

structure of the claimed material or suitable methods of obtaining that form or structure. *In re

Cofer,* 354 F.2d 664, 148 USPQ 268 (CCPA 1966) (Claims to the free-flowing crystalline form

of a compound were held unobvious over references disclosing the viscous liquid form of the

same compound because the prior art of record did not suggest the claimed compound in

crystalline form or how to obtain such crystals.). See also *Ex parte Stern,* 13 USPQ2d 1379 (Bd.

Pat. App. & Inter. 1987) (Claims to interleukin-2 (a protein with a molecular weight of over

12,000) purified to homogeneity were held unpatentable over references which recognized the

desirability of purifying interleukin-2 to homogeneity in a view of a reference which taught a

method of purifying proteins having molecular weights in excess of 12,000 to homogeneity

Application/Control Number: 13/919,734                                    Page 13
Art Unit: 1628

wherein the prior art method was similar to the method disclosed by appellant for purifying

interleukin-2)." Here, a compound is being claimed at a specific level of purity that is similar to

the prior art. Patentability is based on the product itself, not the process of arriving at the

product. See M.P.E.P. § 2113. Further, "The Patent Office bears a lesser burden of proof in

making out a case of *prima facie* obviousness for product-by-process claims because of their

peculiar nature" than when a product is claimed in the conventional fashion. *In re Fessmann,* 489

F.2d 742, 744, 180 USPQ 324, 326 (CCPA 1974).

As such, a person having ordinary skill in the art would have arrived at the instantly

claimed invention in view of the disclosure of the prior art. One would have been motivated to

do so because the only difference between the claimed product and that taught by the prior art is

a slight difference in concentration of water and one out of five impurities taught by the prior art.

One would have a reasonable expectation of success that the composition claimed would have

the same and/or substantially similar properties based on merely altering the purity by a minimal

percentage one of the five purities and water. Specifically, the marginal percentage difference in

impurity differs by a maximum of 1.1 percent for water and 0.8 percent for impurity 5.

However, the mere difference in the level of purity of the product is not *per se* patentable. The

issue turns to whether the purity of the product is non-obvious over the prior art. While

Applicant provides some advantages in its Specification as to why the process used to arrive at

the claimed product is better than the process of the '977 disclosure, the advantages are not

directed towards the product itself. For example, the ease of manufacture and the ability to use

the manufacturing process instantly claimed on a large scale, as well as a more cost-effective

process do not relate to the product itself. As such, the examiner believes that a *prima facie* case

has been made and secondary considerations, such as unexpected results have not been made of record.

As such, no claim is allowed.


### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JARED D. BARSKY whose telephone number is (571)272-2795. The examiner can normally be reached on M-F, 8:30 AM - 5:00 PM EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Winston Shen can be reached on 571-272-3157. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/JARED D. BARSKY/
Examiner, Art Unit 1628

# EXHIBIT 3

## Remarks

Upon entry of the amendments, claims 18, 19, 21-24, 27-33, 38-43, 45, 47, 48, 51, and 52 are pending.  Claims 4-17 and 20 were previously canceled, and claims 1-3, 25, 26, 34-37, 44, 46, 49, 50, and 53 are canceled without disclaimer or prejudice.

Claims 18, 19, 21, 30, 38, 40-43, 45, 47, 48, 51, and 52 have been amended to more clearly define the invention.  Support for the amendments can be found throughout the as-filed application, *e.g.*, at page 37, line 18 – page 39, line 7.

Claims 27 and 41 have been amended to maintain appropriate claim dependency.

Claims 31-33 have been amended to correct typographical errors.

No new matter is added.


**Claim Rejections – *35 U.S.C. § 102***

Claims 18 and 53 are rejected as being anticipated by Pellicciari *et al.* (*J. Med. Chem.* 50, 4265 (2007), "Pellicciari").  The Examiner asserts that Pellicciari describes obeticholic acid.  Thus, the Examiner concludes that claims 18 and 53 are anticipated by Pellicciari.

The rejection as applied to claim 53 is moot due to its cancellation.

With respect to the rejection as applied to claim 18, without acquiescence and solely for the purposes of advancing prosecution, Applicants have amended claim 18 to recite that the obeticholic acid comprises less than 1% of chenodeoxycholic acid ("CDCA").  Pellicciari does not teach obeticholic acid comprising less than 1% of CDCA.  Thus, Pellicciari does not anticipate claim 18.  Accordingly, claim 18 is novel, and the rejection should be withdrawn.


**Claim Rejections – *35 U.S.C. § 102/§ 103***

Claims 18, 19, and 21-53 are rejected as being anticipated by, or in the alternative, obvious over Natalini *et al.* (*Anal. Bioanal. Chem.* 388, 1681 (2007), "Natalini"), as evidenced by Eichner *et al.* (US20070087961, "Eichner") and Kipp *et al.* (US20030077329, "Kipp").  The Examiner asserts that Natalini teaches purification of 6-ECDCA[1] and CDCA through reverse phase high performance liquid chromatography ("RP-HPLC"), that Eichner describes sodium dihydrogen phosphate as a pharmaceutically acceptable carrier, and that Kipp discloses sodium hydroxide as a pH adjusting agent.  Thus, the Examiner concludes that the combination of

---

[1] Obeticholic acid may also be called 6-ECDCA.

Attorney Docket No. IPHA-017/001US 321961-2208

Natalini, Eichner, and Kipp teaches separating 6-ECDCA, and that absent evidence to the contrary, the instant claims lack novelty or are obvious over Natalini, as evidenced by Eichner and Kipp.  Applicants traverse.

*Novelty*

The instant claims are directed to obeticholic acid comprising less than 1% of CDCA (claim 18), a pharmaceutical composition comprising obeticholic acid which comprises less than 1% of CDCA (claim 19 and dependent claims therefrom), and a pharmaceutical composition comprising obeticholic acid which comprises between 0% and 0.2% of CDCA (claim 52).  None of Natalini, Eichner, and Kipp teaches each and every element of the instant claims.  Thus, the instant claims are novel over Natalini, Eichner, and Kipp.  Accordingly, the rejection under 35 U.S.C. § 102 should be withdrawn.

*Obviousness*

A consistent criterion for determination of obviousness is whether prior art would have suggested to one of ordinary skill in the art that the claimed invention should be carried out and would have a reasonable likelihood of success, in view of the prior art.[2]  In addition, to establish a *prima facie* case of obviousness, a reasonable expectation of success in achieving the claimed invention based on the disclosures of the prior art by a skilled artisan is required.[3]  Particularly, with regard to the patentability of a purified compound, MPEP states "[f]actors to be considered in determining whether a purified form of an old product is obvious over the prior art include . . . whether the prior art suggests . . . **suitable** methods of obtaining that form or structure".[4]

As discussed above, the instant claims are directed to obeticholic acid and a pharmaceutical composition thereof, wherein the obeticholic acid comprises less than 1% of CDCA.  The instant invention **possesses advantageous properties**.  Specifically, as stated in the Declaration by Dr. Melissa Rewolinski, highly pure obeticholic acid comprising less than 1% of CDCA, as instantly claimed, shows **improved, potent pharmaceutical effectiveness**.[5]  A skilled artisan, in view of Natalini, Eichner, and Kipp, would not have been suggested to carry out the instant invention, and could not have reached the instant invention with a reasonable expectation of success.

---

[2] *In re Dow Chemical Co.*, 837 F.2d 469 (Fed. Cir. 1988).
[3] *MPEP* §2143.02.
[4] *MPEP* §2144.04 (emphasis added).
[5] Declaration of Dr. Melissa Rewolinski under 37 C.F.R. § 1.132 ("Rewolinski Declaration), paragraph 6.

117679613 v1

Attorney Docket No. IPHA-017/001US 321961-2208

A skilled artisan after reading Natalini, Eichner, and Kipp would not have been suggested to carry out the instant invention.  The combination of Natalini, Eichner, and Kipp fails to teach or suggest obtaining a highly pure obeticholic acid comprising less than 1% of CDCA as instantly claimed: Natalini relates to a study of the correlation between critical micellar concentration (CMC) and chromatographic index of several bile acid derivatives, including CDCA and obeticholic acid, and use of the correlation in evaluating the hydrophobic/hydrophilic balance of those bile acid derivatives; Eichner is directed to conjugates of hydroxyalkyl starch and erythropoietin; and Kipp merely describes preparing stable particles of pharmaceutical agents in frozen aqueous matrix.  That is, the combination of Natalini, Eichner, and Kipp does not teach or suggest purifying obeticholic acid, much less separating obeticholic acid from CDCA.  Thus, a skilled artisan, in view of Natalini, Eichner, and Kipp, would not have been suggested to practice the instant invention.

Moreover, a skilled artisan, based on the disclosure of Natalini, Eichner, and Kipp, could not have arrived at the instant invention with a reasonable expectation of success.  Contrary to the Examiner's assertion, Natalini does not teach use of RP-HPLC as a purification method.  Rather, Natalini describes utilizing RP-HPLC merely to measure the retention factors of several bile acids.  In particular, each of the bile acid derivatives, including obeticholic acid and CDCA, was **separately analyzed** by RP-HPLC in Natalini.  In other words, Natalini does not teach or suggest in any way purifying any of the bile acid derivatives listed therein, let alone separating CDCA from obeticholic acid using RP-HPLC.  Further, as stated in the Rewolinski Declaration, CDCA and obeticholic acid differs only in the presence of the 6-ethyl group in obeticholic acid, and accordingly it would be impractical to separate CDCA and obeticholic acid using column chromatography due to the similarities in their physicochemical properties (*e.g.*, partition co-efficient and total surface polarity, as indicated by the LogP and tPSA values below, respectively):[6]

---

[6] Rewolinski Declaration, paragraphs 7 and 8.

Attorney Docket No. IPHA-017/001US 321961-2208

Boiling Point: 1144.68 [K]
Melting Point: 726.04 [K]
Log P: 4.95
tPSA: 77.76
pKa: 4.669, 14.626, 15.078

Boiling Point: 1103.59 [K]
Melting Point: 707.74 [K]
Log P: 4.13
tPSA: 77.76
pKa: 4.670, 14.624, 15.075

None of Natalini, Eichner, and Kipp, alone or in combination, teaches or suggests that RP-HPLC could remove CDCA from obeticholic acid. Certainly, none of Natalini, Eichner, and Kipp, alone or in combination, teaches or suggests that RP-HPLC could separate CDCA from obeticholic acid to achieve a highly pure obeticholic acid having less than 1% of CDCA, as instantly claimed. That is, the combination of Natalini, Eichner, and Kipp fails to provide a **suitable** method for obtaining the instant invention, as is required. As such, a skilled artisan, in view of Natalini, Eichner, and Kipp, could not reasonably expect to successfully reach the instant invention.

Based on the foregoing discussion, the instant claims are not obvious over Natalini, in view of Eichner and Kipp. Thus, the rejection under 35 U.S.C. § 103 should be withdrawn.

**Claim Rejections – *35 U.S.C. § 102***

Claims 18, 19, 21, 25, 26, 30-34, 36, 38, 40-42, 45, 47, 49, 52 and 53 are rejected as being anticipated by Ferrari *et al.* (WO2006/122977, "Ferrari"). The Examiner asserts that Ferrari describes methods of preparing purified obeticholic acid. Thus, the Examiner concludes the claims listed above are anticipated by Ferrari. Applicants traverse.

The instant claims are directed to obeticholic acid comprising less than 1% of CDCA (claim 18), a pharmaceutical composition comprising obeticholic acid which comprises less than 1% of CDCA (claim 19 and dependent claims therefrom), and a pharmaceutical composition comprising obeticholic acid which comprises between 0% and 0.2% of CDCA (claim 52). Ferrari does not teach obeticholic acid comprising less than 1%, let alone 0.2%, of CDCA. Thus, Ferrari does not anticipate the instant claims. Accordingly, the instant claims are novel, and the rejection should be withdrawn.

9

Attorney Docket No. IPHA-017/001US 321961-2208

**Claim Rejections – *35 U.S.C. § 103***

Claims 22-24, 27-29, 35, 37, 39, 43-44, 46, 48, 50, and 51 are rejected as being obvious over Ferrari.  The Examiner asserts that the obeticholic acid prepared in Ferrari falls within the specification limit prescribed in Table B of the present application, and that the only difference between the obeticholic acid of Ferrari and the obeticholic acid of the instant invention is the amount of impurity 5 (*i.e.*, CDCA) and water.  Thus, the Examiner concludes the claims listed above are obvious over Ferrari.  Applicants traverse.

A consistent criterion for determination of obviousness is whether prior art would have suggested to one of ordinary skill in the art that the claimed invention should be carried out and would have a reasonable likelihood of success, in view of the prior art.[7]  In addition, to establish a *prima facie* case of obviousness, a reasonable expectation of success in achieving the claimed invention based on the disclosures of the prior art by a skilled artisan is required.[8]  Particularly, with regard to the patentability of a purified compound, MPEP states "[f]actors to be considered in determining whether a purified form of an old product is obvious over the prior art include . . . whether the prior art suggests . . . **suitable** methods of obtaining that form or structure".[9]  Also, it is well recognized that "[a] prior art reference must be considered in its entirety, *i.e.*, as a whole . . ."[10]

As discussed above, the instant invention is directed to obeticholic acid and a pharmaceutical composition thereof, wherein the obeticholic acid comprises less than 1% of CDCA, and **possesses advantageous properties**.  A skilled artisan, in view of Ferrari, would not have been suggested to carry out the instant invention, and could not have reached the instant invention with a reasonable expectation of success.

A skilled artisan after reading Ferrari would not have been suggested to carry out the instant invention.  Ferrari teaches an improved synthetic process for preparing obeticholic acid with a high yield and purity.  However, Ferrari makes no mention that the obeticholic acid prepared therein suffers from any deficiencies.  Particularly, Ferrari does not indicate in any way that the obeticholic acid generated therein needs to be further purified to remove any impurities,

---

[7] *In re Dow Chemical Co.*, 837 F.2d 469 (Fed. Cir. 1988).
[8] *MPEP* §2143.02.
[9] *MPEP* §2144.04 (emphasis added).
[10] *MPEP* § 2141.02(VI), quoting *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983).

10

Attorney Docket No. IPHA-017/001US 321961-2208

much less CDCA.  Thus, a skilled artisan, in view of improved synthesis of Ferrari, would not have been suggested to practice the instant invention.

Moreover, a skilled artisan, based on the disclosure of Ferrari, could not have arrived at the instant invention with a reasonable expectation of success.  As an initial matter, as stated in the Rewolinski Declaration, a skilled artisan using the process described in Ferrari could in no way achieve a highly pure obeticholic acid comprising less than 1% of CDCA, as instantly claimed.[11]  In addition, not only does Ferrari fail to teach or suggest how the CDCA impurity would be generated according to the synthesis described therein, but, more importantly, Ferrari also fails to provide any guidance on how any of the steps or reagents described therein could be modified to decrease the CDCA impurity by any extent, let alone less than 1%.  Thus, a skilled artisan, in view of Ferrari, could not reasonably expect to successfully reach the instant invention.

To support the rejection, the Examiner seems to suggest that a skilled artisan, in view of Ferrari, would resort to HPLC and, by using HPLC, would reasonably expect to achieve the instant invention.  Applicants disagree.  Ferrari clearly teaches that chromatographic purification is not desirable, particularly at a large synthesis scale.[12]  Further, Ferrari indicates that one of the advantages of the synthesis described therein is the **removal** of purification by chromatography.[13]  In other words, Ferrari would lead a skilled artisan away from using HPLC to produce highly pure obeticholic acid, as instantly claimed.  Moreover, as stated in the Rewolinski Declaration, due to the similarities in their physicochemical properties (as discussed above), it would be impractical to separate CDCA and obeticholic acid using column chromatography in order to achieve the instant invention.[14]

Based on the foregoing discussion, a skilled artisan, in view of Ferrari, not only would not be suggested to carry out the instant invention, but also could not achieve the instant invention with a reasonable expectation of success.  Moreover, a skilled artisan would be led away by Ferrari from utilizing HPLC to purify obeticholic acid.  As such, the instant claims are not obvious over Ferrari.  Accordingly, the rejection should be withdrawn.

---

[11] Rewolinski Declaration, paragraph 9.
[12] *See* Ferrari, page 3, lines 9-11.
[13] *See* Ferrari, page 8, lines 21-22.
[14] Rewolinski Declaration, paragraphs 7 and 8.

11

Attorney Docket No. IPHA-017/001US 321961-2208

**Conclusion**

On the basis of the foregoing amendments and remarks, Applicants respectfully submit that the pending claims are in condition for allowance.  Should any questions or issues arise concerning this application, the Examiner is encouraged to contact the undersigned at the telephone number provided below.


Dated:  June 8, 2015                          Respectfully submitted,

Cooley LLP
ATTN:  Patent Group                    By:   / Chen Chen /
1299 Pennsylvania Avenue NW, Suite 700       Heidi A. Erlacher
Washington, DC  20004                        Reg. No. 45,409
Tel:  (617) 937-2300                         Chen Chen
Fax: (202) 842-7899                          Reg. No. 73,384

# EXHIBIT 4

E-file                                                    Attorney Docket No. IPHA-017/001US 321961-2208
Date of Deposit: June 8, 2015

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| APPLICANTS: | Steiner *et al.* | CONFIRMATION NO.: | 1063 |
| SERIAL NO.: | 13/919,734 | EXAMINER: | Barsky, J. |
| FILING DATE: | June 17, 2013 | ART UNIT: | 1628 |
| FOR: | Preparation and Uses of Obeticholic Acid | | |

## DECLARATION OF DR. MELISSA REWOLINSKI UNDER 37 C.F.R. § 1.132

I, Melissa Rewolinski, hereby declare and state that:

1.      I am the Vice President of Intercept Pharmaceuticals, Inc., the assignee of the subject application.  I have over 17 years of experience in chemical synthesis of organic small molecules.

2.      I received a bachelor's degree in chemistry and a doctoral degree in synthetic organic chemistry from Rice University.

3.      I am a co-inventor of the subject application, U.S. Patent Application Serial No. 13/919,734.  By virtue of my education and work experience, I am skilled in the art of organic synthetic chemistry, both currently and at the time of the subject invention.

4.      I am aware of the Non-Final Office Action mailed January 8, 2015 in this application.  I understand that the Examiner has rejected the claimed invention as being obvious over Natalini *et al.* (*Anal. Bioanal. Chem.* 388, 1681 (2007), "Natalini"), as evidenced by Eichner *et al.* (US20070087961, "Eichner") and Kipp *et al.* (US20030077329, "Kipp"), and over Ferrari *et al.* (WO2006/122977, "Ferrari").

117025141 v1

Attorney Docket No. ACAC-002/C03US

5.      I make this declaration to show that the instant invention yields advantageous results, and that highly pure obeticholic acid comprising less than 1% of chenodeoxycholic acid ("CDCA") could not be successfully prepared in view of Natalini, Eichner, Kipp, and Ferrari.

6.      I assert that obeticholic acid is at least 100-fold more potent than CDCA in activating the FXR nuclear receptor. Accordingly, removing CDCA as an impurity from obeticholic acid significantly increases FXR activation by obeticholic acid. As such, the instant highly pure obeticholic acid and a pharmaceutical composition thereof, comprising less than 1% of CDCA, would advantageously display improved, potent pharmaceutical effectiveness for treating diseases mediated by the FXR nuclear receptor.

7.      I also assert that obeticholic acid and CDCA differ only in the 6-ethyl group present in obeticholic acid, and accordingly obeticholic acid and CDCA are similar in many of their physicochemical properties, including partition co-efficient and total surface polarity, as evidenced by the LogP and tPSA values shown below:



Boiling Point: 1144.68 [K]
Melting Point: 726.04 [K]
Log P: 4.95
tPSA: 77.76
pKa: 4.669, 14.626, 15.078

Boiling Point: 1103.59 [K]
Melting Point: 707.74 [K]
Log P: 4.13
tPSA: 77.76
pKa: 4.670, 14.624, 15.075

8.      I further assert that due to the similarity in their physicochemical properties, it would be impractical to separate obeticholic acid and CDCA by using a chromatographic purification method such as HPLC to achieve highly pure obeticholic acid comprising less than 1% of CDCA.

Attorney Docket No. ACAC-002/C03US

9.     I have been participating in the development of obeticholic acid and am aware of the synthetic method described in Ferrari. I assert that the synthetic method in Ferrari could not produce obeticholic acid that comprises less than 1% of CDCA.

10.    I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001 and that willful false statements may jeopardize the validity of this application and any patent issuing therefrom.

Dr. Melissa Rewolinski

Signed this 8th day of June, 2015

3

# EXHIBIT 5

Attorney Docket No. IPHA-017/001US 321961-2208

**Remarks**

Upon entry of the amendments, claims 19, 21-24, 27-33, 38-43, 45, 47, 48, 51, and 52 are pending.  Claims 1-17, 20, 25, 26, 34-37, 44, 46, 49, 50, and 53 were previously canceled, and claim 18 is canceled without disclaimer or prejudice.

Applicant has amended the specification to correct the description of Figures 39 and 40 in the Brief Description of the Drawings section.  The amendments relate to the accurate solid form of obeticholic acid which was analyzed by the differential scanning calorimetry (DSC).  Support for the amendments can be found in the as-filed specification at least on page 90, line 4 through page 91, line 21 (particularly page 90, lines 13-14 ("Tg of Form 1 (102-112 $^{\circ}$C)" and "Tm of Form F (120-124 $^{\circ}$C), and page 91, lines 8-21), and in Figures 39 and 40.

No new matter has been added.

**Declaration by Dr. Melissa Rewolinski**

In accordance with the telephonic interview with the Examiner on October 5, 2015, Applicant submits herewith a Declaration by Dr. Melissa Rewolinski, which states, in paragraph 5, that highly pure obeticholic acid comprising less than 1% chenodeoxycholic acid could not be successfully prepared in view of Pellicciari,[1] Natalini, Eichner, Kipp, and Ferrari.

**Claim Rejections – *35 U.S.C. § 102***

Claims 18 is rejected as being anticipated by Pellicciari *et al.* (*J. Med. Chem.* 50, 4265 (2007)).  Without acquiescence, Applicant has canceled claim 18, rendering the rejection moot.

---

[1] Pellicciari *et al.*, *J. Med. Chem.* 50, 4265 (2007)

123881979 v1

Attorney Docket No. IPHA-017/001US 321961-2208

## Conclusion

On the basis of the foregoing amendments and remarks, Applicant respectfully submits that the pending claims are in condition for allowance.  Should any questions or issues arise concerning this application, the Examiner is encouraged to contact the undersigned at the telephone number provided below.


Dated:  November 12, 2015

Respectfully submitted,

Cooley LLP
ATTN:  Patent Group
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC  20004
Tel:  (617) 937-2300
Fax: (202) 842-7899

By:

/ Chen Chen /
Heidi A. Erlacher
Reg. No. 45,409
Chen Chen
Reg. No. 73,384

8

123881979 v1

# EXHIBIT 6

E-file                                    Attorney Docket No. IPHA-017/001US 321961-2208

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| APPLICANTS: | Steiner *et al.* | CONFIRMATION NO.: | 1063 |
| SERIAL NO.: | 13/919,734 | EXAMINER: | Barsky, J. |
| FILING DATE: | June 17, 2013 | ART UNIT: | 1628 |
| FOR: | Preparation and Uses of Obeticholic Acid | | |

### DECLARATION OF DR. MELISSA REWOLINSKI UNDER 37 C.F.R. § 1.132

I, Melissa Rewolinski, hereby declare and state that:

1.      I am the Vice President of Intercept Pharmaceuticals, Inc., the assignee of the subject application. I have over 17 years of experience in chemical synthesis of organic small molecules.

2.      I received a bachelor's degree in chemistry and a doctoral degree in synthetic organic chemistry from Rice University.

3.      I am a co-inventor of the subject application, U.S. Patent Application Serial No. 13/919,734. By virtue of my education and work experience, I am skilled in the art of organic synthetic chemistry, both currently and at the time of the subject invention.

4.      I am aware of the Non-Final Office Action mailed January 8, 2015 in this application. I understand that the Examiner has rejected the claimed invention as lacking novelty over Pellicciari *et al.* (*J. Med. Chem.* 50, 4265 (2007), "Pellicciari"), and as being obvious over Natalini *et al.* (*Anal. Bioanal. Chem.* 388, 1681 (2007), "Natalini"), as evidenced by Eichner *et al.* (US20070087961, "Eichner") and Kipp *et al.* (US20030077329, "Kipp"), and as being obvious over Ferrari *et al.* (WO2006/122977, "Ferrari").

5.      I make this declaration to show that the instant invention yields advantageous results, and that highly pure obeticholic acid comprising less than 1% of chenodeoxycholic acid ("CDCA") could not be successfully prepared in view of Pellicciari, Natalini, Eichner, Kipp, and Ferrari.

6.      I assert that obeticholic acid is at least 100-fold more potent than CDCA in activating the FXR nuclear receptor.  Accordingly, removing CDCA as an impurity from obeticholic acid significantly increases FXR activation by obeticholic acid.  As such, the instant highly pure obeticholic acid and a pharmaceutical composition thereof, comprising less than 1% of CDCA, would advantageously display improved, potent pharmaceutical effectiveness for treating diseases mediated by the FXR nuclear receptor.

7.      I also assert that obeticholic acid and CDCA differ only in the 6-ethyl group present in obeticholic acid, and accordingly obeticholic acid and CDCA are similar in many of their physicochemical properties, including partition co-efficient and total surface polarity, as evidenced by the LogP and tPSA values shown below:



Boiling Point: 1144.68 [K]
Melting Point: 726.04 [K]
Log P: 4.95
tPSA: 77.76
pKa: 4.669, 14.626, 15.078



Boiling Point: 1103.59 [K]
Melting Point: 707.74 [K]
Log P: 4.13
tPSA: 77.76
pKa: 4.670, 14.624, 15.075

8.      I further assert that due to the similarity in their physicochemical properties, it would be impractical to separate obeticholic acid and CDCA by using a chromatographic purification method such as HPLC to achieve highly pure obeticholic acid comprising less than 1% of CDCA.

2

Attorney Docket No. IPHA-017/001US 321961-2208

9.      I have been participating in the development of obeticholic acid and am aware of the synthetic method described in Ferrari. I assert that the synthetic method in Ferrari could not produce obeticholic acid that comprises less than 1% of CDCA.


10.     I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001 and that willful false statements may jeopardize the validity of this application and any patent issuing therefrom.


Dr. Melissa Rewolinski

Signed this 25th day of September, 2015

3

# EXHIBIT 7



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

127041          7590          11/24/2015

Cooley LLP/Intercept Pharmaceuticals, Inc.
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004

| EXAMINER |
|---|
| BARSKY, JARED |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1628 | |

DATE MAILED: 11/24/2015

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/919,734 | 06/17/2013 | André Steiner | IPHA-017/001US | 1063 |

TITLE OF INVENTION: Preparation and Uses of Obeticholic Acid

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $480 | $0 | $0 | $480 | 02/24/2016 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.  THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT.  SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED.  <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u>  SEE 35 U.S.C. 151.  THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION.  IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>   Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
**or <u>Fax</u>   (571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

127041        7590        11/24/2015
Cooley LLP/Intercept Pharmaceuticals, Inc.
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

| | |
|---|---|
| | (Depositor's name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/919,734 | 06/17/2013 | André Steiner | IPHA-017/001US | 1063 |

TITLE OF INVENTION: Preparation and Uses of Obeticholic Acid

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $480 | $0 | $0 | $480 | 02/24/2016 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| BARSKY, JARED | 1628 | 514-182000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

4a. The following fee(s) are submitted:

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. Change in Entity Status (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____   Date _____

Typed or printed name _____   Registration No. _____

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/919,734 | 06/17/2013 | André Steinor | IPHA-017/001US | 1063 |

127041          7590          11/24/2015

Cooley LLP/Intercept Pharmaceuticals, Inc.
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004

| EXAMINER |
|---|
| BARSKY, JARED |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1628 | |

DATE MAILED: 11/24/2015

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
### (Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 13/919,734 | Applicant(s) STEINER ET AL. | |
|---|---|---|---|
| | Examiner JARED D. BARSKY | Art Unit 1628 | AIA (First Inventor to File) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the amendments of November 12, 2015*.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on_____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *19, 21-24, 27-33, 38-43, 45, 47, 48, 51, and 52*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov .

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

      a) ☐ All    b) ☐ Some    *c) ☐ None of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☒ Examiner's Amendment/Comment
6. ☒ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

| /JARED D. BARSKY/ Examiner, Art Unit 1628 | |
|---|---|

Application/Control Number: 13/919,734                                          Page 2
Art Unit: 1628

The present application is being examined under the pre-AIA first to invent provisions.

## NOTICE OF ALLOWANCE

**The following is an examiner's statement of reasons for allowance**:

The claims below were noted as allowable in the previous Office Action.

Applicant filed a declaration on November 12, 2015, as requested by the examiner that confirms that Pelliciari et al. (as well as the other prior art cited in the previous rejection) do not disclose a form of obeticholic acid that comprises less than 1% chenodeoxycholic acid as claimed in independent claims 19 and 52. Specifically, the Declaration of Dr. Melissa Rewolinski indicates that "highly pure obeticholic acid comprising less than 1% chenodeoxycholic acid ('CDCA') <u>could not be</u> successfully prepare in view of Pelliciari, Natalini, Eichner, Kipp, and Ferrari." (Declaration filed November 12, 2015, at par. 5). This statement is phrase as a fact, not an opinion. As such, the examiner has taken it as such.

The declaration obviates the prior art of record.

**Claims 19, 21-24, 27-33, 38-43, 45, 47, 48, 51, and 52 are allowed.**

### _Conclusion_

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JARED BARSKY whose telephone number is (571) 272-

Application/Control Number: 13/919,734                                      Page 3
Art Unit: 1628

2795.  The examiner can normally be reached on Monday through Friday, 9:30 am - 6:00

pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Winston Shen can be reached on (571) 272-3157.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.  Status

information for unpublished applications is available through Private PAIR only.  For

more information about the PAIR system, see http://pair-direct.uspto.gov. Should you

have questions on access to the Private PAIR system, contact the Electronic Business

Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO

Customer Service Representative or access to the automated information system, call

800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/JARED D. BARSKY/
Examiner, Art Unit 1628

/CRAIG RICCI/
Primary Examiner, Art Unit 1628

# EXHIBIT 8

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/947,658 | 11/20/2015 | André Steiner | IPHA-017/D01US | 6185 |

127041          7590          09/26/2017
Cooley LLP/Intercept Pharmaceuticals, Inc.
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004

| EXAMINER |
|---|
| BARSKY, JARED |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1628 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/26/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

ip.docketing@interceptpharma.com
zpatdcdocketing@cooley.com
michelle.iwamoto-fan@interceptpharma.com

PTOL-90A (Rev. 04/07)

| **Office Action Summary** | **Application No.**<br>14/947,658 | **Applicant(s)**<br>STEINER ET AL. | |
|---|---|---|---|
| | **Examiner**<br>JARED D. BARSKY | **Art Unit**<br>1628 | **AIA (First Inventor to File) Status**<br>Yes |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _3_ MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on _7/28/2017_.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL**.   2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☒ Claim(s) _1-8 and 10-17_ is/are pending in the application.
   5a) Of the above claim(s) _4-7_ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) _1-3,8 and 10-17_ is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

   **Certified copies:**
   a)☐ All   b)☐ Some**  c)☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____.

Application/Control Number: 14/947,658                                         Page 2
Art Unit: 1628

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

## DETAILED ACTION

### *Election/Restrictions*

Applicant's election with traverse of **cholestatic liver disease or cholestatic condition** in the reply filed on July 28, 2017, is acknowledged.  Applicant argues that a reasonable number of species are elected.  The examiner respectfully disagrees.  While some particular conditions are claimed, the claims as a whole, include preventing all FXR-mediated conditions.  Prevention therefore the claims include all subject that are merely capable of having an FXR-mediated condition.  This is an unduly burdensome subject population for the examiner to consider.  As such, the requirement for an election of a subject population is made FINAL.

As such, claims 4-7 are <u>withdrawn</u> for being directed to a non-elected species.


### *Status of the Claims*

Claims 1-8 and 10-17 are pending.  Claims 4-7 are withdrawn.  Claims 1-3, 8, 10-17 are examined.

### *Claim Rejections - 35 USC § 112*

<u>Claims 15-17</u> are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention.  Specifically, the phrase **"substantially similar" and the term "about"** used in these claims are not clear.  It is not clear to a person of ordinary skill what substantial similarity means

Application/Control Number: 14/947,658                                    Page 3
Art Unit: 1628

and where a line of demarcation distinguishes substantially similarly from dissimilar or

unsubstantial similarity.  Similarly, it is not clear what less than about 1% means.  It could

include less than 2% or it could only include up to 1.1%.


### *Claim Rejections - 35 USC § 112*

The following is a quotation of the first paragraph of 35 U.S.C. 112:

The specification shall contain a written description of the invention, and of the manner

and process of making and using it, in such full, clear, concise, and exact terms as to enable any

person skilled in the art to which it pertains, or with which it is most nearly connected, to make

and use the same and shall set forth the best mode contemplated by the inventor of carrying out

his invention.

1.      **Claims 1-3, 8, and 10-17 are rejected under 35 U.S.C. 112, first paragraph, because
the specification, while being enabling for a cholestatic liver disease, does not reasonably
provide enablement for <u>prevention of any FXR mediated condition</u>, including any
cardiovascular disease.  The specification does not enable any person skilled in the art to
which it pertains, or with which it is most nearly connected, to use the invention
commensurate in scope with these claims**.

2.      While Applicant has enabled a method of treating cholestatic liver disease, in the sense

that Applicant enables a method for reducing triglycerides, e.g.  However, reducing triglycerides

does not enable prevention of any cardiovascular disease and any FXR-mediated condition.

Cardiovascular diseases include arrhythmia, peripheral artery disease, and others.  Accordingly,

claims 1-3, 8, and 10-17 are rejected under 35 U.S.C. 112, first paragraph, because the

specification, while being enabling for the treatment of diseases (conditions or disorders) as

discussed, does not reasonably provide enablement for the prevention of such diseases. The

specification does not enable any person skilled in the art to which it pertains, or with which it is

most nearly connected, to make and use the invention commensurate in scope with these claims.

3.      Enablement is considered in view of the Wands factors (MPEP 2164.01(A)). These

include: nature of the invention, breadth of the claims, guidance of the specification, the

existence of working examples, state of the art, predictability of the art and the amount of

experimentation necessary. All of the Wands factors have been considered, with the most

relevant factors discussed below.

4.      **Nature of the invention**: The instant invention is drawn to a method of preventing an

FXR mediated condition. As defined by the Merriam-Webster Online Dictionary, to prevent

something is "to keep something from happening or existing." As such, the term 'prevent' is

distinct from, for example, the term 'treat' or 'manage' which would entail reducing the

likelihood of an event or ameliorating some of the symptoms of a disease or condition.

Accordingly, the nature of the invention is extremely complex in that it mandates that any person

administered the instant compound will never have any cardiovascular condition, for the entirety

of that person's life.

5.      **Breadth of the claims**: The claims are broad in that they encompass a method for

preventing any FXR mediated condition. As such, the claims are extremely broad in that they

claim that administration of pure obeticholic acid to any subject will prevent that subject from

ever developing an FXR-mediated condition. Additionally, the treatment group is broad since a

patient in need of prevention of an FXR-mediated condition could encompass the entire world

population; that is, every living person is in need of a method that will completely eradicate the possibility of that person developing an FXR-mediated condition. Thus, the breadth of the claims is extremely broad, which further exacerbates the complexity of the invention.

6. **Guidance of the specification/The existence of working examples**: The amount of direction provided by the Applicant is considered to be determined by the specification and the working examples. Applicant's data do not demonstrate that the instant invention is capable of preventing any disease or disorder. Rather, there is not a single example in the instant Specification of an actual treatment in an *in vivo* subject.

7. **State of the art/Predictability of the art**: The level of predictability in the art is considered to be relatively low. The basis of all modern medicine and biology is, of course, chemistry. Yet even under the best of circumstances, and several hundred years after Lavoisier laid the foundations of its modern practice, chemistry remains and experimental science. Neither the medicinal/biological arts nor the chemical arts upon which they are based have advanced to the point where certainty has replaced the need for clinical and/or laboratory experimentation. In the instant case, even a cursory perusal of the teachings of the medicinal arts reveals that they have not advanced to the point where complex conditions such as obesity can in any way be said to be preventable. While it is possible to treat obesity, as to its prevention, the art, in general, teaches, instead, that what may in some cases be prevented with regard to such diseases or disorders are their associated symptoms.

8. **Amount of experimentation necessary**: Given the complex nature of the invention, which is exacerbated by the breadth of the claims, and given the lack of working examples and the high degree of unpredictability in the art, it would require undue experimentation for a person

of ordinary skill in the art to make and use the invention as claimed.  The skilled artisan would be required to undertake long-term animal tests, preferably over a period of years, preferably involving a relatively long-lived experimental animal such as dogs or monkeys, or a human clinical trial.  Animal experiments include, along with induction of the disease state, administration of the potential pharmaceutical compound and collection and analysis of data, additional burdens associated with compliance with animal welfare regulations, care, feeding, and other maintenance of the animals, dissection of dead animals to collect data, and disposal of dead animals after the protocol is finished. Administering the claimed compounds for a period of years to a suitable subject population is an undue amount of experimentation needed in order to practice the full range of the claimed invention. As prevention in the full sense is an extremely high bar for any clinical outcome, there is no reason to believe that the therapy would be successful, and any actual success would be a surprising and unpredictable result.


### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102 of this title, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.  Patentability shall not be negated by the manner in which the invention was made.

**Claims 1-3 and 10-14 are rejected under 35 U.S.C. 103 as being unpatentable over Ferrari et al., (WO2006/122977) (cited in IDS).**

Application/Control Number: 14/947,658                                           Page 7
Art Unit: 1628

Ferrari teaches methods of preparing **purified forms of obeticholic acid** (p. 4).
Additionally, the compounds taught are used to increase HDL cholesterol and to lower
triglycerides for the **prevention and treatment of hepatic disease of cholestatic origin** (p2,
lines 4-5).

According to the instant Specification, Table B compares the impurities and water
concentration formulation by the instantly claimed process of arriving at Form 1 and that
described in the '997 application (shown below).

**Table B: Comparison of Impurities of Obeticholic Acid Generated from Process of the Application and '977 Process**

| Parameter | Specification limit | Process of the application | '977 process |
|---|---|---|---|
| Water (KF) | NMT 4.5% | 1.0% | 2.3% |
| Impurity 1 and Impurity 4 | NMT 0.15% | <0.05% | <0.05% |
| Impurity 2 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 3 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 5 | NMT 3.0% | 0.2% | 1.0% |
| Impurity 6 | NMT 0.15% | <0.05% | <0.05% |

Impurity 1 is 6-ethylursodeoxycholic acid.
Impurity 2 is 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid
Impurity 3 is 6β-ethylchenodeoxycholic acid.
Impurity 4 is 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid.
Impurity 5 is chenodeoxycholic acid.
Impurity 6 is 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid (6ECDCA dimer).
NMT refers to "not more than".

The table above shows that the '977 process and the instant application fall within the
"Specification limit" prescribed.  Additionally, the only conclusively established impurity
differential exists for impurity 5 and water because the other parameters include a "less than"
symbol, which is interpreted as inclusive of lower amounts.  Further, the claimed term "about"
could be interpreted to include those embodiments of the '977 application.

With regard to claims 10-13, the examiner notes that Applicant has not established a non-obvious difference between the instantly claimed impurity concentrations and those impurity concentrations produced by the process described in the '977 disclosure with respect to the following claims.  According to M.P.E.P. § 2144.04, "Pure materials are novel *vis-à-vis* less pure or impure materials because there is a difference between pure and impure materials. Therefore, the issue is whether claims to a pure material are unobvious over the prior art. *In re Bergstrom,* 427 F.2d 1394, 166 USPQ 256 (CCPA 1970). Purer forms of known products may be patentable, but the mere purity of a product, by itself, does not render the product unobvious. Factors to be considered in determining whether a purified form of an old product is obvious over the prior art include whether the claimed chemical compound or composition has the same utility as closely related materials in the prior art, and whether the prior art suggests the particular form or structure of the claimed material or suitable methods of obtaining that form or structure. *In re Cofer,* 354 F.2d 664, 148 USPQ 268 (CCPA 1966) (Claims to the free-flowing crystalline form of a compound were held unobvious over references disclosing the viscous liquid form of the same compound because the prior art of record did not suggest the claimed compound in crystalline form or how to obtain such crystals.). See also *Ex parte Stern,* 13 USPQ2d 1379 (Bd. Pat. App. & Inter. 1987) (Claims to interleukin-2 (a protein with a molecular weight of over 12,000) purified to homogeneity were held unpatentable over references which recognized the desirability of purifying interleukin-2 to homogeneity in a view of a reference which taught a method of purifying proteins having molecular weights in excess of 12,000 to homogeneity wherein the prior art method was similar to the method disclosed by appellant for purifying interleukin-2)."  Here, a compound is being claimed at a specific level of purity that is similar to

Application/Control Number: 14/947,658                                   Page 9
Art Unit: 1628

the prior art.  Patentability is based on the product itself, not the process of arriving at the

product. See <u>M.P.E.P. § 2113</u>.  Further, "The Patent Office bears a lesser burden of proof in

making out a case of *prima facie* obviousness for product-by-process claims because of their

peculiar nature" than when a product is claimed in the conventional fashion. *In re Fessmann,* 489

F.2d 742, 744, 180 USPQ 324, 326 (CCPA 1974).

 <u>With regard to claim 14</u>, the burden is on Applicant to explain and show why the

embodiments taught by the prior art could not have a Tg in "about" the range of 102-112°C.

 As such, no claim is allowed.


### *Conclusion*

 Any inquiry concerning this communication or earlier communications from the

examiner should be directed to JARED D. BARSKY whose telephone number is (571)272-2795.

The examiner can normally be reached on M-F, 8:30 AM - 5:00 PM EST.

 If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Winston Shen can be reached on 571-272-3157.  The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

 Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would

Application/Control Number: 14/947,658                                              Page 10

Art Unit: 1628

like assistance from a USPTO Customer Service Representative or access to the automated

information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/JARED D BARSKY/
Primary Examiner, Art Unit 1628

# EXHIBIT 9

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/496,398 | 04/25/2017 | André Steiner | IPHA-017/C02/US | 1041 |

| | |
|---|---|
| 127041          7590          09/29/2017 | EXAMINER |
| Cooley LLP/Intercept Pharmaceuticals, Inc. | BARSKY, JARED |
| 1299 Pennsylvania Avenue, NW, Suite 700 | |
| Washington, DC 20004 | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1628 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/29/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

ip.docketing@interceptpharma.com
zpatdcdocketing@cooley.com
michelle.iwamoto-fan@interceptpharma.com

| *Office Action Summary* | Application No. 15/496,398 | Applicant(s) STEINER ET AL. | |
|---|---|---|---|
| | Examiner JARED D. BARSKY | Art Unit 1628 | AIA (First Inventor to File) Status Yes |

| -- The MAILING DATE of this communication appears on the cover sheet with the correspondence address -- |
|---|

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>4/25/2017</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on \_\_\_\_\_.
2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on \_\_\_\_\_; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5)☒ Claim(s) <u>15-75</u> is/are pending in the application.
    5a) Of the above claim(s) \_\_\_\_\_ is/are withdrawn from consideration.
6)☐ Claim(s) \_\_\_\_\_ is/are allowed.
7)☒ Claim(s) <u>15-75</u> is/are rejected.
8)☐ Claim(s) \_\_\_\_\_ is/are objected to.
9)☐ Claim(s) \_\_\_\_\_ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on \_\_\_\_\_ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
    a)☐ All  b)☐ Some**  c)☐ None of the:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. \_\_\_\_\_.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)
2)☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date \_\_\_\_\_.
3)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. \_\_\_\_\_.
4)☐ Other: \_\_\_\_\_.

Application/Control Number: 15/496,398                                      Page 2

Art Unit: 1628

The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.

## DETAILED ACTION

### *Status of the Claims*

Claims 15-75 are pending and examined.

### *Claim Rejections - 35 USC § 102/§ 103*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 and 35

U.S.C. 103 that forms the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

**§ 102-** (a)(1) the claimed invention was patented, described in a printed
publication, or in public use, on sale or otherwise available to the public before
the effective filing date of the claimed invention.

**§ 103-** A patent for a claimed invention may not be obtained, notwithstanding that the
claimed invention is not identically disclosed as set forth in section 102 of this title, if the
differences between the claimed invention and the prior art are such that the claimed
invention as a whole would have been obvious before the effective filing date of the
claimed invention to a person having ordinary skill in the art to which the claimed
invention pertains.  Patentability shall not be negated by the manner in which the
invention was made.

**Claims 15-75 are rejected under 35 U.S.C. 102(a)(1) as anticipated by or, in the**

**alternative, under 35 U.S.C. 103 as obvious over Natalini et al., "Correlation between CMC**

**and chromatographic index: simple and effective evaluation of hydrophobic/ hydrophilic**

**balance of bile acids," Anal Bioanal Chem (2007) 388:1681-1688 (cited in IDS).**

The instant claims are product claims.  Thus, irrespective of how they were produced,

they are examined based the on the structural limitations claimed. See <u>M.P.E.P. § 2113</u>.

Natalini teaches a method of purifying through reverse phase high performance liquid chromatography (RP-HPLC) the most potent FXR agonist, (6-ECDCA) (p. 1681, 1st par.).  RP-HPLC was conducted using a mobile phase of NaH2PO4 in water, and NaOH as a buffer (p. 1682, *Materials*).   The materials were filtered and bile acids were prepared in concentrations of 1.0 and 1.5 mg/ml.   Table 1 indicates the analytes that were separated included 6ECDCA and CDCA (i.e., chenodeoxycholic acid), among others.  As such, the prior art teachings separating 6-ECDCA through a purification technique that would yield a mobile phase comprising: sodium dihydrogen phosphate, sodium hydroxide (i.e., the mobile phase), and the separated 6-ECDCA in a container or vial comprising the mobile phase solvent and buffer, yielding 6-EDCA, a pharmaceutical carrier, and a buffer.

The examiner notes that 6-ECDCA was separated out and the fraction collector included NaOH (i.e., a buffer) and sodium dihydrogen phosphate (i.e., the mobile phase components). Absent evidence to the contrary, purified 6-ECDCA comprises minimal amounts, if any, of bile acid (BA) compound.  Further, the examiner does not have the facilities and resources to provide the factual evidence needed in order to establish that the product of the prior art does not possess the same material, structural and functional characteristics of the claimed product. "In the absence of evidence to the contrary, the burden is on the applicant to prove that the claimed product is different from those taught by the prior art and to establish patentable differences."  See *In re Best* 562F.2d 1252, 195 USPQ 430 (CCPA 1977) and *Ex parte Gray* 10 USPQ 2d 1922 (PTO Bd. Pat. App. & Int. 1989).  Additionally, the instant Specification notes that HPLC was used (as shown in Table B on page 31) to identify the percentages of impurities in an obeticholic acid as prepared using a method discussed in WO2006/122977.  This is indicia

Application/Control Number: 15/496,398                                    Page 4
Art Unit: 1628

that HPLC separates out other bile acids during purification, including UCDA (i.e.,

chenodeoxycholic acid).  According to <u>M.P.E.P. § 2113</u>, "Once the examiner provides a

rationale tending to show that the claimed product appears to be <u>the same or similar</u> to that of the

prior art, although produced by a different process, the burden shifts to applicant to come

forward with evidence establishing an unobvious difference between the claimed product and the

prior art product." *In re Marosi,* 710 F.2d 798, 802, 218 USPQ 289, 292 (Fed. Cir. 1983).

Further, "[T]he lack of physical description in a product-by-process claim makes

determination of the patentability of the claim more difficult, since in spite of the fact that the

claim may recite only process limitations, it is the patentability of the product claimed and not of

the recited process steps which must be established. We are therefore of the opinion that when

the prior art discloses a product which reasonably appears to be either identical with or only

slightly different than a product claimed in a product-by-process claim, <u>a rejection based

alternatively on either section 102 or section 103 of the statute is eminently fair and acceptable</u>.

As a practical matter, the Patent Office is not equipped to manufacture products by the myriad of

processes put before it and then obtain prior art products and make physical comparisons

therewith." *In re Brown,* 459 F.2d 531, 535, 173 USPQ 685, 688 (CCPA 1972).

<u>With regard to claim 40</u>, less than about 3% water includes no water.

<u>Alternatively</u>, if the exact percentages of each impurity claimed are not anticipated by the

prior art disclosure, those differences appear to be only slight differences.  As such, the burden is

on applicant to provide <u>a non-obvious difference</u> between the prior art and the instant claims. See

<u>M.P.E.P. § 2113</u>.

As such, claims 15-75 are rejected by the prior art.

Application/Control Number: 15/496,398                                    Page 5

Art Unit: 1628

<u>*Claim Rejections - 35 USC § 103*</u>

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness

rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the
> claimed invention is not identically disclosed as set forth in section 102 of this
> title, if the differences between the claimed invention and the prior art are such
> that the claimed invention as a whole would have been obvious before the
> effective filing date of the claimed invention to a person having ordinary skill in
> the art to which the claimed invention pertains. Patentability shall not be negated
> by the manner in which the invention was made.

**Claims 15-75 are rejected under 35 U.S.C. 103 as being unpatentable over Ferrari et**

**al., (WO2006/122977) (cited in IDS).**

Ferrari teaches methods of preparing purified forms of obeticholic acid (p. 4). According

to the instant Specification, Table B compares the impurities and water concentration

formulation by the instantly claimed process of arriving at Form 1 and that described in the '997

application (shown below).

Table B: Comparison of Impurities of Obeticholic Acid Generated from Process of
the Application and '977 Process

| Parameter | Specification limit | Process of the application | '977 process |
|---|---|---|---|
| Water (KF) | NMT 4.5% | 1.0% | 2.1% |
| Impurity 1 and Impurity 4 | NMT 0.15% | <0.05% | <0.05% |
| Impurity 2 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 3 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 5 | NMT 3.0% | 0.2% | 1.0% |
| Impurity 6 | NMT 0.15% | <0.05% | <0.05% |

Impurity 1 is 6-ethylursodeoxycholic acid.
Impurity 2 is 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.
Impurity 3 is 6β-ethylchenodeoxycholic acid.
Impurity 4 is 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid.
Impurity 5 is chenodeoxycholic acid.
Impurity 6 is 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic
acid (6ECDCA dimer).
NMT refers to "not more than".

The table above shows that the '977 process and the instant application fall within the

"Specification limit" prescribed.  Additionally, the only conclusively established impurity

differential exists for impurity 5 and water because the other parameters include a "less than"

symbol, which is interpreted as inclusive of lower amounts.  Applicant has <u>not</u> established a non-

obvious difference between the instantly claimed impurity concentrations and those impurity

concentrations produced by the process described by Ferrari.

Claims 32-35, 41, 43, 50, 53-55, 58, and 59 include concentrations of impurity 5 that is

about 0.5% or below.  This is only a slight difference from 1.0% produced by the process of the

'977 disclosure.

<u>With regard to claim 40</u>, less than about 3% water includes no water.

According to <u>M.P.E.P. § 2144.04</u>, "Pure materials are novel *vis-à-vis* less pure or impure

materials because there is a difference between pure and impure materials. Therefore, <u>the issue is</u>

<u>whether claims to a pure material are unobvious over the prior art</u>. *In re Bergstrom,* 427 F.2d

1394, 166 USPQ 256 (CCPA 1970). Purer forms of known products may be patentable, but the

mere purity of a product, by itself, does not render the product unobvious. Factors to be

considered in determining whether a purified form of an old product is obvious over the prior art

include whether the claimed chemical compound or composition has the same utility as closely

related materials in the prior art, and whether the prior art suggests the particular form or

structure of the claimed material or suitable methods of obtaining that form or structure. *In re*

*Cofer,* 354 F.2d 664, 148 USPQ 268 (CCPA 1966) (Claims to the free-flowing crystalline form

of a compound were held unobvious over references disclosing the viscous liquid form of the

same compound because the prior art of record did not suggest the claimed compound in

crystalline form or how to obtain such crystals.). See also *Ex parte Stern,* 13 USPQ2d 1379 (Bd.
Pat. App. & Inter. 1987) (Claims to interleukin-2 (a protein with a molecular weight of over
12,000) purified to homogeneity were held unpatentable over references which recognized the
desirability of purifying interleukin-2 to homogeneity in a view of a reference which taught a
method of purifying proteins having molecular weights in excess of 12,000 to homogeneity
wherein the prior art method was similar to the method disclosed by appellant for purifying
interleukin-2)."  Here, a compound is being claimed at a specific level of purity that is similar to
the prior art.  Patentability is based on the product itself, not the process of arriving at the
product. See M.P.E.P. § 2113.  Further, "The Patent Office bears a lesser burden of proof in
making out a case of *prima facie* obviousness for product-by-process claims because of their
peculiar nature" than when a product is claimed in the conventional fashion. *In re Fessmann,* 489
F.2d 742, 744, 180 USPQ 324, 326 (CCPA 1974).

As such, a person having ordinary skill in the art would have arrived at the instantly
claimed invention in view of the disclosure of the prior art.  One would have been motivated to
do so because the only difference between the claimed product and that taught by the prior art is
a slight difference in concentration of water and one out of five impurities taught by the prior art.
One would have a reasonable expectation of success that the composition claimed would have
the same and/or substantially similar properties based on merely altering the purity by a minimal
percentage one of the five purities and water.  Specifically, the marginal percentage difference of
impurities is a maximum of 1.1 percent for water and 0.8 percent for impurity 5.  However, the
mere difference in the level of purity of the product is not *per se* patentable.  The issue turns to
whether the purity of the product is non-obvious over the prior art.  While Applicant provides

Application/Control Number: 15/496,398                                      Page 8
Art Unit: 1628

some advantages in its Specification as to why the process used to arrive at the claimed product

is better than the process of the '977 disclosure, the advantages are not directed towards the

product itself.  For example, the ease of manufacture and the ability to use the manufacturing

process instantly claimed on a large scale, as well as a more cost-effective process do not relate

to the product itself.   As such, the examiner believes that a *prima facie* case has been made and

secondary considerations, such as unexpected results have not been made of record.


### ***Double Patenting (Non-provisional)***

The nonstatutory double patenting rejection is based on a judicially created doctrine

grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or

improper timewise extension of the "right to exclude" granted by a patent and to prevent possible

harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where

the conflicting claims are not identical, but at least one examined application claim is not

patentably distinct from the reference claim(s) because the examined application claim is either

anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*,

140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d

2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van

Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619

(CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may

be used to overcome an actual or provisional rejection based on nonstatutory double patenting

provided the reference application or patent either is shown to be commonly owned with the

examined application, or claims an invention made as a result of activities undertaken within the

scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination

under the first inventor to file provisions of the AIA as explained in MPEP § 2159.  See MPEP

§§ 706.02(l)(1) - 706.02(l)(3) for applications not subject to examination under the first inventor

to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR

1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be used.

Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the

form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or

PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out completely

online using web-screens. An eTerminal Disclaimer that meets all requirements is auto-

processed and approved immediately upon submission. For more information about eTerminal

Disclaimers, refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

**Claims 15-75 are rejected on the ground of nonstatutory double patenting as being
unpatentable over claims 1-10 of <u>U.S. Patent No. 9,732,116</u>.**  Although the claims at issue are

not identical, they are not patentably distinct from each other because the claims of the '116

patent are directed towards a polymorph of the claimed OCA, which appears to have the same

properties instantly claimed.  The instant claims therefore encompass the patented crystalline

forms.

**Claims 15-75 are rejected on the ground of nonstatutory double patenting as being
unpatentable over claims 1-23 of <u>U.S. Patent No. 9,238,673</u>.**  Although the claims at issue are

not identical, they are not patentably distinct from each other because the claims of the '673

patent are directed towards a polymorph (i.e., Form 1) of the claimed OCA, which appears to

Application/Control Number: 15/496,398                                        Page 10
Art Unit: 1628

have the same properties instantly claimed.  The instant claims therefore encompass the patented

crystalline forms.


### *Double Patenting (Provisional)*

The nonstatutory double patenting rejection is based on a judicially created doctrine

grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or

improper timewise extension of the "right to exclude" granted by a patent and to prevent possible

harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where

the conflicting claims are not identical, but at least one examined application claim is not

patentably distinct from the reference claim(s) because the examined application claim is either

anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*,

140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d

2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van

Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619

(CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may

be used to overcome an actual or provisional rejection based on nonstatutory double patenting

provided the reference application or patent either is shown to be commonly owned with the

examined application, or claims an invention made as a result of activities undertaken within the

scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination

under the first inventor to file provisions of the AIA as explained in MPEP § 2159.  See MPEP

§§ 706.02(l)(1) - 706.02(l)(3) for applications not subject to examination under the first inventor

to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR
1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be used.
Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the
form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or
PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out completely
online using web-screens. An eTerminal Disclaimer that meets all requirements is auto-
processed and approved immediately upon submission. For more information about eTerminal
Disclaimers, refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

**Claims 15-75 are provisionally rejected on the ground of nonstatutory double
patenting as being unpatentable over claims 1-5, 8-13, and 24 of copending <u>Application No.
14/979,005</u>.** Although the claims at issue are not identical, they are not patentably distinct from
each other because the claims of the '005 application are directed towards a crystalline form of
the claimed OCA, which appears to have the same properties instantly claimed.  The instant
claims therefore encompass the patented crystalline forms.

This is a provisional nonstatutory double patenting rejection because the patentably
indistinct claims have not in fact been patented.

As such, no claim is allowed.

### *<u>Conclusion</u>*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JARED D. BARSKY whose telephone number is (571)272-2795. The examiner can normally be reached on M-F, 8:30 AM - 5:00 PM EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Winston Shen can be reached on 571-272-3157. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/JARED D BARSKY/
Primary Examiner, Art Unit 1628

# EXHIBIT 10

**Via EFS**
**Date of Deposit: December 29, 2017**                                **Attorney Docket No. IPHA-017/C02/US**

## REMARKS

Reconsideration and withdrawal of all pending rejections are respectfully requested in view of the claim amendments and remarks presented herein, which place the application into condition for allowance.

**I.      Status of the Claims and Formal Matters**

Claims 15-75 are pending. Claims 15, 18, 20-41, 43, 50, 53-55, and 58-75 have been amended for clarity and to further define the pharmaceutical composition as comprising a non-crystalline obeticholic acid.  Support for the amendments can be found throughout the specification as filed, for example, at page 31, lines 26-27.  No new matter has been added.

**II.     Rejections under 35 USC § 102 or 103**

Claims 15-75 are rejected under 35 U.S.C. 102(a)(l) as allegedly anticipated by or, in the alternative, under 35 U.S.C. 103 as allegedly obvious over Natalini et al., Anal. Bioanal. Chem. (2007) 388:1681-1688 ("Natalini").  Applicants disagree with the rejections.

Contrary to the Examiner's allegations, Natalini does not teach "a method of *purifying* through reverse phase high performance liquid chromatography (RP-HPLC) the most potent FXR agonist, (6-ECDCA) (p. 1681, 1st par.)" (emphasis added), and Table 1 does not indicate that "the analytes that were *separated* included 6ECDCA and CDCA (i.e., chenodeoxycholic acid), among others." (emphasis added). The Examiner's conclusion that the prior art teaches *separating* 6-ECDCA through a purification technique, and that absent evidence to the contrary, *purified* 6-ECDCA comprises minimal amounts, if any, of bile acid (BA) compound are inconsistent with the teachings of the reference.

Applicants respectfully submit that Natalini describes an analytical method (RP-HPLC) of measuring retention factors which are based on the average results of three consecutive injections of **each compound**, the chromatographed bile acid (see, for example, p.1683, left column). Nowhere does Natalini suggest that the described method can be used for <u>purifying</u> OCA or <u>separating</u> a mixture containing OCA and any other bile acids, especially for the purposes of manufacturing an active ingredient for a pharmaceutical composition as disclosed in the present application. The reference only relates to analysis of individual samples of various

Via EFS
Date of Deposit: December 29, 2017                    Attorney Docket No. IPHA-017/C02/US

bile acids listed in Table 1, and not to their purification, separation or analysis of impurities contained in any of the examined bile acid samples, let alone 6-ECDCA specifically.

The Examiner's statement that "the prior art discloses a product which reasonably appears to be either identical with or only slightly different than a product claimed in a product-by-process claim" is clearly unsupported by the teachings of the cited reference as Natalini does not teach or suggest the claimed composition comprising non-crystalline OCA comprising less than 1% by weight of chenodeoxycholic acid (CDCA) impurity or any other impurity recited in the present claims.

With regard to dependent claim 40, Applicants note that the claim further limits water content in the composition of claim 15 not to exceed 3%. Applicants are of opinion that claim 40 is a proper dependent claim.

Accordingly, the rejections under 35 U.S.C. 102(a)(l) or 103 of claims 15-75 over Natalini should be reconsidered and withdrawn.

## III.   Rejections under 35 USC § 103

Claims 15-75 are rejected under 35 U.S.C. 103 as allegedly being unpatentable over Ferrari et al., (WO2006/122977) ("Ferrari"). Applicants disagree.

Contrary to the Examiner's allegations, Ferrari does not teach a method of preparing **purified** forms of obeticholic acid. Although the disclosed percentages of impurities obtained in the '977 process and the process of the instant application fall within the "Specification limit" as noted by the Examiner, the product obtained by the present method has an improved purity profile, especially with regard to impurity 5.

A consistent criterion for determination of obviousness is whether prior art would have suggested to one of ordinary skill in the art that the claimed invention should be carried out and would have a reasonable likelihood of success, in view of the prior art (*In re Dow Chemical* Co., 837 F.2d 469 (Fed. Cir. 1988). In addition, to establish a *prima facie* case of obviousness, a reasonable expectation of success in achieving the claimed invention based on the disclosures of the prior art by a skilled artisan is required. MPEP §2143.02. Particularly, with regard to the patentability of a purified compound, MPEP states "[f]actors to be considered in determining whether a purified form of an old product is obvious over the prior art include ...whether the prior art suggests ... **suitable** methods of obtaining that form or structure". MPEP §2144.04 (emphasis added). Also, it is well recognized that "[a] prior art reference must be considered in

11

**Via EFS**
**Date of Deposit:  December 29, 2017**                    Attorney Docket No. IPHA-017/C02/US

its entirety, i.e., as a whole." MPEP § 2141.02(VI), quoting *WL. Gore &Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540 (Fed. Cir. 1983).

As discussed above, the instant invention is directed to a pharmaceutical composition comprising non-crystalline obeticholic acid, wherein the non-crystalline obeticholic acid comprises less than 1% of CDCA.

A skilled artisan, in view of Ferrari, would not have been suggested to carry out the instant invention, and could not have reached the instant invention with a reasonable expectation of success.  Ferrari makes no mention that the obeticholic acid prepared therein suffers from any deficiencies. Particularly, Ferrari does not indicate in any way that the obeticholic acid generated therein needs to be further purified to remove any impurities, much less CDCA and even less so to the amount of less than 1% by weight.  Thus, a skilled artisan, in view of Ferrari, would not have been motivated to practice the instant invention.

Moreover, a skilled artisan, based on the disclosure of Ferrari, could not have arrived at the instant invention with a reasonable expectation of success. As stated in the Rewolinski Declaration submitted in the parent application No. 13/919,734, a skilled artisan using the process described in Ferrari could in no way achieve a highly pure obeticholic acid comprising less than 1% of CDCA, as instantly claimed. In addition, not only does Ferrari fail to teach or suggest how the CDCA impurity would be generated according to the synthesis described therein, but, more importantly, Ferrari also fails to provide any guidance on how any of the steps or reagents described therein could be modified to decrease the CDCA impurity by any extent, let alone less than 1%. Thus, a skilled artisan, in view of Ferrari, could not reasonably expect to successfully reach the instant invention.

In response to the Examiner's assertion that claims 32-35, 41, 43, 50, 53-55, 58, and 59 recite concentration of impurity 5 of about 0.5% or below corresponds to only a slight difference from 1.0% produced by the process of the '977 disclosure, Applicants submit that the non-obviousness lies not in the slight difference in the amount of impurity 5, but in the <u>targeted reduction</u> of the amount of a <u>specific impurity</u> as recited in the present claims.  Furthermore, CDCA is a critical impurity, removal of which can significantly increase FXR activation by obeticholic acid, which is at least 100-fold more potent than CDCA.  As such, the claimed composition possesses an improved pharmaceutical profile (The Rewolinski Declaration submitted in the parent application No. 13/919,734).

**Via EFS**
**Date of Deposit: December 29, 2017**                                      Attorney Docket No. IPHA-017/C02/US

Therefore, contrary to the Examiner's allegations, a person having ordinary skill in the art would not have arrived at the instantly claimed invention in view of the disclosure of the cited prior art. A skilled artisan would not have been motivated to select a specific impurity that needs to be further removed and design an improved synthesis targeting particularly the reduction of this specific impurity based on the cited reference. Applicants further submit that the Examiner's allegations of obviousness are based on the knowledge gleaned only from the applicant's disclosure and **not** from the knowledge which was within the level of ordinary skill in the art at the time the claimed invention was made. As such, the Examiner's conclusion of obviousness is based on improper hindsight reasoning. MPEP 2145.

Accordingly, the rejections under 35 U.S.C. 103 of claims 15-75 over Ferrari should be reconsidered and withdrawn.

## IV.   Double Patenting Rejections

Claims 15-75 are rejected on the ground of nonstatutory double patenting as allegedly being unpatentable over claims 1-10 of U.S. Patent No. 9,732,116. Applicants disagree with the rejection.

According to the Office Action, the claims at issue, although not identical, are not patentably distinct from the claims of the '116 patent because they encompass the patented crystalline forms of '116 patent.

Applicants respectfully submit that the present claims are directed to a pharmaceutical composition comprising non-crystalline obeticholic acid, and therefore do not encompass crystalline forms of the '116 patent.

Therefore, non-statutory obviousness-type double patenting rejection over claims 1-10 of U.S. Patent No. 9,732,116 should be reconsidered and withdrawn.

Claims 15-75 are rejected on the ground of nonstatutory double patenting as being allegedly unpatentable over claims 1-23 of U.S. Patent No. 9,238,673.

According to the Office action, the claims at issue, although not identical, are not patentably distinct from the claims of the '673 patent.

Applicants respectfully submit that in the interest of advancing prosecution, a terminal disclaimer will be filed upon finding of allowable subject matter.

**Via EFS**
**Date of Deposit:  December 29, 2017**                                                                    **Attorney Docket No. IPHA-017/C02/US**

Claims 15-75 are provisionally rejected on the ground of nonstatutory double patenting as being allegedly unpatentable over claims 1-5, 8-13, and 24 of copending Application No. 14/979,005. Applicants disagree with the rejection.

The Examiner contends that although the claims at issue are not identical, they are not patentably distinct from the claims of the '005 application because they encompass the patented crystalline forms.

Applicants respectfully submit that the present claims are directed to a pharmaceutical composition comprising <u>non-crystalline</u> obeticholic acid, and therefore do not encompass crystalline forms of the '005 application.

Therefore, provisional non-statutory obviousness-type double patenting rejection over claims 1-5, 8-13, and 24 of copending Application No. 14/979,005 should be reconsidered and withdrawn.

**Via EFS**
**Date of Deposit:  December 29, 2017**                        **Attorney Docket No. IPHA-017/C02/US**

## **CONCLUSION**

By this paper, Applicants believe the application is now in condition for allowance.  If there is any remaining issue or impediment, the Examiner is encouraged to contact the undersigned at the number below.

Respectfully submitted,


Dated:  December 29, 2017                     /Eugenia Kiselgof/
                                              Eugenia Kiselgof
                                              Registration No. 65,258
                                              Agent for Applicants

                                              Michelle A. Iwamoto-Fan
                                              Registration No. 55,296
                                              Attorney for Applicants

                                              Intercept Pharmaceuticals, Inc.
                                              10 Hudson Yards, 37th Floor
                                              New York, New York 10001
                                              Telephone: (646) 757-2344
                                              Fax: (646) 747-1001

# EXHIBIT 11

U<small>NITED</small> S<small>TATES</small> P<small>ATENT AND</small> T<small>RADEMARK</small> O<small>FFICE</small>

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/947,658 | 11/20/2015 | André Steiner | IPHA-017/D01US | 6185 |

127041          7590          06/01/2018
Intercept Pharmaceuticals, Inc.
Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NEW YORK 10001
UNITED STATES OF AMERICA

| EXAMINER |
|---|
| BARSKY, JARED |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1628 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 06/01/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

angel.matos@interceptpharma.com
ip.docketing@interceptpharma.com
zIPPatentDocketingMailboxUS@cooley.com

| *Notice of Allowability* | Application No.<br>14/947,658 | Applicant(s)<br>Steiner et al. | |
|---|---|---|---|
| | Examiner<br>JARED D BARSKY | Art Unit<br>1628 | AIA Status<br>Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**
All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included
herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS
NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative
of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to the telephonic interview of April 9, 2018.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the
   restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 1-8 and 10-14 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent
   Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information
   , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All    b) ☐ Some    *c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the
         International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file areply complying with the requirements
   noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
      Paper No./Mail No. _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each
   sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the
   attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08),
   Paper No./Mail Date _____ .
3. ☐ Examiner's Comment Regarding Requirement for Deposit
   of Biological Material _____ .
4. ☐ Interview Summary (PTO-413),
   Paper No./Mail Date. _____ .

5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /JARED BARSKY/<br>Primary Examiner, Art Unit 1628 | |
|---|---|
| | |

Application/Control Number: 14/947,658                                          Page 2
Art Unit: 1628

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### *Corrected Notice of Allowability*

Canceled claim 9 was improperly shown as allowed in the Notice of Allowability of April 12, 2018. As such, the claims are renumbered to show claim 9 as canceled.

**As such, claims 1-8 and 10-14 are allowed.**

**Claims 9 and 15-17 are canceled.**

### *Conclusion*

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JARED BARSKY whose telephone number is (571) 272-2795. The examiner can normally be reached on Monday through Friday, 9:30 am - 6:00 pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Winston Shen can be reached on (571) 272-3157. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 14/947,658                                      Page 3
Art Unit: 1628

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/JARED BARSKY/
Primary Examiner, Art Unit 1628

# EXHIBIT 12



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

127041        7590        08/27/2018
Intercept Pharmaceuticals, Inc.
Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

| EXAMINER |
| --- |
| BARSKY, JARED |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 1628 | |

DATE MAILED: 08/27/2018

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 15/496,398 | 04/25/2017 | André Steiner | IPHA-017/C02/US | 1041 |

TITLE OF INVENTION: Preparation and Uses of Obeticholic Acid

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 11/27/2018 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. <u>PROSECUTION ON THE MERITS IS CLOSED.</u> THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** _Mail_   **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
or _Fax_   **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

127041          7590          08/27/2018
Intercept Pharmaceuticals, Inc.
Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/496,398 | 04/25/2017 | André Steiner | IPHA-017/C02/US | 1041 |

TITLE OF INVENTION: Preparation and Uses of Obeticholic Acid

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 11/27/2018 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| BARSKY, JARED | 1628 | 514-182000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2.** For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)



Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

**4a. The following fee(s) are submitted:**

☐ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s):** **(Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____          Date _____

Typed or printed name _____          Registration No. _____

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/496,398 | 04/25/2017 | André Steiner | IPHA-017/C02/US | 1041 |

127041 7590 08/27/2018

Intercept Pharmaceuticals, Inc.
Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

| EXAMINER | |
|---|---|
| BARSKY, JARED | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1628 | |

DATE MAILED: 08/27/2018

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No.<br>15/496,398 | Applicant(s)<br>Steiner et al. | |
|---|---|---|---|
| | Examiner<br>JARED D BARSKY | Art Unit<br>1628 | AIA Status<br>Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to the terminal disclaimer and claim set of 7/2/2018 and 8/1/2018, respectively.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 15-75. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

    a) ☐All    b) ☐ Some    *c) ☐ None of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____

5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

/JARED BARSKY/
Primary Examiner, Art Unit 1628

Application/Control Number: 15/496,398                                              Page 2
Art Unit: 1628

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### *Reasons for Allowance*

Applicant filed a <u>Terminal Disclaimer</u> that was approved by the Office on July 2, 2018. As such, the sole rejection of record is withdrawn.

**<u>Claims 15-75 are allowed.</u>**

**<u>Claims 1-14 are canceled.</u>**

### *Conclusion*

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JARED BARSKY whose telephone number is (571) 272-2795. The examiner can normally be reached on Monday through Friday, 9:30 am - 6:00 pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Winston Shen can be reached on (571) 272-3157. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished

Application/Control Number: 15/496,398                                         Page 3
Art Unit: 1628

applications is available through Private PAIR only.  For more information about the PAIR system,

see http://pair-direct.uspto.gov.  Should you have questions on access to the Private PAIR system,

contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).  If you would like

assistance from a USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/JARED BARSKY/
Primary Examiner, Art Unit 1628

# EXHIBIT 13

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 1 OF 2**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| | Application Number | 15/139,138 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Filing Date | April 26, 2016 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | 1617 |
| | Examiner Name | Carlos A. Azpuru |
| **(Use as many sheets as necessary)** | Attorney Docket Number | IPHA-024/001US 321961-2410 |

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1. | 7,078,376 B1 | 07-18-2006 | Thomson | |
| | 2. | 7,138,390 B2 | 11-21-2006 | Pellicciari | |
| | 3. | 2005/0101565 A1 | 05-12-2005 | Dasseux | |
| | 4. | 2012/0071451 A1 | 03-22-2012 | Spenard et al. | |
| | 5. | 2012/0160944 A1 | 06-28-2012 | Dodd et al. | |
| | 6. | 2013/0345188 A1 | 12-26-2013 | Steiner et al. | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | 7. | WO 2015/036442 A1 | 03-19-2015 | INSERM | | |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | 7. | CORPECHOT, C. et al. "Biochemical Response to Ursodeoxycholic Acid and Long-Term Prognosis in Primary Biliary Cirrhosis", *Hepatology*, 2008, vol. 48, p. 871-877. | |
| | 8. | CORPECHOT, C. et al. "Early primary biliary cirrhosis: Biochemical response to treatment and prediction of long-term outcome", *Journal of Hepatology*, 2011, vol. 55, p. 1361–1367. | |
| | 9. | KUIPER, E. et al. "Improved Prognosis of Patients with Primary Biliary Cirrhosis That Have a Biochemical Response to Ursodeoxycholic Acid", *Gastroenterology*, 2009, vol. 136, p. 1281–1287. | |
| | 10. | KUMAGI, T. et al. "Baseline Ductopenia and Treatment Response Predict Long-Term Histological Progression in Primary Biliary Cirrhosis", *The American Journal of Gastroenterology*, 2010, vol. 105, p. 2186-2194. | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. [1] CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(ii)) because that application was filed after June 30, 2003 or is available in the IFW. ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120. [1] Applicant's unique citation designation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

SHEET 2 OF 2

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | Application Number | 15/139,138 |
| | Filing Date | April 26, 2016 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | 1617 |
| | Examiner Name | Carlos A. Azpuru |
| | Attorney Docket Number | IPHA-024/001US 321961-2410 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | 11. | MOMAH, N. et al. "Optimizing biochemical markers as endpoints for clinical trials in primary biliary cirrhosis", *Liver International*, 2012, vol. 32, p. 790-795. | |

140507570 v1

| Examiner Signature: | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with a single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 14

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/139,138 | 04/26/2016 | Richard Gail Lancaster | IPHA-024/N01/US | 4136 |

127041      7590      05/10/2017
Cooley LLP/Intercept Pharmaceuticals, Inc.
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004

| EXAMINER |
|---|
| AZPURU, CARLOS A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/10/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

ip.docketing@interceptpharma.com
zpatdcdocketing@cooley.com
michelle.iwamoto-fan@interceptpharma.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | **Application No.**<br>15/139,138 | **Applicant(s)**<br>LANCASTER ET AL. | |
|---|---|---|---|
| | **Examiner**<br>CARLOS AZPURU | **Art Unit**<br>1617 | **AIA (First Inventor to File) Status**<br>Yes |

| *-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --* |
|---|

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>2</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☐ Responsive to communication(s) filed on _____.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL**.    2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims\***

5)☒ Claim(s) <u>1-37</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☐ Claim(s) _____ is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☒ Claim(s) <u>1-37</u> are subject to restriction and/or election requirement.

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a)☐ All   b)☐ Some\*\*  c)☐ None of the:
   1.☐ Certified copies of the priority documents have been received.
   2.☐ Certified copies of the priority documents have been received in Application No. _____.
   3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

\*\* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)

2)☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date _____.

3)☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____.

4)☐ Other: _____.

Application/Control Number: 15/139,138                                          Page 2
Art Unit: 1617

The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.

### *Election/Restrictions*

Restriction to one of the following inventions is required under 35 U.S.C. 121:

I. Claims 1-10, drawn to a composition, classified in A61K 9/1617.

II. Claims 11-12, drawn to a tablet, classified in A61K 9/2013.

III. Claim 13, drawn to a method of preparing, classified in A61K 9/1688.

IV. Claims 14-37, drawn to a method of treating, classified in A61K 9/0024.

The inventions are distinct, each from the other because of the following reasons:

Inventions Group I  and Group II are related as subcombinations disclosed as

usable together in a single combination.  The subcombinations are distinct if they do not

overlap in scope and are not obvious variants, and if it is shown that at least one

subcombination is separately usable.  In the instant case, subcombination Group I has

separate utility such as a capsule filler.  See MPEP § 806.05(d).

The examiner has required restriction between subcombinations usable together.

Where applicant elects a subcombination and claims thereto are subsequently found

allowable, any claim(s) depending from or otherwise requiring all the limitations of the

allowable subcombination will be examined for patentability in accordance with 37 CFR

1.104.  See MPEP § 821.04(a).  Applicant is advised that if any claim presented in a

continuation or divisional application is anticipated by, or includes all the limitations of, a

claim that is allowable in the present application, such claim may be subject to

Application/Control Number: 15/139,138                                      Page 3
Art Unit: 1617

provisional statutory and/or nonstatutory double patenting rejections over the claims of

the instant application.

Inventions Group I  and Group III are related as process of making and product

made.  The inventions are distinct if either or both of the following can be shown: (1)

that the process as claimed can be used to make another and materially different

product or (2) that the product as claimed can be made by another and materially

different process (MPEP § 806.05(f)).  In the instant case the product can be made by

another  and materially process such as ball milling, high pressure homogenization or a

cryogenic spray process.

Inventions Group I  and Group IV  are related as product and process of use.

The inventions can be shown to be distinct if either or both of the following can be

shown: (1) the process for using the product as claimed can be practiced with another

materially different product or (2) the product as claimed can be used in a materially

different process of using that product. See MPEP § 806.05(h).  In the instant case, the

process for using the product as claimed cane be practiced with another materially

different product such as ursodiol.

Restriction for examination purposes as indicated is proper because all the

inventions listed in this action are independent or distinct for the reasons given above

and there would be a serious search and/or examination burden if restriction were not

required because one or more of the following reasons apply:

The Groups are independent and distinct as shown above and the search and/or

examination of all Groups would entail an undue burden on this office.

Application/Control Number: 15/139,138                                    Page 4
Art Unit: 1617

**Applicant is advised that the reply to this requirement to be complete must include (i) an election of a invention to be examined** even though the requirement may be traversed (37 CFR 1.143) **and (ii) identification of the claims encompassing the elected invention**.

The election of an invention may be made with or without traverse. To reserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the restriction requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement will result in the loss of right to petition under 37 CFR 1.144. If claims are added after the election, applicant must indicate which of these claims are readable upon the elected invention.

Should applicant traverse on the ground that the inventions are not patentably distinct, applicant should submit evidence or identify such evidence now of record showing the inventions to be obvious variants or clearly admit on the record that this is the case. In either instance, if the examiner finds one of the inventions unpatentable over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C. 103 or pre-AIA 35 U.S.C. 103(a) of the other invention.

## Election of Species

If Group IV elected, the following election of species is required:


This application contains claims directed to the following patentably distinct species 1) Method of treating PBC; 2) Method of treating the various conditions set out in claim 15. The species are independent or distinct because they represent diseases that can various etiologies. Further, the conditions set out in claim 15 appear to be secondary to PBC, which the primary disease to be treated and can lead to these other conditions. Enablement for direct treatment of these conditions must be considered . In addition, these species are not obvious variants of each other based on the current record.

Applicant is required under 35 U.S.C. 121 to elect a single disclosed species, or a single grouping of patentably indistinct species, for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable. Currently, none are generic.

There is a search and/or examination burden for the patentably distinct species as set forth above because at least the following reason(s) apply:  Search for treatment of all the conditions of both species would entail an undue burden on search and/or examination.

**Applicant is advised that the reply to this requirement to be complete must include (i) an election of a species to be examined** even though the requirement

may be traversed (37 CFR 1.143) **and (ii) identification of the claims encompassing the elected species or grouping of patentably indistinct species**, including any claims subsequently added. An argument that a claim is allowable or that all claims are generic is considered nonresponsive unless accompanied by an election.

The election may be made with or without traverse. To preserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the election of species requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement will result in the loss of right to petition under 37 CFR 1.144. If claims are added after the election, applicant must indicate which of these claims are readable on the elected species or grouping of patentably indistinct species.

Should applicant traverse on the ground that the species, or groupings of patentably indistinct species from which election is required, are not patentably distinct, applicant should submit evidence or identify such evidence now of record showing them to be obvious variants or clearly admit on the record that this is the case. In either instance, if the examiner finds one of the species unpatentable over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C. 103 or pre-AIA 35 U.S.C. 103(a) of the other species.

Upon the allowance of a generic claim, applicant will be entitled to consideration of claims to additional species which depend from or otherwise require all the limitations of an allowable generic claim as provided by 37 CFR 1.141.

A telephone call was not made to Eugenia Kiselgof on 05/02/2017 to request an oral election to the above restriction requirement, but did not result in an election being made.


## Inventorship

Applicant is reminded that upon the cancellation of claims to a non-elected invention, the inventorship must be corrected in compliance with  37 CFR 1.48(a) if one or more of the currently named inventors is no longer an inventor of at least one claim remaining in the application. A request to correct inventorship under 37 CFR 1.48(a) must be accompanied by an application data sheet in accordance with 37 CFR 1.76 that identifies each inventor by his or her legal name and by the processing fee required under 37 CFR 1.17(i).


## Rejoinder

The examiner has required restriction between product or apparatus claims and process claims. Where applicant elects claims directed to the product/apparatus, and all product/apparatus claims are subsequently found allowable, withdrawn process claims that include all the limitations of the allowable product/apparatus claims should be considered for rejoinder. All claims directed to a nonelected process invention must include all the limitations of an allowable product/apparatus claim for that process invention to be rejoined.

Application/Control Number: 15/139,138                                    Page 8
Art Unit: 1617

In the event of rejoinder, the requirement for restriction between the product/apparatus claims and the rejoined process claims will be withdrawn, and the rejoined process claims will be fully examined for patentability in accordance with 37 CFR 1.104. Thus, to be allowable, the rejoined claims must meet all criteria for patentability including the requirements of 35 U.S.C. 101, 102, 103 and 112. Until all claims to the elected product/apparatus are found allowable, an otherwise proper restriction requirement between product/apparatus claims and process claims may be maintained. Withdrawn process claims that are not commensurate in scope with an allowable product/apparatus claim will not be rejoined. See MPEP § 821.04. Additionally, in order for rejoinder to occur, applicant is advised that the process claims should be amended during prosecution to require the limitations of the product/apparatus claims. **Failure to do so may result in no rejoinder.** Further, note that the prohibition against double patenting rejections of 35 U.S.C. 121 does not apply where the restriction requirement is withdrawn by the examiner before the patent issues. See MPEP § 804.01.

### *Inquiries*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to CARLOS AZPURU whose telephone number is (571)272-0588.  The examiner can normally be reached on Tu-Fri, 6:30 am - 5:00 pm.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an

Application/Control Number: 15/139,138                                    Page 9
Art Unit: 1617

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

  If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Johann R. Richter can be reached on (571) 272-0646.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

  Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/CARLOS AZPURU/                              Carlos A. Azpuru
Primary Examiner, Art Unit 1617              Primary Examiner
                                             Art Unit 1617

caz

Case 1:20-cv-01105-MN   Document 226-2   Filed 08/31/22   Page 305 of 397 PageID #: 7001

Application/Control Number: 15/139,138                                    Page 10
Art Unit: 1617

# EXHIBIT 15

**Attorney Docket No.: IPHA-024/N01/US**

## CLAIMS

1.      A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 µm or less.


2.      The composition of claim 1, wherein at least 50% of the particles have a diameter of 100 µm or less.


3.      The composition of claim 2, wherein at least 50% of the particles have a diameter of 50 µm or less.


4.      The composition of claim 3, wherein at least 50% of the particles have a diameter of 10 µm or less.


5.      The composition of claim 4, wherein at least 50% of the particles have a diameter of 5 µm or less.


6.      The composition of claim 1, wherein at least 90% of the particles have a diameter of 200 µm or less.


7.      The composition of claim 6, wherein at least 90% of the particles have a diameter of 100 µm or less.


8.      The composition of claim 7, wherein at least 90% of the particles have a diameter of 25 µm or less.


9.      The composition of claim 1 further comprising at least one pharmaceutically acceptable excipient having an alcohol content of less than about 6% (wt/wt).

10.     The composition of claim 9, wherein the at least one pharmaceutical acceptable excipient is sodium starch glycolate.

11.     A tablet comprising an intra-granular portion and an extra-granular portion, the intra-granular portion comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose, and one or more additional pharmaceutical excipients, and the extra-granular portion comprising one or more pharmaceutical excipients.

12.     The tablet of claim 11, wherein the extra-granular portion comprises microcrystalline cellulose.

13.     A method for preparing a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, wherein at least 50% of the particles have a diameter of 200 μm or less, comprising forming the particles through jet-milling.

14.     A method of treating primary biliary cirrhosis (PBC) in a patient in need thereof, said method comprising administering a composition comprising an effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less.

15.     A method of treating a condition selected from the group consisting of primary sclerosing cholangitis (PSC), chronic liver disease, nonalcoholic fatty liver disease (NAFLD), nonalcoholic steatohepatitis (NASH), hepatitis C infection, alcoholic liver disease, liver damage due to progressive fibrosis and liver fibrosis in a patient in need thereof, said method comprising administering a composition comprising an effective amount of obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less.

16.     The method of claim 15, wherein said condition is nonalcoholic steatohepatitis (NASH).

17.     The method of claim 14, wherein said method further comprises administering said obeticholic acid composition as a starting dose.

18.     The method of claim 17, wherein said starting dose is administered in a titration period.

19.     The method of claim 18, wherein said titration period comprises 1 to 6 months.

20.     The method of claim 18, wherein said titration period is 3 months.

21.     The method of claim 18, wherein said titration period is 6 months.

22.     The method of claim 18, wherein said starting dose is administered to said patient once daily.

23.     The method of claim 18, wherein said starting dose is administered to said patient once weekly.

24.     The method of claim 18, wherein said starting dose is administered to said patient once every other day.

25.     The method of claim 14, wherein said composition comprises obeticholic acid in an amount of about 1 mg to 50 mg.

26.     The method of claim 25, wherein said amount is about 1 mg to 25 mg.

27.     The method of claim 25, wherein said amount is about 1 mg to 10 mg.

28.     The method of claim 14, wherein said composition comprises about 5 mg obeticholic acid.

29.     The method of claim 14, wherein said composition comprises about 10 mg obeticholic acid.

30.     The method of claim 14, wherein said composition comprises about 25 mg obeticholic acid.

31.     The method of claim 25, wherein said amount is about 50 mg.

32.     The method of claim 17, wherein said starting dose comprises about 5 mg.

33.     The method of claim 32, wherein said starting dose is adjusted to about 10 mg after a titration period of about 1 to 6 months.

34.     The method of claim 14, wherein the method further comprises administering a bile acid binding resin at least 4 hours before administration of the composition.

35.     The method of claim 14, wherein the method further comprises administering a bile acid binding resin at least 4 hours after administration of the composition.

36.     The method of claim 14, further comprising administering ursodeoxycholic acid to the patient.

37.     The method of claim 14, wherein the patient is not responsive to treatment with ursodeoxycholic acid.

# EXHIBIT 16

Attorney Docket No.: IPHA-024/N01US
Application No.: 15/139,138
Page 6

# REMARKS

Claims 1-37 are currently pending in this application.  By this paper, new claims 38-43 have been added.  Support for the new claims can be found, for example, in paragraphs [0089], [0090], [00243], [00245], [00569], [00577], [00594], and [00598] of the application as filed.  No new matter has been added by these claims.

According to the Office Action, restriction to one of the following inventions is required under 35 U.S.C. 121:

I. Claims 1-10, drawn to a composition, classified in A61K 9/1617.

II. Claims 11-12, drawn to a tablet, classified in A61K 9/2013.

Ill. Claim 13, drawn to a method of preparing, classified in A61K 9/1688.

IV. Claims 14-37, drawn to a method of treating, classified in A61K 9/0024.

In response, Applicants elect Group I, claims 1-10 and new claims 40-43, drawn to a composition, with traverse.

According to MPEP § 806(C), "[w]here inventions are related as disclosed, but are not distinct as claimed, restriction is never proper."  The inventions of Groups I-IV are not distinct because they are connected, for example, in design (e.g., structure).  See MPEP § 802.01(II).  The claims encompassed by these Groups all relate to obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof.  Furthermore, all Groups are classified together (e.g., A61K) and do not require a different field of search because searching for obeticholic aicd would result in finding art pertinent to all of the inventions (e.g., compositions, tablets, methods of their preparation and method of treatment using such composition and or tablets).  "Where, however, the classification is the same and the field of search is the same and there is no clear indication of separate future classification and field of search, no reasons exist for dividing among independent or related inventions." MPEP § 808.02.

Specifically, the Examiner asserts that Inventions of Group I and Group II are related as subcombinations disclosed as usable together in a single combination. The Examiner further refers to MPEP § 806.05(d).  MPEP § 806.05(d) actually states that the subcombinations are distinct if they do not overlap in scope and are not obvious variants, and if it is shown that at least one subcombination is separately usable. Although the

Examiner concludes that the subcombinations are distinct because subcombination of Group I has separate utility such as a capsule filler, Applicants respectfully submit that according to MPEP § 806.05(d), the claimed inventions are <u>not</u> distinct, because they do overlap in scope, as both groups encompass claims to formulations comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, and furthermore, the tablet of Group II can encompass the composition of Group I.  As such, the inventions of Group I, claims 1-10 and new claims 40-43, and Group II, claims 11-12 and new claims 38-39, are not distinct and restriction between at least these two groups is improper and should be withdrawn.

With regard to Inventions of Groups III and IV, the Examiner further alleges that in the instant case the product can be made by another process such as ball milling, high pressure homogenization or a cryogenic spray process, and the process for using the product as claimed can be practiced with another materially different product such as ursodiol.  Contrary to the Examiner's allegations, the claimed product cannot be made by another process such as ball milling, high pressure homogenization or a cryogenic spray process because these processes may not provide the desired particle size and particle size disrtibution.  For example, one of ordinary skill in the art would know that jet-milling is a preferred process for making the claimed product particles because it provides very narrow particle size range, whereas although ball milling may produce the desired particle size, the particle size distribution curve is very wide, and therefore, undesirable for the claimed product.  As such, without further factual support, the Examiner's assertions are purely conclusory.

With regard to restriction between Groups I and IV, Applicant respectfully submit that although the structure of ursodiol differs from that of obeticholic acid, both compounds belong to a class of bile acids and have similar core structure.  As such, ursodiol may not be considered as materially different product.  Furthermore, Ocaliva® (obeticholic acid or OCA) is a unique and superior treatment for PBC, because, for example, some patients have inadequate therapeutic response to, or unable to tolerate ursodiol, and a significantly lower risk of liver transplant or liver-related death was observed in OCA-treated patients compared to placebo ± ursodiol. (Phase 3 POISE Study, https://clinicaltrials.gov/ct2/show/NCT01473524).

Attorney Docket No.: IPHA-024/N01US
Application No.: 15/139,138
Page 8

As such, restrictions between product and process for making and product and method of using the product are also improper and should be withdrawn.

Accordingly, Applicants request reconsideration and withdrawal of the restriction requirement and examination of all claims, 1-43, on the merits.

Election of Species requirement is not address herein, since Applicants elect, Group I, with traverse.

Attorney Docket No.: IPHA-024/N01US
Application No.: 15/139,138
Page 9

## **CONCLUSION**

      In view of the remarks herein, reconsideration and withdrawal of the restriction requirement is requested. Early and favorable consideration of the application on the merits, and early allowance of the application are earnestly solicited.

      The Examiner is invited to contact the undersigned if additional information is required of the present application.


Respectfully submitted,


Dated:  July 7, 2017
      /Eugenia Kiselgof/
      Eugenia Kiselgof
      Registration No. 65,258
      Agent for Applicants

      Michelle A. Iwamoto-Fan
      Registration No. 55,296
      Attorney for Applicants

      Intercept Pharmaceuticals, Inc.
      10 Hudson Yards, 37th Floor
      New York, New York 10001
      Telephone: (646) 757-2344
      Fax: (646) 747-1001

# EXHIBIT 17

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 1 OF 2**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| | Application Number | 15/139,138 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Filing Date | April 26, 2016 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | 1617 |
| | Examiner Name | Carlos A. Azpuru |
| **(Use as many sheets as necessary)** | Attorney Docket Number | IPHA-024/001US 321961-2410 |

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| /C.A.A/ | 1. | 7,078,376 B1 | 07-18-2006 | Thomson | |
| | 2. | 7,138,390 B2 | 11-21-2006 | Pellicciari | |
| | 3. | 2005/0101565 A1 | 05-12-2005 | Dasseux | |
| | 4. | 2012/0071451 A1 | 03-22-2012 | Spenard et al. | |
| | 5. | 2012/0160944 A1 | 06-28-2012 | Dodd et al. | |
| /C.A.A/ | 6. | 2013/0345188 A1 | 12-26-2013 | Steiner et al. | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| /C.A.A/ | 7. | WO 2015/036442 A1 | 03-19-2015 | INSERM | | |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| /C.A.A/ | 7. | CORPECHOT, C. et al. "Biochemical Response to Ursodeoxycholic Acid and Long-Term Prognosis in Primary Biliary Cirrhosis", *Hepatology*, 2008, vol. 48, p. 871-877. | |
| /C.A.A/ | 8. | CORPECHOT, C. et al. "Early primary biliary cirrhosis: Biochemical response to treatment and prediction of long-term outcome", *Journal of Hepatology*, 2011, vol. 55, p. 1361-1367. | |
| /C.A.A/ | 9. | KUIPER, E. et al. "Improved Prognosis of Patients with Primary Biliary Cirrhosis That Have a Biochemical Response to Ursodeoxycholic Acid", *Gastroenterology*, 2009, vol. 136, p. 1281-1287. | |
| /C.A.A/ | 10. | KUMAGI, T. et al. "Baseline Ductopenia and Treatment Response Predict Long-Term Histological Progression in Primary Biliary Cirrhosis", *The American Journal of Gastroenterology*, 2010, vol. 105, p. 2186-2194. | |

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 07/15/2017 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.  ¹ CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  ¹ Applicant's unique citation designation number (optional).  ² See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  ³ Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  ⁴ For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  ⁵ Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  ⁶ Applicant is to place a check mark here if English language Translation is attached.

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

SHEET 2 OF 2

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | Application Number | 15/139,138 |
| | Filing Date | April 26, 2016 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | 1617 |
| | Examiner Name | Carlos A. Azpuru |
| | Attorney Docket Number | IPHA-024/001US 321961-2410 |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| /C.A.A/ | 11. | MOMAH, N. et al. "Optimizing biochemical markers as endpoints for clinical trials in primary biliary cirrhosis", *Liver International*, 2012, vol. 32, p. 790-795. | |

140507570 v1

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 07/15/2017 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW. ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120. [1] Applicant's unique citation designation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 18



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 127041 | 7590 | 04/10/2018 |

Intercept Pharmaceuticals, Inc.
Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

| EXAMINER |
|---|
| AZPURU, CARLOS A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

DATE MAILED: 04/10/2018

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/139,138 | 04/26/2016 | Richard Gail Lancaster | IPHA-024/N01/US | 4136 |

TITLE OF INVENTION: COMPOSITIONS OF OBETICHOLIC ACID AND METHODS OF USE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $500 | $0 | $0 | $500 | 07/10/2018 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to: <u>Mail</u>**

**Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**or <u>Fax</u>   (571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

127041        7590        04/10/2018
Intercept Pharmaceuticals, Inc.
Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/139,138 | 04/26/2016 | Richard Gail Lancaster | IPHA-024/N01/US | 4136 |

TITLE OF INVENTION: COMPOSITIONS OF OBETICHOLIC ACID AND METHODS OF USE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $500 | $0 | $0 | $500 | 07/10/2018 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| AZPURU, CARLOS A | 1617 | 424-499000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**
☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2.** For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)


Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

**4a. The following fee(s) are submitted:**
☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)
☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____   Date _____

Typed or printed name _____   Registration No. _____

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/139,138 | 04/26/2016 | Richard Gail Lancaster | IPHA-024/N01/US | 4136 |

127041        7590        04/10/2018

Intercept Pharmaceuticals, Inc.
Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

| EXAMINER |
|---|
| AZPURU, CARLOS A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

DATE MAILED: 04/10/2018

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
### (Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 15/139,138 | | Applicant(s) Lancaster et al. | |
|---|---|---|---|---|
| | Examiner CARLOS A AZPURU | | Art Unit 1617 | AIA Status Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to the amendment filed 03/14/2018.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 1-13 and 38-43 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐All      b) ☐ Some      *c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file areply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☑ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

/CARLOS A AZPURU/
Primary Examiner, Art Unit 1617

Application/Control Number: 15/139,138                                                    Page 2
Art Unit: 1617

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the first

inventor to file provisions of the AIA.

### *Withdrawn Rejection*

The rejection of claims 14-37 under 35 USC 112, first paragraph for enablement is withdrawn after

cancellation of those claims in the amendment filed 03/14/2018.

### *Reasons for Allowance*

The following is an examiner's statement of reasons for allowance: The prior art neither teaches,

nor fairly suggests the instantly claimed obeticholic particulate composition.  WO 2015/038442 is cited

as a patent of interest. The instantly claimed invention is allowable over the prior art of record.

Any comments considered necessary by applicant must be submitted no later than the payment

of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such

submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

### *Contact Information*

Any inquiry concerning this communication or earlier communications from the examiner

should be directed to CARLOS A AZPURU whose telephone number is (571)272-0588.  The examiner can

normally be reached on 9 am- 3 pm, 4 pm-8pm.

Examiner interviews are available via telephone, in-person, and video conferencing using a

USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use

the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

Application/Control Number: 15/139,138                                                    Page 3
Art Unit: 1617

   If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor,

Johann R Richter can be reached on 571-272-0646. The fax phone number for the organization where

this application or proceeding is assigned is 571-273-8300.

   Information regarding the status of an application may be obtained from the Patent Application

Information Retrieval (PAIR) system. Status information for published applications may be obtained

from either Private PAIR or Public PAIR. Status information for unpublished applications is available

through Private PAIR only. For more information about the PAIR system, see http://pair-

direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer

Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR

CANADA) or 571-272-1000.

/CARLOS A AZPURU/
Primary Examiner, Art Unit 1617

caz

# EXHIBIT 19

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 1 OF 2**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| | Application Number | 16/248,512 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Filing Date | January 15, 2019 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | TBA |
| | Examiner Name | TBA |
| *(Use as many sheets as necessary)* | Attorney Docket Number | IPHA-024/C02/US |

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1. | 6,238,695 | 05-29-2001 | Makooi-Morehead et al. | |
| | 2. | 7,078,376 B1 | 07-18-2006 | Thomson | |
| | 3. | 7,138,390 B2 | 11-21-2006 | Pellicciari | |
| | 4. | 10,052,337 | 08-21-2018 | Lancaster et al. | |
| | 5. | 2005/0101565 A1 | 05-12-2005 | Dasseux | |
| | 6. | 2012/0071451 A1 | 03-22-2012 | Spenard et al. | |
| | 7. | 2012/0160944 A1 | 06-28-2012 | Dodd et al. | |
| | 8. | 2013/0345188 A1 | 12-26-2013 | Steiner et al. | |
| | 9. | 2014/0186438 A1 | 07-03-2014 | Manku et al. | |
| | 10. | 2019/0076446 A1 | 03-14-2019 | Lancaster et al. | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | 11. | WO 2011/131943 A2 | 10-27-2011 | Cipla Limited et al. | | |
| | 12. | WO 2014/142364 A2 | 09-18-2014 | Mochida Pharmaceutical Co., Ltd. | | |
| | 13. | WO 2015/036442 A1 | 03-19-2015 | INSERM | | |
| | 14. | WO 2016/107575 A1 | 07-07-2016 | Crystal Pharmatech Co., Ltd. | | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW. ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120. ¹ Applicant's unique citation designation number (optional). ² See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. ³ Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). ⁴ For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. ⁵ Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. ⁶ Applicant is to place a check mark here if English language Translation is attached.

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 2 OF 2**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | Application Number | 16/248,512 |
| | Filing Date | January 15, 2019 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | TBA |
| | Examiner Name | TBA |
| | Attorney Docket Number | IPHA-024/C02/US |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title ofthe item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | 15. | CORPECHOT, C. et al. "Biochemical Response to Ursodeoxycholic Acid and Long-Term Prognosis in Primary Biliary Cirrhosis", Hepatology, 2008, vol. 48, p. 871-877. | |
| | 16. | CORPECHOT, C. et al. "Early primary biliary cirrhosis: Biochemical response to treatment and prediction of long-term outcome", Journal of Hepatology, 2011, vol. 55, p. 1361–1367. | |
| | 17. | KUIPER, E. et al. "Improved Prognosis of Patients with Primary Biliary Cirrhosis That Have a Biochemical Response to Ursodeoxycholic Acid", Gastroenterology, 2009, vol. 136, p. 1281–1287. | |
| | 18. | KUMAGI, T. et al. "Baseline Ductopenia and Treatment Response Predict Long-Term Histological Progression in Primary Biliary Cirrhosis", The American Journal of Gastroenterology, 2010, vol. 105, p. 2186-2194. | |
| | 19. | MOMAH, N. et al. "Optimizing biochemical markers as endpoints for clinical trials in primary biliary cirrhosis", Liver International, 2012, vol. 32, p. 790-795. | |
| | 20. | MUDALIAR, S. et al. "Efficacy and Safety of the Farnesoid X Receptor Agonist Obeticholic Acid in Patients With Type 2 Diabetes and Nonalcoholic Fatty Liver Disease", Gastroenterology, 2013, Vol. 145, No. 3, p. 574-582. | |
| | 21. | STANIMIROV, B. et al. "Pleiotropic functions of bile acids mediated by the farnesoid X receptor", Acta Gastro-Enterologica Belgica, 2012, Vol. 75, p. 389-398. | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application related upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 20

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 1 OF 2**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | Application Number | 16/248,512 |
| | Filing Date | January 15, 2019 |
| | First Named Inventor | Richard Gail LANCASTER |
| | Art Unit | 1617 |
| | Examiner Name | Carlos A. AZPURU |
| | Docket Number | IPHA-024/C02/US |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (*if known*) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | 1. | EP 0261693 | 03-30-1988 | Warner-Lambert Company | | |
| | 2. | WO 2004/004774 A2 | 01-15-2004 | Esperion Therapeutics, Inc. | | |
| | 3. | WO 2006/056812 A1 | 06-01-2006 | Vectura Limited | | |
| | 4. | WO 2007/008480 A1 | 01-18-2007 | Nanotherapeutics, Inc. | | |
| | 5. | WO 2010/121323 A1 | 10-28-2010 | Iceutica Pty Ltd. | | |
| | 6. | WO 2013/192097 A1 | 12-27-2013 | Intercept Pharmaceuticals, Inc. | | |
| | 7. | WO 2014/184271 A1 | 11-20-2014 | TES Pharma SRL. | | |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | 8. | FUKUNAKA T. et al. "Effect of Particle Shape of Active Pharmaceutical Ingredients Prepared by Fluidized-Bed Jet-Milling on Cohesiveness", Journal of Pharmaceutical Sciences, 2005, Vol. 94, No. 5, p. 1004-1012. | |
| | 9. | HIRSCHFIELD G. et al. "Efficacy of Obeticholic Acid in Patients with Primary Billiary Cirrhosis and Inadequate Response to Ursodeoxycholic Acid", Gastroenterology, 2015, 148(4), p. 751-761. | |
| | 10. | KESISOGLOU F. et al. "Understanding the Effect of API Properties on Bioavailability Through Absorption Modelling", The AAPS Journal, , 2008, Vol. 10, No. 4, p. 516-525. | |
| | 11. | LI J. et al. "The role of Intra- and Extragranular Microcrystal line Cellusose In Tablet Dissolution", Pharmaceutical Development and Technology, 1996, Vol. 1, No. 4, p. 343-355. | |
| | 12. | LOH Z. et al. "Overview of milling techniques for improving the solubility of poorly water-soluble drugs", Science Direct, Asian Journal of Pharmaceutical Sciences, 2015, Vol. 10, p. 255-274. | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW. ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 2 OF 2**

| Substitute for form 1449/PTO | | Complete if Known | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | | Application Number | 16/248,512 |
| | | Filing Date | January 15, 2019 |
| | | First Named Inventor | Richard Gail LANCASTER |
| | | Art Unit | 1617 |
| | | Examiner Name | Carlos A. AZPURU |
| | | Docket Number | IPHA-024/C02/US |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | 13. | PATEL R. et al.  "An overview of size reduction technologies in the field of pharmaceutical manufacturing", Asian Journal of Pharmaceutics, 2008, p. 216-220. | |
| | 14. | Questran® powder 44.4% package insert, 2012. | |

214615879 v1

| Examiner Signature: | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 21

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

SHEET 1 OF 1

| Substitute for form 1449/PTO | | Complete if Known | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | | Application Number | 16/248,512 |
| | | Filing Date | January 15, 2019 |
| | | First Named Inventor | Lancaster |
| | | Art Unit | 1617 |
| | | Examiner Name | C. A. Azpuru |
| | | Attorney Docket Number | IPHA-024/C02US 321961-3041 |

### U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1. | 8,216,613 | 07-10-2012 | Gryczke | |
| | 2. | 2004/0161407 A1 | 08-19-2004 | Kimura et al. | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | 3. | WO 2005/077935 A1 | 08-25-2005 | Pfizer Limited | | |

### NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title ofthe item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | | | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW. ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120. [1] Applicant's unique citation designation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 22

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 1 OF 3**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| | Application Number | 16/787,796 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Filing Date | February 11, 2020 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | TBA |
| | Examiner Name | TBA |
| *(Use as many sheets as necessary)* | Attorney Docket Number | IPHA-024/C06/US |

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1. | 6,238,695 | 05-29-2001 | Makooi-Morehead et al. | |
| | 2. | 7,078,376 B1 | 07-18-2006 | Thomson | |
| | 3. | 7,138,390 B2 | 11-21-2006 | Pellicciari | |
| | 4. | 10,052,337 | 08-21-2018 | Lancaster et al. | |
| | 5. | 2005/0101565 A1 | 05-12-2005 | Dasseux | |
| | 6. | 2012/0071451 A1 | 03-22-2012 | Spenard et al. | |
| | 7. | 2012/0160944 A1 | 06-28-2012 | Dodd et al. | |
| | 8. | 2013/0345188 A1 | 12-26-2013 | Steiner et al. | |
| | 9. | 2014/0186438 A1 | 07-03-2014 | Manku et al. | |
| | 10. | 2019/0076446 A1 | 03-14-2019 | Lancaster et al. | |
| | 11. | 2019/0255071 A1 | 08-22-2019 | Lancaster et al. | |
| | 12. | 2020/0046735 A1 | 02-13-2020 | Lancaster et al. | |
| | 13. | 2020/0046736 A1 | 02-13-2020 | Lancaster et al. | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | 14. | EP 0261693 | 03-30-1988 | Warner-Lambert Company | | |
| | 15. | WO 2004/004774 A2 | 01-15-2004 | Esperion Therapeutics, Inc. | | |
| | 16. | WO 2006/056812 A1 | 06-01-2006 | Vectura Limited | | |
| | 17. | WO 2007/008480 A1 | 01-18-2007 | Nanotherapeutics, Inc. | | |
| | 18. | WO 2010/121323 A1 | 10-28-2010 | Iceutica Pty Ltd. | | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 2 OF 3**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| | Application Number | 16/787,796 |
| | Filing Date | February 11, 2020 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | TBA |
| | Examiner Name | TBA |
| *(Use as many sheets as necessary)* | Attorney Docket Number | IPHA-024/C06/US |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | 19. | WO 2011/131943 A2 | 10-27-2011 | Cipla Limited et al. | | |
| | 20. | WO 2013/192097 A1 | 12-27-2013 | Intercept Pharmaceuticals, Inc. | | |
| | 21. | WO 2014/142364 A2 | 09-18-2014 | Mochida Pharmaceutical Co., Ltd. | | |
| | 22. | WO 2014/184271 A1 | 11-20-2014 | TES Pharma SRL. | | |
| | 23. | WO 2015/036442 A1 | 03-19-2015 | INSERM | | |
| | 24. | WO 2016/107575 A1 | 07-07-2016 | Crystal Pharmatech Co., Ltd. | | |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | 25. | CORPECHOT, C. et al. "Biochemical Response to Ursodeoxycholic Acid and Long-Term Prognosis in Primary Biliary Cirrhosis", Hepatology, 2008, vol. 48, p. 871-877. | |
| | 26. | CORPECHOT, C. et al. "Early primary biliary cirrhosis: Biochemical response to treatment and prediction of long-term outcome", Journal of Hepatology, 2011, vol. 55, p. 1361–1367. | |
| | 27. | FUKUNAKA T. et al. "Effect of Particle Shape of Active Pharmaceutical Ingredients Prepared by Fluidized-Bed Jet-Milling on Cohesiveness", Journal of Pharmaceutical Sciences, 2005, Vol. 94, No. 5, p. 1004-1012. | |
| | 28. | HIRSCHFIELD G. et al. "Efficacy of Obeticholic Acid in Patients with Primary Billiary Cirrhosis and Inadequate Response to Ursodeoxycholic Acid", Gastroenterology, 2015, 148(4), p. 751-761. | |
| | 29. | KESISOGLOU F. et al. "Understanding the Effect of API Properties on Bioavailability Through Absorption Modelling", The AAPS Journal, , 2008, Vol. 10, No. 4, p. 516-525. | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 3 OF 3**

| Substitute for form 1449/PTO | | Complete if Known | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | | Application Number | 16/787,796 |
| | | Filing Date | February 11, 2020 |
| | | First Named Inventor | Richard Gail Lancaster |
| | | Art Unit | TBA |
| | | Examiner Name | TBA |
| | | Attorney Docket Number | IPHA-024/C06/US |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | 30. | KUIPER, E. et al. "Improved Prognosis of Patients with Primary Biliary Cirrhosis That Have a Biochemical Response to Ursodeoxycholic Acid", Gastroenterology, 2009, vol. 136, p. 1281–1287. | |
| | 31. | KUMAGI, T. et al. "Baseline Ductopenia and Treatment Response Predict Long-Term Histological Progression in Primary Biliary Cirrhosis", The American Journal of Gastroenterology, 2010, vol. 105, p. 2186-2194. | |
| | 32. | LI J. et al. "The role of Intra- and Extragranular Microcrystal line Cellusose In Tablet Dissolution", Pharmaceutical Development and Technology, 1996, Vol. 1, No. 4, p. 343-355. | |
| | 33. | LOH Z. et al. "An overview of size reduction technologies in the field of pharmaceutical manufacturing", Science Direct, Asian Journal of Pharmaceutical Sciences, 2015, Vol. 10, p. 255-274. | |
| | 34. | MOMAH, N. et al. "Optimizing biochemical markers as endpoints for clinical trials in primary biliary cirrhosis", Liver International, 2012, vol. 32, p. 790-795. | |
| | 35. | MUDALIAR, S. et al. "Efficacy and Safety of the Farnesoid X Receptor Agonist Obeticholic Acid in Patients With Type 2 Diabetes and Nonalcoholic Fatty Liver Disease", Gastroenterology, 2013, Vol. 145, No. 3, p. 574-582. | |
| | 36. | PATEL R. et al.  "Overview of milling techniques for improving the solubility of poorly water-soluble drugs", Asian Journal of Pharmaceutics, 2008, p. 216-220. | |
| | 37. | Questran® powder 44.4% package insert, 2012. | |
| | 38. | STANIMIROV, B. et al. "Pleiotropic functions of bile acids mediated by the farnesoid X receptor", Acta Gastro-Enterologica Belgica, 2012, Vol. 75, p. 389-398. | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 23

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 1 OF 1**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| | Application Number | 16/787,796 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Filing Date | February 11, 2020 |
| | First Named Inventor | Richard Gail LANCASTER |
| | Art Unit | 1617 |
| | Examiner Name | Carlos A. AZPURU |
| *(Use as many sheets as necessary)* | Attorney Docket Number | IPHA-024/C06US 321961-3197 |

### U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1. | 8,216,613 | 07-10-2012 | Gryczke | |
| | 2. | 2004/0161407 A1 | 08-19-2004 | Kimura et al. | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | 3. | WO 2005/077935 A1 | 08-25-2005 | Pfizer Limited | | |

### NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | | | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 24

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

SHEET 1 OF 2

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | Application Number | 16/248,512 |
| | Filing Date | January 15, 2019 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | ~~TBA~~ 1617 |
| | Examiner Name | ~~TBA~~ Carlos Azpuru |
| | Attorney Docket Number | IPHA-024/C02/US |

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| /C.A.A/ | 1. | 6,238,695 | 05-29-2001 | Makooi-Morehead et al. | |
| | 2. | 7,078,376 B1 | 07-18-2006 | Thomson | |
| | 3. | 7,138,390 B2 | 11-21-2006 | Pellicciari | |
| | 4. | 10,052,337 | 08-21-2018 | Lancaster et al. | |
| | 5. | 2005/0101565 A1 | 05-12-2005 | Dasseux | |
| | 6. | 2012/0071451 A1 | 03-22-2012 | Spenard et al. | |
| | 7. | 2012/0160944 A1 | 06-28-2012 | Dodd et al. | |
| | 8. | 2013/0345188 A1 | 12-26-2013 | Steiner et al. | |
| | 9. | 2014/0186438 A1 | 07-03-2014 | Manku et al. | |
| /C.A.A/ | 10. | 2019/0076446 A1 | 03-14-2019 | Lancaster et al. | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| /C.A.A/ | 11. | WO 2011/131943 A2 | 10-27-2011 | Cipla Limited et al. | | |
| /C.A.A/ | 12. | WO 2014/142364 A2 | 09-18-2014 | Mochida Pharmaceutical Co., Ltd. | | |
| /C.A.A/ | 13. | WO 2015/036442 A1 | 03-19-2015 | INSERM | | |
| /C.A.A/ | 14. | WO 2016/107575 A1 | 07-07-2016 | Crystal Pharmatech Co., Ltd. | | |

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 10/17/2019 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  [1] CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

SHEET 2 OF 2

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| | Application Number | 16/248,512 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Filing Date | January 15, 2019 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | ~~TBA~~ 1617 |
| *(Use as many sheets as necessary)* | Examiner Name | ~~TBA~~ Carlos Azpuru |
| | Attorney Docket Number | IPHA-024/C02/US |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| /C.A.A/ | 15. | CORPECHOT, C. et al. "Biochemical Response to Ursodeoxycholic Acid and Long-Term Prognosis in Primary Biliary Cirrhosis", Hepatology, 2008, vol. 48, p. 871-877. | |
| | 16. | CORPECHOT, C. et al. "Early primary biliary cirrhosis: Biochemical response to treatment and prediction of long-term outcome", Journal of Hepatology, 2011, vol. 55, p. 1361–1367. | |
| | 17. | KUIPER, E. et al. "Improved Prognosis of Patients with Primary Biliary Cirrhosis That Have a Biochemical Response to Ursodeoxycholic Acid", Gastroenterology, 2009, vol. 136, p. 1281–1287. | |
| | 18. | KUMAGI, T. et al. "Baseline Ductopenia and Treatment Response Predict Long-Term Histological Progression in Primary Biliary Cirrhosis", The American Journal of Gastroenterology, 2010, vol. 105, p. 2186-2194. | |
| | 19. | MOMAH, N. et al. "Optimizing biochemical markers as endpoints for clinical trials in primary biliary cirrhosis", Liver International, 2012, vol. 32, p. 790-795. | |
| | 20. | MUDALIAR, S. et al. "Efficacy and Safety of the Farnesoid X Receptor Agonist Obeticholic Acid in Patients With Type 2 Diabetes and Nonalcoholic Fatty Liver Disease", Gastroenterology, 2013, Vol. 145, No. 3, p. 574-582. | |
| /C.A.A/ | 21. | STANIMIROV, B. et al. "Pleiotropic functions of bile acids mediated by the farnesoid X receptor", Acta Gastro-Enterologica Belgica, 2012, Vol. 75, p. 389-398. | |

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 10/17/2019 |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 25

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

SHEET 1 OF 2

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | Application Number | 16/248,512 |
| | Filing Date | January 15, 2019 |
| | First Named Inventor | Richard Gail LANCASTER |
| | Art Unit | 1617 |
| | Examiner Name | Carlos A. AZPURU |
| | Docket Number | IPHA-024/C02/US |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| /C.A.A/ | 1. | EP 0261693 | 03-30-1988 | Warner-Lambert Company | | |
| | 2. | WO 2004/004774 A2 | 01-15-2004 | Esperion Therapeutics, Inc. | | |
| | 3. | WO 2006/056812 A1 | 06-01-2006 | Vectura Limited | | |
| | 4. | WO 2007/008480 A1 | 01-18-2007 | Nanotherapeutics, Inc. | | |
| | 5. | WO 2010/121323 A1 | 10-28-2010 | Iceutica Pty Ltd. | | |
| | 6. | WO 2013/192097 A1 | 12-27-2013 | Intercept Pharmaceuticals, Inc. | | |
| /C.A.A/ | 7. | WO 2014/184271 A1 | 11-20-2014 | TES Pharma SRL. | | |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| /C.A.A/ | 8. | FUKUNAKA T. et al. "Effect of Particle Shape of Active Pharmaceutical Ingredients Prepared by Fluidized-Bed Jet-Milling on Cohesiveness", Journal of Pharmaceutical Sciences, 2005, Vol. 94, No. 5, p. 1004-1012. | |
| /C.A.A/ | 9. | HIRSCHFIELD G. et al. "Efficacy of Obeticholic Acid in Patients with Primary Billiary Cirrhosis and Inadequate Response to Ursodeoxycholic Acid", Gastroenterology, 2015, 148(4), p. 751-761. | |
| /C.A.A/ | 10. | KESISOGLOU F. et al. "Understanding the Effect of API Properties on Bioavailability Through Absorption Modelling", The AAPS Journal, , 2008, Vol. 10, No. 4, p. 516-525. | |
| /C.A.A/ | 11. | LI J. et al. "The role of Intra- and Extragranular Microcrystal line Cellusose In Tablet Dissolution", Pharmaceutical Development and Technology, 1996, Vol. 1, No. 4, p. 343-355. | |
| /C.A.A/ | 12. | LOH Z. et al. "Overview of milling techniques for improving the solubility of poorly water-soluble drugs", Science Direct, Asian Journal of Pharmaceutical Sciences, 2015, Vol. 10, p. 255-274. | |

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 04/30/2020 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  ¹ CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  ¹ Applicant's unique citation designation number (optional).  ² See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  ³ Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  ⁴ For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  ⁵ Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  ⁶ Applicant is to place a check mark here if English language Translation is attached.

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

SHEET 2 OF 2

Substitute for form 1449/PTO

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT

*(Use as many sheets as necessary)*

| Complete if Known | |
|---|---|
| Application Number | 16/248,512 |
| Filing Date | January 15, 2019 |
| First Named Inventor | Richard Gail LANCASTER |
| Art Unit | 1617 |
| Examiner Name | Carlos A. AZPURU |
| Docket Number | IPHA-024/C02/US |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| /C.A.A/ | 13. | PATEL R. et al. "An overview of size reduction technologies in the field of pharmaceutical manufacturing", Asian Journal of Pharmaceutics, 2008, p. 216-220. | |
| /C.A.A/ | 14. | Questran® powder 44.4% package insert, 2012. | |

214615879 v1

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 04/30/2020 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 26

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

SHEET 1 OF 1

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| | Application Number | 16/248,512 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Filing Date | January 15, 2019 |
| | First Named Inventor | Lancaster |
| | Art Unit | 1617 |
| | Examiner Name | C. A. Azpuru |
| *(Use as many sheets as necessary)* | Attorney Docket Number | IPHA-024/C02US 321961-3041 |

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| /C.A.A/ | 1. | 8,216,613 | 07-10-2012 | Gryczke | |
| /C.A.A/ | 2. | 2004/0161407 A1 | 08-19-2004 | Kimura et al. | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| /C.A.A/ | 3. | WO 2005/077935 A1 | 08-25-2005 | Pfizer Limited | | |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | | | |

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 05/27/2020 |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 27

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 1 OF 3**

| | |
|---|---|
| Substitute for form 1449/PTO | **Complete if Known** |

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**

*(Use as many sheets as necessary)*

| | |
|---|---|
| Application Number | 16/787,796 |
| Filing Date | February 11, 2020 |
| First Named Inventor | Richard Gail Lancaster |
| Art Unit | ~~TBA~~ 1617 |
| Examiner Name | ~~TBA~~ Carlos Azpuru |
| Attorney Docket Number | IPHA-024/C06/US |

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.¹ | Document Number Number-Kind Code² (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| /C.A.A/ | 1. | 6,238,695 | 05-29-2001 | Makooi-Morehead et al. | |
| | 2. | 7,078,376 B1 | 07-18-2006 | Thomson | |
| | 3. | 7,138,390 B2 | 11-21-2006 | Pellicciari | |
| | 4. | 10,052,337 | 08-21-2018 | Lancaster et al. | |
| | 5. | 2005/0101565 A1 | 05-12-2005 | Dasseux | |
| | 6. | 2012/0071451 A1 | 03-22-2012 | Spenard et al. | |
| | 7. | 2012/0160944 A1 | 06-28-2012 | Dodd et al. | |
| | 8. | 2013/0345188 A1 | 12-26-2013 | Steiner et al. | |
| | 9. | 2014/0186438 A1 | 07-03-2014 | Manku et al. | |
| | 10. | 2019/0076446 A1 | 03-14-2019 | Lancaster et al. | |
| | 11. | 2019/0255071 A1 | 08-22-2019 | Lancaster et al. | |
| | 12. | 2020/0046735 A1 | 02-13-2020 | Lancaster et al. | |
| /C.A.A/ | 13. | 2020/0046736 A1 | 02-13-2020 | Lancaster et al. | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.¹ | Foreign Patent Document Country Code³-Number⁴-Kind Code⁵ (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| /C.A.A/ | 14. | EP 0261693 | 03-30-1988 | Warner-Lambert Company | | |
| | 15. | WO 2004/004774 A2 | 01-15-2004 | Esperion Therapeutics, Inc. | | |
| | 16. | WO 2006/056812 A1 | 06-01-2006 | Vectura Limited | | |
| | 17. | WO 2007/008480 A1 | 01-18-2007 | Nanotherapeutics, Inc. | | |
| /C.A.A/ | 18. | WO 2010/121323 A1 | 10-28-2010 | Iceutica Pty Ltd. | | |

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 03/17/2020 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MEPP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied under 37 CFR 1.98(a)(2)(iii) because that application was filed after June 30, 2003 or is available in the IFW. ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  ¹ Applicant's unique citation designation number (optional). ² See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  ³ Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  ⁴ For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. ⁵ Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. ⁶ Applicant is to place a check mark here if English language Translation is attached.

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 2 OF 3**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br><br>*(Use as many sheets as necessary)* | Application Number | 16/787,796 |
| | Filing Date | February 11, 2020 |
| | First Named Inventor | Richard Gail Lancaster |
| | Art Unit | TBA |
| | Examiner Name | TBA |
| | Attorney Docket Number | IPHA-024/C06/US |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | 19. | WO 2011/131943 A2 | 10-27-2011 | Cipla Limited et al. | | |
| | 20. | WO 2013/192097 A1 | 12-27-2013 | Intercept Pharmaceuticals, Inc. | | |
| | 21. | WO 2014/142364 A2 | 09-18-2014 | Mochida Pharmaceutical Co., Ltd. | | |
| | 22. | WO 2014/184271 A1 | 11-20-2014 | TES Pharma SRL. | | |
| | 23. | WO 2015/036442 A1 | 03-19-2015 | INSERM | | |
| | 24. | WO 2016/107575 A1 | 07-07-2016 | Crystal Pharmatech Co., Ltd. | | |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | 25. | CORPECHOT, C. et al. "Biochemical Response to Ursodeoxycholic Acid and Long-Term Prognosis in Primary Biliary Cirrhosis", Hepatology, 2008, vol. 48, p. 871-877. | |
| | 26. | CORPECHOT, C. et al. "Early primary biliary cirrhosis: Biochemical response to treatment and prediction of long-term outcome", Journal of Hepatology, 2011, vol. 55, p. 1361–1367. | |
| | 27. | FUKUNAKA T. et al. "Effect of Particle Shape of Active Pharmaceutical Ingredients Prepared by Fluidized-Bed Jet-Milling on Cohesiveness", Journal of Pharmaceutical Sciences, 2005, Vol. 94, No. 5, p. 1004-1012. | |
| | 28. | HIRSCHFIELD G. et al. "Efficacy of Obeticholic Acid in Patients with Primary Billiary Cirrhosis and Inadequate Response to Ursodeoxycholic Acid", Gastroenterology, 2015, 148(4), p. 751-761. | |
| | 29. | KESISOGLOU F. et al. "Understanding the Effect of API Properties on Bioavailability Through Absorption Modelling", The AAPS Journal, , 2008, Vol. 10, No. 4, p. 516-525. | |

| Examiner Signature: | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /C.A.A/

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 3 OF 3**

| Substitute for form 1449/PTO | | Complete if Known | |
|---|---|---|---|
| | | Application Number | 16/787,796 |
| | | Filing Date | February 11, 2020 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | | First Named Inventor | Richard Gail Lancaster |
| | | Art Unit | TBA 1617 |
| | | Examiner Name | TBA Carlos Azpuru |
| *(Use as many sheets as necessary)* | | Attorney Docket Number | IPHA-024/C06/US |

**NON PATENT LITERATURE DOCUMENTS**

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| /C.A.A/ | 30. | KUIPER, E. et al. "Improved Prognosis of Patients with Primary Biliary Cirrhosis That Have a Biochemical Response to Ursodeoxycholic Acid", Gastroenterology, 2009, vol. 136, p. 1281–1287. | |
| | 31. | KUMAGI, T. et al. "Baseline Ductopenia and Treatment Response Predict Long-Term Histological Progression in Primary Biliary Cirrhosis", The American Journal of Gastroenterology, 2010, vol. 105, p. 2186-2194. | |
| | 32. | LI J. et al. "The role of Intra- and Extragranular Microcrystal line Cellusose In Tablet Dissolution", Pharmaceutical Development and Technology, 1996, Vol. 1, No. 4, p. 343-355. | |
| | 33. | LOH Z. et al. "An overview of size reduction technologies in the field of pharmaceutical manufacturing", Science Direct, Asian Journal of Pharmaceutical Sciences, 2015, Vol. 10, p. 255-274. | |
| | 34. | MOMAH, N. et al. "Optimizing biochemical markers as endpoints for clinical trials in primary biliary cirrhosis", Liver International, 2012, vol. 32, p. 790-795. | |
| | 35. | MUDALIAR, S. et al. "Efficacy and Safety of the Farnesoid X Receptor Agonist Obeticholic Acid in Patients With Type 2 Diabetes and Nonalcoholic Fatty Liver Disease", Gastroenterology, 2013, Vol. 145, No. 3, p. 574-582. | |
| | 36. | PATEL R. et al. "Overview of milling techniques for improving the solubility of poorly water-soluble drugs", Asian Journal of Pharmaceutics, 2008, p. 216-220. | |
| | 37. | Questran® powder 44.4% package insert, 2012. | |
| /C.A.A/ | 38. | STANIMIROV, B. et al. "Pleiotropic functions of bile acids mediated by the farnesoid X receptor", Acta Gastro-Enterologica Belgica, 2012, Vol. 75, p. 389-398. | |

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 03/17/2020 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.  * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW.  ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120.  [1] Applicant's unique citation designation number (optional).  [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04.  [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 28

Used in Lieu of PTO/SB/08A/B
(Based on PTO 11-07 version)

**SHEET 1 OF 1**

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| | Application Number | 16/787,796 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Filing Date | February 11, 2020 |
| | First Named Inventor | Richard Gail LANCASTER |
| | Art Unit | 1617 |
| | Examiner Name | Carlos A. AZPURU |
| *(Use as many sheets as necessary)* | Attorney Docket Number | IPHA-024/C06US 321961-3197 |

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| /C.A.A/ | 1. | 8,216,613 | 07-10-2012 | Gryczke | |
| /C.A.A/ | 2. | 2004/0161407 A1 | 08-19-2004 | Kimura et al. | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3]-Number[4]-Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| /C.A.A/ | 3. | WO 2005/077935 A1 | 08-25-2005 | Pfizer Limited | | |

## NON PATENT LITERATURE DOCUMENTS

| Examiner's Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | | | |

| Examiner Signature: | /CARLOS A AZPURU/ | Date Considered | 05/28/2020 |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. * CITE NO.: Those application(s) which are marked with an single asterisk (*) next to the Cite No. are not supplied (under 37 CFR 1.98(a)(2)(iii)) because that application was filed after June 30, 2003 or is available in the IFW. ** CITE NO.: Those document(s) which are marked with an double asterisk (**) next to the Cite No. are not supplied because they were previously cited by or submitted to the Office in a prior application relied upon in this application for an earlier filing date under 35 U.S.C. 120. [1] Applicant's unique citation designation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

# EXHIBIT 29

Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/248,512 | 01/15/2019 | Richard Gail Lancaster | IPHA-024/C02/US | 2820 |

127041        7590        06/01/2020
Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

| EXAMINER |
|---|
| AZPURU, CARLOS A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 06/01/2020 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

angel.matos@interceptpharma.com
ip.docketing@interceptpharma.com
zIPPatentDocketingMailboxUS@cooley.com

| **_Corrected_** **_Notice of Allowability_** | **Application No.** 16/248,512 | **Applicant(s)** Lancaster et al. | |
|---|---|---|---|
| | **Examiner** CARLOS A AZPURU | **Art Unit** 1617 | **AIA (FITF) Status** Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☐ This communication is responsive to _____.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 38-42,44-56 and 59-62 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   - a) ☐ All   b) ☐ Some   *c) ☐ None of the:
     1. ☐ Certified copies of the priority documents have been received.
     2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
     3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   - * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 05222020.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☐ Examiner's Amendment/Comment
6. ☐ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

/CARLOS A AZPURU/
Primary Examiner, Art Unit 1617

# EXHIBIT 30

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

127041          7590          06/04/2020
Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

| EXAMINER |
|---|
| AZPURU, CARLOS A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

DATE MAILED: 06/04/2020

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/787,796 | 02/11/2020 | Richard Gail Lancaster | IPHA-024/C06/US | 8799 |

TITLE OF INVENTION: COMPOSITIONS OF OBETICHOLIC ACID AND METHODS OF USE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 09/04/2020 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. <u>PROSECUTION ON THE MERITS IS CLOSED.</u> THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

| By mail, send to: | Mail Stop ISSUE FEE | By fax, send to: | (571)-273-2885 |
|---|---|---|---|
| | Commissioner for Patents | | |
| | P.O. Box 1450 | | |
| | Alexandria, Virginia 22313-1450 | | |

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

127041          7590          06/04/2020

**Intercept Pharmaceuticals, Inc.**
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

| | |
|---|---|
| | (Typed or printed name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/787,796 | 02/11/2020 | Richard Gail Lancaster | IPHA-024/C06/US | 8799 |

TITLE OF INVENTION: COMPOSITIONS OF OBETICHOLIC ACID AND METHODS OF USE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 09/04/2020 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| AZPURU, CARLOS A | 1617 | 424-499000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐ Issue Fee ☐ Publication Fee (if required) ☐ Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web ☐ Enclosed check ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

| Authorized Signature _____ | Date _____ |
|---|---|
| Typed or printed name _____ | Registration No. _____ |

PTOL-85 Part B (08-18) Approved for use through 01/31/2020          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/787,796 | 02/11/2020 | Richard Gail Lancaster | IPHA-024/C06/US | 8799 |

127041     7590     06/04/2020

Intercept Pharmaceuticals, Inc.
10 Hudson Yards
37th Floor
NEW YORK, NY 10001

| EXAMINER |
|---|
| AZPURU, CARLOS A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

DATE MAILED: 06/04/2020

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No.<br>16/787,796 | Applicant(s)<br>Lancaster et al. | |
|---|---|---|---|
| | Examiner<br>CARLOS A AZPURU | Art Unit<br>1617 | AIA (FITF) Status<br>Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to the amendment filed 05/26/202.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 1-33. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐All       b) ☐ Some       *c) ☐ None of the:
   - 1. ☐ Certified copies of the priority documents have been received.
   - 2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   - 3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 05262020.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

/CARLOS A AZPURU/
Primary Examiner, Art Unit 1617

Application/Control Number: 16/787,796                                    Page 2
Art Unit: 1617

### Notice of Pre-AIA or AIA Status

The present application, filed on or after March 16, 2013, is being examined under the first

inventor to file provisions of the AIA.

### Withdrawn Rejection

The rejection of the claims under 35 USC 112, first paragraph, for enablement is withdrawn in

view of applicant's request for reconsideration filed 05/26/2020.

### Allowable Subject Matter

Claims 1-33 are allowed.

### Reasons for Allowance

The following is an examiner's statement of reasons for allowance: The prior art neither teaches,

nor fairly suggests the instantly claimed method of treating primary biliary cholangitis (PBC). The closest

prior art is that of US 2013/0345188 A1 (Steiner et al) for its disclosure of an obeticholic acid

composition. The instant method is allowable over the prior art of record.

Any comments considered necessary by applicant must be submitted no later than the payment

of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such

submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

### Correspondence

Any inquiry concerning this communication or earlier communications from the examiner

should be directed to CARLOS A AZPURU whose telephone number is (571)272-0588.  The examiner can

normally be reached on 9 am- 3 pm, 4 pm-8pm.

Application/Control Number: 16/787,796                                                     Page 3
Art Unit: 1617

     Examiner interviews are available via telephone, in-person, and video conferencing using a

USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use

the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

     If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor,

Johann R Richter can be reached on 571-272-0646.  The fax phone number for the organization where

this application or proceeding is assigned is 571-273-8300.

     Information regarding the status of an application may be obtained from the Patent Application

Information Retrieval (PAIR) system.  Status information for published applications may be obtained

from either Private PAIR or Public PAIR.  Status information for unpublished applications is available

through Private PAIR only.  For more information about the PAIR system, see https://ppair-

my.uspto.gov/pair/PrivatePair. Should you have questions on access to the Private PAIR system, contact

the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information system, call 800-786-

9199 (IN USA OR CANADA) or 571-272-1000.


/CARLOS A AZPURU/
Primary Examiner, Art Unit 1617

caz

# EXHIBIT 31
# REDACTED IN ITS ENTIRETY

# EXHIBIT 32

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau



(43) International Publication Date
23 November 2006 (23.11.2006)

PCT

(10) International Publication Number
**WO 2006/122977 A2**

(51) **International Patent Classification:**
*C07J 9/00* (2006.01)      *A61P 9/10* (2006.01)
*A61K 31/575* (2006.01)

(21) **International Application Number:**
PCT/EP2006/062446

(22) **International Filing Date:**      19 May 2006 (19.05.2006)

(25) **Filing Language:**      English

(26) **Publication Language:**      English

(30) **Priority Data:**
MI2005A000912      19 May 2005 (19.05.2005)      IT

(71) **Applicant** *(for all designated States except US)*: **ER-REGIERRE S.P.A.** [IT/IT]; Via Francesco Baracca 19, I-24060 San Paolo d'Argon (IT).

(72) **Inventors; and**
(75) **Inventors/Applicants** *(for US only)*: **FERRARI, Massimo** [IT/IT]; Via Antonio Locatelli 7, I-24069 Cenate Sotto (IT). **PELLICCIARI, Roberto** [IT/IT]; Via Ulisse Rocchi, 60, I-06123 Perugia (IT).

(74) **Agents: GERVASI, Gemma** et al.; Corso Di Porta Vittoria 9, I-20122 Milan (IT).

(81) **Designated States** *(unless otherwise indicated, for every kind of national protection available)*: AE, AG, AL, AM, AT, AU, AZ, BA, BB, BG, BR, BW, BY, BZ, CA, CH, CN, CO, CR, CU, CZ, DE, DK, DM, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LC, LK, LR, LS, LT, LU, LV, LY, MA, MD, MG, MK, MN, MW, MX, MZ, NA, NG, NI, NO, NZ, OM, PG, PH, PL, PT, RO, RU, SC, SD, SE, SG, SK, SL, SM, SY, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, YU, ZA, ZM, ZW.

(84) **Designated States** *(unless otherwise indicated, for every kind of regional protection available)*: ARIPO (BW, GH, GM, KE, LS, MW, MZ, NA, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HU, IE, IS, IT, LT, LU, LV, MC, NL, PL, PT, RO, SE, SI, SK, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

**Declarations under Rule 4.17:**
—  *as to applicant's entitlement to apply for and be granted a patent (Rule 4.17(ii))*
—  *of inventorship (Rule 4.17(iv))*

**Published:**
—  *without international search report and to be republished upon receipt of that report*

*For two-letter codes and other abbreviations, refer to the "Guidance Notes on Codes and Abbreviations" appearing at the beginning of each regular issue of the PCT Gazette.*

(54) Title: PROCESS FOR PREPARING 3α(β)-7α(β)-DIHYDROXY-6α(β)-ALKYL-5β-CHOLANIC ACID



(57) **Abstract:**      Process for preparing  3α-7α(β)-dihydroxy-6α(β)-alkyl-5β-cholanic acid (I) in which R is a linear or branched $C_1$-$C_5$ alkyl and the relative intermediates 3α-hydroxy-6β-       alkyl-7-keto-5β-cholanic       (VIII)       and 3α-hydroxy-6α-alkyl-7-keto-5β-cholanic (IX).

WO 2006/122977 A2

JDG_OBET_0000482

1

## PROCESS FOR PREPARING 3α(β)-7α(β)-DIHYDROXY-6α(β)-ALKYL-5β-CHOLANIC ACID.

Description

5    **FIELD OF THE INVENTION**

The present invention concerns a process for the preparation of 3α-7α(β)-dihydroxy-6α(β)-alkyl-5β-cholanic acids.

**STATE OF THE ART**

Farnesoid X receptors (FXR) are initially orphan nuclear receptors, identified for

10   the first time from a cDNA library of rat liver (B.M Forman et al., *Cell*. **81**:687-693 (1995)), they are members of the family of nuclear receptors of ligand-activated transcription factors, including the receptors of steroid, retinoid and thyroid hormones (D.J. Mangelsdorf , et al, *Cell.***83**:841-850(1995)).

Several bile acids of a natural type bind together and activate FXR in physiological

15   concentrations as described in WO00/37077 and in particular chenodeoxycholic, deoxycholic, litocholic acids and the relative conjugates with taurine and glycine.

It is also believed that FXR are involved in the regulation of the homeostasis of bile acids and of cholesterol.

WO02/072598 describes 3-α,7-α-dihydroxy-6α-alkyl-(allyl)-5β-cholanic acids with

20   general formula (A)



(A)

in which R' is ethyl, propyl or allyl which are also agonists of Farnesoid X receptors.

WO 2006/122977                                        PCT/EP2006/062446

2

In particular the compound with formula (I) in which R' = ethyl is two magnitude order more powerful than chenodeoxycholic acid, the most powerful natural FXR agonist

5   The compounds with general formula (A), used in particular to increase HDL cholesterol, to lower triglycerides for the prevention and treatment of hepatic diseases of cholestatic origin, are prepared with a process comprising the following stages:

i) reacting 3-α-hydroxy-7-keto-5β-cholanic acid of formula (II)



10                                        (II)

with dihydro pyrane to obtain the corresponding 3-α-tetrahydropyranyloxy-7-keto-5β-cholanic acid of formula (B)



                                        (B)

15

ii) reacting the compound (B) with an alkyl bromide with formula R'Br in which R' has the meanings indicated above, to obtain the compound (C)

3



(C)

iii) reducing the compound (C) with sodium borohydride to give (D),



5                                             (D)

iv) hydrolysing  (D) to give the compounds (A).

Even though this process comprises only few stages, it presents a series of drawbacks.

Firstly, in all stages the reaction products are purified on a chromatographic column, namely a very expensive separation method that cannot be realised on an industrial scale.

Moreover the reaction yield in stage (ii) is extremely low (12-13%), with a considerable decrease in the global yield, which is lower than 3.5%.

Moreover, still in this stage, hexamethylenphosphonamide is used as a reactant, which is a known cancerogenic agent

## SUMMARY OF THE INVENTION

The Applicant has now found a process which makes it possible to obtain both compounds with general  formula (I)

JDG_OBET_0000485

4



(I)

in which the dashed bond (----) in position 6 and 7 indicates that the substituent may be in position α or β chosen in the class consisting of:

5   i)  3-α,7-α-dihydroxy-6-α-alkyl-5β-cholanic acid with general formula (IA)



(IA)

ii) 3-α,7-α-dihydroxy-6-β-alkyl-5β-cholanic acid with general formula (IB)



10                                                    (IB)

JDG_OBET_0000486

WO 2006/122977                                                          PCT/EP2006/062446

5

iii) 3-α,7-β-dihydroxy-6-α-alkyl-5β-cholanic acid with general formula (IC)



5                                                    (IC)

in which R is a linear or branched $C_1$-$C_5$ alkyl, comprising the following stages

a)  esterifiying  3α-hydroxy-7-keto-5β-cholanic acid (II)



(II)

in  methanol  in  an  acidic  environment  to  obtain  methyl  3α-hydroxy-7-keto-5β-

10     cholanate (III),



(III)

JDG_OBET_0000487

6

b)  Silylating methyl 3α-hydroxy-7-keto-5β-cholanate (III) with trimethylchlorosilane
    to obtain the corresponding 3-α-trimethylsiloxy-7-keto-5β-cholanate (IV),



(IV)

c)  Silylating  methyl 3α-trimethylsiloxy-7-keto-5β-cholanate (IV) obtained in stage
5     (b) with trimethylchlorosilane in the presence of a strong base to obtain methyl
    3α-,7α-di-trimethylsiloxy-6-en-5β-cholanate (V),



(V)

10

d)  Reacting  methyl  3α-,7α-di-trimethylsiloxy-6-en-5β-cholanate  (V)  with  the
    aldehyde R-CHO in which R has the meanings indicated above and a Lewis
    acid, to obtain methyl 3α-hydroxy-6-alkylidene-7-keto-5β-cholanate (VI),

JDG_OBET_0000488

WO 2006/122977                                                    PCT/EP2006/062446

7



(VI)

e)  hydrolysis of methyl 3α-hydroxy-6-alkylidene-7-keto-5β-cholanate to 3α-hydroxy-6-alkylidene-7-keto-5β-colanic acid (VII),



5                                            (VII)

f)  hydrogenating 3α-hydroxy-6-alkylidene-7-keto-5β-cholanic in an aqueous alkaline environment with Pd/C to 3α-hydroxy-6β-alkyl-7-keto-5β-cholanic acid



(VIII)

10

8

g) optionally heat treating the intermediate (VIII) in an aqueous alkaline environment to obtain the corresponding 3α-hydroxy-6α-alkyl-7-keto-5β-cholanic (IX)



5                                                                 (IX)

h) reducing the ketonic group in position (7) to 7-hydroxy group of the intermediate (VIII) or (IX) according to one of the following alternative operating conditions:

h') reducing 3α-hydroxy-6α-alkyl-7-keto-5β-cholanic compound (IX) with metallic

10  hydride to 3α-,7α-di-hydroxy-6α-alkyl -5β-cholanic acid (IA),

h") reducing 3α-hydroxy-6α-alkyl-7-keto-5β-cholanic compound (IX) in the presence of sodium and alcohol and obtaining 3α-,7β-di-hydroxy-6α-alkyl-5β-colanic (IC);

h'") reducing 3α-hydroxy-6β-alkyl-7-keto-5β-cholanic (VIII) in the presence of a

15  metallic hydride to 3α-,7α-di-hydroxy-6β-alkyl-5β-cholanic (IB).

The process according to the present invention in particular for obtaining 3α-,7α-di-hydroxy-6α-alkyl-5β-cholanic acids (IA) presents considerable advantages with respect to the known process described above. In fact, although it contemplates a larger number of stages, it allows the product with formula (I) to be obtained with

20  decidedly satisfactory global yields (24.6%), in any case decidedly higher than those of the known process. Moreover, the intermediates do not need to be purified by chromatography and the use of reagents, such as the highly toxic hexamethylenphosphonamide is avoided.

9

Lastly, with the process of the present invention and as shown above, it is possible to obtain the new compounds of formula (IB) and (IC) which may be used a hepatoprotectors in particular for the treatment and prevention of hepatic diseases of cholestatic origin.

5    The present invention therefore concerns pharmaceutical compositions containing as active principle at least one of the acids (I-B) and (I-C) and the respective pharmaceutically acceptable salts in combination with suitable excipients and/or diluents.

**DETAILED DESCRIPTION OF THE INVENTION**

10   The esterifying reaction of the 3α-hydroxy-7-keto-5β-cholanic acid (II) in stage (a) of the process of the present invention is preferably carried out at a temperature between 30 and 60°C in an acid environment, in which the acid is preferably methanesulphonic acid.

The silylating reaction of the hydroxy group in position 3α- of methyl 3α-hydroxy-7-

15   keto-5β-cholanate contemplated in stage (b) of the process of the present invention is preferably carried out in an apolar solvent, more preferably an aromatic solvent, even more preferably toluene, in the presence of a hydrogen ion acceptor preferably consisting of a tertiary amine, of aliphatic, alicyclic or heteroaromatic type, even more preferably said tertiary amine is triethylamine.

20   According to a particularly preferred embodiment, before being used in stage (c), methyl 3-α-trimethylsiloxy-7-keto-5β-cholanate is not isolated and purified, but on the contrary in this stage the oily residue is used which  is obtained after evaporating the reaction solvent from which the salts have previously been removed  by water extraction.

25   The subsequent silylation of the ketonic group in position 7 contemplated in stage (c) of the process of the present invention is preferably carried out using as the strong base an alkaline amide obtained from ammonia or an alkaline amide of a secondary aliphatic amine. According to a particularly preferred solution, lithium diisopropylamide is used as the  strong base. This reaction is preferably carried

30   out in a polar aprotic solvent, and even more preferably said solvent is tetrahydrofuran.

JDG_OBET_0000491

10

According to a preferred embodiment the product obtained in stage (c), before being used in the following stage (d), is not isolated and purified, but on the contrary in this case too the oily residue is used obtained by evaporating the reaction solvent from which the salts have been previously extracted with water.

5   Stage (d) is preferably carried out in an apolar solvent, preferably chosen from alkyl halide, and even more preferably this solvent is methylene chloride.

Stage (d) is preferably carried out using boron trifluoride etherate as the Lewis acid at a temperature between –90 and –60°C for a period of 2 to 4 hours in the presence of the aldehyde R-CHO in which R has the desired meanings.

10   Subsequently, the reaction mixture is reacted at a temperature between 0 and 35°C for a period of 1 to 6 hours.

In this case too, before being used in the following stage (e), the product obtained in stage (d) is not isolated and purified, but the oily residue is used which was obtained after evaporating the reaction solvent, from which the salts and water-

15   soluble components have been removed with water extraction.

Stage (e) is preferably carried out in an alcoholic solvent, preferably methanol, in the presence of an alkaline hydroxide, even more preferably said alkaline hydroxide is an aqueous solution of 30% sodium hydroxide.

The temperature is preferably comprised between 20 and 60°C.

20   Stage (e) reaction product is preferably isolated after acidification, by crystallisation with an organic solvent, preferably chosen from ethyl acetate and acetone, possibly in the presence of water.

The hydrogenation reaction contemplated in stage (f) is preferably carried out in an aqueous environment in the presence of an aqueous solution of sodium

25   hydroxide with pressure between 1 and 3 atmospheres. When the process of the present invention contemplates stage (g), in particular when the compounds with general formula (IA) or (IC) have to be prepared, this stage is preferably carried out directly on the reaction mixture coming from hydrogenation reaction and is preferably carried by heating said reaction at a temperature between 95 and

30   105°C for a few hours to allow the epimerization of the 6-β-ethyl group into 6-α-ethyl.

WO 2006/122977                                                PCT/EP2006/062446

11

The reaction product coming from stage (f) or possible stage (g) is isolated from the reaction mixture preferably using the following operating conditions.

1) adding the aqueous solution, from which the  catalyst has been removed by filtration is acidified preferably with 85% phosphoric acid,

2) ethyl acetate is added to the mixture obtained in stage (1) and the whole is heated at a temperature between 40 and 70°C.

3) this is then cooled to a temperature between 0 and 30°C and the precipitate obtained is filtered and subsequently dried.

When the reduction of stage (h) is carried out according to the operative conditions contemplated in stage (h') to obtain the compound with formula (IA) or according to the operative conditions contemplated in stage (h''') to obtain the compound with formula (IB) of the process of the present invention, the metallic hydride is preferably sodium borohydride and the reduction reaction is carried out in an alkaline aqueous solution. The reaction is preferably carried out at a temperature between 70 and 105°C for 1 hour.

Instead, when the reduction of stage (h) is carried out according to the operating conditions contemplated in stage (h'') it is preferably carried out  in linear or branched $C_1$-$C_5$ alcohol, even more preferably in sec-butyl alcohol, at the solvent reflux temperature. The product obtained from stage (h') or (h''') is preferably isolated according to the following operative conditions:

1') adding a water immiscible solvent to the reaction mixture, preferably an apolar solvent such as methylene chloride, and acidifying the mixture preferably with phosphoric acid,

2') stirring and allowing to rest to the mixture obtained thereafter eliminating the aqueous phase,

3') extracting the product from the organic phase with water and ammonia,

4') adding phosphoric acid to the aqueous phase thus obtained and stirring the whole for a few hours at a temperature between 20 and 50°C,

5') recovering and drying the precipitated product  by filtration.

The process of the present invention is suitable in particular for the preparation of compounds with formula (I) in which R is preferably methyl.

JDG_OBET_0000493

12

Some examples of preparation according to the process of the invention of the compounds with formula (I) and in particular (IA), (IB) and (IC) in cui R = methyl are given for illustrative purposes, but not limitative.

EXAMPLE 1- PROCESS FOR PREPARING 3α-,7α-DIHYDROXY-6α-ETHYL-5β-
5    CHOLANIC ACID of formula (IA) in which R =methyl

a)  preparation of methyl 3-α-hydroxy-7-keto-5β-cholanate (III).

17.0kg of 3-α-hydroxy-7-keto-5β-cholanic acid, 68kg of methanol and 0.17kg of methansulphonic acid are charged into a reactor. The reaction mixture is then heated to 30-60°C for 1 hour and 25.5kg of demineralised water are added. The
10   mixture obtained is then stirred, cooled  to 20-25°C until a good precipitation is obtained, then cooled further to 0-15°C. The precipitate is filtered and washed with a mixture of water and methanol  and further dried in a oven at about 40°C. 15kg of methyl 3α-hydroxy-7-keto-5β-cholanate (III) is thus obtained. Stoichiometric yield 85.2%.

15   b) preparation of methyl 3α-trimethylsiloxy-7-keto-5β-cholanate (IV),

15.0kg of methyl 3α-hydroxy-7-keto-5β-cholanate, 45kg of toluene, 7.5kg of triethylamine, 7.5kg of trimethylchlorosilane are charged into a reactor.

The mixture is heated to 70-80°C and is kept under stirring at that temperature for about 1 hour, then 37.5kg of water are added and the mixture is stirred at 15-20°C.
20   The lower aqueous phase is then separated and eliminated. The organic phase is concentrated until an oily residue is obtained,  which 15 kg of tetrahydrofuran are added to.

The solution thus obtained containing methyl 3α-trimethylsiloxy-7-keto-5β-cholanate (IV) is used in the following stage (c).

25   c) preparation of methyl 3α-, 7α-di-trimethylsililoxy-5β-cholanate (V)

30kg of tetrahydrofuran are loaded in a reaction, then the mixture is brought to a temperature between –90° and -60°C,  9.8kg of 100% lithium diisopropylamide and  9.3kg of trimethylchlorosilane are added, and the whole solution of tetrahydrofuran prepared in (b) and containing methyl 3-α-trimethylsiloxy-7-keto-
30   5β-cholanate is poured. The mixture is then stirred for about 1 hour at a temperature between–60 and –90°C for 1 hour. A solution of 4.50kg of sodium bicarbonate and 60 kg of water is then poured and the mixture is stirred at 0-10°C,

WO 2006/122977                                                    PCT/EP2006/062446

13

and the lower aqueous phase is separated and eliminated. The lower phase is then concentrated until an oily residue is obtained, which 45.0Kg of methylene chloride- are added to.

The solution of methyl 3α-,7α-di-trimethylsililoxy-5β-cholanate thus obtained is sent to the next stage (d).

d) preparation of methyl 3α-hydroxy-6-ethyliden-7-keto -5β-cholanate (VI) in which R = Methyl

The whole solution of methyl 3α,7α-di-trimethylsililoxy-5β-cholanate in methylene chloride coming from the preceding example in charged into a reactor and cooled to –90/-60°C 1.97kg of acetaldehyde and 5.5kg of boron trifluoride etherate are then added. The reaction mixture is kept  under stirring at the above temperature for 2/4 hours. After that it is heated to 30-35°C and kept at that temperature for about 2/4 hours. Then 60kg of water are added. The mixture obtained is stirred and the aqueous phase is separated. The solution thus obtained containing methyl 3α-hydroxy-6-ethyliden-7-keto-5β-cholanate is sent to the next stage.

e) preparation of 3α-hydroxy-6-ethyliden-7-keto-5β-cholanic (VII) acid in which R =CH$_3$,

The solution of methyl 3-α-hydroxy-6-ethyliden-7-keto-5β-cholanate in methylene chloride obtained in the previous stage is charged  into a reactor. The solvent is then  removed by distillation until an oily residue is obtained, which 15 kg of methanol are added to.

The reaction mixture is then heated to 45-50° C and 7.5kg of 30% sodium hydroxide are poured , and the reaction mixture is kept at the above temperature for about 1 hour. Then 30kg of water are added. 45.0kg of methylene chloride and 7.5kg of 85% phosphoric acid are subsequently added. The lower organic phase is separated and the aqueous phase is eliminated subsequently. The solvent is removed from the organic phase by distillation  until a pasty residue is obtained. About 37.5kg of ethyl acetate are added to the residue and the mixture is heated to 65-75°C, then cooled to 10-35°C. The precipitate obtained, filtered and washed with ethyl acetate, is dried.

JDG_OBET_0000495

14

8.0kg of 3-α-hydroxy-6-ethyliden-7-keto-5β-cholanic acid are obtained, with a stoichiometric yield of 51.8% calculated on methyl 3-α-hydroxy-7-keto-5β-cholanate.

f) preparation of 3-α-hydroxy–6-β-ethyl-7-keto-5β-cholanic acid (IX) in which
5    R=CH₃)

8.0 kg of 3-α-hydroxy-6-α-ethyliden-7-keto-5β-cholanic acid, 48.0kg of water, 5.1kg of 30% sodium hydroxide, 0.80kg of 5% Palladium/Carbon are charged into a reactor. The reaction mixture is hydrogenated at a pressure between 1 and 3 atmospheres, until the hydrogen absorption is no longer noted.

10   (g) preparation of 3α-hydroxy –6-α-ethyl-7-keto-5β-cholanic acid (IX)

At the end of the reaction the mixture is heated to 95-105°C and is kept at that temperature for a few hours to allow the 3α-hydroxy–6-β-ethyl-7-keto-5β-cholanic acid (VIII) to convert into the corresponding epimer of the desired 3α-hydroxy –6-α-ethyl-7-keto-5β-cholanic acid (IX).

15   The suspension is filtered, and the catalyst is recovered. 5.1kg of 85% phosphoric acid   9.6 kg of ethyl acetate are added to the filtered solution, and the reaction mixture is heated to a temperature between 40 and 70°C. It is cooled to a temperature between 0 and 30°C and the precipitate is recovered by filtration. After washing with ethyl acetate, the precipitate is dried in a oven at 65°C. 5.0kg of

20   3α-hydroxy-6α-ethyl-7-keto-β-cholanic acid are obtained. Stoichiometric yield: 62.2%.



25

WO 2006/122977                                                PCT/EP2006/062446

15

Analysis

3-α-hydroxy–6-α-ethyl-7-keto-5β-cholanic (IX)

$C_{26}H_{42}O_4$ m.p. 185-188°C

The $^1$H-NMR analysis carried out with the instrument Bruker DRX-ADVANCE–
5    400Mhz, dissolving the specimen in $CD_3OD$, gave the following results:

0.62 ppm (s, 3$\underline{H}$ of methyl $C_{18}$); 0.76ppm, J=7.4Hz (t, 3$\underline{H}$ of methyl $C_{26}$); 0.89ppm
J= 6.5Hz, (d, 3$\underline{H}$, of methyl $C_{21}$); 1.18ppm (s, 3$\underline{H}$, of methyl $C_{19}$), 2.21 ppm (m, 2$\underline{H}$,
-$CH_2$- of $C_{23}$); 2.50ppm, J=11.17Hz (ψt, C$\underline{H}$ on $C_8$); 2.85ppm J =13Hz and J=
5.4Hz (dd 1$\underline{H}$ in $C_6$), 3.50ppm (m, C$\underline{H}$ on $C_3$).

10   The $^{13}$C NMR analysis carried out with the instrument Bruker DRX-ADVANCE–
200Mhz, dissolving the specimen to be analysed in a mixture of $CD_3OD$ and
$CDCl_3$, gave the following results:

212.82ppm ($C_7$); 179.44ppm ($C_{24}$), 71.26ppm ($C_3$), 54.77ppm ($C_{17}$), 51.98ppm
($C_{14}$),18.84ppm ($C_{21}$), 18.34ppm ($C_{26}$), 12.09ppm ($C_{18}$).

15   h') preparation of 3α,7α-dihydroxy-6α-ethyl-5β-cholanic acid with formula (I) in
which R= methyl.

5.0kg of 3α-hydroxy-6α-ethyl-7-keto-β-cholanic acid, 5.0kg of water, 2.50 kg of
sodium hydroxide are loaded in a reactor. The mixture is then heated to 70-105°C
and a mixture of sodium borohydride dissolved in 2.50 kg of water is poured, the
20   mixture is then kept warm for 1 hour, cooled to room temperature, and 10.0kg of
demineralised water, 15.0kg of methylene chloride and 3.00kg of 85% phosphoric
acid  are added. The mixture is stirred, the lower organic phase is separated  and
the aqueous phase is removed.

 Crystallization of the crude product is obtained by cooling the organic solution.
25   This product is dissolved in 50kg of demineralised water and 1.10kg of  30%
ammonia. The mixture is then stirred until a complete solution is obtained, and
keeping the mixture at 20-50°C, 1.50kg of phosphoric acid is poured. The
precipitated mixture is stirred, always at a temperature between 20 and 50°C, then
the precipitate is recovered by filtration, washed with water and dried.

30   4.50 kg of 3α-,7α-di-hydroxy-6α-ethyl-5β-cholanic acid of formula (I) are obtained,
in which R= methyl. Stoichiometric yield: 89.6%.

WO 2006/122977                                           PCT/EP2006/062446

16

EXAMPLE 2 preparation of 3-α,7α-di-hydroxy-6β-ethyl-5β-cholanic acid of formula (IB) in which R = methyl.

The 3-α-hydroxy-6β-ethyl-7keto-5β-cholanic acid of formula (VIII) prepared as described in example 1 stages (a)-(f) and isolated as described in stage (g), is reduced using the same operating conditions described in example 1 stage (h'). 3-α,7α-di-hydroxy-6β-ethyl-5β-cholanic acid of formula (IB) is then obtained in which R = methyl.

Analysis



3-α,7-α-di-hydroxy–6-β-ethyl-5β-cholanic (IB)

$C_{26}H_{44}O_4$ m.p. 115-118°C

The $^1$H-NMR analysis carried out with the instrument Bruker DRX-ADVANCE–400MHz, dissolving the specimen in $CD_3OD$, gave the following results:

0.70ppm (s, 3$\underline{H}$ of methyl $C_{18}$); 0.95ppm (s, 3$\underline{H}$, of methyl $C_{19}$), 1.00ppm, J=7,65Hz (t, 3$\underline{H}$ of methyl $C_{26}$); 1.45ppm J= 3.5Hz, (d, 3$\underline{H}$, of methyl $C_{21}$);

2.25 ppm (m, 2$\underline{H}$, -$CH_2$- of $C_{23}$); 3.40ppm (m, C$\underline{H}$ on $C_3$), 3.62ppm (m, C$\underline{H}$ on $C_7$).

The $^{13}$C NMR analysis carried out with the instrument Bruker DRX-ADVANCE–200Mhz, dissolving the specimen to be analysed in a mixture of $CD_3OD$ and $CDCl_3$, gave the following results:

177.91ppm ($C_{24}$), 72.18ppm ($C_3$), 71.68ppm ($C_7$); 55.79ppm ($C_{17}$), 50.83ppm ($C_{14}$),18.17ppm ($C_{21}$), 14ppm ($C_{26}$), 11.60ppm ($C_{18}$).

EXAMPLE 3 preparation of 3-α,7β-di-hydroxy-6α-ethyl-5β-cholanic acid with formula (IC) in which R= methyl

According to the operative conditions  described in example 1 stages (a)-(g), the

**WO 2006/122977**                                                   **PCT/EP2006/062446**

17

intermediate (IX) is prepared, to which is added until complete solution sec-butyl alcohol in which sodium has previously been dissolved in molar quantities with respect to the compound (IX) between 3:1 and 3:2. 3-α,7β-di-hydroxy-6α-ethyl-5β-cholanic acid with formula (IC) is obtained in which R= methyl

5      Analysis

3-α,7-β-di-hydroxy–6-α-ethyl-5β-cholanic (IC)

$C_{26}H_{44}O_4$ m.p. 217-219°C



The $^1$H-NMR analysis carried out with the instrument Bruker DRX-ADVANCE–400MHz, dissolving the specimen in $CD_3OD$, gave the following results:

10     0.56ppm (s, 3$\underline{H}$ of methyl $C_{18}$) ; 0.73ppm, J=7.4Hz (t, 3$\underline{H}$ of methyl $C_{26}$); 0.81ppm (s, 3$\underline{H}$, of methyl $C_{19}$), 0.82ppm J= 4.60Hz, (d, 3$\underline{H}$, of methyl $C_{21}$); 2.21ppm (m, 2$\underline{H}$, -$CH_2$- of $C_{23}$), 3.80ppm (br, O-$\underline{H}$ of hydroxyl on $C_3$, on $C_7$ and of carboxyl $C_{24}$); 3.10ppm (m, C$\underline{H}$ on $C_7$); 3.44ppm (m, C$\underline{H}$ on $C_3$).

The $^{13}$C NMR analysis carried out with the instrument Bruker DRX-ADVANCE–

15     200MHz, dissolving the specimen to be analysed in a mixture of $CD_3OD$ and $CDCl_3$, gave the following results:

179ppm ($C_{24}$), 75.65ppm ($C_7$), 71.87ppm ($C_3$), 56ppm ($C_{17}$), 55ppm ($C_{14}$), 18.4ppm ($C_{21}$), 12.24ppm ($C_{26}$), 11.20ppm ($C_{18}$).

JDG_OBET_0000499

18

**CLAIMS**

1. Process for preparing 3α-7α(β)-dihydroxy-6α(β)-alkyl-5β-cholanic acids with general formula (I)



5                                          (I)

in which the dashed bond (----) in position 6 and 7 indicates that the substituent may be in position α or β, chosen in the class consisting of:

i)  3-α,7-α-dihydroxy-6-α-alkyl-5β-cholanic acid with general formula (IA)



10                                         (IA)

ii) 3-α,7-α-dihydroxy-6-β-alkyl-5β-cholanic acid with general formula (IB)

JDG_OBET_0000500

19



(IB)

iii) 3-α,7-β-dihydroxy-6-α-alkyl-5β-cholanic acid with general formula (IC)



(IC)

5    in which R is a linear or branched $C_1$-$C_5$ alkyl comprising:

a) esterifying 3α-hydroxy-7-keto-5β-cholanic acid (II)



(II)

JDG_OBET_0000501

20

in methanol in an acidic environment to obtain methyl 3α-hydroxy-7-keto-5β-cholanate (III),



(III)

5    b) silylating methyl 3-α-hydroxy-7-keto-5β-cholanate (III) with trimethylchlorosilane to obtain the corresponding methyl 3α-trimethylsiloxy-7-keto-5β-cholanate (IV),



(IV)

10    c) silylating methyl 3α-trimethylsiloxy-7-keto-5β-cholanate (IV) obtained in stage (b) in the presence of a strong base and trimethylchlorosilane to obtain methyl 3α-, 7α-di-trimethylsiloxy-6-en-5β-cholanate (V),

WO 2006/122977        PCT/EP2006/062446

21



(V)

d) reacting methyl 3-α-,7α-ditrimethylsiloxy-6-en-5β-cholanate (V) with the aldehyde R-CHO in which R has the meanings indicated above and a Lewis acid, to obtain methyl 3-α-hydroxy-6-alkylidene-7-keto-5β-cholanate (VI),

5



(VI)

e) hydrolysing methyl 3-α-hydroxy-6-ethyliden-7-keto-5β-cholanate (VI) to 3-α-hydroxy-6-alkylidene-7-keto-5β-colanic acid (VII),



(VII)

JDG_OBET_0000503

WO 2006/122977                                    PCT/EP2006/062446

22

f) hydrogenating 3-α-hydroxy-6-alkylidene-7-keto-5β-cholanic in an aqueous alkaline environment with Pd/C to 3-α-hydroxy-6β-alkyl-7-keto-5β-cholanic acid (VIII)



5                                           (VIII)

g) possibly heat treating the intermediate (VIII) in an aqueous alkaline environment to obtain the corresponding 3α-hydroxy-6α-alkyl-7-keto-5β-cholanic (IX)



(IX)

h) reducing the ketonic group in position (7) to 7-hydroxy group of the
10      intermediate (VIII) or (IX) according to one of the following alternative operating
        conditions.

h') reducing 3α-hydroxy-6α-alkyl-7-keto-5β-cholanic acid (IX) with metallic hydride to 3α-,7α-di-hydroxy-6α-alkyl-5β-cholanic acid (IA),

h") reducing 3α-hydroxy-6α-alkyl-7-keto-5β-cholanic acid (IX) in the presence of
15      metallic sodium and alcohol and obtaining of 3α-,7β-di-hydroxy-6α-alkyl-5β-cholanic (IC);

h''') reducing 3α-hydroxy-6β-alkyl-7-keto-5β-cholanic acid (VIII) in the presence of a metallic hydride to 3α-,7α-di-hydroxy-6β-alkyl-5β-cholanic (IB).

JDG_OBET_0000504

WO 2006/122977

PCT/EP2006/062446

23

2. Process according to claim 1, characterised in that the esterification of stage (a) is carried out at a temperature between 30 and 60°C in an acid environment.

3. Process according to claim 2, characterised in that said acid is methanesulphonic acid.

5    4. Process according to any one of the claims 1-3, characterised in that the silylation in stage (b) is carried out in an apolar solvent in the presence of a hydrogen ion acceptor.

5. Process according to claim 4, characterised in that said apolar solvent is an aromatic solvent.

10   6. Process according to claim 5 characterised in that said aromatic solvent is toluene.

7. Process according to claim 4-6, characterised in that said hydrogen ion acceptor is a tertiary amine of an aliphatic, alicyclic or heteroaromatic type

8. Process according to claim 7, characterised in that said tertiary amine is

15   triethylamine.

9. Process according to any one of the claims 1-8, characterised in that the methyl 3-α-trimethylsiloxy-7-keto-5β-cholanate (IV) obtained from stage (b) is not isolated and purified before being used in stage (c).

10. Process according to claim 9, characterised in that in stage (c), as the reagent

20   (IV), the oily residue is used which is obtained after evaporation of the reaction solvent from which the salts have previously been eliminated by extraction with water.

11. Process according to any one of the claims 1-10, characterised in that the subsequent silylation of the ketonic group in stage (c) is carried out using as

25   strong base an alkaline amide obtained from ammonia or an alkaline amide obtained from a secondary amine.

12. Process according to claim 11, characterised in that said alkaline amide is lithium diisopropylamide.

13. Process according to any one of the claims 1-12, characterised in that said

30   stage (c) is carried out in a polar aprotic solvent.

14. Process according to claim 13, characterised in that said polar aprotic solvent is tetrahydrofuran.

24

15. Process according to any one of the claims 1-14, characterised in that methyl 3-α,7-α-ditrimethylsiloxy-6-en-5β-cholanate (V) obtained in stage (c) is not isolated and purified before being used in stage (d).

16. Process according to claim 15, characterised in that as reagent (V) the oily residue is used obtained after evaporating the reaction solvent from which the salts have previously been removed by extraction with water.

17. Process according to any one of the claims 1-16, characterised in that stage (d) is carried out in an apolar solvent.

18. Process according to claim 17, characterised in that said apolar solvent is an alkyl halide.

19. Process according to any one of the claims 17 and 18 in which said solvent is methylene chloride.

20. Process according to any one of the claims 1-19, characterised in that the Lewis acid is boron trifluoride etherate.

21. Process according to claim 20 characterised in that stage (d) is carried out according to the following operating conditions: the reaction mixture is cooled to a temperature between –90°C –60°C and for a period of 2 to 4 hours, then the reaction mixture is kept at a temperature between 0 and 35°C for a period of 1 to 6 hours.

22. Process according to any one of the claims 1-21, characterised in that methyl 3-α-hydroxy-6-alkylidene-7-keto-5β-cholanate (VI) obtained in stage (d), is not isolated and purified before being used in the following stage (e).

23. Process according to claim 22, characterised in that the hydrolysis in stage (e) is carried out using as reagent (VI) the oily residue obtained after evaporation of the reaction solvent from which the salts and water-soluble components have been eliminated by extraction with water.

24. Process according to any one of the claims 1-23, characterised in that the hydrolysis reaction in stage (e) is carried out in an alcoholic solvent, in the presence of an aqueous solution of an alkaline hydroxide.

25. Process according to claim 24. characterised in that said reaction is carried out at a temperature between 20 and 60°C.

25

26. Process according to any one of the claims 1-25, characterised in that the hydrogenation in stage (f) is carried out in an aqueous environment in the presence of an aqueous solution of sodium hydroxide at a pressure between 1 and 3 atmospheres.

5   27. Process according to any one of the claims 1-26, characterised in that, when it comprises stage (g), that stage is carried out directly on the mixture of the reaction obtained from stage (f).

28. Process according to claim 27, characterised in that said stage (g) is carried out at a temperature between 95 and 105°C for a few hours.

10   29. Process according to any one of the claims 1-28, characterised in that the reaction product obtained from stage (f), when that process does not contemplate stage (g), or from stage (g), is isolated from the reaction mixture according to the following operating conditions:

1) acidifying the aqueous solution from which the catalyst has been removed by
15       filtration,

2) adding ethyl acetate to the mixture obtained in stage (1) and heating the whole to a temperature between 40 and 70°C.

3) cooling to a temperature between 0 and 30°C, filtering and drying the precipitate obtained.

20   30. Process according to any one of the claims 1-29, characterised in that when the reduction of stage (h) is carried out according to the operating conditions contemplated in stage (h') or according to the operating conditions (h''') the metallic hydride is sodium borohydride in an aqueous solution in which an alkaline hydroxide has been dissolved.

25   31. Process according to claim 30, characterised in that said alkaline hydroxide consists of  a  solution of 30% sodium hydroxide.

32. Process according to claim 30-31, characterised in that the reaction is carried out at a temperature between 70 and 105°C for 1 hour.

33. Process according to claim 30-32, characterised in that the product obtained is
30   isolated according to the following operating conditions:

1') adding a water immiscible solvent to the reaction mixture and acidifying the mixture with phosphoric acid,

26

2') stirring and allowing to rest the mixture obtained and eliminating the aqueous phase,

3') extracting the product from the organic phase with water and ammonia,

4') adding phosphoric acid to the aqueous phase thus obtained and stirring the whole at a temperature between 20 and 50°C,

5') recovering and drying the precipitated product by filtration.

34. Process according to any one of the claims 1-29, characterised in that when stage (h) is carried out according to the operative conditions (h") the reduction reaction is carried out in linear or branched alcohol $C_1$-$C_5$, at the solvent reflux temperature.

35. Process according to claim 34, characterised in that said alcohol is sec-butyl alcohol.

36. Process according to any one of the claims 1-35 in which R is preferably methyl.

37. Process according to any one of the claims 1-30 for preparing 3-α,7-α-dihydroxy-6α-ethyl-5β-cholanic acid.

38. 3-α-hydroxy-6-β-alky-7-keto-5β-cholanic acid (VIII)



(VIII)

in which R is a linear or branched $C_1$-$C_5$ alkyl.

(IX)39. 3-α-hydroxy-6-α-alkyl-7-keto-5β-cholanic acid(IX)

WO 2006/122977                                                PCT/EP2006/062446

27



(IX)

in which R is a linear or branched $C_1$-$C_5$ alkyl.

40. 3-α,7-α-dihydroxy-6-β-alkyl-5β-cholanic of general formula (IB)



5                                                                 (IB)

in which R is a linear or branched $C_1$-$C_5$ alkyl.

41. 3-α,7-β-dihydroxy-6-α-alkyl-5β-cholanic of general formula (IC)



(IC)

10      in which R is a linear or branched $C_1$-$C_5$ alkyl.

Case 1:20-cv-01105-MN   Document 226-2   Filed 08/31/22   Page 396 of 397 PageID #: 7092

42. Pharmaceutical composition containing as active ingredient at least one of the 3-α,7-α-dihydroxy-6-β-alkyl-5β-cholanic acids according to claim 40 or the respective pharmaceutically acceptable salts in combination with suitable excipients and/or diluents.

5   43. Pharmaceutical composition containing as active ingredient at least one of the 3-α,7-β-dihydroxy-6-α-alkyl-5β-cholanic acids according to claim 41 and the respective pharmaceutically acceptable salts in combination with suitable excipients and/or diluents.

JDG_OBET_0000510

# EXHIBITS 33 – 40 REDACTED IN THEIR ENTIRETY