**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

INTERCEPT PHARMACEUTICALS, INC. and INTERCEPT PHARMA EUROPE LTD.,

Plaintiffs,

v.

APOTEX INC. and APOTEX CORP.,

Defendants.

Civil Action No. 20-1105-MN
CONSOLIDATED

REDACTED - PUBLIC VERSION

**DEFENDANTS' FINAL INVALIDITY CONTENTIONS**

## I. PRELIMINARY STATEMENT

Pursuant to the Scheduling Order in the above captioned actions (D.I. 26 in C.A. 20-1105 (MN)), Defendants Apotex Inc. and Apotex Corp. (collectively, "Apotex"); Amneal EU, Ltd. and Amneal Pharmaceuticals of New York, LLC (collectively, "Amneal"); Lupin Ltd. and Lupin Pharmaceuticals, Inc. (collectively, "Lupin"); MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. (collectively, "MSN"); Optimus Pharma Pvt. Ltd. and Optimus Drugs Private Ltd. (collectively, "Optimus"); and Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories, Ltd. (collectively, "DRL") (all collectively, "Defendants"), through their undersigned counsel, hereby provide the following Invalidity Contentions to Plaintiffs Intercept Pharmaceuticals, Inc. ("Intercept Pharmaceuticals") and Intercept Pharma Europe Limited ("IPEL") (collectively, "Intercept" or "Plaintiffs").

Defendants contend that each of the claims asserted against Defendants in U.S. Patent No. RE48,286 ("the RE286 patent"), U.S. Patent No. 9,238,673 ("the '673 patent"), U.S. Patent No. 10,174,073 ("the '073 patent"), U.S. Patent No. 10,047,117 ("the '117 patent"), U.S. Patent No. 10,052,337 ("the '337 patent"), U.S. Patent No. 10,751,349 ("the '349 patent"), and U.S. Patent No. 10,758,549 ("the '549 patent") (collectively, the "Asserted Patents") are invalid. Defendants reserve the right to amend, modify, and/or supplement these Invalidity Contentions pursuant to the Federal Rules of Civil Procedure, Local Rules, and/or Court's Orders. Discovery and investigation regarding the Asserted Patents and potential grounds for invalidity is ongoing. In particular, no fact depositions have occurred to date and the parties presently dispute certain deficiencies concerning Plaintiffs' document production. Accordingly, Defendants expressly reserve the right to rely on newly discovered information and/or submit supplemental contentions as fact discovery proceeds. This disclosure is made in good faith and is based upon Defendants' present understanding of the claims being asserted by Plaintiffs (the "Asserted Claims") in

Plaintiffs' initial infringement contentions. Defendants' invalidity positions in these contentions may be in the alternative and do not constitute any concession by Defendants for purposes of claim construction or infringement. *See, e.g.*, *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000).

If Plaintiffs revise their infringement contentions to add additional claims, Defendants reserve the right to amend their contentions to include invalidity contentions for those newly added claims. Defendants reserve the right, without prejudice, to amend, modify, and/or supplement these Initial Invalidity Contentions as additional research is conducted, prior art is discovered, discovery is obtained, supplements or modifications are made to the infringement theories advanced by Plaintiffs, claim construction positions are taken or orders issued, expert discovery is obtained, and for any other reason permitted under the Federal Rules of Civil Procedure, Local Rules, and/or the Court's Orders.

These Invalidity Contentions identify where in each item of prior art the claim limitations are found. The citations to references are representative of the teachings of the listed references and additional support for these contentions may be found elsewhere in the cited references. Defendants reserve the right to rely on the entirety of the references cited herein. The absence of a particular reference in these Contentions is not a waiver or admission by Defendants. Defendants also reserve the right to rely on any combination of the references cited herein, even if not explicitly set forth below.

Furthermore, these contentions are provided without prejudice to Defendants' right to introduce at trial any subsequently-discovered evidence or expert opinions relating to currently-known facts and to produce and introduce at trial all evidence, whenever discovered, relating to the proof of subsequently-discovered facts. Moreover, facts, documents and things now known

may be imperfectly understood and, accordingly, such facts, documents and things may not be included in the following contentions. Defendants reserve the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert opinion testimony, documents, and things notwithstanding the written statements herein. Defendants further reserve their right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, documents and things that are not currently recalled but might be recalled at some time in the future.

Defendants object to the disclosure of information that is protected by the attorney-client privilege, the attorney work-product immunity, the common interest privilege or any other applicable privilege or immunity. To the extent that Defendants inadvertently disclose information that may be protected from discovery under the attorney-client privilege, the attorney work- product immunity, the common interest privilege or any other applicable privilege or immunity, such inadvertent disclosure does not constitute a waiver of any such privilege or immunity.

The information set forth below is provided without waiving: (1) the right to object to the use of any statement for any purpose, in this action or any other action, on the grounds of privilege, relevance, materiality or any other appropriate grounds; (2) the right to object to any request involving or relating to the subject matter of the statements herein; or (3) the right to revise, correct, supplement or clarify any of the statements provided below at any time.

Defendants reserve the right to allege the invalidity of the asserted claims on bases other than those disclosed herein.

**A. Plaintiffs' Asserted Claims**

These Invalidity Contentions are made in response to Plaintiffs' Disclosure of Asserted

Claims and Plaintiffs' Initial Infringement Contentions made pursuant to the Court's Scheduling Order. In their disclosure of asserted claims, Plaintiffs assert the following claims against one or more Defendants:

- Claims 1-14 of the RE286 patent
- Claims 1-23 of the '673 patent
- Claims 1-29 and 36-61 of the '073 patent
- Claims 1-4, 6, and 8-13 of the '117 patent
- Claims 1-19 of the '337 patent
- Claims 1-22 of the '349 patent
- Claims 1-33 of the '549 patent

Defendants hereby provide disclosures and related documents pertaining only to the Asserted Claims as identified and presented in Plaintiffs' Disclosure of Asserted Claims.

**B. Claim Construction**

The Court has entered the following claim constructions pertaining to the claims of the asserted patents:

| Claim Term | Claim Construction |
|---|---|
| "pharmaceutical composition"<br><br>('673 Patent, claims 1–23; '073 Patent, claims 1–2, 6–27, 36–37, 39–42, 44–61) | "formulation containing obeticholic acid in a form suitable for administration to a subject" |
| "pharmaceutical formulation"<br><br>('117 Patent, claim 1) | "formulation containing obeticholic acid in a form suitable for administration to a subject" |
| "cholestatic liver disease"<br><br>('117 Patent, claims 2 and 3) | "disease or condition in which bile excretion from the liver is impaired or blocked" |
| "chronic liver disease"<br><br>('117 Patent, claims 2 and 4) | "disorder of the liver that persists over time" |
| "primary biliary cirrhosis"<br><br>('117 Patent, claims 2 and 6) | "also known as primary biliary cholangitis" |

| | |
|---|---|
| "jet-milling"<br><br>('337 Patent, claim 13) | "milling that jets compressed gas and raw material particles from a nozzle into a chamber to reduce particle size through collisions" |
| "jet-milled"<br><br>('337 Patent, claim 14) | "reduced in size using jet-milling" |
| "jet-milled particles"<br><br>('349 Patent, claims 1 and 19; '549 Patent, claims 12 and 23) | "particles that have been reduced in size using jet-milling" |
| "crude OCA"<br><br>('073 Patent, claims 1, 27, 30, 33, 36, and 41) | "the chemical compound obeticholic acid as the free acid that needs additional purification to be pharmaceutically acceptable" |
| "obeticholic acid Form 1" / "obeticholic is Form 1"<br><br>('673 Patent, claims 1–23; '117 Patent, claim 8) | "non-crystalline obeticholic acid" |
| "substantially pure solid form of obeticholic acid"<br><br>('117 Patent, claim 1) | "solid form obeticholic acid that has a potency of greater than about 95%, taking into account impurities, including solvents and water" |
| "particles"<br><br>('337 Patent, claims 1–8, 13, 15; '349 Patent, claims 1, 19; '549 Patent, claims 12, 23) | plain and ordinary meaning, which is "minute portions of matter" |
| "intra-granular portion comprising obeticholic acid" / "intra-granular portion comprises said obeticholic acid" / "intra-granular portion comprises obeticholic acid"<br><br>('337 patent, claim 11; '349 patent, claim 4; '549 patent, claims 12, 23) | plain and ordinary meaning |

D.I. 142 and D.I. 146. These Invalidity Contentions reflect the claim constructions as ordered by the Court. Defendants reserve the right to amend, modify, and/or supplement these Invalidity

Contentions in the event any portion of the Court's claim construction rulings are overturned or otherwise modified.

**C. Dates of Invention**

Plaintiffs have not provided any evidence of conception and reduction to practice of the Asserted Patents. Thus, the Asserted Patents are not entitled to any date of invention earlier than their effective filing date. To the extent Plaintiffs are able to assert an earlier date of invention for the Asserted Patents, Defendants further reserve their right to amend, modify, or supplement these Invalidity Contentions, including, but not limited to, their identification and production of prior art.

**D. Prior Art Identification and Citation**

The accompanying claim charts include exemplary citations of anticipation and obviousness combinations of references under 35 U.S.C. §§ 102 and 103, but the identified citations and disclosed combinations are not meant to be exhaustive. In an effort to focus the issues, Defendants identify only limited portions of the cited references. It should be recognized that a person of ordinary skill in the art ("POSA") would generally read a prior art reference as a whole and in the context of other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a POSA would rely on other information including other publications and general scientific or engineering knowledge. Indeed, the cited references may be combined and modified in a number of obvious ways to achieve the claimed products. Plaintiffs have not provided any explanation for what limitations they believe are missing in any reference, much less what aspects of combinations of references Plaintiffs believe are deficient when comparing them to the asserted claims. Given the obviousness of the claimed subject matter, there are many references in the prior art with overlapping teachings, and if the Plaintiffs critique one, Defendants could easily rely on another

disclosed reference given the advanced state of the art.

Defendants therefore reserve the right to rely upon other combinations or portions of the prior art references not specifically cited herein and on other publications and expert testimony to provide context and to aid understanding and interpretation of the identified portions. Defendants also reserve the right to rely upon other prior art references, other publications, and the testimony of experts to establish that the alleged inventions would have been obvious to a POSA, including on the basis of modifying or combining certain cited references. Defendants also reserve the right to rely upon any admissions relating to prior art in the asserted patents or their prosecution histories and prosecution history of related patents/applications.

Where Defendants identify a particular figure in a prior art reference, the identification should be understood to encompass the caption and description of the figure as well as any text relating to the figure in addition to the figure itself. Similarly, where an identified portion of text refers to a figure or other material, the identification should be understood to include the referenced figure or other material as well.

## II.    THE PATENTS-IN-SUIT

### A.    U.S. Patent No. RE48,286 ("the RE286 patent")

The RE286 patent, entitled "Steroids as agonists for FXR," issued on October 27, 2020. The RE286 patent issued from Application No. 16,448,503, filed on June 21, 2019. The RE286 patent is a reissue of U.S. Patent No. 7,138,390 ("Pellicciari '390"). The RE286 patent claims priority to Provisional Application No. 60/274,959, filed on March 12, 2001. Therefore, its earliest potential priority date is March 12, 2001. The RE286 patent names Roberto Pellicciari as its sole inventor.

The RE286 patent relates to compounds of formula (I):

(I)

wherein R is ethyl and pharmaceutically acceptable salts, solvates or amino acid conjugates thereof. (*See, e.g.,* the 'RE286 patent at Abstract.) The compounds of formula (I) are useful as FXR agonists. (*Id.*)

The RE286 patent issued with 14 claims, of which claims 1, 2 and 3 are independent claims. Claims 4-6, 8-10, and 12-14 depend from claim 1; claim 7 depends from claim 6 and claim 11 depend form claim 10. Claims 1-14 are reproduced below:

1. A compound of formula I:

(I)

wherein R is ethyl and pharmaceutically acceptable salts, solvates or amino acid conjugates thereof.

2. The glycine conjugate of a compound of formula (I):

(I)

wherein R is ethyl.

3. The taurine conjugate of a compound of formula (I):

(I)

wherein R is ethyl.

4. A pharmaceutical formulation comprising a compound according to claim 1 and a pharmaceutically acceptable carrier or diluent.

5. A method for the treatment of an FXR mediated disease or condition in a mammal comprising administering to a mammal suffering from an FXR mediated disease or condition a therapeutically effective amount of a compound according to claim 1, wherein said FXR mediated disease or condition is selected from the group consisting of hypercholesteremia, hyperlipidemia, low HDL-cholesterol, and high triglycerides.

6. A method for the treatment of cardiovascular disease in a mammal comprising administering to a mammal suffering from a cardiovascular disease a therapeutically effective amount of a compound according to claim 1, wherein said cardiovascular disease is selected from the group consisting of artherosclerosis and hypercholesteremia.

7. The method according to claim 6, wherein said cardiovascular disease is atherosclerosis.

8. A method for increasing HDL cholesterol in a mammal, said method comprising administering to a mammal whose HDL cholesterol is to be increased a therapeutically effective amount of a compound according to claim 1.

9. A method for lowering triglycerides in a mammal, said method comprising administering to a mammal whose triglycerides are to be increased a therapeutically effective amount of a compound according to claim 1.

10. The compound of claim 1, wherein said compound is radiolabeled.

11. The compound of claim 10, wherein said compound is tritiated.

12. The compound of claim 1, which is the compound of formula I:

(I)

$CO_2H$ H HO OH H R

wherein R is ethyl.

13. A pharmaceutically acceptable salt of the compound of claim 1.

14. A solvate of the compound of claim 1.

**B. U.S. Patent No. 9,238,673 (“the ’673 patent”)**

The ’673 patent, titled “Preparation and uses of obeticholic acid,” issued on January 19, 2016. The ’673 patent issued from Application No. 13/919,734, filed on June 17, 2013, and claims priority to Provisional Application No. 61/661,531, filed on June 19, 2012. Therefore, its earliest potential priority date is June 19, 2012.

According to the publicly available assignment records at the USPTO, Intercept Pharmaceuticals, Inc. is the owner of the ’673 patent. The ’673 patent names the following inventors: André Steiner, Heidi Waenerlund Poulsen, Emilie Jolibois, Melissa Rewolinski, Ralf Gross, Emma Sharp, Fiona Dubas-Fisher, and Alex Eberlin.

The ’673 patent issued with 23 claims. Claims 1–23 are recited below:

1. A pharmaceutical composition comprising obeticholic acid Form 1 and a pharmaceutically acceptable carrier, wherein the obeticholic acid Form 1 comprises less than 1% of chenodeoxycholic acid.

2. The pharmaceutical composition of claim 1, wherein the obeticholic acid Form 1 further comprises not more than 0.15% of 6β-ethylchenodeoxycholic acid.

3. The pharmaceutical composition of claim 2, wherein the obeticholic acid Form 1 comprises less than about 0.07% of 6β-ethylchenodeoxycholic acid.

4. The pharmaceutical composition of claim 3, wherein the obeticholic acid Form 1 comprises less than about 0.06% of 6β-ethylchenodeoxycholic acid.

5. The pharmaceutical composition of claim 4, wherein the obeticholic acid Form 1 comprises less than about 0.05% of 6β-ethylchenodeoxycholic acid.

6. The pharmaceutical composition of claim 1, wherein the obeticholic acid Form 1 comprises less than about 0.5% of chenodeoxycholic acid.

7. The pharmaceutical composition of claim 6, wherein the obeticholic acid Form 1 comprises less than about 0.3% of chenodeoxycholic acid.

8. The pharmaceutical composition of claim 7, wherein the obeticholic acid Form 1 comprises less than about 0.2% of chenodeoxycholic acid.

9. The pharmaceutical composition of claim 1, wherein the obeticholic acid Form 1 further comprises not more than 0.15% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)- 7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

10. The pharmaceutical composition of claim 9, wherein the obeticholic acid Form 1 comprises less than about 0.07% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

11. The pharmaceutical composition of claim 10, wherein the obeticholic acid Form 1 comprises less than about 0.06% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

12. The pharmaceutical composition of claim 11, wherein the obeticholic acid Form 1 comprises less than about 0.05% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

13. The pharmaceutical composition of claim 1, wherein the obeticholic acid Form 1 further comprises not more than 0.15% of 6β-ethylchenodeoxycholic acid and not more than 0.15% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl- 5β-cholan-24-oic acid.

14. The pharmaceutical composition of claim 13, wherein the obeticholic acid Form 1 comprises less than about 0.07% of 6β-ethylchenodeoxycholic acid.

15. The pharmaceutical composition of claim 13, wherein the obeticholic acid Form 1 comprises less than about 0.05% of 6β-ethylchenodeoxycholic acid.

16. The pharmaceutical composition of claim 13, wherein the obeticholic acid Form 1 comprises less than about 0.5% of chenodeoxycholic acid.

17. The pharmaceutical composition of claim 16, wherein the obeticholic acid Form 1 comprises less than about 0.3% of chenodeoxycholic acid.

18. The pharmaceutical composition of claim 17, wherein the obeticholic acid Form 1 comprises less than about 0.2% of chenodeoxycholic acid.

19. The pharmaceutical composition of claim 1, wherein the obeticholic acid Form 1 comprises less than about 0.05% of 6β-ethylchenodeoxycholic acid, and less than about 0.05% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

20. The pharmaceutical composition of claim 19, wherein the obeticholic acid Form 1 comprises less than about 0.3% of chenodeoxycholic acid.

21. The pharmaceutical composition of claim 20, wherein the obeticholic acid Form 1 comprises less than about 0.2% of chenodeoxycholic acid.

22. The pharmaceutical composition of claim 1, wherein the obeticholic acid Form 1 further comprises less than about 2% of water.

23. A pharmaceutical composition comprising obeticholic acid Form 1 and a pharmaceutically acceptable carrier, wherein the obeticholic acid Form 1 comprises one or more compound selected from 6β-ethylchenodeoxycholic acid, chenodeoxycholic acid, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan- 24-oic acid, wherein 6β-ethylchenodeoxycholic acid is present in an amount between about 0% and not more than 0.05%, chenodeoxycholic acid is present in an amount between about 0% and not more than 0.2%, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid is present in an amount between about 0% and not more than 0.05%.

**C. U.S. Patent No. 10,174,073 ("the '073 patent")**

The '073 patent, titled "Preparation and uses of obeticholic acid," issued on January 8, 2019. The '073 patent issued from Application No. 15/496,398, filed on April 25, 2017, which is a continuation of Application No, 14/947,492, filed on November 20, 2015, which is a continuation of Application No. 13/919,734 (now the '673 patent), filed on June 17, 2013. The '073 patent claims priority to Provisional Application No. 61/661,531, filed on June 19, 2012. Therefore, its earliest potential priority date is June 19, 2012.

According to the publicly available assignment records at the USPTO, Intercept Pharmaceuticals, Inc. is the owner of the '073 patent. The '073 patent names the following inventors: André Steiner, Heidi Waenerlund Poulsen, Emilie Jolibois, Melissa Rewolinski, Ralf Gross, Emma Sharp, Fiona Dubas-Fisher, and Alex Eberlin.

The '073 patent issued with 61 claims. Claims 1–61 are recited below:

1. A pharmaceutical composition comprising non-crystalline obeticholic acid (OCA) comprising less than 1% by weight of chenodeoxycholic acid (CDCA), wherein the non-crystalline OCA is prepared by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent.

2. The pharmaceutical composition of claim 1, wherein the at least one organic solvent is selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate.

3. The pharmaceutical composition of claim 1, wherein the at least one organic solvent comprises n-butyl acetate.

4. The pharmaceutical composition of claim 1, wherein the process further comprises the step of converting a crystalline form of OCA to the non-crystalline OCA by dissolving the crystalline form in an aqueous NaOH solution and adding HCl.

5. The pharmaceutical composition of claim 1, wherein the process further comprises the step of reacting 3α-hydroxy-6α-ethyl-7-keto-5β-cholan-24-oic acid with NaBH4 to form the crude OCA.

6. The pharmaceutical composition of claim 1, wherein the non-crystalline OCA comprises a total of not more than 0.15% by weight of 6-ethylursodeoxycholic acid and 3α,7α- dihydroxy-6-ethyliden-5β-cholan-24-oic acid.

7. The pharmaceutical composition of claim 6, wherein the non-crystalline OCA comprises a total of less than about 0.07% by weight of 6-ethylursodeoxycholic acid and 3α,7α- dihydroxy-6-ethyliden-5β-cholan-24-oic acid.

8. The pharmaceutical composition of claim 7, wherein the non-crystalline OCA comprises a total of less than about 0.06% by weight of 6-ethylursodeoxycholic acid and 3α,7α- dihydroxy-6-ethyliden-5β-cholan-24-oic acid.

9. The pharmaceutical composition of claim 8, wherein the non-crystalline OCA comprises a total of less than about 0.05% by weight of 6-ethylursodeoxycholic acid and 3α,7α- dihydroxy-6-ethyliden-5β-cholan-24-oic acid.

10. The pharmaceutical composition of claim 1, wherein the non-crystalline OCA comprises not more than 0.15% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24- oic acid.

11. The pharmaceutical composition of claim 10, wherein the non-crystalline OCA comprises less than 0.07% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.

12. The pharmaceutical composition of claim 11, wherein the non-crystalline OCA comprises less than 0.06% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.

13. The pharmaceutical composition of claim 12, wherein the non-crystalline OCA comprises less than 0.05% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.

14. The pharmaceutical composition of claim 1, wherein the non-crystalline OCA comprises not more than 0.15% by weight of 6β-ethylchenodeoxycholic acid.

15. The pharmaceutical composition of claim 14, wherein the non-crystalline OCA comprises less than about 0.07% by weight of 6β-ethylchenodeoxycholic acid.

16. The pharmaceutical composition of claim 15, wherein the non-crystalline OCA comprises less than about 0.06% by weight of 6β-ethylchenodeoxycholic acid.

17. The pharmaceutical composition of claim 16, wherein the non-crystalline OCA comprises less than about 0.05% by weight of 6β-ethylchenodeoxycholic acid.

18. The pharmaceutical composition of claim 1, wherein the non-crystalline OCA comprises less than about 0.5% by weight of CDCA.

19. The pharmaceutical composition of claim 18, wherein the non-crystalline OCA comprises less than about 0.3% by weight of CDCA.

20. The pharmaceutical composition of claim 19, wherein the non-crystalline OCA comprises less than about 0.2% by weight of CDCA.

21. The pharmaceutical composition of claim 1, wherein the non-crystalline OCA comprises from 0.01% by weight to less than 1% by weight of CDCA.

22. The pharmaceutical composition of claim 21, wherein the non-crystalline OCA further comprises not more than 0.15% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

23. The pharmaceutical composition of claim 22, wherein the non-crystalline OCA comprises less than about 0.07% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

24. The pharmaceutical composition of claim 23, wherein the non-crystalline OCA comprises less than about 0.06% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

25. The pharmaceutical composition of claim 24, wherein the non-crystalline OCA comprises less than about 0.05% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

26. The pharmaceutical composition of claim 1, wherein the non-crystalline OCA further comprises less than about 3% by weight of water.

27.    A pharmaceutical composition comprising non-crystalline obeticholic acid (OCA) and not more than 1% by weight of chenodeoxycholic acid (CDCA), wherein the OCA is prepared by a process comprising at least one step of crystallizing crude OCA using an organic solvent selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate.

28.    The pharmaceutical composition of claim 27, wherein the solvent comprises n-butyl acetate.

29.    The pharmaceutical composition of claim 27, wherein the non-crystalline OCA comprises from 0.01% by weight to not more than 1% by weight of CDCA.

30.    A crystalline form of obeticholic acid (OCA) produced by a process of crystallizing crude OCA using at least one organic solvent.

31.    The crystalline form of OCA of claim 30, wherein the at least one organic solvent is selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate.

32.    The crystalline form of OCA of claim 31, wherein the at least one organic solvent comprises n-butyl acetate.

33.    A composition comprising a crystalline form of obeticholic acid (OCA), wherein the crystalline form of OCA is produced by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent.

34.    The composition of claim 33, wherein the at least one organic solvent is selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate.

35.    The composition of claim 34, wherein the at least one organic solvent comprises n- butyl acetate.

36.    A pharmaceutical composition comprising non-crystalline obeticholic acid (OCA), wherein the OCA is prepared by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent, and wherein the OCA comprises a total of less than 2% by weight of one or more impurities selected from 6-ethylursodeoxycholic acid, 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid, 6β-ethylchenodeoxycholic acid, 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid, chenodeoxycholic acid (CDCA), and 3a (3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl- 5β-cholan-24-oic acid.

37.    The pharmaceutical composition of claim 36, wherein the at least one organic solvent is selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate.

38.    The pharmaceutical composition of claim 37, wherein the at least one organic

solvent comprises n-butyl acetate.

39.    The pharmaceutical composition of claim 36, wherein the non-crystalline OCA comprises less than 1% by weight of CDCA.

40.    The pharmaceutical composition of claim 39, wherein the non-crystalline OCA comprises from 0.01% by weight to less than 1% by weight of CDCA.

41.    A pharmaceutical composition comprising non-crystalline obeticholic acid (OCA) wherein the non-crystalline OCA is prepared by a process comprising a step of crystallizing crude OCA using at least one organic solvent, and wherein the OCA comprises a total of less than 2% by weight of one or more impurities selected from 6β-ethylursodeoxycholic acid, 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid, 6β-ethylchenodeoxycholic acid, 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid, chenodeoxycholic acid (CDCA), and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl- 5β-cholan-24-oic acid.

42.    The pharmaceutical composition of claim 41, wherein the at least one organic solvent is selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate.

43.    The pharmaceutical composition of claim 42, wherein the at least one organic solvent comprises n-butyl acetate.

44.    The pharmaceutical composition of claim 41, wherein the non-crystalline OCA comprises less than 1% by weight of CDCA.

45.    The pharmaceutical composition of claim 44, wherein the non-crystalline OCA comprises from 0.01% by weight to less than 1% by weight of CDCA.

46.    The pharmaceutical composition of claim 41, wherein the non-crystalline OCA comprises a total of not more than 0.15% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid.

47.    The pharmaceutical composition of claim 46, wherein the non-crystalline OCA comprises a total of less than about 0.07% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid.

48.    The pharmaceutical composition of claim 47, wherein the non-crystalline OCA comprises a total of less than about 0.06% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid.

49.    The pharmaceutical composition of claim 48, wherein the non-crystalline OCA comprises a total of less than about 0.05% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid.

50.    The pharmaceutical composition of claim 41, wherein the non-crystalline OCA

comprises not more than 0.15% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24- oic acid.

51. The pharmaceutical composition of claim 50, wherein the non-crystalline OCA comprises less than 0.07% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.

52. The pharmaceutical composition of claim 51, wherein the non-crystalline OCA comprises less than 0.06% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.

53. The pharmaceutical composition of claim 52, wherein the non-crystalline OCA comprises less than 0.05% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.

54. The pharmaceutical composition of claim 51, wherein the non-crystalline OCA comprises not more than 0.15% by weight of 6β-ethylchenodeoxycholic acid.

55. The pharmaceutical composition of claim 54, wherein the non-crystalline OCA comprises less than about 0.07% by weight of 6β-ethylchenodeoxycholic acid.

56. The pharmaceutical composition of claim 55, wherein the non-crystalline OCA comprises less than about 0.06% by weight of 6β-ethylchenodeoxycholic acid.

57. The pharmaceutical composition of claim 56, wherein the non-crystalline OCA comprises less than about 0.05% by weight of 6β-ethylchenodeoxycholic acid.

58. The pharmaceutical composition of claim 41, wherein the non-crystalline OCA comprises not more than 0.15% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

59. The pharmaceutical composition of claim 58, wherein the non-crystalline OCA comprises less than about 0.07% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

60. The pharmaceutical composition of claim 59, wherein the non-crystalline OCA comprises less than about 0.06% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

61. The pharmaceutical composition of claim 60, wherein the non-crystalline OCA comprises less than about 0.05% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid.

**D. U.S. Patent No. 10,047,117 ("the '117 patent")**

The '117 patent, titled "Preparation and uses of obeticholic acid," issued on August 14,

2018. The ’117 patent issued from Application No. 14/947,658, filed on November 20, 2015, which is a division of Application No. 13/919,734 (now the ’673 patent), filed on June 17, 2013. The ’117 patent claims priority to Provisional Application No. 61/661,531, filed on June 19, 2012. Therefore, its earliest potential priority date is June 19, 2012.

According to the publicly available assignment records at the USPTO, Intercept Pharmaceuticals, Inc. is the owner of the ’117 patent. The ’117 patent names the following inventors: André Steiner, Heidi Waenerlund Poulsen, Emilie Jolibois, Melissa Rewolinski, Ralf Gross, Emma Sharp, Fiona Dubas-Fisher, and Alex Eberlin.

The ’117 patent issued with 13 claims. Claims 1–13 are recited below:

> 1. A method of treating an FXR mediated disease or condition in a subject comprising administering to the subject a pharmaceutical formulation comprising an effective amount of a substantially pure solid form of obeticholic acid, wherein the solid form of obeticholic acid comprises less than 1% of chenodeoxycholic acid, and wherein the formulation comprises about 1 mg to about 30 mg of obeticholic acid.
>
> 2. The method of claim 1, wherein the FXR mediated disease or condition is selected from biliary atresia, cholestatic liver disease, chronic liver disease, nonalcoholic steatohepatitis, hepatitis C infection, alcoholic liver disease, primary biliary cirrhosis, primary sclerosing cholangitis, liver damage due to progressive fibrosis, liver fibrosis, and cardiovascular diseases including atherosclerosis, arteriosclerosis, hypercholesterolemia, and hyperlipidemia.
>
> 3. The method of claim 2, wherein the FXR mediated disease or condition is cholestatic liver disease.
>
> 4. The method of claim 2, wherein the FXR mediated disease or condition is chronic liver disease.
>
> 5. The method of claim 2, wherein the FXR mediated disease or condition is nonalcoholic steatohepatitis.
>
> 6. The method of claim 2, wherein the FXR mediated disease or condition is primary biliary cirrhosis.
>
> 7. The method of claim 2, wherein the FXR mediated disease or condition is liver fibrosis.
>
> 8. The method of claim 1, wherein the solid form of obeticholic acid is Form 1 and wherein

the solid form of obeticholic acid Form 1 is the non-crystalline form.

9. The method of claim 1, wherein the solid form of obeticholic acid comprises no more than 0.5% of chenodeoxycholic acid.

10. The method of claim 1, wherein the solid form of obeticholic acid comprises not more than 0.15% of 6β-ethylchenodeoxycholic acid.

11. The method of claim 1, wherein the solid form of obeticholic acid comprises not more than 0.15% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5βcholan-24-oic acid.

12. The method of claim 1, wherein the solid form of obeticholic acid comprises one or more compounds selected from 6β-ethylchenodeoxycholic acid, chenodeoxycholic acid, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan- 24-oic acid, wherein 6β-ethylchenodeoxycholic acid is present in an amount between 0% and not more than 0.05%, chenodeoxycholic acid is present in an amount between 0% and not more than 0.2%, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α- hydroxy-6α-ethyl-5β-cholan-24-oic acid is present in an amount between 0% and not more than 0.05%.

13. The method of claim 8, wherein the solid form of obeticholic acid Form 1 is characterized by a glass transition temperature (Tg) of 102 to 112° C.

**E. U.S. Patent No. 10,052,337 ("the '337 patent")**

The '337 patent, titled "Compositions of obeticholic acid and methods of use," issued on August 21, 2018. The '337 patent issued from Application No. 15/139,138, filed on April 26, 2016, and claims priority to Provisional Application Nos. 62/153,040 and 62/317,933, which were filed on April 27, 2015 and April 4, 2016, respectively. Therefore, its earliest potential priority date is April 27, 2015.

According to the publicly available assignment records at the USPTO, Intercept Pharmaceuticals, Inc. is the owner of the '337 patent. The '337 patent names the following inventors: Richard Gail Lancaster, Kay K. Olmstead, Masashi Kagihiro, Mitsuhiro Matono, Ikuko Taoka, Mark Pruzanski, David Shapiro, Roya Hooshmand-Rad, Richard Pencek, Cathi Sciacca, Lise Eliot, Jeffrey Edwards, Leigh A. MacConell, and Tonya K. Marmon.

The ’337 patent issued with 19 claims. Claims 1–19 are recited below:

1. A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 µm or less.

2. The composition of claim 1, wherein at least 50% of the particles have a diameter of 100 µm or less.

3. The composition of claim 2, wherein at least 50% of the particles have a diameter of 50 µm or less.

4. The composition of claim 3, wherein at least 50% of the particles have a diameter of 10 µm or less.

5. The composition of claim 4, wherein at least 50% of the particles have a diameter of 5 µm or less.

6. The composition of claim 1, wherein at least 90% of the particles have a diameter of 200 µm or less.

7. The composition of claim 6, wherein at least 90% of the particles have a diameter of 100 µm or less.

8. The composition of claim 7, wherein at least 90% of the particles have a diameter of 25 µm or less.

9. The composition of claim 1 further comprising at least one pharmaceutically acceptable excipient having an alcohol content of less than about 6% (wt/wt).

10. The composition of claim 9, wherein the at least one pharmaceutical acceptable excipient is sodium starch glycolate.

11. A tablet comprising an intra-granular portion and an extra-granular portion, the intra- granular portion comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose, and one or more additional pharmaceutical excipients, and the extra-granular portion comprising one or more pharmaceutical excipients.

12. The tablet of claim 11, wherein the extra-granular portion comprises microcrystalline cellulose.

13. A method for preparing a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, wherein at least 50% of the particles have a diameter of 200 µm or less,

comprising forming the particles through jet-milling.

14. The tablet of claim 11, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is jet-milled.

15. The tablet of claim 14, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 μm or less.

16. The composition of claim 1 is in a unit dosage form.

17. The composition of claim 16, wherein the unit dosage form is a tablet.

18. The composition of claim 17, wherein the tablet comprises an intra-granular portion and an extra-granular portion.

19. The composition of claim 18, wherein the intra-granular portion comprises microcrystalline cellulose and obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in a ratio between about 20:1 to about 1:5.

**F. U.S. Patent No. 10,751,349 ("the '349 patent")**

The '349 patent, titled "Compositions of Obeticholic Acid and Methods of Use," issued on August 25, 2020. The '349 patent issued from Application No. 16/248,512, filed on January 15, 2019, which is a continuation of Application No. 16/030,141 (now U.S. Patent No. 10,646,499), filed on July 9, 2018, which is a continuation of Application No. 15/139,138 (now the '337 patent), filed on April 26, 2016. The '549 patent claims priority to Provisional Application No. 62/153,040, filed on April 27, 2015, and Provisional Application No. 62/317,933, filed on April 4, 2016. Therefore, its earliest potential priority date is April 27, 2015.

According to the publicly available assignment records at the USPTO, Intercept Pharmaceuticals, Inc. is the owner of the '349 patent. The '349 patent names the following inventors: Richard Gail Lancaster, Kay K. Olmstead, Masashi Kagihiro, Mitsuhiro Matono, Ikuko Taoka, Mark Pruzanski, David Shapiro, Roya Hooshmand-Rad, Richard Pencek, Cathi Sciacca, Lise Eliot, Jeffrey Edwards, Leigh A. MacConell, and Tonya K. Marmon.

The ’349 patent issued with 22 claims. Claims 1–22 are recited below:

1. A tablet comprising obeticholic acid in an amount of 1 mg to 50 mg and a pharmaceutically acceptable excipient, wherein said obeticholic acid is in the form of jet-milled particles having a diameter of less than about 100 μm when analyzed by laser diffraction, and wherein D50 is not more than 50 μm, and wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 6% (wt/wt).

2. The tablet of claim 1, wherein D50 is not more than 20 μm.

3. The tablet of claim 1, wherein D50 is not more than 10 μm.

4. The tablet of claim 1, wherein the tablet comprises an intra-granular portion and an extra- granular portion, wherein the intra-granular portion comprises said obeticholic acid and a pharmaceutically acceptable excipient, and the extragranular portion comprises a pharmaceutically acceptable excipient.

5. The tablet of claim 4, wherein the extra-granular portion does not contain obeticholic acid.

6. The tablet of claim 1, wherein said pharmaceutically acceptable excipient having a total primary alcohol impurity of less than about 6% (wt/wt) is sodium starch glycolate.

7. The tablet of claim 5, wherein the intra-granular portion comprises a diluent selected from: starch, pregelatinized starch, microcrystalline cellulose, calcium carbonate, dibasic calcium phosphate, tribasic calcium phosphate, calcium phosphate, lactose, dextrose, fructose, lactitol, lactose, magnesium carbonate, magnesium oxide, maltitol, maltodextrin, maltose, simethicone, sodium chloride, talc, xylitol, sorbitol, mannitol, and sucrose, and/or a combination thereof.

8. The tablet of claim 5, wherein the extra-granular portion comprises a diluent selected from: starch, pregelatinized starch, microcrystalline cellulose, calcium carbonate, dibasic calcium phosphate, tribasic calcium phosphate, calcium phosphate, lactose, dextrose, fructose, lactitol, lactose, magnesium carbonate, magnesium oxide, maltitol, malto-dextrin, maltose, simethicone, sodium chloride, talc, xylitol, sorbitol, mannitol, and sucrose, and/or a combination thereof.

9. The tablet of claim 7, wherein the diluent is microcrystalline cellulose.

10. The tablet of claim 9, wherein a ratio of microcrystalline cellulose to obeticholic acid in the intra-granular portion is from about 20:1 to about 1:5.

11. The tablet of claim 10, wherein the ratio is from about 20: 1 to about 1: 1.

12. The tablet of claim 11, wherein the ratio is from 20: 1 to about 5: 1.

13. The tablet of claim 5, wherein the tablet comprises 5 mg of obeticholic acid.

14. The tablet of claim 5, wherein the tablet comprises 10 mg of obeticholic acid.

15. The tablet of claim 5, wherein the tablet comprises 25 mg of obeticholic acid.

16. The tablet of claim 1, wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 3% (wt/wt).

17. The tablet of claim 1, wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 0.5% (wt/wt).

18. The tablet of claim 1, wherein D50 is not more than 5 µm.

19. A tablet comprising: obeticholic acid in an amount of 1 mg to 50 mg; and sodium starch glycolate,

wherein said obeticholic acid is in the form of jet-milled particles having a diameter of less than about 100 µm when analyzed by laser diffraction, wherein D50 is not more than 50 µm, and

wherein the total alcohol impurity in said sodium starch glycolate is less than about 6% (wt/wt).

20. The tablet of claim 19, wherein D50 is not more than 5 µm.

21. The tablet of claim 19, wherein the total alcohol impurity in said sodium starch glycolate is less than about 3% (wt/wt).

22. The tablet of claim 19, wherein the total alcohol impurity in said sodium starch glycolate is less than about 0.5% (wt/wt).

**G. U.S. Patent No. 10,758,549 ("the '549 patent")**

The '549 patent, titled "Compositions of Obeticholic Acid and Methods of Use," issued on September 1, 2020. The '549 patent issued from Application No. 16/787,796, filed on February 11, 2020, which is a continuation of Application No. 16/030,141 (now U.S. Patent No. 10,646,499), filed on July 9, 2018, which is a continuation of Application No. 15/139,138 (now the '337 patent), filed on April 26, 2016. The '549 patent claims priority to Provisional Application No. 62/153,040, filed on April 27, 2015. Therefore, its earliest potential

priority date is April 27, 2015.

According to the publicly available assignment records at the USPTO, Intercept Pharmaceuticals, Inc. is the owner of the '549 patent. The '549 patent names the following inventors: Richard Gail Lancaster, Kay K. Olmstead, Masashi Kagihiro, Mitsuhiro Matono, Ikuko Taoka, Mark Pruzanski, David Shapiro, Roya Hooshmand-Rad, Richard Pencek, Cathi Sciacca, Lise Eliot, Jeffrey Edwards, Leigh A. MacConell, and Tonya K. Marmon.

The '549 patent issued with 33 claims. Claims 1–33 are recited below:

> 1. A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject a tablet comprising an intra-granular portion and an extra-granular portion, the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, and the extra-granular portion comprising one or more pharmaceutically acceptable excipients,
>
> wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w);
>
> wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; and
>
> wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M).
>
> 2. The method of claim 1, wherein the amount is about 1mg to about 10 mg.
>
> 3. The method of claim 1, wherein the intra-granular portion comprises obeticholic acid.
>
> 4. The method of claim 1, wherein the amount is a starting dose and the tablet is administered in a titration period.
>
> 5. The method of claim 4, wherein the titration period is from 1 month to 6 months.
>
> 6. The method of claim 5, wherein the titration period is 3 months or 6 months.
>
> 7. The method of claim 1, wherein the amount is 10 mg, and the tablet is administered daily.
>
> 8. The method of claim 1, wherein the amount is 5 mg, and the tablet is administered daily.

9. The method of claim 1, wherein the amount is about 1 mg to about 5 mg, and the tablet is administered daily.

10. The method of claim 1, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered.

11. The method of claim 1, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered.

12. A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject a tablet comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients,

wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, and wherein at least 50% of the particles have a diameter of 200 μm or less;

wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w);

wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; and

wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M).

13. The method of claim 12, wherein the amount is about 1mg to about 10 mg.

14. The method of claim 12, wherein tablet comprises obeticholic acid.

15. The method of claim 12, wherein the amount is a starting dose and the tablet is administered in a titration period.

16. The method of claim 15, wherein the titration period is from 1 month to 6 months.

17. The method of claim 16, wherein the titration period is 3 months or 6 months.

18. The method of claim 12, wherein the amount is 10 mg, and the tablet is administered daily.

19. The method of claim 12, wherein the amount is 5 mg, and the tablet is administered daily.

20. The method of claim 12, wherein the amount is about 1 mg to about 5 mg, and the tablet is administered daily.

21. The method of claim 12, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered.

22. The method of claim 12, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered.

23. A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject a tablet comprising an intra-granular portion and an extra-granular portion, the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, and the extra-granular portion comprising one or more pharmaceutically acceptable excipients,
    wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, and wherein at least 50% of the particles have a diameter of 200 μm or less;
    wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w);
    wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; and
    wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M).

24. The method of claim 23, wherein the intra-granular portion comprises obeticholic acid.

25. The method of claim 24, wherein the amount is 10 mg, and the tablet is administered daily.

26. The method of claim 24, wherein the amount is 5 mg, and the tablet is administered daily.

27. The method of claim 24, wherein the amount is about 1 mg to about 5 mg, and the tablet is administered daily.

28. The method of claim 24, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered.

29. The method of claim 24, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered.

30. The method of claim 23, wherein the amount is about 1mg to about 10 mg.

31. The method of claim 23, wherein the amount is a starting dose and the tablet is administered in a titration period.

32. The method of claim 31, wherein the titration period is from 1 month to 6 months.

33. The method of claim 32, wherein the titration period is 3 months or 6 months.

## III. LEGAL FRAMEWORK

### A. Anticipation

A patent is invalid for anticipation under 35 U.S.C. § 102 if a single prior art reference discloses each and every limitation of the claimed invention. *See Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). A single prior art reference may anticipate without disclosing a feature of the claimed invention if such feature is necessarily present, or inherent, in that reference. *See id*. "While inherent anticipation may not be established by probabilities or possibilities, if the prior art's disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it [is] well-settled that the disclosures should be regarded as sufficient." *King Pharms., Inc. v. Eon Labs., Inc.*, 616 F.3d 1267, 1276 (Fed. Cir. 2010) (internal quotation, citations, and alterations omitted). In other words, the "inherent result must inevitably result from the disclosed steps." *In re Montgomery*, 677 F.3d 1375, 1380 (Fed. Cir. 2012).

"Newly discovered results of known processes directed to the same purpose are not patentable because such results are inherent." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,246 F.3d 1368, 1376-77 (Fed. Cir. 2001). "[I]t matters not that those of ordinary skill [in the art] may not have recognized the inherent characteristics of the prior art." *In re Montgomery*, 677 F.3d at 1380 (internal quotation, citations, and alterations omitted).

### B. Obviousness

A claim is invalid for obviousness if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). For example, the refinement of ranges does not

typically impart patentability of a claimed invention over the prior art. *See, e.g.*, *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807-808 (Fed. Cir. 1989); *In re Geisler*, 116 F.3d 1465, 1469-70 (Fed. Cir. 1997). Absent a demonstration of criticality, variation in a concentration, temperature, or other such feature does not indicate nonobviousness over prior art disclosing a different value for the same parameter. *See In re Woodruff*, 919 F.2d 1575 (Fed. Cir. 1990). In particular, a claim is obvious if it teaches a range that, while not overlapping with the prior art, is close enough that a POSA would expect them to have the same properties. *See Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 783 (Fed. Cir. 1985).

A claimed modification of a prior art product is "obvious to try" where there are a "finite number of identified, predictable solutions," and if such modification is successful, "it is likely the product not of innovation but of ordinary and common sense." *KSR, Int'l Co. v. Teleflex, Inc.*, 550U.S. 398, 421 (2007). Accordingly, if the prior art explicitly teaches an array of features, and the prior art components "provide only their known properties, to produce results shown or predicted in the prior art," then such combinations would have been obvious. *See Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*, 748 F.3d 1354, 1360-61 (Fed. Cir. 2014).

Moreover, whether a particular feature or embodiment is identified as "preferred" in a prior art reference does not limit the scope of the overall reference as disclosure against a later claim. *See id*.

A claim may also be shown to be obvious in view of the prior art. Although the ultimate determination of obviousness under § 103 is a question of law, the evaluation is based on several underlying factual factors, often referred to as "the Graham factors," including: "(1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, such as

commercial success, long-felt need, and the failure of others." *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1320 (Fed. Cir. 2011) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). However, even secondary considerations of nonobviousness may be inadequate to overcome a strong prima facie case of obviousness. *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

The Supreme Court's decision in *KSR* further indicates that the *Graham* factors are to be evaluated flexibly and in view of common sense. Specifically, *KSR* indicates that pressure to solve a known problem, the presence of a limited number of predictable solutions, and anticipated success are all relevant factors in determining whether an invention is obvious. The inquiry may be referred to as the "common sense" standard, and is described below.

When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103. . . . Rigid preventative rules that deny fact finders recourse to common sense, however, are neither necessary under our case law nor consistent with it. *KSR*, 550 U.S. at 418-19.

The common sense standard provides that the motivation to combine references may be present in the nature of the problem to be solved or known by one of skill in the art. In establishing any of the contentions set forth herein, Defendants may rely on common sense and/or the knowledge of a POSA at the time of the alleged inventions.

"It is well settled that a prior art reference may anticipate when the claim limitations not expressly found in that reference are nonetheless inherent in it." *In re Cruciferous Sprout Litig.*,

301 F.3d 1343, 1349 (Fed. Cir. 2002)). It is also well settled that "inherency may supply a missing claim limitation in an obviousness analysis." *Hospira, Inc. v. Fresenius Kabi*, 946 F.3d 1322, 1329 (Fed. Cir. 2020). "Inherency is established in the context of obviousness when 'the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art.'" *Id.* (quoting *Par Pharm. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1195- 96 (Fed. Cir. 2014)).

**C. Invalidity under 35 U.S.C. § 112**

Under 35 U.S.C. § 112, the specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112.

**1. <u>Indefiniteness</u>**

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 2129 (quotations and citations omitted). The analysis to determine if a claim is invalid for indefiniteness examines the claims, specification, and prosecution history "to ascertain if they convey to one of skill in the art with reasonable certainty the scope of the invention claimed." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015); *see also Horizon Pharma Ireland Ltd. v. Actavis Labs., UT, Inc.*, No. 14-7992, 2016 WL 4408990, at *8 (D.N.J. Aug. 17, 2016) (applying definiteness requirement to "consisting essentially of").

**2. <u>Enablement</u>**

A patent's specification must describe the invention and "the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same." 35 U.S.C. § 112. Claims are not enabled when, at the effective filing date of the patent, a POSA could not practice their full scope without undue experimentation. *See Wyeth & Cordis Corp. v. Abbott Labs*., 720 F.3d 1380, 1384 (Fed. Cir. 2013). In addition, the scope of enablement must be commensurate with the full scope of the claim. *Id*. at 1384–85; *see also AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003). The Federal Circuit has provided several factors that may be utilized in determining whether a disclosure would require undue experimentation: (1) the quantity of experimentation necessary;

(2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the alleged invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

**3. <u>Written Description</u>**

The inventor must describe the invention so that the public will know what it is and that he or she has truly made the claimed invention. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 535 U.S. 722, 736 (2002) ("These [ ] requirements must be satisfied before issuance of the patent, for exclusive patent rights are given in exchange for disclosing the invention to the public. What is claimed by the patent application must be the same as what is disclosed in the specification. . . ." (internal citations omitted)). "[T]he hallmark of written description is disclosure." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). "[I]t is the specification itself that must demonstrate possession." *Id.* at 1352.

## IV. SUMMARY OF THE RELEVANT PRIOR ART

The following is a list of prior art references that support Defendants' Invalidity Contentions and a preliminary description of the prior art that anticipates and/or renders obvious the asserted claims of the patents-in-suit is also provided.[1]

Defendants' contentions identify exemplary and/or representative portions and/or features of the cited prior art which may also contain additional descriptions of, or alternative support for the claim limitations. Defendants may rely on uncited portions of the identified prior art, other documents, and expert testimony, to provide context or to aid in understanding such prior art and the state of the art. For example, among other background references, Defendants reserve the right to rely on standard textbooks such as Modern Pharmaceutics and Aulton's Pharmaceutics to illustrate the common knowledge of a POSA. Citations to a particular figure in a reference include the caption and description of the figure and any text relating to the figure. Similarly, citations to particular text referring to a figure also include the figure and caption as well.

In addition to prior art, Defendants intend to rely on Plaintiffs' internal documents to show inherency. Exemplary citations to Plaintiffs' internal documents are cited throughout these contentions. For the avoidance of doubt, Defendants intend to rely on Plaintiffs' documents concerning processes for preparing Plaintiffs' batches of obeticholic acid and the characteristics thereof. *See, e.g.*, INT_OCA_0747321-INT_OCA_0749997; INT_OCA_0253880-INT_OCA_0253962; INT_OCA_0383395-INT_OCA_0383397; INT_OCA_0117971-

---

[1] In addition to the prior art references specifically identified herein, Defendants reserve the right to rely on other relevant prior art to show motivation, expectation of success, the level of skill in the art, the knowledge of a person of ordinary skill in the art at the relevant time, and/or relevant background information regarding the claimed subject matter of the patents-in-suit. Moreover, to the extent Plaintiffs (or any other party) challenges such motivation or expectation of success, Defendants reserve the right to rely on any and all evidence available, including, but not limited to, any prior art reference cited herein, as well as additional references.

INT_OCA_0117993; INT_OCA_0879249-INT_OCA_0879471; INT_OCA_1516495-INT_OCA_1523242.

**A. U.S. Patent Publication No. 2013/0345188 ("the '188 publication")**

U.S. Patent Publication No. 2013/0345188 ("the '188 publication") published on December 26, 2013 and is prior art to the '337 patent, '349 patent, and '549 patent under at least AIA § 102(a)(1).

The '188 publication discloses obeticholic acid tablets and that "[t]he 5 mg, 10 mg, and 25 mg formulations have been used as phase 3 clinical trial material." '188 publication at ¶ [0328]. These tablets comprise, inter alia, anhydrous obeticholic acid, microcrystalline cellulose, and sodium starch glycolate. *Id.* at ¶ [0219] (disclosing four formulations, each with these excipients). The formulations include ratios of microcrystalline to obeticholic acid ranging from about 17.6:1 to 6.28:1, and teaches that microcrystalline cellulose is used as a filler/binder. *Id.* The '188 publication teaches that in these formulations, "obeticholic acid quantity presented . . . is adjusted based on the potency of the drug substance Lot used, and amount of microcrystalline cellulose is correspondingly decreased." *Id.* The '188 publication further discloses that "a tablet may be prepared by compressing an intimate mixture comprising a powder or granules of obeticholic acid and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent . . . ." *Id.* at ¶ [0201]. For example, the 10 mg tablet contains the following:



| 10 mg tablet | | | |
|---|---|---|---|
| Obeticholic acid | 10.0 mg* | API | HSE |
| Microcrystalline cellulose | 176.0 mg* | Filler/Binder | USP-NF/EP/JP |
| Sodium starch glycolate | 12.0 mg | Disintegrant | USP-NF/EP/JP |
| Magnesium stearate | 2.0 mg | Lubricant | USP-NF/EP/JP |
| Opadry ® II green or white | 8.0 mg | Coating Material | HSE |
| Total weight | 208.0 mg | | |

*Id.* at ¶ [0219].

The ’188 publication also discloses that Form 1 of obeticholic acid, which “can be used as the pharmaceutically active ingredient” exists as “small irregular particles.” *Id.* at ¶ [0329], [0347]. In particular, of the six batches of Form 1 analyzed, the ’188 publication reports that the particles “all look similar” with “[p]article size ranges from less than 1 µm to 3 µm.” *Id.* at ¶ [0347]. The ’188 publication explains that Form 1’s water solubility is 17.9 µmol/L and Form F’s water solubility is 9.1 µmol/L. *Id.* at ¶ [0385].

The ’188 publication further teaches methods of treating a variety of FXR-mediated diseases. the ’188 publication teaches administering obeticholic acid to treat “biliary atresia, cholestatic liver disease, chronic liver disease, nonalcoholic steatohepatitis (NASH), hepatitis C infection, alcoholic liver disease, primary biliary cirrhosis (PBC), liver damage due to progressive fibrosis, liver fibrosis, and cardiovascular diseases including atherosclerosis, arteriosclerosis, hypercholesteremia, and hyperlipidemia.” *Id.* at ¶ [0221]. With respect to dosing, the ’188 publication teaches administering “about 1 mg to about 50 mg” of obeticholic acid daily. *Id.* ¶ [0263]. The ’188 publication teaches:

> “[T]he amount of obeticholic acid actually administered will be determined by a physician, in the light of the relevant circumstances, including the condition to be treated, the chosen route of administration, the form of obeticholic acid administered, the age, weight, and response of the individual patient, and the severity of the patient's symptoms . . . .” *Id.*

The ’188 publication advises that “[i]n some instances dosage levels below the lower limit of the aforesaid range may be more than adequate, while in other cases still larger doses may be employed without causing any harmful side effect, provided that such larger doses are first divided into several smaller doses for administration throughout the day.” *Id.*

**B. Lieberman, Lachman & Schwartz, “Pharmaceutical Dosage Forms: Tablets Volume 1,” Ch. 1, Preformulation Testing (2d ed. 1989) (“Lieberman”)**

Lieberman, Lachman & Schwartz, “Pharmaceutical Dosage Forms: Tablets Volume 1,” Ch. 1, Preformulation Testing (2d ed. 1989) (“Lieberman”) published in 1989 and is prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Lieberman explains:

> It is probably safest to grind most new drugs having particles that are above approximately 100 µm in diameter. If the material consists of particles primarily 30 µm or less in diameter, then grinding is unnecessary, except if the material exists as needles – where grinding may improve flow and handling properties, or if the material is poorly water-soluble where grinding increases dissolution rate. Grinding should reduce coarse material to, preferably, the 10- to 40-µm range. Once this is accomplished, controlled testing can be performed both for subsequent in vivo studies and for in-depth preformulation studies.
> Lieberman at 5-6.

**C. Aulton, “Pharmaceutics – the science of dosage form design,” Ch. 1, The Design of Dosage Forms (1988) (“Aulton”)**

Aulton, “Pharmaceutics – the science of dosage form design,” Ch. 1, The Design of Dosage Forms (1988) (“Aulton”) published in 1988 and is prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Aulton discloses that by 1988, it was “generally recognized that poorly soluble drugs showing a dissolution rate-limiting step in the absorption process will be more readily bioavailable when administered in a finely subdivided form with larger surface than as a coarse

material." Aulton at 8.

**D. A. Takahashi et al., "Using Fluid Bed Granulation to Improve the Dissolution of Poorly Water-Soluble Drugs," BRAZ. ARCH. BIOL. TECHNOL. v.55 n3: pp. 477-484, May/June 2012, ("Takahashi")**

A. Takahashi et al., "Using Fluid Bed Granulation to Improve the Dissolution of Poorly Water-Soluble Drugs," BRAZ. ARCH. BIOL. TECHNOL. v.55 n3: pp. 477-484, May/June 2012, ("Takahashi") published in 2012 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Takahashi studied the impact of wet granulation on low soluble BCS Class II drugs; nimodipine and spironolactone. Takahasi at 477-78. Granules were prepared by blending various excipients, including lactose, microcrystalline cellulose, colloidal silicon dioxide and roscarmellose sodium using povidone as a binder. *Id.* at 478. All the granules prepared included microcrystalline cellulose. *Id.* The granules thus prepared were blended with magnesium stearate and compressed into tablets. *Id.* The tablets prepared were compared to tablets made using physical mixtures of the same drugs and excipients in the same proportions. *Id.* at 479.

Tablets made from the granules and physical mixtures were then compared for dissolution characteristics. *Id.* at 482. The results of the dissolution tests performed by Takahashi showed that the tablets prepared from granules had faster dissolution that the tablets prepared from physical mixtures. *Id.* 482-83. The conclusion of Takahashi was that the use of wet granulation improved the dissolution characteristics of the two BCS Class II drugs; nimodipine and spironolactone. *Id.* at 483-84.

**E. U.S. Patent No. 6,933,380 ("the '380 patent")**

U.S. Patent No. 6,933,380 ("the '380 patent") issued on August 23, 2005 and is is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The ’380 patent discloses pharmaceutical excipients, including sodium starch glycolate having low; e.g. less than 3000 ppm of residual solvents. ’380 patent at 4:41-6:36. The ’380 patent discloses that methanol and ethanol are of particular concern as residual solvents because they are used as process solvents and have ICH limits of 3000 ppm and 5000 ppm respectively. *Id.* In addition, Table 3 in the ’380 patent discloses seven commercially available sodium starch glycolate grades, all of which contain less than 6% residual alcohol. *Id.* at 6:12-31.

**F. K. Chu, et al., “Effect of Particle Size on the Dissolution Behaviors of Poorly Watersoluble Drugs,” ARCH PHARM RES Vol 35, No 7, 1187-1195, (2012) (“Chu”)**

K. Chu, et al., “Effect of Particle Size on the Dissolution Behaviors of Poorly Watersoluble Drugs,” ARCH PHARM RES Vol 35, No 7, 1187-1195, (2012) (“Chu”) published in 2012 and is prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Chu teaches that “[w]hen administered orally, the dissolution rate can be the rate-limiting step for poorly water-soluble drugs, particularly BCS Class (biopharmaceutical classification system) II and IV compounds.” Chu at 1187. Chu discloses that milling is a common technique to increase the dissolution rate by increasing the specific surface area of pharmaceutical APIs. *Id.* at 1188. Moreover, Chu discloses that micronized drugs show better clinical efficacy than nonmicronized drugs. *Id.* Finally, Chu discloses that a decrease in particle size leads to a larger increase in dissolution rate through an increase in specific surface area and a decrease in thickness of the diffusion layer around each particle. *Id.*

**G. Y. Krishnaiah, “Pharmaceutical Technologies for Enhancing Oral Bioavailability of Poorly Soluble Drugs,” J OF BIOEQUIV & AVAILAB, Vol. 2(2): 028-036 (2010) (“Krishnaiah”)**

Y. Krishnaiah, “Pharmaceutical Technologies for Enhancing Oral Bioavailability of Poorly Soluble Drugs,” J OF BIOEQUIV & AVAILAB, Vol. 2(2): 028-036 (2010) (“Krishnaiah”)

published in 2010 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Krishnaiah discloses that a variety of pharmaceutical formulation technologies are used to enhance oral bioavailability of BCS class II drugs. Krishnaiah at Abstract. According to Krishnaiah, “[t]he oral bioavailability of drugs presented in a solid dosage form depends mainly on size, size distribution and morphology of particles. This is due to enhanced surface area of drug particles available for dissolution.” *Id.* at 028. “Hence, a variety of micronization technologies such as spray-drying, freeze-drying, crystallization and milling processes were developed to decrease the particle size.” *Id.* at 028-029.

**H. Y. Kawabata et al., “Formulation design for poorly water-soluble drugs based on biopharmaceutics classification system: Basic approaches and practical applications,” INT. J. PHARM. 420 (2011) 1– 10 (“Kawabata”)**

Y. Kawabata et al., “Formulation design for poorly water-soluble drugs based on biopharmaceutics classification system: Basic approaches and practical applications,” INT. J. PHARM. 420 (2011) 1– 10 (“Kawabata”) published in 2011 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Kawabata discloses that for BCS Class II drugs particle size reduction is an approach widely used to increase dissolution rate as well as salt formation. Kawabata at 4. Kawabata states that “[t]he dissolution rate of a drug proportionally increases with increasing surface area of drug particles.” *Id.* Kawabata reports that micronization successfully enhanced the bioavailability of poorly water-soluble drugs such as griseofulvin, digoxin, and felodipine. *Id.* “The common method to obtain micronized drug particles is mechanical pulverization of larger drug particles. Jet milling, ball milling, and pin milling are commonly used for dry milling.” *Id.* “For solid

powders, the lowest particle size that can be achieved by conventional milling is about 2 – 3 µm." *Id.*

**I. J. Markarian, Using Micronization to Reduce API Particle Size, PharmaTech.com, Jan. 13, 2013, ("Markarian")**

J. Markarian, Using Micronization to Reduce API Particle Size, PharmaTech.com, Jan. 13, 2013, ("Markarian") published in 2013 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Markarian teaches that jet milling is capable of producing API particles in the 2 – 5 µm range. *See* Markarian.

**J. FDA Guidance, Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances, 65 Fed. Reg. 83041-83063 (Dec. 29, 2000) ("FDA Q6A Guidance")**

FDA Guidance, Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances, 65 Fed. Reg. 83041-83063 (Dec. 29, 2000) ("FDA Q6A Guidance") published on December 29, 2000 and is prior art to the RE286 patent under at least pre-AIA § 102(a), prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b), and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1). FDA Q6A Guidance provides guidance on developing new drug substances. FDA Q6A Guidance at 83046. FDA Q6A Guidance explains, "[f]or some new drug substances intended for use in solid or suspension drug products, particle size can have a significant effect on dissolution rates, bioavailability, and/or stability. In such instances, testing for particle size distribution should be carried out using an appropriate procedure, and acceptance criteria should be provided." *Id.* FDA Q6A Guidance provides a decision tree for addressing particle size in new drug substances:



*Id.* at 83054.

**K. U.S. Patent Publication No. 2014/0371190 ("Pellicciari '190")**

U.S. Patent Publication No. 2014/0371190 ("Pellicciari '190") published on December 18, 2014 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1). The relevant disclosures in Pellicciari '190 are not subject to the prior art exceptions under AIA § 102(b)(1).

Pellicciari '190 reports that obeticholic acid has a water solubility of only 9 µM. Pellicciari '190 at ¶¶ [0089], [0197]. Pellicciari '190 further explains that both obeticholic acid and UDCA are natural or synthetic analogues of bile acids, and both have a water solubility of

less than 10 µM. *Id.* at ¶¶ [0089], [0096], [0197].

**L. J.C. Chaumeil, "Miconization: A Method of Improving the Bioavailability of Poorly Soluble Drugs," METH. FIND. EXP. CLIN. PHARMACOL. 1998, 20(3) ("Chaumeil")**

J.C. Chaumeil, "Miconization: A Method of Improving the Bioavailability of Poorly Soluble Drugs," METH. FIND. EXP. CLIN. PHARMACOL. 1998, 20(3) ("Chaumeil") published in 1998 and is prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Chaumeil teaches that "reducing particle size by micronization can improve the rate of dissolution of poorly soluble materials," including by jet-milling. Chaumeil at 211–215. Chaumeil provides examples in which the micronization of a poorly soluble drug provided a dissolution rate four times better than its unmicronized counterpart, and explains that for another poorly soluble drug, reducing the median particle size (including down to 3 µm) "was the best way of increasing the rate of dissolution . . . ." *Id.* at 213-214.

**M. Ketan T. Savjani, et al., "Drug Solubility: Importance and Enhancement Techniques," ISRN PHARMACEUTICS, Vol. 2012 ("Savjani")**

Ketan T. Savjani, et al., "Drug Solubility: Importance and Enhancement Techniques," ISRN PHARMACEUTICS, Vol. 2012 ("Savjani") published in 2012 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Savjani teaches that "[t]he solubility of [a] drug is often intrinsically related to drug particle size; as a particle becomes smaller, the surface area to volume ratio increases." Savjani at 3. Savjani explains that "[m]ore than 40% [of] NCEs (new chemical entities) developed in pharmaceutical industry are practically insoluble in water" and therefore have poor dissolution rates, which can be addressed by reducing the particle size, including by jet-milling. *Id.* at 2–3.

**N. Woo Sik Choi et al., "Amorphous ultrafine particle preparation for improvement of bioavailability of insoluble drugs: grinding characteristics of fine**

**grinding mills," INT. J. MINER. PROCESS. 74S (2004) S165–S172 ("Choi 2004")**

Woo Sik Choi et al., "Amorphous ultrafine particle preparation for improvement of bioavailability of insoluble drugs: grinding characteristics of fine grinding mills," INT. J. MINER. PROCESS. 74S (2004) S165–S172 ("Choi 2004") published in 2004 prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Choi 2004 describes "the preparation of ultrafine particle[s] of insoluble drugs in water and the improvement of physicochemical properties by using three types of fine grinding mills," and studies UDCA as a model insoluble drug. Choi 2004 at Abstract. Choi 2004 explains that "[t]he particle size of medicinal materials is an important physical property that affects the pharmaceutical behaviors such as dissolution, chemical stability, and bioavailability of solid dosage forms." Choi 2004 at S166. Because "[a] fundamental problem of insoluble drugs is often an insufficient bioavailability," Choi 2004 teaches that "[d]ecreasing the particle size of these drugs can improve their rate of dissolution." *Id.* at S165. Choi 2004 analyzes data relating to the micronization of UDCA and concludes that "the solubility and dissolution rate of insoluble drug UDCA can be improved by the particle size reduction." *Id.* at S171; *see also id.* at S169 Fig. 4.

Choi 2004 further expresses a preference for jet-milling over grinding by a planetary ball mill or vibration rod mill. Choi 2004 teaches that upon subjecting UDCA to jet-milling to reduce particle size, the "median diameter of ground sample by jet mill was about 1.5 µm," with "a sharp particle size distribution from 0.68 to 5.64 µm." *Id.* at S169. In contrast, the particle size of a UDCA sample ground by vibration rod mill had "a wide variation," ranging from 7 to 76 µm. *Id.* Choi 2004 further finds that both "the vibration rod mill and the jet mill showed more significantly

hepato-protective effects compared with intact UDCA and the UDCA ground by the planetary ball mill." *Id.* at S172.

### O. International PCT Patent Application Publication No. WO 2008/062475 ("WO '475")

International PCT Patent Application Publication No. WO 2008/062475 ("WO '475") published on May 29, 2008 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

WO '475 teaches that UDCA (aka ursodiol) "is characterized as having low solubility and high permeability," and thus "the rate limiting step for oral bioavailability of Ursodiol is the dissolution of the drug from the pharmaceutical dosage form." WO '475 at 3:4–9. WO '475 teaches that a "dosage form prepared using micronized and unmicronized ursodiol, results in an improved dissolution and absorption characteristics." *Id.* at 3:13–15. Specifically, "[i]n the preferred embodiment, [u]rsodiol is micronized to obtain reduced particle size e.g. $d_{90}$ particle size of less than 20 micron, preferably less than 10 micron, and more particularly less than 7 micron." *Id.* at 4:25–27. WO '475 proposes claims for embodiments in which up to 95% of the ursodiol particles are micronized at an average particle size of less than about 7 microns. *Id.* at 10:1–13.

### P. International PCT Patent Application Publication No. WO 2013/057741 ("WO '741")

International PCT Patent Application Publication No. WO 2013/057741 ("WO '741") published on April 25, 2013 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

WO '741 explains that because UDCA is "practically insoluble in water," its bioavailability "highly depend[s] on particle size." WO '741 at 1:15–19, 4:1–2. WO '741 teaches that the dissolution and bioequivalency profile of UDCA is improved when "at least 90% of the

particles of micronized ursodeoxycholic acid have a size less than 25 microns." *Id.* at 4:7–18. WO '741 further teaches that "[m]icronization of ursodeoxycholic acid is carried out using conventionally known mills, such as a ball mill, colloid mill, grinding mill, air jet mill, roller mill, impact mill, etc." *Id.* at 4:20–22. Among these, WO '741 teaches that "[a]ir jet milling is particularly well suited as it is a well proven technique that consistently produces particles of a size less than 25 microns." *Id.* at 4:22–23.

### Q. International PCT Patent Application Publication No. WO 2013/037482 ("WO '482")

International PCT Patent Application Publication No. WO 2013/037482 ("WO '482") published on March 21, 2013 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

WO '482 claims "synthetic derivatives of natural bile acids, preferably 6-Ethyl-CDCA" and discloses numerous oral dosage forms, including tablets, that can be used with various pharmaceutically acceptable excipients. WO '482 at 17:28-21:6, 39:23-26. WO '482 further teaches compositions "formulated as aerosols for topical application, such as by inhalation," and teaches that such formulations will have particle sizes with "diameters of less than about 50 microns, such as less than about 10 microns." *Id.* at 24:11-18.

### R. International PCT Patent Application Publication No. WO 2004/007521 ("WO '521")

International PCT Patent Application Publication No. WO 2004/007521 ("WO '521") published on January 22, 2004 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1). WO '521 discloses CDCA derivatives suitable for tablets "prepared by compressing an intimate mixture comprising a powder or granules of the active ingredient and one or more optional ingredients . . . ." WO '521 at 14:20-24. WO '521 further teaches that "[f]or pulmonary

administration via the mouth, the particle size of the powder or droplets typically ranges from 0.5 to 10 µm, preferably from 1 to 5 µm, to ensure delivery into the bronchial tree." *Id.* at 14:28-15:2.

### S. A Study of INT 747 (6-ECDCA) in Combination With Ursodeoxycholic Acid (URSO®, UDCA) in Patients With Primary Biliary Cirrhosis, Study NCT00550862 ("NCT 862")

A Study of INT 747 (6-ECDCA) in Combination With Ursodeoxycholic Acid (URSO®, UDCA) in Patients With Primary Biliary Cirrhosis, Study NCT00550862 ("NCT 862") published by February 14, 2012 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(a) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

NCT 862 analyzed the efficacy of 10 mg, 25 mg, or 50 mg of obeticholic acid administered once daily in combination with UDCA. NCT 862 Study sought to treat patients with patients with primary biliary cirrhosis "to assess the effects of INT-747 on 1) hepatocellular injury and liver function, 2) disease-specific and general health symptoms and 3) biomarkers of hepatic inflammation and fibrosis." Patients were treated for a period of 12 weeks. The study results showed clinically significant results for the primary outcome, relative % alkaline phosphatase, in each of the obeticholic acid treatment groups compared to placebo. Each of the obeticholic acid treatment groups were also associated with significant decreases in serum gamma-glutamyl transpeptidase and alanine aminotransferase compared to placebo.

### T. Phase 3 Study of Obeticholic Acid Evaluating Clinical Outcomes in Patients With Primary Biliary Cirrhosis, Study NCT 01473524 ("NCT 524")

Phase 3 Study of Obeticholic Acid Evaluating Clinical Outcomes in Patients With Primary Biliary Cirrhosis, Study NCT 01473524 ("NCT 524") published by January 25, 2012 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(a) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

NCT 524 analyzed the efficacy of obeticholic acid to "improve liver function in persons

with Primary Biliary Cirrhosis (PBC).” The study was designed to administer “5 or 10 mg tablets once daily for 12 months during double-blind phase.” One arm of the study involved treating patients with “OCA 5 mg for 6 months and then titrating up to 10 mg for remainder of double blind period.”

**U. Raoul Poupon, “Primary biliary cirrhosis: A 2010 update,” J. HEPAT. 2010 vol. 52 j 745–758 (“Poupon”)**

Raoul Poupon, “Primary biliary cirrhosis: A 2010 update,” J. HEPAT. 2010 vol. 52 j 745–758 (“Poupon”) published in 2010 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Poupon teaches that “[c]holestyramine is widely used as first-line treatment” of symptoms and complications associated with PBC. Poupon at 753. Poupon teaches that when UDCA is coadministered with cholestyramine, “UDCA and cholestyramine should be spaced a minimum of 4 h apart to prevent binding and loss of efficacy.” *Id.* at 753-54.

**V. U.S. Patent No. 7,994,352 (“the ’352 patent”)**

U.S. Patent No. 7,994,352 (“the ’352 patent”) issued on August 9, 2011 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(a) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

The ’352 patent is directed to a process for preparing 3α-7α(β)-di-hydroxy-6α(β)-alkyl-5β- cholanic acid compounds, including obeticholic acid. ’352 patent at 13:20-33. The ’352 patent discloses that these compounds are “used in particular to increase HDL cholesterol, [and] to lower triglycerides for the prevention and treatment of hepatic disease of cholestatic origin . . . .” *Id.* at 1:63-66. The ’352 patent also discloses that these compounds may be used in a pharmaceutical composition “in combination with suitable excipients and/or diluents.” *Id.* at 7:1-

3.

**W. Pellicciari et al., "Nongenomic actions of bile acids, synthesis and preliminary characterization of 23- and 6,23-alkyl-substituted bile acid derivatives as selective modulators for the G-protein coupled receptor TGR5," J. Med Chem. 2007, 50, 4265-4268 ("Pellicciari 2007")**

Pellicciari et al., "Nongenmoic Actions of Bile Acids, Synthesis and Preliminary Characterization of 23- and 6,23-Alkyl-Substituted Bile Acid Derivatives as Selective Modulators for the G-Protein Coupled Receptor TGR5," J. Med Chem. 2007, 50, 4265-4268 ("Pellicciari 2007") published in 2007 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Pellicciari 2007 discloses that bile acids ("BAs") and bile derivatives are "key elements of paracrine and endocrine functions, and regulation of the immune system." Pellicciari 2007 at 4265. It discloses that the orphan farnesoid X receptor ("FXR") is a BA nuclear receptor whereby Bas or BA derivatives can modulate FXR to regulate levels of lipid and carbohydrate metabolism. *Id.* It further discloses the BA derivative 6ECDCA as "the most potent steroid ligand for FXR so far available":

$CO_2H$

HO OH

6α-Ethyl-Chenodeoxycholic Acid
(6ECDCA, **1**)

*Id.*

**X. U.S. Patent No. 8,338,628 ("the '628 patent")**

U.S. Patent No. 8,338,628 ("the '628 patent") issued on December 25, 2012 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The '628 patent discloses the FXR receptor agonist 6-ECDCA:

'628 patent at Figure 1. It discloses that 6-ECDCA is "more potent . . . compared to the parent CDCA derivative" and therefore is "a prime candidate for use in pharmacological therapy and as a tool to study the function of FXR." *Id.* at 1:37-44.

**Y. Delalonde, M., Fitouri, R., Ruiz, E. et al., « Impact of Physicochemical Environment on the Super Disintegrant Functionality of Cross-Linked Carboxymethyl Sodium Starch: Insight on Formulation Precautions," AAPS PharmSciTech 16, 407–412 (2015) ("Delalonde 2014")**

Delalonde, M., Fitouri, R., Ruiz, E. et al., Impact of Physicochemical Environment on the Super Disintegrant Functionality of Cross-Linked Carboxymethyl Sodium Starch: Insight on Formulation Precautions," AAPS PharmSciTech 16, 407–412 (2015) ("Delalonde 2014") published online on October 28, 2014 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Delalonde 2014 states that the "aim of this work is to improve the understanding of the physicochemical mechanisms involved in the functionality of cross-linked carboxymethyl

sodium starch (CCSS) as a tablet super disintegrant (SD).” Delalonde 2014 at Abstract. Delalonde 2014 discloses that “[i]n pure water, the disintegration time of CCSS tablets is relatively fast and becomes slower as the ethanol content increases in the disintegration medium.” *Id.* at 409. “[W]hen testing water/ethanol 50/50, the disintegration becomes excessively long.” *Id.*

### Z. U.S. Patent No. 5,512,558 (“the ’558 patent”)

U.S. Patent No. 5,512,558 (“the ’558 patent”) issued on April 30, 1996 and is prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

The ’558 patent teaches pharmaceutical compositions of bile acid derivatives that are administered in various dosage forms in doses ranging from 3mg to 5000mg, depending on the weight of the patient. ’558 patent at 12:3-8.

### AA. International PCT Patent Application Publication No. WO 2012/072689 (“WO ’689”)

International PCT Patent Application Publication No. WO 2012/072689 (“WO ’689”) published on June 7, 2012 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(a) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

WO ’689 discloses a pharmaceutical composition of the bile acid nor-ursodeoxycholic acid:

Nor-UDCA – VI

WO ’689 at 18. WO ’689 discloses a process for developing a composition of Nor-UDCA without micronization, resulting in a composition where at least 50% of particles have a diameter of as low as 0.5 micrometer and at least 90% of particles have a diameter of as low as 2 micrometers. *Id.* at 5, 10-11. WO ’689 discloses the use of “starch and starch derivatives” in formulations of Nor- UDCA. *Id.* at 19. WO ’689 states that the formulation can be in the form of a tablet. *Id.*

**BB. Shotton, E., and G. S. Leonard, “Effect of intragranular and extragranular disintegrating agents on particle size of disintegrated tablets,” Journal of pharmaceutical sciences 65.8 (1976): 1170-1174 (“Shotton”)**

Shotton, E., and G. S. Leonard, “Effect of intragranular and extragranular disintegrating agents on particle size of disintegrated tablets,” Journal of pharmaceutical sciences 65.8 (1976): 1170-1174 (“Shotton”) published in 1976 and is prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Shotton discloses that “[a] combination of intra- and extragranular disintegrating agents

gave the best compromise" to obtain effective disintegration in tablets. Shotton at Abstract. Shotton discloses the use of the disintegrant microcrystalline cellulose in both portions of the tablet. *Id.* at 1170.

**CC. U.S. Patent No. 7,157,101 ("the '101 patent"or "Thosar")**

U.S. Patent No. 7,157,101 ("the '101 patent"or "Thosar") issued on January 2, 2007 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The '101 patent is directed to pharmaceutical compositions comprising active agents, including aldosterone receptor blockers. '101 patent at Abstract. More specifically, the '101 patent discloses pharmaceutical compositions comprising eplerenone in the form or tablets where the tablets comprise intra- and extra-granular sections. *Id.* at 35:8-60, Example 1.

The '101 patent also discloses processes for preparing the tablets and improvements thereof. For example, the '101 patent states that "[t]he use of extragranular microcrystalline cellulose (that is, microcrystalline cellulose added to a wet granulated composition after the drying step) in addition to intragranular microcrystalline cellulose (that is, microcrystalline cellulose added to the composition during or before the wet granulation step) can be used to improve tablet hardness and/or disintegration time." *Id.* at 9:4-11.

**DD. U.S. Patent Publication No. 2012/0160944 ("Dodd '944")**

U.S. Patent Publication No. 2012/0160944 ("Dodd '944") published on June 28, 2012 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Dodd '944 is directed to methods for producing nanoparticle and microparticle powders of biologically active materials that have improved powder handling properties. Dodd '944 at Abstract. The powders discloses by Dodd "have unexpectedly improved powder handling techniques, making them advantageous for us in commercial applications." *Id.* at ¶ [0001].

Dodd discloses that it is well known that the dissolution of a particulate drug will increase with increasing surface area. *Id.* at ¶ [0004]. "One way of increasing surface area is decreasing particle size. Consequently, methods of making finely divided or sized drugs have been studied with a view to controlling the size and size range of drug particles for pharmaceutical compositions." *Id.*

**EE.    Johnston, I., et al., "PTU-193 A Novel, Rational Approach  to  Treating Primary Bile Acid Diarrhoea: a Proof of Concept Study of the FXR Agonist Obeticholic Acid," Gut 62.Suppl 1 (2013): A127-A128 ("Johnston")**

Johnston, I., et al., "PTU-193 A Novel, Rational Approach to Treating Primary Bile Acid Diarrhoea: a Proof of Concept Study of the FXR Agonist Obeticholic Acid," Gut 62.Suppl 1 (2013): A127-A128 ("Johnston") published in 2013 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Johnston discloses a study where patients received 25 mg of obeticholic acid orally daily for two weeks. Johnston at Abstract. Johnston states that the "study has shown for the first time that rational therapy with the FXR agonist OCA in PBAD is well tolerated and effective, stimulating serum FGF19 and reducing postprandial BA, resulting in clinical improvements in stool frequency and type." *Id.* at Conclusion.

**FF.    Mudaliar, Sunder, et al., "Efficacy and safety of the farnesoid X receptor agonist obeticholic acid in patients with type 2 diabetes and nonalcoholic fatty liver disease," Gastroenterology 145.3 (2013): 574-582 ("Mudaliar")**

Mudaliar, Sunder, et al., "Efficacy and safety of the farnesoid X receptor agonist obeticholic acid in patients with type 2 diabetes and nonalcoholic fatty liver disease," Gastroenterology 145.3 (2013): 574-582 ("Mudiliar") published in 2013 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Mudaliar discloses a study where patients were given placebo, 25 mg obeticholic acid, or 50 mg obeticholic acid once daily for six weeks.  Mudaliar at Abstract.  The study showed that

"administration of 25 or 50 mg OCA for 6 weeks was well tolerated, increased insulin sensitivity, and reduced markers of liver inflammation and fibrosis in patients with type 2 diabetes mellitus and nonalcoholic fatty liver disease. Longer and larger studies are warranted." *Id.*

**GG. U.S. Patent No. 4,921,848 ("the '848 patent")**

U.S. Patent No. 4,921,848 ("the '848 patent") issued on May 1, 1990 and is prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The '848 patent teaches biliary acid derivatives of formula (I) shown below:

COOH
$R_1$
HO
OH
$CH_3$
(I)

wherein $R_1$ is hydrogen or hydroxy, and the methyl and hydroxy groups at 6- and 7-positions respectively can be either in α or β configuration. *Id.* at 1:10-27. The '848 patent teaches that compounds having the structure formula (I) are the 6-methyl derivatives of the following natural biliary acids: ursodeoxycholic (UDCA) 3α, 7β OH), ursocholic (3α, 7β OH; $R_1$ = OH), chenodeoxycholic (3α, 7αOH) and cholic (3α, 7αOH; $R_1$=OH) acids. *Id.* at 1:28-32.

> The present invention also relates to the physiologically acceptable salts of compounds of formula I, as well as possible glycine or taurine conjugated forms. Moreover, since compounds I can have the methyl group at 6-position as well as the hydroxy group at 7- position either in α or β configurations, the invention also relates to the single isomers or diastereoisomers and the mixtures thereof. The above cited biliary acids have been used for a long time in human therapy for the

> treatment of biliary calculosis, as antidyspeptic, eupeptic, antidyslipidemic and choleretic agents, and generally in all those pathological conditions in which a stimulation of biliary flow and a qualitative and/or quantitative change thereof are required.

*Id.* at 1:33-48.

The '848 patent further teaches that the 7-position (with the -OH group, unchanged in comparison with the natural molecule) has been found to be critical with respect to the pharmacological activity of the biliary acid derivatives. *Id.* at 1:64-2:2. "As regards the effect on lipid biliary secretion, compounds I preferentially decrease cholesterol secretion, keeping constant the phospholipid one." *Id.* at 2:21-23.

**HH. U.S. Patent No. 5,061,701 ("the '701 patent")**

U.S. Patent No. 5,061,701 ("the '701 patent") issued in 1991 and is prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The '701 discloses bile acid derivatives having the general formula of compound I highlighted below

COOH (I)
R1
HO OH
F

wherein R1 is hydrogen, in addition to process for the preparation thereof and pharmaceutical composition comprising the same. '701 patent at Cover. The '701 patent also teaches physiologically acceptable salts of compound I, in addition to glycine or taurine conjugated forms. *Id.* at 1. Further, the '701 patent describes that the bile acid derivatives disclosed therein

been used for a long time in human therapy for the treatment of biliary calculosis, as antidyspeptic, eupeptic, antidyslipidemic and choleretic agents, and generally in all those pathological conditions in which a stimulation of bile flow and a qualitative and/or quantitative change thereof are required. *Id.*

The ’701 patent further teaches that the 7-position (with the -OH group, unchanged in comparison with the natural molecule) has been found to be critical with respect to the pharmacological activity of the biliary acid derivatives. *Id.* at 2.

### II. Kim HG, Une M, Hino A, et al., “Bile acid sulfonate and 7-alkylated bile acid analogs: effect on intestinal absorption of taurocholate and cholesterol 7alpha-hydroxylase activity in cultured rat hepatocytes,” Steroids. 2000 Jan;65(1):24- 28 (“Kim”)

Kim HG, Une M, Hino A, et al., “Bile acid sulfonate and 7-alkylated bile acid analogs: effect on intestinal absorption of taurocholate and cholesterol 7alpha-hydroxylase activity in cultured rat hepatocytes,” Steroids. 2000 Jan;65(1):24-28 (“Kim”) published in 2000 and is prior art prior art to the RE286 patent under at least pre-AIA § 102(a), prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b), and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Kim examined the effects of 7-alkylated chenodeoxycholic acids (CDC) and three sulfonate analogs of CDC, Ursodeoxycholic acid) UDC, and cholic acid (C) on taurocholate (TC) absorption from the terminal ileum and liver cholesterol 7a-hydroxylase activity. Kim at 24-25.

I, $R_1$ = methyl
II, $R_1$ = ethyl
III, $R_1$ = propyl

R= $O^-$ or $NHCH_2CH_2SO_3^-$

IV, R = OH, 7α-OH
V, R = H, 7α-OH
VI, R = H, 7β-OH

Fig. 1. Structure of bile acid sulfonate and 7-alkylated bile acid analogs.

*Id.* at 25.

Furthermore, Kim developed new bile acid analogs to resist bacterial 7-dehydroxylation, including 7-alkylated bile acids and bile acid sulfonates as shown above. *Id.* "These bile acid analogs are absorbed from the intestine, taken up by the liver and enter enterohepatic circulation similar to endogenous bile acids." *Id.* at 24.

During the development of the bile acid analogs, Kim discovered that 7-alkylated CDCs and bile acid sulfonates strongly participate in enterohepatic circulation immediately after oral administration, like endogenous bile acids. *Id.* at 26. Kim teaches that "[i]f the bile acid analogs exhibit the inhibitory effects on absorption of endogenous bile acids and do not suppress cholesterol 7α-hydroxylase activity, they should reduce serum cholesterol levels." *Id.* at 26-27.

**JJ. Kuroki, Syoji, et al., "7-Methyl bile acids: 7 β-methyl-cholic acid inhibits bacterial 7-dehydroxylation of cholic acid and chenodeoxycholic acid in the hamster," Journal of lipid research 28.7 (1987): 856-863 ("Kuroki")**

Kuroki, Syoji, et al., "7-Methyl bile acids: 7 β-methyl-cholic acid inhibits bacterial 7-

dehydroxylation of cholic acid and chenodeoxycholic acid in the hamster," Journal of lipid research 28.7 (1987): 856-863 ("Kuroki") published in 1987 and is prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Kuroki teaches that the steroidal 7 alpha-hydroxyl group plays an important role in cholesterol-bile acid metabolism. Kuroki at 856. Thus, the 7 alpha-hydroxylation of cholesterol is the initial and rate-limiting step of bile acid synthesis, and the primary bile acids of most mammalian species, chenodeoxycholic acid (CDCA) and cholic acid (CA), possess a 7 alpha-hydroxyl group. *Id.* Both bile acids participate significantly in the solubilization and absorption of lipids in the intestinal tract. *Id.* 7-Dehydroxylation of these primary bile acids to form lithocholic acid (LCA) and deoxycholic acid (DCA), respectively, is the major pathway for the excretion of bile acids into feces. *Id.* In addition, certain bile acids that do not have a 7-hydroxyl group are considered to be hepatotoxic and carcinogenic. *Id.*

Kuroki highlights that studies have focused on the in vivo inhibition of the 7-dehydroxylation of bile acids, because this might result in prolonged enterohepatic circulation of physiologically valuable bile acids and reduce the concentration of the potentially toxic secondary bile acids. *Id.* Kuroki further teaches that one of the ways in which 7-dehydroxylation of bile acids may be inhibited or prevented by "[i]ntroduction of protective group in the bile acid nucleus on or near the 7-position that might render the bile acid analogy resistant to enzymatic dihydroxylation." *Id.* at 849.

**KK. Pellicciari et al., "6α-Ethyl-Chenodeoxycholic Acid (6-ECDCA), a Potent and Selective FXR Agonist Endowed with Anticholestatic Activity," J. Med. Chem. 2002, 45, 3569-3572 ("Pellicciari 2002")**

Pellicciari et al., "6α-Ethyl-Chenodeoxycholic Acid (6-ECDCA), a Potent and Selective

FXR Agonist Endowed with Anticholestatic Activity," J. Med. Chem. 2002, 45, 3569-3572 ("Pellicciari 2002") published in 2002 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Pellicciari 2002 teaches that obeticholic acid is "almost 2 orders of magnitude more potent than CDCA." Pellicciari 2002 at 3572. Pellicciari 2002 teaches that obeticholic acid was developed to treat "a variety of human liver diseases such as primary biliary cirrhosis, primary sclerosing cholangitis, cystic fibrosis, and intrahepatic cholestasis of pregnancy" in light of the "role of FXR in [bile acid] biosynthesis and transport from the liver." *Id.* at 3570.

Pellicciari 2002 teaches a method of preparing obeticholic acid (here, compound "6b") according to the following process:

**Scheme 1**[a]

**a**: R = Me
**b**: R = Et
**c**: R = Pr
**d**: R = Bn

*Id.* at 3570.

**LL. U.S. Patent No. 7,138,390 ("Pellicciari '390")**

U.S. Patent No. 7,138,390 ("Pellicciari '390") published on November 21, 2006 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Pellicciari '390 teaches the role of obeticholic acid in FXR-mediated diseases, and discloses "a pharmaceutical formulation comprising a compound of formula (I) and a pharmaceutically acceptable carrier or diluent." *Id.* at 2:32-34. Pellicciari '390 teaches that obeticholic acid can be used in "for the treatment of a number of cholestatic liver disease[s] and other lipid related diseases and conditions." *Id.* at 5:3-6; *see also, e.g.*, *id.* at 2:42-67 (disclosing that the compound of formula (I) can be administered to: (1) prevent or treat cardiovascular disease; (2) increase HDL cholesterol; (3) lower triglycerides; and (4) prevent or treat cholestatic liver disease). Pellicciari '390 discloses that obeticholic acid can be used to treat the following cardiovascular diseases: atherosclerosis, arteriosclerosis, hypercholesteremia, and hyperlipidemia. *Id.* at 4:50-60.

Pellicciari '390 teaches "a typical daily dose for the treatment of FXR mediated diseases and conditions, for instance, may be expected to lie in the range of from about 0.01 mg/kg to about 100 mg/kg." *Id.* at 5:29-32; *see also id.* at 9:30-10:48 (disclosing obeticholic acid). Pellicciari '390 teaches that obeticholic acid may be given in tablet form which may contain from 0.05 to 95% by weight obeticholic acid. *Id.* at 5:29-53. Pellicciari '390 also discloses that the "tablet may be prepared by compressing an intimate mixture comprising a powder or granules of the active ingredient and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent, or by moulding anintimate mixture of powdered active

ingredient and inert liquid diluent." *Id.* at 6:36-42.

Pellicciari '390 describes the same process of preparing obeticholic acid as Pellicciari 2002, and specifies that obeticholic acid "was chromatographed on silica gel column," and that two intermediates were also purified by silica gel chromatography. *Id.* at 9:30-10:48.

**MM. International PCT Patent Application Publication No. WO 2006/122977 ("Ferrari '977")**

International PCT Patent Application Publication No. WO 2006/122977 ("Ferrari '977") published on November 23, 2006 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1). Ferrari '977 explains that obeticholic acid is "two magnitude order more powerful than chenodeoxycholic acid, the most powerful natural FXR agonist," and can be used "for the prevention and treatment of hepatic diseases of cholestatic origin." Ferrari '977 at 2:1-6. Ferrari '977 sought to improve upon the process disclosed by Pellicciari '390 (referring to WO 2002/072598, which shares the same disclosure). *Id.* at 1:19-2:8. In particular, Ferrari '977 observes that this process "presents a series of drawbacks," including requiring that "in all stages the reaction products are purified on a chromatographic column, namely a very expensive separation method that cannot be realized on an industrial scale." *Id.* at 3:7-11. Ferrari '977 adds that the yield is "lower than 3.5%" and includes a reactant that could be carcinogenic. *Id.* at 3:12-15.

In contrast, Ferrari '977 discloses a process in which "the intermediates do not need to be purified by chromatography," a yield of 24.6% is obtained, and highly toxic reagents are avoided. *Id.* at 8:21-23; *see also id.* at 12:4-15:31 (disclosing process for preparing obeticholic acid). Ferarri '977 discloses a process of preparing obeticholic acid that includes a step of "[c]rystallization of the crude product" to form purified obeticholic acid. *Id.* at 15:24. Ferarri '977

teaches that "crystallisation [occurs] with an organic solvent, preferably chosen from ethyl acetate and acetone, possibly in the presence of water." *Id.* at 10:20-22. The organic solution is cooled to crystallize the crude product, and obeticholic acid is then precipitated, filtered, washed, and dried. *Id.* at 15:24-29.

**NN. U.S. Patent No. 7,994,352 ("Ferrari '352")**

U.S. Patent No. 7,994,352 ("Ferrari '352") published on August 9, 2011 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1). Ferrari '352 claims priority to Ferrari '977 and contains the same disclosures as Ferarri '977. Ferarri '352 further claims processes for preparing 3α,7α(β)-dihydroxy-6α(β)-alkyl-5β-cholanic acids, including obeticholic acid. *See, e.g.*, Ferrari '352 at claim 1.

**OO. U.S. Patent Publication No. US 2009/0062526 ("Yu '526")**

U.S. Patent Publication No. US 2009/0062526 ("Yu '526") published on March 5, 2009 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Yu '526 sought to improve upon the process disclosed by Pellicciari 2002. According to Yu '526, the starting material in Pellicciari 2002, 7-keto-lithocholic acid, is "very expensive" and the process produced an inadequately low yield of obeticholic acid. Yu '526 at [0004]; *see also* Pellicciari 2002 at 3570. Yu '526 explains that "[g]iven the great promise of 6-ECDCA as a research tool and therapeutic molecule, a more efficient and less expensive methodology for the synthesis of this compound is needed." Yu '526 at [0004]; *see also id.* at Abstract. Yu '526 likewise teaches that "6-ECDCA has recently been identified by traditional medicinal chemistry methods and found to be more potent with $EC_{50}$ values around 100 nM compared to the parent CDCA derivative." *Id.* Accordingly, obeticholic acid is a "prime candidate for use in

pharmacological therapy and as a tool to study the function of FXR." *Id.* Specifically, Yu '526 teaches that obeticholic acid "may be used in treating atherosclerosis, diabetes and cholestatic disease." *Id.* at [0003].

Yu '526 details the process for preparing 6-ECDCA, which includes using various organic reagents to convert CDCA to 6-ECDCA with three intermediate compounds. *Id.* at [0043]-[0047]. The process is depicted below:

*Id.* at Fig. 6B; *see also id.* at [0028]-[0029]. Yu '526 teaches that purifying obeticholic acid prepared by the above-described process by flash column chromatography to obtain an 80% yield. *Id.* at [0047]. Flash column chromatography is further employed to purify intermediate compounds, teaching that "the crude oil was purified by flash column chromatography" to form both intermediate compounds 1 and 2. *Id.* at [0044]-[0045].

**PP. U.S. Patent No. 8,338,628 ("Yu '628")**

U.S. Patent No. 8,338,628 ("Yu '628") issued from a patent application filed on May 22, 2008 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior

art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1). Yu ’628 issued from the patent publication Yu ’526 and contains the same disclosures as Yu ’526. Yu ’628 further claims processes for preparing obeticholic acid. *See* Yu ’628 at claims 1-4.

**QQ. The Farnesoid X Receptor (FXR) Ligand Obeticholic Acid in NASH Treatment (FLINT) Trial, Study NCT01265498 (“NASH-FLINT”)**

The Farnesoid X Receptor (FXR) Ligand Obeticholic Acid in NASH Treatment (FLINT) Trial, Study NCT01265498 (“NASH-FLINT”) published on December 21, 2010 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

NASH-FLINT studied the effect of 25 mg of obeticholic acid administered to subjects with evidence of nonalcoholic steatohepatitis (NASH). *See* NASH-FLINT.

**RR. A Study of INT 747 (6-ECDCA) in Combination With Ursodeoxycholic Acid (URSO®, UDCA) in Patients With Primary Biliary Cirrhosis, Study NCT00550862 (“PBC Study”)**

A Study of INT 747 (6-ECDCA) in Combination With Ursodeoxycholic Acid (URSO®, UDCA) in Patients With Primary Biliary Cirrhosis, Study NCT00550862 (“PBC Study”) published on October 27, 2007 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1). PBC Study analyzed the efficacy of 10 mg, 25 mg, or 50 mg of obeticholic acid in combination with UDCA. *See* PBC Study. PBC Study sought to treat patients with patients with primary biliary cirrhosis “to assess the effects of INT-747 on 1) hepatocellular injury and liver function, 2) disease-specific and general health symptoms and 3) biomarkers of hepatic inflammation and fibrosis.” *Id.*

**SS. Intercept Pharmaceuticals’ FXR Agonist INT-747 Meets Primary Endpoint in a Phase II Clinical Trial in Type 2 Diabetic Patients with Nonalcoholic Fatty Liver Disease, Intercept Pharmaceuticals Inc Press Release, October 1, 2009 (“Intercept Press Release”)**

Intercept Pharmaceuticals' FXR Agonist INT-747 Meets Primary Endpoint in a Phase II Clinical Trial in Type 2 Diabetic Patients with Nonalcoholic Fatty Liver Disease, Intercept Pharmaceuticals Inc Press Release, October 1, 2009 ("Intercept Press Release") published in 2009 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The Intercept Press Release states that obeticholic acid met a primary endpoint in a clinical study of diabetic patients with non-alcoholic fatty liver disease (NAFLD). Intercept Press Release at 1. According to the Intercept Press Release the study results validated the mechanism of FXR activation by obeticholic acid. *Id.* The Intercept Press Release states that insulin resistance is an important driver of liver fibrosis. *Id.* The Intercept Press Release also states that treatment with obeticholic acidimproved insulin sensitivity in diabetic patients with NAFLD. *Id.*

**TT. Intercept Pharmaceuticals to Collaborate With NIDDK on Study of Obeticholic Acid (INT-747) in Nonalcoholic Steatohepatitis (NASH), BioSpace, July 28, 2010 ("BioSpace")**

Intercept Pharmaceuticals to Collaborate With NIDDK on Study of Obeticholic Acid (INT- 747) in Nonalcoholic Steatohepatitis (NASH), BioSpace, July 28, 2010 ("BioSpace") published in 2010 and is prior art to the'673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

BioSpace discloses that nonalcoholic steatohepatitis is a more serious form of nonalcoholic fatty liver disease (NAFLD) that is associated with obesity and insulin resistance. BioSpace at 2.

**UU. International PCT Patent Application Publication No. WO 2006/044391 ("WO '391")**

International PCT Patent Application Publication No. WO 2006/044391 ("WO '391") published on April 27, 2006 and is prior art to the '673, '073, and '117 patents under at least pre-

AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

WO ’391 discloses treating nonalcoholic fatty liver disease (NAFLD) and nonalcoholic steatohepatitis (NASH) with FXR agonists. WO ’391 at [0028]. WO ’391 further discloses examples using obeticholic acid. *Id.* at [0081]-[0097].

**VV. Natalini et al., “Correlation between CMC and chromatographic index: simple and effective evaluation of the hydrophobic/hydrophilic balance of bile acids,” Anal Bioanal Chem 388:1681-1688 (2007) (“Natalini 2007”)**

Natalini et al., “Correlation between CMC and chromatographic index: simple and effective evaluation of the hydrophobic/hydrophilic balanceof bile acids,” Anal Bioanal Chem 388:1681-1688 (2007) (“Natalini 2007”) published in 2007 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Natalini 2007 discloses a process for separating bile acid derivatives. Natalini 2007 discloses that obeticholic acid is “the most potent FXR agonist found thus far.” Natalini 2007 at 1681. Natalini 2007 then purports to determine the critical micellar concentration (“CMC”) of various bile acids, including obeticholic acid and CDCA, in order to determine the physiochemical properties of bile acids. *Id.* Natalini 2007 discloses that the CMC measures the “self-aggregation” of bile acids. *Id.* Natalini 2007 then discloses several ways to determine the CMC of bile acids, including reverse phase high performance liquid chromatography (“RP-HPLC”). *Id.* at 1681-82. Natalini 2007 sets forth several known advantages of RP-HPLC, including the separating out of impurities. *Id.* at 1682.

**WW. Wang et al., *Endogenous Bile Acids Are Ligands for the Nuclear Receptor FXR/BAR,* Molecular Cell, Vol. 3, 543-553 (May 1999) (“Wang 1999”)**

Wang et al., *Endogenous Bile Acids Are Ligands for the NuclearReceptor FXR/BAR,* Molecular Cell, Vol. 3, 543-553 (May 1999) (“Wang 1999”) published in May 1999 and is

prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Wang 1999 discloses the use of RP-HPLC to purify the components of bile, including bile acids. Wang 1999 at 545. Wang 1999 discloses that free bile acids include CDCA. *Id.* at 543.

**XX. L. Harwood & C. Moody, "Experimental Organic Chemistry, Principles and Practice," Ch. 3, Organic Reactions: from Starting Materials to Pure Organic Product (1989) ("Harwood")**

L. Harwood & C. Moody, "Experimental Organic Chemistry, Principles and Practice," Ch. 3, Organic Reactions: from Starting Materials to Pure Organic Product (1989) ("Harwood") published in 1989 and is prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Harwood discloses that it was known that "[t]he simplest and most effective technique for the purification of solid organic compounds is crystallization." Harwood at 127. Harwood describes the well-known process for purifying an organic compound by crystallization, which involves five stages: dissolution, filtration, crystallization, collection of the crystals, and drying the crystals. *Id.*

**YY. D. Pavia et al., "Organic Laboratory Techniques" (1998) ("Pavia")**

D. Pavia et al., "Organic Laboratory Techniques" (1998) ("Pavia") published in 1998 and is prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Pavia teaches that it was known that "[o]rganic compounds that are solid at room temperature are *usually* purified by crystallization." Pavia at 648 (emphasis added).

**ZZ. Fujiwara et al., "First-principles and Direct Design Approaches for the Control of Pharmaceutical Crystallization," Journal of Process Control 15 (2005) 493–504 ("Fujiwara")**

Fujiwara et al., "First-principles and Direct Design Approaches for the Control of Pharmaceutical Crystallization," Journal of Process Control 15 (2005) 493–504 ("Fujiwara") published in 2005 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Fujiwara discloses that "[c]rystallization is the main separation and purification process for the manufacturing of drug substances." Fujiwara at Abstract. According to Fujiwara, "[n]ot only does crystallization affect the efficiency of downstream operations such as filtering, drying, and formulating, the efficacy of the drug can be dependent on the final crystal form." *Id.* Fujiwara also discloses that "[m]ost pharmaceutical manufacturing processes include a series of crystallization processes to achieve high purity and toproduce the desired final crystal form." *Id.* at 494.

**AAA. S. Rohani, "Applications of the Crystallization Process in the Pharmaceutical Industry," Front. Chem. Eng. China 2010, 4(1): 2–9 ("Rohani")**

S. Rohani, "Applications of the Crystallization Process in the Pharmaceutical Industry," Front. Chem. Eng. China 2010, 4(1): 2–9 ("Rohani") published in 2010 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Rohani discloses that "[c]rystallization from solution is used extensively during the synthesis and purification of APIs." Rohani at 2. "The most efficient method is cooling crystallization." *Id.*

**BBB. Iverlund et al., "Carbon Cartridges and Their Use as a Purification Step in Pharmaceutical API Processes," Proceedings of European Congress of Chemical Engineering (ECCE-6) Copenhagen, 16-20 September 2007 ("Iverlund")**

Iverlund et al., "Carbon Cartridges and Their Use as a Purification Step in Pharmaceutical API Processes," Proceedings of European Congress of Chemical Engineering (ECCE-6)

Copenhagen, 16-20 September 2007 (“Iverlund”) published in 2007 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Iverlund discloses that in the pharmaceutical industry powdered carbon is “frequently used as a method to remove impurities.” Iverlund at 852. “Impurities may be those present at unacceptablepercentage levels or those that may be almost undetectable in quantity, but still affect the colour ofthe API.” *Id.* In a case study, Iverlund discloses a carbon treatment to reduce a high-level impurity from ~3% to at least less than 2%, prior to a “Pures” crystallization step producing the Active Pharmaceutical Ingredient (API). *Id.* at 855-858 The process was scaled up from ~80 mL in the laboratory to ~300 L in a development plant. *Id.* at 856. Trials were run to confirm the most effective carbon type for reduction of the impurity. *Id.* The optimized process succeeded in reducing the target impurity to less than 1% before a final crystallization. *Id.* at 856-57.

**CCC. Vrani, “Amorphous Pharmaceutical Solids,” Bosnian Journal of Basic Medical Sciences 2004; 4 (3): 35-39 (“Vrani”)**

Vrani, “Amorphous Pharmaceutical Solids,” Bosnian Journal of Basic Medical Sciences 2004; 4 (3): 35-39 (“Vrani”) published in 2004 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Vrani discloses “the tendency for amorphous materials to sorb significant amounts of water vapor from their surroundings can give rise to a markedly reduced chemical and physical stability relative to the crystalline form of the material.” Vrani at 37. “The sorbed water may participate in a chemical reaction (hydrolysis), or may simply act as a catalyst for a chemical reaction.” *Id.* Vrani also discloses that “sorbed solvents such as water will also plasticize most amorphous pharmaceutical materials [ ], and this can have a negative impact on both physical

and chemical stability by increasing the molecular mobility of the sample at any given temperature." *Id.*

**DDD. Fox & Whitesell, Organic Chemistry, 1994 ("Fox")**

Fox & Whitesell, Organic Chemistry, 1994 ("Fox") published in 1994 and is prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Fox discloses that it was known in the art that chromatography is "a powerful separation tool" that can be used "to obtain pure individual components of a mixture." Fox at 110; *see also id.* at 113-14 ("Because each component is obtained as a single compound, chromatography is also a method for purification."). Fox discloses numerous chromatography methods, including liquid chromatography with alumina or silica gel, high performance liquid chromatography ("HPLC"), or thin-layer chromatography. *See id.* at 112-116

**EEE. David Carr, "The Handbook of Analysis and Purification of Peptides and Proteins by Reversed-Phase HPLC," Third Edition (2002) (available at http://www.harvardapparatus.com/media/harvard/pdf/AM24.pdf) ("Carr")**

David Carr, "The Handbook of Analysis and Purification of Peptides and Proteins by Reversed-Phase HPLC," Third Edition(2002) (available at http://www.harvardapparatus.com/media/harvard/pdf/AM24.pdf) ("Carr") published in 2002 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Carr discloses that "[r]eversed-Phase High Performance Liquid Chromatography (RP-HPLC) has become a widely used, well-established tool for the analysis and purification of biomolecules." Carr at 2.

**FFF. Görög, "The sacred cow: the questionable role of assay methods in**

**characterizing the quality of bulk pharmaceuticals," Journal of Pharmaceutical and Biomedical Analysis 36 (2005) 931–937 ("Görög")**

Görög, "The sacred cow: the questionable role of assay methods in characterizing the quality of bulk pharmaceuticals," Journal of Pharmaceutical and Biomedical Analysis 36 (2005) 931–937 ("Görög") published in 2005 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Görög estimates that there is approximately a 0.5–1.0% margin of error when using conventional HPLC assay methods. Görög at 934.

**GGG. Byrn et al., "Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations," Pharm. Research, 21995, Vol. 12, 945-954 ("Byrn")**

Byrn et al., "Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations," Pharm. Research, 21995, Vol. 12, 945-954) ("Byrn") published in 1995 and is prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Byrn is directed to methods for isolating and purifying polymorphs of pharmaceutical compounds by common chemical operations. *See, e.g.,* Byrn at 946. For example, Byrn describes a logical sequence of steps to follow, in the form of decision trees and flow charts "for each of the most common solid state forms." *Id.* at 945. Byrn identifies the "first step" in polymorphic identification "is to crystallize the substance from a number of different solvents," which "should include those used in the final crystallization steps and those used during formulation and processing and may also include water, methanol, ethanol, propanol, isopropanol, acetone, acetonitrile, ethyl acetate, hexane, and mixtures if appropriate." *Id.* This process can be accomplished "by cooling hot saturated solutions or partly evaporating clear saturated solutions." *Id.*

Byrn also teaches that "it is advisable to investigate the drug substance for the existence of polymorphs and hydrates since these may be encountered at any stage of the drug manufacturing process or upon storage of the drug substance or dosage form." *Id*. at 946; *see also id.* at 948 ("In summary, it is important to determine whether polymorphs are present and to solve any problems before pivotal clinical studies are initiated.").

Byrn also discloses:

> Thus, the way to avoid a substantial amount of work in this area is to select a single solid form for production. Usually, this would be the most physically stable form when their bioavailabilities are not significantly different. Selection of the most stable form would, of course, insure that there would be no conversion into other forms.

*Id*. at 948.

**HHH. Takata et al., "Cocrystal Screening of Stanolone and Mestanolone Using Slurry Crystallization," Crystal Growth & Design, 2008, Vol. 8(8), 3032-3037 ("Takata")**

Takata et al., "Cocrystal Screening of Stanolone and Mestanolone Using Slurry Crystallization," Crystal Growth & Design, 2008, Vol. 8(8), 3032-3037 ("Takata") published in 2008 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Takata is directed to a slurry crystallization technique used with two steroids, stanolone and mestanolone. *See* Takata at Abstract. According to Takata, the "slurry technique has been applied to determine the most stable form and the relationship of thermodynamic stability among polymorphs." *Id*. at 3032. The process for performing the technique is "adding a solvent to the mixture of a host and a guest leads to cocrystallization and is readily useful for systematic cocrystal screening without requiring a robotic system." *Id*.

Takata disclosed a small list of solvents used for crystallization and their results in Table

2. Among this list are ethanol, acetonitrile, butyl acetate, and water. *See id*. at 3034.

### III. FDA Guidance for Industry, "Manufacturing, Processing, or Holding Active Pharmaceutical Ingredients" (March 1998) ("FDA Manufacturing Guidance")

FDA Guidance for Industry, "Manufacturing, Processing, or Holding Active Pharmaceutical Ingredients" (March 1998) ("FDA Manufacturing Guidance") published in March 1998 and is prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

FDA Manufacturing Guidance "provide[s] guidance on FDA's expectations regarding current good manufacturing practices (CGMP) for manufacturing, processing, packing, or holding (i.e., storage) of active pharmaceutical ingredients (APIs)." FDA Manufacturing Guidance at 1. FDA Manufacturing Guidance recommends that "all impurities at or above 0.1% should be identified." *Id.* at 22.

FDA Manufacturing Guidance also discusses reprocessing by crystallization if the impurity levels are too high, and milling if the particle size is too big. *Id.* at 38-40. In fact, FDA Manufacturing Guidance defines "reprocessing" as "[i]ntroducing an . . . API that does not conform to standards or specifications, back into the process and repeating one or more steps that are part of the established manufacturing process (e.g., recrystallization using the same solvent)." *Id*. at 52. FDA Manufacturing Guidance provides the following suggestions for reprocessing:

> Intermediates and API batches that occasionally do not conform to specifications for percent transmittance/color, or critical attributes (e.g., purity, impurities, particle size) can be reprocessed by repeating a crystallization step or other physical manipulation steps (e.g., dissolution, filtration, milling, blending) that are part of an established process.
>
> If it becomes necessary to more than occasionally reprocess batches by physical manipulation, a thorough investigation should be conducted and documented to determine the adequacy of the original process. Appropriate actions should be taken to minimize the risk of recurrence. For example, if investigation of

> the nonconformance and/or review of the process reveals an abnormally high rate of batches that need to be recrystallized, it would be reasonable to incorporate the recrystallization as part of the normal process.
>
> All reprocessing procedures should be reviewed and approved by the quality control unit. These procedures should specify the conditions and limitations for reprocessing by physical manipulations and require an evaluation of each nonconforming batch to determine its suitability for reprocessing. For example, one or more recrystallizations from the final solvent might be justified, but continuous reprocessing of batches until they meet a given quality specification would indicate a problem with the original process. A specific record should be generated to document reprocessing steps and subsequent handling and incorporated into the original batch record.
>
> Appropriate tests should be conducted on reprocessed batches to ensure that reprocessing does not adversely affect the quality or purity of the API or intermediate. These tests should include, as appropriate, purity, physical attributes, and impurity profiles. In all cases, the significance of the nonconformance and its impact on the critical quality attributes of the API or intermediate should determine how much analytical data is sufficient to justify the reprocessing.
>
> Reprocessing operations should be subjected to appropriate evaluation to show that these steps consistently perform the expected functions and result in batches that comply with all established standards, specifications, and characteristics.

*Id*. at 39.

**JJJ. FDA Guidance for Industry Q3A Impurities in New Drug Substances, Revision 2 ("FDA Q3A Guidance")**

FDA Guidance for Industry Q3A Impurities in New Drug Substances, Revision 2 ("FDA Q3A Guidance") published in June 2008 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The FDA Q3A Guidance provides guidelines for the identification and qualification of impurities in active pharmaceutical ingredients (APIs). *See generally* FDA Q3A Guidance. FDA Q3A Guidance states that the Applicant "should summarize the actual and potential impurities most likely to arise during synthesis, purification, and storage of the drug substance. *Id.* at 3. Further, it states that all impurities should be qualified as described in the guidance. *Id.* The FDA Q3A Guidance states that acceptance levels (for impurities) should be set no higher than the level

that can justified by safety data and should be consistent with the level achievable by the manufacturing process and analytical capability. *Id.* at 6. The FDA Q3A Guidance also states that qualification is the process of acquiring and evaluating data that establishes the biological safety of an individual impurity or a given impurity profile at the level(s) specified. *Id.* The applicant should provide a rationale for establishing impurity acceptance criteria that includes safety considerations. *Id.* The level of any impurity present in a new drug substance that has been adequately tested in safety and/or clinical studies would be considered qualified. *Id.*

The FDA Q3A Guidance states that in some cases, decreasing the level of impurity to not more than the threshold can be simpler than providing safety data. *Id.* at 7. Attachment 1 to the FDA Q3A Guidance provides qualification thresholds for impurities. *Id.* at 11. According to the FDA Q3A Guidance for a drug with a maximum daily dose below 2 g the qualification threshold is 0.15% or 1 mg intake per day, whichever is lower. *Id.* Thresholds higher than this should be scientifically justified.

**KKK. The International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human use, ICH Harmonised Tripartite Guideline—Impurities in New Drug Substances Q3A(R2) ("ICH Q3A Guideline")**

The International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human use, ICH Harmonised Tripartite Guideline—Impurities in New Drug Substances Q3A(R2) ("ICH Q3A Guideline") published in October 2006 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The ICH Q3A Guideline provides regulations for the "content and qualification of impurities in new drug substances produced by chemical synthesis," such as the classification, reporting, and permissible concentration levels of impurities (referred to in the industry as

specifications). ICH Q3A Guideline at 1, § 1. The ICH Q3A Guideline classifies impurities as organic impurities, inorganic impurities, and residual solvents. *Id.* "Organic impurities can arise during the manufacturing process and/or storage of the new drug substance. They can be identified or unidentified" and include starting materials, by-products, intermediates, degradation products, reagents, ligands, and catalysts. *Id.* at 1, § 2. Concerning organic impurities, the ICH Q3A Guideline states:

The applicant should summarise the actual and potential impurities most likely to arise during the synthesis, purification, and storage of the new drug substance. This summary should be based on sound scientific appraisal of the chemical reactions involved in the synthesis, impurities associated with raw materials that could contribute to the impurity profile of the new drug substance, and possible degradation products. This discussion can be limited to those impurities that might reasonably be expected based on knowledge of the chemical reactions and conditions involved.

In addition, the applicant should summarise the laboratory studies conducted to detect impurities in the new drug substance. This summary should include test results of batches manufactured during the development process and batches from the proposed commercial process, as well as the results of stress testing (*see* ICH Q3A Guideline Q1A on Stability) used to identify potential impurities arising during storage. The impurity profile of the drug substance batches intended for marketing should be compared with those used in development, and any differences discussed.

The studies conducted to characterise the structure of actual impurities present in the new drug substance at a level greater than (>) the identification threshold given in Attachment 1 (e.g., calculated using the response factor of the drug substance) should be described. Note that any

impurity at a level greater than (>) the identification threshold in any batch manufactured by the proposed commercial process should be identified. In addition, any degradation product observed in stability studies at recommended storage conditions at a level greater than (>) the identification threshold should be identified. When identification of an impurity is not feasible, a summary of the laboratory studies demonstrating the unsuccessful effort should be included in the application. Where attempts have been made to identify impurities present at levels of not more than (≤) the identification thresholds, it is useful also to report the results of these studies. *Id.* at 2, § 3.1.

The ICH Q3A Guideline also instructs that for regulatory approval of a new drug substance, "[t]he registration application should include documented evidence that the analytical procedures are validated and suitable for the detection and quantification of impurities (*see* ICH Q2A and Q2B Guidelines for Analytical Validation)." *Id*. at 3, § 4. For reporting impurity content of batches of a drug substance, "[a]nalytical results should be provided in the application for all batches of the new drug substance used for clinical, safety, and stability testing, as well as for batches representative of the proposed commercial process." *Id*. at 3, § 5. "Quantitative results should be presented numerically, . . . [and] [a]ny impurity at a level greater than (>) the reporting threshold (see Attachment 1) and total impurities observed in these batches of the new drug substance should be reported with the analytical procedures indicated." *Id*. For drug substances having a maximum daily dose of ≤ 2g/day, the ICH Q3A Guideline provides an "Identification Threshold" of 0.10% or 1.0 mg/day (whichever is lower) and a "Qualification Threshold" of 0.15% or 1.0 mg/day (whichever is lower). *See id.* at 8 (Attachment 1).

**LLL. Lian Yu, "Amorphous pharmaceutical solids: preparation, characterization and stabilization," Advanced Drug Delivery Reviews 48, 27–42 (2001) ("Yu 2001")**

Lian Yu, "Amorphous pharmaceutical solids: preparation, characterization and stabilization," Advanced Drug Delivery Reviews 48, 27–42 (2001) ("Yu 2001") published in

2001 and is prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Yu 2001 discloses that amorphous solids have desirable characteristics, including “higher solubility, higher dissolution rate, and sometimes better compression characteristics than corresponding crystals.” Yu 2001 at 28.

**MMM. Snyder et al., “Preparative HPLC Separation” in Practical HPLC Method Development (John Wiley & Sons, Inc. 2nd ed. 1997) (“Snyder”)**

Snyder et al., “Preparative HPLC Separation” in Practical HPLC Method Development (John Wiley & Sons, Inc. 2nd ed. 1997) (“Snyder”) published in 1997 and is prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Snyder discloses that “[w]hen only small amounts of pure product are required an analytical HPLC method . . . can be used to recover nanogram-to-sub-milligram quantities of product.” Snyder at 616. Snyder further explains that “[f]or the recovery of purified product from an impure starting material, it is convenient to use the same optimized HPLC conditions that were developed initially for analysis of the sample.” *Id.* at 618.

**NNN. Rajevic et al., “Assay of Ursodeoxycholic Acid and Related Impurities in Pharmaceutical Preparations by HPLC With Evaporative Light Scattering Detector,” J. Liq. Chrom. & Rel. Technol., 1998, Vol. 21(18), 2821-2830 (“Rajevic”)**

Rajevic et al., “Assay of Ursodeoxycholic Acid and Related Impurities in Pharmaceutical Preparations by HPLC With Evaporative Light Scattering Detector,” J. Liq. Chrom. & Rel. Technol., 1998, Vol. 21(18), 2821-2830 (“Rajevic”) published in 1998 and is prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Rajevic disclosed an HPLC method that was developed for assay and purity control of

ursodeoxycholic acid. *See* Rajevic at Abstract. Using this method, Rajevic was able to separate ursodeoxycholic acid, ursocholic acid, cholic acid, chenodeoxycholic acid, deoxycholic acid, and lithocholic acid. *See id*.

The pharmaceutical formulations of UDCA could contain impurities that have been reported to be toxic, like lithocholic acid (LCA), or poorly tolerated CDCA, even if only present in small quantities, an accurate, precise, and simple technique for quality control of UDCA in pharmaceutical dosage forms is required. *Id.* at 2822. " Ten different formulations of UDCA, which are commercially available in Italy, were assayed using the proposed method (Table 3). The amount of active ingredient found experimentally is within 3% of the amount declared. The percentage of the related impurities, only in the few cases examined, is found to be a bit over the limits of 1% for CDCA allowed in Italian pharmacopoeia; it is, nevertheless, allowed in American and Japanese pharmacopoeias (1.5 %)." *Id.* at 2827. Table 3 is provided below:

**Table 3**

**Assay of UDCA and Related Impurity Levels in Commercial Dosage Forms**

| Sample | Label Claim | Found ± RSD[a] | Impurity Concentration (%) | | | | |
|---|---|---|---|---|---|---|---|
| | | | UCA | CA | CDCA | DCA | LCA |
| A | 150 mg | 99.5±1.2 | --- | --- | 0.65 | --- | --- |
| B | 150 mg | 97.8±2.1 | 0.11 | --- | 1.14 | --- | --- |
| C | 125 mg | 100.7±2.0 | --- | --- | 0.62 | --- | --- |
| D | 150 mg | 101.6±1.12 | --- | --- | 0.17 | --- | --- |
| E | 150 mg | 98.6±2.4 | --- | --- | 0.23 | --- | --- |
| F | 300 mg | 102.0±2.1 | --- | --- | 0.11 | --- | --- |
| G | 150 mg | 100.8±1.8 | --- | --- | 0.41 | --- | <0.05 |
| H | 150 mg | 100.1±1.7 | --- | --- | 0.95 | --- | --- |
| I | 50mg | 98.4±2.4 | 0.06 | --- | 1.06 | --- | <0.05 |
| J | 300 mg | 99.5±2.7 | --- | --- | 0.06 | --- | --- |

[a] Each value represents the mean (± relative standard deviation of six determinations.

*Id.* at 2828.

**OOO. U.S. Patent No. 4,379,093 ("Bonaldi")**

U.S. Patent No. 4,379,093 to Bonaldi *et al*. ("Bonaldi"), titled "Process For Preparing High Purity Ursodeoxycholic Acid," issued on April 5, 1983 and is prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Bonaldi is directed to a process for preparing very pure ursodeoxycholic acid using cholic acid as the starting material. *See* Bonaldi at Abstract. More specifically, the process is suitable for producing ursodeoxycholic acid on an industrial scale where the product is not contaminated with the chenodeoxycholic acid epimer (3-alpha-7-beta-dihydroxycholanic acid). *See id*. at 1:5-9. Bonaldi disclosed "a new process which enables ursodeoxycholic acid to be prepared directly at pharmaceutical purity, and in particular free from chenodeoxycholic acid, without subsequent complicated and costly purification processes being necessary." *Id*. at 2:9-15. In Example 1, Bonaldi disclosed that ursodeoxycholic acid is obtained with a low amount of chenodeoxycholic acid (≤ 1%) and an even lower amount of other impurities (≤ 0.3%). *See id.* at 8:5-16.

**PPP. The Chenodiol Label, Nexgen Pharma, Inc. ("Chenodiol Label")**

The Chenodiol Label, Nexgen Pharma, Inc. ("Chenodiol Label") was first marketed on October 22, 2009 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The commercial product Chenodiol contains 250 mg of chenodeoxycholic acid in tablet form to be administered 3 to 7 times per day. Chenodiol Label at 1, 7.

**QQQ. Mason et al., "Farnesoid-X Receptor Agonists: A New Class of Drugs For the Treatment of PBC? An International Study Evaluating the Addition of INT- 747 to Ursodeoxycholic Acid," J. of Hepatology, 2010, Vol. 52, S1 ("Mason")**

Mason et al., "Farnesoid-X Receptor Agonists: A New Class of Drugs For the Treatment of PBC? An International Study Evaluating the Addition of INT-747 to Ursodeoxycholic Acid," J. of Hepatology*,* 2010*,* Vol. 52, S1 ("Mason") publishedon April 15, 2010 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Mason is an abstract for an oral presentation regarding a clinical trial of 6-ethyl chenodeoxycholic acid (i.e., obeticholic acid or INT-747). *See* Mason at S1. The study was a double blind, placebo controlled, dose response study to evaluate the effects of INT-747 on alkaline phosphatase, other liver enzymes, and safety in patients with primary biliary cirrhosis (PBC) while on ursodeoxycholic acid. *See id*. The dosing regimen was INT-747 (10 mg/25 mg/50 mg) once daily for 12 weeks. *See id*.

The safety results showed that pruritus was the most common Adverse Experience. *See id*. Mason concludes that "INT-747 is the first rationally developed drug for cholestatic liver disease; this study clearly shows it has efficacy in PBC and merits further evaluation." *Id*. at 52.

**RRR. Porez et al., "Bile acid receptors as targets for the treatment of dyslipidemia and cardiovascular disease," Journal of Lipid Research, Volume 53 (2012), pp. 1723-1737 ("Porez 2012")**

Porez et al., "Bile acid receptors as targets for the treatment of dyslipidemia and cardiovascular disease," Journal of Lipid Research,Volume 53 (2012), pp. 1723-1737 ("Porez 2012") published in 2012 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Porez 2012 discloses that FXR receptors can be targeted for the treatment of cardiovascular diseases such as dyslipidemia and atherosclerosis. Porez 2012 at Abstract. Porez 2012 further teaches that, among other things, FXR receptors are promising targets for the

treatment of cardiometabolic diseases such as cardiovascular disease, atherosclerosis, dyslipidemia, and hypercholestrolemia. *See id.* at 1723-24.

**SSS. U.S. Patent Application Publication No. 2006/0069070 ("Fiorucci")**

U.S. Patent Application Publication No. 2006/0069070 to Fiorucci *et al*. ("Fiorucci"), titled "Treatment of Fibrosis Using FXR Ligands," published on March 30, 2006 and is prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Fiorucci is directed to methods for inhibition of fibrosis mediated by the farnesoid X receptor (FXR). *See* Fiorucci at Abstract. This method involves administering a high potency, activating ligand of FXR. *See id*.

Fiorucci disclosed that the compound to be used "is not chenodeoxyxholic [sic] acid (CDCA) or ursodeoxycholic acid (UDCA)." *Id*. at [0011]. However, the FXR ligand may be "6EDCA, tauro-6-ECDCA, 6EUDCA, GW4064, 6α-MeCDCA, 6α-PrCDCA, fexaramine, or guggulsterone." *Id*. at [0014]. The use of one of these compounds for potentially treating several diseases is disclosed, including the treatment of liver fibrosis, non-alcoholic steatohepatitis (NASH), and chronic liver disease. *Id*. at [0013], [0014], [0077].

**TTT. Roda et al., "New 6-substituted bile acids: physico-chemical and biological properties of 6α-methyl ursodeoxycholic acid and 6α-methyl-7-epicholic acid," Journal of Lipid Research, Vol. 35, 1994 ("Roda")**

Roda et al., "New 6-substituted bile acids: physico-chemical and biological properties of 6α-methyl ursodeoxycholic acid and 6α-methyl-7-epicholic acid," Journal of Lipid Research, Vol. 35, 1994 ("Roda") was published in 1994 and is prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Roda discloses the synthesis and testing of an analog of UDCA containing a 6α-methyl group ("6-MUDCA"). Roda found that the 6α-methyl group slightly increases the lipophilicity and slightly lowers critical micellar concentration with respect to the corresponding naturally occurring UDCA. Roda at 2271. Testing in simulated bile found that the 6-MUDCA demonstrated a higher cholesterol-holding capacity and a faster cholesterol gallstone dissolution rate than UDCA. *Id.* at 2272. The 6-MUDCA analog was highly stable toward 7-deoxyhydroxylation when incubated with human stool in anaerobic conditions. *Id.* In animal studies on rats and hamsters, 6-MUDCA was found to be efficiently secreted in bile, with a cumulative recovery similar to UDCA. *Id.* at 2272-73. Roda disclosed that 6-MUDCA shows potential as a cholesterol gallstone- dissolving agent. In this regard, its most important properties are moderate lipophilicity, good metabolic stability, and better conservation in the enterohepatic circulation.  *Id.* at 2268.

Roda discloses that the extensive use of UDCA to treat choleastatic liver diseases created a need for developing new, more potent synthetic analogs. *Id.* at 2269. One reason identified to develop UDCA analogs is to make the UDCA molecule more stable to 7-dehydroxylation, which would increase its biological half-life and enhance its activity. *Id.* Analogs of UDCA were identified, as an area of study since the increased activity of UDCA "has been partially attributed to the fact that it is less detergent than any of the endogenous bile acids present in human bile." *Id.* at 2268.

Roda discloses that the "rationale for adding the methyl group in position 6 was to prevent, by steric hindrance, 7-deydroxylation or epimerization, and thus to stabilize the molecule during exposition to intestinal bacteria. We also reasoned that, despite this alteration, the molecule should be amidated by the liver, following a pharmacokinetic pattern similar to that of

conventional amidated BA [bile acid], and then efficiently absorbed by the intestine, either as a free or an amidated BA [bile acid]." *Id.* at 2269. Roda also discloses that when compared with UDCA, 6- MUDCA shows a faster in vitro dissolution rate of cholesterol monohydrate and also higher cholesterol holding capacity. *Id.* at 2272.

**UUU. U.S. Patent No. 6,465,258 (the "'258 patent")**

U.S. Patent No. 6,465,258 titled "FXR receptor-mediated modulation cholesterol metabolism" (the "'258 patent") was filed on January 6, 2000, and is therefore prior art to the RE826 patent under at least pre-AIA 35 U.S.C. §102(a) and §102(e), prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b), and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The '258 patent teaches biochemical and cell-based assays for identifying compounds that can modulate FXR-mediated regulation of cholesterol metabolism. '258 patent at 3:11-13. The invention in the '258 patent pertains to the discovery that ligands for the formerly orphan receptor FXR include bile acids, and that the binding of a bile acid to FXR results in suppression of cholesterol catabolism. *Id.* at 6:22-25.

The '258 patent teaches that "ligands that are suitable for use in the assays of the invention include, but are not limited to, bile acids and related compounds such as CDCA (chenodeoxycholic acid), GCDCA (glycochenodeoxycholic acid), TCDCA (taurochenodeoxycholic acid), GCA (glycocholic acid), TCA (taurocholic acid), DCA (deoxycholic acid), LCA (lithocholic acid), DHCA (dehydrocholic acid), UDCA (ursodeoxycholic acid) and CA (cholic acid)." *Id.* at 8:54-67. In addition, the '258 patent teaches methods for identifying FXR ligands. *Id.*

The '258 patent also teaches pharmaceutical compositions and methods for treating

Farnesoid X receptor (FXR)-mediated disorders and conditions, such as atherosclerosis, cardiovascular disorders, lipid disorders and hypercholesterolemia using therapeutic agent(s) described therein. *Id.* at 21:54-64. The candidate therapeutic agent is typically prepared as a pharmaceutical composition and is administered to a subject suffering from a FXR-mediated disorder or condition. Preferably, the candidate therapeutic agents will, upon administration to the subject, cause total cholesterol levels to decrease about 10%, more preferably a decrease of about 20%, and most preferably a decrease of about 25-45%. *Id.*

The '258 patent further teaches the primary bile acid chenodeoxycholic acid (CDCA) specifically activates the gene expression regulatory activity of FXR. *Id.* at 23:60-24:29.

**VVV. International PCT Patent Application Publication No. WO 2000/37077 to Blanchard (the "WO '077 publication")**

International PCT Patent Application Publication No. WO 2000/37077 to Blanchard (the "WO '077 publication") was published on June 29, 2000 and claims priority to a U.S. patent application filed on December 23, 1998. It is thus prior art to the RE826 patent under at least pre-AIA 35 U.S.C. §102(a) and §102(e), prior art to the '673, '073, and '117 patents under at least pre- AIA § 102(b), and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The WO '077 publication is directed to assays for identifying ligands and for measuring activity of test compounds on the FXR receptor. WO '077 publication at 3. The assays are used to identify compounds for the treatment of diseases or disorders modulated by the FXR receptor. *Id*. The disclosed assays include FRET assays, scintillation proximity, and homogeneous time-resolved fluorimetry ("HTRF"). *Id.* at 5-6. Examples 2 and 3 provide examples of assays for the FXR receptor, including a FRET assay. The patent teaches that the compounds with activity can be formulated into a variety of pharmaceutical formulations, including tablets and capsules. *Id.* at 34-35. WO '077 also teaches that compounds showing activity could be used to treat a variety

of FXR-mediated disorders in mammals. *Id.* at 33.

**WWW. International PCT Patent Application Publication No. WO 2000/40965 to Shan (the "WO '965 publication")**

International PCT Patent Application Publication No. WO 2000/40965 to Shan *et al*. (the "WO '965 publication"), titled "FXR Receptor-Mediated Modulation of Cholesterol Metabolism," published on July 13, 2000. It is therefore prior art to the RE286 patent under at least pre-AIA 35 U.S.C. § 102(a), prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1) .

The WO '965 publication is directed to methods and compositions useful for modulating cholesterol levels and *in vitro* assays for the FXR receptor to identify candidate therapeutic agents for modulation of cholesterol metabolism. *See* WO '965 publication at Abstract. The methods involve analyzing the effect of a test compound on the binding of FXR to a ligand for FXR. The methods involve providing a reaction mixture that comprises (a) a polypeptide that comprises a ligand binding domain of an FXR, (b) a ligand for FXR, and (c) a test compound, and determining whether the amount of binding of the FXR ligand binding domain to the ligand for FXR is increased or decreased in the presence of the test compound compared to the amount of binding in the absence of the test compound. *Id.* at 3-4.

The WO '965 publication discloses that the FXR receptor was known at least since 1995. *Id.* at 3. The WO '965 publication discloses that the ligands could include "but are not limited to, bile acids and related compounds such as CDCA (chenodeoxycholic acid), GCA (glychocholic acid), TCA (taurocholic acid), DCA (deoxycholic acid), LCA (lithocholic acid), DHCA (dehydrocholic acid), UDCA (ursodeoxycholic acid) and CA (cholic acid)." *Id.* at 12. The assays can also employ coactivators and corepressors with which FXR interacts. *Id.* at 13. Examples 1 to 4 provide assays using CDCA among other bile acids as ligands.

The WO ’965 publication further discloses that “FXR-mediated disorders and conditions, such as atherosclerosis, cardiovascular disorders, lipid disorders and hypercholesterolemia, can be treated using the methods described herein. The candidate therapeutic agent is typically prepared as a pharmaceutical composition and is administered to a subject suffering from a FXR-mediated disorder or condition.” *Id.* at 32. The WO ’965 publication disclosed that “Atherosclerosis is a leading cause of death, myocardial infarctions, stroke, peripheral vascular disease and cardiovascular disease.” *Id*. at 1:16-17. “One of the major contributing factors to atherosclerosis is hypercholesterolemia.” *Id*. at 1:20-21. “FXR-mediated disorders and conditions, such as atherosclerosis, cardiovascular disorders, lipid disorders and hypercholesterolemia, can be treated with therapeutic agent(s) identified using the methods described herein.” *Id*. at 32:9-11.

The WO ’965 publication also provides kits and integrated systems for high-throughput assaying for FXR activity, binding of ligands to FXR, or screening for an inhibitor or activator of FXR activity. Example 5 provides three different high throughput in vitro assays that are useful to identify compounds that can modulate binding of FXR ligands to the FXR ligand binding domain: Fluorescence Polarization, FRET and an enzyme-linked immunosorbent assay (“ELISA”). The WO ’965 publication also teaches how therapeutic agents could then be formulated into pharmaceutical formulations, including solid oral dose formulations. *Id.* at 32-34. The WO ’965 publication disclosed that in treating FXR mediated disorders and conditions, the compounds are formulated as pharmaceutical compositions comprising pharmaceutically acceptable carriers or excipients. *See id*. at 32:17-24.

**XXX. International PCT Patent Application Publication No. WO 2000/25134 to Blanchard (the “WO ’134 publication”)**

International PCT Patent Application Publication No. WO 2000/25134 to Blanchard (the

"WO '134 publication") was published on May 4, 2000 and claims priority to applications filed on October 23, 1998, December 23, 1998 and May 19, 1999. It is thus prior art to the RE286 patent under at least pre-AIA 35 U.S.C. §102(a) and §102(e), prior art to the'673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

The WO '134 publication is directed to assays for identifying ligands and measuring activity for the FXR nuclear receptors utilizing proximity and fluorescence resonance energy transfer ("FRET"). WO '134 publication at 2-3. The assay disclosed by the WO '134 publication provides methods "for the rapid and simple determination of a ligand for a nuclear receptor…" *Id.* at 3. Examples 2 and 3 provide examples of assays for the FXR receptor, including a FRET assay.

**YYY. Makishima et al., "Identification of a Nuclear Receptor for Bile Acids," Science, 1999, Vol. 284, 1362-1365 ("Makishima")**

Makishima et al., "Identification of a Nuclear Receptor for Bile Acids," Science, 1999, Vol. 284, 1362-1365 ("Makishima") published on May 21, 1999, and is therefore prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Makishima is a study into the mechanism of the enzymatic conversion of cholesterol to bile acids and the role that the farnesoid X receptor (FXR) plays in this mechanism. *See* Makishima at 1362. It was found that FXR was strongly activated by bile acids. *See id.* For example, Makishima disclosed that the "activation of FXR was specific and limited to the primary bile acid chenodeoxycholic acid (CDCA) and to a much lesser extents to a secondary bile acids deoxycholic acid (DCA) and lithocholic acid (LCA) . . . ." *Id.*

The potency of the bile acids was also determined. "The most potent activator CDCA,

had a half maximal effective concentration ($EC_{50}$) of 50 µM and 10 µM on murine and human FXR, respectively." *Id*. In addition to regulating FXR, Makishima disclosed that CDCA regulated its own synthesis by a feedback mechanism involving the expression of the enzyme cholesterol 7α- hydroxylase (Cyp7a). *See id*. at 1364. A table comparing the relative activity of CDCA and several other bile acids was disclosed in Fig. 1A. *See id*. at 1363.

Makishima concluded that "the observation that LXRα and FXR function as key regulators for cholesterol and bile acid homeostasis has important therapeutic implications for the discovery of drugs targeted against these receptors." *Id*. at 1364.

Also disclosed were glycine and taurine analogs of CDCA, when Makishima stated "[d]erivatives of CDCA conjugated with glycine (GCDCA) or taurine (TCDCA) were also active in both biochemical assays (Fig. 1, E and F) but were inactive in the cell-based assays (Fig. 1, A, B, and D)." *Id*. at 1363.

**ZZZ. Hofmann et al., "The Continuing Importance of Bile Acids in Liver and Intestinal Disease," *Arch Intern. Med.*, 1999, Vol. 159, 2647-2658 ("Hoffman")**

Hofmann et al., "The Continuing Importance of Bile Acids in Liver and Intestinal Disease," *Arch Intern. Med*., 1999, Vol. 159, 2647-2658 ("Hoffman") published in December 1999, and is therefore prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Hofmann is a review article presenting an overview of bile acids, their formation, chemical structure, and function. *See* Hofmann at 2647. More specifically, Hofmann "summarizes the most recent information on the functions of bile acids in the liver and small intestine, including their role in liver, biliary, and intestinal disease and the use of ursodiol in the treatment of cholestatic liver disease." *Id*.

For example, Hofmann disclosed that CDCA was metabolized to form lithocholic acid.

*See id.* at 2649. Hofmann disclosed that CDCA was known as a “primary bile acid” because other bile acids were formed from CDCA by enzymatic modification. *See id*. One metabolic pathway is the removal of the C-7 hydroxy of CDCA to form lithocholic acid. *See id*.

Lithocholic acid was disclosed by Hofmann to be “a highly hepatotoxic bile acid.” *Id*. Further, “dehydroxylation in the distal intestine make bile acids virtually insoluble and thereby lower the aqueous concentration and bacteriostatic effect of bile acids.” *Id*. at 2650.

Also disclosed were conjugates of bile acids. For example, “[d]eoxycholic acid is conjugated with glycine or taurine and circulates with the primary bile acids.” *Id*. at 2649.

**AAAA. U.S. Patent No. 6,060,465 (“Miljkovic”)**

U.S. Patent No. 6,060,465 to Miljkovic *et al*. (“Miljkovic”), titled “Bile Acids and Their Derivatives as Glycoregulatory Agents,” issued on May 9, 2000, and is therefore prior art under pre-AIA 35 U.S.C. § 102(a) to RE286 patent, prior art to the ’673, ’073, and ’117 patents under at least pre-AIA § 102(b), and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Miljkovic is directed to compounds and methods for regulating serum glucose levels. *See* Miljkovic at Abstract. The compounds include a series of bile acids. *See id*. This series included bile acids substituted at the 6-position. Figure 1 from Miljkovic represents the general structure of the disclosed bile acids and is reproduced below.

Regarding the groups, Miljkovic disclosed that the 6-position (i.e., $R_4$), could be an alkyl

group having up to 10 carbon atoms.

$R_1$, $R_2$, $R_3$, *$R_4$,* and $R_5$ are independently hydrogen or XL where

> X is nothing, 0, S, NH or NL and L is hydrogen, metallic ion, halogen, an *alkyl* or alenyl radical having *up to 10 carbon atoms*, which is branched or *unbranched*, a cycloalkyl radical having 3 to 8 carbon atoms, or a benzyl radical which is unsubstituted or substituted 1 to 3 times by F, Cl, Br, ($C_1$—$C_4$)-alkyl or ($C_1$—$C_4$)- alkoxy; and where L is bonded to $R_1$, L can alternatively be an amino acid; and $R_6$ is $(CH_2)_n$ where $0 \leq n \leq 5$.

*Id*. at 3:44-54 (emphases added).

**BBBB. Costantino et al., "Evaluation of Hydrophobic/hydrophilic Balance of Bile Acids by Comparative Molecular Field Analysis (CoMFA)," *Steroids*, 2000, Vol. 65, 483-489 ("Costantino")**

Costantino et al., "Evaluation of Hydrophobic/hydrophilic Balance of Bile Acids by Comparative Molecular Field Analysis (CoMFA)," *Steroids*, 2000, Vol. 65, 483-489, ("Costantino") published in September 2000, and is therefore prior art to the RE286 patent under at least pre-AIA 35 U.S.C. § 102(a), prior art to the '673, '073, and '117 patents under at least pre- AIA § 102(b), and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1)

.

Costantino is a study of bile acids, such as ursodeoxycholic acid (UDCA) and its analogs, that are modified to improve metabolic stability. *See* Costantino at 483. Costantino disclosed that bile acids such as ursodeoxycholic acid "are absorbed by passive diffusion during their first pass through the intestine, hydrophobicity is the main molecular determinant of the rate and overall efficacy of their transport." *Id*. "Thus, chemical modifications of particular features of a BA molecule, while often producing an improved biologic behavior of that molecule in a given functional district, could not be sufficient to confer the potential for therapeutic development unless an 'ideal' value of hydrophobic/hydrophilic balance is kept." *Id*.

**CCCC. Yang et al., "Physical Factors Contributing to Hydrophobic Constant π," *Quant. Struct.-Act. Relat*., 1986, Vol. 5, 12-18 ("Yang")**

Yang et al., "Physical Factors Contributing to Hydrophobic Constant π," *Quant. Struct.-Act. Relat.*, 1986, Vol. 5, 12-18 ("Yang") published in 1986, and is therefore prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Yang is a study directed to chemical groups and their hydrophobicity. Specifically, Yang showed that the addition of the ethyl group increases hydrophobicity, where the measure of hydrophobicity (pi) of methyl is 0.56 and that of ethyl is 1.02. *See* Yang at 14 (the greater the number, the greater the hydrophobicity).

**DDDD. Silverman et al., "The Organic Chemistry of Drug Design and Drug Action," First Ed., Academic Press, 1992, Silverman, Ed. ("Silverman")**

Silverman et al., "The Organic Chemistry of Drug Design and Drug Action," First Ed., Academic Press, 1992, Silverman, Ed. ("Silverman") published in 1992, and is therefore prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Silverman is a book directed to the study of organic chemistry and the role it plays in drug design and discover. With respect to structural homologues, Silverman taught that in a homologous series (i.e., ones that differ by a $CH_2$ group) show regularities of increase and decrease. *See* Silverman at 16. "For many series of compounds, lengthening of a saturated carbon side chain from one (methyl) to five to nine atoms (pentyl to nonyl) produces an increase in pharmacological effects." *See id*.

**EEEE. Badger *et al*., "Biological Activity of Compounds in Homologous Series" (*Nature*, 1946, Vol. 158, 585) ("Badger")**

Badger *et al*., "Biological Activity of Compounds in Homologous Series" (*Nature*, 1946, Vol. 158, 585) ("Badger") published on October 26, 1946, and is therefore prior art to the RE286,

’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Badger taught that the biological activity of compounds in homologous series depended on the number of carbons.

> WHEN a biological action may be attributed to a physical mechanism, the equi-effective (equi-toxic, equi-narcotic, etc.) concentrations of compounds in homologous series decrease very rapidly as the number of carbon atoms increases: the molar concentration required to produce a given effect is approximately one third that of the preceding member; that is, the logarithm of the equi-effective concentration is a linear function of the number of carbon atoms. This generalization holds fairly well over a wide range of biological actions and homologous series, and it has been used to predict the activity of higher members of a series from results obtained with the lower homologues. The decrease in equi-effective concentration does not however, proceed indefinitely. As the homologous series is ascended, a member is reached which has the maximum activity, and the higher members are either entirely inactive or have very greatly reduced activity. The position of this ‘cut-off’ depends on the homologous series, on the nature of the biological action being investigated, and even on the relative resistance of different strains of the same organism. It is the purpose of this communication to suggest that the position of this ‘cut-off’ can be approximately predicted from the results obtained with lower homologues.

Badger at 585.

**FFFF. Ng *et al.*, “Suitability of [11,12-$^3H_2$]chenodeoxycholic Acid and [11,12-$^3H_2$]lithocholic Acid For Isotope Dilution Studies of Bile Acid Metabolism In Man” (*J. Lipid Res.*, 1977, Vol. 17, 753-758) (“Ng”)**

Ng *et al.*, “Suitability of [11,12-$^3H_2$]chenodeoxycholic Acid and [11,12-$^3H_2$]lithocholic Acid For Isotope Dilution Studies of Bile Acid Metabolism In Man” (*J. Lipid Res.*, 1977, Vol. 17, 753-758) (“Ng”) published in 1977, and is therefore prior art to the RE286, ’673, ’073, and ’117 patents under at least pre-AIA § 102(b) and prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Ng is a study directed to the suitability of tritiated chenodeoxycholic acid and lithocholic acid for use in the study of bile acid metabolism. *See* Ng at 753. Specifically, Ng disclosed

"[t]ritium-labeled bile acids facilitate the study of bile acid metabolism in man." *Id*. The two tritiated bile acids were [11,12-$^3H_2$]chenodeoxycholic acid and [11,12-$^3H_2$]lithocholic acid. *See id*.

**GGGG. U.S. Patent No. 3,859,437 ("Weigand")**

U.S. Patent No. 3,859,437 to Weigand *et al*. ("Weigand"), titled "Reducing Cholesterol Levels," issued on January 7, 1975, and is therefore prior art to the RE286, '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Weigand is directed to methods for reducing cholesterol levels by administering bile acid analogs. *See* Weigand at Abstract. Specifically, Weigand disclosed the use of bile acids in reducing cholesterol and lipids, including triglycerides. *See id.* 1:9-11. Weigand disclosed in Example III that a patient was treated with 3α,7α-dihydroxy-5β-cholanic acid over the course of 10 days and the triglyceride levels dropped from 2021 mg/100 mL to 1484 mg/100mL. *See id*. at 5:45–6:13.

**HHHH. International PCT Patent Application Publication No. WO 00/28332 ("Medford")**

International PCT Patent Application Publication No. WO 00/28332 to Medford *et al*. ("Medford"), titled "Methods and Compositions to Lower Plasma Cholesterol Levels," published on May 18, 2000, and is therefore prior art to the RE286 patent under at least pre-AIA 35 U.S.C. § 102(a), prior art to the '673, '073, and '117 patents under at least pre-AIA § 102(b) and prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Medford is directed to methods and compositions to lower plasma cholesterol levels by lowering the levels of circulating low density lipoproteins (LDL) and very low density

lipoproteins (VLDL). *See* Medford at 1:3-5. Medford disclosed that certain active agents could decrease the total cholesterol while increasing the HDL levels. "Cholesterol lowering agents decrease total plasma and LDL cholesterol and may increase HDL." *Id.* at 4:30-31. "Depending on the agent and the dose used, statins may decrease plasma triglyceride levels and may increase HDL." *Id*. at 5:22- 24.

**IIII. Elizabeth J. Carey & Keith D. Lindor, "Current pharmacotherapy for cholestatic liver disease," Expert Opin. Pharmacother. (2012) 13(17): 2473- 2484 ("Carey 2012")**

Elizabeth J. Carey & Keith D. Lindor, "Current pharmacotherapy for cholestatic liver disease," Expert Opin. Pharmacother. (2012) 13(17): 2473-2484 ("Carey 2012") published in 2012 and is prior art to the '337, '349, and '549 patents under at least AIA § 102(a)(1).

Carey 2012 purports to "address medical treatment of the most common cholestatic liver diseases: primary biliary cirrhosis (PBC) [the prior name for primary biliary cholangitis] . . . ." Carey 2012 at 2473. Carey 2012 discloses the use of multiple drugs to treat PBC, including UDCA and farnesoid X receptor agonists such as obeticholic acid. *Id.* at 2474-75. Carey 2012 discloses two clinical studies administering obeticholic acid in 10, 25, and 50 mg dosages, and Carey noted that "preliminary data suggest that obeticholic acid may be a potential first-line agent for the treatment of PBC, warranting direct comparison to UDCA." *Id.* at 2475.

Carey 2012 also discloses the use of bile acid binding resins to treat a symptom of cholestasis, noting that a bile acid binding resin "relieves or improves pruritus in the majority of patients." *Id.* at 2478.

**JJJJ. Chris Corpechot, "Primary biliary cirrhosis and bile acids," Clinics and Research and Hepatology and Gastroenterology (2012) 36, S13-S20 ("Corpechot 2012")**

Chris Corpechot, "Primary biliary cirrhosis and bile acids," Clinics and Research and Hepatology and Gastroenterology (2012) 36, S13-S20 ("Corpechot 2012") published in 2012 and

is prior art to the ’337, ’349, and ’549 patents under at least AIA § 102(a)(1).

Corpechot 2012 states that “[t]he dihydroxylated bile acid ursodeoxycholic acid (UDCA) has now been regarded for 20 years as the standard treatment for primary biliary cirrhosis (PBC) . . .” Corpechot 2012 at Abstract. Corpechot 2012 also states that “[m]ore recently, a novel derivative of CDCA and potent farnesoid X receptor (FXR) agonist called obeticholic acid (OCA) has shown promising biochemical effects in phase- II studies either alone or in combination with UDCA, thereby apparently opening up avenues for new bile- acid therapies.” *Id.* at S14. Corpechot 2012 reports that one study showed that “165 patients with persistently high ALP [alkaline phosphatase] levels (>1.5 × ULN) while on stable UDCA treatment were randomized to either a placebo or OCA at 10 mg, 25 mg or 50 mg once daily for 12 weeks after prior UDCA therapy,” and these patients showed “a significant and approximately 25% reduction in ALP in the three OCA arms compared with a 3% change from baseline in the placebo group.” *Id.* at S17. Corpechot 2012 found that “[t]hese data have led to the development of a long- term phase-III trial of OCA in UDCA-treated patients based on an up-titration assessment of OCA with 5-mg increments every 3 months up to 25 mg.” *Id.*

**KKKK. Japanese Publication Number JP-A-4-250093 (“TSUCHIDA”)**

TSUCHIDA titled “Thermal recording body,” was published on September 4, 1992. Therefore, TSUCHIDA constitutes prior art under 35 U.S.C. §102(b) as “the invention was … described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.”

TSUCHIDA teaches a cholinic acid derivative represented by the following structure:

wherein X1, X2, X3, and X4 each independently represent -CO- or -CHR-, and each R is a hydrogen atom, a hydroxyl group, a lower alkyl group, a lower alkoxyl group, an aralkyloxy group, or a lower alkylcarbonyloxy group. *See* Tsuchida at Abstract, 897.

## V. INVALIDITY OF THE ASSERTED CLAIMS OF THE RE286 PATENT

The asserted claims of the RE286 patent are invalid as described more fully below and as identified in attached Appendix A, which is incorporated by reference in addition to the information discussed in this document.

### A. Claims 1-14 of the RE286 patent are rendered obvious by the ’848 patent and/or the ’701 patent in view of Kim, Kuroki, Roda, the ’258 patent, the WO ’965 publication, the WO ’134 publication, TSUCHIDA, and/or the WO ’077 publication, alone or in combination.

It would have been obvious to one of ordinary skill in the art, at the time of filing of the application that led to the RE286 patent, to produce, at the least, obeticholic acid and its taurine and glycine conjugates recited in claims 1-3, a pharmaceutical formulation as recited in claim 4, methods for the treatment of an FXR mediated disease as recited in claims 5-9 and the compounds as recited in claims 10-12, in addition to the pharmaceutically acceptable salt as recited in claim 13 and the solvate as recited in claim 14 of the RE286 patent by combining the teachings of the ’848 patent and/or the ’701 patent in view of Kim and/or Kuroki, Roda, the ’258 patent, the WO ’965 publication, the WO ’134 publication, and the WO ’077 publication alone or in combination.

The ’848 patent teaches biliary acid derivatives of formula (I) shown below:

wherein $R_1$ is hydrogen or hydroxy, and the methyl and hydroxy groups at 6- and 7-positions respectively can be either in α or β configuration. The patent teaches that this compound has "been used for a long time in human therapy for the treatment of biliary calculosis, as antidyspeptic, eupeptic, antidyslipidemic and choleretic agents, and generally in all those pathological conditions in which a stimulation of biliary flow and a qualitative and/or quantitative change thereof are required. Therapeutic possibilities of natural molecules promoted the development of a number of synthetic or semi-synthetic derivatives in the attempt to obtain improved drugs as regard pharmacokinetic, metabolism or chemico-physical aspects (lipophilia/hydrophilia ratio, stability, critical micellar concentration)." '848 patent at 1:41-57.

The '701 patent teaches bile acid derivatives having the general formula of compound I highlighted below:

,

wherein $R_1$ is hydrogen, in addition to process for the preparation thereof and pharmaceutical composition comprising the same. The ’701 patent also teaches physiologically acceptable salts of compound I, in addition to glycine or taurine conjugated forms. Further, the ’701 patent describes that the bile acid derivatives disclosed therein been used for a long time in human therapy for the treatment of biliary calculosis, as antidyspeptic, eupeptic, antidyslipidemic and choleretic agents, and generally in all those pathological conditions in which a stimulation of bile flow and a qualitative and/or quantitative change thereof are required.

The structure of the compound recited in the claims of the RE286 patent is as following:

wherein R is ethyl.

As such, the only difference between the compound recited in the claims of the RE286

patent as compared to the biliary acid derivative having the general formula of compound I as taught in the ’848 patent and/or the bile acid derivative having the general formula of compound I as taught in the ’701 patent is that the compound recited in the claims of the RE286 patent contains an ethyl group at the 6-position whereas the biliary acid derivative of the ’848 patent contains a methyl group at the 6-position and the bile acid derivative of the ’701 patent contains a fluorine group at the 6-position.

A person of ordinary skill in the art would have had a reasonable expectation of success to start with the compound taught in the ’848 patent and/or the compound taught in the ’701 patent as a lead compound and further modify the methyl group and/or the fluorine group at the 6-position to obtain the compound recited in the claims of the RE286 patent based on Kim and/or Kuroki, and Roda, alone or in combination, for the following reasons.

Kim teaches that if a bile acid analog can stimulate the digestion and absorption of fats, suppress the cholesterol 7α-hydroxylase activity less than endogenous bile acids, and competitively inhibit the absorption of endogenous bile acids, it should be useful as a cholesterol reducing agent. Kim also teaches that introduction of alkyl group (including ethyl group) at 7-position of CDC significantly decreased the inhibitory effect of CDC on cholesterol 7α-hydroxylase. Further, Kim teaches that the above inhibitory effect was enhanced by the elongation of alkyl chain introduced.

Kuroki teaches that in vivo inhibition of the 7-dehydroxylation of bile acids result in prolonged enterohepatic circulation of physiologically valuable bile acids and reduce the concentration of the potentially toxic secondary bile acids. As such, to inhibit or prevent 7-dehydroxylation, Kuroki teaches that “[i]ntroduction of protective group in the bile acid nucleus on or near the 7-position that might render the bile acid analogy resistant to enzymatic

dihydroxylation."

Further, Roda teaches that "6α-methyl analogs were highly stable toward 7-dehydroxylation … 6α-methyl ursodeoxycholic acid is efficiently secreted in bile with a cumulative recovery similar to that of ursodeoxycholic acid … only metabolites of 6α-methyl ursodeoxycholic acid identified were its glycine and taurine amidated forms … in conclusion … 6α-methyl ursodeoxycholic acid shows potential as a cholesterol dissolving agent … good metabolic stability and better conservation in the enterohepatic circulation with respect to ursodeoxycholic acid." Roda at 2268.

Thus, a person of ordinary skill in the art would have been motivated to start with the biliary acid derivative of the '848 patent and/or the bile acid derivative of the '701 patent as a lead compound because such compounds have been known to be used in human therapy for the treatment of biliary calculosis, as antidyspeptic, eupeptic, antidyslipidemic and choleretic agents, and generally in all those pathological conditions in which a stimulation of biliary flow and a qualitative and/or quantitative change thereof are required.

The motivation to modify the substitution at the 6-position with an ethyl group is provided by combining the teachings of (i) the '701 patent that the 7-position, with the -OH group, unchanged in comparison with the natural molecule, has been found to be critical with respect to the pharmacological activity of the biliary acid derivatives, (ii) Kim that the inhibitory effect of bile acid analog was enhanced by the alkyl chain elongation and (iii) Kuorki that introduction of protective group in the bile acid nucleus near the 7-position would render the bile acid derivative resistance to enzymatic dihydroxylation.

A POSA would also have been able to make and test analogs with an ethyl substitution at the 6-position without undue experimentation. It was well-known to a POSA how to make an

ethyl substitution at the 6-position using basic organic chemistry. In addition, prior art references such as the WO ’965 publication, the WO ’077 publication, and the WO ’134 publication disclose assays to quickly test potential test compounds on the FXR receptor for activity.

The FXR receptor was known and described in the literature at least since 1995. WO ’965 at 3. The WO ’965 publication provides *in vitro* assays for the FXR receptor to identify candidate therapeutic agents for modulation of cholesterol metabolism. The methods involve analyzing the effect of a test compound on the binding of FXR to a ligand for FXR. The WO ’965 publication discloses that the ligands could include “but are not limited to, bile acids and related compounds such as CDCA (chenodeoxycholic acid), GCA (glychocholic acid), TCA (taurocholic acid), DCA (deoxycholic acid), LCA (lithocholic acid), DHCA (dehydrocholic acid), UDCA (ursodeoxycholic acid) and CA (cholic acid).” *Id.* at 12-13. The assays can also employ coactivators and corepressors with which FXR interacts. *Id.* at 13. Examples 1 to 4 provide assays using CDCA among other bile acids as ligands.

The WO ’965 publication also provides kits and integrated systems for high-throughput assaying for FXR activity, binding of ligands to FXR, or screening for an inhibitor or activator of FXR activity. Example 5 provides three different high throughput in vitro assays that are useful to identify compounds that can modulate binding of FXR ligands to the FXR ligand binding domain: Fluorescence Polarization, FRET and an enzyme-linked immunosorbent assay (“ELISA”).

The WO ’077 publication is directed to assays for identifying ligands and for measuring activity of test compounds on the FXR receptor. WO ’077 publication at 3. The assays are used to identify compounds for the treatment of diseases or disorders modulated by the FXR receptor. *Id.* The disclosed assays include FRET assays, scintillation proximity, and homogeneous time-

resolved fluorimetry ("HTRF"). *Id.* at 5-6. Examples 2 and 3 provide examples of assays for the FXR receptor, including a FRET assay.

The WO '134 publication is directed to assays for identifying ligands and measuring activity for the FXR nuclear receptors utilizing proximity and FRET. WO '134 publication at 2-3. The assay disclosed by the WO '134 publication provides methods "for the rapid and simple determination of a ligand for a nuclear receptor…" *Id.* at 3. Examples 2 and 3 provide examples of assays for the FXR receptor, including a FRET assay.

FRET was one of the test methods used by the applicants of the RE268 patent to measure and compare the activity of obeticholic acid, the 6-methyl substituted analog of CDCA, and the naturally occurring bile acid on the FXR receptor. Thus, it would have been obvious for a POSA to start with the lead compound of the '848 patent and Roda and substitute the 6-methyl group with a 6-ethyl group with a reasonable expectation of success. In addition, in view of the assays disclosed in the WO '138 publication, the WO '077 publication, and the WO '965 publication, a POSA would have been able to measure and appreciate the increased activity of obeticholic acid without undue experimentation.

Thus, claim 1 would have been obvious over the '848 patent and the '701 patent in view of Kim and Kuroki because Kim and Kuroki provide sufficient motivation to substitute the methyl group at 6-position of the '848 patent and/or fluoro group of the '701 patent with an ethyl group. Similarly, one of ordinary skill in the art would have had the motivation to produce the compound as recited in claim 12 and a pharmaceutically acceptable salt as recited in claim 13 of the RE286 patent.

By combining the teachings of the above described prior art with that of the WO '077 publication, a person of ordinary skill in the art would have had a reasonable expectation of

success in producing the compounds of claims 1-3 and 12-13 because the WO ’077 publication teaches methods for identifying compounds for the treatment of diseases or disorders modulated by FXR, comprising the step of determining whether the compound interacts directly with FXR, wherein a compound that interacts directly with FXR is a compound for the treatment.

Further, it would have been obvious to produce a glycine and taurine conjugate of the ethyl substituted bile acid derivative, as recited in claims 2-4, because the ’848 patent and the ’701 patent teach glycine and taurine conjugated bile acid derivatives, in addition to a pharmaceutical composition comprising the respective bile acid derivatives.

Furthermore, one of ordinary skill in the art would have been motivated to use the 6-ethyl substituted bile acid derivative resulting from the combination of the above cited art in the methods of treatment as recited in claims 5-10 because the ’848 patent and the ’701 patent teach that bile acid derivatives can used in human therapy for the treatment of biliary calculosis, as antidyspeptic, eupeptic, antidyslipidemic and choleretic agents, and generally in all those pathological conditions in which a stimulation of biliary flow and a qualitative and/or quantitative change thereof are required. Further, motivation to produce the methods of treatment as recited in claims 5-9 can be gleaned from the ’258 patent, which teaches pharmaceutical compositions and methods for treating Farnesoid X receptor (FXR)-mediated disorders and conditions, such as atherosclerosis, cardiovascular disorders, lipid disorders and hypercholesterolemia; and that chenodeoxycholic acid (CDCA) specifically activates the gene expression regulatory activity of FXR.

In addition, the compounds recited in claims 10 and 11 of the RE286 patent would have been obvious to a person of ordinary skill in the art because the WO ’077 publication teaches radiolabeled compounds, such as with tritium, for preparation of pharmaceutical composition,

which may be formulated as a solvate.

Thus, one of ordinary skill in the art would have been motivated and would have had a reasonable expectation of success in producing the Obeticholic acid and its taurine and glycine conjugates recited in claims 1-3, a pharmaceutical formulation as recited in claim 4, methods for the treatment of an FXR mediated disease as recited in claims 5-9 and the compounds as recited in claims 10-12, in addition to the pharmaceutically acceptable salt as recited in claim 13 and the solvate as recited in claim 14 of the RE286 patent by combining the teachings of the ’848 patent and/or the ’701 patent in view of Kim and/or Kuroki, Roda, the ’258 patent and the WO ’077 publication, alone or in combination, at the time the application that led to the RE286 patent was filed.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section V.C.

### B. Claims 1-14 of the RE286 patent are rendered obvious by Makishima, Hofmann, Roda, Constantino, Miljkovic, and Yang, and/or additional art as cited herein

#### 1. <u>Claims 1 and 12</u>

Independent claim 1 claims a compound of formula (I):

1. A compound of [formula I] *formula (I)*:

(I)

HO, H, R, OH, H, $CO_2H$

wherein R is ethyl and pharmaceutically acceptable salts, solvates or amino acid conjugates thereof.

Independent claim 12 also claims a compound of formula (I) but is limited to only the compound of formula (I) where R is ethyl, effectively excluding pharmaceutically acceptable salts, solvates or amino acid conjugates thereof.

As of the earliest possible priority date for RE286, bile acids such as chenodeoxycholic acid were known in the art to be farnesoid X receptor (FXR) modulators, essential for the solubilization and transport of dietary lipids, and regulating the enzymatic conversion of cholesterol to bile acids. *See* Makishima at 1362. For example, Makishima disclosed that the "activation of FXR was specific and limited to the primary bile acid chenodeoxycholic acid (CDCA) and to a much lesser extents to a secondary bile acids deoxycholic acid (DCA) and lithocholic acid (LCA)." *Id*. "The most potent activator CDCA, has a half maximal effective concentration ($EC_{50}$) of 50 µM and 10 µM on murine and human FXR respectively." *Id*. In addition to regulating FXR, Makishima disclosed that CDCA regulated its own synthesis by a feedback mechanism involving the expression of the enzyme cholesterol 7α-hydroxylase (Cyp7a). *See id*. at 1364. Makishima concluded that "the observation that LXRα and FXR function as key regulators for cholesterol and bile acid homeostasis has important therapeutic

implications for the discovery of drugs targeted against these receptors." *Id.*

A table comparing the relative activity of CDCA and several other bile acids was disclosed in Fig. 1A, reproduced below.



*Id.* at 1363.

As can be seen in the table, CDCA has greater activity against FXR than other structurally related bile acids, such as lithocholic acid (LCA).

Accordingly, it would have been obvious for a person of ordinary skill in the art to choose chenodeoxycholic acid (CDCA) as a lead compound when performing further research into a drug which could modulate FXR and cholesterol biosynthesis. The structure of CDCA is presented below.

Chenodeoxycholic acid

While CDCA was an obvious starting point for further research, it was also known that CDCA was metabolized to form lithocholic acid. *See* Hofmann at 2649. Hofmann disclosed that CDCA was known as a "primary bile acid" because other bile acids were formed from CDCA by enzymatic modification. *See id*. One metabolic pathway is the removal of the C-7 hydroxy of CDCA to form lithocholic acid. *See id*. While not pictured in Hofmann, this transformation is depicted below, with the C-7 hydroxy emphasized for clarity.

Chenodeoxycholic acid → Lithocholic acid

Lithocholic acid was disclosed by Hofmann to be "a highly hepatotoxic bile acid." *Id*. Further, "dehydroxylation in the distal intestine make bile acids virtually insoluble and thereby lower the aqueous concentration and bacteriostatic effect of bile acids." *Id*. at 2650.

As such, it would have been obvious to modify CDCA such that dehydroxylation was reduced, thus producing less lithocholic acid, a bile acid known to be both less potent against FXR and also hepatotoxic.

Methods for hindering dehydroxylation of the C7 hydroxy in bile acids were known in the art. For example, Roda, which is directed to the evaluation of 6-substituted bile acids,

disclosed that adding an alkyl group to the 6-position reduced dehydroxylation at the 7-position. Specifically, Roda stated "the rational for adding alpha methyl in ursodiol at 6 position is to prevent by steric hindrance the 7-dehydroxylation and stabilize molecule to intestinal bacteria." Roda at 2269. Ursodiol (also known as ursodeoxycholic acid or UCDA) is a structural analog of CDCA. The structures of ursodiol and the 6-methyl derivative are presented below.

Ursodiol

6-Methyl Ursodiol

Roda was not an isolated solution to dehydroxylation, for as Roda stated, "[b]ile acid (BA) analogs resistant to 7-dehydroxylation by intestinal bacteria have already been reported; these include 7-hydroxy-methyl derivatives of cholic acid (CA) and UDCA (11, 12), as well as 6- hydroxy-methyl-substituted BA (18)." *Id*. at 2268. "When designing a new UDCA analog, it is important not only to make the molecule more stable to 7-dehydroxylation but also to increase its biological half-life and to enhance its activity." *Id*. "The main advantages offered by these new analogs, as demonstrated in the rat, are the lack of side-chain amidation in the case of unconjugated analogs (or deamidation of the corresponding taurine conjugate forms), and simultaneous prevention of 7-dehydroxylation by intestinal flora." *Id*. at 2269. The "6-MUDCA is very resistant to bacterial dehydroxylation." *Id*. at 2277.

Accordingly, it would have been obvious to modify CDCA with an alkyl group at the 6-position in order to reduce dehydroxylation.

While numerous examples of methyl substituted bile acids were known in the art,[2]

[2]chenodeoxycholic acid is substituted at the 6-position with an ethyl group. Thus, obeticholic acid differs in that it has one additional methylene unit from the 6-methyl-ursodiol of Roda. However, the ethyl analog of chenodeoxycholic acid would have been obvious in light of the disclosures in Makishima, Hofmann, and Roda. That is, the addition of a methyl or ethyl group to chenodeoxycholic acid is nothing more than routine optimization of an alkyl chain substituent in an obvious substitution pattern.

Compounds which are position isomers (compounds having the same radicals in physically different positions on the same nucleus) or homologs (compounds differing regularly by the successive addition of the same chemical group, e.g., by $-CH_2-$ groups) are generally of sufficiently close structural similarity that there is a presumed expectation that such compounds possess similar properties. *In re Wilder*, 563 F.2d 457, 195 U.S.P.Q. 426 (C.C.P.A. 1977); *see also In re May*, 574 F.2d 1082, 197 U.S.P.Q. 601 (C.C.P.A. 1978) (stereoisomers *prima facie* obvious); *Valeant Pharm. Int'l, Inc. v. Mylan Pharm. Inc.*, 955 F.3d 25, 32 (Fed. Cir. 2020) (Federal Circuit case law "reflects an understanding that skilled artisans can expect structurally similar compounds to have similar properties.").

Accordingly, it would have been obvious to make the chemical modification of adding an ethyl group to chenodeoxycholic acid in order to reduce dehydroxylation. A graphic representation of this transformation is depicted below.

[2] For example, *see* Frigerio, G. *et a*l. (EP Publication No. 0312867), Une, M. et al. (*J. Lipid Res*., 1984, Vol. 25, 407-410), and Kuroki, S. *et al*. (*J. Lipid Res*., 1985, Vol. 26, 1205-1211).

Chenodeoxycholic acid

Obeticholic acid

In addition to this being just routine optimization, bile acids with ethyl substitution at the 6-position were known in the art. For example, Miljkovic disclosed a series of bile acids substituted at the 6-position. Figure 1 from Miljkovic represents the general structure of the disclosed bile acids and is reproduced below.

Regarding the groups, Miljkovic disclosed that the 6-position (i.e., $R_4$), could be an alkyl group having up to 10 carbon atoms.

> $R_1$, $R_2$, $R_3$, *$R_4$,* and $R_5$ are independently hydrogen or XL where
>
> X is nothing, 0, S, NH or NL and L is hydrogen, metallic ion, halogen, an *alkyl* or alenyl radical having *up to 10 carbon atoms*, which is branched or *unbranched*, a cycloalkyl radical having 3 to 8 carbon atoms, or a benzyl radical which is unsubstituted or substituted 1 to 3 times by F, Cl, Br, ($C_1$—$C_4$)-alkyl or ($C_1$—$C_4$)- alkoxy; and where L is bonded to $R_1$, L can alternatively be an amino acid; and
>
> $R_6$ is $(CH_2)_n$ where $0 \leq n \leq 5$.

Miljkovic at 3:44-54 (emphases added).

Should the patent holder allege that it would not have been obvious to add an ethyl to

chenodeoxycholic acid, additional motivation may be found in the art for such a substitution. For, it was known that bile acids are impacted by their hydrophobicity. As an example, Costantino disclosed that bile acids such as ursodeoxycholic acid "are absorbed by passive diffusion during their first pass through the intestine, hydrophobicity is the main molecular determinant of the rate and overall efficacy of their transport." Costantino at 483. "Thus, chemical modifications of particular features of a BA molecule, while often producing an improved biologic behavior of that molecule in a given functional district, could not be sufficient to confer the potential for therapeutic development unless an 'ideal' value of hydrophobic/hydrophilic balance is kept." *Id*. Accordingly, it would have been obvious to modify a bile acid to adjust its hydrophobicity.

Alkyl groups were known to influence hydrophobicity. For example, Yang disclosed hydrophobic parameters of various groups. Specifically, Yang showed that the addition of the ethyl group increases hydrophobicity, where the measure of hydrophobicity (pi) of methyl is 0.56 and that of ethyl is 1.02. *See* Yang at 14. The greater the number, the greater the hydrophobicity. As an additional note, Roda disclosed the addition of the methyl group increases lipophilic area ($\pi CH3 = +0.56$, compared to $\pi H = + 0.23$ or $\pi OH = -1.64$) and thus the hydrophobicity. *See* Roda at 2274. Therefore, a person of ordinary skill in the art would modify CDCA from Makishima with the hydrophobic teachings of Roda, Costantino, and Yang to insert a more lipophilic group at the 6-position, such as an ethyl group.

As such, in view of the teachings of Makishima, Hofmann, and Roda, and, if necessary, the teachings of Costantino and Yang, the compound of formula (I) would have been obvious. Furthermore, a person of ordinary skill in the art would have been motivated to prepare such a compound and would have had a reasonable expectation of success. Accordingly, claims 1 and 12 would have been obvious.

2. **Claims 2 and 3**

Independent claims 2 and 3 are directed to glycine and taurine conjugates of the compound of formula (I). Claims 2 and 3 recite:

2. The glycine conjugate of a compound of formula (I):

(I)

wherein R is ethyl.

3. The taurine conjugate of a compound of formula (I):

(I)

wherein R is ethyl.

As discussed above, the compound of formula (I) would have been obvious. Further, glycine and taurine conjugates of bile acids were known in the art.

For example, Makishima disclosed that "[d]erivatives of CDCA conjugated with glycine (GCDCA) or taurine (TCDCA) were also active in both biochemical assays (Fig. 1, E and F) but were inactive in the cell-based assays (Fig. 1, A, B, and D)." Makishima at 1362.

As another example, Costantino disclosed glycine and taurine conjugated bile acids, such

as those conjugated ursodeoxycholic acid (UDCA). "While the knowledge on the metabolic fate of bile acids within the enterohepatic circulation can provide the rational basis for a given chemical modification (e.g. conjugation with amino acids different from glycine and taurine in order to prevent bacterial deconjugation), it should always be kept in mind that for drugs like UDCA that are absorbed by passive diffusion during their first pass through the intestine, hydrophobicity is the main molecular determinant of the rate and overall efficacy of their transport." Costantino at 483.

As a third example, Miljkovic disclosed glycine and taurine conjugated compounds when describing the limited set of analogs, stating "[i]ncluded in these permutations, it is particularly contemplated that $R_1$ may be amino-, glycine, taurine, alanine or other amino acid group." Miljkovic at 3:55-57.

As such, a glycine and taurine conjugates of the compound of formula (I) would have been obvious in view of the disclosures in any one of Makishima, Costantino, or Miljkovic. Accordingly, Claims 2 and 3 would have been obvious. Furthermore, a person of ordinary skill in the art would have been motivated to prepare such compounds and would have had a reasonable expectation of success.

### 3. <u>Dependent claims 4-11 and 13-14</u>

The claim chart below shows why the dependent claims of the RE286 patent would have been obvious including providing exemplary citations to the prior art:

| | |
|---|---|
| 4. A formulation comprising compound according to claim 1 and a pharmaceutically acceptable carrier or diluent. | As claim 4 depends directly from claim 1, the same invalidity argument from Claim 1 applies equally here.<br><br>Claim 4 further requires that the compound of formula (I) is in a pharmaceutical composition comprising a pharmaceutically acceptable carrier or diluent.<br><br>As of the earliest possible priority date for the RE286 patent, bile acids formulated as pharmaceutical compositions comprising a carrier or diluent were known in the art. For example, the WO |

| | |
|---|---|
| | ’965 publication disclosed compounds applicable in FXR mediated modulation of cholesterol metabolism. *See* WO ’965 publication at Abstract. These compounds included chenodeoxycholic acid (CDCA), which as discussed above, is a structural analog of obeticholic acid. *See id*. at 12:25-30. The WO ’965 publication disclosed that in treating FXR mediated disorders and conditions; the compounds are formulated as pharmaceutical compositions comprising pharmaceutically acceptable carriers or excipients. *See id*. at 32:17-24.<br>As such, a pharmaceutical composition comprising a compound of formula (I) and a pharmaceutically acceptable carrier would have been obvious in view of the disclosures in the WO ’965 publication. Accordingly, claim 4 would have been obvious. |
| 5. A method for the treatment of an FXR mediated disease or condition in a mammal comprising administering to a mammal suffering from an FXR mediated disease or condition a therapeutically effective amount of a compound according to claim 1, wherein said FXR mediated disease or condition is selected from the group consisting of hypercholesteremia, hyperlipidemia, low HDL- | As claim 5 depends directly from claim 1, the same invalidity argument from claim 1 applies equally here.<br><br>Claim 5 further requires a method of treatment where the method comprises administration of the compound of formula (I) for the treatment of an FXR mediated disease consisting of hypercholesteremia, hyperlipidemia, low HDL-cholesterol, or high triglycerides.<br><br>The WO ’965 publication disclosed that FXR mediated diseases could be treated using bile acids such as CDCA, by showing that CDCA specifically activated the FXR. *See* WO ’965 publication at 35:12–36:9. These FXR mediated diseases included hypercholesterolemia. “Atherosclerosis is a leading cause of death, myocardial infarctions, stroke, peripheral vascular disease and cardiovascular disease.” *Id*. at 1:16-17. “One of the major contributing factors to atherosclerosis is hypercholesterolemia.” *Id*. at 1:20-21. “FXR-mediated disorders and conditions, such as atherosclerosis, cardiovascular disorders, lipid disorders and hypercholesterolemia, can be treated with therapeutic agent(s) identified using the methods described herein.” *Id*. at 32:9-11.<br><br>As such, the use of a compound of formula (I) for the treatment of an FXR mediated disease such as hypercholesteremia would have been obvious in view of the disclosures in the WO ’965 publication. Accordingly, claim 5 would have been obvious. |

| | |
|---|---|
| 6. A method for the treatment of cardiovascular disease in a mammal comprising administering to a mammal suffering from a cardiovascular disease a therapeutically effective amount of a compound according to claim 1, wherein said cardiovascular [desease] *disease* is selected from the group consisting of[artherosclerosis] *atherosclerosis* and hypercholesteremia. | As claim 6 depends directly from claim 1, the same invalidity argument from Claim 1 applies equally here.<br><br>Claim 6 further requires a method of treatment where the method comprises administration of the compound of formula (I) for the treatment of a cardiovascular disease consisting of atherosclerosis or hypercholesteremia.<br>As discussed above, the WO ’965 publication disclosed the applicability of the bile acid CDCA in the treatment of atherosclerosis or hypercholesteremia. “FXR-mediated disorders and conditions, such as atherosclerosis, cardiovascular disorders, lipid disorders and hypercholesterolemia, can be treated with therapeutic agent(s) identified using the methods described herein.” *Id.* at 32:9-11.<br><br>As such, the use of a compound of formula (I) for the treatment of a cardiovascular disease such as atherosclerosis or hypercholesteremia would have been obvious in view of the disclosures in the WO ’965 publication. Accordingly, claim 6 would have been obvious. |
| 7. The method according to claim 6, wherein said cardiovascular disease is atherosclerosis. | As claim 7 depends directly from claim 6 and requires the treatment of atherosclerosis (as disclosed in the WO ’965 publication), the same invalidity argument from claim 6 applies equally here. Accordingly, claim 7 would have been obvious. |

| | |
|---|---|
| 8. A method for increasing HDL cholesterol in a mammal, said method comprising administering to a mammal whose HDL cholesterol is to be increased a therapeutically effective amount of a compound according to claim 1. | *See* comments against claim 1 above.<br><br>Claim 8 further requires a method for increasing HDL cholesterol by administering a therapeutically effective amount of the compound of formula (I).<br><br>As discussed above, the WO '965 publication disclosed the applicability of the bile acid CDCA in the treatment of artherosclerosis or hypercholesteremia. *See id*. at 32:9-11. Further, Weigand disclosed the use of bile acids in reducing overall cholesterol levels and lipids, including triglycerides. *See* Weigand at 1:9-11. Accordingly, both the WO '965 publication and Weigand disclosed that bile acids had an effect on overall cholesterol levels.<br><br>It was known in the art that certain active agents could decrease the total cholesterol while increasing the HDL levels. "Cholesterol lowering agents decrease total plasma and LDL cholesterol ad may increase HDL." Medford at 4:30-31. "Depending on the agent and the dose used, statins may decrease plasma triglyceride levels and may increase HDL." *Id*. at 5:22- 24.<br><br>Thus, it was known in the art that bile acids could lower the overall cholesterol level and active agents could increase HDL levels while lowering total cholesterol. Accordingly, it would have been obvious to administer a bile acid, such as obeticholic acid, to modify the overall cholesterol level and raise the HDL levels.<br><br>Therefore, claim 8 would have been obvious. |

| | |
|---|---|
| 9. A method for lowering triglycerides in a mammal, said method comprising administering to a mammal whose triglycerides are to be decreased a therapeutically effective amount of a compound according to claim 1. | As claim 9 depends directly from claim 1, the same invalidity argument from Claim 1 applies equally here.<br><br>Claim 9 further requires a method of treatment where the method comprises administration of the compound of formula (I) in order to lower triglycerides. As of the earliest possible priority date for the RE286 patent, bile acids were known to be useful in lowering the level of triglycerides. For example, Weigand disclosed the use of bile acids in reducing cholesterol and lipids, including triglycerides. See Weigand at 1:9-11.<br>In a "preferred embodiment, this invention contemplates the such compounds as 3α,7α-dihydroxy-5β-cholanic acid; 3α,7α-diacyloxy-5b-cholanic acid; 3,7-dioxo-5β-cholanic acid; 3α,7β-dihydroxy 5b-cholanic acid; 3α,7β-diacyloxy-5β-cholanic acid, 3α-hydroxy-7β-acetoxy-5β-cholanic acid; 3α-hydroxy-7α-acyloxy-5β-cholanic acid, for example, 3α-hydroxy-7α-acetoxy-5β-cholanic acid, and other like compounds." |
| | *Id*. at 3:40-49. A structural representation of the compounds is reproduced below:<br><br><br><br>*Id*. at 2:26-40.<br><br>Weigand disclosed in Example III that a patient was treated with 3α,7α-dihydroxy-5β-cholanic acid over the course of 10 days and the triglyceride levels dropped from 2021 mg/100 mL to 1484 mg/100mL. *See id*. at 5:45–6:13.<br><br>As such, a method of reducing triglyceride levels using a compound of formula (I) would have been obvious in view of the disclosures in Weigand.<br><br>Accordingly, claim 9 would have been obvious. |

| | |
|---|---|
| 10. The compound of claim 1, wherein said compound is radiolabeled. | As claim 10 depends directly from claim 1, the same invalidity argument from claim 1 applies equally here.<br>Claim 10 further requires the compound be radiolabeled. As of the earliest possible priority date for the RE286 patent, radiolabeled bile acids were known in the art. For example, Ng disclosed a report on the suitability of tritiated chenodeoxycholic acid and lithocholic acid for use in the study of bile acid metabolism. *See* Ng at 753. Specifically, Ng disclosed, "[t]ritium-labeled bile acids facilitate the study of bile acid metabolism in man." *Id.* The two tritiated bile acids were [11,12-$^3H_2$]chenodeoxycholic acid and [11,12-$^3H_2$]lithocholic acid. *See id.*<br><br>As such, a radiolabeled compound of formula (I), where that radiolabeled compound is tritiated, would have been obvious in view of the disclosures in Ng.<br><br>Accordingly, claim 10 would have been obvious. |
| 11. The compound of claim 10, wherein said compound is tritiated. | As claim 11 depends directly from claim 10 and requires that the compound is tritiated, the same invalidity analysis from claim 10 applies equally here. Accordingly, claim 11 would have been obvious. |
| 13. A pharmaceutically acceptable salt of the compound of claim 1. | As claim 13 depends directly from claim 1, the same invalidity argument from claim 1 applies equally here.<br><br>Claim 13 further requires that the compound be a pharmaceutically acceptable salt. As of the earliest possible priority date for the RE286 patent, salts of compounds were well known. Indeed, the RE286 patent admits that "[s]uitable pharmaceutically acceptable salts according to the present invention will be readily determined by one skilled in the art. . .<br>. Such salts of the compounds of formula (I) may be prepared using conventional techniques, from the compound of formula<br>(I) by reacting, for example, the appropriate base with the compound of formula (I)." RE 286 patent at 4:22-33.<br><br>Further, Roda disclosed the use of bile acid salts. "All the experiments were carried out using the sodium salts of the synthesized bile acids. The sodium salts were prepared by adding an equimolar amount of $NaHCO_3$ to the aqueous suspension of the free acid, which was heated to 80°C, agitated in an ultrasound bath, and then freeze-dried." Roda at 2269.<br><br>As an additional example, Miljkovic also disclosed the use of bile acid salts. *See* Miljkovic at 6:66–7:7.<br><br>Accordingly, claim 13 would have been obvious. |

| | |
|---|---|
| 14. A solvate of the compound of claim 1. | As claim 14 depends directly from claim 1, the same invalidity argument from claim 1 applies equally here.<br><br>Claim 14 further requires that the compound be a solvate. As of the earliest possible priority date for RE ’286 solvates were well known. *See, e.g.*, Byrn at 946 (disclosing water, methanol, ethanol, propanol, isopropanol, acetone, acetonitrile, ethyl acetate and hexane as potential solvents). It would have been obvious to a POSA to use any one of those solvents to make a solvate of the compound of claim 1. Accordingly, claim 14 would have been obvious. |

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section V.C.

**C. Any secondary considerations are inadequate to overcome the prima facie obviousness of the claims**

Defendants contend that there are no secondary considerations regarding the asserted claims of the RE286 patent that are relevant in assessing obviousness. That said, Defendants note that secondary considerations are not part of the *prima facie* case of obviousness. Rather, a patentee may try and rebut a *prima facie* case of obviousness by coming forward with purported evidence of such secondary considerations. *Bayer Pharma AG v. Watson Labs., Inc.*, 183 F. Supp. 3d 579, 589 (D. Del. 2016). Defendants therefore have no burden at this stage to come forward with evidence rebutting such considerations. Quite the contrary, it is Plaintiffs’ obligation and burden alone to come forward with evidence of so-called secondary considerations, if any, on which they intend to rely.

Plaintiffs to date have raised no substantive or plausible secondary considerations in connection with the ’RE286 patent. For example, in response to Joint Interrogatory No. 4, Plaintiffs simply say that they “intend to rely on all applicable objective indicia of nonobviousness, including skepticism by experts and others in the field, teaching away, failure

of others, long-felt but unmet need, unexpected results, praise in the field, copying and commercial success," and do not attempt to tie any particular secondary consideration to any claim or patent, and thus have failed to show nexus. Regardless, Plaintiffs do not even provide any suggestion of what their theories might be with regard to most of these secondary considerations.

Plaintiffs discuss only three examples of secondary considerations in a generic manner, again untied to any particular claim or patent, each of which cannot overcome the clear showing of obviousness here. They are discussed below. First, Plaintiffs allege copying is evidence of non-obviousness. However, courts have repeatedly held that any alleged copying has little relevance to obviousness in Hatch-Waxman cases such as this one where ANDA filers are required to establish bioequivalence to the reference drug product. *See, e.g.*, *Purdue Pharma Products L.P. v. Par Pharmaceutical, Inc.*, 642 F.Supp.2d 329, 373-74 (D. Del. 2009). Any similarities Plaintiffs allege exist would be due to efficiency of pursuing FDA approval and not any technical merit of the patent or its claims.

Second, Plaintiffs allege long-felt but unmet need in PBC patients under-responsive to UDCA at increased risk of progressing to end-stage liver disease. Again, Plaintiffs have failed to tie this alleged need to any claim or patent in any way, or provide any facts explaining how this alleged need was met. For example, there was significant prior art disclosing formulations of obeticholic acid, and Plaintiffs provide no meaningful allegation of why or even how its claimed formulations differ. To the extent Plaintiffs' alleged need is limited

to the commercial availability of products, that only speaks to the motivation to proceed with such a formulation and has no relevance to the technical merits of the patents.

Third, Plaintiffs allege two statements made by Drs. Pellicciari and Rewolinski to the USPTO indicate evidence of unexpected results. These self-serving statements again are untied to any patent or claim. For example, Dr. Rewolinski's statement regarding formulation has no relevance to the compounds claimed herein. Additionally, Dr. Pellicciari's statement regarding potency of the compound in comparison to other compounds is unsupported by the evidence, is untied to any claim or limitation, and at most is a difference of degree and not kind.

Defendants reserve the right to further rebut any claims of secondary considerations of non-obviousness raised by Plaintiffs, if any, as discovery proceeds in this case.

**D. Invalidity of the RE286 patent Under 35 U.S.C. § 112**

**1. <u>Claims 5-9 of the RE286 patent are Invalid under Section 112</u>**

To the extent they are not found obvious, claims 5 to 9 of the RE286 patent are indefinite, lack written description, and lack enablement. The claims are directed to "treating" various FXR conditions and cardiovascular diseases by administering a "therapeutically effective amount" of obeticholic acid to a mammal. The claimed diseases and conditions that can be treated in a mammal are (1) FXR mediated diseases or conditions consisting of hypercholesterolemia, hyperlipidemia, low HDL-cholesterol and high triglycerides, and (2) cardiovascular diseases consisting atherosclerosis and hypercholesterolemia. RE286 patent at 12:4-27. The RE286 patent

fails to provide reasonable ranges or amounts that would be therapeutically effective to treat mammals with these conditions. The RE286 patent contains a very broad range of 0.01 mg/kg to about 100 mg/kg to treat a broad class of various FXR mediated diseases or conditions. *Id.* at 5:54-57. The patent does not provide any examples of treatment to any mammals. Nor does the RE286 patent disclose the criteria to determine whether the conditions are treated. For use in treatment of "choleastatic liver diseases," the patent states a therapeutically effective amount "will be an amount sufficient to increase bile flow to the intestine." *Id.* at 5:44-46. However, the patent specification does not tell a POSA how to evaluate if a drug product satisfies this criterion for evaluating treatment of choleastatic liver diseases. Moreover, the patent specification provides no information to determine whether the specifically claimed diseases (hypercholesterolemia, hyperlipidemia, atherosclerosis, etc.) are treated.

The claims are indefinite without this information. The claims fail to inform whether a given strength of the claimed compound is a "therapeutically effective amount." *See, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 59 (2015) (finding the claim term "unobtrusive manner" "highly subjective" and indefinite because nothing in the specification or prosecution history provided an objective standard for measuring the scope of that phrase); *see also Adaptix, Inc. v. Apple, Inc.*, No. 5:13-CV-01776-PSG, 2015 WL 332111, at *1 (N.D. Cal. Jan. 23, 2015), *appeal dismissed* (Nov. 10, 2015) (granting summary judgment of invalidity on the basis that the term "each cluster" was indefinite because, under Nautilus, it "might mean several different things and no informed and confident choice is available among the contending definitions" (internal citations omitted)).

For substantially the same reasons, the claims are not enabled and there is no written description. The Federal Circuit has explained that while "it is unnecessary to prove that a

claimed pharmaceutical compound actually achieves a certain result, . . . when the inventor expressly claims that result, [Federal Circuit] case law provides that that result must be supported by adequate disclosure in the specification." *Nuvo Pharm. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1384 (Fed. Cir. 2019) (holding claims were invalid for lack of written description where " the inventor chose to claim the therapeutic effectiveness of uncoated PPI, but he did not adequately describe the efficacy of uncoated PPI so as to demonstrate to ordinarily skilled artisans that he possessed and actually invented what he claimed"). This is because "the law is clear that a patent cannot be awarded for mere theoretical research without more." *Biogen Int'l GmbH v. Mylan Pharm.*, 18 F.4th 1333, 1343-44 (Fed. Cir. 2021) (holding claims were invalid for lack of written description where the specification included a "single passing reference" to the claimed dose, untethered to the claimed indication, and was "not listed as an independent therapeutically efficacious dose").

Further, to the extent they are not found obvious, claims 5 to 9 of the RE286 patent are not enabled for any of the claimed diseases or conditions, let alone the full scope of the claims that cover multiple diseases and conditions. The claimed diseases that can be treated in a mammal are (1) FXR mediated diseases or conditions consisting of hypercholesterolemia, hyperlipidemia, low HDL-cholesterol and high triglycerides, and (2) cardiovascular diseases consisting atherosclerosis and hypercholesterolemia. *Id.* at 12:4-27. However, the patent specification does not disclose how a POSA would have treated each, or any, of these diseases or conditions for the many species of mammals. As stated above, the patent specification fails to provide reasonable ranges for treatment of these diseases or conditions for any mammal. It does not provide dosing, any examples or criteria to determine when treatment for a disease or condition is therapeutically effective. To the extent that the patent owner argues that a general disclosure of treatment for

diseases and conditions would have informed a POSA how to treat the many species of mammals, then that only further supports the obviousness of these claims in light of the prior art discussed above.

Similarly, because the patent specification does not show examples of the claimed invention, let alone the full range of the claimed invention, the named inventors have not shown that they were in possession of the claimed invention, making claims 5 to 9 of the RE286 patent also invalid for lacking written description.

#### 2. Claims 8 and 9 of the RE286 patent are Indefinite

Claims 8 and 9 of the RE286 patent recite terms such as“"increasing HDL cholesterol”" and“"lowering HDL cholesterol”" However, the metes and bounds of such recitations are not mentioned in the specification, and hence the scope of said claims is not clear. A person of ordinary skill in the art cannot determine the scope of claims 8 and 9 of the RE286 patent so as to understand the meets and bounds of the claimed invention. Accordingly, these claims are indefinite under 35 U.S.C. § 112, second paragraph.

## VI. INVALIDITY OF THE ASSERTED CLAIMS OF THE ’673 PATENT

The asserted claims of the ’673 patent are invalid as described more fully below and as identified in attached Appendix B, which is incorporated by reference in addition to the information discussed in this document.

### A. Claims 1-23 of the ’673 patent are anticipated by Ferrari ’977 and/or Ferrari ’352

Ferrari ’977 and/or Ferrari ’352[3] expressly or inherently disclose each limitation of claims

[3] Ferrari ’352 claims priority to Ferrari ’977 and contains all of the same disclosures. For simplicity, all citations herein are to Ferrari ’977.

1–23. Independent claims 1 and 23 of the ’673 patent are recited below:

> 1. A pharmaceutical composition comprising obeticholic acid Form 1 and a pharmaceutically acceptable carrier, wherein the obeticholic acid Form 1 comprises less than 1% of chenodeoxycholic acid.
>
> 23. A pharmaceutical composition comprising obeticholic acid Form 1 and a pharmaceutically acceptable carrier, wherein the obeticholic acid Form 1 comprises one or more compound selected from 6β-ethylchenodeoxycholic acid, chenodeoxycholic acid, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid, wherein 6β-ethylchenodeoxycholic acid is present in an amount between about 0% and not more than 0.05%, chenodeoxycholic acid is present in an amount between about 0% and not more than 0.2%, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid is present in an amount between about 0% and not more than 0.05%.

Ferrari ’977 discloses pharmaceutical compositions comprising obeticholic acid and a pharmaceutically acceptable carrier. Ferrari ’977 explains that obeticholic acid is “two magnitude order more powerful than chenodeoxycholic acid, the most powerful natural FXR agonist,” and can be used “for the prevention and treatment of hepatic diseases of cholestatic origin.” Ferrari ’977 at 2:1-6. Ferrari ’977 teaches that obeticholic acid may be used in “pharmaceutical compositions . . . in combination with suitable excipients and/or diluents.” *Id.* at 9:5-8.

Ferrari ’977 also discloses a process for preparing a highly-purified form of Form 1 obeticholic acid. *See id.* at 12:4-15:31 (disclosing process for preparing obeticholic acid). Ferrari ’977 discloses a process for preparing obeticholic acid in which “the intermediates do not need to be purified by chromatography.” *Id.* at 2:21-23. The process also includes a step of “[c]rystallization of the crude product” to form purified obeticholic acid. *Id.* at 12:4-15:31. Ferarri ’977 teaches that crystallisation [occurs] with an organic solvent, preferably chosen from ethyl acetate and acetone, possibly in the presence of water.” *Id.* at 10:20-22. The organic solution is cooled to crystallize the crude product, and obeticholic acid is then precipitated, filtered, washed, and dried. *Id.* at 15:24-29.

The process disclosed by Ferrari ’977 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1 and 23 of the ’673 patent. A POSA would understand that the use of purer intermediates would result in a more purified end-product, and that the step of crystallizing the crude obeticholic acid would further reduce the presence of impurities. A POSA would also expect that crystallizing crude obeticholic acid followed by precipitating the mixture would result in converting obeticholic acid from a crystalline to amorphous form (i.e., obeticholic acid Form 1).

Later-published documents and internal data, including data from the ’673 patent specification itself, further supports that Ferrari ’977 teaches a process for preparing the claimed highly-purified compositions of Form 1 obeticholic acid. *See, e.g.*, *Hospira, Inc. v. Fresenius Kabi*, 946 F.3d 1322, 1329-30 (Fed. Cir. 2020) (explaining that “the work of the inventor or the patentee can be used as the evidence of inherency”).

First, statements from the inventors suggest that Ferrari ’977 discloses a process for preparing Form 1 obeticholic acid. The ’673 patent acknowledges that Ferarri ’977 discloses many of the “same” steps described in the ’673 patent specification for preparing Form 1 obeticholic acid. *See* ’673 patent at 24:5-27:36 (explaining steps 3, 4, and 7 are the “same” as Ferrari ’977). Importantly, the ’673 patent acknowledges that Ferrari ’977 uses the “same” process as the final step disclosed in the ’673 patent, *id.*, which the ’673 patent states converts crystalline obeticholic acid to the Form 1 amorphous form, *see id.* at 54:35-47. Consistent with this understanding, during prosecution, the applicant did not refute the examiner’s finding that Ferrari ’977 taught preparing obeticholic acid Form 1. *See* Jan. 8, 2015 Non-Final Rejection at 3, 8; *see generally* June 8, 2015 Applicant Remarks. During prosecution of a European counterpart, the applicant likely acknowledged that Ferrari ’977 results in Form 1 obeticholic acid. *See*

EP2861613A1, 11-17- 2017 Submission at 3 ("As set out in Tables A and B on pages 30 and 31 of the present application, the process of the present invention results in obeticholic acid Form 1 which has a higher purity that that achieved by the process of [WO '977]. The objective technical problem is therefore how to provide an improved method for forming non-crystalline obeticholic acid form 1."). Plaintiffs' internal documents likewise confirm that the Ferrari '977 process naturally results in obeticholic acid Form 1. *See, e.g.*, INT_OCA_0875651-INT_OCA_0875657; INT_OCA_0875658-INT_OCA_0875659; INT_OCA_0880086; INT_OCA_0774841-INT_OCA_0774856; INT_OCA_0885891-INT_OCA_0885934; *accord* INT_OCA_0909657-INT_OCA_0909701; INT_OCA_0879736-INT_OCA_0879956.

Second, the '673 patent suggests that Ferrari '977 discloses a process for preparing obeticholic acid having the purity profile required by claims 1 and 23. The '673 patent reports the following purity profile for a composition purportedly prepared according to the process disclosed by Ferrari '977, "determined using HPLC methods":

TABLE B

Comparison of Impurities of Obeticholic Acid Generated from Process of the Application and '977 Process

| Parameter | Specification limit | Process of the application | '977 process |
|---|---|---|---|
| Water (KF) | NMT 4.5% | 1.0% | 2.1% |
| Impurity 1 and Impurity 4 | NMT 0.15% | <0.05% | <0.05% |
| Impurity 2 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 3 | NMT 0.15% | <0.05% | <0.1% |
| Impurity 5 | NMT 3.0% | 0.2% | 1.0% |
| Impurity 6 | NMT 0.15% | <0.05% | <0.05% |

Impurity 1 is 6-ethylursodeoxycholic acid.
Impurity 2 is 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid.
Impurity 3 is 6β-ethylchenodeoxycholic acid.
Impurity 4 is 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid.
Impurity 5 is chenodeoxycholic acid.
Impurity 6 is 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid (6ECDCA dimer).
NMT refers to "not more than".

’673 patent at 27:46-28:48. In particular, Table B of the ’673 patent supports that the Ferrari ’977 process naturally results in obeticholic acid having “less than 1%” or “not more than about 0.2%” of chenodeoxycholic acid, as required by claims 1 and 23, respectively. *See id.* at claims 1 and 23. Table B of the ’673 patent further supports that the Ferrari ’977 process naturally results in obeticholic acid having “not more than 0.05%” of 6β-ethylchenodeoxycholic acid and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid, as required by claim 23. *See id.* at claim 23.

Table B of the ’673 patent reports that the Ferrari ’977 process results in the same impurity levels as the ’673 patent process for the impurities 6-ethylursodeoxycholic acid (Impurity 1), 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid (Impurity 4), and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid (Impurity 6)—each of which are less than 0.05%. *Id.*; *see also id.* at claim 23. The impurity levels are similar—and potentially identical—for each of the remaining impurities in both the Ferrari ’977 process and the ’673 patent process. With respect to the impurities 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24- oic acid (Impurity 2) and 6β-ethylchenodeoxycholic acid (Impurity 3), Table B reports that both are present at levels ***less than*** 0.1% when obeticholic acid is prepared pursuant to the Ferrari ’977 process, which includes a level of not more than 0.05%. *Id.* at 27:46-28:48; *see also id.* at claim 23. With respect to the impurity chenodeoxycholic acid (Impurity 5), Table B reports an impurity level of 1.0% upon following the Ferrari ’977 process as compared to 0.2% upon following the ’673 patent process, *id.* at 27:46-28:48, but a POSA would not interpret this to mean that the Ferrari ’977 process resulted in an impure obeticholic acid composition. Critically, the ’673 patent does not disclose what “HPLC methods” were used to detect the impurities reported in Table B, or if the same “HPLC methods” were used to detect impurities in both the

obeticholic acid compositions resulting from the Ferrari '977 and '673 patent processes.

Plaintiffs prepared several batches of obeticholic acid according to the Ferrari '977 process. *See, e.g.*, INT_OCA_0972379-INT_OCA_0972434; *see also* INT_OCA_0309988-INT_OCA_0310066. These batches of obeticholic acid were highly pure, consistent with that reported in Table B of the '673 patent. *See, e.g.*, INT_OCA_0972379-INT_OCA_0972434; *see also* INT_OCA_0309988-INT_OCA_0310066; INT_OCA_0965271-INT_OCA_0965275; INT_OCA_1516592-INT_OCA_1516596; INT_OCA_1516587-INT_OCA_1516591; INT_OCA_1516592-INT_OCA_1516596; INT_OCA_ 1516597-INT_OCA_1516600. Plaintiffs' documents confirm that the data reported in Table B were obtained from different sources and under different conditions. *See, e.g.*, INT_OCA_0811005-INT_OCA_0811195; INT_OCA_0972379-INT_OCA_0972434; INT_OCA_0309988-INT_OCA_0310066. INT_OCA_1518586-INT_OCA_1518604.

A POSA would understand that there is a margin of error with any HPLC methodology, and that employing different HPLC methodologies can result in the detection of different amounts of impurities. *See, e.g.*, Görög at 934, (estimating that there is approximately a 0.5–1.0% margin of error for HPLC assay methods); [redacted] A POSA would understand that a reported impurity level of "1.0%" for chenodeoxycholic acid would fall within the margin of error of "less than 1%," as required by claim 1 of the '673 patent. *See* '673 patent at claim 1. With a difference of only 0.8%, a POSA would also understand the reported impurity level for chenodeoxycholic acid (1.0%) resulting from the Ferrari '977 process to fall within the margin of error of "less than about 0.2%," as required by claim 23. *See id.* at claim 23.

Claims 1 and 23 of the ’673 patent are thus anticipated by Ferrari ’977.

Claims 2–21 directly or indirectly depend from claim 1 and further limit the amount of the impurities in obeticholic acid. In particular, claims 2–21 limit the amount of the impurity 6β-ethylchenodeoxycholic acid, chenodeoxycholic acid, and/or 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid to the following concentrations: (1) “less than about” 0.05% to 0.15% of 6β-ethylchenodeoxycholic acid; (2) “less than about” 0.2% to 0.5% of chenodeoxycholic acid; and/or (3) “less than about” 0.05% to 0.15% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. *See* ’673 patent at claims 2–21. As discussed above in connection with claim 23, on information and belief, practicing the Ferrari ’977 process would naturally result in an obeticholic acid composition comprising less than about 0.05% 6β-ethylchenodeoxycholic acid, less than about 0.2% chenodeoxycholic acid, and less than about 0.05% 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24- oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. *See also* ’673 patent at 27:46-28:48. Ferrari ’977 thus expressly or inherently discloses each of the limitations of claims 2–21 of the ’673 patent. Claim 22 depends from claim 1 and further requires that the obeticholic acid Form 1 “comprises less than about 2% of water.” ’673 patent at claim 22. Table B of the ’673 patent reports obtaining “2.1%” water upon following the Ferrari ’977 process, as “determined using HPLC methods.” *Id.* at 27:46-28:48. A POSA would understand that a reported impurity level of “2.1%” for water would fall within the margin of error of “less than 2%,” as required by claim 22 of the ’673 patent. *See id.* at claim 22. Ferrari ’977 thus expressly or inherently discloses each of the limitations of claim 22 of the ’673 patent.

Claims 2–22 of the ’673 patent are thus anticipated by Ferrari ’977.

**B. Claims 1-23 of the ’673 patent are anticipated by Yu ’526 and/or Yu ’628**

Yu ’526 and/or Yu ’628[4] expressly or inherently disclose each limitation of claims 1–23.

Yu ’526 discloses pharmaceutical compositions comprising obeticholic acid and a pharmaceutically acceptable carrier. For example, Yu ’526 explains that there is “great promise of 6-ECDCA as a research tool and therapeutic molecule,” and that obeticholic acid is a “prime candidate for use in pharmacological therapy and as a tool to study the function of FXR.” Yu ’526 at [0004]; *see also id.* at Abstract, [0003]. Specifically, Yu ’526 teaches that obeticholic acid “may be used in treating atherosclerosis, diabetes and cholestatic disease.” *Id.* at [0003]. Pellicciari 2002, which Yu ’526 incorporates by reference in its entirety (*id.* at [0060, 0069]), further discloses administering 6-ECDCA as a pharmaceutical composition after dissolving it in saline solution. Pellicciari 2002 at 3571.

Yu ’526 also discloses a process for preparing a highly-purified form of obeticholic acid. Yu ’526 at [0043]-[0047]. The process is depicted below:

[4] Yu ’628 issued from the patent publication Yu ’526 and contains all of the same disclosures as Yu ’526. For simplicity, all citations herein are to Yu ’526.

*Id.* at Fig. 6B; *see also id.* at [0028]-[0029]. Yu '526 teaches purifying obeticholic acid prepared by the above-described process by flash column chromatography to obtain an 80% yield. *Id.* at [0047]. Flash column chromatography is further employed to purify intermediate compounds, teaching that "the crude oil was purified by flash column chromatography" to form both intermediate compounds 1 and 2. *Id.* at [0044]-[0045].

On information and belief, the process disclosed by Yu '526 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1–23 of the '673 patent. Yu '526 provides analytical data of the resulting obeticholic acid that indicates a highly-purified compound. *See id.* at [0047].

A later-published article by Yu supports that Yu '526 teaches a process for preparing the claimed highly-purified compositions of Form 1 obeticholic acid. *See, e.g.*, *Hospira*, 946 F.3d at 1329 (Fed. Cir. 2020) ("Extrinsic evidence can be used to demonstrate what is 'necessarily present' in a prior art embodiment even if the extrinsic evidence is not itself prior art.").

Yu 2012 confirms that the process disclosed in Yu '526 creates obeticholic acid having a melting point of 120.7-121°C. D. Yu et al., "An improved synthesis of 6a-ethylchenodeoxycholic acid (6ECDCA), a potent and selective agonist for the Farnesoid X Receptor (FXR)," Steroids

77 (2012) 1335–1338, 1338 ("Yu 2012"). This melting point is consistent with melting point data disclosed in the '673 patent for crystalline obeticholic acid. *See* '673 patent at 72:43-73:25. As a crystalline form, the obeticholic acid prepared by Yu '526 would be highly purified. *See, e.g.*, Harwood at 127 ("The simplest and most effective technique for the purification of solid organic compounds is crystallization."); Pavia at 648 ("Organic compounds that are solid at room temperature are *usually* purified by crystallization.") (emphasis added). On information and belief, some or all of this crystalline form would convert to obeticholic acid Form 1, naturally resulting in obeticholic acid Form 1 having the purity profile recited by claims 1–23 of the '673 patent.

Claims 1–23 of the '673 patent are thus anticipated by Yu '526.

**C.      Claims 1-23 of the '673 patent are anticipated by Pellicciari '390**

Pellicciari '390 expressly or inherently discloses each limitation of claims 1–23.

Pellicciari '390 discloses pharmaceutical compositions comprising obeticholic acid and a pharmaceutically acceptable carrier. Pellicciari '390 teaches the role of obeticholic acid in FXR-mediated diseases, and discloses "a pharmaceutical formulation comprising a compound of formula (I) and a pharmaceutically acceptable carrier or diluent." Pellicciari '390 at 2:32-37; *see also id.* at 5:38-42 (explaining the "present invention provides pharmaceutical compositions comprising, as active ingredient, a compound of formula (1) or a pharmaceutically acceptable salt or solvate thereof, together with at least one pharmaceutical carrier or diluent").

Pellicciari '390 also discloses a process for preparing a highly-purified form of obeticholic acid. Pellicciari '390 discloses preparing obeticholic acid pursuant to the following general scheme:

Scheme I

$CO_2H$

HO O

$CO_2H$

O O O

-continued

$CO_2Et$

HO O

R

II

$CO_2Et$

HO OH

R

III

$CO_2H$

H

HO OH

H R

I

*Id.* at 7:43-8:41. In particular, Pellicciari '390 specifies that obeticholic acid "was chromatographed on silica gel column," and that two intermediates were also purified by silica gel chromatography. *Id.* at 9:30-10:48.

On information and belief, the process disclosed by Pellicciari '390 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1–23 of the '673 patent. *See, e.g.*, INT_OCA_0309988-INT_OCA_0310066; INT_OCA_0774841-INT_OCA_0774856;

INT_OCA_0842885-INT_OCA_0842902; INT_OCA_0120871-INT_OCA_0120885; INT_OCA-0445004-INT_OCA_0445005; INT_OCA_1111174- INT_OCA_1111184; INT_OCA_0383395-INT_OCA_0383397; INT_OCA_0383376; INT_OCA_1159904-INT_OCA_1159906; INT_OCA_1160856; MSN(OBA)_0063099-MSN(OBA)_0063128. A POSA would understand that the use of purer intermediates would result in a more purified end-product, and that the repeated use of silica gel chromatography would reduce the presence of impurities. *Id.* During prosecution, the applicant also did not refute the examiner's finding that the compound disclosed by Pellicciari 2002—which provides the identical process for preparing obeticholic acid as Pellicciari '390—taught preparing obeticholic acid Form 1. *See* Jan. 8, 2015 Non-Final Rejection at 3, 8; *see generally* June 8, 2015 Applicant Remarks; *see also* MSN(OBA)_0063099-MSN(OBA)_0063128.

Claims 1–23 of the '673 patent are thus anticipated by Pellicciari '390.

**D. Claims 1-23 of the '673 patent are rendered obvious by Ferrari '977 and/or Ferrari '352 in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

As discussed above in Section VI.A, which is incorporated by reference, Ferrari '977 and/or Ferrari '352 expressly or inherently disclose each limitation of claims 1–23 of the '673 patent. In particular, on information and belief, the process disclosed by Ferrari '977 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1–23 of the '673 patent. To the extent the obeticholic acid resulting from the Ferrari '977 process differs from the claimed obeticholic acid, claims 1–23 would have been obvious.

As discussed below, a POSA would have been motivated, with a reasonable expectation of success, to increase the purity of obeticholic acid. Doing so would naturally result in obeticholic acid having the claimed purity profile. Defendants are unaware of any objective

indicia supporting the patentability of the ’673 patent claims, thus claims 1–23 would have been obvious.

**1. A POSA would have been motivated to increase the purity of obeticholic acid.**

A POSA would have been motivated to obtain increased purity levels of obeticholic acid compositions for at least two independent reasons relating to optimizing obeticholic acid compositions and the preparation thereof. This motivation is evidenced by the simultaneous work by multiple researchers. *See Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000) (“[T]he possibility of near simultaneous invention by two or more equally talented inventors working independently, . . . may or may not be an indication of obviousness when considered in light of all the circumstances.”) (citation and quotation omitted).

First, during prosecution, inventor Melissa Rewolinski filed a declaration claiming it was beneficial to minimize the amount of CDCA in obeticholic acid compositions due to their comparative potencies:

> I assert that obeticholic acid is at least 100-fold more potent than CDCA in activating the FXR nuclear receptor. Accordingly, removing CDCA as an impurity from obeticholic acid significantly increases FXR activation by obeticholic acid. As such, the instant highly pure obeticholic acid and a pharmaceutical composition thereof, comprising less than 1% of CDCA, would advantageously display improved, potent pharmaceutical effectiveness for treating diseases mediated by the FXR nuclear receptor.

Rewolinski Decl., ¶ 6, dated June 8, 2015. But the prior art repeatedly recognized that obeticholic acid was related to CDCA and “almost 2 orders of magnitude more potent than CDCA.” Pellicciari 2002 at 3572; Ferrari ’977 at 2:1-6 (same); Yu ’526 at [0003] (“6-ECDCA has recently been . . . found to be more potent with $EC_{50}$ values around 100 nM compared to the parent CDCA derivative.”). Accepting Dr. Rewolinski’s declaration as true, a POSA would have been motivated to optimize obeticholic acid compositions by minimizing the amount of the less-

potent form, CDCA. *See, e.g.*, *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955) ("[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.").

Second, a POSA would have been motivated to limit the recited impurities in obeticholic acid compositions in connection with FDA guidelines and standards to develop pharmaceutical compositions. *See, e.g.*, *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301 (Fed. Cir. 2007) ("[I]f it is known that some desirable property of a mixture derives in whole or in part from a particular one of its components, . . . the purified compound is prima facie obvious over the mixture even without an explicit teaching that the ingredient should be concentrated   or purified."). For example, FDA Manufacturing Guidance recommends that "all impurities at or above 0.1% should be identified." FDA Manufacturing Guidance at 22. The ICH Q3A Guideline further instructs that for drug substances having a maximum daily dose of ≤ 2g/day, there should be an "Identification Threshold" of 0.10% or 1.0 mg/day (whichever is lower) and a "Qualification Threshold" of 0.15% or 1.0 mg/day (whichever is lower) for organic impurities. ICH Q3A Guideline at 8 (Attachment 1); *see also id.* at 1 (explaining organic impurities include, among other things, starting materials, by-products, intermediates, and degradation products); *see also* FDA Q3A Guidance (same).

A POSA would have looked to these guidelines and standards because a POSA would have known that obeticholic acid was intended for use in pharmaceutical compositions. *See, e.g.*, Pellicciari 2002 at 3570 (teaching obeticholic acid's use in FXR-mediated diseases); Ferrari '977 at 2:1-6. (teaching obeticholic acid's use "for the prevention and treatment of hepatic diseases of cholestatic origin"); Yu '526 at [0004] (explaining it was known that obeticholic acid was a "prime candidate for use in pharmacological therapy"). Indeed, as of the priority date, clinical

trials were already initiated to study obeticholic acid as a pharmaceutical agent. *See generally* NASH-FLINT; PBC Study.

With respect to water content, a POSA would have been motivated to minimize the amount of water in obeticholic acid. Vrani discloses the tendency for amorphous materials to sorb significant amounts of water vapor from their surroundings can give rise to a markedly reduced chemical and physical stability relative to the crystalline form of the material. Vrani at 37. The sorbed water may participate in a chemical reaction (hydrolysis) or may simply act as a catalyst for a chemical reaction. *Id.* Vrani also discloses that sorbed solvents such as water will also plasticize most amorphous pharmaceutical materials, and this can have a negative impact on both physical and chemical stability by increasing the molecular mobility of the sample at any given temperature. *Id.*

**2. A POSA would have reasonably expected to obtain highly-purified obeticholic acid.**

**a) Routine methods to purify compounds were known in the art.**

A POSA would have reasonably expected obtaining the claimed purity levels using routine procedures known in the art. Well before the alleged priority date, it was known that "[t]he simplest and most effective technique for the purification of solid organic compounds is crystallization." Harwood at 127. Harwood describes the well-known process for purifying an organic compound by crystallization, which involves five stages: dissolution, filtration, crystallization, collection of the crystals, and drying the crystals. *Id.* Indeed, it was known that "[o]rganic compounds that are solid at room temperature are *usually* purified by crystallization." Pavia at 648 (emphasis added). Pavia teaches that "[c]rystallization . . . produces very pure material." *Id.* FDA Manufacturing Guidance likewise specifies that issues with impurity levels in API can be addressed "by repeating a crystallization step or other physical manipulation steps

(e.g., dissolution, filtration, milling, blending) that are part of an established process." FDA Manufacturing Guidance at 39. If purity concerns persist, FDA Manufacturing Guidance explains "it would be reasonable to incorporate the recrystallization as part of the normal process." *Id.*

Similarly, Fujiwara discloses that crystallization is the main separation and purification process for the manufacturing of drug substances. Fujiwara at Abstract. According to Fujiwara, not only does crystallization affect the efficiency of downstream operations such as filtering, drying, and formulating, the efficacy of the drug can be dependent on the final crystal form. Fujiwara also discloses that most pharmaceutical manufacturing processes include a series of crystallization processes to achieve high purity and to produce the desired final crystal form. *Id.* at Abstract, 494. Rohani also discloses that crystallization from solution is used extensively during the synthesis and purification of APIs. *See generally* Rohani. The most efficient method is cooling crystallization. *Id.* at 2.

A POSA also would have known that chromatography methods could be used to further purify obeticholic acid. It was known in the art that chromatography is "a powerful separation tool" that can be used "to obtain pure individual components of a mixture." Fox at 110; *see also id.* at 113-14 ("Because each component is obtained as a single component, chromatography is also a method for purification."). Numerous chromatography methods were known in the art, including liquid chromatography with alumina or silica gel, high performance liquid chromatography ("HPLC"), or thin-layer chromatography. *See id.* at 112-16; *see also, e.g.*, Carr ("Reversed-Phase High Performance Liquid Chromatography (RP-HPLC) has become a widely used, well-established tool for the analysis and purification of biomolecules."). Indeed, the prior art processes for preparing obeticholic acid explicitly employed chromatography methods. *See, e.g.*, Pellicciari '390 at 9:30-10:48; Yu '526 at [0044]-[0047]. It would have been obvious to a

POSA to simply add one or more crystallization or chromatography steps to the disclosed methods of preparing obeticholic acid to obtain highly pure obeticholic acid.

As of the priority date, a POSA also would have understood that if one can measure purity using HPLC, one can also make a pure sample with the same technique by isolating the peak corresponding to the drug as it elutes off the column, which is routinely done in preparative HPLC. *See* Snyder at 616 ("When only small amounts of pure product are required an analytical HPLC method . . . can be used to recover nanogram-to-sub-milligram quantities of product."). The difference between measuring the purity of a compound—an analytical test—and preparing a pure compound—a preparative technique—is one only of scale. Indeed, the process of measuring purity using HPLC inherently creates a pure compound and provides guidance on the parameters and conditions that should be used to make a pure compound. *See id.* at 618 ("For the recovery of purified product from an impure starting material, it is convenient to use the same optimized HPLC conditions that were developed initially for analysis of the sample.").

Iverlund discloses that in the pharmaceutical industry powdered carbon is frequently used as a method to remove impurities. Iverlund at 852. Impurities may be those present at unacceptable percentage levels or those that may be almost undetectable in quantity, but still affect the color of the API. *Id.* In a case study, Iverlund discloses a carbon treatment to reduce a high-level impurity from ~3% to at least less than 2%, prior to a "Pures" crystallization step producing the Active Pharmaceutical Ingredient (API). *Id.* at 855-858. The process was scaled up from ~80 mL in   the laboratory to~300 L in a development plant. *Id.* at 856. Trials were run to confirm the most effective carbon type for reduction of the impurity. *Id.* The optimized process succeeded in reducing the target impurity to less than 1% before a final crystallization. *Id.* at 856-57.

**b) <u>Methods for purifying bile acid agonists were known in the art.</u>**

The prior art further disclosed mechanisms to purify compositions of bile acid agonists.

Natalini 2007 discloses a process for separating bile acid derivatives, including obeticholic acid, which it discloses is "the most potent FXR agonist found thus far." Natalini 2007 at 1681. Natalini 2007 purports to determine the critical micellar concentration ("CMC") of various bile acids, including obeticholic acid and CDCA, in order to determine the physiochemical properties of bile acids. *Id.* Natalini 2007 discloses that the CMC measures the""self-aggregatio"" of bile acids. *Id.* Natalini 2007 then discloses several ways to determine the CMC of bile acids, including RP-HPLC. *Id.* at 1681-82. Natalini 2007 sets forth several known advantages of RP-HPLC, including the separating out of impurities. *Id.* at 1682. Wang 1999 also discloses the use of RP- HPLC to purify the components of bile, including bile acids. Wang 1999 at 545. Wang 1999 discloses that free bile acids include CDCA. *Id.* at 543.

As an additional example of known purification techniques applicable to bile acids, Rajevic disclosed an HPLC method developed for assay and purity control of ursodeoxycholic acid ("UDCA"), which is separated from all related compounds. *See* Rajevic at Abstract. Rajevic disclosed that "the pharmaceutical formulations of UDCA could contain impurities that have been reported to be toxic, like lithocholic acid (LCA), or poorly tolerated CDCA, even if only present in small quantities, an accurate, precise, and simple technique for quality control of UDCA in pharmaceutical dosage forms is required." *Id.* at 2822.

As still another example of known purification techniques applicable to bile acids, Bonaldi disclosed an industrial process for producing ursodeoxycholic acid of high purity, one that is in particular not contaminated by the chenodeoxycholic acid epimer. *See* Bonaldi at 1:5. In Example 1, Bonaldi disclosed that ursodeoxycholic acid is obtained with a low amount of

chenodeoxycholic acid (≤ 1%) and an even lower amount of other impurities (≤ 0.3%). *See id*. at 8:15-16.

Based on one or more of these disclosures, a POSA would have been motivated, with a reasonable expectation of success, to develop a composition containing obeticholic acid and an excipient with a low level of CDCA obtained via standard separation procedures. A POSA would have known that there were mechanisms to separate obeticholic and CDCA, including RP-HPLC and HPLC, and the specific methods discussed above employed by Pellicciari ’390 and Yu ’526. A POSA would have expected to be able to separate the two compounds based on their differences in structure at the 6α position.

**3. Employing routine methods for purifying obeticholic acid would result in obeticholic acid having the claimed purity profile.**

As discussed above in Section VI.A, practicing the process disclosed by Ferrari ’977 would naturally result in highly-purified obeticholic acid. On information and belief, Ferrari ’977 discloses a process for preparing obeticholic acid that would inherently have the claimed purity profile. *See, e.g.*, *Par Pharm., Inc.,* 120 F. Supp. 3d at 473-75; *Schering Corp. v. Geneva Pharm., Inc.,* 339 F.3d 1373, 1379 (Fed. Cir. 2003) (It is well established that “a [claim] limitation or the entire invention is inherent and in the public domain if it is the 'natural result flowing from' the explicit disclosure of the prior art.”) (quoting *Eli Lilly & Co. v. Barr Labs, Inc.,* 251 F.3d 955, 970 (Fed. Cir. 2001)); *see also Scaltech, Inc. v. Retec/Tetra, LLC,* 269 F.3d 1321, 1329 (Fed. Cir. 2001); *see also In re Peterson*, 315 F.3d 1325, 1329-30 (Fed. Cir. 2003) (explaining that “even a slight overlap in range establishes a prima facie case of obviousness”).

Any differences between the Ferrari ’977 obeticholic acid compositions and the claimed subject matter are merely differences in degree, not kind, and would have been within the skill level of a POSA. Even if an “applicant’s modification results in great improvement and utility

over the prior art, it may still not be patentable if the modification was within the capabilities of one skilled in the art, unless the claimed ranges 'produces a new and unexpected results which is different in kind and not merely in degree from the results of the prior art.'" *In re Huang*, 100 F.3d 135, 139, (Fed. Cir. 1996). Similarly, claim limitations reciting what would be measured if a composition were tested are of no patentable significance when those limitations are an inherent property of the composition disclosed by the obvious combination of prior art elements. *Par*, 773 F.3d at 1194-96; *Santarus, Inc. v. Par Pharma., Inc.,* 694 F.3d 1344, 1354 (Fed. Cir. 2012) ("[A]n obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations.").

To the extent there are any differences between the Ferrari '977 processes and products and those claimed in the '673 patent, the claimed processes and products are nevertheless obvious such that the resulting purity profile would have been inherently obvious. *See, e.g.*, *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1329 (Fed. Cir. 2020) ("inherency may supply a missing claim limitation in an obviousness analysis.") (quoting *Par Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1194-95 (Fed. Cir. 2014); *see also, e.g.*, *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1294 n. 1 (Fed. Cir. 2013). An element is inherent for purposes of the obviousness analysis '"when the limitation at issue is the "natural result" of the combination of prior art elements."' *Par*, 773 F.3d at 1995; *see also In re Huai-Hung Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011). The claimed purity profile would have been the natural result of the above-described obvious methods for purifying obeticholic acid. *See, e.g.*, INT_OCA_0309988-INT_OCA_0310066; INT_OCA_0774841-INT_OCA_0774856; INT_OCA_0842885-INT_OCA_0842902; INT_OCA_0120871-INT_OCA_0120885; INT_OCA-0445004-INT_OCA_0445005; INT_OCA_1111174-INT_OCA_1111184; INT_OCA_0383395-

INT_OCA_0383397; INT_OCA_0383376; INT_OCA_1159904-INT_OCA_1159906; INT_OCA_1160856; MSN(OBA)_0063099-MSN(OBA)_0063128. At a minimum, a POSA would have obtained obeticholic acid having the claimed purity profile using methods known in the art through routine experimentation. *See, e.g.*, *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (not inventive to discover the optimum or workable ranges of a result-effective variable through routine experimentation); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368 (Fed. Cir. 2007) ("[D]iscovery of an optimum value of a variable in a known process is usually obvious.").

**4. <u>A POSA would know how to yield an amorphous form of obeticholic acid.</u>**

To the extent the obeticholic acid formed pursuant to Ferrari '977 and/or Ferrari '352 did not naturally convert to an amorphous form, a POSA would know how to convert crystalline obeticholic acid to an amorphous form (Form 1) using known methods, such as quickly evaporating the solvent from the chromatographed solution, and would be motivated to do so to increase the solubility of obeticholic acid. *See, e.g.*, Yu 2001 at 28 ("Amorphous solids have higher solubility, higher dissolution rate, and sometimes better compression characteristics than corresponding crystals.").

For all of these reasons, a POSA would have arrived at the compositions recited by claims 1–23 of the '673 patent.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section VI.G.

**E. Claims 1-23 of the '673 patent are rendered obvious by Yu '526 and/or Yu '628 in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

As discussed above in Section VI.B, which is incorporated by reference, Yu '526 and/or

Yu ’628 expressly or inherently disclose each limitation of claims 1–23 of the ’673 patent. In particular, on information and belief, the process disclosed by Yu ’526 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1–23 of the ’673 patent. To the extent the obeticholic acid resulting from the Yu ’526 process differs from the claimed obeticholic acid, the products and processes of claims 1–23 would have been obvious such that the resulting purity profile would have been inherently obvious. *See, e.g.*, *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1329 (Fed. Cir. 2020) (“inherency may supply a missing claim limitation in an obviousness analysis.”) (quoting *Par Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1194-95 (Fed. Cir. 2014); *see also, e.g.*, *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1294 n. 1 (Fed. Cir. 2013). An element is inherent for purposes of the obviousness analysis ‘“when the limitation at issue is the “natural result” of the combination of prior art elements.”’ *Par*, 773 F.3d at 1995; *see also In re Huai-Hung Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011)..

For the same reasons discussed *supra* with respect to Ferrari ’977, a POSA would have been motivated, with a reasonable expectation of success, to increase the purity of obeticholic acid. *See* Section VI.D. Doing so would naturally result in obeticholic acid having the claimed purity profile. Additionally, to the extent the obeticholic acid formed pursuant to Yu ’526 did not naturally convert to an amorphous form, a POSA would know how to convert crystalline obeticholic acid to an amorphous form (Form 1) using known methods, such as quickly evaporating the solvent from the chromatographed solution, and would be motivated to do so to increase the solubility of obeticholic acid. *See, e.g.*, Yu 2001 at 28 (“Amorphous solids have higher solubility, higher dissolution rate, and sometimes better compression characteristics than corresponding crystals.”). Claims 1–23 thus would have been obvious.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section VI.G.

**F. Claims 1-23 of the '673 patent are rendered obvious by Pellicciari '390 in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

As discussed above in Section VI.C, which is incorporated by reference, Pellicciari '390 expressly or inherently disclose each limitation of claims 1–23 of the '673 patent. In particular, on information and belief, the process disclosed by Pellicciari '390 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1–23 of the '673 patent. To the extent the obeticholic acid resulting from the Pellicciari '390 process differs from the claimed obeticholic acid, the products and processes of claims 1–23 would have been obvious such that the resulting purity profile would have been inherently obvious. *See, e.g.*, *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1329 (Fed. Cir. 2020) ("inherency may supply a missing claim limitation in an obviousness analysis.") (quoting *Par Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1194-95 (Fed. Cir. 2014); *see also, e.g.*, *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1294 n. 1 (Fed. Cir. 2013). An element is inherent for purposes of the obviousness analysis '"when the limitation at issue is the "natural result" of the combination of prior art elements."' *Par*, 773 F.3d at 1995; *see also In re Huai-Hung Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011).

For the same reasons discussed *supra* with respect to Ferrari '977, a POSA would have been motivated, with a reasonable expectation of success, to yield Form 1 obeticholic acid and increase the purity of obeticholic acid. *See* Section VI.D.1-4. Doing so would naturally result in obeticholic acid having the claimed purity profile. Claims 1–23 thus would have been obvious.

Finally, as will be discussed in greater detail below, any secondary considerations are

inadequate to overcome the prima facie obviousness of the claims. *See* Section VI.G.

### G. Any secondary considerations are inadequate to overcome the prima facie obviousness of the claims.

Defendants contend that there are no secondary considerations regarding the asserted claims of the '673 patent that are relevant in assessing obviousness. That said, Defendants note that secondary considerations are not part of the *prima facie* case of obviousness. Rather, a patentee may try and rebut a *prima facie* case of obviousness by coming forward with purported evidence of such secondary considerations. *Bayer Pharma AG v. Watson Labs., Inc.*, 183 F. Supp. 3d 579, 589 (D. Del. 2016). Defendants therefore have no burden at this stage to come forward with evidence rebutting such considerations. Quite the contrary, it is Plaintiffs' obligation and burden alone to come forward with evidence of so-called secondary considerations, if any, on which they intend to rely.

Plaintiffs to date have raised no substantive or plausible secondary considerations in connection with the '673 patent. For example, in response to Joint Interrogatory No. 4, Plaintiffs simply say that they "intend to rely on all applicable objective indicia of nonobviousness, including skepticism by experts and others in the field, teaching away, failure of others, long-felt but unmet need, unexpected results, praise in the field, copying and commercial success," and do not attempt to tie any particular secondary consideration to any claim or patent, and thus have failed to show nexus. Regardless, Plaintiffs do not even provide any suggestion of what their theories might be with regard to most of these secondary considerations.

Plaintiffs discuss only three examples of secondary considerations in a generic manner, again untied to any particular claim or patent, each of which cannot overcome the clear showing of obviousness here. They are discussed below. First, Plaintiffs allege copying is evidence of non-obviousness. However, courts have repeatedly held that any alleged copying

has little relevance to obviousness in Hatch-Waxman cases such as this one where ANDA filers are required to establish bioequivalence to the reference drug product. *See, e.g.*, *Purdue Pharma Products L.P. v. Par Pharmaceutical, Inc.*, 642 F.Supp.2d 329, 373-74 (D. Del. 2009). Any similarities Plaintiffs allege exist would be due to efficiency of pursuing FDA approval and not any technical merit of the patent or its claims.

Second, Plaintiffs allege long-felt but unmet need in PBC patients under-responsive to UDCA at increased risk of progressing to end-stage liver disease. Again, Plaintiffs have failed to tie this alleged need to any claim or patent in any way, or provide any facts explaining how this alleged need was met. For example, there was significant prior art disclosing formulations of obeticholic acid, and Plaintiffs provide no meaningful allegation of why or even how its claimed formulations differ. To the extent Plaintiffs' alleged need is limited to the commercial availability of products, that only speaks to the motivation to proceed with such a formulation and has no relevance to the technical merits of the patents.

Third, Plaintiffs allege two statements made by Drs. Pellicciari and Rewolinski to the USPTO indicate evidence of unexpected results. These self-serving statements again are untied to any patent or claim. For example, Dr. Pellicciari's statement regarding potency of the compound in comparison to other compounds has no relevance to the formulations claimed in this patent.

Additionally, Dr. Rewolinski's statement that Plaintiffs raise is in direct contradiction to the clear evidence of the prior art, in addition to evidence that was available to Dr. Rewolinski at the time, and cannot overcome obviousness. *See, e.g.*, *infra* at VI.I.

During the prosecution of the '673 patent, the patentee argued that the claimed obeticholic acid compositions comprising less than 1% of CDCA "possess advantageous properties." June 8, 2015 Applicant Remarks at 10. Named inventor Melissa Rewolinski also declared that "the instant highly pure obeticholic acid and a pharmaceutical composition thereof, comprising less than 1% of CDCA, would advantageously display improved, potent pharmaceutical effectiveness for treating diseases mediated by the FXR nuclear receptor." Rewolinski Decl., ¶ 6, dated June 8, 2015.

As discussed above, however, the prior art repeatedly recognized that obeticholic acid was related to CDCA and "almost 2 orders of magnitude more potent than CDCA." Pellicciari 2002 at 3572; Ferrari '977 at 2:1-6 (same); Yu '526 at [0003] ("6-ECDCA has recently been . . . found to be more potent with $EC_{50}$ values around 100 nM compared to the parent CDCA derivative."). Accepting Dr. Rewolinski's declaration as true, a POSA would have been motivated to optimize obeticholic acid compositions by minimizing the amount of the less-potent form, CDCA. *See, e.g.*, *In re Aller*, 220 F.2d at 456 ("[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation."). The resulting obvious compositions would naturally result in reduced CDCA such that the resulting purity profile would have been inherently obvious.

Furthermore, a reduction in an impurity level for CDCA—a naturally-occurring and non-toxic substance—is a difference in degree, not kind. *In re Huang*, 100 F.3d 135, 139 (Fed. Cir.

1996) (explaining that even if an "applicant's modification results in great improvement and utility over the prior art, it may still not be patentable if the modification was within the capabilities of one skilled in the art, unless the claimed ranges 'produces a new and unexpected results which is different in kind and not merely in degree from the results of the prior art.'"); *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1011-12 (Fed. Cir. 2018) (evidence of alleged unexpected results was insufficient where patentee failed to show that a 20% increase in yield was a difference in kind rather than just a difference in degree).

Thus, the results discussed during prosecution do not support nonobviousness of the claims. Accordingly, for at least the above reasons, each claim of the '673 patent is invalid under 35 U.S.C. § 103 as obvious over the prior art.

Defendants reserve the right to further rebut any claims of secondary considerations of non-obviousness raised by Plaintiffs, if any, as discovery proceeds in this case.

**H. Invalidity of the '673 patent Under 35 U.S.C. § 112**

Claims 1-23 of the '673 patent are indefinite Claims 1-23 of the '673 patent are invalid for indefiniteness.

Claims 1-23 of the '673 patent all require that the claimed obeticholic acid Form 1 comprise less than, or not more than, a specified percentage of one or more impurities. *See* '673 patent at claims 1-23. However, the specification fails to inform a POSA how to measure the claimed impurity levels. Instead, the '673 patent states that "[t]he amounts of the impurities can be determined by procedures known in the art, e.g., HPLC, NMR, or methods from US Pharmacopeia, or European Pharmacopeia, or a combination of two or more of these methods." *Id.* at 40:32-36. Likewise, Table B of the '673 patent reports the impurity levels of obeticholic acid upon following the process disclosed in the '673 patent and the Ferrari '977 process, but

merely states that the impurities were "determined using HPLC methods." *Id.* at 27:46-28:48. Table B of the '673 patent thus fails to disclose what protocols (e.g., HPLC solvents, detector wavelength, flow rates, column, etc.) should be used when evaluating the impurity profile of obeticholic acid.

A POSA would understand that employing different procedures known in the art to measure impurities can result in different numerical results for the same sample. For example, a POSA would understand that there is a margin of error with any HPLC methodology, and that employing different HPLC methodologies can result in the detection of different amounts of impurities. *See, e.g.*, Görög at 934 (estimating that there is approximately a 0.5–1.0% margin of error for HPLC assay methods). A POSA would thus understand that a given batch of obeticholic acid having a certain purity as measured by one conventional methodology could have a different purity level as measured by a second conventional methodology.

Given the absence of any disclosure in the '673 patent regarding how to measure the purity of obeticholic acid or what procedures to use, a POSA would be unable to reasonably ascertain whether a batch of obeticholic acid satisfied the recited impurity limitations. *See, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (internal citations and quotations omitted), *cert. denied,* 136 S. Ct. 59 (2015) (finding the claim term "unobtrusive manner" "highly subjective" and indefinite because nothing in the specification or prosecution history provided an objective standard for measuring the scope of that phrase); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344-45 (Fed. Cir. 2015) (holding claim invalid for indefiniteness of the phrases "molecular weight" and "average molecular weight" because there was no reasonable certainty as to how molecular weight was to be measured in light of the specification and prosecution history).

Claims 1-23 of the ’673 patent are thus invalid for indefiniteness.

**1. Claims 1-23 of the ’673 patent are not enabled and/or fail the written description requirement.**

At least to the extent the claims of the ’673 patent would not have been obvious to a POSA, then the claims are not enabled and/or fail the written description requirement. The specification only describes formulating the claimed composition by crystallizing intermediate material, and both the specification and prosecution history discuss the use of an intermediate crystallization process and how such process makes the product different from prior art compositions. To the extent a POSA would not be motivated to make the claimed composition with a reasonable expectation of success in doing so, then a POSA would need undue experimentation in order to achieve the claims. There are many different techniques for purifying compositions, and the specification gives no guidance on how to achieve the claims aside from using the intermediate crystallization step. In addition, the applicants were not in possession of the claimed composition where an intermediate crystallization step is not utilized, and therefore the claims would be invalid for failure to satisfy the written description requirement.

Additionally, to comply with the enablement requirement of 35 U.S.C. § 112(a), a patent specification must enable one of ordinary skill in the art to make and use the full scope of the claimed invention without undue experimentation. *See CFMT, Inc.*, 349 F.3d at 1338. The enablement requirement ensures that, in order to obtain exclusionary rights, the patentee communicates his invention to the public in a meaningful and useful way. *Id*. The allegedly novel aspects of the invention must be disclosed and not left to inference. *Crown Operations Intl, Ltd.*, 289 F.3d at 1367. Enablement is also determined as of the effective filing date. *Plant Genetic Sys., NV.*, 315 F.3d at 1339. The Federal Circuit outlined the following factors to determine whether the requisite amount of experimentation is undue: (1) the quantity of experimentation

necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability of the art, and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). While the analysis and conclusion of a lack of enablement are based on the factors discussed above and the evidence as a whole, it is not necessary to discuss each factor in the enablement rejection. *See* MPEP § 2164.04, citing *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

Importantly, Plaintiffs argued during claim construction, and the Court held that "obeticholic acid Form 1" and "obeticholic acid is Form 1" as the terms are used in the '673 patent claims, are limited only to non-crystalline obeticholic acid, but are not limited by the process of manufacture. D.I. 142 at 2. Namely, the Court determined that Form 1 within the scope of the patent claims does not need to be manufactured using crystalline obeticholic acid intermediate in the penultimate step of synthesis. *Id.* at 5-6. However, the specification discloses only processes of manufacturing the claimed Form I products using a crystalline obeticholic acid intermediate. In fact, the patent specification explains that the use of a crystalline obeticholic acid as the penultimate step in producing Form 1 as "critical" to the purity of Form 1, '673 patent at 29:31-36, which is the very characteristic the applicants relied upon to distinguish its claims from the prior art. *Id.* At 27:41-46. Thus, the full scope of the claims cannot be enabled and lack written description here because a POSA could not know of any methods, other than the use of a crystalline obeticholic acid as the penultimate step, to obtain the compositions claimed in the '673 patent.

Claims 1-23 are not enabled. Relevant *Wands* factors are presented below:

**a) The Quantity of Experimentation Necessary**

According to the ’673 specification, “[t]he percentages of impurities were determined using HPLC methods.” ’673 patent at 27:50-51; *see also id.* at 9:38-39, 51-52; Example 2; 55:42-44 (“isolation of the fraction of the E/Z isomer peaks with the HPLC method 2”). Yet, as explained by named inventor Dr. Melissa Rewolinski during prosecution:

> I also assert that obeticholic acid and [chenodeoxycholic acid] differ only in the 6-ethyl group present in obeticholic acid, and accordingly obeticholic acid and [chenodeoxycholic acid] are similar in many of their physicochemical properties . . . [and] ***due to the similarities in their physiochemical properties, it would be impractical to separate obeticholic acid and [chenodeoxycholic acid] by using a chromatographic purification method such as HPLC*** to achieve highly pure obeticholic acid comprising less than 1% of [chenodeoxycholic acid].

*See* 06-08-2015 Rewolinski Declaration at 2 (emphasis added); *see also* 06-08-2015 Response at 8 (“it would be impractical to separate CDCA and obeticholic acid using column chromatography due to the similarities in their physicochemical properties.”).

A specification lacks enablement if it fails to teach one of skill in the art “how to make and use the full scope of the claimed invention without ‘undue experimentation.’” *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1370 (Fed. Cir. 2013). Here, Claim 1 requires “less than 1% of chenodeoxycholic acid,” which encompasses levels as low as 0%. However, Table B disclosed achieving 0.2% chenodeoxycholic acid, but not any lower. In light of the inventor’s statements during prosecution, it would require extensive experimentation for a POSA to practice the full scope of the claims. *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012) (claims to a semiconductor device that could change in resistance by “at least 10%” were not enabled, even though the specification enabled a device that changed resistance by 11.8%, because the specification did not enable devices that changed resistance by 100% or 1000% percent); *see also In re Fisher*, 427 F.2d 833, 839 (C.C.P.A. 1970) (“In cases

involving unpredictable factors, such as most chemical reactions . . ., the scope of enablement obviously varies inversely with the degree of unpredictability of the factors involved.").

In other words, according to Dr. Rewolinski and the patentee, a POSA cannot use HPLC to separate obeticholic acid and [chenodeoxycholic acid] due to similarities in their physiochemical properties. *Id.* As such, a person of ordinary skill in the art must undertake a high level of experimentation to practice the full scope of the claim.

**b) <u>The Existence of Working Examples</u>**

With respect to working examples, independent claim 1 recites "the obeticholic acid Form 1 comprises less than 1% of chenodeoxycholic acid." This encompasses levels as low as 0%, but as discussed above, Table B from the '673 patent disclosed achieving 0.2% chenodeoxycholic acid, but not any lower.

It is well established that compliance with the enablement requirement does not turn on whether examples are disclosed in an application. Indeed, a specification need not include examples *if* the invention is otherwise disclosed in an enabling manner. MPEP § 2164.02.[5] However, the lack of a working example in a specification is a factor to be considered in evaluating whether the specification is enabling–especially in an unpredictable art. *Id.* In this regard, most chemical cases involve unpredictable factors. MPEP § 2164.03 (*citing In re Fisher*, 427 F.2d 833 (C.C.P.A. 1970)).

The '673 patent provides no actual working examples where obeticholic acid is obtained in the full range of the recited purity. The specification merely lists potential purity ranges.

[5] While the MPEP does not have the force of law, it is entitled to notice so far as it is an official interpretation of statutes and regulations with which it is not in conflict. *Refac Int'l Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1584 (Fed. Cir. 1996). *See also Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 296 F.3d 1316, 1324 (Fed. Cir. 2002)

Accordingly, the description provided in the ’673 patent appears to be nothing more than a general disclosure that would lead one to plausibly test all available options. However, “‘[i]f mere plausibility were the test for enablement under §112, applicants could obtain patent rights to “inventions” consisting of little more than respectable guesses as to the likelihood of their success. When one of the guesses later proved true, the “inventor” would be rewarded the spoils instead of the party who demonstrated that the method actually worked.’” *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1325 (Fed. Cir. 2005). Thus, the ’673 patent does not teach a person of ordinary skill in the art how to achieve the entire range for the recited purity of obeticholic acid.

* * * *

In light of the above discussion of the *Wands* factors, it is clear that claim 1 is not enabled and therefore invalid. Claims 2-23 all require the obeticholic acid composition to comprise the same or a lower amount of chenodeoxycholic acid. Therefore, claims 2-23 are not enabled for the same reasons as discussed above for claim 1.

**I.**





## VII. INVALIDITY OF THE ASSERTED CLAIMS OF THE ’073 PATENT

The asserted claims of the ’073 patent are invalid as described more fully below and as identified in attached Appendix C, which is incorporated by reference in addition to the information discussed in this document.

### A. Claims 1-29 and 36-61 of the ’073 patent are anticipated by Ferrari ’977 and/or Ferrari ’352

Claims 1-29 and 36-61 of the ’073 patent are product-by-process claims. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1315 (Fed. Cir. 2006) (explaining that a product-by-process claim is “one in which the product is defined at least in part in terms of the method or process by which it is made”) (quotation omitted). When “determining the validity of a product-by-process claim, the focus is on the product and not the process of making it.’” *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012) (quoting *Amgen Inc. v. Hoffmann-La Roche, Ltd.*, 580 F.3d 1340, 1369 (Fed. Cir. 2009)); *see also SmithKline*, 439 F.3d at 1317. Thus, “if the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process.” *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985). Put simply, “an old product is not patentable even if it is made by a new process.” *Greenliant*, 692 F.3d at 1268; *see also SmithKline*, 439 F.3d at 1317.

For the reasons explained below, Ferrari '977 and/or Ferrari '352[6] expressly or inherently disclose each limitation of claims 1–29 and 36–61.

### 1. Independent claims 1, 27, 36, and 41 are anticipated.

Ferrari '977 anticipates independent claims 1, 27, 36, and 41, which are recited below:

1. A pharmaceutical composition comprising non-crystalline obeticholic acid (OCA) comprising less than 1% by weight of chenodeoxycholic acid (CDCA), wherein the non- crystalline OCA is prepared by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent.

27. A pharmaceutical composition comprising non-crystalline obeticholic acid (OCA) and not more than 1% by weight of chenodeoxycholic acid (CDCA), wherein the OCA is prepared by a process comprising at least one step of crystallizing crude OCA using an organic solvent selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate.

36. A pharmaceutical composition comprising non-crystalline obeticholic acid (OCA), wherein the OCA is prepared by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent, and wherein the OCA comprises a total of less than 2% by weight of one or more impurities selected from 6-ethylursodeoxycholic acid, $3\alpha$-hydroxy-$6\alpha$-ethyl-7-cheto-$5\beta$-cholan-24-oic acid, $6\beta$-ethylchenodeoxycholic acid, $3\alpha,7\alpha$-dihydroxy-6-ethyliden-$5\beta$-cholan-24-oic acid, chenodeoxycholic acid (CDCA), and 3a ($3\alpha,7\alpha$-dihydroxy-$6\alpha$-ethyl-$5\beta$-cholan-24-oyloxy)-$7\alpha$-hydroxy-$6\alpha$-ethyl- $5\beta$-cholan-24-oic acid.

41. A pharmaceutical composition comprising non-crystalline obeticholic acid (OCA) wherein the non-crystalline OCA is prepared by a process comprising a step of crystallizing crude OCA using at least one organic solvent, and wherein the OCA comprises a total of less than 2% by weight of one or more impurities selected from $6\beta$-ethylursodeoxycholic acid, $3\alpha$-hydroxy-$6\alpha$-ethyl-7-cheto-$5\beta$-cholan-24-oic acid, $6\beta$-ethylchenodeoxycholic acid, $3\alpha,7\alpha$-dihydroxy-6-ethyliden-$5\beta$-cholan-24-oic acid, chenodeoxycholic acid (CDCA), and $3\alpha$($3\alpha,7\alpha$-dihydroxy-$6\alpha$-ethyl-$5\beta$-cholan-24-oyloxy)-$7\alpha$-hydroxy-$6\alpha$-ethyl- $5\beta$-cholan-24-oic acid.

As discussed above in Section VI.A, which is incorporated by reference, Ferrari '977 discloses pharmaceutical compositions comprising obeticholic acid, and on information and belief, the process disclosed by Ferrari '977 would naturally result in a non-crystalline Form 1

---

[6] Ferrari '352 claims priority to Ferrari '977 and contains all of the same disclosures. For simplicity, all citations herein are to Ferrari '977.

160

obeticholic acid comprising less than 1% by weight of CDCA. Accordingly, the product resulting from preparing the compositions claimed by claims 1 and 27 is taught by Ferrari '977. *See, e.g.*, *Greenliant*, 692 F.3d at 1268. Ferrari '977 thus anticipates independent claims 1 and 27.

On information and belief, the process disclosed by Ferrari '977 would also naturally result in a non-crystalline Form 1 obeticholic acid comprising less than 2% by weight of the impurities recited by independent claims 36 and 41. Table B of the '073 patent reports the presence of six impurities: 6β-ethylursodeoxycholic acid, 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid, 6β-ethylchenodeoxycholic acid, 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid, chenodeoxycholic acid (CDCA), and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α- hydroxy-6α-ethyl-5β-cholan-24-oic acid. '073 patent at 27:5-24. Table B reports that these six impurities are collectively present at a concentration of less than 1.3%. *See id.* Ferrari '977 thus anticipates independent claims 36 and 41.

**2. <u>Dependent claims 2–26, 28, 29, 37–40, and 42–61 are anticipated.</u>**

Dependent claims 2–5, 28, 37, 38, 42, and 43 further limit the process for preparing the claimed compositions, and accordingly are irrelevant for purposes of invalidity. *See, e.g.*, *Greenliant*, 692 F.3d at 1268. Ferrari '977 thus anticipates claims 2–5, 28, 37, 38, 42, and 43.

Dependent claims 6–26, 29, 39–40, 44–61 further limit the amount of the impurities in obeticholic acid. As discussed below, these claims are also anticipated by Ferrari '977.

Claims 6–9 and 46–49 limit the amount of the impurities 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid from "a total of not more than 0.15%" to "a total of less than" 0.05% to 0.07%. As discussed above in Section VI.A, the process disclosed by Ferrari '977 would naturally result in highly-purified Form 1 obeticholic acid. Table B of the

’073 patent further supports that the Ferrari ’977 obeticholic acid would comprise a total of less than 0.05% of the impurities 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid, reporting that the two impurities are present “<0.05%.” ’073 patent at 27:5-24. Ferrari ’977 thus anticipates claims 6–9 and 46–49.

Claims 10–13 and 50–53 limit the amount of the impurity 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid from “not more than 0.15%” to “less than” 0.05% to 0.07%. As discussed above in Section VI.A, on information and belief, the process disclosed by Ferrari ’977 would naturally result in obeticholic acid comprising less than 0.05% of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. Ferrari ’977 thus anticipates claims 10–13 and 50–53.

Claims 14–17 and 54–57 and limit the amount of the impurity 6β-ethylchenodeoxycholic acid from “not more than 0.15%” to “less than” 0.05% to 0.07%. As discussed above in Section VI.A, on information and belief, the process disclosed by Ferrari ’977 would naturally result in obeticholic acid comprising less than 0.05% of 6β-ethylchenodeoxycholic acid. Ferrari ’977 thus anticipates claims 14–17 and 54–57.

Claims 18–21, 29, 39, 40, 44, and 45 limit the amount of the impurity CDCA to “less than about” 0.2% to 1% or “from 0.01% by weight to less than 1%” by weight. As discussed above in Section VI.A, on information and belief, the process disclosed by Ferrari ’977 would naturally result in obeticholic acid comprising less than 0.2% of CDCA. Ferrari ’977 thus anticipates claims 18–21, 29, 39, 40, 44, and 45.

Claims 22–25 and 54–57 limit the amount of the impurity 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid from “not more than 0.15%” to “less than” 0.05% to 0.07%. As discussed above in Section VI.A, on information and belief, the process disclosed by Ferrari ’977 would naturally result in obeticholic acid comprising less

than 0.05% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. Ferrari ’977 thus anticipates claims 22–25 and 58–61.

Claim 26 limits the amount of water to “less than about 3% by weight.” Table B of the ’073 patent supports that the Ferrari ’977 obeticholic acid would comprise less than about 3% of water, reporting that water is present at “<2.1%.” ’073 patent at 27:5-24. Ferrari ’977 thus anticipates claim 26.

### B. Claims 1-29 and 36-61 of the ’073 patent are anticipated by Yu ’526 and/or Yu ’628

As explained above in Section VII.A, claims 1-29 and 36-61 of the ’073 patent are product- by-process claims, and validity of these claims focuses on the product and not the process of making it. *See, e.g.*, *SmithKline*, 439 F.3d at 1315; *Greenliant*, 692 F.3d at 1268.

As discussed above in Section VI.B, which is incorporated by reference, Yu ’526 discloses pharmaceutical compositions comprising obeticholic acid, and on information and belief, the process disclosed by Yu ’526 would naturally result in highly-purified Form 1 obeticholic acid. For the same reasons discussed above with respect to the ’673 patent, on information and belief, the process disclosed by Yu ’526 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1-29 and 36-61 of the ’073 patent.

Claims 1-29 and 36-61 of the ’073 patent are thus anticipated by Yu ’526.

### C. Claims 1-29 and 36-61 of the ’073 patent are anticipated by Pellicciari ’390

As explained above in Section VII.A, claims 1-29 and 36-61 of the ’073 patent are product- by-process claims, and validity of these claims focuses on the product and not the process of making it. *See, e.g.*, *SmithKline*, 439 F.3d at 1315; *Greenliant*, 692 F.3d at 1268.

As discussed above in Section VI.C, which is incorporated by reference, Pellicciari ’390 discloses pharmaceutical compositions comprising obeticholic acid, and on information and

belief, the process disclosed by Pellicciari '390 would naturally result in highly-purified Form 1 obeticholic acid.    For the same reasons discussed above with respect to the '673 patent, on information and belief, the process disclosed by Pellicciari '390 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1-29 and 36-61 of the '073 patent.

Claims 1-29 and 36-61 of the '073 patent are thus anticipated by Pellicciari '390.

**D.    Claims 1-29 and 36-61 of the '073 patent are rendered obvious by Ferrari '977 and/or Ferrari '352 in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

As discussed above in Section VII.A, which is incorporated by reference, Ferrari '977 and/or Ferrari '352 expressly or inherently disclose each limitation of claims 1–29 and 36–61 of the '073 patent. In particular, on information and belief, the process disclosed by Ferrari '977 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1–29 and 36–61 of the '073 patent. To the extent the obeticholic acid resulting from the Ferrari '977 process differs from the claimed obeticholic acid, claims 1–29 and 36–61 would have been obvious as well.

For the same reasons discussed *supra* with respect to the '673 patent, a POSA would have been motivated, with a reasonable expectation of success, to yield Form 1 obeticholic acid and to increase the purity of obeticholic acid. *See* Sections VI.D.1-4. Doing so would naturally result in obeticholic acid products having the claimed purity profile, rendering the purity profiles inherently obvious. Claims 1–29 and 36–61 thus would have been obvious.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims.  *See* Section VII.G.

**E.    Claims 1-29 and 36-61 of the '073 patent are rendered obvious by Yu '526 and/or Yu '628 in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

As discussed above in Section VII.B, which is incorporated by reference, Yu '526 and/or

Yu ’628 expressly or inherently disclose each limitation of claims 1–29 and 36–61 of the ’073 patent. In particular, on information and belief, the process disclosed by Yu ’526 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1–29 and 36–61 of the ’073 patent. To the extent the obeticholic acid resulting from the Yu ’526 process differs from the claimed obeticholic acid, the products and processes of claims 1–29 and 36–61 would have been obvious, rendering the claimed purity profiles inherently obvious as well.

For the same reasons discussed *supra* with respect to Ferrari ’977 and the ’673 patent, a POSA would have been motivated, with a reasonable expectation of success, to yield Form 1 obeticholic acid and to increase the purity of obeticholic acid. *See* Sections VI.D.1-4. Doing so would naturally result in obeticholic acid having the claimed purity profile. Claims 1–29 and 36–61 thus would have been obvious.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section VII.G.

**F. Claims 1-29 and 36-61 of the ’073 patent are rendered obvious by Pellicciari ’390 in view of a POSA’s knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

As discussed above in Section VII.C, which is incorporated by reference, Pellicciari ’390 expressly or inherently disclose each limitation of claims 1–29 and 36–61 of the ’073 patent. In particular, on information and belief, the process disclosed by Pellicciari ’390 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 1–29 and 36–61 of the ’073 patent. To the extent the obeticholic acid resulting from the Pellicciari ’390 process differs from the claimed obeticholic acid, the products and processes of claims 1–29 and 36–61 would have been obvious, rendering the claimed purity profiles inherently obvious as well.

For the same reasons discussed *supra* with respect to Ferrari ’977 and the ’673 patent, a

POSA would have been motivated, with a reasonable expectation of success, to yield Form 1 obeticholic acid and to increase the purity of obeticholic acid. *See* Sections VI.D.1-4. Doing so would naturally result in obeticholic acid having the claimed purity profile. Claims 1–29 and 36–61 thus would have been obvious.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section VII.G.

### G. Any secondary considerations are inadequate to overcome the prima facie obviousness of the claims

Defendants contend that there are no secondary considerations regarding the asserted claims of the ’073 patent that are relevant in assessing obviousness. That said, Defendants note that secondary considerations are not part of the *prima facie* case of obviousness. Rather, a patentee may try and rebut a *prima facie* case of obviousness by coming forward with purported evidence of such secondary considerations. *Bayer Pharma AG v. Watson Labs., Inc.*, 183 F. Supp. 3d 579, 589 (D. Del. 2016). Defendants therefore have no burden at this stage to come forward with evidence rebutting such considerations. Quite the contrary, it is Plaintiffs’ obligation and burden alone to come forward with evidence of so-called secondary considerations, if any, on which they intend to rely.

Plaintiffs to date have raised no substantive or plausible secondary considerations in connection with the ’073 patent. For example, in response to Joint Interrogatory No. 4, Plaintiffs simply say that they “intend to rely on all applicable objective indicia of nonobviousness, including skepticism by experts and others in the field, teaching away, failure of others, long-felt but unmet need, unexpected results, praise in the field, copying and commercial success,” and do not attempt to tie any particular secondary consideration to any claim or patent, and thus have failed to show nexus. Regardless, Plaintiffs do not even provide any suggestion of what their

theories might be with regard to most of these secondary considerations.

Plaintiffs discuss only three examples of secondary considerations in a generic manner, again untied to any particular claim or patent, each of which cannot overcome the clear showing of obviousness here. They are discussed below. First, Plaintiffs allege copying is evidence of non-obviousness. However, courts have repeatedly held that any alleged copying has little relevance to obviousness in Hatch-Waxman cases such as this one where ANDA filers are required to establish bioequivalence to the reference drug product. *See, e.g.*, *Purdue Pharma Products L.P. v. Par Pharmaceutical, Inc.*, 642 F.Supp.2d 329, 373-74 (D. Del. 2009). Any similarities Plaintiffs allege exist would be due to efficiency of pursuing FDA approval and not any technical merit of the patent or its claims.

Second, Plaintiffs allege long-felt but unmet need in PBC patients under-responsive to UDCA at increased risk of progressing to end-stage liver disease. Again, Plaintiffs have failed to tie this alleged need to any claim or patent in any way, or provide any facts explaining how this alleged need was met. For example, there was significant prior art disclosing formulations of obeticholic acid, and Plaintiffs provide no meaningful allegation of why or even how its claimed formulations differ from the prior art. To the extent Plaintiffs' alleged need is limited to the commercial availability of products, that only speaks to the motivation to proceed with such a formulation and has no relevance to the technical merits of the patents.

Third, Plaintiffs allege two statements made by Drs. Pellicciari and Rewolinski to the USPTO indicate evidence of unexpected results. These self-serving statements again are untied to any patent or claim. For example, Dr. Pellicciari's statement regarding potency of the compound in comparison to other compounds has no relevance to the formulations claimed in this patent. Additionally, Dr. Rewolinski's statement that Plaintiffs raise is in direct contradiction to the clear evidence of the prior art, in addition to evidence that was available to Dr. Rewolinski at the time, and cannot overcome obviousness for the same reasons described above. *See, e.g.*, *supra* at VI.G.

Defendants reserve the right to further rebut any claims of secondary considerations of non-obviousness raised by Plaintiffs, if any, as discovery proceeds in this case.

**H. Invalidity of the '073 patent Under 35 U.S.C. § 112**

**1. <u>Claims 1-29 and 36-61 of the '073 patent are indefinite</u>**

Claims 1-29 and 36-61 of the '073 patent are invalid for indefiniteness.

First, claims 1-29 and 36-61 of the '073 patent require that the claimed non-crystalline obeticholic acid comprise less than, or not more than, a specified percentage of one or more impurities. *See* '073 patent at claims 1-29 and 36-61. However, the specification fails to inform a POSA how to measure the claimed impurity levels. Instead, the '073 patent states that "[t]he amounts of the impurities can be determined by procedures known in the art, e.g., HPLC, NMR, or methods from US Pharmacopeial, or European Pharmacopeia, or a combination of two or more of these methods." *Id.* at 40:10-13. Likewise, Table B of the '073 patent reports the impurity levels of obeticholic acid upon following the process disclosed in the '073 patent and the Ferrari

’977 process, but merely states that the impurities were “determined using HPLC methods.” *Id.* at 26:65-27:24. Table B of the ’073 patent thus fails to disclose what protocols (e.g., HPLC solvents, detector wavelength, flow rates, column, etc.) should be used when evaluating the impurity profile of obeticholic acid.

A POSA would understand that employing different procedures known in the art to measure impurities can result in different numerical results for the same sample. For example, a POSA would understand that there is a margin of error with any HPLC methodology, and that employing different HPLC methodologies can result in the detection of different amounts of impurities. *See, e.g.*, Görög at 934 (estimating that there is approximately a 0.5–1.0% margin of error for HPLC assay methods). A POSA would thus understand that a given batch of obeticholic acid having a certain purity as measured by one conventional methodology could have a different purity level as measured by a second conventional methodology.

Given the absence of any disclosure in the ’073 patent regarding how to measure the purity of obeticholic acid or what procedures to use, a POSA would be unable to reasonably ascertain whether a batch of obeticholic acid satisfied the recited impurity limitations. *See, e.g.*, *Interval Licensing*, 766 F.3d at 1371 (finding the claim term “unobtrusive manner” “highly subjective” and indefinite because nothing in the specification or prosecution history provided an objective standard for measuring the scope of that phrase); *see also Teva Pharms.*, 789 F.3d at 1344-45 (holding claim invalid for indefiniteness of the phrases “molecular weight” and “average molecular weight” because there was no reasonable certainty as to how molecular weight was to be measured in light of the specification and prosecution history).

Second, claims 1-29 and 36-61 of the ’073 patent require a “step of crystallizing crude OCA using at least one organic solvent.” *See* ’073 patent at claims 1-29 and 36-61. To the extent

Plaintiffs argue that the "step of crystallizing crude OCA" does not require the formation of crystalline obeticholic acid as a synthetic intermediate, a POSA would be unable to reasonably ascertain whether this process step was performed. *Compare, e.g.*, *id.* at 6:6-34 ("The presentation application is directed to . . . a process for the preparation of obeticholic acid comprising crystalline obeticholic acid as a synthetic intermediate."); *id.* at 20:61-67 ("The process of the present application utilizes a crystalline intermediate in the preparation of obeticholic acid Form 1, which unexpectedly led to significant improvements in the overall preparation and purity of the final product.").

Relatedly, claims 1-29 and 36-61 of the '073 patent are indefinite because a POSA would be unable to reasonably ascertain the scope of "organic solvent." While the '073 patent purports that the production of a "novel crystalline form of obeticholic acid . . . leads to substantially pure obeticholic acid Form 1," *id.*, the '073 patent fails to disclose the range, if any, of organic solvents that produce this crystalline form of obeticholic acid. Instead, the '073 patent merely provides limited examples of preparing this purportedly novel form of obeticholic acid in the specified solvents.[7] *See, e.g.*, *id.* at 20:1-35; *id.* at 53:45-44. A POSA thus would not know with reasonable certainty whether or not a given solvent would qualify as an "organic solvent" capable of "crystallizing crude OCA."

Claims 1-29 and 36-61 of the '073 patent are thus invalid for indefiniteness.

**2. <u>Claims 1-29 and 36-61 of the '073 patent are not enabled and/or fail the written description requirement.</u>**

To the extent the claims of the '073 patent would not have been obvious, the claims are invalid as not enabled and/or as failing the written description requirement. As with the '673

[7] For substantially the same reasons, Defendants reserve the right to argue that claims 1-29 and 36-61 of the '073 patent are invalid for lack of written description and enablement.

patent, the specification and prosecution of the ’073 patent stress the importance of utilizing an intermediate crystallization step in obtaining the claim product, and in fact the ’073 patent claims include such as step in the claims. If a POSA could not have reasonably expected to obtain the subject matter of the ’073 patent, then the claims are not enabled. The specification only teaches the use of an intermediate crystallization step to obtain the subject matter of the claims, and if the claims are not obvious a POSA would need undue experimentation to achieve the full scope of the claims. In addition, the applicant was not in possession of the claimed composition that is obtained using any process other than an intermediate crystallization step. Therefore, the claims would be invalid for failure to satisfy the written description requirement.

Additionally, to comply with the enablement requirement of 35 U.S.C. § 112(a), a patent specification must enable one of ordinary skill in the art to make and use the full scope of the claimed invention without undue experimentation. *See CFMT, Inc.*, 349 F.3d at 1338. The enablement requirement ensures that, in order to obtain exclusionary rights, the patentee communicates his invention to the public in a meaningful and useful way. *Id*. The allegedly novel aspects of the invention must be disclosed and not left to inference. *Crown Operations Intl, Ltd.*, 289 F.3d at 1367. Enablement is also determined as of the effective filing date. *Plant Genetic Sys., NV.*, 315 F.3d at 1339. The Federal Circuit outlined the following factors to determine whether the requisite amount of experimentation is undue: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability of the art, and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). While the analysis and conclusion of a lack of enablement are based on the factors discussed above and the evidence as a whole, it is not

necessary to discuss each factor in the enablement rejection. *See* MPEP § 2164.04, citing *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

Claims 1-29 and 36-61 are not enabled. Relevant *Wands* factors are presented below:

**a) <u>The Quantity of Experimentation Necessary</u>**

According to the ’073 specification, "[t]he percentages of impurities were determined using HPLC methods." ’073 patent at 27:2-3; *see also id.* 9:38-39, 52-53; Example 2; 56:9-11 ("isolation of the fraction of the E/Z isomer peaks with the HPLC method 2"). Yet, as explained by named inventor Dr. Melissa Rewolinski during prosecution of the parent ’673 patent:

> I also assert that obeticholic acid and [chenodeoxycholic acid] differ only in the 6-ethyl group present in obeticholic acid, and accordingly obeticholic acid and [chenodeoxycholic acid] are similar in many of their physicochemical properties . . . [and] ***due to the similarities in their physiochemical properties, it would be impractical to separate obeticholic acid and [chenodeoxycholic acid] by using a chromatographic purification method such as HPLC*** to achieve highly pure obeticholic acid comprising less than 1% of [chenodeoxycholic acid].

*See* 06-08-2015 Rewolinski Declaration at 2 (emphasis added); *see also* 06-08-2015 Response at 8 ("it would be impractical to separate CDCA and obeticholic acid using column chromatography due to the similarities in their physicochemical properties.").

A specification lacks enablement if it fails to teach one of skill in the art "how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1370 (Fed. Cir. 2013). Here, claims 1-29 and 36-61 all require "less than 1% of chenodeoxycholic acid," or another impurity where the impurity range is always specified using "less than" or "not more than," which encompasses levels as low as 0%. However, Table B disclosed achieving 0.2% chenodeoxycholic acid, but not any lower. In light of the inventor's statements during prosecution, it would require extensive experimentation for a

POSA to practice the full scope of the claims. *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012) (claims to a semiconductor device that could change in resistance by "at least 10%" were not enabled, even though the specification enabled a device that changed resistance by 11.8%, because the specification did not enable devices that changed resistance by 100% or 1000% percent); *see also In re Fisher*, 427 F.2d 833, 839 (C.C.P.A. 1970) ("In cases involving unpredictable factors, such as most chemical reactions . . ., the scope of enablement obviously varies inversely with the degree of unpredictability of the factors involved.").

In other words, according to Dr. Rewolinski and the patentee, a POSA cannot use HPLC to separate obeticholic acid and [chenodeoxycholic acid] due to similarities in their physiochemical properties. *Id.* As such, a person of ordinary skill in the art must undertake a high level of experimentation to practice the full scope of the claim.

**b) <u>The Existence of Working Examples</u>**

With respect to working examples, independent claim 1 recites "less than 1% of chenodeoxycholic acid." This encompasses levels as low as 0%, but as discussed above, Table B from the '073 patent disclosed achieving 0.2% chenodeoxycholic acid, but not any lower. Independent Claims 27, 36, and 41 cite similar purity profiles using the "less than" or "not more than" terminology.

It is well established that compliance with the enablement requirement does not turn on whether examples are disclosed in an application. Indeed, a specification need not include examples *if* the invention is otherwise disclosed in an enabling manner. MPEP § 2164.02.[8]

[8] While the MPEP does not have the force of law, it is entitled to notice so far as it is an official interpretation of statutes and regulations with which it is not in conflict. *Refac Int'l Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1584 (Fed. Cir. 1996). *See also Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 296 F.3d 1316, 1324 (Fed. Cir. 2002).

However, the lack of a working example in a specification is a factor to be considered in evaluating whether the specification is enabling–especially in an unpredictable art. *Id.* In this regard, most chemical cases involve unpredictable factors. MPEP § 2164.03 (*citing In re Fisher*, 427 F.2d 833 (C.C.P.A. 1970)).

The '073 patent provides no actual working examples where obeticholic acid is obtained in the full range of the recited purity. The specification merely lists potential purity ranges.

Accordingly, the description provided in the '073 patent appears to be nothing more than a general disclosure that would lead one to plausibly test all available options. However, "'[i]f mere plausibility were the test for enablement under §112, applicants could obtain patent rights to "inventions" consisting of little more than respectable guesses as to the likelihood of their success. When one of the guesses later proved true, the "inventor" would be rewarded the spoils instead of the party who demonstrated that the method actually worked.'" *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1325 (Fed. Cir. 2005). Thus, the '073 patent does not teach a person of ordinary skill in the art how to achieve the entire range for the recited purity of obeticholic acid.

* * * *

In light of the above discussion of the *Wands* factors, it is clear that independent claims 1, 27, 36, and 41 are not enabled and therefore invalid. The dependent claims therefrom all require the obeticholic acid composition to comprise the same or a lower amount of chenodeoxycholic acid. Therefore, the dependent claims are not enabled for the same reasons as discussed above. Accordingly, claims 1-29 and 36-61 are not enabled and therefore invalid.

**I.** [REDACTED]



## VIII. INVALIDITY OF THE ASSERTED CLAIMS OF THE ’117 PATENT

The asserted claims of the ’117 patent are invalid as described more fully below and as identified in attached Appendix D, which is incorporated by reference in addition to the information discussed in this document.

### A. Claims 1–4, 6, and 8–13 of the ’117 patent are anticipated by Pellicciari ’390.

Pellicciari ’390 anticipates claims 1–4, 6, and 8–13. Independent claim 1 is recited below:

> 1. A method of treating an FXR mediated disease or condition in a subject comprising administering to the subject a pharmaceutical formulation comprising an effective amount of a substantially pure solid form of obeticholic acid, wherein the solid form of obeticholic acid comprises less than 1% of chenodeoxycholic acid, and wherein the formulation comprises about 1 mg to about 30 mg of obeticholic acid.

As discussed above in Section VI.C, which is incorporated by reference, Pellicciari ’390 discloses pharmaceutical compositions comprising obeticholic acid, and on information and

belief, the process disclosed by Pellicciari ’390 would naturally result in obeticholic acid comprising less than 1% of CDCA.

Pellicciari ’390 also teaches treating FXR-mediated diseases with obeticholic acid at a dosage range from about 1 mg to 30 mg. Pellicciari ’390 teaches that the disclosed compounds are “useful as FXR agonists” and that “a typical daily dose for the treatment of FXR mediated diseases and conditions, for instance, may be expected to lie in the range of from about 0.01 mg/kg to about 100 mg/kg.” Pellicciari ’390 at Abstract, 5:29-32; *see also id.* at 9:30-10:48 (disclosing obeticholic acid). This corresponds to a range of 0.62 mg to 6200 mg based on the average weight of an adult human (62 kg), which falls within the claimed range. *See, e.g.*, *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999) (“[W]hen a patent claims a chemical composition in terms of ranges of elements, any single prior art reference that falls within each of the ranges anticipates the claim.”). Pellicciari ’390 thus anticipates independent claim 1.

Claim 2 depends from claim 1 and further limits the FXR-mediated disease, claim 3 depends from claim 1 and limits the FXR-mediated disease to cholestatic liver disease, claim 4 depends from claim 1 and limits the FXR-mediated disease to chronic liver disease, and claim 6 depends from claim 1 and limits the FXR-mediated disease to primary biliary cirrhosis. Pellicciari ’390 teaches that obeticholic acid can be used in “for the treatment of a number of cholestatic liver disease[s] and other lipid related diseases and conditions.” *Id.* at 5:3-6; *see also, e.g.*, *id.* at 2:42- 67. Pellicciari ’390 thus anticipates claims 2-4 and 6.

Claim 8 depends from claim 1 and limits the obeticholic acid to Form 1, and claim 13 depends from claim 8 and recites the glass transition temperature of Form 1 as 102 to 112º C. As discussed above in Section VI.C, on information and belief, the process disclosed by Pellicciari

’390 would naturally result in highly-purified Form 1 obeticholic acid. The glass transition temperature of Form 1 is merely an inherent property of the obeticholic acid that would naturally result from the prior art. Pellicciari ’390 thus anticipates claims 8 and 13.

Claims 9–12 further limit the amount of the impurities in obeticholic acid. For the same reasons discussed above with respect to the ’673 patent, on information and belief, the process disclosed by Pellicciari ’390 would naturally result in Form 1 obeticholic acid having the purity profile recited by claims 9–12 of the ’117 patent. *See* Section VI.C. Pellicciari ’390 thus anticipates claims 9–12.

### B. Claims 1-13 of the ’117 patent are rendered obvious by Ferrari ’977 and/or Ferrari ’352 in view of a POSA’s knowledge in the art and in combination with one or more of the prior art references cited herein.

#### 1. <u>The claimed purity profile for Form 1 obeticholic acid would naturally result from the Ferrari ’977 process, or at a minimum, would have been obvious.</u>

As discussed above in Section VI.A, which is incorporated by reference, on information and belief, the process disclosed by Ferrari ’977 would naturally result in a highly-purified form of Form 1 obeticholic acid. *See* ’117 patent at claims 1, 8, and 13. For the same reasons discussed above, on information and belief, the process disclosed by Ferrari ’977 would naturally result in obeticholic acid having the purity profile recited by claims 1 and 9–12. *See* Section VI.A; *see also* ’117 patent at claims 1 and 9–12. Moreover, the products and processes of claims 1-13 would have been obvious in view of Ferarri ’977, rendering the claimed purity profiles inherently obvious as well.

At a minimum, for the reasons discussed above in Sections VI.D.1-4, which is incorporated by reference, a POSA would have been motivated, with a reasonable expectation of success, to increase the purity of obeticholic acid. Doing so would naturally result in obeticholic acid having the claimed purity profile.

**2. <u>The prior art taught treating the claimed FXR-mediated diseases at a dosage range between about 1 mg to about 30 mg of obeticholic acid.</u>**

As discussed above in Section VI.A, Ferrari '977 discloses pharmaceutical compositions comprising obeticholic acid. Well before the alleged priority date, it was also known that obeticholic acid was useful in treating FXR-mediated diseases, included those recited by the '117 patent claims.

For example, Pellicciari 2002 teaches that obeticholic acid was developed to treat "a variety of human liver diseases such as primary biliary cirrhosis, primary sclerosing cholangitis, cystic fibrosis, and intrahepatic cholestasis of pregnancy" in light of the "role of FXR in [bile acid] biosynthesis and transport from the liver." Pellicciari 2002 at 3570. Pellicciari '390 likewise teaches that obeticholic acid can be used "for the treatment of a number of cholestatic liver disease and other lipid related diseases and conditions." Pellicciari '390 at 5:3-6; *see also, e.g.*, *id.* at 2:61- 67; *see also* Ferrari '977 at 2:1-6 (discussing obeticholic acid's use "for the prevention and treatment of hepatic diseases of cholestatic origin"); Yu '526 at [0003] (teaching that obeticholic acid "may be used in treating atherosclerosis, diabetes and cholestatic disease"); WO '391 at [0028], [0081]-[0097] (disclosing using obeticholic acid to treat nonalcoholic fatty liver disease (NAFLD) and nonalcoholic steatohepatitis (NASH)). Porez 2012 likewise taught that FXR receptors can be targeted for the treatment of cardiovascular diseases. Porez 2012 at Abstract, 1723-24.

Obeticholic acid was further studied in multiple clinical trials for FXR-mediated conditions, including nonalcoholic steatohepatitis (NASH) and primary biliary cirrhosis. *See* NASH-FLINT; PBC Study; Mason. PBC Study also analyzed the effects of obeticholic acid on "1) hepatocellular injury and liver function, 2) disease-specific and general health symptoms and 3) biomarkers of hepatic inflammation and fibrosis." PBC Study. Mason, which is an abstract for

an oral presentation regarding a clinical trial of 6-ethyl chenodeoxycholic acid (i.e., obeticholic acid or INT-747), likewise disclosed obeticholic acid as a ligand for the farnesoid-X receptor (FXR) and its use in as an FXR agonist in treating disease. *See* Mason at S1. The study was a double blind, placebo controlled, dose response study to evaluate the effects of INT-747 on alkaline phosphatase, other liver enzymes, and safety in patients with primary biliary cirrhosis (PBC) while on ursodeoxycholic acid. *See id*. Mason concludes that "INT-747 is the first rationally developed drug for cholestatic liver disease;this study clearly shows it has efficacy in PBC and merits further evaluation." *Id*.   Intercept Press Release also discloses that   obeticholic acid met a primary endpoint in a clinical study of diabetic patients with non-alcoholic fatty liver disease.  Intercept Press Release at 1; *see also* BioSpace.

Formulations of obeticholic acid between about 1 mg to about 30 mg for treating FXR-mediated diseases were also taught or suggested by the prior art. For example, Pellicciari '390 teaches the role of obeticholic acid in FXR-mediated diseases, and teaches "a typical daily dose for the treatment of FXR mediated diseases and conditions, for instance, may be expected to lie in the range of from about 0.01 mg/kg to about 100 mg/kg." Pellicciari '390 at 5:29-32; *see also id.* at 9:30-10:48 (disclosing obeticholic acid); *see also, e.g.*, *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) ("In cases involving overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a *prima facie* case of obviousness."); *see also In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (not inventive to discover the optimum or workable ranges of a result-effective variable through routine experimentation); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368 (Fed.Cir. 2007) ("[D]iscovery of an optimum value of a variable in a known process is usually obvious."). NASH-FLINT studied the effect of 25 mg of obeticholic acid administered to subjects with evidence of

nonalcoholic steatohepatitis (NASH). *See* NASH-FLINT. And PBC Study analyzed the efficacy of 10 mg, 25 mg, or 50 mg of obeticholic acid in combination with UDCA to treat primary biliary cirrhosis. *See* PBC Study. In Mason, the dosing regimen was INT-747 (10 mg/25 mg/50 mg) once daily for 12 weeks. *See* Mason at S1. The '558 patent also taught pharmaceutical compositions of bile acid derivatives that are administered in various dosage forms in doses ranging from 3 mg to 5000 mg, depending on the weight of the patient. '558 patent at 12:3-8; *see also* Chenodiol Label at 1, 7.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section VIII.E.

**C. Claims 1-13 of the '117 patent are rendered obvious by Pellicciari '390 in view of a POSA's knowledge in the art and in combination with one or more of the prior art references cited herein.**

As discussed above in Section VI.C, which is incorporated by reference, on information and belief, the process disclosed by Pellicciari '390 would naturally result in a highly-purified form of Form 1 obeticholic acid. *See* '117 patent at claims 1, 8, and 13. For the same reasons discussed above, on information and belief, the process disclosed by Pellicciari '390 would naturally result in obeticholic acid having the purity profile recited by claims 1 and 9–12. *See* Section VI.C. For the same reasons discussed *supra* with respect to Ferrari '977 and the '673 patent, a POSA also would have been motivated, with a reasonable expectation of success, to increase the purity of obeticholic acid. *See* Section VI.D.1-4. Doing so would naturally result in obeticholic acid having the claimed purity profile. Because the products and processes of claims 1-13 would have been obvious, the claimed purity profiles in claims 1 and 9-12 are inherently obvious as well.

As discussed above in Section VIII.B.2, which is incorporated by reference, the prior art

taught treating the claimed FXR-mediated disases at a dosage range between about 1 mg to about 30 mg of obeticholic acid.

With respect to claims 4-7, the prior art taught the treatment of the specifically claimed FXR-mediated diseases as well. For example, Fiorucci is directed to methods for inhibition of fibrosis mediated by FXR. *See* Fiorucci at Abstract. This method involves administering a high potency, activating ligand of FXR. *See id*. Fiorucci disclosed that the compound to be used "is not chenodeoxyxholic [sic] acid (CDCA) or ursodeoxycholic acid (UDCA)." *Id*. at ¶ [0011]. However, the FXR ligand may be "6EDCA, tauro-6-ECDCA, 6EUDCA, GW4064, 6α-MeCDCA, 6α- PrCDCA, fexaramine, or guggulsterone." *Id*. at ¶ [0014]. The use of one of these compounds for potentially treating a number of diseases is disclosed, including the treatment of liver fibrosis, nonalcoholic steatohepatitis (NASH), and chronic liver disease. *Id*. at ¶¶ [0013], [0014], [0015] and [0077]. Thus, claims 4-7 would have been obvious.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section VIII.E.

### D.     Claims 1-13 of the '117 patent are rendered obvious by Yu '526 and/or Yu '628 in view of a POSA's knowledge in the art and in combination with one or more of the prior art references cited herein

As discussed above in Section VI.B, which is incorporated by reference, on information and belief, the process disclosed by Yu '526 would naturally result in a highly-purified form of Form 1 obeticholic acid. *See* '117 patent at claims 1, 8, and 13. For the same reasons discussed above, on information and belief, the process disclosed by Yu '526 would naturally result in obeticholic acid having the purity profile recited by claims 1 and 9–12. *See* Section VI.B; *see also* '117 patent at claims 1 and 9–12. For the same reasons discussed *supra* with respect to Ferrari '977 and the '673 patent, a POSA also would have been motivated, with a reasonable

expectation of success, to increase the purity of obeticholic acid. *See* Sections VI.D.1-4. Doing so would naturally result in obeticholic acid having the claimed purity profile. Because the products and processes of claims 1-13 would have been obvious, the claimed purity profiles in claims 1 and 9-12 are inherently obvious as well.

As discussed above in Section VIII.B.2, which is incorporated by reference, the prior art taught treating the claimed FXR-mediated disases at a dosage range between about 1 mg to about 30 mg of obeticholic acid.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section VIII.E.

### E. Any secondary considerations are inadequate to overcome the prima facie obviousness of the claims

Defendants contend that there are no secondary considerations regarding the asserted claims of the '117 patent that are relevant in assessing obviousness. That said, Defendants note that secondary considerations are not part of the *prima facie* case of obviousness. Rather, a patentee may try and rebut a *prima facie* case of obviousness by coming forward with purported evidence of such secondary considerations. *Bayer Pharma AG v. Watson Labs., Inc.*, 183 F. Supp. 3d 579, 589 (D. Del. 2016). Defendants therefore have no burden at this stage to come forward with evidence rebutting such considerations. Quite the contrary, it is Plaintiffs' obligation and burden alone to come forward with evidence of so-called secondary considerations, if any, on which they intend to rely.

Plaintiffs to date have raised no substantive or plausible secondary considerations in connection with the '117 patent. For example, in response to Joint Interrogatory No. 4, Plaintiffs simply say that they "intend to rely on all applicable objective indicia of nonobviousness, including skepticism by experts and others in the field, teaching away, failure of others, long-felt

but unmet need, unexpected results, praise in the field, copying and commercial success," and do not attempt to tie any particular secondary consideration to any claim or patent, and thus have failed to show nexus. Regardless, Plaintiffs do not even provide any suggestion of what their theories might be with regard to most of these secondary considerations.

Plaintiffs discuss only three examples of secondary considerations in a generic manner, again untied to any particular claim or patent, each of which cannot overcome the clear showing of obviousness here. They are discussed below. First, Plaintiffs allege copying is evidence of non-obviousness. However, courts have repeatedly held that any alleged copying has little relevance to obviousness in Hatch-Waxman cases such as this one where ANDA filers are required to establish bioequivalence to the reference drug product. *See, e.g.*, *Purdue Pharma Products L.P. v. Par Pharmaceutical, Inc.*, 642 F.Supp.2d 329, 373-74 (D. Del. 2009). Any similarities Plaintiffs allege exist would be due to efficiency of pursuing FDA approval and not any technical merit of the patent or its claims.

Second, Plaintiffs allege long-felt but unmet need in PBC patients under-responsive to UDCA at increased risk of progressing to end-stage liver disease. Again, Plaintiffs have failed to tie this alleged need to any claim or patent in any way, or provide any facts explaining how this alleged need was met. For example, there was significant prior art disclosing formulations of obeticholic acid, and Plaintiffs provide no meaningful allegation of why or even how its claimed formulations differ from the prior art. To the extent Plaintiffs' alleged need is limited to the commercial availability of products, that only

speaks to the motivation to proceed with such a formulation and has no relevance to the technical merits of the patents.

Third, Plaintiffs allege two statements made by Drs. Pellicciari and Rewolinski to the USPTO indicate evidence of unexpected results. These self-serving statements again are untied to any patent or claim. For example, Dr. Pellicciari's statement regarding potency of the compound in comparison to other compounds has no relevance to the formulations claimed in this patent. Additionally, Dr. Rewolinski's statement that Plaintiffs raise is in direct contradiction to the clear evidence of the prior art, in addition to evidence that was available to Dr. Rewolinski at the time, and cannot overcome obviousness for the same reasons described above. *See, e.g.*, *supra* at VI.G.

Defendants reserve the right to further rebut any claims of secondary considerations of non-obviousness raised by Plaintiffs, if any, as discovery proceeds in this case.

**F. Invalidity of the '117 patent Under 35 U.S.C. § 112**

**1. <u>Claims 1-13 of the '117 patent are indefinite</u>**

Claims 1-13 of the '117 patent are invalid for indefiniteness.

Claims 1-13 of the '117 patent require that the claimed obeticholic acid comprise less than, or not more than, a specified percentage of one or more impurities. *See* '117 patent at claims 1-13. However, the specification fails to inform a POSA how to measure the claimed impurity levels.

Instead, the '117 patent states that "[t]he amounts of the impurities can be determined by procedures known in the art, e.g., HPLC, NMR, or methods from US Pharmacopeial, or European

Pharmacopeia, or a combination of two or more of these methods." *Id.* at 40:57-60. Likewise, Table B of the '117 patent reports the impurity levels of obeticholic acid upon following the process disclosed in the '117 patent and the Ferrari '977 process, but merely states that the impurities were "determined using HPLC methods." *Id.* at 27:48-28:53. Table B of the '117 patent thus fails to disclose what protocols (e.g., HPLC solvents, detector wavelength, flow rates, column, etc.) should be used when evaluating the impurity profile of obeticholic acid.

A POSA would understand that employing different procedures known in the art to measure impurities can result in different numerical results for the same sample. For example, a POSA would understand that there is a margin of error with any HPLC methodology, and that employing different HPLC methodologies can result in the detection of different amounts of impurities. *See, e.g.*, Görög at 934 (estimating that there is approximately a 0.5–1.0% margin of error for HPLC assay methods). A POSA would thus understand that a given batch of obeticholic acid having a certain purity as measured by one conventional methodology could have a different purity level as measured by a second conventional methodology.

Given the absence of any disclosure in the '117 patent regarding how to measure the purity of obeticholic acid or what procedures to use, a POSA would be unable to reasonably ascertain whether a batch of obeticholic acid satisfied the recited impurity limitations. *See, e.g.*, *Interval Licensing*, 766 F.3d at 1371 (finding the claim term "unobtrusive manner" "highly subjective" and indefinite because nothing in the specification or prosecution history provided an objective standard for measuring the scope of that phrase); *see also Teva Pharms.*, 789 F.3d at 1344-45 (holding claim invalid for indefiniteness of the phrases "molecular weight" and "average molecular weight" because there was no reasonable certainty as to how molecular weight was to be measured in light of the specification and prosecution history).

Claims 1-13 of the '117 patent are thus invalid for indefiniteness.

**2. Claims 1-13 of the '117 patent are not enabled and/or fail the written description requirement.**

To the extent the claims of the '117 patent would not have been obvious, the claims are invalid as not enabled and/or as failing the written description requirement. As with the '673 patent, the specification and prosecution of the '117 patent stress the importance of utilizing an intermediate crystallization step in obtaining the claim product. If a POSA could not have reasonably expected to obtain the subject matter of the '117 patent, then the claims are not enabled. The specification only teaches the use of an intermediate crystallization step to obtain the subject matter of the claims, and if the claims are not obvious a POSA would need undue experimentation to achieve the full scope of the claims. In addition, the applicant was not in possession of the claimed composition that is obtained using any process other than an intermediate crystallization step. Therefore, the claims would be invalid for failure to satisfy the written description requirement.

Additionally, to comply with the enablement requirement of 35 U.S.C. § 112(a), a patent specification must enable one of ordinary skill in the art to make and use the full scope of the claimed invention without undue experimentation. *See CFMT, Inc.*, 349 F.3d at 1338. The enablement requirement ensures that, in order to obtain exclusionary rights, the patentee communicates his invention to the public in a meaningful and useful way. *Id*. The allegedly novel aspects of the invention must be disclosed and not left to inference. *Crown Operations Intl, Ltd.*, 289 F.3d at 1367. Enablement is also determined as of the effective filing date. *Plant Genetic Sys., NV.*, 315 F.3d at 1339. The Federal Circuit outlined the following factors to determine whether the requisite amount of experimentation is undue: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of

working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability of the art, and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). While the analysis and conclusion of a lack of enablement are based on the factors discussed above and the evidence as a whole, it is not necessary to discuss each factor in the enablement rejection. *See* MPEP § 2164.04, citing *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

Importantly, Plaintiffs argued during claim construction, and the Court held that "obeticholic acid Form 1" and "obeticholic acid is Form 1" as the terms are used in the '673 patent claims, are limited only to non-crystalline obeticholic acid, but are not limited by the process of manufacture. D.I. 142 at 2. Namely, the Court determined that Form 1 within the scope of the patent claims does not need to be manufactured using crystalline obeticholic acid intermediate in the penultimate step of synthesis. *Id.* at 5-6. However, the specification discloses <u>only</u> processes of manufacturing the claimed Form I products using a crystalline obeticholic acid intermediate. In fact, the patent specification explains that the use of a crystalline obeticholic acid as the penultimate step in producing Form 1 as "critical" to the purity of Form 1, *e.g.*, '673 patent at 29:31-36, which is the very characteristic the applicants relied upon to distinguish its claims from the prior art. *Id.* at 27:41-46. Thus, the full scope of the claims cannot be enabled and lack written description here because a POSA could not know of any methods, other than the use of a crystalline obeticholic acid as the penultimate step, to obtain the compositions claimed in the '117 patent.

Claims 1-13 are not enabled. Relevant *Wands* factors are presented below:

**a) <u>The Quantity of Experimentation Necessary</u>**

According to the '117 specification, "[t]he percentages of impurities were determined

using HPLC methods." '117 patent at 40:57-58; *see also id.* at 9:38-39, 52-53; Example 2; 56:45-47 ("isolation of the fraction of the E/Z isomer peaks with the HPLC method 2"). Yet, as explained by named inventor Dr. Melissa Rewolinski during prosecution of the parent '673 patent:

> I also assert that obeticholic acid and [chenodeoxycholic acid] differ only in the 6-ethyl group present in obeticholic acid, and accordingly obeticholic acid and [chenodeoxycholic acid] are similar in many of their physicochemical properties . . . [and] ***due to the similarities in their physiochemical properties, it would be impractical to separate obeticholic acid and [chenodeoxycholic acid] by using a chromatographic purification method such as HPLC*** to achieve highly pure obeticholic acid comprising less than 1% of [chenodeoxycholic acid].

*See* 06-08-2015 Rewolinski Declaration at 2 (emphasis added); *see also* 06-08-2015 Response at 8 ("it would be impractical to separate CDCA and obeticholic acid using column chromatography due to the similarities in their physicochemical properties.").

A specification lacks enablement if it fails to teach one of skill in the art "how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 723 F.3d at 1370. Here, claim 1 requires "less than 1% of chenodeoxycholic acid," which encompasses levels as low as 0%. However, Table B disclosed achieving 0.2% chenodeoxycholic acid, but not any lower. In light of the inventor's statements during prosecution, it would require extensive experimentation for a POSA to practice the full scope of the claims. *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d at 1381.

In other words, according to Dr. Rewolinski and the patentee, a POSA cannot use HPLC to separate obeticholic acid and [chenodeoxycholic acid] due to similarities in their physiochemical properties. *Id.* As such, a person of ordinary skill in the art must undertake a high level of experimentation to practice the full scope of the claim.

**b) The Existence of Working Examples**

With respect to working examples, independent claim 1 recites "the solid form of obeticholic acid comprises less than 1% of chenodeoxycholic acid." This encompasses levels as low as 0%, but as discussed above, Table B from the '117 patent disclosed achieving 0.2% chenodeoxycholic acid, but not any lower.

It is well established that compliance with the enablement requirement does not turn on whether examples are disclosed in an application. Indeed, a specification need not include examples *if* the invention is otherwise disclosed in an enabling manner. MPEP § 2164.02.[9] However, the lack of a working example in a specification is a factor to be considered in evaluating whether the specification is enabling–especially in an unpredictable art. *Id.* In this regard, most chemical cases involve unpredictable factors. MPEP § 2164.03 (*citing In re Fisher*, 427 F.2d 833 (C.C.P.A. 1970)).

The '117 patent provides no actual working examples where obeticholic acid is obtained in the full range of the recited purity. The specification merely lists potential purity ranges. Accordingly, the description provided in the '117 patent appears to be nothing more than a general disclosure that would lead one to plausibly test all available options. *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d at 1325. Thus, the '117 patent does not teach a person of ordinary skill in the art how to achieve the entire range for the recited purity of obeticholic acid.

* * * *

In light of the above discussion of the *Wands* factors, it is clear that claim 1 is not enabled

[9] While the MPEP does not have the force of law, it is entitled to notice so far as it is an official interpretation of statutes and regulations with which it is not in conflict. *Refac Int'l Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1584 (Fed. Cir. 1996). *See also Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 296 F.3d 1316, 1324 (Fed. Cir. 2002).

and therefore invalid. Claims 2-13 all require the obeticholic acid composition to comprise the same or a lower amount of chenodeoxycholic acid. Therefore, claims 2-13 are not enabled for the same reasons as discussed above for claim 1.

**G.**





## IX. INVALIDITY OF THE ASSERTED CLAIMS OF THE ’337 PATENT

The asserted claims of the ’337 patent are invalid as described more fully below and as identified in attached Appendix E, which is incorporated by reference in addition to the information discussed in this document.

### A. Claims 1-10 and 16-19 of the ’337 patent Are Anticipated by the ’188 Publication

Under 35 U.S.C. § 102, a claim is considered to have been anticipated, and thus invalid, when a single prior art reference discloses each and every element of the claimed invention. *See Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 715 (Fed Cir. 1984). Further, “a claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference.” *Celeritas Techs. Inc. v. Rockwell Int’l Corp.*, 150 F. 3d 1354, 1361 (Fed. Cir. 1998); *Transclean Corp. v. Bridgewood Services, Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002).

#### 1. <u>Independent Claim 1 is Anticipated</u>

Claim 1 is an independent claim and states:

> 1. A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, wherein

> obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 µm or less.

The ’188 publication discloses tablet formulations comprising obeticholic acid having a particle size ranging from less than 1 to 3 micrometer. Specifically, the ’188 publication discloses:

> FIGS. 23A-23F show that batches 1, 2, 3, 4, 5, and 6 are material made up of large hard agglomerates of small irregular particles. Batches 1, 2, 3, 4, 5, and 6 all look similar. No birefringence was observed under plane polarized light, which is consistent with the material being non-crystalline. ***Particle size ranges from less than 1 µm to 3 µm***. The small size of these particles suggests that they have been precipitated out very quickly.
> *Id.* at [0347] (emphasis added).

The ’188 publication also discloses that the compositions contain a pharmaceutically acceptable excipient, such as “a pharmaceutically acceptable salt, solvate, or amino acid conjugate thereof.” *Id.* at [0208]. For example, a tablet may be prepared by compressing an intimate mixture comprising a powder or granules of obeticholic acid and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent, or by moulding an intimate mixture of powdered active ingredient and inert liquid diluent.” *Id.* at [0201]. Specifically, Form 1 (i.e. batches 1, 2, 3, 4, 5 and 6 described in [0347] as having small size), was prepared as a suspension in water at pH 4. *Id.* at [0374]. A suspension in water is a pharmaceutical composition.

Therefore, the ’188 publication discloses a composition comprising particles of obeticholic acid where not only 50% of the particles had a diameter of 200 µm or less, but all of the particles were less than 200 µm. As the claimed size range in claim 1 is less than 200 µm, the disclosure in the ’188 publication anticipates the claimed range. “[W]hen, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is ‘anticipated’ if one of them is in the prior art.” *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 227 U.S.P.Q. 773 (Fed. Cir.

1985) (citing *In re Petering*, 301 F.2d 676, 682, 133 U.S.P.Q. 275, 280 (C.C.P.A. 1962)) (emphasis in original) (Claims to titanium (Ti) alloy with 0.6-0.9% nickel (Ni) and 0.2-0.4% molybdenum (Mo) were held anticipated by a graph in a Russian article on Ti-Mo-Ni alloys because the graph contained an actual data point corresponding to a Ti alloy containing 0.25% Mo and 0.75% Ni and this composition was within the claimed range of compositions.).

Accordingly, the ’188 publication explicitly disclosed a composition comprising obeticholic acid where the obeticholic acid is in the form of particles where at least 50% of the particles have a diameter of 200 µm or less. Thus, the ’188 publication anticipates claim 1 of the ’337 patent and the claim is invalid.

**2. <u>Dependent Claims 2-10 and 16-19 are anticipated</u>**

Claims 2-8, which depend directly or indirectly from claim 1, are directed to the composition of claim 1 where the size of the particles is further defined. The narrowest of the claims, claim 8, requires that at least 90% of the particles have a diameter of 25 µm or less. As discussed above, the ’188 publication disclosed the optical assessment of six different batches of obeticholic acid, wherein the particle size ranged “from less than 1 µm to 3 µm.” *See* ’188 Publication at [0347]. Accordingly, all of the particles (i.e., 100%) had a particle size of less than 3 µm, which is much less than the “90% of the particles have a diameter of 25 µm or less.” Accordingly, the ’188 publication explicitly disclosed a composition comprising obeticholic acid where the obeticholic acid is in the form of particles where at least 50% of the particles have a diameter of 5 µm or less and at least 90% of the particles have a diameter of 25 µm or less. Thus, the ’188 publication anticipates claims 2-8 of the ’337 patent and the claims are invalid.

Claim 9 and 10 depend from claim 1 and further require specific excipients. Claim 9 requires at least one pharmaceutically acceptable excipient having an alcohol content of less than

about 6% (wt/wt) and claim 10 requires sodium starch glycolate. As discussed above, the ’188 publication also discloses that the compositions contain a pharmaceutically acceptable excipient, such as “a pharmaceutically acceptable salt, solvate, or amino acid conjugate thereof.” *Id.* at [0208]. More specifically, the ’188 publication discloses obeticholic acid formulations containing sodium startch glycolate, colloidal solicon dioxide, magnesium searate, and/or microcrystalline cellulose. *Id.* at [0328]. For example:

| | | | |
|---|---|---|---|
| Obeticholic acid | 25.0 mg* | API | HSE |
| Microcrystalline cellulose | 157.0 mg* | Filler/Binder | USP-NF/EP/JP |
| Sodium starch glycolate | 12.0 mg | Disintegrant | USP-NF/EP/JP |
| Magnesium stearate | 2.0 mg | Lubricant | USP-NF/EP/JP |
| Collodial silicon dioxide | 4.0 mg | Glidant | USP-NF/EP/JP |
| Opadry ® II green or white | 8.0 mg | Coating Material | HSE |
| Total weight | 208.0 mg | | |

*Id.* Colloidal silicon dioxide is an inorganic material with no expected alcohol content. Likewise, magnesium stearate and microcrystalline cellulose are not expected to have significant alcohol content.

Claims 16 and 17 also depend from claim 1 and further require the obeticholic acid composition to be a unit dosage form (claim 16), and more specifically a tablet (claim 17). The ’188 publication discloses various dosage forms, including tablets. *See id.* at [0198] – [0220]. Thus, the ’188 publication anticipates claims 16 and 17 of the ’337 patent and the claims are invalid.

Claims 18 and 19 similarly depend from claim 1 and further require a tablet with an intra-granular and extra-granular portion (claim 18), and more specifically, an intragranular portion that comprises microcrystalline cellulose and obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in a ratio between about 20:1 to about 1:5.

While the '188 publication does not expressly state that the tablet comprises an intra-granular portion and an extra-granular portion, a POSA would have immediately envisaged a tablet with an intra-granular portion and extra-granular portion based on the example formulations disclosed in the '188 publication. *See id.* at [0328] and Table 1. Specifically, the '188 publication expressly contemplates formulating tablets with an intra-granular portion comprising obeticholic acid and a pharmaceutically acceptable excipient, teaching that "a tablet may be prepared by compressing an intimate mixture comprising a powder or granules of obeticholic acid and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent." *Id.* at [0201]; *see also id.* at [0199]. The '188 publication further discloses including additional pharmaceutically acceptable excipients, such as a coating material, which a POSA would understand would be located outside the granules. *See, e.g.*, *id.* at [0208]-[0217], [219].

Additionally, the '188 publication teaches compositions containing obeticholic acid and microcrystalline cellulose at the claimed ratios. For example, the '188 publication disclosed the following 25 mg tablet formulation:

| | 25 mg tablet | |
|---|---|---|
| Obeticholic acid | 25.0 mg* | API |
| Microcrystalline cellulose | 157.0 mg* | Filler/Binder |
| Sodium starch glycolate | 12.0 mg | Disintegrant |
| Magnesium stearate | 2.0 mg | Lubricant |
| Collodial silicon dioxide | 4.0 mg | Glidant |
| Opadry ® II green or white | 8.0 mg | Coating Material |
| Total weight | 208.0 mg | |

*See id.* (emphasis added). Thus, the '188 publication disclosed a formulation containing

microcrystalline cellulose and obeticholic acid at a ratio of 6:1. Of note, the amount of microcrystalline cellulose in the 25 mg formulation in Table 1 of the '188 publication is exactly the same as the total amount of microcrystalline cellulose in the 25 mg formulation in Table 11 of the '337 patent. '337 patent at 89:48-90:28. Thus, the '188 publication anticipates claims 18 and 19 of the '337 patent and the claims are invalid.

**B. Claims 1-19 of the '337 patent are rendered obvious by the '188 publication in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

**1. Independent Claim 1**

To the extent that the '188 publication does not render claim 1-10 and 16-19 of the '337 patent anticipated, the teachings of '188 publication would have rendered Claim 1 obvious. *See In re Kalm*, 378 F.2d 959, 962 (C.C.P.A. 1967) (a complete description of the invention in a prior art reference sufficient to anticipate a claim is the ultimate or epitome of obviousness). As discussed above in Section IX.A, which is incorporated by reference, the '188 publication discloses each limitation of Claim 1 of the '337 patent. To the extent the composition disclosed in the '188 publication differs from the claimed composition, claim 1 would have been obvious.

**a) The '188 publication taught or suggested formulating obeticholic acid compositions at the claimed particle sizes.**

As discussed above, as of the earliest effective filing date of the '337 patent, the '188 publication disclosed a pharmaceutical composition comprising obeticholic acid where the obeticholic acid was in the form of particles and the particle size ranged from less than 1 µm to 3 µm. *See* '188 publication at [0328], [0347]; *see also* WO '689 at 5, 10-11 (disclosing a process for developing a composition of Nor-UDCA without micronization, resulting in a composition where at least 50% of particles have a diameter as low as 0.5 micrometer and at least 90% of particles have a diameter of as low as 2 micrometers).

With respect to the claimed particle size, to the extent necessary, the skilled artisan would have used routine optimization of the sizes provided by the ’188 publication to arrive at the specified value in Claim 1 of the ’337 patent. *In re Aller*, 220 F.2d at 456-57. Determining optimal particle sizes is something that would be performed by a person skilled in the art without undue experimentation (although the result of different sizing methods would yield different results, making these claimns indefinite as described below), and no evidence is provided that the particle sizes provide unexpected benefits. *In re Peterson*, 315 F.3d at 1330. Further, the ’188 publication disclosed a size range which lies inside the claimed range from the ’337 patent, thus creating a prima facie case of obviousness. *In re Wertheim*, 541 F.2d at 257.

Additionally, the ’188 publication explains that “a tablet may be prepared by compressing an intimate mixture comprising a powder or granules of obeticholic acid and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent.” ’188 Publication at [0201]. A tablet prepared by compressing a powder or granules of obeticholic acid would inherently contain obeticholic acid in the form of particles significantly less than 200 µm. Even at the preformulation stage (i.e. prior to deciding on the requirements of particle size in relation to the solubility of the drug), it would be routine for a person of ordinary skill in the art (POSA) to control the size of the compound to below 30 µm. *See, e.g.*, Lieberman, at 5-6. Lieberman explains:

> It is probably safest to grind most new drugs having particles that are above approximately 100µm in diameter. If the material consists of particles primarily 30µm or less in diameter, then grinding is unnecessary, except if the material exists as needles – where grinding may improve flow and handling properties, or if the material is poorly water-soluble where grinding increases dissolution rate. Grinding should reduce coarse material to, preferably, the 10- to 40-µm range. Once this is accomplished, controlled testing can be performed both for subsequent *in vivo* studies and for in-depth preformulation studies.

*Id.*

The ’188 publication also discloses that Form 1 of obeticholic acid, which “can be used

at the pharmaceutically active ingredient" exists as "small irregular particles." '188 publication at [0329], [0347]. In particular, of the six batches of Form 1 analyzed, the '188 publication reports that the particles "all look similar" with "[p]article size ranges from less than 1 µm to 3 µm." *Id.* at [0347].

Accordingly, in light of the disclosures in the '188 publication, it would have been obvious to prepare a composition comprising obeticholic acid wherein the obeticholic acid is in the form of particles having the recited particle size.

**b) <u>A POSA would have been motivated to reduce the particle size of obeticholic acid to increase the dissolution rate.</u>**

Furthermore, a POSA further would have been motivated to formulate a pharmaceutical composition having the claimed particle sizes in order to increase obeticholic acid's dissolution rate. *See generally Bayer Schering Pharma AG v. Barr Labs., Inc.*, No. 05-cv-2308, 2008 WL 628592, at *23-25, 37 (D.N.J. Mar. 3, 2008) (finding that it would have been obvious to try reducing a composition's particle size in light of "the general rule" that "micronization will improve the dissolution of a poorly water soluble drug").

It was known before 2015 that obeticholic acid is poorly water soluble. Specifically, the '188 publication explains that Form 1's water solubility is 17.9 µmol/L and Form F's water solubility is 9.1 µmol/L. '188 publication at [0385]. Pellicciari 2014 likewise reports obeticholic acid having a water solubility of only 9 µM. Pellicciari 2014 at [0089], [0197]. A POSA would understand from these values that obeticholic acid is poorly water soluble.

Well before the priority date, it was also known that decreasing the particle size of a poorly water soluble drug could increase the drug's dissolution rate. *See, e.g.*, Chaumeil at 211–215 (explaining that "reducing particle size by micronization can improve the rate of dissolution of poorly soluble materials," including by jet-milling); Savjani at 3 ("The solubility of [a] drug is

often intrinsically related to drug particle size; as a particle becomes smaller, the surface area to volume ratio increases."); Kawabata at 4 ("The dissolution rate of a drug proportionally increases with increasing surface area of drug particles."); Krishnaiah at 028 ("The oral bioavailability of drugs presented in a solid dosage form depends mainly on size, size distribution and morphology of particles. This is due to enhanced surface area of drug particles available for dissolution."); Chu at 1187 ("When administered orally, the dissolution rate can be the rate-limiting step for poorly water-soluble drugs, particularly BCS Class (biopharmaceutical classification system) II and IV compounds.").

A POSA formulating obeticholic acid as a pharmaceutical composition would have been motivated to reduce the particle size of obeticholic acid. Savjani explains that "[m]ore than 40% [of] NCEs (new chemical entities) developed in pharmaceutical industry are practically insoluble in water" and therefore have poor dissolution rates, which can be addressed by reducing the particle size. Savjani at 2–3. Chu teaches that micronized drugs show better clinical efficacy than non- micronized drugs. Chu at 188. Chaumeil provides examples in which the micronization of a poorly soluble drug provided a dissolution rate four times better than its unmicronized counterpart, and explains that for another poorly soluble drug, reducing the median particle size (including down to 3 µm) "was the best way of increasing the rate of dissolution." Chaumeil at 213-214; *see also, e.g.*, Takahashi at 482-84 (teaching the use of wet granulation improved the dissolution characteristics of the two BCS Class II drugs; nimodipine and spironolactone). Indeed, FDA Q6A Guidance expressly explained that "particle size can have a significant effect on dissolution rates, bioavailability, and/or stability" and provided guidance for addressing the particle size in poorly- soluble drug substances. FDA Q6A Guidance at 83046, 83054.

The '188 publication discloses employing obeticholic acid tablets in clinical trials, and a

POSA would know that in order to formulate tablets, it would be beneficial to reduce the particle size of obeticholic acid to have a median size of significantly less than 200 µm. *See* ’188 Publication at [0328] (“[T]he 5mg, 10mg, and 25 mg formulations have been used as phase 3 clinical trial material.”). When designing a clinical trial using a tablet, a POSA would have been motivated to decrease the particle size of obeticholic acid to improve both bioavailability and dissolution. Similar practices were used to increase the dissolution rate of ursodeoxycholic acid (UDCA). Pellicciari 2014 teaches that both obeticholic acid and UDCA are natural or synthetic analogues of bile acids, and both have a water solubility of less than 10 µM. Pellicciari 2014 at [0089], [0096], [0197]; WO ’475 at 1:10-14, 3:4-5 (showing that UDCA has a similar structure to obeticholic acid and that UDCA is “practically insoluble in water”); ’549 patent at 1:48-63 (same); *see also* July 7, 2017 Applicant Response to Restriction Requirement at 7 (the patentee conceding during prosecution that both obeticholic acid and UDCA “belong to a class of bile acids and have [a] similar core structure” and “may not be considered as materially different product[s]”); *Valeant Pharm.*, 955 F.3d at 32-33 (“When compounds share significant structural and functional similarity, those compounds are likely to share other properties, including optimal formulation for long-term stability.”). Before the priority date, it was known that the dissolution rate of UDCA could be increased by reducing its particle size. *See, e.g.*, Choi 2004.

Choi 2004 describes “the preparation of ultrafine particle[s] of insoluble drugs in water and the improvement of physicochemical properties by using three types of fine grinding mills,” and studies UDCA as a model insoluble drug. Choi 2004 at Abstract. Choi 2004 explains that “[t]he particle size of medicinal materials is an important physical property that affects the pharmaceutical behaviors such as dissolution, chemical stability, and bioavailability of solid dosage forms.” Choi 2004 at 166. Because “[a] fundamental problem of insoluble drugs is often

an insufficient bioavailability," Choi 2004 teaches that "[d]ecreasing the particle size of these drugs can improve their rate of dissolution." *Id.* at 165. Choi 2004 analyzes data relating to the micronization of UDCA and concludes that "the solubility and dissolution rate of insoluble drug UDCA can be improved by the particle size reduction." *Id.* at 171; *see also id.* at 169, Fig. 4.

Additional references echoed the findings of Choi 2004. For example, WO '475 teaches that UDCA (aka ursodiol) "is characterized as having low solubility and high permeability," and thus "the rate limiting step for oral bioavailability of Ursodiol is the dissolution of the drug from the pharmaceutical dosage form." WO '475 at 3:4–9. WO '475 teaches that a "dosage form prepared using micronized and unmicronized ursodiol, results in an improved dissolution and absorption characteristics." *Id.* at 3:13–15. Specifically, "[i]n the preferred embodiment, [u]rsodiol is micronized to obtain reduced particle size e.g. $d_{90}$ particle size of less than 20 micron, preferably less than 10 micron, and more particularly less than 7 micron." *Id.* at 4:25–27; *see also id.* at 4:11–13 (noting that air jet milling "is a well proven technique that consistently produces particles of a size less than 35 microns, preferably less than 20 microns"); *id.* at 3:27–30 (disclosing jet-milled formulations of micronized UDCA "having an average particle size (d90) not more than about 20 microns, preferably les[s]than 10 microns, more preferably said micronized particles have an average particle size less than about 7 microns"). WO '475 proposes claims for embodiments in which up to 95% of the ursodiol particles are micronized at an average particle size of less than about 7 microns. *Id.* at 10:1–13.

WO '741 likewise explains that because UDCA is "practically insoluble in water," its bioavailability is "highly depend[s] on particle size." WO '741 at 1:15–19, 4:1–2. WO '741 teaches that the dissolution and bioequivalency profile of UDCA is improved when "at least 90% of the particles of the ursodeoxycholic acid have a size less than 25 microns." *Id.* at 4:7–18.

Additional references taught or suggested obtaining the claimed particle sizes of obeticholic acid. For example, WO ’482 claims “synthetic derivatives of natural bile acids, preferably 6-Ethyl-CDCA” and discloses numerous oral dosage forms, including tablets, that can be used with various pharmaceutically acceptable excipients. *Id.* at 17:28-21:6, 38:23-26.

WO ’482 further teaches compositions “formulated as aerosols for topical application, such as by inhalation,” and teaches that such formulations will have particle sizes with “diameters of less than about 50 microns, such as less than about 10 microns.” *Id.* at 24:11-18. Similarly, WO ’521 discloses CDCA derivatives suitable for tablets “prepared by compressing an intimate mixture comprising a powder or granules of the active ingredient and one or more optional ingredients.” WO ’521 at 3, 14:20-24. WO ’521 further teaches that “[f]or pulmonary administration via the mouth, the particle size of the powder or droplets typically ranges from 0.5 to 10 μm, preferably from 1 to 5 μm, to ensure delivery into the bronchial tree.” WO ’521 at 14:28-15:2. And WO ’689 discloses a process for developing a composition of Nor-UDCA without micronization (WO 689 at 5), resulting in a composition where at least 50% of particles have a diameter of as low as 0.5 micrometer and at least 90% of particles have a diameter of as low as 2 micrometers (*id.* at 10- 11).

Thus, based on the above references, a POSA would know that tablets for use in a phase 3 clinical trial in the ’188 publication should be optimized and in the form intended for market by reducing the particle size. This would also satisfy a regulatory requirement for particle size control for a poorly soluble API. *See generally* FDA Q6A Guidance. As early as 1988, it was “generally recognized that poorly soluble drugs showing a dissolution rate-limiting step in the absorption process will be more readily bioavailable when administered in a finely subdivided form with larger surface than as a coarse material.” Aulton at 8.

**2. Dependent Claims 2-8**

Claim 2 depends from Claim 1 and recites that at least 50% of the particles have a diameter of 100 µm or less. Claim 3 depends from Claim 2 and recites that at least 50% of the particles have a diameter of 50 µm or less. Claim 4 depends from Claim 3 and recites that at least 50% of the particles have a diameter of 10 µm or less. Claim 5 depends from Claim 4 and recites that at least50% of the particles have a diameter of 5 µm or less. Claim 6 depends from claim 1 and recites that at least 90% of the particles have a diameter of 200 µm or less. Claim 7 depends from claim 6 and recites that at least 90% of the particles have a diameter of 100 µm or less. Claim 8 depends from claim 7 and recites that at least 90% of the particles have a diameter of 25 µm or less.

As discussed above, the '188 publication disclosed the optical assessment of six different batches of obeticholic acid, wherein the "[p]article size ranges from less than 1 µm to 3 µm." *Id.* at [0347]. *See* '188 publication at [0347]. Accordingly, all of the particles (i.e., 100%) had a particle size of less than 3 µm, which is smaller than each of the claimed particle sizes.

Additionally, at least Kawabata and Markarian disclose that common milling techniques, such as jet milling, are capable of producing pharmaceutical APIs having a particle size in the range of 2 – 3 µm or 2 – 5 µm. Kawabata at 4 (teaching "[j]et milling, ball milling, and pin milling are commonly used for dry milling," and "the lowest particle size that can be achieved by conventional milling is about 2 – 3 µm."); Markarian (teaching jet milling is capable of producing API particles in the 2 – 5 µm range); *see also* Choi 2004 at 169 (median diameter of ground sample by jet mill was about 1.5 µm," with "a sharp particle size distribution from 0.68 to 5.64 µm.").

Further, as discussed above with respect to claim 1, the prior art discloses that reductions

in particle size increase dissolution of an API by increasing surface area for BCS Class II drugs such as obeticholic acid. *Supra* Section IX.B.1. Thus, it would have been a matter of routine optimization to arrive at any of the particle size ranges recited in claims 2-8 based on the desired dissolution characteristics of obeticholic acid.

**3. <u>Dependent Claims 9-10</u>**

Claim 9 depends from claim 1 and recites that the composition further comprises at least one pharmaceutically acceptable excipient having an alcohol content of less than 6% (wt/wt).

Claim 10 depends from claim 9 and recites that the at least one pharmaceutical acceptable excipient is sodium starch glycolate.

As discussed above (*see supra* Sections IX.A and IX.B.1), the '188 publication also discloses that the compositions contain a pharmaceutically acceptable excipient, such as "a pharmaceutically acceptable salt, solvate, or amino acid conjugate thereof." '188 publication at [0208]. More specifically, the '188 publication discloses obeticholic acid formulations containing sodium starch glycolate, colloidal solicon dioxide, magnesium searate, and/or microcrystalline cellulose. *Id.* at [0328].

Colloidal silicon dioxide is an inorganic material with no expected alcohol content. Likewise, magnesium stearate, sodium starch glycolate, and microcrystalline cellulose are not expected to have significant alcohol content. For example, the '380 patent discloses pharmaceutical excipients, including sodium starch glycolate having low; e.g, less than 3000 ppm of residual solvents. The '380 patent discloses that methanol and ethanol are of particular concern as residual solvents because they are used as process solvents and have ICH limits of 3000 ppm and 5000 ppm respectively. In addition, Table 3 in the '380 patent discloses seven commercially available sodium starch glycolate grades, all of which contain less than 6% residual alcohol.

Additionally, a POSA would have known that disintegrants such as sodium starch glycolate would increase the dissolution of obeticholic acid, which as discussed *supra*, was known to be poorly water soluble. *See* Bolhuis et al., "Improvement of dissolution of poorly soluble drugs by solid deposition on a super disintegrant. II. The choice of super disintegrants and effect of granulation," European Journal of Pharmaceutical Sciences, 5 (1997) 63-69 ("Bolhuis") at Abstract ("It is demonstrated that the dissolution from capsules and tablets of poorly soluble, hydrophobic drugs can be strongly improved by solid deposition of the drug upon hydrophilic,strongly swelling carriers like the super disintegrants sodium starch glycolate and croscarmellose sodium."). Sodium starch glycolate was accordingly used in compositions comprising similarly- structured bile acids. *See, e.g.*, WO '689 at 19 (disclosing the use of various excipients in solid dosage forms of Nor-UDCA, including starch, starch derivatives, and disintegrants); WO '475 at at 3:3-5, 6:14-22, claims 1, 8, and 9 (disclosing tablets containing UDCA with "[p]harmaceutically acceptable excipient(s) includ[ing] disintegrants" and that "[e]xemplary disintegrants include . . . sodium starch glycolate"); the label for ursodeoxycholic acid ("URSO 250 Label") (indicating that Ursodiol contains sodium starch glycolate).

It would have been obvious to a POSA to use a form of sodium starch glycolate having an alcohol content of less than about 6% (wt/wt), and to formulate a tablet with a total primary alcohol impurity of less than about 6% (wt/wt). The '337 patent concedes that before the priority date, Explotab® from JRS Pharma was commercially available as a sodium starch glycolate having "containing no more than 3% ethanol." '337 patent at 94:15-20. The '380 patent discloses seven commercially available sodium starch glycolate grades, all of which contain low levels of residual alcohol, including as low as 900 ppm.  '380 patent at 6:12-31.

Additionally, it would have been routine for a formulator to use pure excipients without

any impurities such as alcohol. Further, Delalonde 2014 confirmed the deleterious effects of alcohol in a disintegrant, noting that increasing the level of alcohol will increase the disintegration time and thus decrease the effect of the disintegrant in a formulation. *See* Delalonde 2014 at 409. A POSA would have thus been motivated to select an excipient with low total primary alcohol impurity levels.

**4. Independent Claim 11 and Dependent Claims 12 and 16-19**

Claims 11-12 and 16-19 recite:

> 11. A tablet comprising an intra-granular portion and an extra-granular portion, the intra-granular portion comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose and one or more additional pharmaceutical excipients, and the extra-granular portion comprising one or more pharmaceutical excipients.
>
> 12. The tablet of claim 11, wherein the extra-granular portion comprises microcrystalline cellulose.
>
> 16. The composition of claim 1 is in a unit dosage form.
>
> 17. The composition of claim 16, wherein the unit dosage form is a tablet.
>
> 18. The composition of claim 17, wherein the tablet comprises an intra- granular portion and an extra-granular portion.
>
> 19. The composition of claim 18, wherein the intra-granular portion compromises microcrystalline cellulose and obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof in a ration between about 20:1 to about 1:5.

Each of these limitations was taught in the prior art and/or a POSA would have been motivated to formulate the compositions and tablets recited by claims 11-12 and 16-19.

As discussed above (*supra* Sections IX.A and IX.B.1), as of the earliest effective priority date of the ’337 patent, the ’188 publication disclosed pharmaceutical compositions comprising obeticholic acid and microcrystalline cellulose wherein the composition is formulated in tablet form, having an intra-granular and extra-granular portion.

| | 25 mg tablet | | |
|---|---|---|---|
| Obeticholic acid | 25.0 mg* | API | HSE |
| Microcrystalline cellulose | 157.0 mg* | Filler/Binder | USP-NF/EP/JP |
| Sodium starch glycolate | 12.0 mg | Disintegrant | USP-NF/EP/JP |
| Magnesium stearate | 2.0 mg | Lubricant | USP-NF/EP/JP |
| Collodial silicon dioxide | 4.0 mg | Glidant | USP-NF/EP/JP |
| Opadry ® II green or white | 8.0 mg | Coating Material | HSE |
| Total weight | 208.0 mg | | |

’188 publication at [0328], Table I (emphasis added).

The ’188 publication does not expressly disclose a tablet comprising an intra-granular portion and an extra-granular portion. *Supra* Section IX.A.2. However, it teaches making the dosage form by routine and conventional means, which would include the use of intra and extra granular portions. *Id.*; *see also* ’188 publication at [0199]-[0201], [0219], [0244], [0253]. More specifically, the ’188 publication expressly contemplates formulating tablets with an intra-granular portion comprising obeticholic acid and a pharmaceutically acceptable excipient, teaching that “a tablet may be prepared by compressing an intimate mixture comprising a powder or granules of obeticholic acid and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent.” *Id.* at [0201]; *see also id.* at [0199]. The ’188 publication further discloses including additional pharmaceutically acceptable excipients, such as a coating material, which a POSA would understand would be located outside the granules. *See, e.g.*, *id.* at [0208]- [0217], [219]. It further would have been obvious to a POSA to include

microcrystalline cellulose, which acts as a filler/binder, in both the intra-granular and extra-granular portions of the formulation. *See id.* at [0219].

Pellicciari '390 discloses tablets of obeticholic acid "prepared by compressing an intimate mixture comprising a powder or granules of the active ingredient and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent, or by moulding an intimate mixture of powdered active ingredient and inert liquid diluent." Pellicciari '390 at 6:36-40.

Additional prior art reinforces that formulating the claimed intra-granular and extra-granular portions of an obeticholic acid tablet would have been routine to a POSA.

For example, Thosar, which is directed to pharmaceutical compositions comprising active agents, including aldosterone receptor blockers, disclosed pharmaceutical compositions comprising eplerenone in the form or tablets where the tablets comprise intra- and extra-granular sections. *See* Thosar at 35:8-60, Example 1. Thosar also disclosed processes for preparing the tablets and improvements thereof. For example, Thosar states that "[t]he use of extragranular microcrystalline cellulose (that is, microcrystalline cellulose added to a wet granulated composition after the drying step) in addition to intragranular microcrystalline cellulose (that is, microcrystalline cellulose added to the composition during or before the wet granulation step) can be used to improve tablet hardness and/or disintegration time." *Id*. at 9:4-11.

Pellicciari '390 discloses tablets of obeticholic acid "prepared by compressing an intimate mixture comprising a powder or granules of the active ingredient and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent, or by moulding an intimate mixture of powdered active ingredient and inert liquid diluent." Pellicciari '390 at 6:36-40.

As another example, WO ’475 is directed to pharmaceutical compositions of ursodiol comprising micronized particles with enhanced absorption and dissolution characteristics. *See* WO ’475 at 1:3-5. Ursodiol (also known as ursodeoxycholic acid) is structurally related to obeticholic acid, and the structure is reproduced below.

As disclosed by WO ’475, the rate-limiting step for oral bioavailability of ursodiol is the dissolution of the drug from the pharmaceutical dosage form. *See id*. at 3:7-9. The micronized particles according to WO ’475 have an average particle size (d90) not more than about 20 microns, preferably less than 10 microns, and more preferably less than about 7 microns. *See id*. 3:27-30. WO ’475 disclosed the following tablet formulation:

| Sr. No. | Ingredients | Example A mg/tab | Example B mg/tab |
|---|---|---|---|
| 1 | Ursodiol (Micronized particle having D90 value less than 10 microns) | 350.00 | 300.00 |
| 2 | Ursodiol (Unmicronized particle having D90 value more than 170 microns) | 150.00 | 200.00 |
| 3 | Sodium Starch Glycolate | 8.00 | 8.00 |
| 4 | Microcrystalline Cellulose (Avicel PH 101) | 97.00 | 97.00 |
| 5 | Polyethylene Glycol 3350 | 24.00 | 24.00 |
| 6 | Povidone K 30 | 24.00 | 24.00 |
| 7 | Purified Water | q.s. | q.s |
| 8 | Syloid 244 FP | 12.00 | 12.00 |
| 9 | Sodium Starch Glycolate | 40.00 | 40.00 |
| 10 | Microcrystalline Cellulose (Avicel PH 102) | 87.00 | 87.00 |
| 11 | Magnesium Stearate | 8.00 | 8.00 |
| | Total (Core wt.) | 800.00 | 800.00 |
| 12 | Opadry white 03F58991 | 8.00 | 8.00 |
| 13 | Purified Water | 808.00 | 808.00 |

*Id*. at 7:15-30, Example 1 (emphasis added). According to the tableting procedure, ingredients 4 and 5 were dissolved in sufficient quantity of purified water. This solution was then used as a binder solution and added in the rapid mixer granulator within 2 minutes at impeller fast speed and chopper off. Dry granules were passed through oscillating granulator fitted with 16 # mesh along with Syloid 244 FP. Granules were transferred in blender and mixed for 5 minutes. Ingredient 10 was transferred in blender and mixed for 3 minutes. *See id*. at 8:4-20. As can be seen from the above disclosure, WO ’475 taught tablet formulations containing microcrystalline cellulose in both the intra- and extra-granular portions of a tablet where the active agent was a bile acid analog.

Additionally, Takahashi studied the impact of wet granulation on low soluble BCS Class II drugs; nimodipine and spironolactone. Takahashi at 477-78. Granules were prepared by blending various excipients, including lactose, microcrystalline cellulose, colloidal silicon dioxide and croscarmellose sodium using povidone as a binder. *Id.* at 478. All the granules

prepared included microcrystalline cellulose. *Id.* The granules thus prepared were blended with magnesium stearate and compressed into tablets. *Id.* The tablets prepared were compared to tablets made using physical mixtures of the same drugs and excipients in the same proportions. *Id.* at 479. Tablets made from the granules and physical mixtures were compared for dissolution characteristics. *Id.* at 482. The results of the dissolution tests performed by Takahashi showed that the tablets prepared from granules had faster dissolution that the tablets prepared from physical mixtures. *Id.* at 482-83. The conclusion of Takahashi was that the use of wet granulation improved the dissolution characteristics of the two BCS Class II drugs; nimodipine and spironolactone. *Id.* at 483-84.

A 1996 article by Li disclosed results of a study of the effects of intra-granular and extra-granular MCC on two model drugs; metoprolol (highly soluble) and hydrochlorothiazide (slightly soluble). *See* Li, et al., "The Role of Intra- and Extragranular Microcrystalline Cellulose in Tablet Dissolution," Pharmaceutical Development and Technology, 1(4), 343-355 (1996) ("Li"). The formulations prepared also included excipients selected from dicalcium phosphate, lactose, povidone, sodium starch glycolate, croscarmellose sodium, silicon dioxide and magnesium stearate. Formulations were prepared with an intra-granular portion comprising dicalcium phosphate or lactose, a disintegrant and povidone as a binder. The prepared granules were then blended with an extragranular portion comprising a disintegrant, silicon dioxide and magnesium stearate. MCC was added to either the intra-granular portion or the extra-granular portion in each formulation. The final blends were compressed into tablets and tested for disintegration and dissolution. All formulations contained either intra-granular or extra-granular MCC.

Li concludes that because the properties of MCC which make it such an excellent filler also reduce its compactibility after wet granulation, in practice it is preferable to incorporate one-

half into the wet mass and the remainder into the final blend. According to Li, this procedure will provide both the flexibility of granulation end point control resulting from intragranular MCC and the excellent binding and compactibility produced by dry blending of MCC after granulation.

Shotton 1976 discloses that "[a] combination of intra- and extragranular disintegrating agents gave the best compromise" to obtain effective disintegration in tablets. Shotton 1976 at abstract.

Accordingly, a POSA looking to formulate obeticholic acid into a tablet would have been motivated to look at known tablet formulations, including the ursodiol tablet disclosed by WO '475, particularly because of the structural similarity and water solubility between ursodiol and obeticholic acid.[10,11]

Moreover, the prior art also discloses tablets containing microcrystalline cellulose and obeticholic acid in a ration between about 20:1 to about 1:5. *Supra Supra* Section IX.A.2. For example, the '188 publication expressly discloses formulations that include ratios of microcrystalline to obeticholic acid ranging from about 17.6:1 to 6.28:1, and teaches that microcrystalline cellulose is used as a filler/binder. '188 Publication at [0328]; *see also, e.g.*, *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) ("In cases involving overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a *prima facie* case of obviousness."); *see also In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (not inventive to discover the optimum or workable ranges of a result-effective

---

[10] For an example comparing the water solubility of ursodiol and obeticholic acid, *see*, e.g., U.S. Patent No. 8,546,365 at Table 3 (7.5 µM for UDCA vs 9 µM for INT-745)).

[11] Indeed, during prosecution, the applicant argued in a response to a restriction requirement that Groups I and IV are not distinct, stating that obeticholic acid and ursodiol have a similar core structure and therefore cannot be considered materially different. '337 patent PH, 7-7-2017 Response to Restriction Requirement at 7.

variable through routine experimentation); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368 (Fed. Cir. 2007) ("[D]iscovery of an optimum value of a variable in a known process is usually obvious."). The '188 publication teaches that in these formulations, "obeticholic acid quantity presented . . . is adjusted based on the potency of the drug substance Lot used, and amount of microcrystalline cellulose is correspondingly decreased." '188 Publication at [0328].

Notably, the amount of microcrystalline cellulose in the 25 mg formulation in Table I of the '188 publication is exactly the same as the total amount of microcrystalline cellulose in the 25 mg formulation in Table 11 of the '337 patent:

TABLE 11

5 mg, 10 mg, and 25 mg film-coated tablets formulations

| Material | mg/tablet 5 mg | 10 mg | 25 mg |
|---|---|---|---|
| Intragranular | | | |
| OCA Drug Substance [a] | 5.0 | 10.0 | 25.0 |
| Microcrystalline Cellulose [a] | 81.0 | 106.0 | 157.0 |
| Sodium Starch Glycolate | 8.0 | 8.0 | 8.0 |
| Colloidal Silicon Dioxide | — | — | 2.0 |
| Magnesium Stearate | 1.0 | 1.0 | 1.0 |
| Granule Mass | 95.0 | 125.0 | 193.0 |
| Ratio of Microcrystalline Cellulose to OCA | about 16:1 | about 11:1 | about 6:1 |
| Extragranular | | | |
| Microcrystalline Cellulose | 100.0 | 70.0 | — |
| Sodium Starch Glycolate | 4.0 | 4.0 | 4.0 |
| Colloidal Silicon Dioxide | — | — | 2.0 |
| Magnesium Stearate | 1.0 | 1.0 | 1.0 |
| Final Blend/Tablet Core | 200.0 | 200.0 | 200.0 |
| Tablet Coating | | | |
| Opadry II Coating Material | 8.0 | 8.0 | 8.0 |
| Coated Tablet | 208.0 | 208.0 | 208.0 |

Thus, based on the teachings of the above cited prior art, a POSA would have been motivated to prepare the compositions and tablets claimed in Claims 11-12 and 16-19, and would

have had a reasonable expectation of success in doing so.

**5. Independent Claim 13**

Claim 13 is directed to a method for preparing a composition comprising obeticholic acid. Claim 13 recites:

> 13. A method for preparing a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, wherein at least 50% of the particles have a diameter of 200 µm or less, comprising forming the particles through jet-milling.

As discussed above, methods for preparing compositions comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, in the form of particles, wherein at least 50% of the particles have a diameter of 200 µm or less were well-known in the art. *Supra* Sections IX.A and IX.B.1. For example, the '188 publication disclosed tablet formulations comprising obeticholic acid and microcrystalline cellulose, with the obeticholic acid having a particle size ranging from less than 1 to 3 micrometer. *See* '188 publication at [0347]. And the '188 publication teaches making the dosage form by routine and conventional means, which would include the conventional technique of jet milling. *See id.* at [0199]-[0201], [0219], [0244], [0253]).

The process of jet-milling was well-known in the art.

For example, Dodd is directed to methods for producing nanoparticle and microparticle powders of biologically active materials that have improved powder handling properties. *See* Dodd at Abstract. The powders disclosed by Dodd "have unexpectedly improved powder handling techniques, making them advantageous for us in commercial applications." *Id*. at [0001]. Dodd disclosed that it is well known that the dissolution of a particulate drug will increase with increasing surface area. *See id*. at [0004]. "One way of increasing surface area is decreasing

particle size. Consequently, methods of making finely divided or sized drugs have been studied with a view to controlling the size and size range of drug particles for pharmaceutical compositions." *Id.*

Dodd further teaches jet milling and resultant particle sizes:

> For example, dry milling techniques have been used to reduce particle size and hence influence drug absorption. However, in conventional dry milling the limit of fineness is reached generally in the region of about 100 microns (100, 000 nm), at which point material cakes on the milling chamber and prevents any further diminution of particle size. Alternatively, wet grinding may be employed to reduce particle size, but flocculation restricts the lower particle size limit to approximately 10 microns (10,000 nm). The wet milling process, however, is prone to contamination, thereby leading to a bias in the pharmaceutical art against wet milling. Another alternative milling technique, commercial airjet    milling, has provided particles ranging in average size from as low as about 1 to about 50 microns (1,000-50,000 nm).

*Id*. at [0005].

As an additional example, Choi 2004 describes the preparation of ultrafine particle of insoluble drugs in water and the improvement of physicochemical properties by using three types of fine grinding mills such as a planetary ball mill, a vibration rod mill, and a jet mill. *See* Choi at Abstract. Notably, Choi 2004 expresses a preference for jet-milling over grinding by a planetary ball mill or vibration rod mill. Choi 2004 teaches that upon subjecting UDCA to jet-milling to reduce particle size, the "median diameter of ground sample by jet mill was about 1.5 µm," with "a sharp particle size distribution from 0.68 to 5.64 µm." Choi 2004 at S169. In contrast, the particle size of a UDCA sample ground by vibration rod mill had "a wide variation," ranging from 7 to 76 µm. *Id.* Ursodeoxycholic acid (UDCA) was used as the model insoluble drug in Choi 2004. *See id*. The samples ground by three mills were characterized by particle size distribution measurement, apparent solubility measurement, powder X-ray diffraction (PXRD), and in vivo test of a hindrance effect of reactive oxygen species (ROS) generation. *See id*. Choi

2004 disclosed that the UDCA ground by the jet mill inhibited lipid peroxidation. Based on the results, it is considered that the bioavailability such as the solubility and dissolution rate of insoluble drug UDCA can be improved by reducing the size of particles. *See id.* at S171.[12]

WO 475 also teaches jet-milling in the context of ursodeoxycholic acid. WO 475 at 1:14; '337 patent at 1:47-62. A POSA would know that UDCA and obeticholic acid belong to similar classes of chemical compounds and show the same pharmacological activity. In view of the above similarities between, the POSA would look at prior art references involving UDCA to determine the formulation of obeticholic acid in the '337 patent. *See, e.g.*, *Valeant Pharm. Int'l v. Mylan Pharm. Inc.*, 955 F.3d 25, 32-33 (Fed. Cir. 2020) ("When compounds share significant structural and functional similarity, those compounds are likely to share other properties, including optimal formulation for long-term stability.").

WO 475 discloses jet milled formulations of micronized UDCA "having an average particle size (d90) not more than about 20 microns, preferably les[s]than 10 microns, more preferably said micronized particles have an average particle size less than about 7 microns." WO 475 at 3:27-30. This means that at least 90% of the micronized particles have a diameter of not more than about 20 microns (or micrometers), preferably less than 10 microns, and more preferably less than 7 microns. WO 475 discloses that micronized UDCA "results in improved dissolution and absorption characteristics." *Id.* at 3:13-15.

Similarly, WO '741 further teaches that "[m]icronization of ursodeoxycholic acid is carried out using conventionally known mills, such as a ball mill, colloid mill, grinding mill, air

[12] Indeed, during prosecution, the applicant argued in a response to a restriction requirement that Groups I and IV are not distinct, stating that obeticholic acid and ursodiol have a similar core structure and therefore cannot be considered materially different. '337 patent PH, 7-7-2017 Response to Restriction Requirement at 7.

jet mill, roller mill, impact mill, etc." WO '741 at 4:20–22. Among these, WO '741 teaches that "[a]ir jet milling is particularly well suited as it is a well proven technique that consistently produces particles of a size less than 25 microns." *Id.* at 4:22–23.

Furthermore, Kawabata and Markarian disclose that common milling techniques, such as jet milling, are capable of producing pharmaceutical APIs having a particle size in the range of 2–3 µm or 2–5 µm. Kawabata at 4 (teaching "[j]et milling, ball milling, and pin milling are commonly used for dry milling," and "the lowest particle size that can be achieved by conventional milling is about 2 – 3 µm."); Markarian (teaching jet milling is capable of producing API particles in the 2 – 5 µm range); *see also* '944 publication at [0138] (teaching that jet milling is "[a] conventional approach to reducing [particle] size.").

Therefore, the prior art instructs, or at a minimum motivates, a POSA to use jet milling to reduce the particle size of the drug particles to the micron level in order to improve the dissolution of the drug with a reasonable expectation of success.

**6. <u>Dependent Claims 14 and 15</u>**

Claims 14 and 15 are directed to a tablet comprising obeticholic acid with an intra- and extra-granular portion which is prepared by jet-milling. Claims 14 and 15 recite:

> 14. The tablet of claim 11, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is jet-milled.

> 15. The tablet of claim 14, wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, and wherein at least 50% of the particles have a diameter of 200 µm or less.

Claims 14 and 15 are product-by-process claims. Claim 15 is a product-by-process claim because it depends on claim 14 (to the extent claim 15 adds any product limitations, we have

addressed them below). In the case of product-by-process claims, the process limitations are not accorded any weight for determining validity. *Amgen Inc. v. F. Hoffman-La Roche Ltd*., 580 F.3d 1340, 1369 (Fed. Cir. 2009); *Thorpe*, 777 F.2d at 697 ("If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process."). There is an exception to the rule if the process imparts structural or functional differences distinguishing the claimed product from prior art. *Purdue Pharma. L.P. v. Epic Pharma*., LLC, 811 F.3d 1345, 1353 (Fed. Cir. 2016) (finding the process limitation to impart no structural or functional differences; "[t]hus, the court did not err in disregarding the process limitation in its obviousness determination"); *SteadyMed Ltd. v. United Therapeutics Corp*., IPR 2016-00006, Paper 82, 53 (P.T.A.B. March 31, 2017) (finding no structural or functional differences imparted by the process), *aff'd* F.3d (Fed. Cir. 2017).

Such is not the case here, as the tablets claimed in claims 14 and 15 of the '337 patent have the same structural and functional characteristics as the compositions disclosed by the prior art (discussed above). *Fresenius Kabi USA LLC, v. Cubist Pharma*., IPR 2015-01566, Paper 20, 8- 10 (P.T.A.B. Jan. 28, 2016) (finding the process steps merely improved purity levels, which were recited in the claims, and thus, do not impart any unrecited structural or functional features to the claimed product); *Purdue Pharma*., 811 F.3d at 1352 ("Purdue did not claim the remedy of the problem of remaining 14–hydroxy in the oxycodone API—performing a second hydrogenation step. Instead, it claimed the end product—an oxycodone API with low ABUK levels. And, as the district court found, identification of the source of the remaining 14–hydroxy as being 8α had no effect on the structure or nature of the low-ABUK oxycodone product."). Thus, the process of claims 14 and 15 is afforded no weight in a validity analysis. *Purdue*

*Pharma.*, 811 F.3d at 1353- 54 (finding the product-by-process claim directed to purer compound obvious where the process limitation failed to impart a structural or functional difference explaining "the fact that the 14– hydroxy is derived from 8α imparts no structural or functional differences in the low-ABUK hydrocodone API as compared to the prior art products. Thus, the court did not err in disregarding the process limitation in its obviousness determination.").

As such, the process limitations are not accorded any weight for determining the validity of claims 14 and 15 of the '337 patent. *Amgen Inc*., 580 F.3d at 1369. Further, the product of claims 14 and 15, which is the tablet recited in claim 11 of the '337 patent, is obvious in view of the prior art for the reasons discussed above. *Supra* Section IX.B.4.

Even if the process limitations of claims 14 and 15 were given patentable weight, claims 14 and 15 would still have been obvious. For the reasons discussed above, compositions comprising bile acids prepared using techniques such as jet-milling were known in the art. *Supra* Sections IX.B.1-2.

Accordingly, in light of the disclosures in the prior art it would have been obvious for a person of ordinary skill in the art to prepare a tablet comprising obeticholic acid using a jet-mill where the resulting particles have a diameter of 200 µm or less. Furthermore, a person of ordinary skill in the art would have been motivated to prepare such a tablet, and would have had a reasonable expectation of success.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section IX.D.

### C. Claims 1-19 of the '337 patent are anticipated and/or rendered obvious by Ferrari '352, Pellicciari 2007, Pellicciari '390, and/or Yu '628 in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein

#### 1. <u>Independent Claims 1 and 13 and Dependent Claims 2-8 and 14-17</u>

As discussed above, claims 1-8 and 13-17 of the ’337 patent claim compositions and tablets comprising obeticholic acid, wherein the composition or tablet has a certain particle size distribution. Claims 13-17 further require that the particles were formed using jet-milling.

Each of Ferrari ’352, Pellicciari 2007, Pellicciari ’390, and/or Yu ’628 disclose a composition containing obeticholic acid. *See, e.g.*, Ferrari ’352 at Claim 1; Pellicciari 2007 at 4265; Pellicciari ’390 at 5:29-53, 6:36-42, 9:30-10:48; Yu ’628 at claims 1-4. Plaintiffs’ documents show that obeticholic acid prepared according to prior-art processes naturally resulted in particles within the claimed range. *See, e.g.*, INT_OCA_0885891-INT_OCA_0885934; INT_OCA_0965894-INT_OCA_0965942; INT_OCA_0875210-INT_OCA_0875212; INT_OCA_1169263-INT_OCA_1169288; INT_OCA_0651472-INT_OCA_0651473; INT_OCA_1161267-INT_OCA_1161275; INT_OCA_0508676-INT_OCA_0508710; *see also* MSN(OBA)_0063099-MSN(OBA)_0063128.

For the reasons explained above, which are fully incorporated herein, a POSA also would have been motivated to formulate these obeticholic acid compositions such that the obeticholic acid particles were less than 5µm in diameter. *Supra* Sections IX.B.1-6. Moreover, a POSA would have known that jet-milling can be used to achieve this particle size, and in fact is the preferred method for doing so. *Id.*

### 2. <u>Claims 9-12 and 18-19</u>

As discussed above, Claims 9-12 and 18-19 claim obeticholic acid compositions and tablets containing certain excipients and/or having an intra-granular and extra-granular portion.

Each of Ferrari ’352, Pellicciari 2007, Pellicciari ’390, and/or Yu ’628 disclose a composition containing obeticholic acid. *See, e.g.*, Ferrari ’352 at Claim 1; Pellicciari 2007 at 4265; Pellicciari ’390 at 5:29-53, 6:36-42, 9:30-10:48; Yu ’628 at claims 1-4.

For the reasons explained above, which are fully incorporated herein, a POSA would have been motivated to formulate these obeticholic acid compositions with the claimed excipients, and such formulations were known in the art. *Supra* Sections IX.B.1-6. Moreover, a POSA would have been motivated to formulate obeticholic acid tablets such that they contain an intra-granular and extra-granular portion, and similarly such formulations were known in the art. *Id.*

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section IX.D.

#### 3. Any secondary considerations are inadequate to overcome the prima facie obviousness of the claims

Defendants contend that there are no secondary considerations regarding the asserted claims of the '337 patent that are relevant in assessing obviousness. That said, Defendants note that secondary considerations are not part of the *prima facie* case of obviousness. Rather, a patentee may try and rebut a *prima facie* case of obviousness by coming forward with purported evidence of such secondary considerations. *Bayer Pharma AG v. Watson Labs., Inc.*, 183 F. Supp. 3d 579, 589 (D. Del. 2016). Defendants therefore have no burden at this stage to come forward with evidence rebutting such considerations. Quite the contrary, it is Plaintiffs' obligation and burden alone to come forward with evidence of so-called secondary considerations, if any, on which they intend to rely.

Plaintiffs to date have raised no substantive or plausible secondary considerations in connection with the '337 patent. For example, in response to Joint Interrogatory No. 4, Plaintiffs simply say that they "intend to rely on all applicable objective indicia of nonobviousness, including skepticism by experts and others in the field, teaching away, failure of others, long-felt but unmet need, unexpected results, praise in the field, copying and commercial success," and do not attempt to tie any particular secondary consideration to any claim or patent, and thus have

failed to show nexus. Regardless, Plaintiffs do not even provide any suggestion of what their theories might be with regard to most of these secondary considerations.

Plaintiffs discuss only three examples of secondary considerations in a generic manner, again untied to any particular claim or patent, each of which cannot overcome the clear showing of obviousness here. They are discussed below. First, Plaintiffs allege copying is evidence of non-obviousness. However, courts have repeatedly held that any alleged copying has little relevance to obviousness in Hatch-Waxman cases such as this one where ANDA filers are required to establish bioequivalence to the reference drug product. *See, e.g.*, *Purdue Pharma Products L.P. v. Par Pharmaceutical, Inc.*, 642 F.Supp.2d 329, 373-74 (D. Del. 2009). Any similarities Plaintiffs allege exist would be due to efficiency of pursuing FDA approval and not any technical merit of the patent or its claims.

Second, Plaintiffs allege long-felt but unmet need in PBC patients under-responsive to UDCA at increased risk of progressing to end-stage liver disease. Again, Plaintiffs have failed to tie this alleged need to any claim or patent in any way, or provide any facts explaining how this alleged need was met. For example, there was significant prior art disclosing formulations of obeticholic acid, and Plaintiffs provide no meaningful allegation of why or even how its claimed formulations differ from the prior art. To the extent Plaintiffs' alleged need is limited to the commercial availability of products, that only speaks to the motivation to proceed with such a formulation and has no relevance

to the technical merits of the patents.

Third, Plaintiffs allege two statements made by Drs. Pellicciari and Rewolinski to the USPTO indicate evidence of unexpected results. These self-serving statements again are untied to any patent or claim. For example, Dr. Pellicciari's statement regarding potency of the compound in comparison to other compounds has no relevance to the formulations claimed in this patent. Similarly, Dr. Rewolinski's statement regarding CDCA is unrelated to the claims of the '337 patent.

The '337 patent specification states that "[t]he present application is directed to compositions and formulations of obeticholic acid . . . having improved dissolution, solubility, and stability for the treatment of a disease or condition." '337 patent at 6:48-7:5. As discussed above, however, it was "generally recognized that poorly soluble drugs showing a dissolution rate- limiting step in the absorption process will be more readily bioavailable when administered in a finely subdivided form with larger surface than as a coarse material." Aulton at 8; *see also, e.g.*, FDA Q6A Guidance at 83046, 83054 (explaining "particle size can have a significant effect on dissolution rates, bioavailability, and/or stability" and providing guidance for addressing the particle size in poorly-soluble drug substances).

Thus, the results discussed in the '337 patent specification does not support nonobviousness of the claims. *See, e.g.*, *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007) ("[B]y definition, any superior property must be *unexpected* to be considered as evidence of non-obviousness."). Accordingly, for at least the above reasons, each claim of the '337 patent is invalid under 35 U.S.C. § 103 as obvious over the prior art.

Defendants reserve the right to further rebut any claims of secondary considerations of non-obviousness raised by Plaintiffs, if any, as discovery proceeds in this case.

**D. Invalidity of the '337 patent Under 35 U.S.C. § 112**

**1. <u>Claims 1-10, 13, and 15-19 of the '337 are invalid for indefiniteness.</u>**

Claims 1-10, 13, and 15-19 of the '337 patent claims recite obeticholic acid particles having a diameter less than a specified amount. However, the specification fails to inform a POSA how to measure the claimed particle size. Instead, the '337 patent states that "[p]article size analysis can be carried out via different methods," including "sieve technique, wet dispersion method with laser diffraction analysis, dry dispersion method with laser diffraction analysis, or a combination thereof." '337 patent at 16:28–32. The specification further states that "[p]article size analysis is not limited to the methods described herein and can be carried out using any method known to one skilled in the art." *Id.* at 16:32–35.

In particle-size readings, the size of a three dimensional object—which will have a length, width, and depth—are described with a single number. *E.g.*, '337 patent at claim 1 (claiming a 200 μm number to describe the size of particles). A sphere is the only geometric object for which its size is a single number. Therefore, to give a single size to each particle of a powder it is given an "equivalent sphere," which is a single number to define a non-spherical object. Measurements obtained through microscopy, or sieve analysis, or laser diffraction (all of which are allowed in the patent), will result in very different equivalent sphere sizes for any given particle. *See, e.g.*, Alan F. Rawle,

"Basic Principles of Particle Size Analysis," Malvern Instruments (2003).

The claims and the specification likewise fail to inform a POSA as to whether the size measurements are limited to volume distributions or not, or whether number distributions are also within the scope of the claims.

Consequently, it is not possible for a POSA to determine whether a given composition would fall within the claim, as the size that ascribed by different equivalent spheres and different size distributions will yield different median and % size results. *See, e.g.*, *Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*, 151 F. Supp. 3d 525, 548 (D.N.J. 2018) ("In this case, the wording of the claim term 'mean' and specification may be construed as designating an instrument by which to conduct a measurement of 'mean particle size,' but nothing therein guides the skilled practitioner whether to utilize the 'volume weighted mean' or the 'surface weighted mean' that such a device reports as measurements.").

**2. Claims 1-12 and 16-19 of the '337 patent are not enabled and/or fail the written description requirement.**

At least to the extent claims 1-12 and 16-19 of the '337 patent would not have been obvious to a POSA, then the claims are not enabled and/or fail the written description requirement. The specification only describes achieving the claimed particle size through jet-milling, and both the specification and prosecution history discuss the importance of jet milling in both achieving the claimed particle size and from differentiating the claims from the prior art. To the extent it would not be obvious to achieve the claimed particle size, then a POSA would need undue experimentation in order to achieve the claims. There are many different techniques for reducing the particle size in a composition, and the specification gives no guidance on how to achieve the claims aside from using jet milling. In addition, the applicants were not in possession of the claimed composition where jet milling is not utilized, and therefore the claims would be

invalid for failure to satisfy the written description requirement.

Importantly, the Court has held that "particles," as the term is used in the '337 patent claims, is not limited to particles made by the jet-milling method. D.I. 142 at 2. Similarly, Plaintiffs argued during claim construction that "jet-milling is just one way of obtaining the claimed particles." D.I. 115 at 54 (emphasis added). Thus the claims on their face encompass particles made through any mechanism. However, a POSA could not know what micronization methods could be used to achieve the claimed particles. For example, during prosecution the patent applicants contrasted jet-milling with several other prior art micronization techniques, and explained that those methods could not be used. Specifically, the applicants stated "[c]ontrary to the Examiner's allegations, the claimed product **cannot be made** by another process such as ball milling, high pressure homogenization or cryogenic spray process because these processes may not provide the desired particle size and particle size distribution." July 7, 2017 Applicant Response at 7 (emphasis added). This discrepancy illustrates the uncertainty of the claims in context of the patent specification, and demonstrates that the full scope of the "particles" limitations lack written description. Moreover, the full scope of the claims cannot be enabled here because a POSA would not know how to use all prior art processes, including ball milling, high pressure homogenization, or cryogenic spray processes to achieve "particles" as required by the claims. There are no teachings or examples of achieving the required particles, particle size, or particle size distribution other than the use of jet milling—and other known techniques did not work or were not "robust" enough—and a POSA would need undue experimentation to determine the full scope of the claims.

**E.** [redacted]

[redacted]



## X. INVALIDITY OF THE ASSERTED CLAIMS OF THE '349 PATENT

The asserted claims of the '349 patent are invalid as described more fully below and as identified in attached Appendix F, which is incorporated by reference in addition to the information discussed in this document.

### A. Claims 1-22 of the '349 patent are rendered obvious by the '188 publication in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein.

#### 1. <u>Independent claims 1 and 19.</u>

Independent claims 1 and 19 of the '349 patent recite:

1. A tablet comprising obeticholic acid in an amount of 1 mg to 50 mg and a

pharmaceutically acceptable excipient, wherein said obeticholic acid is in the form of jet-

milled particles having a diameter of less than about 100 µm when analyzed by laser diffraction, and wherein $D_{50}$ is not more than 50 µm, and

wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 6% (wt/wt).

> 19. A tablet comprising: obeticholic acid in an amount of 1 mg to 50 mg; and sodium starch glycolate,
> wherein said obeticholic acid is in the form of jet-milled particles having a diameter of less than about 100 µm when analyzed by laser diffraction, wherein D50 is not more than 50 µm, and wherein the total alcohol impurity in said sodium starch glycolate is less than about 6% (wt/wt).

As discussed below, a POSA would have been motivated to formulate obeticholic acid compositions at the claimed particle sizes. While the requirement for "jet-milled" particles is not accorded patentable weight, a POSA nonetheless would have been motivated to reduce obeticholic acid particles through by jet-milling. Finally, the prior art taught or suggested obeticholic acid tablets at the claimed strengths and with the claimed excipients.

**a) <u>The '188 publication taught or suggested formulating obeticholic acid compositions at the claimed particle sizes.</u>**

The '188 publication discloses obeticholic acid compositions and explains that "a tablet may be prepared by compressing an intimate mixture comprising a powder or granules of obeticholic acid and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent." '188 publication at [0201]. A tablet prepared by compressing a powder or granules of obeticholic acid would inherently contain obeticholic acid in the form of particles significantly less than 100 µm. Even at the preformulation stage (i.e. prior to deciding on the requirements of particle size in relation to the solubility of the drug), it would be routine for a person of ordinary skill in the art (POSA) to control the size of the compound to below 30

µm. *See, e.g.*, Lieberman, at 5-6. Lieberman explains:

> It is probably safest to grind most new drugs having particles that are above approximately 100µm in diameter. If the material consists of particles primarily 30µm or less in diameter, then grinding is unnecessary, except if the material exists as needles – where grinding may improve flow and handling properties, or if the material is poorly water-soluble where grinding increases dissolution rate. Grinding should reduce coarse material to, preferably, the 10- to 40-µm range. Once this is accomplished, controlled testing can be performed both for subsequent *in vivo* studies and for in-depth preformulation studies.

*Id.*

The ’188 publication also discloses that Form 1 of obeticholic acid, which “can be used at the pharmaceutically active ingredient” exists as “small irregular particles.” ’188 publication at [0329], [0347]. In particular, of the six batches of Form 1 analyzed, the ’188 publication reports that the particles “all look similar” with “[p]article size ranges from less than 1 µm to 3 µm.” *Id.* at [0347].

**b) <u>The requirement that the particles are “jet-milled” is a product- by-process limitation that is not accorded patentable weight.</u>**

In the case of product-by-process claims, the process limitations are not accorded any weight for determining validity. *Amgen*, 580 F.3d at 1369; *Thorpe*, 777 F.2d at 697 (“If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process.”). The same principles apply to a “nested” product-by-process limitation within a claim. *Biogen MA Inc. v. EMD Serano, Inc.*, 976 F.3d 1326, 1334 (Fed. Cir. 2020) (“There is no logical reason why the nesting of a product-by-process limitation within a method of treatment claim should change how novelty of that limitation is evaluated.”). There is an exception to the rule if the process imparts structural or functional differences distinguishing the claimed product from prior art. *Purdue Pharma.*, 811 F.3d at 1353 (finding the process limitation to impart no structural or functional differences; “[t]hus, the court did not err in disregarding the process limitation in its obviousness

determination”); *SteadyMed*, IPR 2016-00006, Paper 82, 53 (finding no structural or functional differences imparted by the process).

The ’349 patent claims’ requirement that the particles are “jet-milled” is a product-by-process limitation that does not impart structural or functional differences distinguishing the claimed product from prior art. *See, e.g.*, *Belcher Pharms. LLC v. Hospira, Inc.*, C.A. No. 17-cv-00775-LPS, 2019 WL 2526400 (D. Del. May 30, 2019) (finding that a claim requiring the substance be “compounded in an aqueous solution” is a product-by-process claim); *Fresenius Kabi*, IPR 2015-01566, Paper 20, 8-10 (finding the process steps merely improved purity levels, which were recited in the claims, and thus, do not impart any unrecited structural or functional features to the claimed product); *Purdue Pharma.*, 811 F.3d at 1352 (“Purdue did not claim the remedy of the problem of remaining 14–hydroxy in the oxycodone API—performing a second hydrogenation step. Instead, it claimed the end product—an oxycodone API with low ABUK levels. And, as the district court found, identification of the source of the remaining 14–hydroxy as being 8α had no effect on the structure or nature of the low-ABUK oxycodone product.”). Thus, the process step of “jet-milled” particles is afforded no weight in a validity analysis. Nonetheless, as discussed below, such techniques would have been obvious to a POSA.

**c) <u>A POSA would have been motivated to reduce the particle size of obeticholic acid by jet-milling to increase the dissolution rate.</u>**

A POSA further would have been motivated to formulate a pharmaceutical composition having the claimed particle sizes in order to increase obeticholic acid’s dissolution rate. *See generally Bayer Schering Pharma AG v. Barr Labs., Inc.*, No. 05-cv-2308, 2008 WL 628592, at *23-25, 37 (D.N.J. Mar. 3, 2008) (finding that it would have been obvious to try reducing a composition’s particle size in light of “the general rule” that “micronization will improve the dissolution of a poorly water soluble drug”).

It was known before 2015 that obeticholic acid is poorly water soluble. Specifically, the ’188 publication explains that Form 1’s water solubility is 17.9 µmol/L and Form F’s water solubility is 9.1 µmol/L. ’188 publication at [0385]. Pellicciari 2014 likewise reports obeticholic acid having a water solubility of only 9 µM. Pellicciari 2014 at [0089], [0197]. A POSA would understand from these values that obeticholic acid is poorly water soluble.

Well before the priority date, it was also known that decreasing the particle size of a poorly water soluble drug by methods such as jet-milling could increase the drug’s dissolution rate. *See, e.g.*, Chaumeil at 211–215 (explaining that “reducing particle size by micronization can improve the rate of dissolution of poorly soluble materials,” including by jet-milling); Savjani at 3 (“The solubility of [a] drug is often intrinsically related to drug particle size; as a particle becomes smaller, the surface area to volume ratio increases.”); Kawabata at 4 (“The dissolution rate of a drug proportionally increases with increasing surface area of drug particles.”); Krishnaiah at 028 (“The oral bioavailability of drugs presented in a solid dosage form depends mainly on size, size distribution and morphology of particles. This is due to enhanced surface area of drug particles available for dissolution.”); Chu at 1187 (“When administered orally, the dissolution rate can be the rate-limiting step for poorly water-soluble drugs, particularly BCS Class (biopharmaceutical classification system) II and IV compounds.”).

A POSA formulating obeticholic acid as a pharmaceutical composition would have been motivated to reduce the particle size of obeticholic acid. Savjani explains that “[m]ore than 40% [of] NCEs (new chemical entities) developed in pharmaceutical industry are practically insoluble in water” and therefore have poor dissolution rates, which can be addressed by reducing the particle size, including by jet-milling. Savjani at 2–3. Chu discloses that milling is a common technique to increase the dissolution rate by increasing the specific surface area of pharmaceutical

APIs, and teaches that micronized drugs show better clinical efficacy than non-micronized drugs. Chu at 188. Chaumeil provides examples in which the micronization of a poorly soluble drug provided a dissolution rate four times better than its unmicronized counterpart, and explains that for another poorly soluble drug, reducing the median particle size (including down to 3 µm) "was the best way of increasing the rate of dissolution." Chaumeil at 213-214; *see also, e.g.*, Takahashi at 482-84 (teaching the use of wet granulation improved the dissolution characteristics of the two BCS Class II drugs; nimodipine and spironolactone). Indeed, FDA Q6A Guidance expressly explained that "particle size can have a significant effect on dissolution rates, bioavailability, and/or stability" and provided guidance for addressing the particle size in poorly-soluble drug substances. FDA Q6A Guidance at 83046, 83054.

Several references further highlighted the benefits of jet milling to reduce particle size. Kawabata teaches that "[j]et milling, ball milling, and pin milling are commonly used for dry milling," and "the lowest particle size that can be achieved by conventional milling is about 2 – 3 µm." Kawabata at 4; *see also* Markarian (teaching jet milling is capable of producing API particles in the 2 – 5 µm range). Dodd also discloses that it is well known that the dissolution of a particulate drug will increase with increasing surface area. Dodd at [0004]. "One way of increasing surface area is decreasing particle size. Consequently, methods of making finely divided or sized drugs have been studied with a view to controlling the size and size range of drug particles for pharmaceutical compositions." *Id.* A technique in the art known to control particle size is jet milling. *See id.* at [0005].

The '188 publication discloses employing obeticholic acid tablets in clinical trials, and a POSA would know that in order to formulate tablets, it would be beneficial to reduce the particle size of obeticholic acid to have a median size of significantly less than 200 µm. *See* '188

publication at [0328] ("[T]he 5mg, 10mg, and 25 mg formulations have been used as phase 3 clinical trial material.").

When designing a clinical trial using a tablet, a POSA further would have been motivated to decrease the particle size of obeticholic acid. Similar practices were used to increase the dissolution rate of ursodeoxycholic acid (UDCA). Pellicciari 2014 teaches that both obeticholic acid and UDCA are natural or synthetic analogues of bile acids, and both have a water solubility of less than 10 μM. Pellicciari 2014 at [0089], [0096], [0197]; WO '475 at 1:10-14, 3:4-5 (showing that UDCA has a similar structure to obeticholic acid and that UDCA is "practically insoluble in water"); '549 patent at 1:48-63 (same); *see also* July 7, 2017 Applicant Response to Restriction Requirement at 7 (the patentee conceding during prosecution that both obeticholic acid and UDCA "belong to a class of bile acids and have [a] similar core structure" and "may not be considered as materially different product[s]"); *Valeant Pharm.*, 955 F.3d at 32-33 ("When compounds share significant structural and functional similarity, those compounds are likely to share other properties, including optimal formulation for long-term stability."). Before the priority date, it was known that the dissolution rate of UDCA could be increased by reducing its particle size. *See, e.g.*, Choi 2004.

Choi 2004 describes "the preparation of ultrafine particle[s] of insoluble drugs in water and the improvement of physicochemical properties by using three types of fine grinding mills," and studies UDCA as a model insoluble drug. Choi 2004 at Abstract. Choi 2004 explains that "[t]he particle size of medicinal materials is an important physical property that affects the pharmaceutical behaviors such as dissolution, chemical stability, and bioavailability of solid dosage forms." *Id.* at S166. Because "[a] fundamental problem of insoluble drugs is often an insufficient bioavailability," Choi 2004 teaches that "[d]ecreasing the particle size of these drugs

can improve their rate of dissolution." *Id.* at 165. Choi 2004 analyzes data relating to the micronization of UDCA and concludes that "the solubility and dissolution rate of insoluble drug UDCA can be improved by the particle size reduction." *Id.* at S171; *see also id.* at S169, Fig. 4. Choi 2004 further expresses a preference for jet-milling over grinding by a planetary ball mill or vibration rod mill. Choi 2004 teaches that upon subjecting UDCA to jet-milling to reduce particle size, the "median diameter of ground sample by jet mill was about 1.5 µm," with "a sharp particle size distribution from 0.68 to 5.64 µm." *Id.* at S169. In contrast, the particle size of a UDCA sample ground by vibration rod mill had "a wide variation," ranging from 7 to 76 µm. *Id.* Choi 2004 further finds that both "the vibration rod mill and the jet mill showed more significantly hepato-protective effects compared with intact UDCA and the UDCA ground by the planetary ball mill." *Id.* at S172.

Additional references echoed the findings of Choi 2004. For example, WO '475 teaches that UDCA (aka ursodiol) "is characterized as having low solubility and high permeability," and thus "the rate limiting step for oral bioavailability of Ursodiol is the dissolution of the drug from the pharmaceutical dosage form." WO '475 at 3:4–9. WO '475 teaches that a "dosage form prepared using micronized and unmicronized ursodiol, results in an improved dissolution and absorption characteristics." *Id.* at 3:13–15. Specifically, "[i]n the preferred embodiment, [u]rsodiol is micronized to obtain reduced particle size e.g. $d_{90}$ particle size of less than 20 micron, preferably less than 10 micron, and more particularly less than 7 micron." *Id.* at 4:25–27; *see also id.* at 4:11–13 (noting that air jet milling "is a well proven technique that consistently produces particles of a size less than 35 microns, preferably less than 20 microns"); *id.* at 3:27–30 (disclosing jet-milled formulations of micronized UDCA "having an average particle size (d90) not more than about 20 microns, preferably les[s]than 10 microns, more preferably said

micronized particles have an average particle size less than about 7 microns"). WO '475 proposes claims for embodiments in which up to 95% of the ursodiol particles are micronized at an average particle size of less than about 7 microns. *Id.* at 10:1–13.

WO '741 likewise explains that because UDCA is "practically insoluble in water," its bioavailability is "highly depend[s] on particle size." WO '741 at 1:15–19, 4:1–2. WO '741 teaches that the dissolution and bioequivalency profile of UDCA is improved when "at least 90% of the particles of the ursodeoxycholic acid have a size less than 25 microns." *Id.* at 4:7–18. WO '741 further teaches that "[m]icronization of ursodeoxycholic acid is carried out using conventionally known mills, such as a ball mill, colloid mill, grinding mill, air jet mill, roller mill, impact mill, etc." *Id.* at 4:20–22. Among these, WO '741 teaches that "[a]ir jet milling is particularly well suited as it is a well proven technique that consistently produces particles of a size less than 25 microns." *Id.* at 4:22–23.

Additional references taught or suggested obtaining the claimed particle sizes of obeticholic acid. For example, WO '482 claims "synthetic derivatives of natural bile acids, preferably 6-Ethyl-CDCA" and discloses numerous oral dosage forms, including tablets, that can be used with various pharmaceutically acceptable excipients. *Id.* at 17:28-21:6, 38:23-26. WO '482 further teaches compositions "formulated as aerosols for topical application, such as by inhalation," and teaches that such formulations will have particle sizes with "diameters of less than about 50 microns, such as less than about 10 microns." *Id.* at 24:11-18. Similarly, WO '521 discloses CDCA derivatives suitable for tablets "prepared by compressing an intimate mixture comprising a powder or granules of the active ingredient and one or more optional ingredients." WO '521 at 3, 14:20-24. WO '521 further teaches that "[f]or pulmonary administration via the mouth, the particle size of the powder or droplets typically ranges from 0.5 to 10 μm, preferably

from 1 to 5 µm, to ensure delivery into the bronchial tree.” *Id.* at 14:28-15:2. And WO ’689 discloses a process for developing a composition of Nor-UDCA without micronization (WO 689 at 5), resulting in a composition where at least 50% of particles have a diameter of as low as 0.5 micrometer and at least 90% of particles have a diameter of as low as 2 micrometers (*id.* at 10-11). Thus, based on the above references, a POSA would know that tablets for use in a phase 3 clinical trial in the ’188 publication should be optimized and in the form intended for market by reducing the particle size. This would also satisfy a regulatory requirement for particle size control for a poorly soluble API. *See generally* FDA Q6A Guidance. As early as 1988, it was “generally recognized that poorly soluble drugs showing a dissolution rate-limiting step in the absorption process will be more readily bioavailable when administered in a finely subdivided form with larger surface than as a coarse material.” Aulton at 8.

**d) <u>The ’188 publication taught or suggested obeticholic acid tablets at the claimed strengths with the claimed excipients.</u>**

The ’188 publication teaches or suggests obeticholic acid tablets at the claimed strengths and with the claimed excipients—i.e. sodium starch glycolate or a total primary alcohol impurity of less than about 6% (wt/wt).

The ’188 publication discloses obeticholic acid tablets and that “the 5mg, 10mg, and 25 mg formulations have been used as phase 3 clinical trial material.” ’188 publication at [0328]. These tablets comprise, *inter alia*, anhydrous obeticholic acid, microcrystalline cellulose, and sodium starch glycolate. *Id.* at [0219] (disclosing four formulations, each with these excipients); *see also id.* [0328] (disclosing sodium starch glycolate in each formulation).

Additional references taught use of obeticholic acid tablets within the claimed concentration range. For example, Carey 2012, Mason, and PBC Study disclose administration of 10, 25, and 50 mg of obeticholic acid. Carey 2012 at 2475; Mason at S1; PBC Study. NASH-

Flint also discloses administion of 25 mg of obeticholic acid. NASH-Flint.

A POSA also would have known that disintegrants such as sodium starch glycolate could increase the dissolution of obeticholic acid, which as discussed *supra*, was known to be poorly water soluble. *See* Bolhuis at Abstract ("It is demonstrated that the dissolution from capsules and tablets of poorly soluble, hydrophobic drugs can be strongly improved by solid deposition of the drug upon hydrophilic, strongly swelling carriers like the super disintegrants sodium starch glycolate and croscarmellose sodium."). Sodium starch glycolate was accordingly used in compositions comprising similarly-structured bile acids. *See, e.g.*, WO '689 at 19 (disclosing the use of various excipients in solid dosage forms of Nor-UDCA, including starch, starch derivatives, and disintegrants); WO '475 at at 3:3-5, 6:14-22, claims 1, 8, and 9 (disclosing tablets containing UDCA with "[p]harmaceutically acceptable excipient(s) includ[ing] disintegrants" and that "[e]xemplary disintegrants include . . . sodium starch glycolate"); URSO 250 Label (indicating that Ursodiol contains sodium starch glycolate).

It would have been obvious to a POSA to use a form of sodium starch glycolate having an alcohol content of less than about 6% (wt/wt), and to formulate a tablet with a total primary alcohol impurity of less than about 6% (wt/wt). The '349 patent concedes that before the priority date, Explotab® from JRS Pharma was commercially available as a sodium starch glycolate having "containing no more than 3% ethanol." '349 patent at 94:15-20. The '380 patent discloses seven commercially available sodium starch glycolate grades, all of which contain low levels of residual alcohol, including as low as 900 ppm. '380 patent at 6:12-31.

Additionally, it would have been routine for a formulator to use pure excipients without any impurities such as alcohol. Further, Delalonde 2014 confirmed the deleterious effects of alcohol in a disintegrant, noting that increasing the level of alcohol will increase the disintegration

time and thus decrease the effect of the disintegrant in a formulation. *See* Delalonde 2014 at 409. A POSA would have thus been motivated to select an excipient with low total primary alcohol impurity levels.

**2. Dependent claims 2, 3, 6, 16-18, and 20-22.**

Claims 2, 3, 18, and 20 further limit the particle size. In particular, claims 2, 3, and 18 depend from claim 1 and require wherein $D_{50}$ is not more than 20 µm, 10 µm, and 5 µm, respectively, and claim 20 depends from claim 19 and requires wherein $D_{50}$ is not more than 5 µm. A POSA would have been motivated to obtain the particle sizes recited by claims 2, 3, 18, and 20 for the same reasons discussed *supra* with respect to independent claims 1 and 19.

Claims 6, 16, 17, 21, and 22 further limit the pharmaceutically acceptable excipient having a specified primary alcohol impurity. Claim 6 depends from claim 1 and further requires "wherein said pharmaceutically acceptable excipient having a total primary alcohol impurity of less than about 6% (wt/wt) is sodium starch glycolate." Claims 16 and 17 depend from claim 1 and further require that the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 3% (wt/wt) and less than about 0.5% (wt/wt), respectively. Claims 21 and 22 depend from claim 19 and further require that the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 3% (wt/wt) and less than about 0.5% (wt/wt), respectively.

A POSA would have been motivated to reduce the primary alcohol impurity in sodium starch glycolate to less than about 0.5% (wt/wt), and to formulate a tablet with a total primary alcohol impurity of less than about 0.5% (wt/wt). For the same reasons discussed *supra* with respect to independent claims 1 and 19, a POSA would have been motivated to reduce the alcohol impurities in the obeticholic acid, and sodium stach glycolate excipients comprising low amounts

of alcohol were commercially available. *See supra* Section X.A.1.

### 3. **Dependent claims 4, 5, and 7-15.**

Claims 4, 5, and 7-9 further limit the tablet formulation and the excipients contained therein. As discussed herein, a POSA would have been motivated to formulate the tablets recited by claims 4, 5, and 7-9.

Claim 4 depends from claim 1 and further requires "wherein the tablet comprises an intra-granular portion and an extra-granular portion, wherein the intra-granular portion comprises said obeticholic acid and a pharmaceutically acceptable excipient, and the extragranular portion comprises a pharmaceutically acceptable excipient," and claim 5 depends from claim 4 and further requires "wherein the extra-granular portion does not contain obeticholic acid."

Claims 7 and 8 depend from claim 5, and claim 9 depends from claim 7. Claim 7 requires "wherein the intra-granular portion comprises a diluent selected from: starch, pregelatinized starch, microcrystalline cellulose, calcium carbonate, dibasic calcium phosphate, tribasic calcium phosphate, calcium phosphate, lactose, dextrose, fructose, lactitol, lactose, magnesium carbonate, magnesium oxide, maltitol, maltodextrin, maltose, simethicone, sodium chloride, talc, xylitol, sorbitol, mannitol, and sucrose, and/or a combination thereof." Claim 8 requires "wherein the extra-granular portion comprises a diluent selected from: starch, pregelatinized starch, microcrystalline cellulose, calcium carbonate, dibasic calcium phosphate, tribasic calcium phosphate, calcium phosphate, lactose, dextrose, fructose, lactitol, lactose, magnesium carbonate, magnesium oxide, maltitol, malto-dextrin, maltose, simethicone, sodium chloride, talc, xylitol, sorbitol, mannitol, and sucrose, and/or a combination thereof." And claim 9 requires "wherein the diluent is microcrystalline cellulose."

The '188 publication expressly contemplates formulating tablets with an intra-granular

portion comprising obeticholic acid and a pharmaceutically acceptable excipient, teaching that "a tablet may be prepared by compressing an intimate mixture comprising a powder or granules of obeticholic acid and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent." '188 publication at [0201]; *see also id.* at [0199]. The '188 publication further discloses including additional pharmaceutically acceptable excipients, such as a coating material, which a POSA would understand would be located outside the granules. *See, e.g.*, *id.* at [0208]-[0217], [219]. It further would have been obvious to a POSA to include microcrystalline cellulose, which acts as a filler/binder, in both the intra-granular and extra-granular portions of the formulation. *See id.* at [0219].

Additional prior art reinforces that formulating the claimed intra-granular and extra-granular portions of an obeticholic acid tablet would have been routine to a POSA.

For example, Pellicciari '390 discloses tablets of obeticholic acid "prepared by compressing an intimate mixture comprising a powder or granules of the active ingredient and one or more optional ingredients, such as a binder, lubricant, inert diluent, or surface active dispersing agent, or by moulding an intimate mixture of powdered active ingredient and inert liquid diluent." Pellicciari '390 at 6:36-40.

Thosar, which is directed to pharmaceutical compositions comprising active agents, including aldosterone receptor blockers, discloses pharmaceutical compositions comprising eplerenone in the form or tablets where the tablets comprise intra- and extra-granular sections. *See* Thosar at 35:8-60, Example 1. Thosar also discloses processes for preparing the tablets and improvements thereof. For example, Thosar states that "[t]he use of extragranular microcrystalline cellulose (that is, microcrystalline cellulose added to a wet granulated composition after the drying step) in addition to intragranular microcrystalline cellulose (that is,

microcrystalline cellulose added to the composition during or before the wet granulation step) can be used to improve tablet hardness and/or disintegration time." *Id*. at 9:4-11.

As another example, WO '475 discloses the following tablet formulation:

| Sr. No. | Ingredients | Example A mg/tab | Example B mg/tab |
|---|---|---|---|
| 1 | Ursodiol (Micronized particle having D90 value less than 10 microns) | 350.00 | 300.00 |
| 2 | Ursodiol (Unmicronized particle having D90 value more than 170 microns) | 150.00 | 200.00 |
| 3 | Sodium Starch Glycolate | 8.00 | 8.00 |
| 4 | Microcrystalline Cellulose (Avicel PH 101) | 97.00 | 97.00 |
| 5 | Polyethylene Glycol 3350 | 24.00 | 24.00 |
| 6 | Povidone K 30 | 24.00 | 24.00 |
| 7 | Purified Water | q.s. | q.s |
| 8 | Syloid 244 FP | 12.00 | 12.00 |
| 9 | Sodium Starch Glycolate | 40.00 | 40.00 |
| 10 | Microcrystalline Cellulose (Avicel PH 102) | 87.00 | 87.00 |
| 11 | Magnesium Stearate | 8.00 | 8.00 |
| | Total (Core wt.) | 800.00 | 800.00 |
| 12 | Opadry white 03F58991 | 8.00 | 8.00 |
| 13 | Purified Water | 808.00 | 808.00 |

*Id*. at 7:15-30, Example 1 (emphasis added). According to the tableting procedure, ingredients 4 and 5 were dissolved in sufficient quantity of purified water. This solution was then used as a binder solution and added in the rapid mixer granulator within two minutes at impeller fast speed and chopper off. Dry granules were passed through oscillating granulator fitted with 16 # mesh along with Syloid 244 FP. Granules were transferred in blender and mixed for five minutes. Ingredient 10 was transferred in blender and mixed for 3 minutes. *See id*. at 8:4-20. As can be seen from the above disclosure, WO '475 taught tablet formulations containing microcrystalline cellulose in both the intra- and extra-granular portions of a tablet where the active agent was a bile acid analog.

Additionally, Takahashi studied the impact of wet granulation on low soluble BCS Class

II drugs; nimodipine and spironolactone. Takahashi at 477-78. Granules were prepared by blending various excipients, including lactose, microcrystalline cellulose, colloidal silicon dioxide and croscarmellose sodium using povidone as a binder. *Id.* at 478. All the granules prepared included microcrystalline cellulose. *Id.* The granules thus prepared were blended with magnesium stearate and compressed into tablets. *Id.* The tablets prepared were compared to tablets made using physical mixtures of the same drugs and excipients in the same proportions. *Id.* at 479. Tablets made from the granules and physical mixtures were compared for dissolution characteristics. *Id.* at 482. The results of the dissolution tests performed by Takahashi showed that the tablets prepared from granules had faster dissolution that the tablets prepared from physical mixtures. *Id.* at 482-83. The conclusion of Takahashi was that the use of wet granulation improved the dissolution characteristics of the two BCS Class II drugs; nimodipine and spironolactone. *Id.* at 483-84.

Li performed a study of the effects of intra-granular and extra-granular MCC on two model drugs; metoprolol (highly soluble) and hydrochlorothiazide (slightly soluble). The formulations prepared also included excipients selected from dicalcium phosphate, lactose, povidone, sodium starch glycolate, croscarmellose sodium, silicon dioxide and magnesium stearate. Formulations were prepared with an intra-granular portion comprising dicalcium phosphate or lactose, a disintegrant and povidone as a binder. The prepared granules were then blended with an extragranular portion comprising a disintegrant, silicon dioxide and magnesium stearate. MCC was added to either the intra-granular portion or the extra-granular portion in each formulation. The final blends were compressed into tablets and tested for disintegration and dissolution. All formulations contained either intra-granular or extra-granular MCC.

The prior art also disclosed the use of excipients, including disintegrants such as

microcrystalline cellulose, in both portions of the tablet. *See* Shotton 1976 at 1170. Shotton 1976 discloses that "[a] combination of intra- and extragranular disintegrating agents gave the best compromise" to obtain effective disintegration in tablets. *Id.* at Abstract. Further, Example 1 of WO '475 discloses the addition of microcrystalline cellulose and other excipients in the intragranular portion of a URDC tablet, as well as the use of microcrystalline cellulose in the extragranular portion of the tablet. A POSA would have been motivated to develop a tablet containing obeticholic acid and one or more excipients, including the disintegrant microcrystalline cellulose, in the intragranular portion of the tablet, as well as adding an excipient such as microcrystalline cellulose in the extragranular portion of the tablet.

Claims 10-12 further limit the ratio of microcrystalline cellulose to obeticholic acid. Claim 10 depends from claim 9 and further requires "wherein a ratio of microcrystalline cellulose to obeticholic acid in the intra-granular portion is from about 20:1 to about 1:5." Claim 11 depends from claim 10 and requires "the ratio is from about 20: 1 to about 1: 1," and claim 12 depends from claim 11 and requires "the ratio is from 20: 1 to about 5: 1."

The '188 publication expressly discloses formulations that include ratios of microcrystalline to obeticholic acid ranging from about 17.6:1 to 6.28:1, and teaches that microcrystalline cellulose is used as a filler/binder. '188 publication at [0328]; *see also, e.g.*, *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) ("In cases involving overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a *prima facie* case of obviousness."); *see also In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (not inventive to discover the optimum or workable ranges of a result-effective variable through routine experimentation); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368 (Fed. Cir. 2007) ("[D]iscovery of an optimum value of a variable in a known process is usually

obvious.”). The ’188 publication teaches that in these formulations, “obeticholic acid quantity presented . . . is adjusted based on the potency of the drug substance Lot used, and amount of microcrystalline cellulose is correspondingly decreased.” ’188 publication at [0328].

Claims 13-15 depend from claim 5 and further require that comprises 5 mg, 10 mg, and 25 mg of obeticholic acid, respectively. A POSA would have been motivated to formulate obeticholic acid tablets comprising 5 mg, 10 mg, and 25 mg of obeticholic acid for the same reasons discussed *supra* with respect to claim 1. *See* Sections IX.B.1, X.A.1.

**4. Any secondary considerations are inadequate to overcome the prima facie obviousness of the claims**

Defendants contend that there are no secondary considerations regarding the asserted claims of the ’349 patent that are relevant in assessing obviousness. That said, Defendants note that secondary considerations are not part of the *prima facie* case of obviousness. Rather, a patentee may try and rebut a *prima facie* case of obviousness by coming forward with purported evidence of such secondary considerations. *Bayer Pharma AG v. Watson Labs., Inc.*, 183 F. Supp. 3d 579, 589 (D. Del. 2016). Defendants therefore have no burden at this stage to come forward with evidence rebutting such considerations. Quite the contrary, it is Plaintiffs’ obligation and burden alone to come forward with evidence of so-called secondary considerations, if any, on which they intend to rely.

Plaintiffs to date have raised no substantive or plausible secondary considerations in connection with the ’349 patent. For example, in response to Joint Interrogatory No. 4, Plaintiffs simply say that they “intend to rely on all applicable objective indicia of nonobviousness, including skepticism by experts and others in the field, teaching away, failure of others, long-felt but unmet need, unexpected results, praise in the field, copying and commercial success,” and do not attempt to tie any particular secondary consideration to any claim or patent, and thus have

failed to show nexus. Regardless, Plaintiffs do not even provide any suggestion of what their theories might be with regard to most of these secondary considerations.

Plaintiffs discuss only three examples of secondary considerations in a generic manner, again untied to any particular claim or patent, each of which cannot overcome the clear showing of obviousness here. They are discussed below. First, Plaintiffs allege copying is evidence of non-obviousness. However, courts have repeatedly held that any alleged copying has little relevance to obviousness in Hatch-Waxman cases such as this one where ANDA filers are required to establish bioequivalence to the reference drug product. *See, e.g., Purdue Pharma Products L.P. v. Par Pharmaceutical, Inc.*, 642 F.Supp.2d 329, 373-74 (D. Del. 2009). Any similarities Plaintiffs allege exist would be due to efficiency of pursuing FDA approval and not any technical merit of the patent or its claims.

Second, Plaintiffs allege long-felt but unmet need in PBC patients under-responsive to UDCA at increased risk of progressing to end-stage liver disease. Again, Plaintiffs have failed to tie this alleged need to any claim or patent in any way, or provide any facts explaining how this alleged need was met. For example, there was significant prior art disclosing formulations of obeticholic acid, and Plaintiffs provide no meaningful allegation of why or even how its claimed formulations differ from the prior art. To the extent Plaintiffs' alleged need is limited to the commercial availability of products, that only speaks to the motivation to proceed with such a formulation and has no relevance

to the technical merits of the patents.

Third, Plaintiffs allege two statements made by Drs. Pellicciari and Rewolinski to the USPTO indicate evidence of unexpected results. These self-serving statements again are untied to any patent or claim. For example, Dr. Pellicciari's statement regarding potency of the compound in comparison to other compounds has no relevance to the formulations claimed in this patent. Similarly, Dr. Rewolinski's statement regarding CDCA is unrelated to the claims of the '349 patent.

The '349 patent specification states "[t]he composition of the disclosure possess advantageous properties, including improved dissolution profile and solubility." '349 patent at 14:58-60. As discussed above, however, it was "generally recognized that poorly soluble drugs showing a dissolution rate-limiting step in the absorption process will be more readily bioavailable when administered in a finely subdivided form with larger surface than as a coarse material." Aulton at 8; *see also, e.g.*, FDA Q6A Guidance at 83046, 83054 (explaining "particle size can have a significant effect on dissolution rates, bioavailability, and/or stability" and providing guidance for addressing the particle size in poorly-soluble drug substances).

Thus, the results discussed in the '349 patent specification does not support nonobviousness of the claims. *See, e.g.*, *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007) ("[B]y definition, any superior property must be *unexpected* to be considered as evidence of non-obviousness."). Accordingly, for at least the above reasons, each claim of the '349 patent is invalid under 35 U.S.C. § 103 as obvious over the prior art.

Defendants reserve the right to further rebut any claims of secondary considerations of

non-obviousness raised by Plaintiffs, if any, as discovery proceeds in this case.

**B. Invalidity of the '349 patent Under 35 U.S.C. § 112**

**1. <u>Claims 1-22 of the '349 patent are invalid for indefiniteness</u>**

Claims 1-22 of the '349 patent claims recite obeticholic acid particles "wherein said obeticholic acid is in the form of jet- milled particles having a diameter of less than about 100 [or less] µm when analyzed by laser diffraction." However, the specification fails to inform a POSA how to measure the claimed particle size. Instead, the '349 patent states that "[p]article size analysis can be carried out via different methods," including "wet dispersion method with laser diffraction analysis, dry dispersion method with laser diffraction analysis, or a combination thereof." '349 patent at 16:48–62. The specification further states that "[p]article size analysis is not limited to the methods described herein and can be carried out using any method known to one skilled in the art." *Id.* at 16:52–55.

In particle-size readings, the size of a three dimensional object—which will have a length, width, and depth—are described with a single number. *E.g.*, '549 patent at claim 12 (claiming a 200 µm number to describe the size of particles). A sphere is the only geometric object for which its size is a single number. Therefore, to give a single size to each particle of a powder it is given an "equivalent sphere," which is a single number to define a non-spherical object. Measurements obtained through different laser diffraction techniques will result in very different equivalent sphere sizes for any given particle. *See, e.g.*, Alan F. Rawle, "Basic Principles of Particle Size

Analysis," Malvern Instruments (2003).

The claims and the specification likewise fail to inform a POSA as to whether the size measurements are limited to volume distributions or not, or whether number distributions are also within the scope of the claims.

Consequently, it is not possible for a POSA to determine whether a given composition would fall within the claim, as the size that ascribed by different equivalent spheres and different size distributions will yield different median and % size results. *See, e.g.*, *Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*, 151 F. Supp. 3d 525, 548 (D.N.J. 2018) ("In this case, the wording of the claim term 'mean' and specification may be construed as designating an instrument by which to conduct a measurement of 'mean particle size,' but nothing therein guides the skilled practitioner whether to utilize the 'volume weighted mean' or the 'surface weighted mean' that such a device reports as measurements.").

**2. Claims 1-3 and 17-22 are invalid for indefiniteness**

Claims 1-3 and 17-22 recite the term "tablet" generally. However, the patent specification does not describe any tablet other than a tablet specifically comprising an intra-granular portion with a pharmaceutically acceptable excipient and an extra-granular excipient with a pharmaceutically acceptable excipient. The specification does not describe a tablet that does not comprise an intragranular and extragranular portion in a manner that permits one or ordinary skill to practice the claimed invention, without undue experimentation.

The term "tablet" in the specification is described as a tablet that comprises an intragranular and an extra-granular portion. *See* '349 patent at 42:27-28. Further, the patent specification exemplifies that the "improved manufacturing process of obeticholic acid (OCA) tablets" comprises producing tablets comprising an intra-granular portion with a

pharmaceutically acceptable excipient and an extragranular excipient with a pharmaceutically acceptable excipient. *Id*. at col. 85.

Based on the above and the Examples of the '349 patent, the specification does not describe to those skilled in the art how to make and use the full scope, i.e., a "tablet" in forms other than a tablet comprising an intra-granular portion with a pharmaceutically acceptable excipient and an extra-granular excipient with a pharmaceutically acceptable excipient.

Thus, a person of ordinary skill in the art would be able to make and use only a tablet comprising an intra-granular portion with a pharmaceutically acceptable excipient and an extragranular excipient with a pharmaceutically acceptable excipient, but not a tablet in any other form.

Accordingly, the specification does not adequately enable the full scope of the invention as recited in claims 1-3 and 17-22. The specification only enables a tablet comprising an intra-granular portion with a pharmaceutically acceptable excipient and an extra-granular excipient with a pharmaceutically acceptable excipient, and not a tablet in any other form.

In addition, the applicants were not in possession of a tablet that does not have an intra-granular portion with a pharmaceutically acceptable excipient and an extra-granular excipient with a pharmaceutically acceptable excipient, and therefore the claims would be invalid for failure to satisfy the written description requirement.

**3. The claims of the '349 patent are not enabled and/or fail the written description requirement.**

At least to the extent the claims of the '349 patent would not have been obvious to a POSA, then the claims are not enabled and/or fail the written description requirement. The specification only describes achieving the claimed particle size through jet-milling, and both the specification and prosecution history discuss the importance of jet milling in both achieving the

claimed particle size and from differentiating the claims from the prior art. To the extent it would not be obvious to achieve the claimed particle size, then a POSA would need undue experimentation in order to achieve the claims. There are many different techniques for reducing the particle size in a composition, and the specification gives no guidance on how to achieve the claims aside from using jet milling. In addition, the applicants were not in possession of the claimed composition where jet milling is not utilized, and therefore the claims would be invalid for failure to satisfy the written description requirement.

Importantly, the Court has held that "particles," as the term is used in the '349 patent claims, is not limited to particles made by the jet-milling method. D.I. 142 at 2. Similarly, Plaintiffs argued during claim construction that "jet-milling is just one way of obtaining the claimed particles." D.I. 115 at 54 (emphasis added). Thus the claims on their face encompass particles made through any mechanism. However, a POSA could not know what micronization methods could be used to achieve the claimed particles. For example, during prosecution the patent applicants contrasted jet-milling with several other prior art micronization techniques, and explained that those methods could not be used. Specifically, the applicants stated "[c]ontrary to the Examiner's allegations, the claimed product **cannot be made** by another process such as ball milling, high pressure homogenization or cryogenic spray process because these processes may not provide the desired particle size and particle size distribution." July 7, 2017 Applicant Response at 7 (emphasis added). This discrepancy illustrates the uncertainty of the claims in context of the patent specification, and demonstrates that the full scope of the "particles" limitations lack written description. Moreover, the full scope of the claims cannot be enabled here because a POSA would not know how to use all prior art processes, including ball milling, high pressure homogenization, or cryogenic spray processes to achieve "particles" as required by the

claims. There are no teachings or examples of achieving the required particles, particle size, or particle size distribution other than the use of jet milling—and other known techniques did not work or were not "robust" enough—and a POSA would need undue experimentation to determine the full scope of the claims.

**C. [redacted]**

[redacted]

## XI. INVALIDITY OF THE ASSERTED CLAIMS OF THE '549 PATENT

The asserted claims of the '549 patent are invalid as described more fully below and as

identified in attached Appendix G, which is incorporated by reference in addition to the information discussed in this document.

**A. Claims 1-33 of the '549 patent are rendered obvious by the '188 publication in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

**1. Independent Claims 1, 12, and 23 and Dependent Claims 3, 14, and 24**

Claims 1, 3, 12, 14, 23 and 24 recite:

1. A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject a tablet comprising an intra-granular portion and an extra- granular portion, the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, and the extra-granular portion comprising one or more pharmaceutically acceptable excipients, wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w), wherein the amount is a starting dose, an adjusted dose, or a re-adjusted dose; and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M).

3. The method of claim 1, wherein the intra-granular portion comprises obeticholic acid.

12. A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject a tablet comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, and wherein at least 50% of the particles have a diameter of 200 µm or less, wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w), wherein the amount is a starting dose, an adjusted dose, or a re-adjusted dose; and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M).

14. The method of claim 12, wherein the tablet comprises obeticholic acid.

23. A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject a tablet comprising an intra-granular portion and an extra-granular portion, the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt

or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, and the extra- granular portion comprising one or more pharmaceutically acceptable excipients, wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, and wherein at least 50% of the particles have a diameter of 200 µm or less, wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w), wherein the amount is a starting dose, an adjusted dose, or a re-adjusted dose; and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M).

24. The method of claim 23, wherein the intra-granular portion comprises obeticholic acid.

**a) <u>The claimed obeticholic acid tablets were known in the prior art, or at a minimum would have been obvious.</u>**

As discussed above with respect to the ’337 patent in Sections IX.B-C, which are incorporated in full by reference here, the claimed obeticholic acid tablets were disclosed in the prior art, or at a minimum would have been obvious to a POSA as of the priority date for the ’549 patent. *Supra* Sections IX.B-C. Specifically, based on the ’188 publication combined with the knowledge of the POSA and teachings of the prior art cited herein, it was known and/or would have been obvious to manufacture a tablet comprising obeticholic acid, in the form of jet-milled particles, where at least 50% of the particles have a diameter of 200 µm or less, and having an intra-granular portion containing obeticholic acid and one or more pharmaceutically acceptable excipients (including at least one having an alcohol content of less than about 6% (w/w)) and an extra-granular portion. *Id.*

Furthermore, it would have been obvious to include obeticholic acid in an amount of about 1mg to about 50mg, as claimed. *Supra* Sections IX.B-C, X.A. For example, the ’188 publication discloses compositions containing 1-25 mg of obeticholic acid. ’188 publication at [0328] (“[T]he 5mg, 10mg, and 25 mg formulations have been used as phase 3 clinical trial material.”), *id.* at

[0263]. And additional references also taught the use of obeticholic acid tablets within the claimed concentration range. For example, Carey 2012, Mason, and PBC Study disclose administration of 10, 25, and 50 mg of obeticholic acid. Carey 2012 at 2475; Mason at S1; PBC Study. NASH- Flint also discloses administion of 25 mg of obeticholic acid. NASH-Flint.

**b) <u>The prior art taught treating primary biliary cholangitis by administering obeticholic acid daily, every other day, once a week, twice a week, three times a week, one a month, or twice a month.</u>**

The ’188 publication teaches methods of treating PBC with obeticholic acid. ’188 publication at [0221]. Specifically, the ’188 publication discloses obeticholic acid tablets and that “the 5mg, 10mg, and 25 mg formulations have been used as phase 3 clinical trial material.” *Id.* at [0328].

With respect to the limitations requiring specific timing of administration of the tablet (e.g., daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M)), as an initial matter, these limitations add nothing patentable to the claims, as the limitation cover virtually every possible dosing regimen for a tablet, and thus these limitations would be obvious.

Additionally, the ’188 publication teaches administering “about 1 mg to about 50 mg” of obeticholic acid daily, and emphasizes that “the amount of obeticholic acid actually administered will be determined by a physician, in the light of the relevant circumstances,” including the “response of the individual patient.” *Id.* at [0263].

Additional prior art references also teach the daily administration of obeticholic acid. For example, Johnston discloses a study where patients received 25 mg of obeticholic acid orally daily for two weeks. Johnston at Abstract. Mudaliar discloses a study where patients were given placebo, 25 mg obeticholic acid, or 50 mg obeticholic acid once daily for six weeks. Mudaliar at

Abstract. Similarly, Mason discloses once daily administration of 10 mg, 25 mg and 50 mg obeticholic acid. Mason at S1. And NCT 524 discloses once daily administration of 5 mg and 10 mg obeticholic acid.  NCT 524.

Additionally, a POSA would have been motivated to investigate the "phase 3 clinical trial[s]" that used the obeticholic acid tablets taught by the '188 publication. *See* '188 publication at [0328]. Such clinical trials would have motivated a POSA to practice the '549 patent claims with a reasonable expectation of success.

For example, Phase 3 PBC Study expressly taught administering obeticholic acid according to the '549 patent claims. Phase 3 PBC Study analyzed the efficacy of obeticholic acid to "improve liver function in persons with Primary Biliary Cirrhosis (PBC)." Phase 3 PBC Study. One arm of the study involved treating patients with "OCA 5 mg for 6 months and then titrating up to 10  mg for remainder of double blind period," another 6 months. *Id.* Patients were administered "5 or 10 mg tablets once daily." *Id.*

Additionally, Combination PBC Study analyzed the efficacy of 10 mg, 25 mg, or 50 mg of obeticholic acid administered once daily in combination with UDCA. *See* Combination PBC Study. Combination PBC Study sought to treat patients with patients with primary biliary cirrhosis "to assess the effects of INT-747 on 1) hepatocellular injury and liver function, 2) disease-specific and general health symptoms and 3) biomarkers of hepatic inflammation and fibrosis." *Id.* Each of the groups treated with obeticholic acid showed clinically significant decreases in markers of PBC: decreased relative % alkaline phosphatase, and decreases in serum gamma-glutamyl transpeptidase and alanine aminotransferase compared to placebo. *Id.*

A POSA would have known that UDCA is commonly coadministered with cholestyramine, which was "widely used as first-line treatment" of symptoms and complications

associated with PBC. Poupon at 753. Poupon teaches that when UDCA is coadministered with cholestyramine, "UDCA and cholestyramine should be spaced a minimum of 4 h apart to prevent binding and loss of efficacy." *Id.* at 753-54.

Thus, the POSA would have been motivated to administer the tablet daily, every other day, once a week, twice a week, three times a week, one a month, or twice a month in light of the prior art and the POSA would have done so with a reasonable expectation of success.

**2. Claims 2, 13 and 30**

Claims 2, 13 and 30 recite:

2. The method of claim 1, wherein the amount is about 1 mg to about 10 mg.

13. The method of claim 12, wherein the amount is about 1 mg to about 10 mg.

30. The method of claim 23, wherein the amount is about 1 mg to about 10 mg.

As discussed above, the '188 publication discloses tablet formulations containing 1 mg to 25 mg obeticholic acid. '188 publication at at [0328], [0263]; *see also supra* Sections IX.B-C, X.A. Thus, tablets containing the claimed quantities of obeticholic acid were taught in the art. *E.I. DuPont de Nemours & Co. v. Synvina CV*, 904 F.3d 996, 1006 (Fed. Cir. 2018) (an overlap of ranges of a claimed composition with the ranges disclosed in the prior art "creates a presumption of obviousness.")

**3. Claims 4-6, 15-17 and 31-33**

Claims 4-6, 15-17 and 31-33 recite:

> 4. The method of claim 1, wherein the amount is a starting dose and the tablet is administered in a titration period.
>
> 5. The method of claim 4, wherein the titration period is from 1 month to 6 month.
>
> 6. The method of claim 5, wherein the titration period is from 3 months or 6 months.

> 15. The method of claim 12, wherein the amount is a starting dose and the tablet is administered in a titration period.
>
> 16. The method of claim 15, wherein the titration period is from 1 month to 6 month.
>
> 17. The method of claim 16, wherein the titration period is from 3 months or 6 months.
>
> 31. The method of claim 23, wherein the amount is a starting dose and the tablet is administered in a titration period.
>
> 32. The method of claim 31, wherein the titration period is from 1 months or 6 months.
>
> 33. The method of claim 32, wherein the titration period is from 3 months or 6 months.

According to the '549 patent, a "titration period" refers to "a length of time for which a starting dose is administered to a patient." Specifically, the patent states that a "titration period continues for a specified length of time, where the patient is often monitored for liver function and/or liver biochemistry as described herein. In one embodiment a titration period concludes when a patient tolerates an obeticholic acid composition described herein but has a decreased or minimal reduction in alkaline phosphatase." '549 patent at 10:14-23. Monitoring for liver function and/or liver biochemistry would be well within the skill set of a POSA, and the POSA would further know how to adjust the patients' dose in light of the patients' liver function and/or liver biochemistry. Indeed, "the specification does not offer any guidance beyond citation of well-known" dose titration principles. *Anacor Pharm., Inc. v. Flatwing Pharm., LLC*, No. 2019-2264, 2020 WL 5049229, at *4 (Fed. Cir. Aug. 27, 2020).

Additionally, URSO 250 Label, which, like obeticholic acid, is a synthetic bile acid having a similar structure, states that "[l]iver function tests (γ-GT, alkaline phosphatase, AST, ALT) and bilirubin levels should be monitored every month for three months after start of

therapy, and every six months thereafter." URSO 250 Label at 2.2. The URSO 250 Label also states that "[d]osing regimen should be adjusted according to each patient's need at the discretion of the physician." Similarly, the '188 publication emphasizes that "the amount of obeticholic acid actually administered will be determined by a physician, in the light of the relevant circumstances," including the "response of the individual patient." *Id.* at [0263]. And a POSA would have known that administration of a formulation via a titration period is useful for adjusting the dose of the formulation to achieve the maximum benefit without adverse effects. *See, e.g.*, Corpechot 2012 at S17.

#### 4. Claims 7-9, 18-20 and 25-27

Claims 7-9, 18-20 and 25-27 recite:

> 7. The method of claim 1, wherein the amount is 10 mg, and the tablet is administered daily.
>
> 8. The method of claim 1, wherein the amount is 5 mg, and the tablet is administered daily.
>
> 9. The method of claim 1, wherein the amount is about 1 mg to about 5 mg, and the tablet is administered daily.
>
> 18. The method of claim 12, wherein the amount is 10 mg, and the tablet is administered daily.
>
> 19. The method of claim 12, wherein the amount is 5 mg, and the tablet is administered daily.
>
> 20. The method of claim 12, wherein the amount is about 1 mg to about 5 mg, and the tablet is administered daily.
>
> 25. The method of claim 24, wherein the amount is 10 mg, and the tablet is administered daily.
>
> 26. The method of claim 24, wherein the amount is 5 mg, and the tablet is administered daily.
>
> 27. The method of claim 24, wherein the amount is about 1 mg to about 5 mg, and the tablet is administered daily.

As discussed above in Sections IX.B-C, X.A, which are incorporated in full by reference here, it would have been obvious to admister 1mg, 5mg, or 10mg of obeticholic acid daily. *Supra* Sections IX.B-C, X.A; *see also* '188 publication at [0328].

**5. Claims 10-11, 21-22 and 28-29**

Claims 10-11, 21-22 and 28-29 recite:

> 10. The method of claim 1, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered.
>
> 11. The method of claim 1, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered.
>
> 21. The method of claim 12, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered.
>
> 22. The method of claim 12, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered.
>
> 28. The method of claim 24, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered.
>
> 29. The method of claim 24, wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered.

As of the priority date, the person of ordinary skill in the art would have known that bile acid binding resins bind bile acids and bile acids analogs, thereby inhibiting their absorption and efficacy. Indeed, the Public Assessment Report for ursodeoxycholic acid states that bile acid binding agents "should be taken at least 2 hours before or after UCDA intake." Public Assessment Report at 12 (*available at* https://db.cbg-meb.nl/Pars/h111238.pdf).

Additionally, a POSA would have known that UDCA is commonly coadministered with

cholestyramine (a bile acid binding resin), which was "widely used as first-line treatment" of symptoms and complications associated with PBC. Poupon at 753. Poupon teaches that when UDCA is coadministered with cholestyramine, "UDCA and cholestyramine should be spaced a minimum of 4 h apart to prevent binding and loss of efficacy." *Id.* at 753-54.

Thus, it would have been obvious for the person of ordinary skill in the art to require taking a bile acid binding agent at least four hours before or after taking the tablet to ensure adequate absorption and efficacy of obeticholic acid.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section XI.D.

**B. Claims 1-33 of the '549 patent are rendered obvious by Carey 2012 in view of a POSA's knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

**1. <u>Claim 1, 12, and 23</u>**

Claims 1, 12, and 23 of the '549 patent are directed to a method of treating PBC by administering a claimed obeticholic acid tablet having obeticholic acid in the form of jet-milled particles, where at least 50% of the particles have a diameter of 200 µm or less (claim 12 and 13), and having an intra-granular portion containing obeticholic acid and one or more pharmaceutically acceptable excipients (including at least one having an alcohol content of less than about 6% (w/w)) and an extra-granular portion. Each claim requires the use of about 1mg to about 50mg of obeticholic acid. Finally, the dose of obeticholic acid is a starting dose, adjusted dose, or a re- adjusted dose, and the tablet is administer daily, every other day, once a week, twice a week, three times a week, once a month, or twice a week.

Carey 2012 discloses the use of obeticholic acid to "address medical treatment of the most common cholestatic liver diseases: primary biliary cirrhosis (PBC) [the prior name for primary biliary cholangitis] . . . ." Carey 2012 at 2473-75. It also discloses two clinical studies

administering obeticholic acid in 10, 25, and 50 mg dosages, noting that "preliminary data suggest that obeticholic acid may be a potential first-line agent for the treatment of PBC, warranting direct comparison to UDCA." *Id.* at 2475. Further, Carey 2012 discloses administration of tablet forms of ursodeoxycholic acid, which a POSA would have known was structurally similar to obeticholic acid and had been administered via tablet since at least 1999. *Id.* at 2474; *see also* Lindor et al., *High Dose Ursodeoxycholic Acid for the Treatment of Primary Sclerosing Cholangitis*, HEPATOLOGY, 2009 Sep; 50(3):808-814. Based on the disclosure in Carey 2012, a POSA would have been motivated to administer obeticholic acid to treat PBC by administration of a tablet at a dosage of between at least 10 mg and 50 mg.

Further, for the reasons explained above with regards to the '349 patent, which are incorporated here in full, a POSA with experience in formulations would have known that tablets may contain an intra-granular (or contained within the particle of the active pharmaceutical ingredient) and extra-granular (or contained outside of the particle) portion. *Supra* Section X.A. Thus, a POSA would have been motivated to develop a tablet containing obeticholic acid and one or more excipients in the intra-granular portion of the tablet, as well as adding an excipient in the extra-granular portion of the tablet.

And for the reasons explained above, which are incorporated here in full, a POSA would have been motivated to formulate the tablet in a way that would optimize the solubility and dissolution of the tablet. *Supra* Sections IX.B-C, X.A. Specifically, a POSA would have been to utilize a small particle size, in the form of jet-milled particles, and include an excipient with low amounts of alcohol. *Id.*

Finally, the inclusion of limitations in claim 1 regarding starting dose, adjusted dose, readjusted dose, or frequency of dosage add nothing patentable to the claims, as they cover

virtually every possible dosing regimen for a tablet, and thus these limitations would be obvious. Further, Carey 2012 discloses a clinical trial administering obeticholic acid at dosages of 10, 25, and 50 mg. Carey 2012 at 2475 (citing Mason A, et al., *Farnesoid-X receptor agonists: a new class of drugs for the treatment of PBC? An international study evaluating the addition of INT-747 to ursodeoxycholic acid*, J. HEPATOL 2012;52(Suppl 1):S1-2 ("Mason 2012")). And additional prior art discloses the claimed dosing, as discussed above. *Supra* Sections IX.B-C, X.A. Thus, a POSA would thus be motivated to administer a tablet containing obeticholic acid as a starting dose on a once daily basis.

**2. Claims 2-11, 13-22, and 24-33**

Claims 2 and 7-9 of the '549 patent depend from claim 1 and are directed to obeticholic acid in an amount from about 1 mg to about 10 mg. Similarly, claim 13 depends from claim 12 and is directed to obeticholic acid in an amount from about 1 mg to about 10 mg and claim 30 depends from claim 23 and is directed to obeticholic acid in an amount about 1 mg to about 10 mg. Claim 14 of the '549 patent depends from claim 12 and is directed to a tablet comprising obeticholic acid. As discussed in regards to claim 1, the prior art discloses the use of obeticholic acid in the claimed range. *Supra* Section XI.B.1; *see also* Carey 2012 at 2475.

Claim 3 of the '549 patent depends from claim 1 and is directed to an intra-granular portion of the tablet containing obeticholic acid. Similarly, claim 24 depends from claim 23 and is directed to an intragranular portion that comprises obeticholic acid. Claims 3 and 24 are obvious for the same reasons discussed in claim 1 of the '549 patent. *Supra* Section XI.B.1.

Claim 4 of the '549 depends from claim 1 and is directed to administering a starting dose and the tablet is administered in a titration period. Similarly, claims 15 and 31 depend from claims 12 and 23, respectively, and are directed to administering a starting dose, and the tablet is

administered in a titration period. Claims 5 and 6 depend from claims 4 and 5, respectively, and are directed to titration periods of from 1 to 6 months or from 3 to 6 months, respectively. Similarly, claims 16, 17, 32, and 33 depend from claims 15, 16, 31, and 32, respectively, and are directed to titration periods of from 1 to 6 months or from 3 to 6 months, respectively.

The ’549 patent defines "starting dose" as an initial dose provided to a patient to provide a clinical effect while minimizing onset or occurrence of an adverse event. ’549 patent at 10:14-16. As discussed above in Section XI.A.3, which is incorporated in full here, it would have been obvious to administer the obeticholic acid tablets in a titration period.

Additionally, claims 10 and 11 each depend from claim 1 and are directed to administering a bile acid binding resin at least 4 hours before or after the obeticholic acid is administered. Similarly, claims 21-22 and 28-29 depend from claims 12 and 24, respectively, and are directed to administering to the subject a bile acid binding resin at least 4 hours before or after the obeticholic acid is administered. For the reasons explained above in Section XI.A.5, which are incorporated here in full, it would have been obvious to include a bile acid binding resin. Moreover, Carey 2012 discloses the use of bile acid binding resins to treat a symptom of cholestasis, noting that a bile acid binding resin "relieves or improves pruritus in the majority of patients." Carey 2012 at 2478. Carey 2012 also discloses that pruritus is a common symptom during the administration of obeticholic acid, often leading to discontinuation of the obeticholic acid regimen. *Id.* at 2475. A POSA would have known to administer bile acid binding resins in conjunction with obeticholic acid to relieve pruritus.

Claims 18-20 and 25-27 of the ’549 patent depend from claims 12 and 24, respectively, and are directed to administering 10 mg, 5 mg, or between 1 and 5 mg of obeticholic acid daily. As discussed above in Sections IX.B-C, X.A, which are incorporated in full by reference here, it

would have been obvious to admister 1mg, 5mg, or 10mg of obeticholic acid daily. *Supra* Sections IX.B-C, X.A; *see also* ’188 publication at [0328].

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section XI.D.

**C. Claims 1-33 of the ’549 patent are rendered obvious by Ferrari ’352, Pellicciari 2007, Pellicciari ’390, and/or Yu ’628 in view of a POSA’s knowledge in the art, optionally in combination with one or more of the prior art references cited herein.**

**1. Independent Claims 1, 12, and 23**

As explained above, the independent claims are directed to a method of treating PBC by administering a claimed obeticholic acid tablet having obeticholic acid in the form of jet-milled particles, where at least 50% of the particles have a diameter of 200 µm or less (claim 12 and 13), and having an intra-granular portion containing obeticholic acid and one or more pharmaceutically acceptable excipients (including at least one having an alcohol content of less than about 6% (w/w)) and an extra-granular portion. Each claim requires the use of about 1mg to about 50mg of obeticholic acid. Finally, the dose of obeticholic acid is a starting dose, adjusted dose, or a re- adjusted dose, and the tablet is administer daily, every other day, once a week, twice a week, three times a week, once a month, or twice a week.

Each of Ferrari ’352, Pellicciari 2007, Pellicciari ’390, and/or Yu ’628 disclose a composition containing obeticholic acid. Ferrari ’352 at 13:20-33 (claim 1); Pellicciari 2007 at 4265 (Chart 1); Pellicciari ’390 at 2:5-17; Yu ’628 at Figure 1. Each of these references also disclose that obeticholic acid is useful in the treatment of hepatic disease of cholestatic origin. Ferrari ’352 at 1:63-67; Pellicciari 2007 at 4265; Pellicciari ’390 at 2:61-67; Yu ’628 at 1:20-25.

For the reasons explained above in Sections IX.B-C and X.A, which are fully incorporated herein, a POSA would have been motivated to formulate these obeticholic acid tablets to have

obeticholic acid in the form of jet-milled particles, where at least 50% of the particles have a diameter of 200 µm or less (claim 12 and 13), and have an intra-granular portion containing obeticholic acid and one or more pharmaceutically acceptable excipients (including at least one having an alcohol content of less than about 6% (w/w)) and an extra-granular portion. *Supra* Sections IX.B-C and X.A. Moreover, a POSA would have known that jet-milling can be used to achieve this particle size, and in fact is the preferred method for doing so. *Id.*

A POSA also would have been motivated to formulate the tablets to have about 1 mg to about 50 mg of obeticholic acid, utilize a starting dose, adjusted dose, or a re-adjusted dose, and administer the tablets daily, every other day, once a week, twice a week, three times a week, once a month, or twice a week, for the reasons explained above in Section XI.A, which are incorporated in full here. *Supra* Section XI.A.

**2. <u>Dependent claims 2-11, 13-22, and 24-33</u>**

The dependent claims of the'549 patent further claim attiributes of the obeticholic acid tablet, treatment, and/or dosing regimen.

For the reasons explained above, which are fully incorporated herein, a POSA would have been motivated to formulate these obeticholic acid tablets as claimed, and administer the tablets as claimed with the claimed excipients, and such formulations and dosing regimens were known in the art. *Supra* Sections IX.B-C, X.A.

Finally, as will be discussed in greater detail below, any secondary considerations are inadequate to overcome the prima facie obviousness of the claims. *See* Section XI.D.

**D. Any secondary considerations are inadequate to overcome the prima facie obviousness of the claims**

For the same reasons discussed *supra* with respect to the '349 patent, Defendants are unaware of any objective indicia supporting the patentability of the '549 patent claims. *See*

Section X.A.4. Thus, for the reasons discussed here and above, Claims 1–33 would have been obvious.

**E. Invalidity of the '549 patent Under 35 U.S.C. § 112**

**1. <u>Claims 1-6, 9-17, 20-24, and 27-33 are Not Enabled</u>**

The specification of the '549 patent does not describe the claimed invention in a manner that permits one or ordinary skill to practice the claimed invention, without undue experimentation. The specification describes method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject a tablet, wherein the amount is a starting dose and the starting dose is 5 mg and 10 mg.

The specification does not describe a method comprising administering to the subject a tablet, wherein the amount is a starting dose and the starting dose is any amount other than 5 mg and 10 mg comprising administering to the subject a tablet.

Accordingly, the specification does not adequately enable the full scope of the invention [i.e., wherein the amount is 1 mg to 50 mg] as recited in claims 1-6, 9-17, 20-24, and 27-33. The specification only enables methods of treating PBC wherein the amount of obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof is 5 mg and 10 mg.

**2. <u>Claims 12-33 of the '549 patent are Indefinite</u>**

Claims 12-33 of the '549 patent claims recite obeticholic acid particles "wherein at least 50% of the particles have a diameter of 200 μm or less." However, the specification fails to inform a POSA how to measure the claimed particle size. Instead, the '549 patent states that "[p]article size analysis can be carried out via different methods," including "sieve technique, wet dispersion method with laser diffraction analysis, dry dispersion method with laser diffraction analysis, or a combination thereof." '549 patent at 16:48–62. The specification further states that "[p]article size analysis is not limited to the methods described herein and can be carried out using any

method known to one skilled in the art." *Id.* at 16:52–55.

[redacted]

In particle-size readings, the size of a three dimensional object—which will have a length, width, and depth—are described with a single number. *E.g.*, '549 patent at claim 12 (claiming a 200 µm number to describe the size of particles). A sphere is the only geometric object for which its size is a single number. Therefore, to give a single size to each particle of a powder it is given an "equivalent sphere," which is a single number to define a non-spherical object. Measurements obtained through microscopy, or sieve analysis, or laser diffraction (all of which are allowed in the patent), will result in very different equivalent sphere sizes for any given particle. *See, e.g.*, Alan F. Rawle, "Basic Principles of Particle Size Analysis," Malvern Instruments (2003).

The claims and the specification likewise fail to inform a POSA as to whether the size measurements are limited to volume distributions or not, or whether number distributions are also within the scope of the claims.

Consequently, it is not possible for a POSA to determine whether a given composition would fall within the claim, as the size that ascribed by different equivalent spheres and different size distributions will yield different median and % size results. *See, e.g.*, *Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*, 151 F. Supp. 3d 525, 548 (D.N.J. 2018) ("In this case, the wording of the claim term 'mean' and specification may be construed as designating an instrument by which to conduct a measurement of 'mean particle size,' but nothing therein guides the skilled

practitioner whether to utilize the 'volume weighted mean' or the 'surface weighted mean' that such a device reports as measurements.").

**3. The claims of the '549 patent are not enabled and/or fail the written description requirement.**

At least to the extent the claims of the '549 patent would not have been obvious to a POSA, then the claims are not enabled and/or fail the written description requirement. The specification only describes achieving the claimed subject matter through jet-milling, and both the specification and prosecution history discuss the importance of jet milling in both achieving the claimed subject matter and from differentiating the claims from the prior art. To the extent it would not be obvious to achieve the claimed subject matter, then a POSA would need undue experimentation in order to achieve the claims. There are many different techniques for reducing the particle size in a composition, and the specification gives no guidance on how to achieve the claims aside from using jet milling. In addition, the applicants were not in possession of the claimed composition where jet milling is not utilized, and therefore the claims would be invalid for failure to satisfy the written description requirement.

Importantly, the Court has held that "particles," as the term is used in the '549 patent claims, is not limited to particles made by the jet-milling method. D.I. 142 at 2. Similarly, Plaintiffs argued during claim construction that "jet-milling is just one way of obtaining the claimed particles." D.I. 115 at 54 (emphasis added). Thus the claims on their face encompass particles made through any mechanism. However, a POSA could not know what micronization methods could be used to achieve the claimed particles. For example, during prosecution the patent applicants contrasted jet-milling with several other prior art micronization techniques, and explained that those methods could not be used. Specifically, the applicants stated "[c]ontrary to the Examiner's allegations, the claimed product **cannot be made** by another process such as ball

milling, high pressure homogenization or cryogenic spray process because these processes may not provide the desired particle size and particle size distribution." July 7, 2017 Applicant Response at 7 (emphasis added). This discrepancy illustrates the uncertainty of the claims in context of the patent specification, and demonstrates that the full scope of the "particles" limitations lack written description. Moreover, the full scope of the claims cannot be enabled here because a POSA would not know how to use all prior art processes, including ball milling, high pressure homogenization, or cryogenic spray processes to achieve "particles" as required by the claims. There are no teachings or examples of achieving the required particles, particle size, or particle size distribution other than the use of jet milling—and other known techniques did not work or were not "robust" enough—and a POSA would need undue experimentation to determine the full scope of the claims.

**F.** [redacted]

[redacted]

[redacted]



Dated: July 7, 2022

SMITH, KATZENSTEIN & JENKINS LLP

/s/ *Eve H. Ormerod*

Neal C. Belgam (#2721)
Eve H. Ormerod (#5369)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

*Attorneys for Defendants Apotex Inc. and Apotex Corp.*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Samantha G. Wilson*

Anne Shea Gaza (#4093)
Samantha G. Wilson (#5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Amneal EU, Limited, Amneal Pharmaceuticals of New York, LLC, MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., Dr. Reddy's Laboratories, Inc., and Dr. Reddy's Laboratories, Ltd.*

PHILLIPS, MCLAUGHLIN & HALL, P.A.

/s/ *John C. Phillips, Jr.*

John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE 19806-4204
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Defendants Lupin Limited and Lupin Pharmaceuticals, Inc.*

KRATZ & BARRY LLP

/s/ *R Touhey Myer*

R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Attorneys for Defendants Optimus Pharma Pvt. Ltd. and Optimus Drugs Private Ltd.*

## XII. APPENDIX A

### (U.S. PAT. NO. RE48,286) DEFENDANTS' INVALIDITY CONTENTIONS

| INVALIDITY CLAIM CHART: U.S. PATENT NO. RE48,286 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-14 of the RE286 patent pursuant to 35 U.S.C. § 103** |
| 1 | A compound of formula I:<br><br>[Chemical structure (I): HO, H, R, OH, H, $CO_2H$]<br><br>wherein R is ethyl and pharmaceutically acceptable salts, solvates or amino acid conjugates thereof. | **The '848 patent**: 1:7-27<br><br>**The '701 patent**: 1:7-27, 2:12-15<br><br>**Kim**: Page 26, col. 2, Discussion<br><br>**Kuroki**: Page 856, col. 2; page 85, col. 2<br><br>**Roda**: Abstract<br><br>**The '258 patent**: Cols. 2 and 3<br><br>**The WO '077 publication**: Pages 2, lines 24-27<br><br>**TSUCHIDA:** Abstract, 897. |

| | | |
|---|---|---|
| 2 | The glycine conjugate of a compound of formula (I): (I) wherein R is ethyl. | See Claim 1 above<br><br>**<u>The '848 patent</u>**: 1:33-35<br><br>**<u>The '701 patent</u>**: 1:33-35 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. RE48,286 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-14 of the RE286 patent pursuant to 35 U.S.C. § 103** |
| 3 | The taurine conjugate of a compound of formula (I): (I) wherein R is ethyl. | See Claim 1 above<br><br>**<u>The '848 patent</u>**: 1:33-35<br><br>**<u>The '701 patent</u>**: 1:33-35 |

| | | |
|---|---|---|
| 4 | A pharmaceutical formulation comprising a compound according to claim 1 and a pharmaceutically acceptable carrier or diluent. | See Claim 1 above<br><br>**The '848 patent**: 1:33-35<br><br>**The '701 patent**: 1:33-35 |
| 5 | A method for the treatment of an FXR mediated disease or condition in a mammal comprising administering to a mammal suffering from an FXR mediated disease or condition a therapeutically effective amount of a compound according to claim 1, wherein said FXR mediated disease or condition is selected from the group consisting of hypercholesteremia, hyperlipidemia, low HDL-cholesterol, and high triglycerides. | See Claim 1 above<br><br>**The '848 patent**: 1:33-47<br><br>**The '701 patent**: 1:38-45<br><br>**The '258 patent**: 21:54-56 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. RE48,286 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-14 of the RE286 patent pursuant to 35 U.S.C. § 103** |
| 6 | A method for the treatment of cardiovascular disease in a mammal comprising administering to a mammal suffering from a cardiovascular disease a therapeutically effective amount of a compound according to claim 1, wherein said cardiovascular disease is selected from the group consisting of artherosclerosis and hypercholesteremia. | See Claims 1 and 5 above |
| 7 | The method according to claim 6, wherein said cardiovascular disease is atherosclerosis. | See Claims 1, 5, and 6 above |
| 8 | A method for increasing HDL cholesterol in a mammal, said method comprising administering to a mammal whose HDL cholesterol is to be increased a therapeutically effective amount of a compound according to claim 1. | See Claims 1 and 5 above |

| | | |
|---|---|---|
| 9 | A method for lowering triglycerides in a mammal, said method comprising administering to a mammal whose triglycerides are to be increased a therapeutically effective amount of a compound according to claim 1. | See Claims 1 and 5 above |
| 10 | The compound of claim 1, wherein said compound is radiolabeled. | See Claim 1 above<br><br>**The WO '077 publication**: 2:24-27 |
| 11 | The compound of claim 10, wherein said compound is tritiated. | See Claims 1 and 10 above |
| 12 | The compound of claim 1, which is the compound of<br><br>formula I: | See Claim 1 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. RE48,286 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-14 of the RE286 patent pursuant to 35 U.S.C. § 103 |
| | (I)<br>[structure: $CO_2H$, H, HO, H, R, OH]<br><br>wherein R is ethyl. | |
| 13 | A pharmaceutically acceptable salt of the compound of claim 1. | See Claims 1 and 4 above |

| | | |
|---|---|---|
| 14 | A solvate of the compound of claim 1. | See Claims 1 and 10 above |

## XIII. APPENDIX B

### (U.S. PAT. NO. 9,238,673) DEFENDANTS' INVALIDITY CONTENTIONS

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-23 of the '673 patent**[13] |
| 1 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069] (Pellicciari 2002 at 3571)<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12 (Pellicciari 2002 at 3571)<br><br>**Pellicciari '390**: 2:32-41, 5:38-45 |
| | obeticholic acid Form 1 | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | and a pharmaceutically acceptable carrier, | **Ferrari '977**: 9:5-8<br><br>**Ferrari '352**: 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069] (Pellicciari 2002 at 3571) |

[13] For clarity, Defendants intend to rely on additional references with respect to proving inherency, as discussed in the written portion of Defendants' Invalidity Contentions. Defendants further reserve the right to rely on Plaintiffs' internal documents and expert testing to prove inherency.

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-23 of the '673 patent1 |
| | | **Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12 (Pellicciari 2002 at 3571)<br><br>**Pellicciari '390**: 2:32-41, 5:38-42 |
| | wherein the obeticholic acid Form 1 comprises less than 1% of chenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 2 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 further comprises not more than 0.15% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 3 | The pharmaceutical composition of claim 2, | See Claim 2 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.07% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-23 of the '673 patent1 |
| | | **Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 4 | The pharmaceutical composition of claim 3, | See Claim 3 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.06% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 5 | The pharmaceutical composition of claim 4, | See Claim 4 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.05% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 6 | The pharmaceutical composition of claim 1, | See Claim 1 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-23 of the '673 patent** |
| | wherein the obeticholic acid Form 1 comprises less than about 0.5% of chenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 7 | The pharmaceutical composition of claim 6, | See Claim 6 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.3% of chenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 8 | The pharmaceutical composition of claim 7, | See Claim 7 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.2% of chenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-23 of the ’673 patent1** |
| | | **Pellicciari ’390**: 7:43-8:41, 9:30-10:48 |
| 9 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 further comprises not more than 0.15% of 3α(3α,7α- dihydroxy-6α-ethyl-5β- cholan-24-oyloxy)-7α- hydroxy-6α-ethyl-5β-cholan- 24-oic acid. | **Ferrari ’977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48 |
| 10 | The pharmaceutical composition of claim 9, | See Claim 9 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.07% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan- 24-oic acid. | **Ferrari ’977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48 |
| 11 | The pharmaceutical composition of claim 10, | See Claim 10 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.06% of 3α(3α,7α- dihydroxy-6α-ethyl-5β- cholan-24- | **Ferrari ’977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-23 of the '673 patent1 |
| | hydroxy-6α-ethyl-5β-cholan- 24-oic acid. | **Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 12 | The pharmaceutical composition of claim 11, | See Claim 11 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.05% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan- 24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 13 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 further comprises not more than 0.15% of 6β-ethylchenodeoxycholic acid and not more than 0.15% of 3α(3α,7α-dihydroxy-6α-ethyl- 5β-cholan-24-oyloxy)-7α- hydroxy-6α-ethyl-5β-cholan- 24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 14 | The pharmaceutical composition of claim 13, | See Claim 13 above |
| | wherein the obeticholic acid Form 1 comprises less than | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-23 of the '673 patent1** |
| | about 0.07% of 6β-ethylchenodeoxycholic acid. | **Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 15 | The pharmaceutical composition of claim 13, | See Claim 13 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.05% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 16 | The pharmaceutical composition of claim 13, | See Claim 13 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.5% of chenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-23 of the ’673 patent1 |
| 17 | The pharmaceutical composition of claim 16, | See Claim 16 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.3% of chenodeoxycholic acid. | **Ferrari ’977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48 |
| 18 | The pharmaceutical composition of claim 17, | See Claim 17 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.2% of chenodeoxycholic acid. | **Ferrari ’977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48 |
| 19 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.05% of 6β-ethylchenodeoxycholic acid, and less than about 0.05% of 3α(3α,7α-dihydroxy-6α-ethyl- | **Ferrari ’977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-23 of the '673 patent1** |
| | 5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 20 | The pharmaceutical composition of claim 19, | See Claim 19 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.3% of chenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 21 | The pharmaceutical composition of claim 20, | See Claim 20 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.2% of chenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 22 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 further comprises less than about 2% of water. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-23 of the '673 patent |
| | | **Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 23 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069] (Pellicciari 2002 at 3571)<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12 (Pellicciari 2002 at 3571)<br><br>**Pellicciari '390**: 2:32-41, 5:38-45 |
| | obeticholic acid Form 1 | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | and a pharmaceutically acceptable carrier, | **Ferrari '977**: 9:5-8<br>**Ferrari '352**: 6:66-7:3<br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069] (Pellicciari 2002 at 3571)<br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12 (Pellicciari 2002 at 3571)<br>**Pellicciari '390**: 2:32-41, 5:38-45 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| 1 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069]<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12<br><br>**Pellicciari '390**: 2:32-41, 5:38-45<br><br>**Pellicciari 2002**: 3571 |
| | obeticholic acid Form 1 | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28 |
| | and a pharmaceutically acceptable carrier, | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12<br><br>**Pellicciari '390**: 2:32-41, 5:38-45<br><br>**Pellicciari 2002**: 3571 |
| | wherein the obeticholic acid Form 1 comprises less than 1% of chenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 2 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 further comprises not more than 0.15% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494<br><br>**Rohani:** 1-7<br><br>**Fox:** 110, 112-16 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 3 | The pharmaceutical composition of claim 2, | See Claim 2 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.07% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 4 | The pharmaceutical composition of claim 3, | See Claim 3 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.06% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 5 | The pharmaceutical composition of claim 4, | See Claim 4 above |
| | wherein the obeticholic acid Form 1 comprises less than | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | about 0.05% of 6β-ethylchenodeoxycholic acid. | **Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Göröġ:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494<br><br>**Rohani:** 1-7 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 6 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.5% of chenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 7 | The pharmaceutical composition of claim 6, | See Claim 6 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.3% of chenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 8 | The pharmaceutical composition of claim 7, | See Claim 7 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | wherein the obeticholic acid Form 1 comprises less than about 0.2% of chenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 9 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 further comprises not more than 0.15% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 10 | The pharmaceutical composition of claim 9, | See Claim 9 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.07% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1) |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **FDA O3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| 11 | The pharmaceutical composition of claim 10, | See Claim 10 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.06% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görö236g:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia**: 648 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 12 | The pharmaceutical composition of claim 11, | See Claim 11 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.05% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 13 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 further comprises not more than 0.15% of 6β-ethylchenodeoxycholic acid and not more than 0.15% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic:** Abstract, 2822 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Bonaldi:** 1:5, 8:15-16; Example 1 |
| 14 | The pharmaceutical composition of claim 13, | See Claim 13 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.07% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3<br><br>**Harwood:** 127 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 15 | The pharmaceutical composition of claim 13, | See Claim 13 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.05% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 16 | The pharmaceutical composition of claim 13, | See Claim 13 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.5% of chenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999:** 543-545 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 17 | The pharmaceutical composition of claim 16, | See Claim 16 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.3% of chenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study:** 1-3 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 18 | The pharmaceutical composition of claim 17, | See Claim 17 above |
| | wherein the obeticholic acid Form 1 comprises less than | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | about 0.2% of chenodeoxycholic acid. | **Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Göröq:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 19 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.05% of 6β-ethylchenodeoxycholic acid, and less than about 0.05% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103** |
| | | **Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 20 | The pharmaceutical composition of claim 19, | See Claim 19 above |
| | wherein the obeticholic acid Form 1 comprises less than about 0.3% of chenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT:** 1-4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 21 | The pharmaceutical composition of claim 20, | See Claim 20 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | wherein the obeticholic acid Form 1 comprises less than about 0.2% of chenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Göröğ:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 22 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the obeticholic acid Form 1 further comprises less than about 2% of water. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi**: 1:5, 8:15-16; Example 1<br><br>**Vrani**: 37 |
| | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069]<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12<br><br>**Pellicciari '390**: 2:32-41, 5:38-45<br><br>**Pellicciari 2002**: 3571 |
| | obeticholic acid Form 1 | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28 |
| | and a pharmaceutically acceptable carrier, | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069]<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12<br><br>**Pellicciari '390**: 2:32-41, 5:38-45<br><br>**Pellicciari 2002**: 3571 |
| | wherein the obeticholic acid Form 1 comprises one or more compound selected from 6β-ethylchenodeoxycholic acid, chenodeoxycholic acid, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid, wherein 6β-ethylchenodeoxycholic acid is present in an amount between about 0% and not more than 0.05%, chenodeoxycholic acid is | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | present in an amount between about 0% and not more than 0.2%, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid is present in an amount between about 0% and not more than 0.05%. | **FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 9,238,673 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-23 of the '673 patent pursuant to 35 U.S.C. § 103 |
| | | **Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |

## XIV. APPENDIX C

### (U.S. PAT. NO. 10,174,073) DEFENDANTS' INVALIDITY CONTENTIONS

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2] |
| 1 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069] (Pellicciari 2002 at 3571)<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12 (Pellicciari 2002 at 3571)<br><br>**Pellicciari '390**: 2:32-41, 5:38-45 |
| | non-crystalline obeticholic acid (OCA) | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | comprising less than 1% by weight of chenodeoxycholic acid (CDCA) | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30 |

[1] For clarity, Defendants intend to rely on additional references with respect to proving inherency, as discussed in the written portion of Defendants' Invalidity Contentions. Defendants further reserve the right to rely on Plaintiffs' internal documents and expert testing to prove inherency.

[2] Claims 2–5, 28, 37, 38, 42, and 43 further limit the process for preparing the claimed compositions, and accordingly are irrelevant for purposes of invalidity. *See, e.g.*, *Greenliant*, 692 F.3d at 1268. Thus, those claims are not addressed in this claim chart.

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2] |
| | | **Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | wherein the non-crystalline OCA is prepared by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 6 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA comprises a total of not more than 0.15% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 7 | The pharmaceutical composition of claim 6, | See Claim 6 above |
| | wherein the non-crystalline OCA comprises a total of less | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent**[1,2] |
| | than about 0.07% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 8 | The pharmaceutical composition of claim 7, | See Claim 7 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.06% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 9 | The pharmaceutical composition of claim 8, | See Claim 8 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.05% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent**[1,2] |
| 10 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 11 | The pharmaceutical composition of claim 10, | See Claim 10 above |
| | wherein the non-crystalline OCA comprises less than 0.07% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 12 | The pharmaceutical composition of claim 11, | See Claim 11 above |
| | wherein the non-crystalline OCA comprises less than 0.06% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2]** |
| | | **Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 13 | The pharmaceutical composition of claim 12, | See Claim 12 above |
| | wherein the non-crystalline OCA comprises less than 0.05% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 14 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 15 | The pharmaceutical composition of claim 14, | See Claim 14 above |
| | wherein the non-crystalline OCA comprises less than about | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent**[1,2] |
| | 0.07% by weight of 6β-ethylchenodeoxycholic acid. | **Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 16 | The pharmaceutical composition of claim 15, | See Claim 15 above |
| | wherein the non-crystalline OCA comprises less than about 0.06% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 17 | The pharmaceutical composition of claim 16, | See Claim 16 above |
| | wherein the non-crystalline OCA comprises less than about 0.05% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 18 | The pharmaceutical composition of claim 1, | See Claim 1 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent**[1,2] |
| | wherein the non-crystalline OCA comprises less than about 0.5% by weight of CDCA. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 19 | The pharmaceutical composition of claim 18, | See Claim 18 above |
| | wherein the non-crystalline OCA comprises less than about 0.3% by weight of CDCA. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 20 | The pharmaceutical composition of claim 19, | See Claim 19 above |
| | wherein the non-crystalline OCA comprises less than about 0.2% by weight of CDCA. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2]** |
| | | **Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 21 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA comprises from 0.01% by weight to less than 1% by weight of CDCA. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 22 | The pharmaceutical composition of claim 21, | See Claim 21 above |
| | wherein the non-crystalline OCA further comprises not more than 0.15% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 23 | The pharmaceutical composition of claim 22, | See Claim 22 above |
| | wherein the non-crystalline OCA comprises less than about 0.07% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan- | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2]** |
| | 24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 24 | The pharmaceutical composition of claim 23, | See Claim 23 above |
| | wherein the non-crystalline OCA comprises less than about 0.06% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 25 | The pharmaceutical composition of claim 24, | See Claim 24 above |
| | wherein the non-crystalline OCA comprises less than about 0.05% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 26 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA further comprises less | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the ’073 patent[1,2] |
| | than about 3% by weight of water. | **Ferrari ’352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48 |
| 27 | A pharmaceutical composition comprising | **Ferrari ’977**: 2:1-6, 9:5-8<br><br>**Ferrari ’352**: 1:63-66, 6:66-7:3<br><br>**Yu ’526**: Abstract, [0003]-[0004], [0060], [0069] (Pellicciari 2002 at 3571)<br><br>**Yu ’628**: Abstract, 1:19-58, 10:15-30, 11:6-12 (Pellicciari 2002 at 3571)<br><br>**Pellicciari ’390**: 2:32-41, 5:38-45 |
| | non-crystalline obeticholic acid (OCA) | **Ferrari ’977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48 |
| | and not more than 1% by weight of chenodeoxycholic acid (CDCA), | **Ferrari ’977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent**[1,2] |
| | | **Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | wherein the OCA is prepared by a process comprising at least one step of crystallizing crude OCA using an organic solvent selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 29 | The pharmaceutical composition of claim 27, | See Claim 27 above |
| | wherein the non-crystalline OCA comprises from 0.01% by weight to not more than 1% by weight of CDCA. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 36 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2] |
| | | **Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12<br><br>**Pellicciari '390**: 2:32-41, 5:38-45 |
| | non-crystalline obeticholic acid (OCA), | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | wherein the OCA is prepared by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent, | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | and wherein the OCA comprises a total of less than 2% by weight of one or more impurities selected from 6-ethylursodeoxycholic acid, 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid, 6β-ethylchenodeoxycholic acid, 3α,7α-dihydroxy-6-ethyliden- | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2]** |
| | 5β-cholan-24-oic acid, chenodeoxycholic acid (CDCA), and 3a (3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | |
| 39 | The pharmaceutical composition of claim 36, | See Claim 36 above |
| | wherein the non-crystalline OCA comprises less than 1% by weight of CDCA. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 40 | The pharmaceutical composition of claim 39, | See Claim 39 above |
| | wherein the non-crystalline OCA comprises from 0.01% by weight to less than 1% by weight of CDCA. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 41 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2] |
| | | **Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069] (Pellicciari 2002 at 3571)<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12 (Pellicciari 2002 at 3571)<br><br>**Pellicciari '390**: 2:32-41, 5:38-45 |
| | non-crystalline obeticholic acid (OCA) | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | wherein the non-crystalline OCA is prepared by a process comprising a step of crystallizing crude OCA using at least one organic solvent, and | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | wherein the OCA comprises a total of less than 2% by weight of one or more impurities selected from 6β-ethylursodeoxycholic acid, 3α- | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2]** |
| | hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid, 6β-ethylchenodeoxycholic acid, 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid, chenodeoxycholic acid (CDCA), and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 44 | The pharmaceutical composition of claim 41, | See Claim 41 above |
| | wherein the non-crystalline OCA comprises less than 1% by weight of CDCA. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 45 | The pharmaceutical composition of claim 44, | See Claim 44 above |
| | wherein the non-crystalline OCA comprises from 0.01% by weight to less than 1% by weight of CDCA. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2]** |
| | | **Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 46 | The pharmaceutical composition of claim 41, | See Claim 41 above |
| | wherein the non-crystalline OCA comprises a total of not more than 0.15% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 47 | The pharmaceutical composition of claim 46, | See Claim 46 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.07% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 48 | The pharmaceutical composition of claim 47, | See Claim 47 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.06% by weight of 6-ethylursodeoxycholic acid | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent**[1,2] |
| | and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 49 | The pharmaceutical composition of claim 48, | See Claim 48 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.05% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 50 | The pharmaceutical composition of claim 41, | See Claim 41 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 51 | The pharmaceutical composition of claim 50, | See Claim 50 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2] |
| | wherein the non-crystalline OCA comprises less than 0.07% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 52 | The pharmaceutical composition of claim 51, | See Claim 51 above |
| | wherein the non-crystalline OCA comprises less than 0.06% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 53 | The pharmaceutical composition of claim 52, | See Claim 52 above |
| | wherein the non-crystalline OCA comprises less than 0.05% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2]** |
| | | **Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 54 | The pharmaceutical composition of claim 51, | See Claim 51 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 55 | The pharmaceutical composition of claim 54, | See Claim 54 above |
| | wherein the non-crystalline OCA comprises less than about 0.07% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 56 | The pharmaceutical composition of claim 55, | See Claim 55 above |
| | wherein the non-crystalline OCA comprises less than about 0.06% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2] |
| | | **Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 57 | The pharmaceutical composition of claim 56, | See Claim 56 above |
| | wherein the non-crystalline OCA comprises less than about 0.05% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 58 | The pharmaceutical composition of claim 41, | See Claim 41 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 59 | The pharmaceutical composition of claim 58, | See Claim 58 above |
| | wherein the non-crystalline OCA comprises less than about | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-29 & 36-61 of the '073 patent[1,2]** |
| | 0.07% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 60 | The pharmaceutical composition of claim 59, | See Claim 59 above |
| | wherein the non-crystalline OCA comprises less than about 0.06% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 61 | The pharmaceutical composition of claim 60, | See Claim 60 above |
| | wherein the non-crystalline OCA comprises less than about 0.05% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:7-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| 1 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069]<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12<br><br>**Pellicciari '390**: 2:32-41, 5:38-45<br><br>**Pellicciari 2002**: 3571 |
| | non-crystalline obeticholic acid (OCA) | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28 |
| | comprising less than 1% by weight of chenodeoxycholic acid (CDCA) | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| | wherein the non-crystalline OCA is prepared by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent. | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| 2 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the at least one organic solvent is selected | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate. | **Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| 3 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the at least one organic solvent comprises n-butyl acetate | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| 4 | The pharmaceutical composition of claim 1, | See Claim 1 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | wherein the process further comprises the step of converting a crystalline form of OCA to the non-crystalline OCA by dissolving the crystalline form in an aqueous NaOH solution and adding HCl. | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| 5 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the process further comprises the step of reacting 3α-hydroxy-6α-ethyl-7-keto-5β-cholan-24-oic acid with NaBH4 to form the crude OCA. | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28 |
| 6 | The pharmaceutical composition of claim 1, | See Claim 1 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | wherein the non-crystalline OCA comprises a total of not more than 0.15% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 7 | The pharmaceutical composition of claim 6, | See Claim 6 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.07% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 8 | The pharmaceutical composition of claim 7, | See Claim 7 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.06% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1) |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103** |
| 9 | The pharmaceutical composition of claim 8, | See Claim 8 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.05% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari ’977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari ’352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 10 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Göröğ:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 11 | The pharmaceutical composition of claim 10, | See Claim 10 above |
| | wherein the non-crystalline OCA comprises less than 0.07% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Göröq:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103** |
| | | **ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic:** Abstract, 2822 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Bonaldi:** 1:5, 8:15-16; Example 1 |
| 12 | The pharmaceutical composition of claim 11, | See Claim 11 above |
| | wherein the non-crystalline OCA comprises less than 0.06% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31, 15:24-29<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 13 | The pharmaceutical composition of claim 12, | See Claim 12 above |
| | wherein the non-crystalline OCA comprises less than 0.05% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103 |
| | | **Yu ’628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494<br><br>**Rohani:** 1-7<br><br>**Fox:** 110, 112-16 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 14 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103** |
| | | **Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 15 | The pharmaceutical composition of claim 14, | See Claim 14 above |
| | wherein the non-crystalline OCA comprises less than about 0.07% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari ’977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 16 | The pharmaceutical composition of claim 15, | See Claim 15 above |
| | wherein the non-crystalline OCA comprises less than | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | about 0.06% by weight of 6β-ethylchenodeoxycholic acid. | **Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 17 | The pharmaceutical composition of claim 16, | See Claim 16 above |
| | wherein the non-crystalline OCA comprises less than about 0.05% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103 |
| | | **Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007:** 1681-82 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 18 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA comprises less than about 0.5% by weight of CDCA. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Göröç:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT:** 1-4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 19 | The pharmaceutical composition of claim 18, | See Claim 18 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | wherein the non-crystalline OCA comprises less than about 0.3% by weight of CDCA. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 20 | The pharmaceutical composition of claim 19, | See Claim 19 above |
| | wherein the non-crystalline OCA comprises less than about 0.2% by weight of CDCA. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 21 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA comprises from 0.01% by weight to less than 1% by weight of CDCA. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1) |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| 22 | The pharmaceutical composition of claim 21, | See Claim 21 above |
| | wherein the non-crystalline OCA further comprises not more than 0.15% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 23 | The pharmaceutical composition of claim 22, | See Claim 22 above |
| | wherein the non-crystalline OCA comprises less than about 0.07% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari '390**: 7:43-8:41, 9:30-10:48<br>**Pellicciari 2002**: 3570-71<br>**Görög:** 934<br>**FDA Manufacturing Guidance**: 22, 39<br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br>**FDA Q3A Guidance**: 4-17<br>**NASH-FLINT**: 1-4<br>**PBC Study**: 1-3<br>**Harwood:** 127<br>**Pavia:** 648<br>**Fujiwara**: Abstract, 494<br>**Rohani**: 1-7<br>**Fox**: 110, 112-16<br>**Carr**: 2 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 24 | The pharmaceutical composition of claim 23, | See Claim 23 above |
| | wherein the non-crystalline OCA comprises less than about 0.06% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Göröģ:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103 |
| | | **ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic:** Abstract, 2822 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Bonaldi:** 1:5, 8:15-16; Example 1 |
| 25 | The pharmaceutical composition of claim 24, | See Claim 24 above |
| | wherein the non-crystalline OCA comprises less than about 0.05% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 26 | The pharmaceutical composition of claim 1, | See Claim 1 above |
| | wherein the non-crystalline OCA further comprises less than about 3% by weight of water. | **Ferrari ’977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494<br><br>**Rohani:** 1-7<br><br>**Fox:** 110, 112-16 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 27 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069]<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12<br><br>**Pellicciari '390**: 2:32-41, 5:38-45<br><br>**Pellicciari 2002**: 3571 |
| | non-crystalline obeticholic acid (OCA) | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28 |
| | and not more than 1% by weight of chenodeoxycholic acid (CDCA), | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study:** 1-3 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| | wherein the OCA is prepared by a process comprising at least one step of crystallizing crude OCA using an organic solvent selected from the | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate. | **Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| 28 | The pharmaceutical composition of claim 27, | See Claim 27 above |
| | wherein the solvent comprises n-butyl acetate. | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| 29 | The pharmaceutical composition of claim 27, | See Claim 27 above |
| | wherein the non-crystalline OCA comprises from 0.01% by weight to not more than 1% by weight of CDCA. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | |
|---|---|
| **Claim** | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |

| | | |
|---|---|---|
| | | **Yu ’526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4<br><br>**PBC Study:** 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494<br><br>**Rohani:** 1-7<br><br>**Fox:** 110, 112-16 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 36 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069]<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12<br><br>**Pellicciari '390**: 2:32-41, 5:38-45<br><br>**Pellicciari 2002**: 3571 |
| | non-crystalline obeticholic acid (OCA), | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28 |
| | wherein the OCA is prepared by a process comprising at least one step of crystallizing crude OCA using at least one organic solvent, | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| | and wherein the OCA comprises a total of less than 2% by weight of one or more impurities selected from 6-ethylursodeoxycholic acid, 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid, 6β-ethylchenodeoxycholic acid, 3α,7α-dihydroxy-6-ethyliden- | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | 5β-cholan-24-oic acid, chenodeoxycholic acid (CDCA), and 3a (3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 37 | The pharmaceutical composition of claim 36, | See Claim 36 above |
| | wherein the at least one organic solvent is selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate. | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| 38 | The pharmaceutical composition of claim 37, | See Claim 37 above |
| | wherein the at least one organic solvent comprises n-butyl acetate. | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| 39 | The pharmaceutical composition of claim 36, | See Claim 36 above |
| | wherein the non-crystalline OCA comprises less than 1% by weight of CDCA. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1) |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Bonaldi:** 1:5, 8:15-16; Example 1 |
| 40 | The pharmaceutical composition of claim 39, | See Claim 39 above |
| | wherein the non-crystalline OCA comprises from 0.01% by weight to less than 1% by weight of CDCA. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 41 | A pharmaceutical composition comprising | **Ferrari '977**: 2:1-6, 9:5-8<br><br>**Ferrari '352**: 1:63-66, 6:66-7:3<br><br>**Yu '526**: Abstract, [0003]-[0004], [0060], [0069]<br><br>**Yu '628**: Abstract, 1:19-58, 10:15-30, 11:6-12 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari '390**: 2:32-41, 5:38-45<br><br>**Pellicciari 2002**: 3571 |
| | non-crystalline obeticholic acid (OCA) | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28 |
| | wherein the non-crystalline OCA is prepared by a process comprising a step of crystallizing crude OCA using at least one organic solvent, and | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| | wherein the OCA comprises a total of less than 2% by | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | weight of one or more impurities selected from 6β-ethylursodeoxycholic acid, 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid, 6β-ethylchenodeoxycholic acid, 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid, chenodeoxycholic acid (CDCA), and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 42 | The pharmaceutical composition of claim 41, | See Claim 41 above |
| | wherein the at least one organic solvent is selected from the group consisting of acetonitrile, heptane, nitromethane, and n-butyl acetate. | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Takata**: 3034 |
| 43 | The pharmaceutical composition of claim 42, | See Claim 42 above |
| | wherein the at least one organic solvent comprises n-butyl acetate | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28<br><br>**Takata**: 3034 |
| 44 | The pharmaceutical composition of claim 41, | See Claim 41 above |
| | wherein the non-crystalline OCA comprises less than 1% by weight of CDCA. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 45 | The pharmaceutical composition of claim 44, | See Claim 44 above |
| | wherein the non-crystalline OCA comprises from 0.01% by weight to less than 1% by weight of CDCA. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103** |
| 46 | The pharmaceutical composition of claim 41, | See Claim 41 above |
| | wherein the non-crystalline OCA comprises a total of not more than 0.15% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari ’977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103** |
| | | **Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 47 | The pharmaceutical composition of claim 46, | See Claim 46 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.07% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari ’977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 48 | The pharmaceutical composition of claim 47, | See Claim 47 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.06% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic:** Abstract, 2822 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Bonaldi:** 1:5, 8:15-16; Example 1 |
| 49 | The pharmaceutical composition of claim 48, | See Claim 48 above |
| | wherein the non-crystalline OCA comprises a total of less than about 0.05% by weight of 6-ethylursodeoxycholic acid and 3α,7α-dihydroxy-6-ethyliden-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 50 | The pharmaceutical composition of claim 41, | See Claim 41 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari ’977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari ’352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu ’526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103** |
| | | **Yu ’628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 51 | The pharmaceutical composition of claim 50, | See Claim 50 above |
| | wherein the non-crystalline OCA comprises less than 0.07% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 52 | The pharmaceutical composition of claim 51, | See Claim 51 above |
| | wherein the non-crystalline OCA comprises less than 0.06% by weight of 3α-hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study:** 1-3 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 53 | The pharmaceutical composition of claim 52, | See Claim 52 above |
| | wherein the non-crystalline OCA comprises less than 0.05% by weight of 3α- | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103 |
| | hydroxy-6α-ethyl-7-cheto-5β-cholan-24-oic acid. | **Yu ’526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu ’628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari ’390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 54 | The pharmaceutical composition of claim 51, | See Claim 51 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007:** 1681-82 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 55 | The pharmaceutical composition of claim 54, | See Claim 54 above |
| | wherein the non-crystalline OCA comprises less than about 0.07% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17<br><br>**NASH-FLINT:** 1-4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 56 | The pharmaceutical composition of claim 55, | See Claim 55 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | wherein the non-crystalline OCA comprises less than about 0.06% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Göröq:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 57 | The pharmaceutical composition of claim 56, | See Claim 56 above |
| | wherein the non-crystalline OCA comprises less than about 0.05% by weight of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Pellicciari 2002**: 3570-71<br><br>**Göröperiod:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 58 | The pharmaceutical composition of claim 41, | See Claim 41 above |
| | wherein the non-crystalline OCA comprises not more than 0.15% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1) |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| 59 | The pharmaceutical composition of claim 58, | See Claim 58 above |
| | wherein the non-crystalline OCA comprises less than about 0.07% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 60 | The pharmaceutical composition of claim 59, | See Claim 59 above |
| | wherein the non-crystalline OCA comprises less than about 0.06% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari ’390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103** |
| | | **Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 61 | The pharmaceutical composition of claim 60, | See Claim 60 above |
| | wherein the non-crystalline OCA comprises less than about 0.05% by weight of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Göröig:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the '073 patent pursuant to 35 U.S.C. § 103 |
| | | **ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic:** Abstract, 2822 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,174,073 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-29 & 36-61 of the ’073 patent pursuant to 35 U.S.C. § 103** |
| | | **Bonaldi:** 1:5, 8:15-16; Example 1 |

## XV. APPENDIX D

### (U.S. PAT. NO. 10,047,117) DEFENDANTS' INVALIDITY CONTENTIONS

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-4, 6, and 8-13 of the '117 patent[1]** |
| 1 | A method of treating an FXR mediated disease or condition in a subject comprising | **Pellicciari '390**: Abstract, 2:42-67, 5:3-45, 9:30-10:48 |
| | administering to the subject a pharmaceutical formulation comprising an effective amount of a substantially pure solid form of obeticholic acid, | **Pellicciari '390**: Abstract, 2:21-23, 5:29-45, 9:30-10:48 |
| | wherein the solid form of obeticholic acid comprises less than 1% of chenodeoxycholic acid, and | **Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | wherein the formulation comprises about 1 mg to about 30 mg of obeticholic acid. | **Pellicciari '390**: Abstract, 5:29-32, 9:30-10:48 |
| 2 | The method of claim 1, | See Claim 1 above |
| | wherein the FXR mediated disease or condition is selected from biliary atresia, cholestatic liver disease, chronic liver disease, nonalcoholic steatohepatitis, hepatitis C infection, alcoholic liver disease, | **Pellicciari '390**: Abstract, 2:42-67, 5:3-32 |

[1] For clarity, Defendants intend to rely on additional references with respect to proving inherency, as discussed in the written portion of Defendants' Invalidity Contentions. Defendants further reserve the right to rely on Plaintiffs' internal documents and expert testing to prove inherency.

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-4, 6, and 8-13 of the '117 patent1** |
| | primary biliary cirrhosis, primary sclerosing cholangitis, liver damage due to progressive fibrosis, liver fibrosis, and cardiovascular diseases including atherosclerosis, arteriosclerosis, hypercholesterolemia, and | |
| 3 | The method of claim 2, | See Claim 2 above |
| | wherein the FXR mediated disease or condition is cholestatic liver disease. | **Pelicciari '390**: Abstract, 2:42-67, 5:3-32 |
| 4 | The method of claim 2, | See Claim 2 above |
| | wherein the FXR mediated disease or condition is chronic liver disease. | **Pelicciari '390**: Abstract, 2:42-67, 5:3-32 |
| 6 | The method of claim 2, | See Claim 2 above |
| | wherein the FXR mediated disease or condition is primary biliary cirrhosis. | **Pelicciari '390**: Abstract, 2:42-67, 5:3-32 |
| 8 | The method of claim 1, | See Claim 1 above |
| | wherein the solid form of obeticholic acid is Form 1 and | **Pelicciari '390**: 7:43-8:41, 9:30-10:48 |
| | wherein the solid form of obeticholic acid Form 1 is the non-crystalline form. | **Pelicciari '390**: 7:43-8:41, 9:30-10:48 |
| 9 | The method of claim 1, | See Claim 1 above |
| | wherein the solid form of obeticholic acid comprises no more | **Pelicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that anticipate claims 1-4, 6, and 8-13 of the '117 patent**[1] |
| | than 0.5% of chenodeoxycholic acid. | |
| 10 | The method of claim 1, | See Claim 1 above |
| | wherein the solid form of obeticholic acid comprises not more than 0.15% of 6β-ethylchenodeoxycholic acid. | **Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 11 | The method of claim 1, | See Claim 1 above |
| | wherein the solid form of obeticholic acid comprises not more than 0.15% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5βcholan-24-oic acid. | **Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| 12 | The method of claim 1, | See Claim 1 above |
| | wherein the solid form of obeticholic acid comprises one or more compounds selected from 6β-ethylchenodeoxycholic acid, chenodeoxycholic acid, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid, | **Pellicciari '390**: 7:43-8:41, 9:30-10:48 |
| | wherein 6β-ethylchenodeoxycholic acid is present in an amount between 0% and not more than 0.05%, chenodeoxycholic acid is present in an amount between 0% and not more than 0.2%, and | **Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that anticipate claims 1-4, 6, and 8-13 of the '117 patent[1] |
| | 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid is present in an amount between 0% and not more than 0.05%. | |
| 13 | The method of claim 8, | See Claim 8 above |
| | wherein the solid form of obeticholic acid Form 1 is characterized by a glass transition temperature (Tg) of 102 to 112° C. | **Pellicciari '390**: 2:32-37, 5:38-42, 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103** |
| 1 | A method of treating an FXR mediated disease or condition in a subject comprising | **Pellicciari '390**: Abstract, 5:3-6, 5:29-32, 9:30-10:48<br><br>**Yu '526**: [0003]<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1<br><br>**Intercept Press Release**: 1<br><br>**BioSpace**: 1-2 |
| | administering to the subject a pharmaceutical formulation comprising an effective amount of a substantially pure solid form of obeticholic acid, | **Ferrari '977**: 2:1-6, 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: Abstract, 2:21-23, 5:3-6, 5:29-45, 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570<br><br>**WO '391**: [0028], [0081]-[0097]<br><br>**Porez 2012**: Abstract, 1723-24 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103 |
| | | **NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1<br><br>**Enhsen '558**: 12:3-8<br><br>**Chenodiol Label:** 1, 7 |
| | wherein the solid form of obeticholic acid comprises less than 1% of chenodeoxycholic acid, and | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1) |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103 |
| | | **FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103 |
| | wherein the formulation comprises about 1 mg to about 30 mg of obeticholic acid. | **Pellicciari '390**: Abstract, 2:61-67, 5:3-6, 5:29-32, 9:30-10:48<br><br>**Pellicciari 2002**: 3570<br><br>**Ferrari '977**: 2:1-6<br><br>**Yu '526**: [0003]<br><br>**WO '391**: [0028], [0081]-[0097]<br><br>**Porez 2012**: Abstract, 1723-24<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1<br><br>**Enhsen '558**: 12:3-8<br><br>**Chenodiol Label:** 1, 7 |
| 2 | The method of claim 1, | See Claim 1 above |
| | wherein the FXR mediated disease or condition is selected from biliary atresia, cholestatic liver disease, chronic liver disease, nonalcoholic steatohepatitis, hepatitis C infection, alcoholic liver disease, primary biliary cirrhosis, primary | **Pellicciari '390**: Abstract, 2:61-67, 5:3-6, 5:29-32, 9:30-10:48<br><br>**Pellicciari 2002**: 3570<br><br>**Ferrari '977**: 2:1-6<br><br>**Yu '526**: [0003] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103 |
| | sclerosing cholangitis, liver damage due to progressive fibrosis, liver fibrosis, and cardiovascular diseases including atherosclerosis, arteriosclerosis, hypercholesterolemia, and hyperlipidemia. | **WO '391**: [0028], [0081]-[0097]<br><br>**Porez 2012**: Abstract, 1723-24<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1 |
| 3 | The method of claim 2, | See Claim 2 above |
| | wherein the FXR mediated disease or condition is cholestatic liver disease. | **Pellicciari '390**: Abstract, 2:61-67, 5:3-6, 5:29-32, 9:30-10:48<br><br>**Pellicciari 2002**: 3570<br><br>**Ferrari '977**: 2:1-6<br><br>**Yu '526**: [0003]<br><br>**WO '391**: [0028], [0081]-[0097]<br><br>**Porez 2012**: Abstract, 1723-24<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103** |
| 4 | The method of claim 2, | See Claim 2 above |
| | wherein the FXR mediated disease or condition is chronic liver disease. | **Pellicciari '390**: Abstract, 2:61-67, 5:3-6, 5:29-32, 9:30-10:48<br><br>**Pellicciari 2002**: 3570<br><br>**Ferrari '977**: 2:1-6<br><br>**Yu '526**: [0003]<br><br>**WO '391**: [0028], [0081]-[0097]<br><br>**Porez 2012**: Abstract, 1723-24<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1 |
| 6 | The method of claim 2, | See Claim 2 above |
| | wherein the FXR mediated disease or condition is primary biliary cirrhosis. | **Pellicciari '390**: Abstract, 2:61-67, 5:3-6, 5:29-32, 9:30-10:48<br><br>**Pellicciari 2002**: 3570<br><br>**Ferrari '977**: 2:1-6<br><br>**Yu '526**: [0003]<br><br>**WO '391**: [0028], [0081]-[0097] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103 |
| | | **Porez 2012**: Abstract, 1723-24<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1 |
| 8 | The method of claim 1, | See Claim 1 above |
| | wherein the solid form of obeticholic acid is Form 1 and wherein the solid form of obeticholic acid Form 1 is the non-crystalline form. | **Ferrari '977**: 2:21-23, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:66-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Yu 2001:** 28 |
| 9 | The method of claim 1, | See Claim 1 above |
| | wherein the solid form of obeticholic acid comprises no more than 0.5% of chenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103** |
| | | **Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 10 | The method of claim 1, | See Claim 1 above |
| | wherein the solid form of obeticholic acid comprises not more than 0.15% of 6β-ethylchenodeoxycholic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance:** 4-17 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103 |
| | | **NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 11 | The method of claim 1, | See Claim 1 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103** |
| | wherein the solid form of obeticholic acid comprises not more than 0.15% of 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5βcholan-24-oic acid. | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48<br><br>**Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara:** Abstract, 494 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103 |
| | | **Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858<br><br>**Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Rajevic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 12 | The method of claim 1, | See Claim 1 above |
| | wherein the solid form of obeticholic acid comprises one or more compounds selected from 6β-ethylchenodeoxycholic acid, chenodeoxycholic acid, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid, wherein 6β-ethylchenodeoxycholic acid is present in an amount | **Ferrari '977**: 2:1-3:6, 10:20-22, 12:4-15:31<br><br>**Ferrari '352**: 1:59-2:65, 7:59-63, 8:52-11:30<br><br>**Yu '526**: [0003]-[0004], [0028]-[0029], [0043]-[0047], Fig. 6B<br><br>**Yu '628**: 1:12-58, 4:32-61, 6:19-7:54, Fig. 6B<br><br>**Pellicciari '390**: 7:43-8:41, 9:30-10:48 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103** |
| | between 0% and not more than 0.05%, chenodeoxycholic acid is present in an amount between 0% and not more than 0.2%, and 3α(3α,7α-dihydroxy-6α-ethyl-5β-cholan-24-oyloxy)-7α-hydroxy-6α-ethyl-5β-cholan-24-oic acid is present in an amount between 0% and not more than 0.05%. | **Pellicciari 2002**: 3570-71<br><br>**Görög:** 934<br><br>**FDA Manufacturing Guidance**: 22, 39<br><br>**ICH Q3A Guideline**: 1, 8 (Attachment 1)<br><br>**FDA Q3A Guidance**: 4-17<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Harwood:** 127<br><br>**Pavia:** 648<br><br>**Fujiwara**: Abstract, 494<br><br>**Rohani**: 1-7<br><br>**Fox**: 110, 112-16<br><br>**Carr**: 2<br><br>**Snyder**: 616-18<br><br>**Iverlund**: 852-858 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,047,117 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-13 of the '117 patent pursuant to 35 U.S.C. § 103** |
| | | **Natalini 2007**: 1681-82<br><br>**Wang 1999**: 543-545<br><br>**Raievic**: Abstract, 2822<br><br>**Bonaldi:** 1:5, 8:15-16; Example 1 |
| 13 | The method of claim 8, | See Claim 8 above |
| | wherein the solid form of obeticholic acid Form 1 is characterized by a glass transition temperature (Tg) of 102 to 112° C. | **Pellicciari '390**: 2:32-37, 5:38-42, 7:43-8:41, 9:30-10:48 |

## XVI. APPENDIX E

### (U.S. PAT. NO. 10,052,337) DEFENDANTS' INVALIDITY CONTENTIONS

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103** |
| 1 | A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, | **'188 Publication**: [0201], [0207], [0208], [0328], [0374] |
| | wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, | **'188 Publication**: [0347]<br>**WO '689**: 5, 10-11 |
| | and wherein at least 50% of the particles have a diameter of 200 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 2 | The composition of claim 1, | *See* claim 1 |
| | wherein at least 50% of the particles have a diameter of 100 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 3 | The composition of claim 2, | *See* claim 2 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | wherein at least 50% of the particles have a diameter of 50 μm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 4 | The composition of claim 3, | *See* claim 3 |
| | wherein at least 50% of the particles have a diameter of 10 μm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 5 | The composition of claim 4, | *See* claim 4 |
| | wherein at least 50% of the particles have a diameter of 5 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 6 | The composition of claim 1, | *See* claim 1 |
| | wherein at least 90% of the particles have a diameter of 200 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 7 | The composition of claim 6, | *See* claim 6 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | |
| | wherein at least 90% of the particles have a diameter of 100 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 8 | The composition of claim 7, | *See* claim 7 |
| | wherein at least 90% of the particles have a diameter of 25 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 9 | The composition of claim 1 | *See* claim 1 |
| | further comprising at least one pharmaceutically acceptable excipient having an alcohol content of less than about 6% (wt/wt). | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| 10 | The composition of claim 9, | *See* claim 9 |
| | wherein the at least one pharmaceutical acceptable excipient is sodium starch glycolate. | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| 11 | A tablet comprising an intra-granular portion and an extra-granular portion, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | the intra-granular portion comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose, and one or more additional pharmaceutical excipients, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | and the extra-granular portion comprising one or more pharmaceutical excipients. | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| 12 | The tablet of claim 11, | *See* claim 11 |
| | wherein the extra-granular portion comprises microcrystalline cellulose. | **'188 Publication**: [0328], Table I |
| 13 | A method for preparing a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, | **188 Publication**: [0201], [0207], [0208], [0328], [0374] |
| | in the form of particles, | **'188 Publication**: [0347]<br>**WO '689**: 5, 10-11 |
| | wherein at least 50% of the particles have a diameter of 200 µm or less, | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475:** 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| | comprising forming the particles through jet-milling. | **'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd**: [0001], [0004], [0005]<br>**Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian**<br>**'944 publication**: [0138] |
| 14 | The tablet of claim 11, | *See* claim 11 |
| | wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is jet-milled. | **'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd**: [0001], [0004], [0005]<br>**Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian**<br>**'944 publication**: [0138] |
| 15 | The tablet of claim 14, | *See* claim 14 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103** |
| | | |
| | wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, | **'188 Publication**: [0347]<br>**WO '689**: 5, 10-11 |
| | and wherein at least 50% of the particles have a diameter of 200 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 16 | The composition of claim 1 is | *See* claim 1 |
| | in a unit dosage form. | **'188 Publication**: *e.g.*, [0199], [0208]-[0220] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103** |
| 17 | The composition of claim 16, | *See* claim 16 |
| | wherein the unit dosage form is a tablet. | **'188 Publication**: *e.g.*, [0199], [0208]-[0220] |
| 18 | The composition of claim 17, | *See* claim 17 |
| | wherein the tablet comprises an intra-granular portion and an extra-granular portion. | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| 19 | The composition of claim 18, | *See* claim 18 |
| | wherein the intra-granular portion comprises microcrystalline cellulose and obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | in a ratio between about 20:1 to about 1:5. | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-19 of the ’337 Patent pursuant to 35 U.S.C. § 103** |
| | | **Pellicciari ’390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**’365 Patent**: Table 3 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103** |
| 1 | A composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, | **Ferrari '352**: claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4 |
| | wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, | **'188 Publication**: [0347]<br>**WO '689**: 5, 10-11 |
| | and wherein at least 50% of the particles have a diameter of 200 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah:** 028 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 2 | The composition of claim 1, | *See* claim 1 |
| | wherein at least 50% of the particles have a diameter of 100 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 3 | The composition of claim 2, | *See* claim 2 |
| | wherein at least 50% of the particles have a diameter of 50 μm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 4 | The composition of claim 3, | *See* claim 3 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | |
| | wherein at least 50% of the particles have a diameter of 10 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 5 | The composition of claim 4, | *See* claim 4 |
| | wherein at least 50% of the particles have a diameter of 5 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103** |
| | | **Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 6 | The composition of claim 1, | *See* claim 1 |
| | wherein at least 90% of the particles have a diameter of 200 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 7 | The composition of claim 6, | *See* claim 6 |
| | wherein at least 90% of the particles have a diameter of 100 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103** |
| 8 | The composition of claim 7, | *See* claim 7 |
| | wherein at least 90% of the particles have a diameter of 25 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 9 | The composition of claim 1 | *See* claim 1 |
| | further comprising at least one pharmaceutically acceptable excipient having an alcohol content of less than about 6% (wt/wt). | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| 10 | The composition of claim 9, | *See* claim 9 |
| | wherein the at least one pharmaceutical acceptable excipient is sodium starch glycolate. | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| 11 | A tablet comprising an intra-granular portion and an extra-granular portion, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | the intra-granular portion comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, microcrystalline cellulose, and one or more additional pharmaceutical excipients, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the ’337 Patent pursuant to 35 U.S.C. § 103 |
| | | **Shotton 1976**: Abstract<br>**’365 Patent**: Table 3 |
| | and the extra-granular portion comprising one or more pharmaceutical excipients. | **’188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari ’390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**’365 Patent**: Table 3 |
| 12 | The tablet of claim 11, | *See* claim 11 |
| | wherein the extra-granular portion comprises microcrystalline cellulose. | **’188 Publication**: [0328], Table I |
| 13 | A method for preparing a composition comprising obeticholic acid, or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof, | **188 Publication**: [0201], [0207], [0208], [0328], [0374] |
| | in the form of particles, | **’188 Publication**: [0347]<br>**WO ’689**: 5, 10-11 |
| | wherein at least 50% of the particles have a diameter of 200 µm or less, | **’188 Publication**: [0328], [0347], [0385]<br>**WO ’689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| | comprising forming the particles through jet-milling. | **'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd**: [0001], [0004], [0005]<br>**Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian**<br>**'944 publication**: [0138] |
| 14 | The tablet of claim 11, | *See* claim 11 |
| | wherein obeticholic acid or a pharmaceutically acceptable salt, ester, | **'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd:** [0001], [0004], [0005] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | or amino acid conjugate thereof is jet-milled. | **Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian '944 publication**: [0138] |
| 15 | The tablet of claim 14, | *See* claim 14 |
| | wherein obeticholic acid or a pharmaceutically acceptable salt, ester, or amino acid conjugate thereof is in the form of particles, | **'188 Publication**: [0347]<br>**WO '689**: 5, 10-11 |
| | and wherein at least 50% of the particles have a diameter of 200 µm or less. | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-19 of the '337 Patent pursuant to 35 U.S.C. § 103 |
| | | **WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| 16 | The composition of claim 1 is | *See* claim 1 |
| | in a unit dosage form. | **'188 Publication**: *e.g.*, [0199], [0208]-[0220] |
| 17 | The composition of claim 16, | *See* claim 16 |
| | wherein the unit dosage form is a tablet. | **'188 Publication**: *e.g.*, [0199], [0208]-[0220] |
| 18 | The composition of claim 17, | *See* claim 17 |
| | wherein the tablet comprises an intra-granular portion and an extra-granular portion. | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| 19 | The composition of claim 18, | *See* claim 18 |
| | wherein the intra-granular portion comprises microcrystalline cellulose and obeticholic acid, or a pharmaceutically | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 35:8-60, Example 1, 9:4-11 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,052,337 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-19 of the ’337 Patent pursuant to 35 U.S.C. § 103** |
| | acceptable salt, ester, or amino acid conjugate thereof | **Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**’365 Patent**: Table 3 |
| | in a ratio between about 20:1 to about 1:5. | **’188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari ’390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**’365 Patent**: Table 3 |

## XVII. APPENDIX F

### (U.S. PAT. NO. 10,751,349) DEFENDANTS' INVALIDITY CONTENTIONS

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| 1 | A tablet comprising obeticholic acid in an amount of 1 mg to 50 mg and a pharmaceutically acceptable excipient | **'188 Publication**: [0201], [0219], [0328]-[0329], [0347]<br><br>**Pellicciari 2014**: [0089], [0197]<br><br>**Carey 2012**: 2475<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1<br><br>**WO '689:** 19<br><br>**WO '475:** 3:3-5, 6:14-22, claims 1, 8, and 9<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| | wherein said obeticholic acid is in the form of jet-milled particles having a diameter of less than about 100 µm | **Lieberman**: 5-6<br><br>**'188 Publication:** [0201], [0328]-[0329], [0385], [0347] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103** |
| | when analyzed by laser diffraction, and wherein $D_{50}$ is not more than 50 µm, and | **Pellicciari 2014**: [0089], [0096], [0197]<br><br>**Chaumeil**: 211–215<br><br>**Savjani**: 2-3<br><br>**Kawabata**: at 4<br><br>**Krishnaiah**: 028<br><br>**Chu**: 1187-88<br><br>**Takahashi**: 482-84<br><br>**FDA Q6A Guidance**: 83046, 83054<br><br>**Kawabata**: 4<br><br>**Dodd**: [0004]-[0005]<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13<br><br>**Choi 2004**: Abstract, 165-166, 169, 171-172<br><br>**WO '741**: 1:15–19, 4:1–23<br><br>**WO '428**: 17:28-21:6, 24:11-18, 38:23-26 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **WO '521**: 3, 14:20-15:2<br><br>**WO '689**: 5, 10-11<br><br>**Aulton:** 8 |
| | wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 6% (wt/wt). | **'188 Publication**: [0201], [0219], [0328]<br><br>**WO '689:** 19<br><br>**WO '475:** 3:3-5, 6:14-22, claims 1, 8, and 9<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| 2 | The tablet of claim 1, | See Claim 1 above. |
| | wherein $D_{50}$ is not more than 20 µm. | **Lieberman**: 5-6<br><br>**'188 Publication**: [0201], [0328]-[0329], [0385], [0347]<br><br>**Pellicciari 2014**: [0089], [0096], [0197]<br><br>**Chaumeil**: 211–215<br><br>**Savjani**: 2-3<br><br>**Kawabata**: at 4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **Krishnaiah**: 028<br><br>**Chu**: 1187-88<br><br>**Takahashi**: 482-84<br><br>**FDA Q6A Guidance**: 83046, 83054<br><br>**Kawabata**: 4<br><br>**Dodd**: [0004]-[0005]<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13<br><br>**Choi 2004**: Abstract, 165-166, 169, 171-172<br><br>**WO '741**: 1:15–19, 4:1–23<br><br>**WO '428**: 17:28-21:6, 24:11-18, 38:23-26<br><br>**WO '521**: 3, 14:20-15:2<br><br>**WO '689**: 5, 10-11<br><br>**Aulton**: 8 |
| 3 | The tablet of claim 1, | See Claim 1 above |
| | wherein $D_{50}$ is not more than 10 µm. | **Lieberman**: 5-6<br><br>**'188 Publication:** [0201], [0328]-[0329], [0385], [0347] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **Pellicciari 2014**: [0089], [0096], [0197]<br><br>**Chaumeil**: 211–215<br><br>**Savjani**: 2-3<br><br>**Kawabata**: at 4<br><br>**Krishnaiah**: 028<br><br>**Chu**: 1187-88<br><br>**Takahashi**: 482-84<br><br>**FDA Q6A Guidance**: 83046, 83054<br><br>**Kawabata**: 4<br><br>**Dodd**: [0004]-[0005]<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13<br><br>**Choi 2004**: Abstract, 165-166, 169, 171-172<br><br>**WO '741**: 1:15–19, 4:1–23<br><br>**WO '428**: 17:28-21:6, 24:11-18, 38:23-26 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **WO '521**: 3, 14:20-15:2<br><br>**WO '689**: 5, 10-11<br><br>**Aulton:** 8 |
| 4 | The tablet of claim 1, | See Claim 1 above |
| | wherein the tablet comprises an intra-granular portion and an extra-granular portion, wherein the intra-granular portion comprises said obeticholic acid and a pharmaceutically acceptable excipient, and the extragranular portion comprises a pharmaceutically acceptable excipient. | **'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br><br>**Pellicciari '390**: 6:36-40<br><br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi**: 477-84<br><br>**Shotton 1976**: 1170<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| 5 | The tablet of claim 4, | See Claim 4 above |
| | wherein the extra-granular portion does not contain obeticholic acid. | **'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br><br>**Pellicciari '390**: 6:36-40<br><br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi**: 477-84<br><br>**Shotton 1976**: 1170<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13, claims 1, 8, and 9 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **WO '689:** 19<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| 6 | The tablet of claim 1, | See Claim 1 above |
| | wherein said pharmaceutically acceptable excipient having a total primary alcohol impurity of less than about 6% (wt/wt) is sodium starch glycolate. | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**Pellicciari '390:** 6:36-40<br><br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi:** 477-84<br><br>**Shotton 1976**: 1170<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13, claims 1, 8, and 9<br><br>**WO '689:** 19<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| 7 | The tablet of claim 5, | See Claim 5 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103** |
| | wherein the intra-granular portion comprises a diluent selected from: starch, pregelatinized starch, microcrystalline cellulose, calcium carbonate, dibasic calcium phosphate, tribasic calcium phosphate, calcium phosphate, lactose, dextrose, fructose, lactitol, lactose, magnesium carbonate, magnesium oxide, maltitol, maltodextrin, maltose, simethicone, sodium chloride, talc, xylitol, sorbitol, mannitol, and sucrose, and/or a combination thereof. | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**Pellicciari '390**: 6:36-40<br><br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi**: 477-84<br><br>**Shotton 1976**: 1170<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13, claims 1, 8, and 9<br><br>**WO '689:** 19<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| 8 | The tablet of claim 5, | See Claim 5 above |
| | wherein the extra-granular portion comprises a diluent selected from: starch, pregelatinized starch, microcrystalline cellulose, calcium carbonate, dibasic calcium phosphate, tribasic calcium phosphate, calcium phosphate, lactose, dextrose, fructose, lactitol, lactose, magnesium carbonate, magnesium oxide, maltitol, malto- | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**Pellicciari '390**: 6:36-40<br><br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi**: 477-84<br><br>**Shotton 1976**: 1170 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103** |
| | dextrin, maltose, simethicone, sodium chloride, talc, xylitol, sorbitol, mannitol, and sucrose, and/or a combination thereof. | **WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13, claims 1, 8, and 9<br><br>**WO '689:** 19<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| 9 | The tablet of claim 7, | See Claim 7 above |
| | wherein the diluent is microcrystalline cellulose. | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**Pellicciari '390**: 6:36-40<br><br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi**: 477-84<br><br>**Shotton 1976**: 1170<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13, claims 1, 8, and 9<br><br>**WO '689:** 19<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103** |
| | | **'380 Patent:** 6:12-31 |
| 10 | The tablet of claim 9, | See Claim 9 above |
| | wherein a ratio of microcrystalline cellulose to obeticholic acid in the intra-granular portion is from about 20:1 to about 1:5. | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328] |
| 11 | The tablet of claim 10, | See Claim 10 above |
| | wherein the ratio is from about 20: 1 to about 1: 1. | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328] |
| 12 | The tablet of claim 11, | See Claim 11 above |
| | wherein the ratio is from 20: 1 to about 5: 1. | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328] |
| 13 | The tablet of claim 5, | See Claim 5 above |
| | wherein the tablet comprises 5 mg of obeticholic acid. | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**'188 Publication**: [0201], [0219], [0328]-[0329], [0347]<br><br>**Pellicciari 2014**: [0089], [0197]<br><br>**Carey 2012**: 2475<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1 |
| 14 | The tablet of claim 5, | See Claim 5 above |
| | wherein the tablet comprises 10 mg of obeticholic acid. | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **'188 Publication**: [0201], [0219], [0328]-[0329], [0347]<br><br>**Pellicciari 2014**: [0089], [0197]<br><br>**Carey 2012**: 2475<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1 |
| 15 | The tablet of claim 5, | See Claim 5 above |
| | wherein the tablet comprises 25 mg of obeticholic acid | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**'188 Publication**: [0201], [0219], [0328]-[0329], [0347]<br><br>**Pellicciari 2014**: [0089], [0197]<br><br>**Carey 2012**: 2475<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1 |
| 16 | The tablet of claim 1, | See Claim 1 above |
| | wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 3% (wt/wt). | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**Pellicciari '390:** 6:36-40 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi**: 477-84<br><br>**Shotton 1976**: 1170<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13, claims 1, 8, and 9<br><br>**WO '689:** 19<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| 17 | The tablet of claim 1, | See Claim 1 above |
| | wherein the pharmaceutically acceptable excipient has a total primary alcohol impurity of less than about 0.5% (wt/wt). | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**Pellicciari '390**: 6:36-40<br><br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi**: 477-84<br><br>**Shotton 1976**: 1170<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13, claims 1, 8, and 9 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **WO '689:** 19<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| 18 | The tablet of claim 1, | See Claim 1 above |
| | wherein $D_{50}$ is not more than 5 µm. | **Lieberman**: 5-6<br><br>**'188 Publication**: [0201], [0328]-[0329], [0385], [0347]<br><br>**Pellicciari 2014**: [0089], [0096], [0197]<br><br>**Chaumeil**: 211–215<br><br>**Saviani**: 2-3<br><br>**Kawabata**: at 4<br><br>**Krishnaiah**: 028<br><br>**Chu**: 1187-88<br><br>**Takahashi**: 482-84<br><br>**FDA Q6A Guidance**: 83046, 83054<br><br>**Kawabata:** 4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **Dodd**: [0004]-[0005]<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13<br><br>**Choi 2004**: Abstract, 165-166, 169, 171-172<br><br>**WO '741**: 1:15–19, 4:1–23<br><br>**WO '428**: 17:28-21:6, 24:11-18, 38:23-26<br><br>**WO '521**: 3, 14:20-15:2<br><br>**WO '689**: 5, 10-11<br><br>**Aulton**: 8 |
| 19 | A tablet comprising: obeticholic acid in an amount of 1 mg to 50 mg; and sodium starch glycolate, | **'188 Publication**: [0201], [0219], [0328]-[0329], [0347]<br><br>**Pellicciari 2014**: [0089], [0197]<br><br>**Carey 2012**: 2475<br><br>**NASH-FLINT**: 1-4<br><br>**PBC Study**: 1-3<br><br>**Mason**: S1<br><br>**WO '689**: 19 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **WO '475:** 3:3-5, 6:14-22, claims 1, 8, and 9<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| | wherein said obeticholic acid is in the form of jet-milled particles having a diameter of less than about 100 μm when analyzed by laser diffraction, wherein $D_{50}$ is not more than 50 μm, and | **Lieberman**: 5-6<br><br>**'188 Publication**: [0201], [0328]-[0329], [0385], [0347]<br><br>**Pellicciari 2014**: [0089], [0096], [0197]<br><br>**Chaumeil**: 211–215<br><br>**Savjani**: 2-3<br><br>**Kawabata**: at 4<br><br>**Krishnaiah**: 028<br><br>**Chu**: 1187-88<br><br>**Takahashi**: 482-84<br><br>**FDA Q6A Guidance**: 83046, 83054<br><br>**Kawabata:** 4 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **Dodd**: [0004]-[0005]<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13<br><br>**Choi 2004**: Abstract, 165-166, 169, 171-172<br><br>**WO '741**: 1:15–19, 4:1–23<br><br>**WO '428**: 17:28-21:6, 24:11-18, 38:23-26<br><br>**WO '521**: 3, 14:20-15:2<br><br>**WO '689**: 5, 10-11<br><br>**Aulton:** 8 |
| | wherein the total alcohol impurity in said sodium starch glycolate is less than about 6% (wt/wt). | **'188 Publication**: [0201], [0219], [0328]<br><br>**WO '689:** 19<br><br>**WO '475:** 3:3-5, 6:14-22, claims 1, 8, and 9<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| 20 | The tablet of claim 19, | See claim 19 above |
| | wherein $D_{50}$ is not more than 5 µm. | **Lieberman:** 5-6 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103** |
| | | **'188 Publication**: [0201], [0328]-[0329], [0385], [0347]<br><br>**Pellicciari 2014**: [0089], [0096], [0197]<br><br>**Chaumeil**: 211–215<br><br>**Savjani**: 2-3<br><br>**Kawabata**: at 4<br><br>**Krishnaiah**: 028<br><br>**Chu**: 1187-88<br><br>**Takahashi**: 482-84<br><br>**FDA Q6A Guidance**: 83046, 83054<br><br>**Kawabata**: 4<br><br>**Dodd**: [0004]-[0005]<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13<br><br>**Choi 2004**: Abstract, 165-166, 169, 171-172<br><br>**WO '741**: 1:15–19, 4:1–23 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | | **WO '428**: 17:28-21:6, 24:11-18, 38:23-26<br><br>**WO '521**: 3, 14:20-15:2<br><br>**WO '689**: 5, 10-11<br><br>**Aulton:** 8 |
| 21 | The tablet of claim 19, | See Claim 19 above |
| | wherein the total alcohol impurity in said sodium starch glycolate is less than about 3% (wt/wt). | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**Pellicciari '390**: 6:36-40<br><br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi**: 477-84<br><br>**Shotton 1976**: 1170<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13, claims 1, 8, and 9<br><br>**WO '689:** 19<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |
| 22 | The tablet of claim 19, | See Claim 19 above |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,751,349 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-22 of the '349 patent pursuant to 35 U.S.C. § 103 |
| | wherein the total alcohol impurity in said sodium starch glycolate is less than about 0.5% (wt/wt). | **'188 Publication:** [0199], [0201], [0208]-[0217], [0219], [0328]<br><br>**Pellicciari '390:** 6:36-40<br><br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br><br>**Takahashi:** 477-84<br><br>**Shotton 1976**: 1170<br><br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13, claims 1, 8, and 9<br><br>**WO '689:** 19<br><br>**Ursodiol 2007 PI**<br><br>**Delalonde 2014:** 409<br><br>**'380 Patent:** 6:12-31 |

## XVIII. APPENDIX G

### (U.S. PAT. NO. 10,758,549) DEFENDANTS' INVALIDITY CONTENTIONS

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| 1 | A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject | **'188 publication**: [0221], [0328]<br>**'188 publication**: [0221], [0328]<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | a tablet comprising an intra-granular portion and an extra-granular portion, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253], [0328], [0263]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3<br>**Carey 2012**: 2475 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Mason**: S1<br>**PBC Study**<br>**NASH-Flint** |
| | and the extra-granular portion comprising one or more pharmaceutically acceptable excipients, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w); | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| | wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Combination PBC Study** |
| | and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M). | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 2 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is about 1mg to about 10 mg. | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| 3 | The method of claim 1, | *See* claim 1 |
| | wherein the intra-granular portion comprises obeticholic acid. | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| 4 | The method of claim 1, | *See* claim 1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent  pursuant to 35 U.S.C. § 103** |
| | wherein the amount is a starting dose and the tablet is administered in a titration period. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 5 | The method of claim 4, | *See* claim 4 |
| | wherein the titration period is from 1 month to 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 6 | The method of claim 5, | *See* claim 5 |
| | wherein the titration period is 3 months or 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 7 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is 10 mg, | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| 8 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 9 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is about 1 mg to about 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 10 | The method of claim 1, | *See* claim 1 |
| | wherein the method further comprises administering to the subject a bile acid | **Public Assessment Report**: 12<br>**Poupon:** 753-54 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | binding resin at least 4 hours before the tablet is administered. | |
| 11 | The method of claim 1, | *See* claim 1 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 12 | A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject | **'188 publication**: [0221], [0328]<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | a tablet comprising beticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253], [0263], [0328]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3<br>**Carey 2012**: 2475<br>**Mason**: S1<br>**PBC Study**<br>**NASH-Flint** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, | **'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd**: [0001], [0004], [0005]<br>**Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian**<br>**'944 publication**: [0138] |
| | and wherein at least 50% of the particles have a diameter of 200 μm or less; | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w); | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| | wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M). | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 13 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is about 1mg to about 10 mg. | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | |
| 14 | The method of claim 12, | *See* claim 12 |
| | wherein tablet comprises obeticholic acid. | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| 15 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is a starting dose and the tablet is administered in a titration period. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 16 | The method of claim 15, | *See* claim 15 |
| | wherein the titration period is from 1 month to 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 17 | The method of claim 16, | *See* claim 16 |
| | wherein the titration period is 3 months or 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | |
| 18 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is 10 mg, | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 19 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 20 | The method of claim 12, | *See* claim 12 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | wherein the amount is about 1 mg to about 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 21 | The method of claim 12, | *See* claim 12 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 22 | The method of claim 12, | *See* claim 12 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 23 | A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject | **'188 publication**: [0221], [0328]<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | a tablet comprising an intra-granular portion and an extra-granular portion, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253], [0263], [0328]]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3<br>**Carey 2012**: 2475<br>**Mason**: S1<br>**PBC Study**<br>**NASH-Flint** |
| | and the extra-granular portion comprising one or more pharmaceutically acceptable excipients, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, | **'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd**: [0001], [0004], [0005]<br>**Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian**<br>**'944 publication**: [0138] |
| | and wherein at least 50% of the particles have a diameter of 200 µm or less; | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | **Aulton**: 8<br>**Markarian** |
| | wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w); | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| | wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M). | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 24 | The method of claim 23, | *See* claim 23 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | wherein the intra-granular portion comprises obeticholic acid. | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| 25 | The method of claim 24, | *See* claim 24 |
| | wherein the amount is 10 mg, | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 26 | The method of claim 24, | *See* claim 24 |
| | wherein the amount is 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 27 | The method of claim 24, | *See* claim 24 |
| | wherein the amount is about 1 mg to about 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 28 | The method of claim 24, | *See* claim 24 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 29 | The method of claim 24, | *See* claim 24 |
| | wherein the method further comprises administering to the subject a bile acid | **Public Assessment Report**: 12<br>**Poupon:** 753-54 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | binding resin at least 4 hours after the tablet is administered. | |
| 30 | The method of claim 23, | *See* claim 23 |
| | wherein the amount is about 1mg to about 10 mg. | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| 31 | The method of claim 23, | *See* claim 23 |
| | wherein the amount is a starting dose and the tablet is administered in a titration period. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 32 | The method of claim 31, | *See* claim 31 |
| | wherein the titration period is from 1 month to 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 33 | The method of claim 32, | *See* claim 32 |
| | wherein the titration period is 3 months or 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| 1 | A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject | **Carey**: 2473-75<br>**Lindor**: 808-814 |
| | a tablet comprising an intra-granular portion and an extra-granular portion, | **'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi**: 477-84<br>**Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| | the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, | **Carey**: 2473-75<br>**Lindor**: 808-814<br>**'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi**: 477-84<br>**Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| | and the extra-granular portion comprising one or more pharmaceutically acceptable excipients, | **'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi**: 477-84<br>**Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| | wherein at least one pharmaceutically acceptable excipient in the tablet has an | **'188 Publication**: [0201], [0219], [0328]<br>**WO '689**: 19 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | alcohol content of less than about 6% (w/w); | **WO '475:** 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014:** 409<br>**'380 Patent:** 6:12-31 |
| | wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; | **Carey**: 2473-75<br>**Lindor**: 808-814<br><br>*See also:*<br>**URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M). | **Carey**: 2473-75<br><br>*See also:*<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | |
| 2 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is about 1mg to about 10 mg. | **Carey**: 2473-75<br>**Lindor**: 808-814 |
| 3 | The method of claim 1, | *See* claim 1 |
| | wherein the intra-granular portion comprises obeticholic acid. | **Carey**: 2473-75<br>**Lindor**: 808-814<br>**'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi**: 477-84<br>**Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| 4 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is a starting dose and the tablet is administered in a titration period. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 5 | The method of claim 4, | *See* claim 4 |
| | wherein the titration period is from 1 month to 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| 6 | The method of claim 5, | *See* claim 5 |
| | wherein the titration period is 3 months or 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 7 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is 10 mg, | **Carey**: 2473-75<br>**Lindor**: 808-814 |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 8 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | |
| 9 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is about 1 mg to about 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 10 | The method of claim 1, | *See* claim 1 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54<br>**Carey 2012**: 2478 |
| 11 | The method of claim 1, | *See* claim 1 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54<br>**Carey 2012**: 2478 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| 12 | A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject | **Carey**: 2473-75<br>**Lindor**: 808-814 |
| | a tablet comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, | **Carey**: 2473-75<br>**Lindor**: 808-814<br>**'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi**: 477-84<br>**Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| | wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, | **'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd**: [0001], [0004], [0005]<br>**Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian**<br>**'944 publication**: [0138] |
| | and wherein at least 50% of the particles have a diameter of 200 µm or less; | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah:** 028 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| | wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w); | **'188 Publication**: [0201], [0219], [0328]<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409<br>**'380 Patent**: 6:12-31 |
| | wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; | **Carey: 2473-75**<br>**Lindor: 808-814**<br><br>*See also:*<br>**URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract. |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | **Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M). | **Carey**: 2473-75<br><br>*See also:*<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 13 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is about 1mg to about 10 mg. | **Carey**: 2473-75<br>**Lindor**: 808-814 |
| 14 | The method of claim 12, | *See* claim 12 |
| | wherein tablet comprises obeticholic acid. | **Carey**: 2473-75<br>**Lindor**: 808-814<br>**'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi**: 477-84<br>**Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| 15 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is a starting dose and the tablet is administered in a titration period. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 16 | The method of claim 15, | *See* claim 15 |
| | wherein the titration period is from 1 month to 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 17 | The method of claim 16, | *See* claim 16 |
| | wherein the titration period is 3 months or 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 18 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is 10 mg, | **Carey**: 2473-75<br>**Lindor**: 808-814 |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | **Combination PBC Study** |
| 19 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 20 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is about 1 mg to about 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 21 | The method of claim 12, | *See* claim 12 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54<br>**Carey 2012**: 2478 |
| 22 | The method of claim 12, | *See* claim 12 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54<br>**Carey 2012**: 2478 |
| 23 | A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject | **Carey**: 2473-75<br>**Lindor**: 808-814 |
| | a tablet comprising an intra-granular portion and an extra-granular portion, | **'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi**: 477-84<br>**Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| | the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, | **Carey**: 2473-75<br>**Lindor**: 808-814<br>**'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi:** 477-84 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | **Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| | and the extra-granular portion comprising one or more pharmaceutically acceptable excipients, | **'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi**: 477-84<br>**Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| | wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, | **'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd**: [0001], [0004], [0005]<br>**Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian**<br>**'944 publication**: [0138] |
| | and wherein at least 50% of the particles have a diameter of 200 µm or less; | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475:** 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| | wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w); | **'188 Publication**: [0201], [0219], [0328]<br>**WO '689:** 19<br>**WO '475:** 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014:** 409<br>**'380 Patent:** 6:12-31 |
| | wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; | **Carey: 2473-75**<br>**Lindor: 808-814**<br><br>*See also:*<br>**URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M). | **Carey**: 2473-75<br><br>*See also:*<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 24 | The method of claim 23, | *See* claim 23 |
| | wherein the intra-granular portion comprises obeticholic acid. | **Carey**: 2473-75<br>**Lindor**: 808-814<br>**'188 Publication:** [0199], [0201], [0208]-[0217], [219]<br>**Pellicciari '390**: 6:36-40<br>**Thosar:** 7:15-30, 8:4-20, 9:4-11, 35:8-60, Example 1<br>**Takahashi**: 477-84<br>**Shotton 1976**: 1170<br>**WO '475**: 1:10-14, 3:4-30, 4:11-27, 10:1-13 |
| 25 | The method of claim 24, | *See* claim 24 |
| | wherein the amount is 10 mg, | **Carey**: 2473-75<br>**Lindor**: 808-814 |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract. |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 26 | The method of claim 24, | *See* claim 24 |
| | wherein the amount is 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 27 | The method of claim 24, | *See* claim 24 |
| | wherein the amount is about 1 mg to about 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 28 | The method of claim 24, | *See* claim 24 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54<br>**Carey 2012**: 2478 |
| 29 | The method of claim 24, | *See* claim 24 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54<br>**Carey 2012**: 2478 |
| 30 | The method of claim 23, | *See* claim 23 |
| | wherein the amount is about 1mg to about 10 mg. | **Carey**: 2473-75<br>**Lindor**: 808-814 |
| 31 | The method of claim 23, | *See* claim 23 |
| | wherein the amount is a starting dose and the tablet is administered in a titration period. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 32 | The method of claim 31, | *See* claim 31 |
| | wherein the titration period is from 1 month to 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | |
| 33 | The method of claim 32, | *See* claim 32 |
| | wherein the titration period is 3 months or 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| 1 | A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject | **Ferrari '352**: Claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4. |
| | a tablet comprising an intra-granular portion and an extra-granular portion, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, | **Ferrari '352**: Claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4.<br>**'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253], [0328], [0263]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3<br>**Carey 2012**: 2475<br>**Mason**: S1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | **PBC Study**<br>**NASH-Flint** |
| | and the extra-granular portion comprising one or more pharmaceutically acceptable excipients, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w); | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| | wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | | |
| | and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M). | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 2 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is about 1mg to about 10 mg. | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| 3 | The method of claim 1, | *See* claim 1 |
| | wherein the intra-granular portion comprises obeticholic acid. | **Ferrari '352**: Claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4.<br>**'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| 4 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is a starting dose and the tablet is administered in a titration period. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 5 | The method of claim 4, | *See* claim 4 |
| | wherein the titration period is from 1 month to 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 6 | The method of claim 5, | *See* claim 5 |
| | wherein the titration period is 3 months or 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 7 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is 10 mg, | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Combination PBC Study** |
| 8 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 9 | The method of claim 1, | *See* claim 1 |
| | wherein the amount is about 1 mg to about 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 10 | The method of claim 1, | *See* claim 1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 11 | The method of claim 1, | *See* claim 1 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 12 | A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject | **'188 publication**: [0221], [0328]<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | a tablet comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, | **Ferrari '352**: Claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4.<br>**'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253], [0263], [0328]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Carey 2012**: 2475<br>**Mason**: S1<br>**PBC Study**<br>**NASH-Flint** |
| | wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, | **Ferrari '352**: Claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4.<br>**'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd**: [0001], [0004], [0005]<br>**Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian**<br>**'944 publication**: [0138] |
| | and wherein at least 50% of the particles have a diameter of 200 µm or less; | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Savjani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| | wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w); | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| | wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | times a week (TIW), once a month (QM), or twice a month (Q2M). | **NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 13 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is about 1mg to about 10 mg. | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| 14 | The method of claim 12, | *See* claim 12 |
| | wherein tablet comprises obeticholic acid. | **Ferrari '352**: Claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4.<br>**'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| 15 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is a starting dose and the tablet is administered in a titration period. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| 16 | The method of claim 15, | *See* claim 15 |
| | wherein the titration period is from 1 month to 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 17 | The method of claim 16, | *See* claim 16 |
| | wherein the titration period is 3 months or 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 18 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is 10 mg, | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 19 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is 5 mg, | **'188 publication**: [0328], [0263] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 20 | The method of claim 12, | *See* claim 12 |
| | wherein the amount is about 1 mg to about 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 21 | The method of claim 12, | *See* claim 12 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 22 | The method of claim 12, | *See* claim 12 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 23 | A method of treating primary biliary cholangitis (PBC) in a subject in need thereof, said method comprising administering to the subject | **'188 publication**: [0221], [0328]<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | a tablet comprising an intra-granular portion and an extra-granular portion, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | the intra-granular portion comprising obeticholic acid or a pharmaceutically acceptable salt or amino acid conjugate thereof in an amount of about 1 mg to about 50 mg, and one or more pharmaceutically acceptable excipients, | **Ferrari '352**: Claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4.<br>**'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253], [0263], [0328]]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3<br>**Carey 2012**: 2475<br>**Mason**: S1<br>**PBC Study**<br>**NASH-Flint** |
| | and the extra-granular portion comprising one or more pharmaceutically acceptable excipients, | **'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li**<br>**Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| | wherein the obeticholic acid or the pharmaceutically acceptable salt or amino acid conjugate thereof is in the form of jet-milled particles, | **Ferrari '352**: Claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4.<br>**'188 Publication**: [0199]-[0201], [0219], [0244], [0253]<br>**Dodd**: [0001], [0004], [0005]<br>**Choi**: Abstract, 169<br>**WO '475**: 1:14, 3:27-30, 3:13-15.<br>**WO '741**: 4:20–22, 4:22–23.<br>**Kawabata**: 4<br>**Markarian**<br>**'944 publication**: [0138] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | |
|---|---|
| **Claim** | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | |
| and wherein at least 50% of the particles have a diameter of 200 µm or less; | **'188 Publication**: [0328], [0347], [0385]<br>**WO '689**: 5, 10-11<br>**Lieberman**: 5-6<br>**Chaumeil**: 211–215<br>**Saviani**: 2-3<br>**Kawabata**: 4<br>**Krishnaiah**: 028<br>**Chu**: 1187-88<br>**Takahashi**: 482-84<br>**FDA Q6A Guidance**: 83046, 83054<br>**Pellicciari 2014**: [0089], [0096], [0197]<br>**WO '475**: 1:10-14, 3:4-9, 3:27-30, 4:11-13, 4:25-27, 10:1-13<br>**Choi 2004**: Abstract, 165, 166, 171, 169, Fig. 4<br>**WO '741**: 1:15–19, 4:1–2, 4:7–18<br>**WO '482**: 17:28-21:6, 38:23-26, 24:11-18<br>**WO '521**: 3, 14:20-24, 14:28-15:2<br>**WO '689**: 5, 10-11<br>**Aulton**: 8<br>**Markarian** |
| wherein at least one pharmaceutically acceptable excipient in the tablet has an alcohol content of less than about 6% (w/w); | **'188 Publication**: [0208], [0328]<br>**'380 Patent**: *e.g.*, Table 3, 6:12-31<br>**WO '689**: 19<br>**WO '475**: 3:3-5, 6:14-22, claims 1, 8, and 9<br>**Ursodiol 2007 PI**<br>**Delalonde 2014**: 409 |
| wherein the amount is a starting dose, an adjusted dose or a re-adjusted dose; | **URSO 250 Label**: 2.2.<br>**'188 publication:** [0263] |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Corpechot 2012**: S17<br>**'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| | and wherein the tablet is administered daily (QD), every other day (Q2D), once a week (QW), twice a week (BID), three times a week (TIW), once a month (QM), or twice a month (Q2M). | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 24 | The method of claim 23, | *See* claim 23 |
| | wherein the intra-granular portion comprises obeticholic acid. | **Ferrari '352**: Claim 1<br>**Pellicciari 2007**: 4265<br>**Pellicciari '390**: 5:29-53, 6:36-42, 9:30-10:48<br>**Yu '628**: claims 1-4.<br>**'188 publication**: *see* [0328], Table I, [0199]-[0201], [0208]-[0217], [0219], [0244], [0253]<br>**Pellicciari '390**: 6:36-40<br>**Thosar**: 35:8-60, Example 1, 9:4-11<br>**Roy**: 1, lines 3-5; 3, lines 7-9, 15-30; 8, lines 4-20<br>**Takahashi**: 477-84<br>**Li** |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| Claim | | Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103 |
| | | **Shotton 1976**: Abstract<br>**'365 Patent**: Table 3 |
| 25 | The method of claim 24, | *See* claim 24 |
| | wherein the amount is 10 mg, | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 26 | The method of claim 24, | *See* claim 24 |
| | wherein the amount is 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 27 | The method of claim 24, | *See* claim 24 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| | wherein the amount is about 1 mg to about 5 mg, | **'188 publication**: [0328], [0263] |
| | and the tablet is administered daily. | **'188 publication**: *see* [0263], [0328]<br>**Johnston**: Abstract<br>**Mudaliar**: Abstract.<br>**Mason**: S1<br>**NCT 524**<br>**Phase 3 PBC Study**<br>**Combination PBC Study** |
| 28 | The method of claim 24, | *See* claim 24 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours before the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 29 | The method of claim 24, | *See* claim 24 |
| | wherein the method further comprises administering to the subject a bile acid binding resin at least 4 hours after the tablet is administered. | **Public Assessment Report**: 12<br>**Poupon**: 753-54 |
| 30 | The method of claim 23, | *See* claim 23 |
| | wherein the amount is about 1mg to about 10 mg. | **'188 publication**: [0328], [0263]<br>**Carey 2012**: 2475 |

| INVALIDITY CLAIM CHART: U.S. PATENT NO. 10,758,549 | | |
|---|---|---|
| **Claim** | | **Disclosures in the prior art that invalidate claims 1-33 of the '549 Patent pursuant to 35 U.S.C. § 103** |
| 31 | The method of claim 23, | *See* claim 23 |
| | wherein the amount is a starting dose and the tablet is administered in a titration period. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 32 | The method of claim 31, | *See* claim 31 |
| | wherein the titration period is from 1 month to 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |
| 33 | The method of claim 32, | *See* claim 32 |
| | wherein the titration period is 3 months or 6 months. | **URSO 250 Label**: 2.2.<br>**'188 publication**: [0263]<br>**Corpechot 2012**: S17 |

29534907.1